## UNITED STATES DISTRICT COURT FOR THE

## NORTHERN DISTRICT OF TEXAS

## FORT WORTH DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| *Plaintiff* | ) | |
| | ) | |
| v. | ) | Case No. 4:21-cr-00005-O-1 |
| | ) | |
| THE BOEING COMPANY, | ) | |
| | ) | |
| *Defendant.* | ) | |
| _____ | ) | |

**SECOND AMENDED MOTION OF NAOISE CONNOLLY RYAN, AS REPRESENTATIVE OF MICHAEL RYAN; EMILY CHELANGAT BABU AND JOSHUA MWAZO BABU, AS REPRESENTATIVES OF JARED BABU MWAZO; CATHERINE BERTHET, AS REPRESENTATIVE OF CAMILLE GEOFFROY; HUGUETTE DEBETS, AS REPRESENTATIVE OF JACKSON MUSONI; LUCA DIECI, AS REPRESENTATIVE OF PAOLO DIECI; BAYIHE DEMISSIE, AS REPRESENTATIVE OF ELSABET MINWUYELET WUBETE; SRI HARTATI, AS REPRESENTATIVE OF ERYANTO; ZIPPORAH KURIA, AS REPRESENTATIVE OF JOSEPH KURIA WAITHAKA; JAVIER DE LUIS, AS REPRESENTATIVE OF GRAZIELLA DE LUIS Y PONCE; NADIA MILLERON AND MICHAEL STUMO, AS REPRESENTATIVES OF SAMYA STUMO; CHRIS MOORE, AS REPRESENTATIVE OF DANIELLE MOORE; PAUL NJOROGE, AS REPRESENTATIVE OF CAROLYNE NDUTA KARANJA, RYAN NJUGUNA NJOROGE, KELLI W. PAULS, AND RUBI W. PAULS; YUKE MEISKE PELEALU, AS REPRESENTATIVE OF RUDOLF PETRUS SAYERS; JOHN KARANJA QUINDOS, AS REPRESENTATIVE OF ANNE WANGUI KARANJA; GUY DAUD ISKANDAR ZEN S., AS REPRESENTATIVE OF FIONA ZEN; AND OTHER SIMILARLY SITUATED REPRESENTATIVES OF THE VICTIMS OF THE CRASHES OF LION AIR FLIGHT JT610 AND ETHIOPIAN AIRLINES FLIGHT ET302 UNDER THE CRIME VICTIMS' RIGHTS ACT FOR FINDINGS THAT THE PROPOSED BOEING DEFERRED PROSECUTION AGREEMENT WAS NEGOTIATED IN VIOLATION OF THE VICTIMS' RIGHTS AND FOR REMEDIES FOR THOSE VIOLATIONS**

Warren T. Burns                           Paul G. Cassell (Counsel of Record)
Burns Charest, LLP                        Utah Appellate Project
900 Jackson Street                        S.J. Quinney College of Law
Suite 500                                 University of Utah
Dallas, TX 75202                          383 S. University St.
469-904-4550                              Salt Lake City, UT 84112
wburns@burnscharest.com                   801-585-5202
                                          cassellp@law.utah.edu
                                          (no institutional endorsement implied)
                                          (*pro hac vice* application to be filed)

*Attorneys for Victims' Families*

## **TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................ 2

FACTUAL BACKGROUND ............................................................................................. 5

I.    Boeing's Two-Year Criminal Conspiracy Directly and Proximately Produced Two Deadly 737 Max Crashes and Killed 346 Passengers and Crew. ..................................... 5

II.    The Justice Department Secretly Negotiates a Deferred Prosecution Agreement with Boeing and Misleads the Victims About What It is Doing. ...................................... 7

III.    The Government and Boeing Seek to Avoid any Substantive Proceedings Before this Court.................................................................................................................... 11

IV.    The Dual MAX Tragedies Resulted from Widespread Criminal Wrongdoing at Boeing, not the Isolated Actions of a Few "Bad Apples." ............................................. 12

DISCUSSION .................................................................................................................. 16

I.    The Government Violated the Victims' Families' CVRA Rights by Secretly Negotiating the DPA with Boeing. ....................................................................... 17

      A.    The CVRA Is a Broad Bill of Rights Protecting Victims of Federal Crimes. ........................................................................................... 17

      B.    The Government Violated the Victims' Families' CVRA Right to "Confer" with Prosecutors by Deliberately Concealing that it was Negotiating a Deferred Prosecution Agreement. ........................................ 18

      C.    The Government Also Violated the Victims' Families' CVRA Right to "Timely Notice" of the Deferred Prosecution Agreement. .................................. 23

      D.    The Government Also Violated the Victims' Families' CVRA Right to Be "Treated with Fairness" By Misleading the Families. ......................................... 24

II.    After Finding CVRA Violations, the Court Should Direct the Government, Boeing, and the Victims to Provide Briefing on the Appropriate Remedies and then Grant Appropriate Remedies..................................................................... 26

CONCLUSION ................................................................................................................ 28

CERTIFICATE REGARDING CONFERENCE .......................................................... 30

CERTIFICATE OF COMPLIANCE REGARDING LENGTH .................................. 31

CERTIFICATE OF SERVICE ...................................................................................... 32

## **TABLE OF AUTHORITIES**

Cases

*Doe 1 v. United States,*
  359 F. Supp. 3d 1201 (S.D. Fla. 2019) .............................................................. 4, 26

*Franklin v. Gwinnett Cty. Pub. Sch.,*
  503 U.S. 60 (1992).................................................................................................. 27

*In re de Henriquez,*
  No. 15-3054, 2015 WL 10692637 (D.C. Cir. 2015) ............................................. 17

*In re Dean,*
  527 F.3d 391 (5th Cir. 2008).......................................................................... passim

*In re Ethiopian Airlines Flight 302 Crash,*
  No. 1:19-cv-02170 (N.D. Ill. 2019) ....................................................................... 22

*In re Lion Air Flight JT 610 Crash,*
  No. 1:18-cv-07686 (N.D. Ill. 2018) ....................................................................... 22

*In re The Boeing Company Derivative Litigation,*
  No. 2019-0907-MTZ, 2021 WL 4059934 (Del. Ch. Sept. 7, 2021) ...................... 13

*In re Wild,*
  994 F.3d 1244 (11th Cir. en banc 2021)................................................................ 21

*Kenna v. United States Dist. Court for C.D. Cal.,*
  435 F.3d 1011 (9th Cir. 2006) ............................................................................... 17

*Latiolais v. Huntington Ingalls, Inc.*
  951 F.3d 286 (5th Cir. 2020)................................................................................. 24

*Marbury v. Madison,*
  5 U.S. 137 (1803) ................................................................................................... 26

*Sossamon v. Lone Star State of Texas,*
  560 F.3d 316 (5th Cir. 2009).................................................................................. 26

*Sossamon v. Texas,*
  563 U.S. 277 (2011)................................................................................................ 26

*Transcon. Gas Pipe Line Co., LLC v. 6.04 Acres, More or Less,*
  139 S. Ct. 634 (2019).............................................................................................. 27

*Transcon. Gas Pipe Line Co., LLC v. 6.04 Acres, More or Less,*
  910 F.3d 1130 (11th Cir. 2018) ............................................................................. 27

*United States v. Atl. States Cast Iron Pipe Co.,*
  612 F. Supp. 2d 453 (D.N.J. 2009) ....................................................................... 18

*United States v. BP Prods. N. Am. Inc.,*
  No. H-07-434, 2008 WL 501321 (S.D. Tex. Feb. 21, 2008) .................................. 20

*United States v. Degenhardt,*
    405 F. Supp. 2d 1341 (D. Utah 2005) ................................................................ 18

*United States v. Forkner,*
    DE 1, No. 4:21-cr-268-O (N.D. Tex. Oct. 14, 2021) ........................................... 13

*United States v. Oakum,*
    No. 3:08-cr-132, 2009 WL 790042 (E.D. Va. 2009) ........................................... 20

*United States v. Rubin,*
    558 F.Supp.2d 411 (E.D.N.Y.2008) ................................................................... 21

*United States v. Stevens,*
    239 F. Supp. 3d 417 (D. Conn. 2017) ........................................................... 17, 18

*United States v. Turner,*
    367 F.Supp.2d 319 (E.D.N.Y. 2005) .................................................................. 17

