**UNITED STATES DISTRICT COURT FOR THE**

**NORTHERN DISTRICT OF TEXAS**

**FORT WORTH DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| *Plaintiff* | ) | |
| | ) | |
| v. | ) | Case No. 4:21-cr-005-O-1 |
| | ) | |
| THE BOEING COMPANY, | ) | |
| | ) | |
| *Defendant.* | ) | |
|                       | ) | |

**REPLY IN SUPPORT OF MOTION OF NAOISE CONNOLLY RYAN, AS
REPRESENTATIVE OF MICHAEL RYAN; EMILY CHELANGAT BABU AND JOSHUA
MWAZO BABU, AS REPRESENTATIVES OF JARED BABU MWAZO; CATHERINE
BERTHET, AS REPRESENTATIVE OF CAMILLE GEOFFROY; HUGUETTE DEBETS,
AS REPRESENTATIVE OF JACKSON MUSONI; LUCA DIECI, AS
REPRESENTATIVE OF PAOLO DIECI; BAYIHE DEMISSIE, AS REPRESENTATIVE
OF ELSABET MINWUYELET WUBETE; SRI HARTATI, AS REPRESENTATIVE OF
ERYANTO; ZIPPORAH KURIA, AS REPRESENTATIVE OF JOSEPH KURIA
WAITHAKA; JAVIER DE LUIS, AS REPRESENTATIVE OF GRAZIELLA DE LUIS Y
PONCE; NADIA MILLERON AND MICHAEL STUMO, AS REPRESENTATIVES OF
SAMYA STUMO; CHRIS MOORE, AS REPRESENTATIVE OF DANIELLE MOORE;
PAUL NJOROGE, AS REPRESENTATIVE OF CAROLYNE NDUTA KARANJA, RYAN
NJUGUNA NJOROGE, KELLI W. PAULS, AND RUBI W. PAULS; YUKE MEISKE
PELEALU, AS REPRESENTATIVE OF RUDOLF PETRUS SAYERS; JOHN KARANJA
QUINDOS, AS REPRESENTATIVE OF ANNE WANGUI KARANJA; GUY DAUD
ISKANDAR ZEN S., AS REPRESENTATIVE OF FIONA ZEN; AND OTHER
SIMILARLY SITUATED REPRESENTATIVES OF THE VICTIMS OF THE CRASHES
OF LION AIR FLIGHT JT610 AND ETHIOPIAN AIRLINES FLIGHT ET302 UNDER
THE CRIME VICTIMS' RIGHTS ACT FOR EXERCISE OF THIS COURT'S
SUPERVISORY POWER OVER THE DEFERRED PROSECUTION AGREEMENT**

Warren T. Burns
Burns Charest, LLP
900 Jackson Street
Suite 500
Dallas, TX 75202
469-904-4550
wburns@burnscharest.com

Paul G. Cassell
(Counsel of Record)
Utah Appellate Project
S.J. Quinney College of Law
University of Utah
383 S. University St.
Salt Lake City, UT 84112
801-585-5202
cassellp@law.utah.edu
(no institutional endorsement implied)
(*pro hac vice*)

*Attorneys for Victims' Families*

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES...........................................................................................iv

INTRODUCTION .........................................................................................................1

ARGUMENT .................................................................................................................2

I. Several Key Aspects of the DPA Warrant this Court's Close Scrutiny.............................2

    A. Affirmatively Exonerating Boeing's Senior Management...................................2

    B. Extending Immunity for Any of the Conduct in the Statement of Facts.............5

    C. Counting Funds Boeing Was Contractually Obligated to Pay Anyway .............7

    D. The Government's Failure to Confer with Victims' Families ............................9

II. This Court is Empowered to Review and Withhold Approval of the DPA Pursuant to
the Speedy Trial Act and Its Supervisory Powers ...................................................10

    A. CVRA "Victim" Status Is Not Required for the Court to Exercise Its Supervisory
Powers...........................................................................................................10

    B. This Court Possesses Power to Substantively Review the DPA ......................11

        1. This Court Possesses Power to Substantively Review the DPA Under the
Speedy Trial Act.......................................................................................11

        2. This Court Possess Power to Substantively Review the DPA Under its
Inherent Powers .......................................................................................15

    C. "Equitable" Considerations Do Not Preclude the Court from Requiring
Revisions to the DPA ....................................................................................17

CONCLUSION.............................................................................................................24

CERTIFICATE OF SERVICE .........................................................................................25

## **TABLE OF AUTHORITIES**

Cases

*Abraham v. Alpha Chi Omega*, 708 F.3d 614, 620 (5th Cir. 2013) ................................................. 21

*Bagby Elevator Co. v. Schindler Elevator Corp.*, 609 F.3d 768, 774 (5th Cir. 2010). ................ 21

*Balfour Beatty Rail, Inc. v. Kansas City S. Ry. Co.*, 173 F. Supp. 3d 363, 407–08 (N.D. Tex. 2016), aff'd as modified and remanded, 725 F. App'x 256 (5th Cir. 2018). ........................... 21

*Bank of Nova Scotia v. United States*, 487 U.S. 250, 264 (1988) ................................................. 15

*Bank of Saipan v. CNG Fin. Corp.*, 380 F.3d 836, 840 (5th Cir. 2004) ........................................ 21

*Clark v. Amoco Prod. Co.,* 794 F.2d 967, 971 (5th Cir.1986 ........................................................ 22

*In re Allen*, 701 F.3d 734, 735 (5th Cir. 2012) .......................................................................... 20, 22

*McNabb v. United States*, 318 U.S. 332, 347 (1943). .................................................................. 16

*Nautilus Ins. Co. v. S. Vanguard Ins. Co.*, 899 F. Supp. 2d 538, 549 (N.D. Tex. 2012)............... 22

*U.S. v. Bean*, 564 F.2d 700, 704 (5th Cir. 1977). ..................................................................... 13, 17

*U.S. v. Fokker Services, B.V.,* 818 F.3d 733 (D.C. Cir. 2016 ................................................ passim

*U.S. v. Jeter*, 315 F.3d 445, 447-48 (5th Cir. 2002)................................................................ 13, 17

*U.S. v. Merritt*, 36 F.3d 89 (5th Cir. 1994 ..................................................................................... 13

*U.S. v. Miles*, 10 F.3d 1135, 1139 (5th Cir.1993 ......................................................................... 13

*United States v. Batson*, 608 F.3d 630, 633 (9th Cir. 2010) ....................................................... 20

*United States v. Clem*, 422 F.Supp.3d 1105 (N.D.W.V. 2019 ..................................................... 11

*United States v. Hasting*, 461 U.S. 499, 505 (1983). .................................................................. 15

*United States v. HSBC Bank USA, N.A.,* 863 F.3d 125 (2d Cir. 2017), ........................... 11, 14, 16

