TED CRUZ
TEXAS

COMMITTEES:
FOREIGN RELATIONS
COMMERCE
JUDICIARY
RULES AND ADMINISTRATION
JOINT ECONOMIC COMMITTEE

## United States Senate

The Honorable Reed O'Connor
U.S. District Court for the Northern District of Texas
501 West 10th Street, Room 201
Fort Worth, TX 76102-3673

Re: *United States v. the Boeing Company*, Case No. 4:21-CR-00005-0

Dear Judge O'Connor:

I am writing as *amicus curiae* to share my concerns about the collusive deferred prosecution agreement ("DPA") recently submitted to this Court by the U.S. Department of Justice and the Boeing Company. *See* ECF No. 4. As explained below, the ongoing dispute about this DPA is important for at least two reasons. The first is obvious: the family members who have objected to the DPA are "victims" within the meaning of the Crime Victims' Rights Act ("CVRA" or "the Act"), 18 U.S.C. § 3771, and they have not received the process guarantees required by that Act. The second problem is that this case is illustrative of why collusive settlements are an increasingly serious problem in our legal system that require careful judicial attention and real consequences when the government fails to follow the law.

## 1.    The Families are "Victims" of Boeing's Criminal Conduct.

Boeing engaged in criminal conduct that defrauded government regulators and left hundreds of people dead in preventable plane crashes. The government's professed handwringing about who is actually a "victim" here is belied by the entire settlement. This is not a mine-run fraud case where some low-level employee lied or committed a technical violation; it is a long-running conspiracy that directly led to some of the worst air travel disasters of the 21st century. The deferred prosecution agreement is therefore a landmark settlement and, among other things, requires Boeing to pay $500 million to those who lost family members in the two plane crashes, including the families that the Justice Department now argues aren't really victims at all.  The government's position is simply nonsensical.

The CVRA defines "crime victim" as any person who has been "directly and proximately harmed as a result of the commission of a Federal offense." 18 U.S.C. § 3771(e)(2). As the victim's briefs explain at length, this includes the family members

SUITE 961
300 E. 8TH STREET,
AUSTIN, TX 78701
(512) 916-5834

SUITE 410
3626 NORTH HALL STREET,
DALLAS, TX 76219
(214) 599-8749

SUITE 9047
1919 SMITH STREET,
HOUSTON, TX 77002
(713) 718-3057

SUITE 1603
200 SOUTH 10TH STREET,
MCALLEN, TX 78501
(956) 686-7339

SUITE 950
9901 IH-10 WEST,
SAN ANTONIO, TX 78230
(210) 340-2885

SUITE 501
305 SOUTH BROADWAY,
TYLER, TX 75702
(903) 593-5130

SUITE SR-404
RUSSELL BUILDING
WASHINGTON, DC 20510
(202) 224-5922

of those who were killed in the two crashes—both because they were victims of criminal conduct that the government has agreed to not prosecute (such as voluntary manslaughter) and because it is likely that the crashes would never have occurred if Boeing had been honest with regulators about the problems with the Maneuvering Characteristics Augmentation System on the Boeing 737 MAX aircraft. If the government did not think these people were victims, it is hard to see why it thought a half-billion dollar compensation fund was appropriate. The Justice Department's attempt to have it both ways now is simply not credible.

What the victims complain of is exactly what the CVRA forbids: being excluded from the process and not treated with respect. Compensation is of course very important, and indeed a requirement of federal laws like the Mandatory Victim's Restitution Act, 18 U.S.C. § 3663A. But so is being heard. The government knows this, which is why it has tried to retroactively remedy its misconduct by holding meetings with victims, including the very unusual step of giving the victims a meeting with the Attorney General. Such meetings, however, cannot undo the fact that it appears to have excluded victims from the negotiation process and may have actively misled them. Belated meetings and an apology are no substitute for following the law, and this Court should say so.

This need not intrude on prosecutorial discretion. After all, the problem here is not that the Justice Department exercised its discretion, but that it did so in violation of Congressionally mandated procedural requirements that ensure that prosecutorial decisions are informed by the experiences of crime victims. It is important that the government does not walk away from this case with a mere slap on the wrist, especially since, as explained next, collusive settlements are an increasing problem in federal enforcement.

## 2. Collusive Settlements are Incompatible with the Rule of Law.

Busy courts understandably want to clear their dockets, and when a suit involves only private parties, basic principles of economics counsel in favor of deferring to their judgements about settlements. But in government enforcement proceedings— whether civil or criminal—it is important that Courts carefully scrutinize parties' agreements to make sure that they comply with federal law, serve the public interest, and protect the rights of victims. This is certainly true with respect to criminal cases, as the CVRA requires courts to "ensure" that victims are afforded their CVRA rights. 18 U.S.C. § 3771(b)(1).

