UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Criminal Action No. 4:21-cr-5-O |
| | § | |
| THE BOEING COMPANY, | § | |
| | § | |
| Defendant. | § | |

## MEMORANDUM OPINION & ORDER

Before the Court are the Second Amended Motion for Findings that the DPA was Negotiated in Violation of the Victim's Rights ("CVRA Motion") (ECF No. 52); the Government's Response (ECF No. 58); Movants' Reply (ECF No. 71); the Motion for Exercise of the Court's Supervisory Power over the Deferred Prosecution Agreement (ECF No. 17); the Government's Response (ECF No. 60); Movants' Reply (ECF No. 65); the Motion for an Arraignment of Boeing (ECF No. 18); the Government's Response (ECF No. 61); Boeing's Combined Response (ECF No. 62); Movants' Reply (ECF No. 66); the Motion for Disclosure of Relevant Information (ECF No. 72); the Government's Response (ECF No. 73); Boeing's Response (ECF No. 74); Movants' Reply (ECF No. 75); and Senator Ted Cruz's Amicus Brief in Support of Movants (ECF No. 90). The Court reserves ruling on the motions and **ORDERS** an evidentiary hearing to determine whether Movants have standing to assert rights under the Crime Victims' Rights Act.

## I.     FACTUAL BACKGROUND

In 2011, Boeing began developing a new version of the Boeing 737 called the 737 MAX. Before U.S. airlines may use new commercial airplanes such as the 737 MAX, the Federal Aviation Administration ("FAA") must evaluate and approve the new version of the airplane. The FAA

determines: (1) whether the airplane meets federal airworthiness standards; and (2) what minimum level of pilot training is required for a pilot to fly the airplane for a U.S. airline. The two determinations are made by separate sub-groups within the FAA.

The Aircraft Evaluation Group ("AEG") is the sub-group that determines the minimum level of training required for U.S.-based airline pilots to fly a new version of an aircraft. The AEG does that by evaluating the differences between the new and old aircraft versions, then publishing a "differences training" determination for the new version. Training levels range from Level A, the least intensive, to Level E, the most intensive. The AEG publishes its determination in a Flight Standardization Board Report ("FSB Report"). Airlines must train their pilots in accordance with the FSB Report, and more intensive training tends to be more expensive for the airlines.

One of Boeing's goals in designing the 737 MAX was to ensure differences training no greater than Level B. Levels of training greater than Level B may require expensive, time-consuming flight-simulator training, while Level B training can be completed anywhere in a matter of hours using a computer or tablet. According to one of Boeing's chief technical pilots, differences training above Level B could have cost Boeing and its customers "tens of millions of dollars." Deferred Prosecution Agreement (DPA) 33, ECF No. 4.

In developing the 737 MAX, Boeing adjusted the size and placement of the engines compared to the airplane's predecessor. The changes altered the 737 MAX's aerodynamics and caused the airplane's nose to pitch up during specific flight conditions. To correct this behavior, Boeing installed the Maneuvering Characteristics Augmentation System ("MCAS") as a new part of the flight controls for the 737 MAX. When activated, MCAS automatically adjusts the horizontal stabilizer located near the airplane's tail, causing the nose of the airplane to pitch down. As originally designed, MCAS operated only during a maneuver called a high-speed, wind-up

turn, in which the airplane turns sharply in a corkscrew-like pattern at speeds of Mach 0.6 to 0.8. A high-speed, wind-up turn is a "certification" maneuver that a pilot would never perform on a typical commercial passenger flight. But sometime after June 2015, Boeing expanded MCAS's operational scope, allowing MCAS to activate at speeds as low as Mach 0.2. The low-speed expansion meant that MCAS could activate during takeoff and landing.

The Government alleges that two Boeing employees hid MCAS's low-speed expansion from the AEG. Both employees held the position of chief technical pilot for the 737 MAX program at different times. Part of the chief technical pilot's duties were to work with the AEG on the differences-training determination. According to the Government, the chief technical pilots intentionally hid MCAS's low-speed expansion from the AEG so that they could secure the less rigorous Level B training. In July 2017, the AEG published the first 737 MAX FSB Report, certifying the airplane for Level B differences training. The FSB Report and subsequent training materials did not mention MCAS.

On October 29, 2018, a 737 MAX operating as Lion Air Flight 610 crashed shortly after taking off from Indonesia. None of the 189 passengers and crew survived. The AEG learned that MCAS had activated during the flight and began investigating the operation of MCAS in connection with pilot training. On March 10, 2019, another 737 MAX, operating as Ethiopian Airlines Flight 302, crashed shortly after taking off from Ethiopia. Again, none of the 157 passengers and crew survived. Three days later, the President ordered the grounding of all 737 MAX aircraft in the United States.

