# EXHIBIT 1

**UNITED STATES OF AMERICA**
Before the
**SECURITIES AND EXCHANGE COMMISSION**

**SECURITIES ACT OF 1933**
Release No. 11105 / September 22, 2022

**ADMINISTRATIVE PROCEEDING**
File No. 3-21140

| | |
|---|---|
| **In the Matter of**<br><br>**THE BOEING COMPANY,**<br><br>Respondent. | ORDER INSTITUTING CEASE-AND-DESIST PROCEEDINGS PURSUANT TO SECTION 8A OF THE SECURITIES ACT OF 1933, MAKING FINDINGS, AND IMPOSING A CEASE-AND-DESIST ORDER |

**I.**

The Securities and Exchange Commission ("Commission") deems it appropriate that cease-and-desist proceedings be, and hereby are, instituted pursuant to Section 8A of the Securities Act of 1933 ("Securities Act"), against The Boeing Company ("Boeing" or "Respondent").

**II.**

In anticipation of the institution of these proceedings, Respondent has submitted an Offer of Settlement (the "Offer"), which the Commission has determined to accept. Solely for the purpose of these proceedings and any other proceedings brought by or on behalf of the Commission, or to which the Commission is a party, and without admitting or denying the findings herein, except as to the Commission's jurisdiction over it and the subject matter of these proceedings, which are admitted, Respondent consents to the entry of this Order Instituting Cease-And-Desist Proceedings Pursuant to Section 8A of the Securities Act of 1933, Making Findings, And Imposing A Cease-And-Desist Order ("Order"), as set forth below.

**III.**

On the basis of this Order and Respondent's Offer, the Commission finds[1] that:

**SUMMARY**

1. This matter concerns Boeing's failure to exercise reasonable care in making statements to the public following two fatal accidents involving its new 737 MAX line of aircraft.

---

[1] The findings herein are made pursuant to Respondent's Offer of Settlement and are not binding on any other person or entity in this or any other proceeding.

Those failures resulted in Boeing making materially misleading statements to investors in November 2018 and April 2019.

2. On October 29, 2018, a Boeing 737 MAX aircraft operated by PT Lion Mentari Airlines ("Lion Air") as Flight 610 crashed shortly after takeoff from Jakarta, Indonesia, killing all 189 passengers and crew (the "Lion Air Crash").

3. Less than five months later, on March 10, 2019, a second 737 MAX, this one operated by Ethiopian Airlines as Flight 302, crashed shortly after takeoff from Addis Ababa, Ethiopia, killing all 157 passengers and crew (the "Ethiopian Airlines Crash").

4. Accident investigations revealed that both crashes involved the erroneous activation of the Maneuvering Characteristics Augmentation System ("MCAS"), a new Boeing flight control law (not described in the 737 MAX flight manuals or pilot training materials) that was designed to help avert stalls by pushing the nose of the airplane downward without input from the crew whenever a sensor on the outside of the fuselage indicated the aircraft was approaching an angle at which a stall may occur.

5. Neither Lion Air Flight 610 nor Ethiopian Airlines Flight 302 was approaching a stall at the time MCAS activated. Rather, on both flights, an erroneous signal from the external sensor repeatedly triggered MCAS while the plane was climbing at a normal angle. On both flights, the crews were unable to regain control of the airplane following the unintended MCAS activations.

6. On March 13, 2019, three days after the Ethiopian Airlines Crash, the U.S. Federal Aviation Administration ("FAA") issued an order grounding the entire 737 MAX fleet due to ongoing safety concerns; similar grounding orders were issued by regulators around the world. Ultimately, more than 20 months would pass before a 737 MAX was once again permitted to fly.

7. In the wake of the Lion Air Crash, Boeing sought to reassure the public and the market about the safety of the 737 MAX. Later, following the Ethiopian Airlines Crash and the subsequent grounding of the 737 MAX, Boeing sought to reassure the public and the market that the process by which the 737 MAX was designed, tested and certified to fly complied with all applicable regulations and with Boeing's own standards and historical practices. In doing so, Boeing failed to exercise reasonable care, resulting in public statements that were materially misleading to investors.