Other Authorities

150 CONG REC. 7296 (Apr. 22, 2004) ........................................................... 3, 17, 26

150 CONG. REC. 22953 (Oct. 9, 2004) ..................................................................... 26

150 CONG. REC. S4261 (Apr. 22, 2004) ................................................................... 18

Attorney General Guidelines for Victim and Witness Assistance,
    Art. IV.H, 28 (May 2012) .................................................................................... 8

Department of Justice Office of Public Affairs, *Boeing Charged with 737 Max Fraud
    Conspiracy and Agrees to Pay over $2.5 Billion* (Jan. 7, 2021),
    https://www.justice.gov/opa/pr/boeing-charged-737-max-fraud-conspiracy-and-agrees-
    pay-over-25-billion ............................................................................................ 12

H. Rep. 114-17, 114th Cong., 1st Sess. (Jan. 27, 2015) .......................................... 24

Hon. Jon Kyl et al., *On the Wings of Their Angels: The Scott Campbell, Stephanie Roper,
    Wendy Preston, Louarna Gillis, and Nila Lynn Crime Victims' Rights Act,*
    9 LEWIS & CLARK L. REV. 581 (2005) ............................................................... 18

Jed S. Rakoff, *Getting Away with Murder,*
    N.Y. REV. OF BOOKS (Dec. 2, 2020) .................................................................. 28

Natalie Kitroeff & Michael S. Schmidt, *Federal Prosecutors Investigating Whether
    Boeing Pilot Lied to F.A.A.,*
    N.Y. TIMES (Feb. 21, 2020) .................................................................................. 8

Paul G. Cassell et al., *Crime Victims' Rights During Criminal Investigations? Applying
    the Crime Victims' Rights Act Before Criminal Charges are Filed?,*
    104 J. CRIM. L. & CRIMINOLOGY 59 (2014) ........................................................ 21

Rules

Fed. R. Crim. P. 60 ................................................................................................... 1

Fed. R. Crim. P. 60(b) ............................................................................................ 26

<u>Statutes</u>

18 U.S.C. § 3771 ............................................................................................................... 1

18 U.S.C. § 3771(a)(2) ..................................................................................................... 24

18 U.S.C. § 3771(a)(5) ............................................................................................... passim

18 U.S.C. § 3771(a)(8) ........................................................................................ 3, 4, 17, 25

18 U.S.C. § 3771(a)(9) ........................................................................................ 3, 4, 17, 23

18 U.S.C. § 3771(b)(1) .............................................................................................. 4, 18, 26

18 U.S.C. § 3771(d)(3) ....................................................................................................... 1

18 U.S.C. § 3771(e)(2)(B) ................................................................................................... 3

**SECOND AMENDED MOTION OF NAOISE CONNOLLY RYAN, AS REPRESENTATIVE OF MICHAEL RYAN; EMILY CHELANGAT BABU AND JOSHUA MWAZO BABU, AS REPRESENTATIVES OF JARED BABU MWAZO; CATHERINE BERTHET, AS REPRESENTATIVE OF CAMILLE GEOFFROY; HUGUETTE DEBETS, AS REPRESENTATIVE OF JACKSON MUSONI; LUCA DIECI, AS REPRESENTATIVE OF PAOLO DIECI; BAYIHE DEMISSIE, AS REPRESENTATIVE OF ELSABET MINWUYELET WUBETE; SRI HARTATI, AS REPRESENTATIVE OF ERYANTO; ZIPPORAH KURIA, AS REPRESENTATIVE OF JOSEPH KURIA WAITHAKA; JAVIER DE LUIS, AS REPRESENTATIVE OF GRAZIELLA DE LUIS Y PONCE; CHRIS MOORE, AS REPRESENTATIVE OF DANIELLE MOORE; PAUL NJOROGE, AS REPRESENTATIVE OF CAROLYNE NDUTA KARANJA, RYAN NJUGUNA NJOROGE, KELLI W. PAULS, AND RUBI W. PAULS; YUKE MEISKE PELEALU, AS REPRESENTATIVE OF RUDOLF PETRUS SAYERS; JOHN KARANJA QUINDOS, AS REPRESENTATIVE OF ANNE WANGUI KARANJA; NADIA MILLERON AND MICHAEL STUMO, AS REPRESENTATIVES OF SAMYA STUMO; GUY DAUD ISKANDER ZEN S., AS REPRESENTATIVE OF FIONA ZEN; AND OTHER SIMILARLY SITUATED REPRESENTATIVES OF THE VICTIMS OF THE CRASHES OF LION AIR FLIGHT JT610 AND ETHIOPIAN AIRLINES FLIGHT ET302 UNDER THE CRIME VICTIMS' RIGHTS ACT FOR FINDINGS THAT THE PROPOSED BOEING DEFERRED PROSECUTION AGREEMENT WAS NEGOTIATED IN VIOLATION OF THE VICTIMS' RIGHTS AND FOR REMEDIES FOR THOSE VIOLATIONS**

Behind closed doors, attorneys for the Government and Defendant Boeing surreptitiously negotiated a Deferred Prosecution Agreement, Dkt. Entry ("DE") #4 ("DPA"), in violation of the rights of the 346 families of the victims of the crashes of Lion Air Flight 610 and Ethiopian Airlines Flight 302—rights guaranteed under the Crime Victims' Rights Act, 18 U.S.C. § 3771 ("CVRA"). In this filing, the victims' families[1] move (as authorized by 18 U.S.C. § 3771(d)(3) and Federal Rule of Criminal Procedure 60) for (1) an order declaring that the Government and Boeing negotiated the DPA in violation of the victims' families' CVRA rights to confer with the attorneys for the Government and to receive timely notice of the DPA; (2) an order declaring that the Government and Boeing negotiated the DPA in violation of the victims' families' CVRA rights to

---

[1] The victims' family members asserting rights are Naoise Connolly Ryan, Emily Chelangat Babu and Joshua Mwazo Babu, Catherine Berthet, Huguette Debets, Luca Dieci, Bayihe Demissie, Sri Hartati, Zipporah Kuria, Javier de Luis, Nadia Milleron and Michael Stumo, Chris Moore, Paul Njoroge, Yuke Meiske Pelealu, John Karanja Quindos, Guy Daud Iskandar Zen S., and other similarly situated families, hereinafter referred to collectively as "the victims' families."

be treated with fairness and with respect for the victims' dignity; and (3) all appropriate remedies for these clear CVRA violations.[2]

## **INTRODUCTION**

It is undisputed that for more than two years Defendant Boeing conspired to impair, obstruct, and interfere with the Federal Aviation Administration's ("FAA's") evaluation of the safety features of the Boeing 737 MAX aircraft. It knew that reporting the 737 MAX's safety issues to the FAA could cost the company tens of millions of dollars, so Boeing covered them up. SOF ¶ 19. The tragic results of Boeing's criminal conspiracy cannot be in doubt: As explained in detail in the DPA's admitted Statement of Facts ("SOF"), Boeing's concealment of safety problems from the FAA directly and proximately produced two horrific plane crashes, killing 346 passengers and crew members. *See, e.g.*, SOF ¶¶ 48, 53.[3]

Against that backdrop, one would assume that the Government would have prioritized conferring with the 346 victims' families about its investigation and ultimate prosecution in this case. And yet, during its extended investigation into Boeing's crimes, far from conferring with the families, the Government chose to hide what it was doing. Rather than reach out to grieving crime victims' families, the Government secretly devised a favorable deferred prosecution agreement with Boeing. But the Government did not just conceal its investigation from the families. The Government also affirmatively misled many victims by denying that any ongoing criminal

---

[2] In two other separate, contemporaneous filings, the victims' families also move for exercise of the Court's supervisory powers over the DPA and for a public arraignment of Boeing.

[3] The DPA *understates* the breadth and gravity of Boeing's wrongdoing by (among other things) downplaying the extent to which this wrongdoing was pervasive within Boeing and driven by emphasizing profit at the expense of safety, transparency, and compliance with regulatory obligations.

investigation into Boeing even existed—as it collaborated with Boeing to resolve that investigation.