*United States v. HSBC Bank USA, N.A.*, No. 12-cr-736, 2013 WL 3306161 (E.D.N.Y. July 1, 2013 ......................................................................................................................................... 11

*United States v. Milstein*, 401 F.3d 53, 63 (2d Cir. 2005) ........................................................... 20

*United States v. Milstein*, 401 F.3d 53, 63 n.3 (2d Cir. 2005) ..................................................... 20

*United States v. Saena Tech Corp.*, 140 F. Supp. 3d 11, 33 (D.D.C. 2015). ........................... 14, 15

Statutes

18 U.S.C. § 1112 ............................................................................................................................. 6

18 U.S.C. § 3161(h)(2), ...................................................................................................... 11, 12, 14

18 U.S.C. § 3771 ...................................................................................................................... 10, 20

Other Authorities

Andrew Tangel, *Boeing Posts Full-Year Loss Amid 737 MAX Setbacks*, WALL STREET JOURNAL, January 29, 2020, accessible at https://www.wsj.com/articles/boeing-falls-to-full-year-loss-11580302091 ............................................................................................................... 8

Ankush Khardori, *Settling a Killer Case for Almost Nothing*, INTELLIGENCER (Jan. 23, 2021), https://nymag.com/intelligencer/2021/01/boeing-settled-737-max-case-for-almost-nothing.html. ........................................................................................... 1, 2, 3, 23

Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 152 (2012 12

Boeing 737 MAX Crash-Victim Beneficiaries Compensation Fund Protocol, at 1, (June 21, 2021), https://boeing737maxcrash-victimbeneficiariescompensationfund.com/. ................... 19

Corporate Prosecution Registry ....................................................................................... 3

DOJ Press Release (Jan. 7, 2021), https://www.justice.gov/opa/pr/boeing-charged-737-max-fraud-conspiracy-and-agrees-pay-over-25-billion. ............................................... 6, 7

Google Finance - The Boeing Co. Information available at https://www.google.com/finance/quote/BA:NYSE?sa=X&ved=2ahUKEwis9pu0yIf2AhUNjIkEHS9RBV8Q3ecFegQIHBAe&window=5Y          8

Immunize, Merriam-Webster Dictionary, *available at* https://www.merriam-webster.com/dictionary/immunize ...................................................................... 5

Mary Miller, *More than Just a Potted Plant: A Court's Authority to Review Deferred Prosecution Agreements Under the Speedy Trial Act and Under Its Inherent Supervisory Power*, 115 MICH. L. REV. 135, 165 (2016) ...................................................................... 13, 16

Matt DeLisi et al., *Murder by Numbers: Monetary Costs Imposed by a Sample of Homicide Offenders*, 21 J. FORENSIC, PSYCHIATRY & PSYCHOLOGY 501 (2010) ..................................... 18

Peter R. Reilly, *Corporate Deferred Prosecution as Discretionary Injustice*, 2017 UTAH L. REV. 839, 857–59 (2017 ................................................................................................. 16

Peter R. Reilly, *Sweetheart Deals, Deferred Prosecution, and Making a Mockery of the Criminal Justice System*, 50 ARIZ. L. J. 1113, 1123 (2018) ................................................... 16

The Design, Development & Certification of the Boeing 737 MAX Final Committee Report prepared for the House of Representatives Committee on Transportation and Infrastructure at p. 209-11, accessible at https://transportation.house.gov/imo/media/doc/2020.09.15%20FINAL%20737%20MAX%20Report%20for%20Public%20Release.pdf ............................................................... 8

**REPLY IN SUPPORT OF MOTION OF NAOISE CONNOLLY RYAN ET AL., REPRESENTATIVES OF THE VICTIMS OF THE CRASHES OF LION AIR FLIGHT JT610 AND ETHIOPIAN AIRLINES FLIGHT ET302, FOR EXERCISE OF THIS COURT'S SUPERVISORY POWER OVER THE DEFERRED PROSECUTION AGREEMENT**

Naoise Connolly Ryan, et al. (the "victims' families")[1], through undersigned counsel, file this reply in support of their motion (Dkt. 17) for this Court to exercise its supervisory power over the Boeing Deferred Prosecution Agreement ("DPA").

## <u>INTRODUCTION</u>

In this case, the Government and Boeing have chosen to lodge a DPA on this Court's docket. As a result, the question before this Court is whether to approve the DPA in its current form. Several aspects of the DPA warrant this Court's close scrutiny—and rejection—under the Speedy Trial Act and this Court's supervisory powers.

This DPA has been described by a former attorney in the Justice Department's Fraud Section as "one of the most unusual and ill-conceived corporate criminal settlements in American history."[2] In the first part of this reply, the victims' families explain several extraordinary features of the DPA that this Court should scrutinize. These include the highly unusual decision to affirmatively exonerate Boeing's senior management, granting Boeing broad immunity for unspecified crimes, crediting Boeing with paying airline customers it was already contractually obligated to pay, and permitting Boeing and the DOJ to enter into the DPA without ever conferring with victim's families.

---

[1] In addition to Ms. Ryan, the other victims' family members filing this brief are Emily Chelangat Babu and Joshua Mwazo Babu, Catherine Berthet, Huguette Debets, Luca Dieci, Bayihe Demissie, Sri Hartati, Zipporah Kuria, Javier de Luis, Nadia Milleron and Michael Stumo, Chris Moore, Paul Njoroge, Yuke Meiske Pelealu, John Karanja Quindos, Guy Daud Iskandar Zen S., and others similarly situated.

[2] Ankush Khardori, *Settling a Killer Case for Almost Nothing*, INTELLIGENCER (Jan. 23, 2021), https://nymag.com/intelligencer/2021/01/boeing-settled-737-max-case-for-almost-nothing.html.

In the second part of this reply, the victims' families demonstrate that, because the DPA currently rests on this Court's docket, this Court has authority to review its provisions. This power has been explained by several persuasive district court opinions. While the Fifth Circuit has yet to squarely address this Court's authority over the DPA, long-standing Fifth Circuit precedent regarding plea bargains supports the conclusion that this Court possesses authority to review the DPA's provisions. Accordingly, the Court should flag several questionable provisions in the DPA for further negotiation by the parties—and conferral with the victims' families—before finally deciding whether to approve the DPA. Such an approach would not raise any question about the DPA's victim compensation fund since those funds are not implicated in the current proceedings.

## ARGUMENT

### I. Several Key Aspects of the DPA Warrant this Court's Close Scrutiny.

Both the Government and Boeing paint a rosy picture that the DPA was a good deal for the victims' families. But, in truth, "the deal [was] a triumph for Boeing and its executives without precedent." Khardori, *supra.* Perhaps Boeing's triumph was unsurprising, as the Government failed to confer with the victims' families while negotiating with Boeing's numerous attorneys. Several remarkable features of the DPA now demand careful inspection by the Court.