It is also true more broadly, as collusive settlements are often used to achieve policy ends that Congress itself has not authorized or that embroil the Justice Department

in endless compliance monitoring, rather than following their congressionally required mission of searching out and prosecuting crimes.

This DPA has many such flaws. Like all DPAs, it hangs the threat of prosecution like a Sword of Damocles over the company so that it will comply with a laundry list of requirements that prosecutors think will remedy the harms and prevent future violations. But the "enhanced reporting requirements" set forth in Attachment D to the DPA are troublingly open-ended and are not grounded in any source of legal authority that the government cites in that agreement. Maybe the compliance program will be good; maybe it won't, but what is certain is that all the important decisions will be made behind closed doors, away from public accountability. *See* ECF No. 4, at 55 ("[T]he reports and the contents thereof are intended to remain and shall remain non-public" because "public disclosure of the reports could discourage cooperation, impede pending or potential government investigations and thus undermine the objectives of the reporting requirement."). This cedes enormous oversight authority to lawyers at the Justice Department. These lawyers may be experienced in criminal law, but they are not experts in corporate compliance for aeronautics companies, which is regulated by the FAA and financial regulators like the SEC. Nor has the government's conduct so far given much reason to believe that its lawyers will act in accordance with the law or in the public interest.

The DPA also puts the Justice Department in charge of who gets victim compensation. An "administrator" selected by the parties makes recommendations about who should receive payment and how much, but "[o]nly the Fraud Section [at the Justice Department] shall be empowered to make final decisions regarding: (a) the individuals who should receive the victim payments from the Crash-Victim Beneficiaries Compensation Amount; and (b) the compensation amounts that these individuals should receive." *Id.* at 13. Again, maybe the Justice Department will rightly determine which victims should get what. But its shabby treatment of the victims thus far gives one reason to doubt.

Leadership at the Justice Department, especially under Democratic administrations, also has a troubling history of directing money to its political friends and allies. Take for instance the settlements negotiated by the Obama administration's Department of Justice following the 2008 financial crisis. While crooked executives got off largely scot-free, senior DOJ lawyers used the threat of crushing punishment to extract enormous "donations" to be made to democratic political allies, such as the National Community Reinvestment Coalition and La Raza. *See, e.g.,* John Allison, *et al.*, *Improper Third-Party Payments in U.S.*

3

*Government Litigation Settlements*, The Regulatory Transparency Project (Feb. 22, 2021) (footnotes omitted), https://tinyurl.com/sdv7jubd.

Thankfully, the Justice Department has since prohibited such corrupt deals. *See Prohibition on Settlement Payments to Non-Governmental Third Parties*, 85 Fed. Reg. 81,409 (Dec. 16, 2020).[1] But there are other ways that improper payments can be made. Here, the Justice Department has final say over a fund that will disburse $1,770,000,000 to airline customers and "$500,000,000 to the heirs, relatives, and/or legal beneficiaries of the crash victims of Lion Air Flight 610 and Ethiopian Airlines Flight 302." ECF No. 4 at 12. Without accountability, it is likely only a matter of time before improper payments are made.

Courts must respect prosecutorial discretion, of course. But prosecutorial discretion should not mean unfettered discretion to ignore the requirements of federal law regarding victim's rights or to leverage the threat of prosecution to become some kind of independent special master. Yet that it is what the Justice Department demands here, arguing that "neither a court's inherent supervisory powers nor the Speedy Trial Act empower federal courts to exercise substantive oversight over the terms of a DPA." ECF No. 62 at 13.

These are troubling arguments. The details of the parties' contentions should receive careful judicial attention free from the presumption—too common in federal criminal law—that "the government always wins." As the Supreme Court recently reminded us, "If men must turn square corners when they deal with the government, it cannot be too much to expect the government to turn square corners when it deals with them." *Niz-Chavez v. Garland*, 141 S. Ct. 1474, 1486 (2021).

This Court should invite further briefing on the proper remedy or remedies.

Respectfully submitted,

_____

Ted Cruz
United States Senator

---

[1] On his first day in office, President Biden directed DOJ to consider revising or rescinding this regulation. *See* Executive Order 13990; *Fact Sheet: List of Agency Actions for Review; Actions Address the COVID-19 Pandemic, Provide Economic Relief, Tackle Climate Change, and Advance Racial Equity*, 85 Fed. Reg. 81409 (Dec. 16, 2020). The Justice Department has thus far wisely not taken any action against this important anti-corruption regulation.