Around the time of the second crash, the U.S. Department of Justice began investigating Boeing. Initially, Boeing's response "frustrated" the Justice Department's investigation. DPA 5, ECF No. 4. After a six-month delay, however, Boeing began cooperating with the investigation by

identifying relevant documents and witnesses. In February 2020, Thomas Gallagher, a representative of the Flight 302 crash victims' families, reached out to the Justice Department seeking information about possible investigations. *See* Movants' App. 63–64, ECF No. 16-1. The Justice Department's Victims' Rights Ombudsman informed Gallagher that the FBI had advised her that it was not investigating the crash, nor was it aware of any open cases at the Justice Department. *Id.* She told Gallagher, "If criminal charges are filed at some point, victims will be advised of that and notified of their rights under the [Crime Victims' Rights Act]." *Id.* at 64. Gallagher then reached out to the FBI Victims' Witness Office, and a victim specialist informed Gallagher that she, too, was unaware of any FBI investigations. *Id.* at 65.

On January 7, 2021, the Government charged Boeing with conspiracy to defraud the United States under 18 U.S.C. § 371. *See* Information, ECF No. 1. The Government alleges that Boeing conspired to defraud the AEG in connection with the AEG's evaluation of MCAS, the 737 MAX differences-training determination, and the FSB Report. *Id.* The same day, the Government filed a Deferred Prosecution Agreement ("DPA") (ECF No. 4) and a Joint Motion for Exclusion of Time Under the Speedy Trial Act (ECF No. 5). In the DPA, Boeing admitted to the Government's statement of facts and accepted responsibility for the acts charged. *See* DPA 2, ECF No. 4.

The DPA imposes several conditions. Boeing must pay a criminal monetary penalty of $243.6 million, which the DPA says "reflects a fine at the low end of the otherwise-applicable Sentencing Guidelines fine range." *Id.* at 7. Boeing also must pay $1.77 billion in compensation to its airline customers and set up a fund of an additional $500 million to be paid to the heirs, relatives, and beneficiaries of those who died in the two airplane crashes. *Id.* The DPA requires Boeing to meet with and report to the Justice Department's Fraud Section to ensure Boeing's compliance with the DPA and other federal law. *Id.* at 7, 53–56. In exchange, the DPA immunizes

4

Boeing from criminal prosecution for all conduct described in the statement of facts. *Id.* at 14. If Boeing complies with its obligations under the DPA for three years, the Government will dismiss the charge with prejudice. *Id.* at 16. If, on the other hand, Boeing breaches or fails to comply with any provision, the Government may prosecute Boeing for the crime charged. *Id.* at 16–19.

On December 16, 2021, more than a dozen family members and representatives of the crash victims filed three motions in this case. In general, Movants argue that the Government and Boeing violated federal law by negotiating the DPA behind closed doors, without conferring with Movants. First, Movants request a finding that Boeing and the Government negotiated the DPA in violation of their rights as victims under federal law. *See* CVRA Mot., ECF No. 52. Second, Movants request that the Court withhold approval of the DPA to ensure the Government confers with the victims. *See* ECF No. 17. Third, Movants ask for an arraignment of Boeing in which Movants will have an opportunity to be heard on the conditions of release. *See* ECF No. 18. A few months later, Movants also requested discovery procedures to obtain information from the Government and Boeing relevant to their motions. *See* ECF No. 72.

In January 2022, the Government held several meetings with some of the Movants and their representatives. The Attorney General personally attended the final meeting. After listening to the Movants' perspectives, the Government reiterated its position to stand by the DPA. Movants insist these meetings were inadequate. After receiving extensive briefing on the issues, the Court held a hearing in which representatives for Movants, the Government, and Boeing presented argument. The issues are now ripe for the Court's review.

## II.     LEGAL BACKGROUND

The Speedy Trial Act generally requires courts to begin trial within seventy days after a defendant is charged with a crime. *See* 18 U.S.C. § 3161(c)(1). The act contains numerous exceptions to that general timeline, however. One of those exceptions is "[a]ny period of delay

during which prosecution is deferred by the attorney for the Government pursuant to written agreement with the defendant, with the approval of the court, for the purpose of allowing the defendant to demonstrate his good conduct." *Id.* § 3161(h)(2). Here, the Government filed the DPA and on the same day moved for an exclusion of time under § 3161(h)(2). *See* J. Mot. for Exclusion of Time, ECF No. 5. The Government and Boeing "believe[d] that such a delay and speedy trial exclusion will allow [Boeing] to demonstrate its good conduct." *Id.* at 3. The Court granted the motion a couple weeks later. *See* Order, ECF No. 13. Under most circumstances, that short process would comply with federal law and effectively delay prosecution under the terms of the DPA. But if the crime affected victims, the Government and the Court must take additional steps.