8. The first misleading public statement was contained in a press release issued by Boeing on November 27, 2018, following the release of the Indonesian government's preliminary report on the Lion Air Crash (the "November 2018 Press Release" or "Press Release"). In that Press Release, Boeing highlighted certain aspects of the preliminary accident report while downplaying others, and also offered the public its "assurance" that the 737 MAX "is as safe as any airplane that has ever flown the skies." However, by that point, Boeing had determined that MCAS posed an ongoing safety issue that required remediation; indeed, Boeing had already begun work on a redesign of the MCAS software to address the safety issue. However, the Press Release made no mention of the MCAS safety issue or planned software redesign.

9. A second set of misleading public statements was made in April 2019 following the Ethiopian Airlines Crash and the 737 MAX grounding (the "April 2019 Statements"). While speaking to investors and analysts during Boeing's first quarter 2019 earnings call on April 24, 2019, and in comments to reporters following Boeing's annual shareholders' meeting on April 29, 2019, Boeing, through its then President and CEO, Dennis A. Muilenburg ("Muilenburg"), stated that "there was no surprise or gap or unknown … that somehow slipped through [the] certification process" for the 737 MAX, and that Boeing had "gone back and confirmed … that we followed exactly the steps in our design and certification processes that consistently produce safe airplanes."

10. Prior to the April 2019 Statements, Boeing had, in responding to a subpoena issued by the U.S. Department of Justice ("DOJ") in a criminal investigation into the 737 MAX certification process, uncovered documents that suggested that key facts about MCAS's operational scope had not been disclosed to the FAA's Aircraft Evaluation Group ("FAA-AEG"), the section of the FAA responsible for the review and approval of pilot training requirements and flight manuals for the 737 MAX. In addition, an internal compliance review had separately identified certain documentation gaps and inconsistencies relating to MCAS and the certification process. None of those facts were disclosed or otherwise known to the public at that time.

11. Boeing offered and sold debt securities to investors after it issued the November 2018 Press Release. Boeing also offered and sold debt securities to investors after Muilenburg's April 2019 Statements.

12. By failing to exercise reasonable care to ensure that statements in its November 2018 Press Release and in the April 2019 Statements were not materially misleading by ensuring that all facts necessary to make those statements not misleading under the circumstances were disclosed to investors, Boeing violated Sections 17(a)(2) and 17(a)(3) of the Securities Act.

**RESPONDENT**

13. **Boeing**, a Delaware corporation headquartered in Arlington, Virginia, engages in the design, development, manufacture, sale and support of commercial jet aircraft, military aircraft, satellites, and other aerospace products. Boeing's common stock is registered under Section 12(b) of the Securities Exchange Act of 1934 ("Exchange Act") and trades on the New York Stock Exchange (under the ticker symbol "BA").

**OTHER RELEVANT INDIVIDUAL**

14. **Muilenburg**, age 58, is a resident of Collinsville, Illinois. Muilenburg was Boeing's President from December 2013 to December 2019, CEO from July 2015 to December 2019, and Chairman of the Board of Directors from March 2016 to October 2019.

3

# FACTS

### A.  Background: The 737 MAX and MCAS

15. Boeing's 737 line of commercial aircraft first came to market in the 1960s. Since that time, Boeing has designed, manufactured, and sold approximately 10 versions of the Boeing 737 to its customers, including commercial airlines around the world.

16. The 737 MAX is Boeing's most recent version of the 737 aircraft line. The 737 MAX was conceived after Boeing faced intense competition from one of its rival commercial airplane manufacturers to produce a fuel-efficient, single aisle plane.

17. Boeing began designing the 737 MAX in 2011 and submitted its initial application for an Amended Type Certificate ("ATC") to the FAA in 2012. In March 2017, the FAA issued an ATC to Boeing for the 737 MAX, and the new plane entered into service a few months later. Quickly after it was launched, the 737 MAX became the best-selling plane in Boeing's history.

18. Although the 737 MAX was built upon the design of its predecessor, the 737 Next Generation (the "737 NG"), some changes were made. For one thing, the engines on the 737 MAX were larger and were positioned slightly forward under the airplane's wings. These changes increased fuel efficiency but altered the aerodynamics of the 737 MAX as compared to its predecessor, particularly at higher angles-of-attack ("AoA"), a measure of the angle between the aircraft's wing and the oncoming air.