When the Government concealed its negotiations from the families of Boeing's victims, it violated the Crime Victims' Rights Act. Congress enacted the CVRA because it found that, in case after case, victims "were kept in the dark by prosecutors too busy to care . . . and by a court system that simply did not have a place for them." 150 CONG REC. 7296 (Apr. 22, 2004) (colloquy by Sens. Feinstein and Kyl). The Act extends to victims the "reasonable right to confer" with attorneys for the Government in the case. 18 U.S.C § 3771(a)(5). By proceeding in secrecy and with deceit, the Government ignored binding Fifth Circuit precedent that, in enacting the CVRA, "Congress made the policy decision—which [courts] are bound to enforce—that the victims have a right to inform the plea negotiation process by conferring with prosecutors." *In re Dean*, 527 F.3d 391, 395 (5th Cir. 2008) (emphasis added). And victims have that right "*before a plea agreement is reached.*" *Id.* The act also guarantees victims' families' rights to "timely notice" of the DPA. *See* 18 U.S.C. § 3771(a)(9). And the CVRA promises victims that they have the right to "be treated with fairness and with respect for the victim's dignity." 18 U.S.C. § 3771(a)(8). When "a crime victim who is . . . deceased, . . . family members[] or any other persons appointed as suitable by the court, may assume the crime victim's rights under [the CVRA]." 18 U.S.C. § 3771(e)(2)(B).

Here, the Government violated all these rights by making *no* effort to confer with hundreds of family members who had loved ones taken from them in the two Boeing crashes. Even worse, the Government misled some of the victims' families by falsely telling them that no criminal investigation into Boeing even existed. Whatever else the Government may do under the CVRA, it cannot deceive victims.

In this filing, the victims' families seek three forms of relief. First, the families seek a declaration that, by choosing to work secretly with Boeing, the Government violated the families' CVRA "reasonable right to confer" and their right to "timely notice" of a DPA. 18 U.S.C. § 3771(a)(5) & (9). Here, the Government willfully did exactly what Congress had forbidden: it kept victims "in the dark."

Second, the families seek a declaration that the Government (again, working closely with Boeing) deliberately misled some of the victims' families about the existence of a criminal investigation into Boeing. Under the CVRA, "When the Government gives information to victims, it cannot be misleading." *Doe 1 v. United States,* 359 F. Supp. 3d 1201, 1219 (S.D. Fla. 2019). Here again, the Government violated the CVRA rights of victims' families, specifically their right to "be treated with fairness." 18 U.S.C. § 3771(a)(8).

Third, Congress has directed that "*the court shall ensure*" that crime victims are "afforded" their rights under the CVRA. 18 U.S.C. § 3771(b)(1) (emphasis added). Under this command, the victims' families are entitled to have the Court use its broad remedial authority to craft an appropriate remedy for the Government's repeated and flagrant violations of the CVRA rights of the aggrieved victims' families.

Because these issues concern the fair treatment of hundreds of victims who died as the direct and proximate result of a willful corporate crime, the victims' families request that this Court first direct the Government and Boeing to respond to this motion, allow the victims' families to reply, and then hold an oral argument where the victims' families counsel can support their motion.

## FACTUAL BACKGROUND[4]

I.    **Boeing's Two-Year Criminal Conspiracy Directly and Proximately Produced Two Deadly 737 Max Crashes and Killed 346 Passengers and Crew.**

As stipulated in the agreed Statement of Facts filed by the Government and Boeing in the DPA, it is undisputed that, for more than two years, Boeing knowingly, and with intent to defraud, conspired to impair, obstruct, and interfere with the FAA's evaluation of the safety of the Boeing 737 MAX aircraft. *See* Criminal Information, Dkt. Entry ("DE") #1; *see also* SOF ¶¶ 16-54. Indeed, as the undisputed Statement of Facts explains, among the direct and easily foreseeable consequences of Boeing's extended and far-reaching conspiracy to obstruct the FAA, the most tragic was two horrific crashes of Boeing 737 MAX aircraft. Quoting from the Statement of Facts: "On October 29, 2018, Lion Air Flight 610, a Boeing 737 MAX, crashed shortly after takeoff into the Java Sea near Indonesia. All 189 passengers and crew on board died." SOF ¶ 48. And less than five months later, "[o]n March 10, 2019, Ethiopian Airlines Flight 302 ("ET Flight 302"), a Boeing 737 MAX, crashed shortly after takeoff near Ejere, Ethiopia. All 157 passengers and crew on board died." *Id.* ¶ 53. In accepting responsibility for its crime that so grievously harmed hundreds of passengers and crew, Boeing also agreed, as part of the DPA, to pay $500 million to the "crash victims of Lion Air Flight 610 and Ethiopian Airlines Flight 302." *Id.* ¶ 13.

Under the CVRA, more than a dozen family members and representatives of these crash "victims"—victims who are specified in the DPA and who were directly and proximately harmed

---

[4] Boeing stipulated to these facts in the Statement of Facts attached to the DPA. If any of the facts that the victims' families proffer is disputed, the families request an evidentiary hearing to establish the relevant facts. In the DPA, Boeing expressly agreed "that it shall not, through present or future attorneys, officers, directors, employees, agents, or any other person authorized to speak for the Company make any public statement, in litigation or otherwise, contradicting the acceptance of responsibility by the Company set forth above or the facts described in the attached Statement of Facts." *See* DPA ¶ 32. In light of that binding commitment, we assume that Boeing (and, likewise, the Government) will not contest the factual recitations that follow.

by Boeing's crime—now file this motion. In this case, the following family members and representatives are assuming the rights of the following victims of Boeing's conspiracy:

Naoise Connolly Ryan had her husband, Mick Ryan, taken from her in the crash of ET Flight 302. She assumes his rights as his representative. *See* Ryan Aff., Ex. 1, Appx. 002.

Emily Chelangat Babu and Joshua Mwazo Babu had their son, Joshua Mwazo Babu, taken from them in the crash of ET Flight 302. They assume his rights as his representative. *See* Babus Aff., Ex. 2, Appx. 005.

Catherine Berthet had her daughter, Camille Geoffroy, taken from her in the crash of ET Flight 302. Catherine assumes Camille's rights as her representative. *See* Berthet Aff., Ex. 3, Appx. 008.

Huguette Debets had the father of her two young children, Jackson Musoni, taken from her in the crash of ET Flight 302. She assumes his rights as his representative. *See* Debets Aff., Ex. 4, Appx. 011.

Bayihe Demissie had his wife, Elsabet Minwuyelet Wubete, taken from him in the crash of ET Flight 302. He assumes her rights as her representative. *See* Demissie Aff., Ex. 5, Appx. 015.

Luca Dieci had his brother, Paolo Dieci, taken from him in the crash of ET Flight 302. Luca assumes Paolo's rights as his representative. *See* Dieci Aff., Ex. 6, Appx. 018.

Sri Hartati had her husband, Eryanto, taken from her in the crash of Lion Air Flight JT610. Sri assumes Eryanto's rights as his representative. *See* Hartati Aff., Ex. 7, Appx. 021.

Zipporah Muthoni Kuria had her father, Joseph Kuria Waithaka, taken from her in the crash of ET Flight 302. Zipporah assumes his rights as his representative. *See* Kuria Aff., Ex. 8, Appx. 024.

Javier de Luis had his sister, Graziella de Luis, taken from him in the crash of ET Flight 302. Javier assumes Graziella's rights as her representative. *See* de Luis Aff., Ex. 9, Appx. 027.

Nadia Milleron and Michael Stumo had their daughter, Samya Stumo, taken from them in the crash of ET Flight 302. They assume her rights as her representative. *See* Milleron and Stumo Aff., Ex. 10, Appx. 030.

Chris Moore had his daughter, Danielle Moore, taken from him in the crash of ET Flight 302. He now assumes her rights as her representative. *See* Moore Aff., Ex. 11, Appx. 046.

Paul Njoroge had his wife, Carolyne Nduta Karanja, and his three children, Ryan Njuguna Njoroge, Kelli W. Pauls, and Rubi W. Pauls, taken from him in the crash of ET Flight 302. Paul assumes their rights as their representative. *See* Njoroge Aff., Ex. 12, Appx. 050.

Yuke Meiske Pelealu had her husband, Rudolf Petrus Sayers, taken from her in the crash of Lion Air Flight JT 610. Yuke assumes his rights as his representative. *See* Pelealu Aff., Ex. 13, Appx. 053.

John Karanja Quindos had his wife, Anne Wangui Karanja, taken from him in the crash of ET Flight 302. He assumes her rights as her representative. *See* Quindos Aff., Ex. 14, Appx. 056.

Guy Daud Iskandar Zen S. had his daughter, Fiona Zen, taken from him in the crash of Lion Air Flight JT 610. He assumes her rights as her representative. *See* Zen Aff., Ex. 15, Appx. 060.

While these specific family members formally bring this action, they are broadly representative of many other victims' family members and assert crime victims' rights on behalf of all the victims' families. Other victims' families who have requested to be listed as supporters of this motion are listed in Attachment A to this motion.