### A. Affirmatively Exonerating Boeing's Senior Management.

After describing Boeing's conspiracy crime, the DPA states that "the misconduct was neither pervasive across the organization, nor undertaken by a large number of employees*, nor facilitated by [Boeing's] senior mismanagement*." DPA at ¶ 4(h) (emphasis added). This exonerating language is extraordinary. When presented with this language, one of the nation's foremost experts on DPAs—Professor Brandon Garrett of Duke Law School—stated that he could "not recall ever seeing language of this sort." Khardori, *supra.* Professor Garrett is in a good position to know whether the Justice Department commonly employs language such as this. He

founded and helps maintain the "Corporate Prosecution Registry," which is designed to provide comprehensive and up-to-date public information on federal organizational prosecutions in the United States. *See* https://corporate-prosecution-registry.com/about/. The registry includes detailed information about every federal organizational prosecution since 2001, as well as deferred and non-prosecution agreements with organizations since 1990. *Id.*

Professor Garrett's conclusion that this exculpatory language is highly unusual is shared by Ankush Khardori, who until 2020 was an attorney in the Justice Department's Fraud Section—the same Justice Department unit that negotiated the DPA. He could not recall affirmative exculpation language like this in any other corporate criminal settlement. Khardori, *supra*. One reason exculpation is not usually included in a DPA is because it is virtually impossible to prove a negative—i.e., that no one higher up in a large corporation was culpable in a crime. In this case, so far as the victims' families have been able to determine, the Justice Department never even required Boeing's senior management to testify about their possible involvement in Boeing's crime of deceiving the FAA. As Mr. Khardori has concluded, "It is virtually inconceivable that the government investigated the company so thoroughly that it could fully exonerate 'senior management'—a phrase that the agreement does not even bother to define." *Id.*

To be sure, in theory the Justice Department could have somehow conducted an extraordinary investigation from the top to bottom of Boeing (one of the largest corporations in the world[3]) and then proven that senior management was uninvolved in the conspiracy. But tellingly, neither the Government nor Boeing have contested the victims' families proffered facts to the contrary.

---

[3] According to Wikipedia, Boeing is ranked 54th on the "Fortune 500" list.

In their initial CVRA enforcement motion, the victims' families advanced an extensive proffer of relevant facts. *See* Dkt. 52 at 5-16. The victims' families asserted that these facts were undisputed and that, if they were disputed, then this Court should hold an evidentiary hearing to resolve the issue. Dkt. 52 at 5 n.4. Both the Government and Boeing objected to an evidentiary hearing—but neither specifically responded to the families' proffer on these issues. As result, the following facts are undisputed and must be accepted by this Court in ruling on victims' families motions.

Among other things, Boeing's senior management and Board of Directors facilitated the misconduct giving rise to the 737 MAX crashes by providing no oversight, ignoring red flags, concealing wrongdoing from the FAA, and attempting to cover up their abdication of responsibility. Dkt. 52 at 14. To ensure it remained blissfully unaware, Boeing neglected to implement procedures for employees and management to voice safety concerns to its Board of Directors. *Id.* And when safety concerns were raised, employee warnings were either explicitly rejected by management or just ignored entirely. *Id.*

The misconduct described in the DPA of "Boeing Employee-1" and "Boeing Employee-2" is part of a pattern. *Id.* Both employees were driven by the "Program Directive" to minimize pilot training requirements for the MAX, and both employees were subject to financial pressures that broadly affected many other Boeing employees involved in the MAX project. *Id.* For example, a Boeing engineering manager complained to Boeing's Director of Global Operations about impossible deadlines and economic pressures, admitting: "I don't know how to fix these things . . . it's systemic. It's culture." *Id.* at 14-15.

Boeing's Board and leadership allowed severe, endemic safety issues to fester by consciously taking a position of willful ignorance. *Id.* at 15. Most alarmingly, Boeing's Board of

Directors *knew* of the 737 MAX's safety issues before the second crash and still failed to take meaningful action. *Id.* By February 2019, the Board was aware that there was a Justice Department investigation underway. *Id.* Nevertheless, at its February Board meeting, the Board affirmatively decided to delay its investigation into the 737 MAX, notwithstanding publicly reported concerns about the airplane's safety. *Id.* The Board's official policy was to bury its head in the sand. *Id.* And there is ample evidence that the Board publicly lied about if and how it monitored the 737 MAX's safety. *Id.* In short, Boeing's leadership directly participated in the type of deceit for which Mr. Forkner has now been indicted—and its leadership could fully understand the horrendous public safety risks its deception created. *Id.*

### B.  Extending Immunity for Any of the Conduct in the Statement of Facts.

Not only did the DPA affirmatively—and contrary to undisputed facts—exonerate senior management, but it also extended broad immunity from prosecution for unspecified crimes stemming from Boeing's deception of the FAA AEG. The DPA provides that the Government "will not bring any criminal or civil case against [Boeing] relating to any of the conduct as described in the attached Statement of Facts or the Information filed pursuant to this Agreement." DPA ¶ 20. The DPA offers no reason for this broad immunity provision.[4]  Furthermore the Government goes on to agree "that any prosecution of [Boeing] for the conduct set forth in the attached Statement of Facts or Information will be and hereby is deferred for the Term. . . . Six months after the

---

[4] The Government claims that the victims' families have inaccurately characterized the DPA as an "immunity agreement." *See* Dkt. 60 at 2. This claim elevates form over substance. The DPA's plain language provides that, after the terms of the DPA expires, the Government agrees "not [to] bring any criminal or civil case against [Boeing] relating to any of the conduct as described in the . . . Statement of Facts or the Information[.]" DPA at 14. In other words, the DPA "immunizes" Boeing by in legal effect protecting it from further prosecution. *See* Immunize, Merriam-Webster Dictionary ("to provide with protection against or immunity from something"), *available at* https://www.merriam-webster.com/dictionary/immunize.

Agreement's expiration, the [Government] shall seek dismissal with prejudice of the [Criminal] Information filed against [Boeing] … and agree[s] not to file charges in the future against [Boeing] based on the conduct described in this Agreement, the attached Statement of Facts, or the Information." DPA ¶¶ 24-25.

The DPA does not bother to itemize which crimes its immunizing. This studied ambiguity turns the DPA into a chameleon. For example, in its press release trumpeting the agreement, the Department broadly claims that "[t]his landmark deferred prosecution agreement will forever serve as a stark reminder of the paramount importance of safety in the commercial aviation industry, and that integrity and transparency may never be sacrificed for efficiency or profit."[5] But when responding to victims' families' CVRA motion, the Government takes the position that only FAA bureaucrats were harmed by Boeing's conspiracy—not the victims' families.