The Crime Victims' Rights Act ("CVRA") guarantees crime victims certain rights in criminal proceedings. Among those rights are the right to be heard at any public proceeding involving the release, plea, sentencing, or parole of the defendant; the right to confer with the Government attorney in the case; the "right to be informed in a timely manner of any plea bargain or deferred prosecution agreement;" and the "right to be treated with fairness." 18 U.S.C. § 3771(a). The CVRA requires the Government to make "best efforts to see that crime victims are notified of, and accorded, the rights" under the act. *Id.* § 3771(c)(1).

The CVRA also imposes duties on district courts. "In any court proceeding involving an offense against a crime victim, the court shall ensure that the crime victim is afforded the rights described in subsection (a)." *Id.* § 3771(b)(1). The crime victim, the crime victims' representative, or the Government attorney may assert the crime victim's rights under the act. *Id.* § 3771(d)(1). And the district court "shall take up and decide any motion asserting a victim's right forthwith." *Id.* § 3771(d)(3).

Movants claim that the Government violated their rights under the CVRA. According to Movants, the Government (1) failed to confer with Movants, (2) failed to provide Movants with timely notice of the DPA, and (3) did not treat Movants "with fairness" as required by the CVRA. *See* CVRA Mot. 24–32, ECF No. 52. Movants propose a variety of remedies but in general ask the Court to set aside the DPA and order the Government to comply with the CVRA. *See id.* 33–34.

The Government and Boeing oppose Movants' requested relief. They raise several objections: (1) the crash victims are not "crime victims" under the CVRA; (2) the Court does not have authority to supervise, modify, or reject a DPA; (3) the CVRA does not provide for a motion to reopen a DPA; and (4) equitable considerations preclude modifying the DPA.

## III.     ANALYSIS

Before Movants may assert any rights under the CVRA, they must show that those whom they represent are "crime victims" under the statute. When interpreting statutory text, the Court "begin[s] with the assumption that the words were meant to express their ordinary meaning." *United States v. Kaluza*, 780 F.3d 647, 659 (5th Cir. 2015) (citation and internal quotation marks omitted). "'When a statute includes an explicit definition, [the Court] must follow that definition,' even if it varies from a term's ordinary meaning." *Digital Realty Tr., Inc. v. Somers*, 138 S. Ct. 767, 776 (2018) (citation omitted). The CVRA explicitly defines "crime victim" as "a person directly and proximately harmed as a result of the commission of a Federal offense or an offense in the District of Columbia." 18 U.S.C. § 3771(e)(2)(A). The Government and Boeing do not dispute that Movants are "lawful representative[s]" of the those who died in the crashes and thus able to represent their interests. *Id.* § 3771(d)(1). The question is thus whether Boeing committed a federal offense that "directly and proximately harmed" those who died in the crashes. *Id.* § 3771(e)(2)(A).

Several courts have separated that question into a more explicit two-step framework. First, the Court determines what "federal offense" Boeing committed; second, the Court determines whether those whom Movants represent were "directly and proximately harmed as a result of the commission of [that] Federal offense." *Id.*; *see United States v. Atl. States Cast Iron Pipe Co.*, 612 F. Supp. 2d 453, 536 (D.N.J. 2009) (collecting cases). This two-step approach is particularly helpful here, as the parties dispute what evidence the Court may consult at each step.

### A. The "federal offense" is Boeing's conspiracy to defraud the United States.

When a jury convicts a defendant, the first step is straightforward. The federal offense is "the offense of conviction, based solely on facts reflected in the jury verdict." *In re McNulty*, 597 F.3d 344, 351 (6th Cir. 2010). But the CVRA indisputably applies to plea agreements and deferred prosecution agreements—situations in which the defendant has not been *convicted* of committing a federal offense. 18 U.S.C. § 3771(a). The difficulty is that even in the absence of a jury conviction or guilty plea, "the definition of 'crime victim' in the CVRA . . . take[s] as a given that there has been a 'federal offense' committed." *Atl. States Cast Iron Pipe*, 612 F. Supp. 2d at 535. The question in this case is how the Court is supposed to determine the "federal offense committed" in the context of a deferred prosecution agreement.

At a minimum, the federal offense consists of the charged offense "admitted by the defendant." *McNulty*, 597 F.3d at 351. Boeing admitted responsibility for one offense: conspiracy to defraud the United States. *See* DPA 2, ECF No. 4; Information, ECF No. 1. "Crime victims" under the CVRA therefore include at least those harmed by Boeing's conspiracy to defraud the United States based on the facts admitted by Boeing. *See McNulty*, 597 F.3d at 351. The more difficult issue is to what extent the CVRA's use of "federal offense" includes offenses *not* charged by the Government or admitted by Boeing. A broader interpretation may include, for example,

offenses supported by the DPA's statement of facts, offenses covered by the DPA's immunity provisions, or other offenses supported by evidence outside the record.