19. In an effort to make the 737 MAX handle more like the 737 NG, Boeing introduced MCAS, a computerized control that would adjust the airplane's horizontal stabilizer in the event the plane's computer received data from an external sensor (known as the AoA sensor) indicating that the angle of the airplane was too steep, which could cause the plane to stall. MCAS was designed to make the necessary adjustments without input from the crew.

20. MCAS was originally designed to operate only under conditions involving both high speeds (Mach 0.6-0.8) and high AoA, conditions that were "outside the normal flight envelope." MCAS was therefore not expected to engage during the course of a normal commercial flight.

21. Later in the design and certification process, however, Boeing expanded the operational scope of MCAS to address a tendency of the 737 MAX to pitch upwards at high AoA even at lower speeds. To achieve this, Boeing widened the speed range within which MCAS could operate to Mach 0.2-0.8, now encompassing speeds at which a commercial flight would regularly travel, and also expanded MCAS's command authority, or the degree to which MCAS could push down the nose of the plane, at lower speeds (the "MCAS Expansion").

4

**B.    U.S. Regulators Approve the Pilot Training Requirements and Flight Manuals for the 737 MAX without Knowledge of the MCAS Expansion.**

22.    When a derivative of an existing aircraft model enters service, pilots certified to fly the previous model can become certified to fly the new model by undergoing "differences training," a training course focused on those aspects of the new model (here, the 737 MAX) that are meaningfully different from the previous model (here, the 737 NG).  As a general matter, the greater the similarity between the two models, the less differences training is required, reducing training costs incurred by operators of the aircraft.

23.    In connection with the overall evaluation, approval and certification process for a derivative airplane, the FAA-AEG is responsible for determining the required level of differences training for U.S.-based airline pilots – and, relatedly, the extent to which new or updated functions must be described in the flight manuals – based on information provided, and recommendations made, by manufacturers such as Boeing.  At the end of this process, the FAA-AEG publishes a Flight Standardization Board Report (the "FSB Report") which contains, among other things, the FAA-AEG's determination on the level and scope of differences training and the contents of the flight manuals.

24.    Here, Boeing took the view that pilots transitioning from the 737 NG to the 737 MAX should be required to undergo only a short computer-based training ("CBT") course, as opposed to more extensive, simulator-based training.  Indeed, even before certification, Boeing advertised, and, in some cases, contractually guaranteed, to its airline customers that only CBT would be required for 737 NG pilots to operate the 737 MAX.  For instance, one purchase agreement with a major airline required Boeing to refund up to $1 million per plane in the event the FAA required more than CBT for 737 MAX pilots.

25.    In advocating for CBT only, Boeing employees responsible for communicating with the FAA-AEG as to differences training and manuals certification – including Boeing Employee-1 and Boeing Employee-2, senior members of the 737 MAX Flight Technical Group – presented MCAS to the FAA-AEG as a feature that could only activate in a very specific, high-speed scenario that was outside the normal flight envelope and therefore unlikely to ever be encountered by a commercial pilot.  They made these representations to FAA-AEG personnel beginning in or around June 2015.

26.    In or around March 2016, Boeing introduced the MCAS Expansion, significantly broadening MCAS's operational scope.  No longer limited to a specific, rare high-speed scenario, MCAS could now activate at abnormally high AoA throughout the entire speed range of the 737 MAX, including during the initial climb and the final descent, and its command authority was significantly increased to allow it to function effectively at lower speeds.

5

27.     In or around August 2016, the FAA-AEG made a provisional determination to accept Boeing's proposal of CBT-only and to omit MCAS from the differences training and flight manuals. At that time, the FAA-AEG was not aware of the MCAS Expansion.[2]

28.     Boeing employees responsible for communicating with the FAA-AEG understood, as evidenced by internal emails, that this provisional determination was contingent on there being "no significant systems changes to the airplane," and that the subsequent disclosure of additional differences to the FAA-AEG "would be a huge threat to that differences training determination."