**II.    The Justice Department Secretly Negotiates a Deferred Prosecution Agreement with Boeing and Misleads the Victims About What It is Doing.**

7

Beginning in May 2019, the United States Department of Justice began a criminal investigation into Boeing's criminal conspiracy. In the extended investigation that followed, the Justice Department developed overwhelming evidence of Boeing's crimes. The Justice Department, however, never conferred with the victims' families about those crimes. Instead, it chose to deliberately conceal its investigation and covertly negotiate with Boeing about resolving the case.

The Fraud Section of the Justice Department's Criminal Division in Washington, D.C. led the investigation into Boeing's conspiracy. This criminal investigation lasted for many months, including much of 2019 and all of 2020. *See, e.g.*, Natalie Kitroeff & Michael S. Schmidt, *Federal Prosecutors Investigating Whether Boeing Pilot Lied to F.A.A.*, N.Y. TIMES (Feb. 21, 2020). At first, Boeing deliberately refused to cooperate with the investigation. Boeing only began to reveal its conduct to the Justice Department after successfully delaying the criminal investigation for six months. SOF ¶ 4(c). During those six months, Boeing's "response frustrated the Fraud Section's investigation." *Id.*

After overcoming Boeing's efforts to prevent it from learning about the criminal conspiracy to conceal the 737 MAX's safety issues, the Justice Department assembled a team of attorneys to negotiate with Boeing's team of attorneys about resolving the case. The Justice Department's own regulations require federal officials to contact victims "at the earliest opportunity after detection of a crime at which it may be done without interfering with an investigation. . . ." Attorney General Guidelines for Victim and Witness Assistance, Art. IV.H at 28 (May 2012). But that never happened. The Government never contacted the victims at *any* point during the investigation, much less at the "earliest opportunity . . . ." *Id.*.

As early as May 2019, victims' families became aware of general media reports suggesting that the Department of Justice was criminally investigating Boeing. Milleron-Stumo Aff., Ex. 10 ¶ 6, Appx. 031.

In February 2020, having heard nothing from the Justice Department (or federal investigators)—and with the one-year anniversary of the crash of Ethiopian Airlines Flight 302 looming—a representative of the victims' families contacted the Justice Department to see what was happening. Milleron-Stumo Aff., Ex. 10 ¶¶ 8–9, Appx. 031. On February 19, 2020, Thomas Gallagher of the non-profit Flight 302 Families Foundation emailed Marie A. O'Rourke, the Victims' Rights Ombudsman at the Justice Department in Washington, D.C., seeking an opportunity for the victims' families to confer. Gallagher Aff., Ex. 16 ¶ 5,  Appx. 064. Mr. Gallagher requested a meeting on behalf of the Foundation's member families and proposed a meeting on March 3, 2020. *Id*. ¶ 5, Appx. 064. Mr. Gallagher sought an update on all Justice Department matters connected to the ET Flight 302 crash, including the progress of any criminal investigation or prosecution conducted by the Justice Department. *Id*.

Ms. O'Rourke responded via email to Mr. Gallagher later that day that she was not aware of which office might be working on the investigation and that she would forward the inquiry to the FBI's Victim-Witness Office. *Id*. ¶ 6, Appx. 064.

The next day, on February 20, 2020, Mr. Gallagher replied to Ms. O'Rourke that news reports indicated that the Justice Department's Criminal Division was investigating Boeing. *Id*.  ¶ 7, Appx. 064. He asked, "How do I go about identifying the attorneys assigned to this investigation?" *Id*.

Ms. O'Rourke replied the same day and stated that the FBI advised her that it did not have any criminal investigation into this crash, nor was it aware of any open cases at the Justice

Department. *Id*. ¶ 8, Appx. 064. She also stated that "[i]f there is an investigation into the safety issues for this model aircraft it would be handled by the NTSB, and you may wish to contact them." *Id*. ¶ 8, Appx. 064 and Ex. 4 to Gallagher Aff. Ms. O'Rourke continued, "It is possible that there are outstanding civil reviews or cases, but since those would not fall within the purview of the Crime Victims' Rights Act, this office cannot assist you." *See id.* She concluded, "If criminal charges are filed at some point, victims will be advised of that and notified of their rights under the CVRA." *Id*., Appx. 075.

On or about February 21, 2020, Mr. Gallagher telephoned the FBI's Victim-Witness Office to seek any information related to the reported investigation of Boeing. *See* Gallagher Aff., Ex. 16 ¶ 9, Appx. 065. Katie McCabe, a victim specialist, called Mr. Gallagher back. *Id*. As Mr. Gallagher best recalls, Ms. McCabe stated she was not aware of any criminal investigation. *Id*.

The Government's representations to the victims' families that no criminal investigation regarding Boeing existed were not only inaccurate but, even worse, clearly deceptive. Naturally, it was distressing for the victims' families to be told one thing by the Justice Department's Victims' Rights Ombudsman while reading the opposite in the news. Ex. 10 ¶ 15, Appx. 032.[5] By keeping the victims' families in the dark, the Government effectively foreclosed any possibility of victims' families conferring with the prosecutors working on the case.

While the Government blocked the victims from conferring with the prosecutors, Boeing had no such difficulty. Ultimately, during the last weeks of 2020 and the first week of 2021, attorneys for the Justice Department and Boeing collaborated to rapidly craft a DPA and associated

---

[5] For example, Nadia Milleron, a representative of one of the victims' family representatives, explained that she could not understand how Ms. O'Rourke could flatly represent that no Justice Department investigation was ongoing while the media reported the exact opposite. *Id*.

statement of facts. This DPA provided numerous benefits to the company but no real accountability for harms its crimes caused the victims and their families. Most important, the DPA immunized Boeing from criminal prosecution for all conduct listed in the Statement of Facts. *See* DPA ¶ 20 ("[T]he Fraud Section agrees, except as provided in this Agreement, that it will not bring any criminal or civil case against the Company relating to any of the conduct as described in the attached Statement of Facts or the Information filed pursuant to this Agreement."). Additionally, the DPA contained an unusual provision styled: "Payment of Crime-Victim Beneficiaries Compensation Amount." DPA ¶ 13. Under this provision, Boeing "agree[d] to pay a total Crash-Victim Beneficiaries Compensation Amount of $500,000,000 to the heirs, relatives, and/or legal beneficiaries of the crash victims of Lion Air Flight 610 and Ethiopian Airlines Flight 302." *Id*. Boeing and the Government do not explain how they arrived at this figure of victim compensation. For the families of the 346 victims of Boeing's crimes, the figure is far below what they believe is reasonable compensation for the deaths of hundreds of victims killed as a direct and proximate result of Boeing's criminal conspiracy. The one thing that is clear about this provision is that the parties deliberately excluded from their negotiations concerning an appropriate "crash-victim compensation amount" the people most directly affected by it.

### III.    The Government and Boeing Seek to Avoid any Substantive Proceedings Before this Court.

After the Government and Boeing reached their secret agreement, the Government first publicly disclosed it by filing it with this Court on January 7, 2021. *See* DE 4. While the Justice Department spent time carefully negotiating with Boeing's lawyers about Boeing's crimes, at no point did the Department inform any of the family members of the 346 victims about the criminal investigation against Boeing—much less confer with the families about an appropriate resolution

of that investigation. *See* Affidavits of Family Member Representatives, Exs. 1- 15, Appx. 001-061.

Immediately after filing the DPA with this Court, the Justice Department did not turn its attention to informing the victims' families about the agreement. Instead of working through its Office for Victims of Crime in Washington, D.C. or the Victim-Witness Coordinator for the U.S. Attorney's Office for the Northern District of Texas[6] to contact the families directly, the Department turned to the Office of Public Affairs to release a congratulatory press release. *See* Department of Justice Office of Public Affairs, *Boeing Charged with 737 Max Fraud Conspiracy and Agrees to Pay over $2.5 Billion* (Jan. 7, 2021), https://www.justice.gov/opa/pr/boeing-charged-737-max-fraud-conspiracy-and-agrees-pay-over-25-billion. The first and only information that the victims' families received that Boeing had been immunized from criminal prosecution was as a result of media coverage of the DPA. *See, e.g.,* Milleron-Stumo Aff., Ex. 10 ¶¶ 17-20, Appx. 032-033.

### IV.    The Dual MAX Tragedies Resulted from Widespread Criminal Wrongdoing at Boeing, not the Isolated Actions of a Few "Bad Apples."