The DPA's plain terms, however, prevent prosecution for federal crimes such as manslaughter, e.g., 18 U.S.C. § 1112, to the extent those crimes involve *any* of Boeing's acts that relate to "defraud[ing], impair[ing], obstruct[ing], defeat[ing], and interfer[ing] with the FAA AEG's lawful function to evaluate MCAS and to include information about MCAS in the 737 MAX FSB Report"—regardless of when, how, or by whom such acts were committed. DPA ¶ 42. This broad language means that a manslaughter prosecution of Boeing for any of these vaguely defined actions is precluded by the agreement. And, obviously, the victims' families killed loved ones would be "victims" of manslaughter crimes as a result of these very acts.

The Government itself made an unmistakable causal connection between Boeing's conduct in the Statement of Facts and these deaths, inferring crimes other than fraud against FAA AEG. It

---

[5] DOJ Press Release (Jan. 7, 2021), https://www.justice.gov/opa/pr/boeing-charged-737-max-fraud-conspiracy-and-agrees-pay-over-25-billion.

said in a press release announcing the DPA that "[t]he tragic crashes of Lion Air Flight 610 and Ethiopian Airlines Flight 302 exposed fraudulent and deceptive conduct by employees of one of the world's leading commercial airplane manufacturers."[6] And the Government stated that "[t]he misleading statements, half-truths, and omissions communicated by Boeing employees to the FAA impeded the government's ability to ensure the safety of the flying public." [7]

The Government's failure to be forthright about exactly what crimes it is immunizing has produced a DPA wrought with ambiguity, setting up this Court to navigate future disputes about what criminal conduct is immunized by the agreement. The DPA should have more precisely and narrowly specified what crimes were immunized, by, for example, eliminating the exoneration clause and limiting the immunity clause to the crimes of fraud on the FAA AEG not resulting in death.

### C.  Counting Funds Boeing Was Contractually Obligated to Pay Anyway.

In its January 7, 2021, press release, the Government told that world that "Boeing will pay a total criminal monetary amount of over $2.5 billion, composed of … compensation payments to Boeing's 737 MAX airline customers of $1.77 billion…"[8] Yet, on close inspection, the DPA states that the "Airline Compensation Amount shall be offset by any payments already made by the Company, as of the date this Agreement is fully executed, to any of its airline customers for the direct pecuniary harm that its airline customers incurred as a result of the grounding of the Company's 737 MAX." DPA ¶ 12. Thus, both the DPA and the press release ignore the fact that, as was reported in the media one year before, Boeing had already settled at least $1.4 billion in

---

[6] *Id.*

[7] *Id.*

[8] *Id.*

customer compensation claims and "projected a total bill of $8.8 billion, excluding potential payments to victims' families or the results of multiple probes being conducted by authorities."[9]

The Government deceptively tried to take credit for these monies that not only were owed contractually, and independently of any investigation, but also had already been paid by the time the DPA was executed. The only reason for listing these amounts in the DPA was to mislead the public into believing the Government had obtained a $2.5 billion criminal settlement. As made clear by the widespread criticism of this portion of the DPA, the Government needed those contractually obligated payments to bolster its actual settlement with Boeing of only $743.6 million—the $500 million price tag for the deaths of 346 victims and a $243.6 million fine that, according to the DPA, represents "Boeing's cost-savings" from the conspiracy. DPA ¶ 9(b).

Indeed, Boeing's crime put at risk the lives of countless other 737 MAX passengers for months after the Lion Air crash. Boeing's deception of the FAA prevented not only the immediate grounding the aircraft but allowed it to continue to deliver new aircraft for immediate use in spite of a report that another crash would certainly occur,[10] all for the sake of its soaring stock price.[11] The 157 passengers and crew on board the 737 MAX that was Ethiopian Airlines Flight 302 paid for this ongoing deception with their lives.

---

[9] Andrew Tangel, *Boeing Posts Full-Year Loss Amid 737 MAX Setbacks*, WALL STREET JOURNAL, January 29, 2020, accessible at https://www.wsj.com/articles/boeing-falls-to-full-year-loss-11580302091.

[10] The Design, Development & Certification of the Boeing 737 MAX Final Committee Report prepared for the House of Representatives Committee on Transportation and Infrastructure at p. 209-11, accessible at https://transportation.house.gov/imo/media/doc/2020.09.15%20FINAL%20737%20MAX%20Report%20for%20Public%20Release.pdf.

[11] Nine days before the Ethiopian Airlines crash, on March 1, 2019, Boeing's stock traded at a record high. Information available at https://www.google.com/finance/quote/BA:NYSE?sa=X&ved=2ahUKEwis9pu0yIf2AhUNjIkEHS9RBV8Q3ecFegQIHBAe&window=5Y.

**D.      The Government's Failure to Confer with Victims' Families.**

In addition to these substantive defects in the DPA, the DPA was procedurally flawed. In a separate motion—the CVRA Motion, Dkt. 52—the victims' families establish that the Government's failure to confer with the victims' families violated the Crime Victims' Rights Act. The Government has disputed that argument—while Boeing has not specifically addressed it. *See* Dkt 62 at 2. For purposes of this reply, even assuming the Government's objection about "victim" status is correct, the DPA still warrants exercise of this Court's supervisory power.

Regardless of whether the Government can technically wriggle out of its CVRA obligations to confer with the victims' families, the Government behavior warrants close scrutiny. The Government itself concedes this fact. In its response to the CVRA Motion, the Government "apologizes for not meeting and conferring with" the victims' families. Dkt. 58 at 1. Presumably the reason for this apology is that the Government now agrees that it was morally offensive for it to finalize a DPA without even discussing it with those who had family killed in the crashes.

Indeed, not only did the Government fail to discuss the DPA with victims' families, it outrageously provided "inaccurate" information about the existence of the Government's investigation. Dkt.58 at 18-19. The Government does not bother to explain how this "inaccurate" information came to be provided to the victims' families—by the Department's Victims' Rights Ombudsman of all people.

This shocking deception and failure to confer with the families is so bad that the Government has promised to put in place formal policies to make sure that they never happens again. Dkt. 58 at 8. But even assuming that the Department drafts new rules that will prospectively prevent such outrages in the future, those rules will not bring any measure of relief to the victims'

families in this case. This Court, however, can and should redress the Government's failures by closely scrutinizing the DPA.

## II. This Court Is Empowered to Review and Withhold Approval of the DPA Pursuant to the Speedy Trial Act and its Supervisory Powers.

Clearly, this extraordinary DPA warrants close scrutiny. Indeed, it is noteworthy that the Government and Boeing spill little ink trying to defend the DPA. Instead, the parties maintain that this Court is powerless to even inquire into the deal, both because the Court has not yet ruled that the families represent "crime victims" and because the Court is powerless to examine the agreement. These arguments are meritless.

### A. CVRA "Victim" Status Is Not Required for the Court to Exercise Its Supervisory Powers.

In oppositions to this particular motion, the Government (and Boeing) rehash their arguments that the victims' families do not represent "crime victims" under the Crime Victims' Rights Act (CVRA), 18 U.S.C. § 3771. Of course, this is the central dispute in connection the victims' families' pending CVRA motion. *Compare* Dkt. 52 (arguing that the 346 victims of two Boeing 737 MAX crashes were "directly and proximately harmed" by Boeing's crimes), *with* Dkt. 58 (Government argues that there is insufficient evidence in the "record" to establish "victim" status); Dkt. 62 at 2 (Boeing agrees with the Government). The Court has granted the victims' families an opportunity to reply on these issues, and the families will file their reply and a supporting proffer of facts on March 4.