Movants argue that "federal offense" encompasses crimes Boeing committed regardless of whether the Government has charged Boeing with those crimes. The argument has some textual support. The CVRA defines "crime victim" as a person "harmed as a result of the commission of a Federal offense." 18 U.S.C. § 3771(e)(2)(A). That definition is not restricted, for example, to the commission of a federal offense "as charged in the information or indictment." Moreover, crime victims may assert their CVRA rights before the Government has even begun a prosecution, by filing a motion "in the district court in the district in which the crime occurred." *Id.* § 3771(d)(3). The statutory language thus indicates that "the rights under the CVRA attach before the Government brings formal charges against a defendant." *Doe 1 v. United States*, 359 F. Supp. 3d 1201, 1218 (S.D. Fla. 2019). But the CVRA's text does not answer the question. Instead, it raises one: in the absence of a charging document, how would a court determine whether a federal offense—and what federal offense—has been committed? More specifically, how does the Court determine what *other* federal offenses Boeing committed besides the offense to which Boeing admitted? Movants provide a few theories.

*First*, Movants argue their family members became CVRA crime victims when the Government began investigating the crashes. Those who died in the two crashes "were 'victims' of the events the Justice Department was investigating," and thus, Movants argue, crime victims. Movants' Reply 15, ECF No. 71. Movants speculate that the Justice Department was investigating Boeing for manslaughter, conspiracy resulting in death, fraud involving aircraft parts producing a failure resulting in death, and other crimes. *See* Mot. for Disclosure of Relevant Information Ex. 1 at 47–48, ECF No. 72-1. Even assuming the Government was investigating Boeing for those

offenses, that alone would not vest rights under the CVRA. The CVRA "ask[s] the court to make factual findings to determine whether any person was 'directly and proximately harmed as a result of the *commission* of [a] Federal offense,'" not the investigation of one. *Atl. States Cast Iron Pipe Co.*, 612 F. Supp. 2d at 535 (emphasis added) (quoting 18 U.S.C. § 3771(e)(2)(A)). Mere investigation of a crime is insufficient to establish that a defendant committed that crime. "Axiomatic and elementary, the presumption of innocence lies at the foundation of our criminal law." *Nelson v. Colorado*, 137 S. Ct. 1249, 1255–56 (2017) (cleaned up).

Movants emphasize that the CVRA "extends rights to victims before charges are filed." Movants' Reply 15, ECF No. 71. To be sure, the CVRA does permit crime victims to assert their CVRA rights even "if no prosecution is underway." 18 U.S.C. § 3771(d)(3). Movants say the "centerpiece" of their argument is *In re Dean*, 527 F.3d 391 (5th Cir. 2008). Movants' Reply 15, ECF No. 71. In *Dean*, the Fifth Circuit recognized that "there are clearly rights under the CVRA that apply before any prosecution is underway." *Id.* at 394 (cleaned up). Before the government had filed charges in *Dean*, it moved for an order outlining procedures under the CVRA. *Id.* at 392. The district court agreed with the government that consulting with the victims would be impracticable and could impair the plea negotiation process. *Id.* The Fifth Circuit reversed, faulting government for filing charges and announcing a plea agreement before conferring with the victims. *Id.* at 393–94. The panel limited its holding: "At least in the posture of this case (and we do not speculate on the applicability to other situations), the government should have fashioned a reasonable way to inform the victims of the likelihood of criminal charges and to ascertain the victims' views on the possible details of a plea bargain." *Id.* at 394.

*Dean* does not resolve the issue here. The panel did not address how courts are to determine the scope of a "federal offense" outside the offenses in the charging document. Crime victims *do*

have rights under the CVRA before a federal offense is charged—when, for example, the government moves "for 'an order outlining the procedures to be followed under the [CVRA]'" before it files charges. *Id.* at 392. Another situation may be when the government concedes a federal offense has been committed (step one) but disputes whether the CVRA movants were harmed by the commission of the offense (step two). Neither situation would require *the Court* to determine whether a federal offense has been committed. Notably, the Government has concurrent obligations under the CVRA to "promulgate regulations to enforce the rights of crime victims and to ensure compliance by responsible officials with the obligations described in law respecting crime victims." 18 U.S.C. § 3771(f)(1). The victims also have rights "to inform the plea negotiation process by conferring with prosecutors before a plea agreement is reached." *Dean*, 527 F.3d at 395. Movants' premise—that the CVRA extends rights to victims before charges are filed—does not necessarily mean that the Court must determine what those charges *may be*. And the Court is aware of no authority supporting the notion that it may determine for itself what charges the Government could bring against a defendant.