29.     On or about November 15, 2016, during a test flight of the 737 MAX in a simulator, Boeing Employee-1 experienced what Boeing Employee-1 recognized as MCAS operating at lower speed. Later that day, Boeing Employee-1 and Boeing Employee-2 discussed MCAS in an electronic chat (the "November 15, 2016 Chat") which contained the following exchange:

> **Boeing Employee-1:** Oh shocker alerT! / MCAS is now active down to M[ach] .2 / It's running rampant in the sim[ulator] on me… / so I basically lied to the regulators (unknowingly)
>
> **Boeing Employee-2:** [I]t wasn't a lie, no one told us that was the case

30.     Following this exchange, Boeing employees responsible for communicating with the FAA-AEG did not inform the FAA-AEG about the MCAS Expansion. And in a January 17, 2017 email to the FAA-AEG, Boeing Employee-1 reminded the FAA-AEG to delete any references to MCAS from the FSB Report, saying "Flight Controls: Delete MCAS, recall we decided we weren't going to cover it in the [manuals] or the CBT … since it's way outside the normal operating envelope."

31.     On or about July 5, 2017, the FAA-AEG published the FSB Report, which omitted any information about MCAS. Consistent with the determinations made by the FAA-AEG as reflected in the published FSB Report, MCAS was not described in the 737 MAX flight manuals or pilot training materials, and was not part of the required differences training for pilots transitioning to the 737 MAX when the 737 MAX entered into service in mid-2017.

---

[2] The MCAS Expansion was reflected in certification documents provided to a different group within the FAA that was responsible for determining whether the 737 MAX met U.S. federal airworthiness certification standards; however, that group was not involved in the review and approval of pilot training requirements and flight manuals.

## C.     The Lion Air Crash and the November 2018 Press Release

*Boeing's Safety Review Board Determines that MCAS Poses a Safety Issue that Requires Remediation, and Boeing Engineers Begin Work on a Software Redesign.*

32.     The Lion Air Crash occurred on October 29, 2018.  Soon after the crash, investigators identified repeated unintended activations of MCAS triggered by erroneous AoA data as a cause of the accident.

33.     In the weeks following the Lion Air Crash, Boeing convened a series of meetings of its Safety Review Board ("SRB") – an internal body comprised of Boeing personnel that evaluate in-service aircraft safety issues – on November 4, 2018, November 6, 2018, and November 15, 2018, to assess the ongoing safety of the 737 MAX in light of the Lion Air Crash.

34.     The SRB determined that the high crew workload required to counter repeated unintended MCAS activation triggered by erroneous AoA data, and the limited amount of time a crew might have to do so before the airplane became unrecoverable (as happened on the Lion Air Crash flight), posed an "airplane safety issue" that required remediation.  The crew workload issue was compounded by the presence of other distracting visual, auditory, and tactile alerts and warnings associated with a damaged or malfunctioning AoA sensor on the 737 MAX.

35.     On November 6, 2018, Boeing issued a bulletin to operators of 737 MAX aircraft informing them that erroneous AoA data could cause uncommanded nose-down movements of the aircraft (without mentioning MCAS by name).  The bulletin instructed pilots to follow the procedures in the flight manuals for a "runaway stabilizer" – a type of malfunction that could present as similar to repeated unintended MCAS activations on the 737 MAX – in the event of uncommanded nose-down movement.

36.     On November 7, 2018, the FAA issued a public emergency airworthiness directive to airlines operating the 737 MAX, informing them of the potential for repeated nose-down movements of the aircraft which, "if not addressed, could cause the flight crew to have difficulty controlling the airplane … and [could result in] possible impact with terrain."  The airworthiness directive identified the issue as an "unsafe condition" on the 737 MAX, and, as an "interim action" pending further analysis, referred crews to the runaway stabilizer procedures described in Boeing's November 6 bulletin.

37.     On or about November 15, 2018, Boeing safety engineers concluded that, in light of the SRB's findings, the MCAS software should be redesigned and re-installed on the 737 MAX fleet to remediate the high crew workload "airplane safety issue."  They determined that the software redesign had to be completed within approximately 27 months, but that the 737 MAX fleet could continue to operate in the interim in light of Boeing's bulletin and the FAA emergency airworthiness directive.