While the foregoing information comes from the DPA signed by the Government and Boeing, it bears emphasis that the DPA's facts appear to have been carefully crafted to downplay the depth and breadth of Boeing's crimes. Had the victims been allowed to confer with the

---

[6] It is not immediately clear why the Government elected to file its DPA in the Fort Worth Division of the Northern District of Texas. For example, none of the prosecutors listed on the docket sheet as representing the Government are listed as maintaining offices in the Fort Worth Division. One thing that is clear about that forum selection, however, is that the victims' families were not considered. Fort Worth is a more difficult location for victims' families to travel to than other districts more obviously connected with Boeing's conspiracy. For example, given that Boeing conspired to obstruct the FAA's safety evaluation in Washington, D.C.—and this case was prosecuted primarily by the Fraud Section of the Criminal Division of the Justice Department in Washington, D.C.—it is unclear why the Government did not elect to proceed there.

Government, as the CVRA requires, they would have presented the Government with evidence exposing the pervasiveness of Boeing's wrongdoing. Three developments illustrate how widespread criminal behavior was within Boeing both before and after the MAX tragedies.

First, the Government recently indicted Mark Forkner, Boeing's former Chief Technical Pilot, for deceiving the FAA in connection with the MAX. *See* Indictment, *United States v. Forkner*, DE 1, No. 4:21-cr-268-O (N.D. Tex. Oct. 14, 2021). The indictment charges Mr. Forkner with withholding material information about the 737 MAX aircraft from the FAA, which directly caused the FAA to issue a lower-level training requirement for MAX pilots. *Id.* at 10. The indictment makes clear that Mr. Forkner undertook those actions pursuant to Boeing's key objective of securing expedited regulatory approval and lax regulatory requirements for the MAX. The Indictment states that the fraud was not only in what Mr. Forkner told the regulators, but also in "[w]hat Forkner *and Boeing* [t]old the FAA[.]" *Id.* at 6 (emphasis added). Indeed, even the Government's press release announcing the indictment makes clear that Mr. Forkner's goal was "to obtain tens of millions of dollars *for Boeing*."[7] In short, the Government's *own* investigation and enforcement decisions make clear that Boeing's wrongdoing was not limited to the isolated actions of a few employees.

Second, the Delaware Court of Chancery recently denied in substantial part Boeing's motion to dismiss a shareholder derivative suit alleging that the company's directors turned a blind eye to red flags regarding safety problems. Mem. Op., *In re: The Boeing Company Derivative Litigation,* No. 2019-0907-MTZ, 2021 WL 4059934 (Del. Ch. Sept. 7, 2021), available at https://courts.delaware.gov/Opinions/Download.aspx?id=324120 ("Delaware Opinion").[8] The

---

[7] *See* https://www.justice.gov/opa/pr/former-boeing-737-max-chief-technical-pilot-indicted-fraud (emphasis added).

[8] As recently reported, Boeing's Board of Directors agreed to a $225 million settlement

Court's 102-page opinion outlines the suit's allegations that Boeing's corporate push to expedite the production, approval, and release of the 737 MAX directly contributed to aircraft safety problems and the MAX's crashes. And it details how a broad group of Boeing employees, officers, and directors—including the company's top leadership—actively and knowingly misled the public and regulators regarding the MAX.

Among other things, Boeing's senior management and Board of Directors facilitated the misconduct giving rise to the MAX crashes by providing no oversight, ignoring red flags, concealing wrongdoing from the FAA, and attempting to cover up their abdication of responsibility. *Id.* at 2-60, 70-96. To ensure it remained blissfully unaware, Boeing neglected to implement procedures for employees and management to voice safety concerns to its Board of Directors. And when safety concerns were raised, employee warnings were either explicitly rejected by management or just ignored entirely. *Id.*

In light of the facts recited in the Delaware Opinion, the misconduct described in the DPA of "Boeing Employee-1"[9] and "Boeing Employee-2" is part of a pattern. Both employees were driven by the "Program Directive" to minimize pilot training requirements for the MAX, and both employees were subject to financial pressures that broadly affected many other Boeing employees involved in the MAX project.[10] For example, one Boeing employee warned the program's general manager that flying on the 737 MAX was not safe. The employee said, "for the first time of my life, I'm sorry to say that I'm hesitant about putting my family on a Boeing airplane." *Id.* at 30. As

---

with shareholders for its misconduct. *See* https://www.wsj.com/articles/boeing-shareholders-reach-settlement-in-737-max-board-oversight-suit-11636076012.

[9] "Boeing Employee-1" is clearly Mark Forkner, who as noted above was himself indicted on October 14, 2021 by a grand jury in this District for two counts of Fraud Involving Aircraft Parts in Interstate Commerce and four counts of Wire Fraud.

[10] *See* SOF at 5-6.

another example, a Boeing engineering manager complained to Boeing's Director of Global Operations about impossible deadlines and economic pressures, admitting: "I don't know how to fix these things . . . it's systemic. It's culture." *Id.* at 31 n.83.

Boeing's Board and leadership allowed severe, endemic safety issues to fester by consciously maintaining a position of willful ignorance. *See generally id.* at 70-96. Because Boeing's Board did not have an adequate reporting mechanism in place, many complaints or safety concerns simply never made it to the attention of the Board. *See id.* at 86-87 ("Because the Board did not have any formal procedures in place to monitor the safety of Boeing's airplanes, the Board was not privy to the truth about MCAS, AOA sensor vulnerabilities, or how those issues were handled in FAA certification and pilot training."). On the rare occasion that concerns made it to the Board's attention, the reports were "one-sided at best and false at worst, conveying only favorable and optimistic safety updates and assurances that the quality of Boeing's aircraft would drive production and revenue." *Id.* at 86.

Most alarmingly, Boeing's Board of Directors *knew* of the 737 MAX's safety issues before the second crash and still failed to take meaningful action. By February 2019, the Board was aware that there was a Justice Department investigation underway. Nevertheless, at their February Board meeting, "the Board affirmatively decided to delay its investigation into the 737 MAX, notwithstanding publicly reported concerns about the airplane's safety." *Id.* at 77. The Board's official policy was to bury its head in the sand. *See id.* at 94 ("The Lion Air Crash and its causes were widely reported in the media; those reports reached the Board; and the Board ignored them."). And there is ample evidence that "[t]he Board publicly lied about if and how it monitored the 737 MAX's safety." *Id.* at 55-56. In short, Boeing's leadership directly participated in the type of deceit for which Mr. Forkner has now been indicted—and could fully understand the risks to public safety

of the deception.

Third, congressional committees have unearthed disturbing evidence surrounding Boeing's crimes. For example, during an October 2019 hearing, Senator Ted Cruz, then-Chairman of the Senate Commerce Committee's Subcommittee on Aviation and Space, closely examined Boeing CEO Dennis Muilenburg. Senator Cruz found Muilenburg's testimony "quite dismaying" because he appeared to have avoided knowledge of a "stunning" exchange between Forkner and another Boeing pilot, in which Forkner said "I basically lied to the regulators (unknowingly)" about the Boeing 737 MAX's safety. Subcomm. Hrng. Tr. (Oct. 19, 2019) at 71-72 (excerpt attached as Ex. 17, Appx. 080-081 ).[11] Later, in December 2020, the Commerce Committee Majority (i.e., Republican) Staff released a report about aviation safety oversight. The report noted how the FAA conducted simulator tests to evaluate pilot reaction times, but immediately before the exercise, Boeing officials coached the test pilots on how to react, violating testing protocols to artificially create the appearance of quick reaction times.[12] When Senator Cruz and other senators tried to investigate these irregularities, they were stonewalled, leading the Senate Committee to conclude that it appeared "FAA and Boeing were attempting to cover up important information that may have contributed to the 737 MAX tragedies." *Id.*

## DISCUSSION

In 2004, Congress enacted the Crime Victims' Rights Act because it found that in case after case victims "were kept in the dark by prosecutors too busy to care . . . and by a court system that

---

[11] Links to additional information about Senator Cruz's concerns are available at: https://www.cruz.senate.gov/newsroom/press-releases/sen-cruz-to-boeing-ceo-and-145the-buck-stops-with-you-and-146

[12] *See* U.S. Senate Committee on Commerce, Science & Transportation, Committee Investigation Report: Aviation Safety Oversight at 45, available at: https://www.commerce.senate.gov/services/files/8F636324-2324-43B2-A178-F828B6E490E8.

simply did not have a place for them." 150 CONG. REC. 7296 (2004) (colloquy by Sens. Feinstein and Kyl). Yet, while the Government was secretly negotiating its DPA with Boeing, it did precisely what Congress had forbidden: it kept the victims' families "in the dark." Through its intentional concealment, the Government plainly violated its CVRA obligations to extend to the victims' families "the reasonable right to confer" and the right "to be informed in a timely manner of any . . . deferred prosecution agreement." 18 U.S.C. 3771(a)(5) & (9). Indeed, by working with Boeing to intentionally mislead the victims' families about the status of the case, the Government violated the victims' families right to "be treated with fairness" and "dignity." 18 U.S.C. § 3771(a)(8). For these, and other reasons explained below, this Court should rule that the DPA was negotiated in violation of the victims' families' CVRA rights and order proceedings to determine the appropriate remedies for those violations.