But this motion does not hinge on whether the families represent protected CVRA "crime victims." Instead, this motion turns on whether the Court should exercise its own power to review the DPA. The victims' families need not represent "crime victims" to provide helpful information to the Court about why the agreement needs examination.

This conclusion is supported by various cases where courts have exercised supervisory power over DPAs on behalf of persons who are not "crime victims." For example, in *United States v. Clem*, 422 F.Supp.3d 1105 (N.D.W.V. 2019), the district court sua sponte reviewed a deferred prosecution agreement—ultimately rejecting the agreement. The case involved a violation of public trust by state magistrate judges who had been elected by the residents of two West Virginia counties. The district court did not conclude that the residents were "victims" of the charged crime. But, nonetheless, the district court found that the Government's proposed DPA did not fully consider the egregiousness of the defendants' conduct and that the court's integrity would be implicated if it allowed the DPA to move forward. This Court should do the same thing here.

Of course, once the victims' families establish that the DPA was orchestrated and executed in violation of the rights as "victims" under the CVRA, that would serve as an *additional* reason for reviewing the DPA here. But "victim" status is not required.

**B.    This Court Possesses Power to Substantively Review the DPA.**

*1.    This Court Possesses Power to Substantively Review the DPA Under the Speedy Trial Act.*

This Court has the power—and, indeed, the obligation—to review and decide whether to approve the DPA under the Speedy Trial Act. Under 18 U.S.C. § 3161(h)(2), "'a court is to exclude the delay occasioned by a deferred prosecution agreement, but only upon approval of the agreement by the court.'" *United States v. Clem*, 422 F.Supp.3d 1105, 1114 (N.D.W.V. 2019) (quoting *United States v. HSBC Bank USA, N.A.*, No. 12-cr-736, 2013 WL 3306161 (E.D.N.Y. July 1, 2013)).[12] This conclusion follows inexorably from the Act's plain language, which contains an

---

[12] In citing *HSBC Bank*, *Clem* noted that there were multiple decisions by the district court in that case connected to the DPA, one of which was later reversed by the Second Circuit. *See United States v. HSBC Bank USA, N.A.*, 863 F.3d 125 (2d Cir. 2017). However, having reviewed

explicit "approval of the court" provision:

> The following periods of delay shall be excluded in computing the time within which an information or an indictment must be filed, or in computing the time within which the trial of any such offense must commence: ... (2) Any period of delay during which prosecution is deferred by the attorney for the Government pursuant to written agreement with the defendant, *with the approval of the court*, for the purpose of allowing the defendant to demonstrate his good conduct.

18 U.S.C. § 3161(h)(2) (emphasis added).

Under section 3161(h)(2)'s plain language, what must be approved is the "written agreement with the defendant." The approval-of-the-court language follows immediately after the written-agreement language. And it is a standard canon of construction that "[w]hen the syntax involves something other than a parallel series of nouns or verbs, a prepositive or postpositive modifier normally applies only to the nearest reasonable referent." ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 152 (2012). This canon is known as the nearest-reasonable-referent canon. *Id.* Here the nearest reasonable referent to "with the approval of the court" is the "written agreement with the defendant." Thus, the congressional syntax makes clear that what requires court approval is the "written agreement."

The Government and Boeing provide no effective response to this interpretation. The Government's response does not even *cite* section 3161, much less provide a persuasive counterinterpretation. *See* Dkt. 60 at 1-5 (failing to cite or discuss the Speedy Trial Act).

So Boeing jumps into the breach, citing *U.S. v. Fokker Services, B.V.,* 818 F.3d 733 (D.C. Cir. 2016), for the proposition that no judicial review of a DPA is possible. Dkt. 62 at 7. But it is important to understand *Fokker's* unusual procedural posture. There, a district court judge had

---

the various decisions, *Clem* concluded that the district court's reasoning in rejecting the DPA was "sound" and should be followed. 422 F.Supp.3d at 1114 n.5. This Court should do the same here, particularly because (as discussed below) the Second Circuit's reasoning relies on principles concerning reviewing plea bargaining at odds with controlling Fifth Circuit precedent.

rejected the Government's motion to exclude time under the Speedy Trial Act on grounds that the prosecutors should have "brought different charges or sought different remedies." *Id.* at 746. In this case, the victims' families are not asking this Court to reject the DPA on grounds that the prosecutors should have "brought different charges." Instead, the victims' families directly attack the DPA itself on various grounds. Thus, while *Fokker* may be correct that a district court should not "assume the role of the Attorney General" in deciding which criminal *charges* are appropriate, *id.* at 747, that does not mean that a district court lacks any role to play when an *agreement* resolving a particular criminal charge is brought before it. *See* Mary Miller, *More than Just a Potted Plant: A Court's Authority to Review Deferred Prosecution Agreements Under the Speedy Trial Act and Under Its Inherent Supervisory Power*, 115 MICH. L. REV. 135, 165 (2016) ("Broad executive power to decline to prosecute is categorically different from the decision to negotiate a DPA, where charges will be brought and courts will be tasked with enforcing them.").

A district court's role in evaluating an agreement concerning the disposition of charges is well established in this Circuit. As the victims' families explained in their initial motion (Dkt. 17 at 6), it has long been the law of the Fifth Circuit that a district court may properly reject a plea agreement that results in "too light a sentence under the circumstances." *United States v. Bean*, 564 F.2d 700, 704 (5th Cir. 1977). Thus, as the Fifth Circuit has repeatedly held, "A district court is free, of course, to reject a plea agreement, and may express its reasons for doing so. The failure of a plea bargain to provide for the imposition of an appropriately severe sentence under the circumstances is a sound reason for a court to reject it." *United States v. Merritt,* 36 F.3d 89 (5th Cir. 1994) (citing *United States v. Miles,* 10 F.3d 1135, 1139 (5th Cir.1993)). Accordingly, in this Circuit, a district court's "belief" that a defendant will "receive too light a sentence is a sound reason for rejecting a plea agreement." *United States v. Jeter,* 315 F.3d 445, 447-48 (5th Cir. 2002).