Movants also provide no guiding principle instructing the Court how to decide whether a defendant committed a federal offense outside the charging document. Perhaps the Court could hold an evidentiary hearing and, if the evidence supports the finding, rule that the defendant committed a federal crime. That route raises serious Sixth Amendment problems, effectively adjudicating the defendant guilty of a federal crime without a jury verdict and other essential criminal procedures. Perhaps, instead, the Court could require a jury finding beyond a reasonable doubt that the defendant committed a federal crime. But that route raises separation-of-powers concerns, as it effectively requires the Government to prosecute the defendant for the crime. Movants provide no satisfactory answers to these constitutional problems. Nor do they supply a

method as to how the Court could find that a defendant committed a federal offense while avoiding these constitutional problems.

A case may arise where victims seek to assert CVRA rights before the Government has filed charges. That case may prove more difficult. When a charging document is present, however, courts "look to the offense of conviction, based solely on facts reflected in the jury verdict or admitted by the defendant." *McNulty*, 597 F.3d at 351. Given that the Government filed an information, a DPA, and a statement of facts to which Boeing admitted, the Court will likewise define the "federal offense" within those bounds. The CVRA underscores that conclusion with its admonition that "[n]othing in [the CVRA] shall be construed to impair the prosecutorial discretion of the Attorney General or any officer under his direction." 18 U.S.C. § 3771(d)(6).

*Second*, Movants argue that the DPA's broad statement of facts supports a variety of other federal offenses that the Government has agreed it will not prosecute. *See* Movants' Reply 15–17, ECF No. 71. Boeing admits to the facts as stated in the DPA. *See* DPA 2, ECF No. 4. The Government agreed "not to file charges in the future against [Boeing] based on the conduct described in [the DPA], the attached Statement of Facts, or the Information." *Id.* at 16. Movants argue those facts support charges of "involuntary manslaughter and other similar crimes" against those whom they represent. Movants' Reply 15–16, ECF No. 71. Because this argument relies on the agreed-upon facts in the DPA, it avoids some the problems of Movants' first argument. But it still requires the Court to consider what crimes the Government *could* have charged.

The Sixth Circuit has noted that speculative charges are inappropriate to consider for purposes of the CVRA, even if the record supports those charges. In *In re McNulty*, 597 F.3d 344 (6th Cir. 2010), an employee asserted rights under the CVRA after his ice-packing company had fired him for refusing to participate in an anticompetitive conspiracy. *See id.* at 352. The company

was charged with participating in "a conspiracy to suppress and eliminate competition" in the ice-packing industry. *Id.* at 346; *see* 15 U.S.C. § 1. The company accepted a plea agreement, and the employee sought to assert rights as a crime victim under the CVRA. *McNulty*, 597 F.3d at 348. The Sixth Circuit held that in determining whether the employee was a "crime victim," it "must (1) look to the offense of conviction, based solely on facts reflected in the jury verdict or admitted by the defendant; and then (2) determine, based on those facts, whether any person or persons were 'directly and proximately harmed as a result of the commission of [that] Federal offense.'" *Id.* at 351 (alteration in original) (citation omitted). The panel held that the employee was "not a victim for the purposes of the CVRA" because his firing and "blackballing" from the ice-packing industry were not "criminal in nature," nor were they "normally associated with the crime of antitrust conspiracy." *Id.* at 352. The harms he suffered were "ancillary" to the federal offenses of conspiracy and restraining interstate commerce. *Id.* The panel then speculated that the employee's "firing and subsequent blackballing in the packaged-ice industry may have supported a charge of obstruction of justice. However, for purposes of the CVRA definition of 'crime victim,' the only material federal offenses are those for which there is a conviction or plea." *Id.* at 352 n.9 (citing *Hughey v. United States*, 495 U.S. 411, 418 (1990)). This Court has similar reservations about broadening the CVRA's definition of "crime victim" to include federal offenses for which there is no conviction or agreement.