38.     Around the same time, the FAA conducted its own safety analysis and reached conclusions similar to those reached by the Boeing SRB, including that the Boeing 737 MAX could continue to operate pending remediation of the MCAS-related crew workload issue;

7

however, the FAA review concluded that a software redesign would have to be completed within approximately 8 months (later shortened to approximately 7 months).

***Boeing Assures the Public that the 737 MAX is "as Safe as Any Airplane that has Ever Flown the Skies" while Working to Remediate the "Airplane Safety Issue."***

39. On or about November 15, 2018, senior executives at Boeing, including Muilenburg, were informed that the SRB had identified the crew workload issue associated with unintended MCAS activation due to erroneous AoA data as an "airplane safety issue" that required remediation, and that Boeing engineers were working on redesigning the MCAS software to address the issue.

40. Also, on or about November 15, 2018, Boeing's Communications team began working with senior Boeing engineers and lawyers, among others, to draft a press release to update the public following the Lion Air Crash (the "Draft Press Release"), which would evolve to become the November 2018 Press Release.

41. Early versions of the Draft Press Release generally confirmed the plane's safety, stating that the 737 MAX was either a "safe airplane" or that it "continue[d] to be safe to fly." Certain versions also noted that Boeing was working with the FAA to "expedite the development and certification of a flight control software update" for MCAS.

42. During this time period, Boeing was the subject of extensive negative media coverage over allegations that Boeing had withheld information from pilots, airlines, regulators and the general public regarding MCAS. Other articles raised concerns about MCAS being too powerful and/or relying on a single sensor, and about the integrity of the certification process for the 737 MAX.

43. Boeing's stock price was also dropping during this time. By November 20, 2018, Boeing's stock price had fallen by 11.6% since the Lion Air Crash.

44. On November 20, 2018, Muilenburg expressed disappointment in Boeing's response to the negative post-crash media coverage, stating in an email that "[w]e are spending too much time playing defense… [we] need to start playing some offense."

45. The next day, an official at the U.S. National Transportation Safety Board ("NTSB") emailed Boeing a draft of the preliminary report on the Lion Air accident investigation (the "Lion Air Preliminary Report"), which was expected to be released to the public by the Indonesian government within the coming days.

46. Later that day, the Communications team sent Muilenburg and other executives an updated version of the Draft Press Release. After reviewing the draft, Muilenburg directed that the Draft Press Release be modified to incorporate a discussion of facts drawn from the Lion Air Preliminary Report, and also suggested removing discussion of the planned MCAS software redesign from the Draft Press Release.

47. On November 24, 2018, the Communications team began revising the Draft Press Release in accordance with Muilenburg's instructions. As a result, the Draft Press Release underwent significant changes as its focus shifted to the Lion Air Preliminary Report.

48. From that point forward, the Draft Press Release no longer mentioned the development of an "MCAS software update," and also stated that Boeing's customers and passengers "have [Boeing's] assurance that the 737 MAX is as safe as any airplane that has ever flown the skies." In the days that followed, Muilenburg and other executives worked with the Communications team to further revise the Draft Press Release.

49. On the afternoon of November 27, 2018, Muilenburg approved the issuance of the November 2018 Press Release via email, writing, "Looks great – factual, and sticks to the report while making our key points. Good to go here …." The November 2018 Press Release was published on Boeing's website that evening, just after the public release of the Lion Air Preliminary Report by the Indonesian government.

50. The November 2018 Press Release highlighted certain facts from the Lion Air Preliminary Report suggesting that pilot error and poor airplane maintenance by Lion Air had contributed to the crash. The November 2018 Press Release did not mention that the SRB had identified an ongoing "airplane safety issue" associated with MCAS or the planned software redesign – indeed, it did not mention MCAS at all. The final November 2018 Press Release also contained the statement: "As our customers and their passengers continue to fly the 737 MAX to hundreds of destinations around the world every day, they have our assurance that the 737 MAX is as safe as any airplane that has ever flown the skies."