I.   **The Government Violated the Victims' Families' CVRA Rights by Secretly Negotiating the DPA with Boeing.**

The Government violated the CVRA by deliberately concealing its DPA with Boeing from the victims.

A.   **The CVRA Is a Broad Bill of Rights Protecting Victims of Federal Crimes.**

In 2004, "Congress crafted the CVRA to recognize the harm and anguish suffered by victims of crime." *In re de Henriquez,* No. 15-3054, 2015 WL 10692637, at *2 (D.C. Cir. 2015). The Act uprooted the long-held "assumption that crime victims should behave like good Victorian children—seen but not heard." *Kenna v. United States Dist. Court for C.D. Cal.*, 435 F.3d 1011, 1013 (9th Cir. 2006). The CVRA stemmed from a concern "that 'prosecutors and law enforcement officers too often ignored or too easily dismissed the legitimate interests of crime victims.'" *United States v. Stevens,* 239 F. Supp. 3d 417, 420 (D. Conn. 2017) (quoting *United States v. Turner*, 367 F.Supp.2d 319, 322 (E.D.N.Y. 2005)). The CVRA is thus best understood as part of a decades-long

"civil rights movement" that sought to "end the unjust treatment of crime victims by reforming the culture of the criminal justice system." Hon. Jon Kyl et al., *On the Wings of Their Angels: The Scott Campbell, Stephanie Roper, Wendy Preston, Louarna Gillis, and Nila Lynn Crime Victims' Rights Act*, 9 LEWIS & CLARK L. REV. 581, 583 (2005).

Congress designed the CVRA "to be a 'broad and encompassing' statutory victims' bill of rights," *United States v. Degenhardt*, 405 F. Supp. 2d 1341, 1343 (D. Utah 2005) (quoting 150 CONG. REC. S4261 (Apr. 22, 204) (statement of Sen. Feinstein)), thereby "making victims independent participants in the criminal justice process." *Kenna*, 435 F.3d at 1013. Congress was concerned the justice system treated crime victims "as non-participants in a critical event in their lives." 150 CONG. REC. S4261 (Apr. 22, 2004) (statement of Sen. Feinstein). To reform the system, Congress gave victims the right "to participate in the process where the information that victims and their families can provide may be material and relevant." *Id.* The CVRA's objective was thus to give all those affected by crimes valuable rights, including the right to be "an independent voice in the criminal proceedings that directly implicate them." *Id*. And the CVRA specifically "places responsibility on the [district] court for its implementation, requiring that '*the court shall ensure* that the crime victim is afforded [those] rights.'" *United States v. Atl. States Cast Iron Pipe Co.,* 612 F. Supp. 2d 453, 458 (D.N.J. 2009) (emphasis added) (*citing* 18 U.S.C. § 3771(b)(1)); *see also Stevens*, 239 F. Supp. 3d at 421 (explaining that "the CVRA imposes no less than an *affirmative* obligation on [district] judges to ensure that the victim's rights are respected" (emphasis in original)).

**B.      The Government Violated the Victims' Families' CVRA Right to "Confer" with Prosecutors by Deliberately Concealing that it was Negotiating a Deferred Prosecution Agreement.**

Given Congress's intent to end the practice of prosecutors keeping crime victims "in the dark," it is unsurprising to find that the CVRA requires prosecutors to confer with victims during negotiations about deferred prosecution agreements and other resolutions of criminal cases. Most important, the CVRA extends to victims a "reasonable right to confer with the attorney for the Government." 18 U.S.C. § 3771(a)(5). The provision commands prosecutors to confer with victims at appropriate points in the criminal justice process, such as before finalizing a DPA with a criminal defendant.

For example, the Fifth Circuit, addressing facts similar to those in this case, held in *In re Dean* that "Congress made the policy decision—which we are bound to enforce—that the victims have a right to inform the plea negotiation process by conferring with prosecutors *before a plea agreement is reached." In re Dean*, 527 F.3d 391, 395 (5th Cir. 2008) (emphasis added). In that case, federal prosecutors investigated a crime by BP Products of North America, Inc. ("BP"). The alleged crime arose out of an explosion at one of its refineries that killed fifteen workers and injured more than 170 other victims. *Id*. at 392. Following those horrific injuries, prosecutors and the corporate defendant then secretly negotiated a resolution of the corporation's criminal responsibility. But before publicly announcing that resolution, the prosecutors filed with the district court a sealed, *ex parte* motion claiming that, because of the nearly 200 victims of the explosion, consulting with them would not be practicable and could result in media coverage that might impair the plea negotiation process. *Id*.

Shortly after this *ex parte* motion was filed, the district court entered a sealed order, finding that notification to victims in advance of the public announcement of a plea agreement was impracticable because of the "large number of victims" and, on account of the extensive media coverage, "any public notification of a potential criminal disposition resulting from the

government's investigation [of the] explosion would prejudice [BP] and could impair the plea negotiation process . . . ." *Id*. at 393. The district court's *ex parte* order prohibited the prosecutors from notifying victims of a potential plea agreement before one had been executed; it directed that once an agreement had been signed, the government was to notify all identifiable victims and afford them their CVRA rights. *Id*.

Prosecutors next filed under seal a criminal information against BP. Two days later, the prosecutors and BP signed the plea agreement. *Id.* The next day, the criminal information was unsealed, and the plea agreement was made public. *Id.* Thereafter, the government mailed various notices to the victims about subsequent hearings and their right to be heard at those hearings. *Id.* A number of the victims appeared and objected to the secret deal that the prosecutors and BP had orchestrated. *Id.* The district court denied their challenges, and the victims appealed to the Fifth Circuit. *Id.*

The Fifth Circuit granted the victims' mandamus petition in part. It directed the district court to take no further action to implement the plea agreement pending further action by the Circuit. *Id*. Thereafter, the Circuit published an opinion holding that the Justice Department violated the CVRA by negotiating the secret plea deal with BP.

The Fifth Circuit began by holding that "[t]here are clearly rights under the CVRA that apply before any prosecution is underway." *Id.* at 394 (citing *United States v. BP Prods. N. Am. Inc.,* No. H-07-434, 2008 WL 501321 at *11 (S.D. Tex. Feb. 21, 2008)). "Logically," the Fifth Circuit explained, these pre-charging rights include the CVRA's "reasonable right" for victims "to confer with the attorney for the Government." *Id.* at 394 (citing 18 U.S.C. § 3771(a)(5)).[13] The

---

[13] Other courts have reached the same conclusion that the CVRA applies before charging. *See, e.g.*, *United States v. Oakum,* No. 3:08-cr-132, 2009 WL 790042 (E.D. Va. 2009) (agreeing with *In re Dean* that CVRA rights are expansive but are subject to the outer limit that the

Fifth Circuit thus held that, on the facts of that case, "[T]he government should have fashioned a reasonable way to inform the victims of the likelihood of criminal charges and to ascertain the victims' views on the possible details of a plea bargain." *Id*.

The Fifth Circuit also specifically rejected the prosecutors' reasons for keeping its negotiations secret. With regard to the numerosity of the victims, the Circuit noted that "where there were fewer than two hundred victims, all of whom could be easily reached, it is not reasonable to say that notification and inclusion were 'impracticable.' There was never a claim that notification itself would have been too cumbersome, time-consuming, or expensive or that not all victims could be identified and located." *Id*. at 395.

With regard to the claim that media coverage could have impaired the plea process, the Fifth Circuit explained that the district court "missed the purpose of the CVRA's right to confer. In passing the Act, Congress made the policy decision—which we are bound to enforce—that the victims have a right to inform the plea negotiation process by conferring with prosecutors before

---

Government has at least "contemplated" charges); *United States v. Rubin,* 558 F.Supp.2d 411, 417 n. 5 (E.D.N.Y.2008) (discussing victims' "ability to seek pre-prosecution relief" under the CVRA). *See generally* Paul G. Cassell et al., *Crime Victims' Rights During Criminal Investigations? Applying the Crime Victims' Rights Act Before Criminal Charges are Filed?*, 104 J. CRIM. L. & CRIMINOLOGY 59, 73–75 (2014).