In light of this well-developed Fifth Circuit precedent, the D.C. Circuit's decision in *Fokker* is inapplicable. *Fokker* noted the clear analogy between the judicial review of a plea bargain and the judicial review of a DPA. 818 F.3d at 745-46. But *Fokker* concluded that, in the D.C. Circuit, trial judges were "not free to withhold approval of guilty pleas … merely because their conception of the public interest differs from that of the prosecuting attorney." 818 F.3d at 745 (internal quotation omitted). In this Circuit, as noted in the four Fifth Circuit decisions collected in the previous paragraph, a trial court *is free* to withhold its approval of a plea agreement merely because it results in "too light a sentence under the circumstances." Thus, regardless of how sound *Fokker*'s reasoning may be in the D.C. Circuit, it conflicts with controlling Fifth Circuit precedents.[13]

Against that backdrop, this Court's order excluding time under the Speedy Trial Act (Dkt. 13) did not involve the necessary judicial review—much less approval—of the DPA. In asking a court to approve a DPA, the Government effectively asks the court "to place its formal imprimatur on the agreement[,] to hold open [a] federal criminal case[,] and to make various findings with respect to the Speedy Trial Act." *United States v. Saena Tech Corp.*, 140 F. Supp. 3d 11, 33 (D.D.C. 2015). The Court's order, which appears to merely rubber-stamp a request from the Government and Boeing, states that "finding in accordance with 18 U.S.C. § 3161(h)(2) that the prosecution has been deferred by the attorney for the Government for the purpose of allowing [Boeing] to demonstrate its good conduct, it is hereby … ORDERED that this Court approves the exclusion from the computation of time in which a trial must be commenced under the Speedy Trial Act a period of 3.5 years from the date on which the Information was filed." Dkt 13. The Court's order merely (and without substantive explanation) approves "the exclusion" of time from a Speedy Trial

_____

[13] For the same reason, the Second Circuit's decision in *United States v. HSBC Bank USA, N.A.,* 863 F.3d 125 (2d Cir. 2017), is inapplicable. The Second Circuit simply followed the reasoning of *Fokker* in reaching its conclusion. *See id.* at 138-39 (citing and discussing *Fokker*).

Act calculation. For all the reasons explained above, what the Speedy Trial Act requires is not approval of a time period but rather of the Government's "written agreement with the defendant." 18 U.S.C. § 3161(h)(2). The Court has yet to give that approval. And, for all the reasons explained here and in the victims' families' initial motion, the Court should withhold its approval.

2. *This Court Possesses Power to Substantively Review the DPA Under Its Inherent Powers.*

The victims' families' motion correctly explained—and Boeing and the DOJ do not dispute—that the federal courts have certain inherent supervisory powers over criminal matters on their dockets. *See Bank of Nova Scotia v. United States*, 487 U.S. 250, 264 (1988) (Scalia, J., concurring) ("[E]very United States court has an inherent supervisory authority over the proceedings conducted before it[.]"). And as the Supreme Court has explained, there are three core purposes underlying the use of these supervisory powers: First, courts may use such powers to "implement a remedy for violation of recognized rights[.]" *United States v. Hasting*, 461 U.S. 499, 505 (1983). Second, courts may—and in some cases must—employ their supervisory powers "to preserve judicial integrity[.]" *Id.* Finally, courts may use their supervisory powers "as a remedy designed to deter illegal conduct[.]" *Id.*

As noted in the victims' families' initial motion, a DPA—particularly one that violates the CVRA—implicates all three of these considerations, not least because a DPA asks the court "to place its formal imprimatur on the agreement[.]" *United States v. Saena Tech Corp.*, 140 F. Supp. 3d 11, 33 (D.D.C. 2015). Boeing nevertheless contends that this Court lacks any authority to reject a DPA—no matter how outrageous it might be. Dkt. 62 at 10. Indeed, Boeing's response sweepingly asserts that this Court lacks the authority to even "supervise . . . a DPA." *Id.* This claim misstates the law. The DPA is a legal document purporting to resolve criminal charges filed on this Court's docket, which necessarily implicates the Court's supervision. The DPA contemplates that

this matter will conclude with a "dismissal with prejudice of the Information filed against [Boeing] …." DPA at 16. That contemplated dismissal would be accomplished by a motion that this Court would necessarily need to determine whether to grant or deny. In other words, this DPA will require this court "[to] become [an] instrument of law enforcement." *McNabb v. United States*, 318 U.S. 332, 347 (1943).

Boeing and the Government are also incorrect in their apparently narrower assertion that this Court lacks the inherent authority to *reject* a DPA. For decades, the Government has recognized that exactly the opposite is true: in DPAs filed with courts across the country, the government acknowledged that courts could accept or reject a DPA "for any reason." *See* Peter R. Reilly, *Corporate Deferred Prosecution as Discretionary Injustice*, 2017 UTAH L. REV. 839, 857–59 (2017) (collecting several DPAs). Notably, the Government's response does not rebut—or even engage with—Professor Reilly's observation. Instead, the Government has simply taken a position in this matter that is contrary to the one it has taken in numerous previous DPAs.

Boeing and the Government point out that two circuits have rejected the use of supervisory powers to invalidate DPAs. *See United States v. Fokker Servs. B.V.*, 818 F.3d 733 (D.C. Cir. 2016); *United States v. HSBC Bank USA, N.A.*, 863 F.3d 125 (2d Cir. 2017). But as Boeing correctly observes, the Fifth Circuit has never adopted this reasoning. *See* Dkt. 62 at n.2. And scholarly observers have identified persuasive reasons why the *Fokker* and *HSBC* cases were wrongly decided. *See*, *e.g.*, Peter R. Reilly, *Sweetheart Deals, Deferred Prosecution, and Making a Mockery of the Criminal Justice System*, 50 ARIZ. L. J. 1113, 1123 (2018) (citing the concerns of jurists, members of Congress, and scholars including Richard Epstein that unsupervised DPAs endow prosecutors with the powers of judges and juries, and therefore violate the separation powers); Miller, *supra*, 115 MICH. L. REV. at 170 (concluding that "district courts are empowered to

substantively review DPAs for fairness, drawing upon the statutory grant of that authority in the Speedy Trial Act and the supervisory power of courts.").

More important, Fifth Circuit jurisprudence strongly suggests that district courts *may* use supervisory powers to invalidate unlawful or otherwise improper DPAs. As explained above, it has long been the law in this Circuit that district courts can reject a plea agreement that would result in "too light a sentence under the circumstances." *See United States v. Bean*, 564 F.2d 700, 704 (5th Cir. 1977); *accord, e.g., United States v. Jeter,* 315 F.3d 445, 447-48 (5th Cir. 2002). This well-established reasoning does and should extend to DPAs. As noted in the victims' families' motion, DPAs are in all material respects analogous to plea agreements: they necessarily entail an assessment of the adequacy of punishment, which is a squarely judicial function; the court's rejection of a DPA presents the Government with the same options as where a court rejects a plea agreement; and both DPAs and plea agreements involve the need to protect judicial integrity as well as the public interest. Dkt. 17 at 6-7.

Notably, neither Boeing nor the Government engage with *Bean* and its Fifth Circuit progeny. This Court should follow *Bean*'s principles and reject the DPA because it results, in effect, in "too light a sentence." 564 F.2d at 704.