Even if the Court were to consider crimes other than what Boeing has admitted to, the DPA's statement of facts does not necessarily support the breadth of charges Movants claim it does. The Government acknowledged in the hearing that the DPA limits Boeing's liability "with respect to the facts set forth in the DPA." Hr'g Tr. 97, ECF No. 95. When asked whether the DPA prohibits a manslaughter or negligent homicide charge, the Government said it "did not find

evidence" that would support those charges. *Id.* at 96. The statement of facts, and thus the liability limitation, were "extremely limited" to the specific fraud crimes committed by the two Boeing chief technical pilots. *Id.* at 97. Those facts could conceivably support other fraud crimes such as wire fraud or fraud concerning aircraft parts. *But see United States v. Forkner*, No. 4:21-cr-00268, 2022 WL 378435, at *3–5 (N.D. Tex. Feb. 8, 2022) (dismissing counts for fraud concerning aircraft parts because MCAS is not an "aircraft part" under the statute's plain language). But it is a stretch to apply a homicide charge based solely on the facts in the DPA, primarily because the Government "did not find evidence of criminal intent" by Boeing employees other than the two chief technical pilots. Hr'g Tr. 97, ECF No. 95. And if the statement of facts does not support a homicide charge, it likely does not limit liability for one. At bottom, the facts describe a scheme to defraud the AEG, which is precisely what the Government charged Boeing with committing.

*Third*, Movants argue that the Court should construe the CVRA broadly to protect as many victims as possible. *See* Movants' Reply 13, ECF No. 71. Movants compare the CVRA to earlier restitution statutes, which they argue "demonstrate a clarion congressional intent to provide restitution to as many victims and in as many cases as possible." *United States v. Martin*, 128 F.3d 1188, 1190 (7th Cir. 1997). As an initial matter, Movants' proposed rule of construction does not overcome the significant problems posed by Movants' interpretation of the CVRA. Merely construing the CVRA broadly does not provide a workable standard by which the Court can determine whether a federal offense has been committed, nor does it resolve the constitutional issues accompanying that inquiry.

In addition, Movants' comparison of the CVRA to restitution statutes proves too much. For fraud crimes such as the one Boeing committed, 18 U.S.C. § 3663A(a)(1) requires a court to "make restitution to the victim of the offense." The statute in turn defines "victim" as "a person

directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered." *Id.* § 3663A(a)(2). That language resembles the "federal offense" language in the CVRA's definition of "crime victim," and is arguably just as broad. The Fifth Circuit has nevertheless held that § 3663A authorizes restitution only "to a victim 'directly and proximately harmed by the defendant's offense of conviction.'" *United States v. Kim*, 988 F.3d 803, 811 (5th Cir.) (citation omitted), *cert. denied*, 142 S. Ct. 225 (2021). Had Congress intended to cover federal offenses the defendant had not been convicted of or agreed to, "Congress would likely have chosen language other than 'the offense,' which refers without question to the offense of conviction." *Hughey*, 495 U.S. at 418 (holding that restitution under 18 U.S.C. § 3663 for losses resulting from an "offense" includes only losses resulting from the offense of conviction). Contrary to Movants' suggestion, the Court's interpretation of the CVRA accords with judicial interpretations of similarly worded restitution statutes.

*Fourth*, Movants suggest that the fund the DPA established for victims of the crashes indicates that Movants represent "crime victims" under the CVRA. *See* CVRA Mot. 17, ECF No. 52. The DPA required Boeing to establish an escrow account for the "Crash-Victim Beneficiaries." DPA 12, ECF No. 4. Boeing agreed to pay $500 million into the escrow account and appoint an administrator to disburse the funds. *Id.* at 12–13. To date, the administrator has disbursed nearly all of the $500 million to the families and representatives of those who died in the crashes. *See* Gov't Resp. 18, ECF No. 58. The existence of the fund does not "preclude [any] beneficiary from pursuing any other lawful claim that such beneficiary might have against [Boeing]" in civil litigation. DPA 14, ECF No. 4. Whether Movants represent "crime victims" under the CVRA is a matter of statutory interpretation. That the Government and Boeing established a fund to

15

compensate those who died in the crashes has no bearing on whether Movants represent "crime victims" as a matter of law.

Another district court ruled similarly in *United States v. Takata Corp.*, No. 21-mc-51040, 2021 WL 4962138 (E.D. Mich. 2021). The Takata Corporation pled guilty to one count of wire fraud concerning the testing of automobile airbag inflators. *See United States v. Takata Corp.*, No. 16-cr-20810 (E.D. Mich. Feb. 27, 2017), ECF No. 23, at 10–11, 47–53. Takata agreed to pay restitution under 18 U.S.C. § 3663A(a)(3) to the victims of the fraud scheme: the manufacturers who had purchased the airbag inflators in reliance on Takata's testing disclosures. *See id.* Takata also agreed to pay $125 million in "additional restitution" to compensate individuals harmed by the malfunction of Takata's airbags. *Id.* at 11. A few years later, the estate of a woman who had died in a car crash involving one of Takata's airbags moved to assert rights under the CVRA as a victim of Takata's "federal offense." *Takata Corp.*, 2021 WL 4962138, at *1. The district court ruled that the "individuals suffering personal injury or wrongful death because of Takata's defective [airbag] inflators [were] not direct victims of the criminal wire fraud committed by Takata." *Id.* at *2. Those who had been harmed by the airbag were thus not "crime victims" under the CVRA. *Id.* "Rather, these individuals [held] a special status as 'other persons' entitled to restitution by agreement under the terms of the Plea Agreement and made operational under 18 U.S.C. § 3663A(a)(3)." *Id.* This case is similar. That the DPA required Boeing to set up a fund to compensate the crash victims does not confer statutory "crime victim" status on Movants under the CVRA.