51. Prior to the issuance of the November 2018 Press Release, Boeing provided drafts to the FAA and NTSB for informational purposes, and those drafts contained the "as safe as any airplane that has ever flown the skies" language. After the November 2018 Press Release was published, a senior official at the NTSB complained to Boeing, via email, that the November 2018 Press Release was not appropriate given Boeing's involvement in the crash investigation, and that "the omission of certain facts and the highlighting of other facts [in the November 2018 Press Release] leads the reader to Boeing's analytical conclusion."

52. On November 28, 2018, the first trading day following the public release of the Lion Air Preliminary Report and Boeing's after-hours publication of the November 2018 Press Release, Boeing's stock closed at $333.5, up 4.8% from the prior day's close (compared to a 2% gain for the S&P 500).

53. The November 2018 Press Release – in particular, the statement that "the 737 MAX is as safe as any airplane that has ever flown the skies" – was misleading under the circumstances absent any discussion of an "airplane safety issue" that required remediation by fixing the MCAS software. Accordingly, Boeing failed to exercise reasonable care in connection with the November 2018 Press Release.

54. A reasonable investor would have considered the statement in the November 2018 Press Release that "the 737 MAX is as safe as any airplane that has ever flown the skies," as well

9

as contrary facts set forth in Paragraph 53, *supra*, that were omitted from the November 2018 Press Release, to be material.

55. In or around February 2019, Boeing offered and sold $1.5 billion of debt securities to investors. At the time of the offers and sales, Boeing had neither retracted nor modified the materially misleading statement contained in the November 2018 Press Release.

**D.     The Boeing Certification Compliance Review and Discovery of "Concerning" Documents Relating to MCAS Differences Training and Manuals**

*Boeing's Compliance Review Identifies Documentation Gaps and Inconsistencies in the Certification Process Relating to MCAS.*

56. On or about November 21, 2018, Boeing senior management assembled a team to review the 737 MAX certification process with a particular focus on MCAS (the "MCAS Certification Compliance Review"), led by a senior Boeing engineer who was familiar with the 737 MAX design, but who had not been directly involved in the certification process. The MCAS Certification Compliance Review team was specifically directed to include in its review aspects of the certification process relating to differences training and flight manuals.

57. The MCAS Certification Compliance Review team presented its initial findings and conclusions to Boeing senior engineering and compliance personnel, together with representatives of the FAA, on or about December 17, 2018, in a live presentation accompanied by a written report. Muilenburg was briefed on the core findings around this time as well. While the written report was further reviewed over the next several months, the core findings and conclusions did not change.

58. The MCAS Certification Compliance Review ultimately concluded that the certification process with respect to MCAS was compliant with FAA regulations. However, the written report identified several documentation gaps and inconsistencies relating to MCAS and the certification process, including a lack of adequate supporting documentation for the assumption, used by Boeing engineers and test pilots throughout the design and testing process, that repeated unintended MCAS activations (as the crew of Lion Air Flight 610 experienced) would be no more hazardous than a single unintended MCAS activation – an assumption that was later called into doubt by the SRB.

59. The MCAS Certification Compliance Review report also noted that the supporting rationale for the decision to remove MCAS from the differences training and flight manuals was not properly documented and had been made contemporaneously with the MCAS Expansion. These findings raised questions as to whether the FAA-AEG had been made aware of, and had an opportunity to evaluate, the MCAS Expansion when it agreed to Boeing's proposal to remove MCAS from the differences training and manuals.

60. The MCAS Certification Compliance Review team was not aware of the November 15, 2016 Chat. Consequently, the November 15, 2016 Chat was not referenced in the MCAS Certification Compliance Review report and did not factor into its findings and conclusions.

10

*Boeing's Senior Officers are Briefed on the November 15, 2016 Chat.*

61. In the wake of the Lion Air Crash, the DOJ began an investigation into the 737 MAX certification process. In January 2019, while collecting documents in connection with the DOJ's investigation, members of Boeing's Legal Department uncovered a series of communications that raised questions about the disclosures made to the FAA-AEG concerning the differences training and manuals certification, including the November 15, 2016 Chat in which Boeing Employee-1 wrote that he had "lied to regulators (unknowingly)" about MCAS.