    The Eleventh Circuit has recently decided that, in a situation where no criminal charges were ever filed, victims cannot seek to vindicate their CVRA right to confer in a separate, free-standing civil action. *In re Wild*, 994 F.3d 1244, 1252-63 (11th Cir. en banc 2021), *petn. for cert pending*, No. 21-351. But the Eleventh Circuit specifically distinguished *In re Dean*, explaining that "the question we answer is different from the one presented in *Dean ....*" *Id.* at 1252 n.7 (noting that the only issue before it was whether "the CVRA authorizes [a victim] to file a free-standing civil suit seeking judicial enforcement of her rights under the CVRA in the absence of any underlying proceeding" and *not* reaching the issue of whether a victim could seek to vindicate CVRA rights "during the course of an ongoing criminal prosecution"). Here, the victims' families are asserting their rights in the course of an ongoing criminal prosecution—e.g., *United States v. Boeing*, Case No. 4:21-cr-005-O-1 (N.D. Tex. 2021).

a plea agreement is reached." *Id.* Accordingly, the Fifth Circuit concluded, "[T]he victims should have been notified of the ongoing plea discussions and should have been allowed to communicate meaningfully with the government, personally or through counsel, before a deal was struck." *Id.*

Under the controlling Fifth Circuit precedent of *In re Dean*, the victims' families in this case clearly possessed CVRA rights even before the Government filed its secretly-negotiated DPA on January 7—most important, a right to confer with the prosecutors. As in that case, the Justice Department could have easily contacted the several hundred victims' families before it finalized any DPA or other resolution. Indeed, the Department's Fraud Section must have known that the families of the 346 victims had retained legal counsel to pursue civil cases against Boeing and that those civil suits had been consolidated in a single forum, the Northern District of Illinois. *See generally In re Lion Air Flight JT 610 Crash*, No. 1:18-cv-07686 (N.D. Ill. 2018); *In re Ethiopian Airlines Flight 302 Crash*, No. 1:19-cv-02170 (N.D. Ill. 2019). Additionally, a centralized Plaintiffs' Executive Committee existed in the consolidated action stemming from the ET Flight 302 crash that could have quickly facilitated communication between the Fraud Section and the families.

The victims' families need *not* prove that the prosecutors would have reached a different DPA if they had conferred with them. To be sure, if the Justice Department had properly conferred, the victims would have explained that the DPA's Statement of Facts relies on the false premise that Boeing's criminal wrongdoing was limited to the conduct of a few rogue employees. This view is incorrect; the same pressures that led to the crashes pervaded all levels of the company. But regardless of whether the DPA would have been substantively different after conferring with victims' families, the CVRA procedurally protected the victims' families' right to confer.

22

The Justice Department deprived the families of that right. Instead of making *any* effort whatsoever to contact the victims' families, the Justice Department instead chose the path of secrecy and deception. In choosing that path, the Department violated the CVRA.

### C.   The Government Also Violated the Victims' Families' CVRA Right to "Timely Notice" of the Deferred Prosecution Agreement.

The government also violated the families' right to receive "timely notice" of a deferred prosecution agreement. *See* 18 U.S.C. § 3771(a)(9).

Congress passed the CVRA in 2004. In May 2008, the Fifth Circuit decided in *In re Dean,* which found that the CVRA required prosecutors to confer with victims before resolving a case. In December 2008, the Government Accountability Office (GAO) released a report to Congress on how courts had construed the CVRA. It reported that courts had "interpreted the CVRA in different ways," contrasting the Fifth Circuit's decision in *In re Dean* with a handful of district court decisions that had seemingly concluded that the CVRA did not apply before charges were filed. *See* GAO Rep. at 61–63 (citing *In re Dean*, 527 F.3d 391 (5th Cir. 2008)).

In 2015, Congress amended the CVRA to resolve that split. The amended CVRA codified *In re Dean* and reinforced that the Act applies before charging by giving victims the "*right to be informed in a timely manner of any plea bargain or deferred prosecution agreement.*" 18 U.S.C. § 3771(a)(9) (emphasis added). This right necessarily applied pre-charging, as the amendment's plain language makes clear. It would not be "timely" for victims to learn about (for example) a deferred prosecution agreement after the agreement had already been finalized—and any victim involvement would be irrelevant. For a notice to be considered "timely," the victims must be told about the DPA before it is finalized and filed with the Court.

Any other reading would render the CVRA's amendment meaningless. Before the 2015 amendments, the CVRA already promised victims a "right to reasonable, accurate, and timely

notice of any public court proceeding . . . involving the crime." *See* 18 U.S.C. § 3771(a)(2). And, as the GAO had noted, the Fifth Circuit in *In re Dean* had made clear that Congress had made the policy choice of requiring prosecutors to confer with victims before resolving a case. If Congress's 2015 amendment about providing notice about a deferred prosecution agreement in a "timely manner" only required notice after a court filing, then the new provision would be superfluous. Such an interpretation contradicts "one of the most basic interpretive canons" that a "statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant." *Latiolais v. Huntington Ingalls, Inc.* 951 F.3d 286, 294 (5th Cir. 2020).

While the plain text of the statute makes clear that victims are entitled to confer with prosecutors before a DPA is finalized with the court, the legislative history also confirms this conclusion. As specifically explained in the House Report accompanying the Justice for Victims of Trafficking Act, "[T]his section *clarifies* Congress's intent that crime victims be notified of plea agreements *or deferred prosecution agreements, including those that may take place prior to a formal charge*." H.R. Rep. No. 114-17 at 7 (Jan. 27, 2015) (emphases added).

Here, the victims' families did not receive notice "in a timely manner" of the Government's DPA with Boeing—i.e., notice at a time when they could have conferred with the Government before the agreement was finalized. They only received notice after the Government and Boeing executed the DPA and filed it with the court.

**D.    The Government Also Violated the Victims' Families' CVRA Right to Be "Treated with Fairness" By Misleading the Families.**

To add insult to injury, not only did the Government fail to confer and provide notice to the victims' families, but it also deliberately misled victims' families about whether it was even criminally investigating Boeing. As recounted at greater length in the factual summary above, in

February 2020, some of the victims' families queried the Justice Department about media reports concerning a possible criminal investigation by the Department related to the crash of Ethiopian Airlines Flight 302. In response, the Justice Department—ironically speaking through its Victims' Rights Ombudsman—assured Thomas Gallagher, the CEO of the ET 302 Families Foundation, that no such criminal investigation existed. The Ombudsman wrote in an email:

> The FBI has advised me that they *do not have a criminal investigation into this crash, nor are they aware of any open cases at the Department of Justice.* If there is an investigation into the safety issues for this model aircraft it would be handled by the NTSB, and you may wish to contact them. It is possible that there are outstanding civil reviews or cases, but since those would not fall within the purview of the Crime Victims' Rights Act, this office cannot assist you. If criminal charges are filed at some point, victims will be advised of that and notified of their rights under the CVRA.

*See* Gallagher Aff., Ex. 16, Appx. 075 (Ex. 4 containing email from Marie A. O'Rourke, Victims' Rights Ombudsman to Tom Gallagher (Feb. 20, 2020) (emphasis added)). Moreover, the Department further falsely assured victims (through the Ombudsman's email to Mr. Gallagher) that if charges were filed, the victims would be advised of that fact.

These statements were blatantly false. The Justice Department had an open criminal investigation related to the crash at that time. And since charges were filed here in this District on January 7, 2021, the Department of Justice has never notified the victims' families of their CVRA rights.

Under the CVRA, crime victims have a right "to be treated with fairness and respect for the victim's dignity." 18 U.S.C. § 3771(a)(8). Crime victims are not treated fairly or with dignity when the Justice Department deceives them. Whatever else "fairness" might mean, it must at least mean that the Government is obligated to keep the victims properly informed and to ensure that their interests are respected in the criminal justice process. *See* 150 CONG. REC. 7303 (Apr. 22,

2004) (statement of Sen. Kyl describing the right to fairness in broad terms). Under the CVRA, "When the Government gives information to victims, it cannot be misleading." *Doe 1 v. United States,* 359 F. Supp. 3d 1201, 1219 (S.D. Fla. 2019). Here again, the Government's deception violated the CVRA.