### C.   "Equitable" Considerations Do Not Preclude the Court from Requiring Revisions to the DPA.

Finally, Boeing argues that "important equitable considerations" preclude this Court from withholding its approval of the DPA at this point in the case. Dkt. 62 at 14. While Boeing is vague about precisely what it means, Boeing appears to be threatening to demand repayment of $500 million from the victims' families if this Court exercises its supervisory powers over the DPA. The Government raises similar concerns on behalf of Boeing. Dkt. 60 at 4 ("… the Government continues to have significant concerns about whether [the Court withholding approval of the DPA]

17

would require individuals who received compensation from the Crash-Victims Beneficiaries fund to repay Boeing.")

This Court should emphatically reject this offensive threat. For starters, the victims' families are not challenging the payments in any way. Boeing does not explain how this Court's consideration of whether to approve the DPA between the Government and Boeing—something that the law already requires—implicates the funds. It is important to recall that the Government and Boeing secretly negotiated among themselves to create the fund, excluding from their discussions the persons most affected: the families. As a result, it is unclear how the Government and Boeing arrived at a $500 million compensation figure for 346 families (less than $1.5 million per family). That figure is far, far below what would seem to be reasonable. *Cf.* Matt DeLisi et al., *Murder by Numbers: Monetary Costs Imposed by a Sample of Homicide Offenders*, 21 J. FORENSIC, PSYCHIATRY & PSYCHOLOGY 501 (2010) (when all ramifications are considered, the average "cost" of a homicide exceeded $17.25 million and approached $24 million).

If this Court concludes that it should withhold its approval of certain non-monetary aspects of the DPA, that finding would not trigger any obligation by 346 victims' families to repay limited funds provided by Boeing. Most obviously, the victims are not a party to the DPA, which is an agreement only between the Government and Boeing. *See* DPA at pp. 24-27 (signatures on the DPA by the Government and Boeing). The victims' families have assumed no obligations under the DPA.

Moreover, nothing in the DPA indicates that Boeing's payments could ever be recovered. To the contrary, the DPA specifically required Boeing to promptly (within ten business days) pay funds into an "escrow account." *See* DPA ¶ 13. The escrow account was obviously designed to preclude Boeing from unfairly attempting to demand repayment from victims' families scattered

18

around the globe from Addis Ababa to Jakarta. Indeed, the funds' distribution protocol specifically stated that "no money from the Compensation Fund will be returned to Boeing." Boeing 737 MAX Crash-Victim Beneficiaries Compensation Fund Protocol, at 1, (June 21, 2021), https://boeing737maxcrash-victimbeneficiariescompensationfund.com/.

In addition, the victims' families were told that accepting the money would never be used against them by Boeing: "Boeing will not use the fact that any [family member] who seeks or receives any compensation from the Compensation Fund … [to] preclude any such [family member] from pursuing any other lawful claim that he/she may have against Boeing." *Id.*

Finally, the victims' families never gave any contractual "consideration" for accepting the funds. Instead, Boeing gratuitously placed its funds into the escrow account specified in the DPA before the Court had approved the DPA. The reason why Boeing paid the funds seems clear: Boeing was attempting to create a "poison pill" that would preclude a victims' challenge to the DPA. No doubt Boeing reasoned that, if any of the victims' families challenged the DPA, that could have possibly imperiled distributing the funds—dividing the victims' families and making a successful court challenge more difficult. This Court should reject such a morally objectionable tactic. Boeing should not be allowed to use its wealth to construct a DPA less susceptible to judicial review than other, less wealthy defendants.

For all these reasons, Boeing would have no legal right to somehow demand any repayment from any of the victims if this Court withholds its approval of the DPA. Indeed, Boeing makes no such claim. Instead, Boeing argues that this Court might somehow rely on alleged "equitable considerations" (Dkt. 62 at 14) to judicially craft a right for repayment. But American courts have no such "equitable" powers to demand that crime victims repay an admitted criminal for funds that it has gratuitously placed in escrow. This Court should reject Boeing's attempt to embroil the

judiciary in a vaporous threat.

Boeing also raises a similar equitable claim that the families' motion is somehow untimely. While Boeing concedes that "the CVRA does not contain time limits for motions to be filed" (Dkt. 62 at 18), Boeing suggests that the Act implicitly imposes time limits. The victims' families will address this specific point at greater length in their reply supporting their CVRA motion. But it is worth pointing out here that both Boeing (and the Government) neglect to cite the controlling Fifth Circuit precedent on this issue. The Fifth Circuit has squarely held that "[t]he CVRA does not contain a time limit within which putative crime victims must seek relief in the district court. The only time limit discussed in the statute applies when a victim seeks 'to re-open a plea or sentence.' Because [the victims] are not seeking to reopen a plea or sentence, that provision is inapplicable." *In re Allen*, 701 F.3d 734, 735 (5th Cir. 2012) (citing 18 U.S.C. § 3771(d)(5) (rejecting argument that victims' seeking to overturn a district court order that they were not "crime victims" entered four years earlier had acted too slowly).

Since the CVRA imposes no time limit for victims to file motions such as those at issue here, Boeing instead seems to be advancing some sort of laches argument—i.e., that the victims' families waited too long to bring their action for the Court to review the DPA. Dkt. 62 at 13-14. Such a laches argument is unavailable to criminal defendants. *See, e.g., United States v. Milstein*, 401 F.3d 53, 63 (2d Cir. 2005) (We have "found no case applying a laches defense in the criminal context"); *see also United States v. Batson*, 608 F.3d 630, 633 (9th Cir. 2010) ("Like the Second Circuit, '[w]e have found no case applying a laches defense in the criminal context.'") (alteration in original) (quoting *United States v. Milstein*, 401 F.3d 53, 63 n.3 (2d Cir. 2005) (per curiam)). For criminal defendants, "the relevant statute of limitations, as well as the speedy trial safeguards of the Due Process Clause serve to protect a defendant's interests against unreasonable delay."

*United States v. Milstein*, 401 F.3d 53, 63 (2d Cir. 2005) (internal citations omitted).

This Court should also reject Boeing's laches argument for the additional reason that it seeks equitable relief, and Boeing comes before this Court with unclean hands. The Fifth Circuit has explained that that the "clean hands doctrine requires that one who seeks equity, does equity." *Bagby Elevator Co. v. Schindler Elevator Corp.*, 609 F.3d 768, 774 (5th Cir. 2010). This means that the "unclean" hands doctrine is an affirmative defense to equitable relief. *See Bank of Saipan v. CNG Fin. Corp.*, 380 F.3d 836, 840 (5th Cir. 2004) ("all equity-oriented actions[] carr[y] with [them] the affirmative defense of 'unclear hands'"); accord *Abraham v. Alpha Chi Omega*, 708 F.3d 614, 620 (5th Cir. 2013) (reaffirming that "a laches defense cannot be asserted by a party with unclean hands because [the defense] is equitable")). The unclean-hands doctrine applies when a party's conduct "has been unconscientious, unjust, marked by a want of good faith, or violates the principles of equity and righteous dealing." *Bank of Saipan*, 380 F.3d at 840 (internal citations omitted); *Balfour Beatty Rail, Inc. v. Kansas City S. Ry. Co.*, 173 F. Supp. 3d 363, 407–08 (N.D. Tex. 2016), aff'd as modified and remanded, 725 F. App'x 256 (5th Cir. 2018).