In sum, the relevant "federal offense" under the CVRA is the offense Boeing admits it committed: conspiracy to defraud the United States. In the context of that admission, the statutory text and relevant caselaw indicate that "crime victims" under the CVRA are those who were

16

harmed by Boeing's fraudulent conspiracy, "based solely on facts . . . admitted by the defendant."
*McNulty*, 597 F.3d at 351. The next step is to "determine, based on those facts, whether any person
or persons were directly and proximately harmed as a result of the commission of that Federal
offense." *Id.* (cleaned up).

### B.   Movants may represent individuals directly and proximately harmed by Boeing's conspiracy to defraud the United States.

The CVRA's "crime victim" definition "imposes dual requirements of cause in fact and
foreseeability." *In re Fisher*, 640 F.3d 645, 648 (5th Cir. 2011). The question is whether Movants
represent individuals who were "*directly* and *proximately* harmed as a result of" Boeing's
conspiracy to defraud the United States based on the facts admitted by Boeing. 18 U.S.C.
§ 3771(e)(2)(A) (emphasis added). "A person is directly harmed by the commission of a federal
offense where that offense is a but-for cause of the harm. A person is proximately harmed when
the harm is a reasonably foreseeable consequence of the criminal conduct." *Fisher*, 640 F.3d at
648 (footnote omitted). The causation inquiry is "fact-specific." *In re Rendon Galvis*, 564 F.3d
170, 175 (2d Cir. 2009). The DPA provides the base level of facts the Court must accept as true,
but the Government agrees that "direct and proximate causation is not solely defined by the
statement of facts."[1] Hr'g Tr. 93, ECF No. 95. The Fifth Circuit has not addressed the evidentiary
standard required to prove causation, but other courts have sensibly applied a preponderance-of-

---

[1] There is some tension between the Government's concession and the Sixth Circuit's statement that a court
should determine causation "based on [the] facts" admitted by the defendant. *In re McNulty*, 597 F.3d 344,
351 (6th Cir. 2010). But the CVRA "does not limit the class of crime victims to those whose identity
constitutes an element of the offense or who happen to be identified in the charging document." *In re
Stewart*, 552 F.3d 1285, 1289 (11th Cir. 2008). "Under the plain language of the statute, a party may qualify
as a victim, even though it may not have been the target of the crime, as long as it suffers harm as a result
of the crime's commission." *Id.*; *see also In re Fisher*, 640 F.3d 645, 648 (5th Cir. 2011). The CVRA
appears to allow—if not require—Movants to introduce some amount of evidence showing they were
harmed by the defendants' offense. The tension in *McNulty* is resolved simply by construing Movants'
proffered facts in light of the facts admitted by Boeing in the DPA.

the-evidence standard. *See United States v. Giraldo-Serna*, 118 F. Supp. 3d 377, 382 (D.D.C. 2015).

Movants request an evidentiary hearing to provide evidence of causation. Movants submitted a proffer of facts they could prove at the hearing, including expert testimony. *See* Mot. for Disclosure of Relevant Information Ex. 1, ECF No. 72-1. They argue the proffered facts would show:

1. To save money, Boeing concealed from the FAA information about how MCAS could improperly activate.[2]

2. If the FAA fully knew about MCAS, the AEG would have required expensive training for pilots on how to deal with improper MCAS activation.[3]

3. As a direct result of Boeing's conspiracy, the FAA did not order pilot training on MCAS, and it omitted information about MCAS in flight training materials.[4]

4. The two crashes resulted at least in part from MCAS activating shortly after takeoff.[5]

5. The FAA's training decisions had worldwide effects, extending to Boeing's 737 MAX customers such as Lion Air and Ethiopian Airlines.

Movants' Reply 19, ECF No. 71. The DPA's statement of facts arguably supports all but Movants' final contention.

Movants also offer expert testimony on causation. First, they wish to call Vickie Norton, a pilot who received training on erroneous MCAS activation. Movants say Norton would testify to the following:

1. The omission in the 737 MAX aircraft flight manual of any substantive references to MCAS was an ultimate "but for" cause of the crashes.

---

[2] *See* DPA 32–33, ECF No. 4.
[3] *See id.*
[4] *See id.* at 35–42.
[5] *See id.* at 41–43.