62. In or around January 2019, Boeing's in-house counsel informed Muilenburg and other senior executives about the existence of the November 15, 2016 Chat. Following that communication, Muilenburg understood the November 15, 2016 Chat to be "concerning."

63. The November 15, 2016 Chat – like the documentation issues highlighted in the MCAS Certification Compliance Review report – raised significant questions concerning the adequacy of Boeing's disclosures about MCAS in connection with the FAA-AEG's review and approval of pilot training requirements and flight manuals for the 737 MAX, including the omission of MCAS from the differences training and the flight manuals.

E. **The Ethiopian Airlines Crash and the April 2019 Statements**

64. The Ethiopian Airlines Crash occurred on March 10, 2019. Once again, accident investigators determined that the accident involved repeated unintended activations of MCAS triggered by erroneous data from an AoA sensor.

65. On March 13, 2019, three days after the Ethiopian Airlines Crash, the FAA issued an order grounding the entire 737 MAX fleet due to ongoing safety concerns; similar grounding orders were issued by regulators around the world. Ultimately, more than 20 months would elapse before the 737 MAX was once again permitted to fly.

66. The extensive negative media coverage of Boeing that followed the Lion Air Crash intensified after the Ethiopian Airlines Crash and the subsequent grounding, as did the downward pressure on Boeing's stock price.

67. Boeing's first quarter earnings call occurred on April 24, 2019. On that call, Muilenburg, on behalf of Boeing, responded to analysts' questions concerning MCAS and the certification process for the 737 MAX. During the questioning, one analyst asked in relevant part: "how did this slip through the engineering organization? How did it slip through the FAA… because it doesn't seem like there was a lot of new science going on here… [t]his seemed to be applications of existing technology to an existing platform." Muilenburg's answer stated in relevant part:

> *[T]here is no technical slip or gap here*… we know that both accidents were a series of events… in this case, there was erroneous angle-of-attack information that came into the airplane from

11

> multiple causes… at some point during the flight, that activated the MCAS control laws, and we know that ultimately there were actions or actions not taken that contributed to the final outcome…
>
> But I can tell you with confidence that we understand our airplane, we understand how the design was accomplished, how the certification was accomplished, and remain fully confident in the product that we've put in the field. But we also know there are areas that we can improve, and that is the source of the software update here. ***But there was no surprise or gap or unknown here or something that somehow slipped through a certification process. Quite the opposite. We know exactly how the airplane was designed. We know exactly how it was certified. We have taken the time to understand that***….

(Emphasis added.)

68. Five days later, on April 29, during a press conference following Boeing's annual shareholders' meeting, a reporter asked Muilenburg whether the MCAS design was deeply flawed. Muilenburg, on behalf of Boeing, responded in relevant part: "***We have gone back and confirmed again … that we followed exactly the steps in our design and certification processes that consistently produce safe airplanes. It was designed per our standards. It was certified per our standards.***" (Emphasis added.)

69. The April 2019 Statements were misleading under the circumstances absent any discussion of the questions raised by the discovery of the November 15, 2016 Chat and the MCAS Certification Compliance Review concerning the adequacy of Boeing's disclosures to the FAA-AEG in connection with the FAA-AEG's review and approval of pilot training requirements and flight manuals for the 737 MAX. Accordingly, Boeing failed to exercise reasonable care in connection with the April 2019 Statements.

70. A reasonable investor would have considered the April 2019 Statements – in particular, the statements that "there was no surprise or gap or unknown … that somehow slipped through [the] certification process" for the 737 MAX, and that Boeing had "gone back and confirmed … that we followed exactly the steps in our design and certification processes that consistently produce safe airplanes" – as well as the contrary facts set forth in Paragraph 69, *supra*, that were omitted from the April 2019 Statements, to be material.

71. In or around May 2019, Boeing offered and sold $3.5 billion of debt securities to investors.

72. In or around July 2019, Boeing offered and sold $5.5 billion of debt securities to investors.

73. At the time of the offers and sales in May and July 2019, neither Boeing nor Muilenburg had retracted or modified the materially misleading April 2019 Statements.