## II.     After Finding CVRA Violations, the Court Should Direct the Government, Boeing, and the Victims to Provide Briefing on the Appropriate Remedies and then Grant Appropriate Remedies.

Against this backdrop of clear CVRA violations, this Court should set further proceedings to determine the appropriate remedy.

The CVRA gives this Court the power—and, indeed, the obligation—to protect victims' CVRA rights. Under the CVRA, "the court shall ensure that the crime victim is afforded the rights described in [the CVRA]." 18 U.S.C. § 3771(b)(1); *see also* Fed. R. Crim. P. 60(b). As the Senate co-sponsor of the CVRA explained, "it is the clear intent and expectation of Congress that the district and appellate courts will establish procedures that will allow for a prompt adjudication of any issues regarding the assertion of a victim's right, while giving meaning to the rights we establish." 150 CONG. REC. 22953 (Oct. 9, 2004) (statement of Sen. Kyl).

Moreover, since the earliest days of our nation, it has been settled law that "where there is a legal right, there is also a legal remedy." *Marbury v. Madison,* 5 U.S. 137, 163 (1803) (internal quotation omitted). Federal courts should "presume the availability of all appropriate remedies unless Congress has expressly indicated otherwise" or given guidance by a "clear indication of its purpose with respect to remedies." *Sossamon v. Lone Star State of Texas,* 560 F.3d 316, 327 n.26 (5th Cir. 2009), *aff'd sub nom. Sossamon v. Texas*, 563 U.S. 277 (2011). For that reason, "Where legal rights have been invaded, and a federal statute provides for a general right to sue for such invasion, federal courts may use any available remedy to make good the wrong

26

done." *Franklin v. Gwinnett Cty. Pub. Sch.,* 503 U.S. 60, 66, 68-69 (1992). Thus, "the district court is presumed to have the authority to grant the requested relief, absent some indication in the underlying statute that such relief is not available." *Transcon. Gas Pipe Line Co., LLC v. 6.04 Acres, More or Less*, 910 F.3d 1130, 1152 (11th Cir. 2018), *cert. denied*, 139 S. Ct. 634 (2019).

Once this Court adjudicates the scope of the Government's CVRA violations, full briefing on the appropriate remedies can proceed—informed by the ruling. After finding CVRA violations, this Court will have ample remedies that it could order to protect the victims' families' CVRA rights and provide a level of transparency and accountability that is thus far missing from the DPA. These remedies include, but are not limited to:

- As a remedy for Boeing's illegal behavior and the illegal agreement, an order directing the Government to meet and confer with the victims' families about its evidence against Boeing and its decision to grant Boeing immunity from further criminal prosecution;

- An order directing the Government to provide to the victims' families its documents and related evidence of Boeing's crimes;

- Exercising the Court's supervisory powers over the DPA;[14]

- Requiring that Boeing appear for a public arraignment and that the victims be heard concerning appropriate conditions of release during the term of the DPA;[15]

- An order that the DPA's "immunity" provision be excised, permitting the victim families to exercise their CVRA right to confer with prosecutors about pursuing further criminal prosecution of Boeing;

- An order that the victim families be permitted to confer with prosecutors about other ways to hold Boeing accountable for its crimes beyond the provisions in the existing DPA;

- A referral of the Government's illegal behavior in reaching the DPA to appropriate investigative authorities, including the House and Senate Committees with authority over the issue and the Department of Justice's Office of Professional Responsibility; and

---

[14] As discussed in a concurrently filed motion for exercise of this Court's supervisory power over the DPA, this remedy is also required by operation of other bodies of law.

[15] As discussed in a concurrently filed motion for arraignment of Boeing and hearing on conditions of release, this result is also required by operation of Rule 10 of the Federal Rules of Criminal Procedure and the CVRA.

- All other appropriate remedies to protect the victims' families' rights and assure transparency and accountability in this criminal case.

These are just some of the remedies that the victims' families will seek—and that this Court should order—following the Court's determination that the Government violated the CVRA. To facilitate careful consideration of these remedial issues, the victims' families request that the Court issue a ruling regarding the scope of the Department's CVRA violations and then direct the victims' families, Boeing, and the Government to brief the appropriate remedies for those violations.

## **CONCLUSION**

The legitimacy of deferred prosecution agreements has been widely debated in this country, with some respected commentators going so far as to allege that they allow corporate defendants to get away with murder. *See* Jed S. Rakoff, *Getting Away with Murder*, N.Y. REV. OF BOOKS (Dec. 2, 2020) (quoting federal district judge Rakoff reciting cases where major corporations have caused death and destruction and the Justice Department has deferred or denied justice), available at https://www.nybooks.com/articles/2020/12/03/getting-away-murder-executive-prosecution/). The victims' families do not ask the Court to enter that debate. Instead, the victims' families ask this Court to go no further than to conclude that, if the Government and a major corporation are going to craft a deferred prosecution agreement for a serious felony, the Government must follow the law.

The CVRA gives the victims of those crimes an opportunity to confer about that agreement and to potentially influence its terms. If the Government wants to use deferred prosecution agreements to grant immunity to corporations like Boeing, it cannot do so secretly. The Government must notify victims—or their families—of the agreement "in a timely manner," give them a chance to confer about its structure before it is finalized and treat them with dignity and respect.

28

Here, the Government deprived the families of their CVRA rights. It did not confer with the victims or notify them before it filed the DPA with the Court. Nor did the Government treat the families with the dignity and respect that the CVRA requires when it deceived the victims' families about whether a criminal investigation was underway.

The victims' families respectfully request that the Court find that the Government (working with Boeing) violated the CVRA and direct further proceedings on the appropriate remedy for those CVRA violations. A proposed order to that effect is attached.

Dated: January 20, 2022

Respectfully submitted,

/s/ Warren T. Burns

Warren T. Burns (Texas Bar No. 24053119)
Burns Charest, LLP
900 Jackson Street
Suite 500
Dallas, TX 75202
469-904-4550
wburns@burnscharest.com

Paul G. Cassell (Utah Bar No. 06078)
(Counsel of Record)
Utah Appellate Project
S.J. QUINNEY COLLEGE OF LAW
University of Utah
383 S. University St.
Salt Lake City, UT 84112
801-585-5202
cassellp@law.utah.edu
(no institutional endorsement implied)
(admitted *pro hac vice*)

*Attorneys for Victims' Families*

## CERTIFICATE REGARDING CONFERENCE

The victims' families are aware of Local Rule 47.1 regarding motion practice. This rule requires the "parties" in a criminal case to comply with various requirements, including a conferral regarding a motion. Because the victims' families are not "parties" to this criminal case—e.g., United States v. Boeing—the victims' families do not believe that the conferral requirement applies to this motion. They are proceeding pursuant to separate authority for asserting crime victims' rights contained in the Crime Victims' Rights Act, 18 U.S.C. § 3771(d)(3) and Fed. R. Crim. P. 60. Nonetheless, out of an abundance of caution, contemporaneously with filing this motion, the victims' families have contacted the Government and Boeing about this motion. Given the nature of this motion, the victims' families believe that their motion is not unopposed, but they will promptly advise the Court if that understanding is mistaken

 /s/ Warren T. Burns
Warren T. Burns

## <u>CERTIFICATE OF COMPLIANCE REGARDING LENGTH</u>

The victims' families are aware of Local Rule 47.2(c) regarding length of "briefs," which are ordinarily limited to 25 pages. The foregoing "motion" of the victims' families is 30 pages in length. Because the victims' families are proceeding pursuant to separate authority for asserting crime victims' rights contained in the Crime Victims' Rights Act, 18 U.S.C. § 3771(d)(3) and Fed. R. Crim. P. 60, the victims' families believe that the 25-page limit for a "brief" is inapplicable. In addition, the foregoing motion of victims' families is one of the three interwoven and contemporaneously filed motions—which would mean, if the rule were applicable, that the victims should have 75 pages to present their combined arguments. The victims' families' three motions together are well under that total page limitation. If the Court believes that a separate motion to exceed page limitations is nonetheless required for this motion, the victims' families would respectfully request leave to file an appropriate motion for five additional pages to present their factual information and arguments here.

<u>/s/ Warren T. Burns</u>
Warren T. Burns

## **CERTIFICATE OF SERVICE**

I certify that on January 20, 2022, the foregoing document was served on the parties to the proceedings via the Court CM/ECF filing system.


 /s/ Warren T. Burns
Warren T. Burns