Even if Boeing—a confessed criminal—is allowed to enter a court of equity, it cannot prevail; the balance of equities tips decisively in favor of the victims' families. On the one hand, Boeing seeks to prevent this Court's scrutiny of the victims' families claims based on an alleged delay of a matter of months in making filings in a complicated case in a complicated procedural posture. On the other hand, Boeing has engaged in criminal conspiracy over many years, ultimately killing 346 innocent people as a result. And the reason for Boeing's conspiracy of defrauding the FAA was for financial gain. Dkt. 4 at A-5. Under withering questioning from Senator Ted Cruz, Boeing's former CEO (Dennis Muilenburg) admitted to Congress that he was aware of improper conduct prior to the crash of ET 302 (*see* Dkt. 56-1 at Appx. 082), and yet, Boeing did not share

this alarming information with the FAA or the public before the second crash. To make matters worse, Boeing originally concealed this information from the Justice Department. *See* Dkt. 4 at 4 (Boeing did not "timely and voluntarily disclose to the Fraud section the offense conduct described in the Statement of Facts"). Internally, at a Boeing Board meeting in February 2019, the Board decided not to conduct its own confidential investigation into the safety of the MAX despite ample warning of the danger. Dkt. 52 at 15. The undisputed facts here show that Boeing's Board member's approach was to bury their heads in the sand: "The Lion Air Crash and its causes were widely reported in the media; those reports reached the Board; and the Board ignored them." *Id.* At the same time, Boeing leadership was aware of the Justice Department's investigation and deliberately refused to cooperate for six months. *Id.* at 8, 15. During those six months, Boeing's "response frustrated the Fraud Section's investigation." *Id.* at 8. Boeing has consistently concealed its conduct, delayed and frustrated investigations, and negotiated in secret a DPA with terms that avoid real accountability. For all these reasons, the Court should not even begin to consider a laches defense from Boeing.

Moreover, if the Court were to entertain a laches argument, Boeing's suggestion must still be rejected because Boeing cannot establish the elements necessary for equitable relief. A laches defense "rests on two elements: (1) an unreasonable delay in bringing a claim although otherwise one has the legal or equitable right to do so, and (2) a good faith change of position by another, to his detriment, because of this delay." *Nautilus Ins. Co. v. S. Vanguard Ins. Co.*, 899 F. Supp. 2d 538, 549 (N.D. Tex. 2012) (citing *Clark v. Amoco Prod. Co.,* 794 F.2d 967, 971 (5th Cir.1986)).

First, the victims' families did not unreasonably delay in making their filings. *See In re Allen*, 701 F.3d 734, 735 (5th Cir. 2012) (rejecting argument that victims seeking to overturn a district court order that they were not "crime victims" entered four years earlier had acted too

22

slowly). Boeing argues that because the victims' families became aware of the DPA when it was publicly announced, they were obligated to move forward to challenge the DPA immediately. But Boeing does not explain exactly how the grieving families scattered around the globe—without notice of or understanding about crime victims' rights in federal criminal proceedings—would have been able to effectively do that without first securing specialized American legal counsel. To be sure, for the last several years, the victims' families have had counsel in their *civil* cases against Boeing. But the victims' families did not obtain counsel in this criminal case until the end of November 2021. *See, e.g.,* Appx. 2 (Noaise Ryan secured counsel in this criminal case on November 23, 2021). The reason for this difficulty in securing counsel is easy to understand. In a criminal case such as this one, contingency fee compensation is not possible. Thus, effective representation for crime victims in criminal matters typically will involve pro bono legal counsel, such as counsel here (Professor Cassell). Once the victims' families secured knowledgeable American legal counsel who understood crime victims' rights issues and the complex procedural path forward, the families promptly filed their challenges.

Second, Boeing claims that it has "taken significant actions to ensure compliance with the terms of the DPA" and that unwinding the agreement now would be inequitable. Dkt. 62 at 19. However, Boeing negotiated its DPA in secret—a fact for which the Government has now directly apologized. *See* Dkt. 58 at 1 ("the Government apologizes for not meeting and conferring with [the victims' families] before entering into the DPA"). And in addition, as the victims' families will prove, the Government and Boeing's secrecy violated the CVRA. *See* Victims' Families CVRA Mot., DE 52. Moreover, as knowledgeable observers have already described (*see* Khardori, *supra),* the DPA's terms were highly irregular, amounting to a mere slap on the wrist for a crime producing the deaths of 346 innocents. Thus, Boeing's purported compliance with the DPA's minimal and

wrongfully negotiated requirements does not amount to a good faith change in position because of any delay on the part of the victims' families.

In sum, the victims' families are not seeking to somehow "unwind" (Dkt. 62 at 14) the DPA's victim compensation fund provisions. Instead, the victims' families ask only that this Court decline to approve the DPA in its current form and state its reasons for withholding approval, pending further discussions between the Government, Boeing and the victims' families. *See Clem*, 422 F. Supp. 3d at 1115–16 (articulating reasons for disapproval); *Fokker Servs.*, 79 F. Supp. 3d at 167 (same). Withholding the Court's approval would allow substantively crafting a more appropriate DPA and procedurally involving the victims' families.

## **CONCLUSION**

For the reasons explained above, the unprecedented DPA in this case demands this Court's close scrutiny. This Court must use its authority under the Speedy Trial Act and its inherent supervisory powers to ensure that justice is properly administered and that the DPA is reformed. The Court should withhold its approval of the DPA until contains penalty provisions commensurate with harms Boeing's conspiracy created and is negotiated transparently with the involvement of the victims' families.

Dated: February 18, 2022

Respectfully submitted,

/s/ Warren T. Burns

Warren T. Burns (Texas Bar No. 24053119)
Burns Charest, LLP
900 Jackson Street
Suite 500
Dallas, TX 75202
469-904-4550
wburns@burnscharest.com

Paul G. Cassell (Utah Bar No. 06078)
(Counsel of Record)
Utah Appellate Project
S.J. QUINNEY COLLEGE OF LAW
University of Utah
383 S. University St.
Salt Lake City, UT 84112
801-585-5202
cassellp@law.utah.edu
(no institutional endorsement implied)
(*pro hac vice*)

*Attorneys for Victims' Families*

## CERTIFICATE OF SERVICE

I certify that on February 18, 2022, the foregoing document was served on the parties to the proceedings via the court's CM/ECF filing system.

/s/  Paul G. Cassell
Paul G. Cassell

25