18

2. Boeing's intentional lack of disclosure, coupled with Boeing's false, misleading, and inaccurate description of MCAS' ultimate control authority and capabilities upon certification of the 737 MAX, caused the two crashes.

3. The lack of pilot training with respect to MCAS caused the two crashes, as adequate training would have prevented each of these tragedies.

4. Had Boeing presented to the FAA a complete, accurate and truthful description of MCAS, the AEG would have mandated Level D flight simulator training for any pilots flying the 737 MAX.

*See id.* at 20. Movants also wish to call Christopher Keyes, who has held various positions in the

FAA. Movants say Keyes would testify to the following:

1. Had Boeing provided the AEG with a complete data set with regards to the MCAS for the 737 MAX, the AEG would have determined that the changes warranted a higher level of differences training involving simulators.

2. All operators—domestic and foreign—of the 737 MAX depend on the FAA for appropriate and accurate information regarding aircraft that they approve and the training they recommend.

3. The act of withholding critical information regarding MCAS rendered the applicable sections of the 737 MAX aircraft flight manual and checklists unusable.

4. The lack of appropriate or incomplete MCAS training put every crewmember and passenger on board every Boeing 737 MAX at an unwarranted risk for a catastrophic event every time they took off.

*See id.* at 20. Finally, Movants wish to call Dr. Rune Storesund, the Executive Director for the

Center for Catastrophic Risk Management at the University of California at Berkeley. *See id.* at

26. Movants say that Dr. Storesund will testify that Boeing's conspiracy, among other things,

delayed required risk-reduction activities and substantially contributed to the crashes. *See id.*

Movants' proffered evidence and expert testimony may show that those whom they

represent were directly and proximately harmed by Boeing's conspiracy to defraud the FAA.

Movants' factual contentions do not contradict anything in the DPA. Indeed, the DPA's statement

of facts directly supports many of Movants' contentions. The Government argues that "the

evidence in the record" does not establish either direct cause or proximate cause. *See* Gov't Resp. 16, ECF No. 58. But in the Government's supporting cases, the courts ruled on the causation issue only after holding a traditional sentencing hearing,[6] considering the lack of proffered evidence,[7] or because causation did not exist as a matter of law.[8] *See* Gov't Resp. 16–17, ECF No. 58. None of those situations is present here. Movants have proffered evidence that may establish causation, but they have not yet had an opportunity to develop the record with that evidence. And the Government's evidentiary judgment that the crashes are ancillary to Boeing's crime is difficult to square with the Government's decision to discuss the crashes in the DPA's statement of facts. At this stage, "the record suggests that . . . evidence *could* be developed to show that" Boeing's fraudulent conspiracy directly and proximately caused harm to Movants. *In re Antrobus*, 519 F.3d 1123, 1126–27 (10th Cir. 2008) (Tymkovich, J., concurring) (emphasis added).

Movants may fail to establish causation, even after a hearing. Movants still carry the burden to establish standing under the CVRA by a preponderance of the evidence. *See Giraldo-Serna*, 118 F. Supp. 3d at 382. If Movants can show that Boeing's conspiracy to defraud the FAA caused the plane crashes, then they can potentially show that they represent "person[s] directly and proximately harmed as a result of the commission of a Federal offense." 18 U.S.C. § 3771(e)(2)(A).

---

[6] *See Fisher*, 640 F.3d at 648; *McNulty*, 597 F.3d at 348.
[7] *In re Doe*, 264 F. App'x 260, 263–64 (4th Cir. 2007) ("Petitioner does not proffer, in either her affidavit or victim impact statement, any evidence from which we can conclude that she suffered 'direct and proximate' harm from [the defendant's crime].").
[8] *In re Antrobus*, 519 F.3d 1123, 1125 (10th Cir. 2008); *cf. id.* at 1126 (Tymkovich, J., concurring) ("In my view, the district court and the government erred in failing to permit the [CVRA movants] reasonable access to evidence which could support their claim. With this information, the [CVRA movants] may have been able to demonstrate the requisite causal connection . . . .").

## IV.        CONCLUSION

Movants may have standing to assert rights under the CVRA, provided they show evidence of causation. *See* 18 U.S.C. § 3771(e)(2)(A). The Court thus **ORDERS** an evidentiary hearing to take place on **August 8, 2022**, at **2:00 PM** in the Second Floor Courtroom of the Federal Courthouse in Fort Worth. At the hearing, Movants may present testimony from the experts they have identified showing that Movants represent individuals who were directly and proximately harmed as a result of Boeing's conspiracy to defraud the United States. The Court will not permit testimony that contradicts or repeats facts admitted by Boeing in the DPA.

**SO ORDERED** this **27th day** of **July, 2022**.

Reed O'Connor
**UNITED STATES DISTRICT JUDGE**