74. On October 18, 2019, it was widely reported that the U.S. House of Representatives Transportation and Infrastructure Committee, which was conducting hearings relating to the 737 MAX, had obtained a series of documents concerning Boeing Employee-1's communications with the FAA-AEG, including the November 15, 2016 Chat, and would be questioning Muilenburg about those documents and related issues during his scheduled congressional testimony later that month.

75. On October 18, 2019, Boeing's stock price dropped by 6.8%, compared to a 0.4% decline for the S&P 500.

## **Violations**

76. As a result of the conduct described above, Boeing violated Sections 17(a)(2) and 17(a)(3) of the Securities Act, which prohibit any person in the offer or sale of securities from obtaining money or property by means of any untrue statement of material fact or any omission to state a material fact necessary in order to make statements made, in light of the circumstances under which they were made, not misleading, and from engaging in any practice or course of business which operates or would operate as a fraud or deceit upon the purchaser in the offer or sale of securities, respectively.  Negligence is sufficient to establish violations of Sections 17(a)(2) and 17(a)(3) of the Securities Act.  *Aaron v. SEC*, 446 U.S. 680, 696-97 (1980).

### **IV.**

In view of the foregoing, the Commission deems it appropriate to impose the sanctions agreed to in Respondent Boeing's Offer.

Accordingly, it is hereby ORDERED that**:**

A. Pursuant to Section 8A of the Securities Act, Boeing cease and desist from committing or causing any violations and any future violations of Sections 17(a)(2) and 17(a)(3) of the Securities Act.

B. Boeing shall, within 14 days of the entry of this Order, pay a civil money penalty in the amount of $200,000,000 to the Securities and Exchange Commission.  If timely payment is not made, additional interest shall accrue pursuant to 31 U.S.C. §3717.

Payment must be made in one of the following ways:

(1) Respondent may transmit payment electronically to the Commission, which will provide detailed ACH transfer/Fedwire instructions upon request;

(2) Respondent may make direct payment from a bank account via Pay.gov through the SEC website at http://www.sec.gov/about/offices/ofm.htm; or

       (3)       Respondent may pay by certified check, bank cashier's check, or United States postal money order, made payable to the Securities and Exchange Commission and hand-delivered or mailed to:

Enterprise Services Center
Accounts Receivable Branch
HQ Bldg., Room 181, AMZ-341
6500 South MacArthur Boulevard
Oklahoma City, OK 73169

       Payments by check or money order must be accompanied by a cover letter identifying Boeing as a Respondent in these proceedings, and the file number of these proceedings; a copy of the cover letter and check or money order must be sent to Celeste A. Chase, Assistant Regional Director, Division of Enforcement, New York Regional Office, Securities and Exchange Commission, 100 Pearl Street, Suite 20-100, New York, NY 10004-2616.

       C.       Pursuant to Section 308(a) of the Sarbanes-Oxley Act of 2002, a Fair Fund is created for the penalties referenced in paragraph B above. This fund may be combined with any other distribution fund or fair fund arising out of the same facts that are the subject of this Order. Amounts ordered to be paid as civil money penalties pursuant to this Order shall be treated as penalties paid to the government for all purposes, including all tax purposes. To preserve the deterrent effect of the civil penalty, Respondent agrees that in any Related Investor Action, it shall not argue that it is entitled to, nor shall it benefit by, offset or reduction of any award of compensatory damages by the amount of any part of Respondent's payment of a civil penalty in this action ("Penalty Offset"). If the court in any Related Investor Action grants such a Penalty Offset, Respondent agrees that it shall, within 30 days after entry of a final order granting the Penalty Offset, notify the Commission's counsel in this action and pay the amount of the Penalty Offset to the Securities and Exchange Commission. Such a payment shall not be deemed an additional civil penalty and shall not be deemed to change the amount of the civil penalty imposed in this proceeding. For purposes of this paragraph, a "Related Investor Action" means a private damages action brought against Respondent by or on behalf of one or more investors based on substantially the same facts as alleged in the Order instituted by the Commission in this proceeding.

       By the Commission.

       Vanessa A. Countryman
       Secretary