# EXHIBIT 1

**UNITED STATES DISTRICT COURT FOR THE**

**NORTHERN DISTRICT OF TEXAS**

**FORT WORTH DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| *Plaintiff* | ) | |
| | ) | |
| v. | ) | Case No. 4:21-cr-005-O-1 |
| | ) | |
| THE BOEING COMPANY, | ) | |
| | ) | |
| *Defendant.* | ) | |
| _____ | ) | |

**VICTIMS' FAMILIES' RE-ASSERTION OF PROFFER OF FACTS THAT THEY
WOULD ESTABLISH AT AN EVIDENTIARY HEARING**

i

## TABLE OF CONTENTS

**XIV.   The Justice Department Provided Inaccurate Information to the Victims' Families About its Investigation into the Two Crashes** ........................................................................... 2

**XV.  The Justice Department and Boeing Negotiate a Rotten DPA** .......................................... 6

**XVI.  Subsequent Events Concerning Lack of an Arraignment, Lack of Conditions of Release, and the Need for Remedies** ............................................................................................. 8

**XVII.  Boeing's Senior Management was Involved in Deceiving the FAA** ............................ 16

**XVIII. Boeing's Senior Management Deceived the Public About MCAS**…………….......... 12

## VICTIMS' FAMILIES' PROFFER OF FACTS THAT THEY WOULD ESTABLISH AT AN EVIDENTIARY HEARING

Naoise Connolly Ryan et al. (the "victims' families" or "victims' representatives"), by and through undersigned counsel, respectfully submit this proffer of facts that, on information and belief, they would establish if the Court were to provide them an evidentiary hearing regarding issues related to the violation of their rights under the Crime Victims' Rights Act ("CVRA)" and remedies for the violations. To assist in identifying the support for some of the statements below, the victims' families include footnote references to some readily available materials that support their assertions. References in the footnotes to the "Statement of Facts" or "SOF" refer to the Statement of Facts that Boeing agreed to in the Deferred Prosecution Agreement (DPA), Dkt. 4 at A-1 to A-16.  References to the "2020 House Comm. Rep." refer to the Final Committee Report: The Design, Development and Certification of the Boeing 737 MAX: Majority Staff of the House Comm. on Transportation and Infrastructure (Sept. 2020) (accepted as an exhibit during the evidentiary hearing in August 2022). References to "anticipated testimony" from various witnesses reflects counsel's belief as to what an anticipated witness would testify to if called as a witness in this matter. This proffer is subject to refinement if additional materials are received. This proffer is also subject to supplementation if the Government provides any specific points of concern or if new information becomes available.

The following proffer retains the paragraph numbering (and associated footnote numbering) from the victims' families earlier proffer (Dkt. 72-1).

## XIV.   The Justice Department Provided Inaccurate Information to the Victims' Families About its Investigation into the Two Crashes.

253.    As early as May 2019, the families of the victims who perished in the 737 MAX crashes became aware of general media reports suggesting that the Department of Justice was investigating Boeing for possible criminal conduct related to the two Boeing 737 MAX crashes.[253]

254.    On February 19, 2020, having heard nothing from the Justice Department (or federal investigators)—and with the one-year anniversary of the crash of Ethiopian Airlines flight 302 looming—Thomas Gallagher of the non-profit Flight 302 Families Foundation emailed Marie A. O'Rourke, the Victims' Rights Ombudsman at the Justice Department in Washington, D.C., seeking information for the victims' families on all matters connected to the Ethiopian Airlines crash, including any ongoing or future criminal investigation or prosecution conducted by the Justice Department in connection with the crashes. Mr. Gallagher requested a meeting on behalf of the Foundation's member families and proposed a date of March 3, 2020.[254]

255.    Ms. O'Rourke responded via email to Mr. Gallagher later that day that she was not aware of which office might be working on the investigation and that she would forward the inquiry to the FBI's Victim-Witness Office.[255]

256.    The next day, February 20, 2020, Mr. Gallagher replied to Ms. O'Rourke that news reports and Boeing's own 2019 Form 10-K filed with the Securities and Exchange Commission (SEC) on January 31, 2020, indicated that the Justice Department's Criminal Division was investigating Boeing. He asked, "How do I go about identifying the attorneys assigned to this investigation?"[256]

---

[253] Milleron-Stumo Aff., Ex. 10 ¶ 6, Appx. 031. Note: References to "Appx." are to the appendix filed along with the Victims' Families motions on December 16, 2021.
[254] *Id.* ¶ 5, Appx. 064.
[255] *Id.* ¶ 6, Appx. 064.
[256] *Id.* ¶ 7, Appx. 064.

257.    Indeed, in its 2019 Form 10-K filed with the SEC on January 31, 2020, Boeing stated that it was "fully cooperating with U.S. government investigations *related to the accidents and the 737 MAX*," including an "investigation by *the U.S. Department of Justice*."[257]

258.    Ms. O'Rourke replied the same day and stated that the FBI advised her that it did not have any criminal investigation into this crash, nor was it aware of any open cases at the Justice Department.  She also stated that "[i]f there is an investigation into the safety issues for this model aircraft it would be handled by the NTSB, and you may wish to contact them." Ms. O'Rourke continued, "It is possible that there are outstanding civil reviews or cases, but since those would not fall within the purview of the Crime Victims' Rights Act, this office cannot assist you." She concluded, "If criminal charges are filed at some point, victims will be advised of that and notified of their rights under the CVRA."[258]

259.    Naturally, it was highly distressing for the victims' families to be told one thing by the Justice Department's Victims' Rights Ombudsman while finding out that the opposite was true through media reports. Nadia Milleron, one of the victims' family group representatives, explained that she could not understand how Ms. O'Rourke could flatly represent that no Justice Department investigation was ongoing while the media reported the exact opposite.[259]

260.    On or about February 21, 2020, Mr. Gallagher telephoned the FBI's Victim-Witness Office to seek any information related to the reported investigation of Boeing. Katie McCabe, a victim specialist, called Mr. Gallagher back.  As Mr. Gallagher best recalls, Ms. McCabe stated she was not aware of any criminal investigation.[260]

---

[257] Boeing Form 10-K for Fiscal Year 2019 at Item 1A (Jan. 31, 2020), available at https://www.sec.gov/ix?doc=/Archives/edgar/data/12927/000001292720000014/a201912dec3110k.htm; anticipated testimony of Boeing representative.
[258] *Id* ¶ 8, Appx. 064, 075 & Ex. 4 to Gallagher Aff.
[259] Ex. 10 ¶ 15, Appx. 032.
[260] *See* Gallagher Aff., Ex. 16 ¶ 9, Appx. 065.

3

261.    The information that Ms. O'Rourke conveyed to the victims' families (through Mr. Gallagher) was inaccurate.[261]

262.    What was inaccurate about the information that Ms. O'Rourke and Ms. McCabe conveyed to the victims' families was that the Justice Department had a criminal investigation ongoing regarding the two Boeing 737 MAX crashes.[262]

263.    Among the crimes that the Justice Department was investigating was fraud involving aircraft parts producing a failure resulting in death.[263]

264.    Among the crimes that the Justice Department was investigating was manslaughter.[264]

265.    Among the crimes that the Justice Department was investigating was conspiracy resulting in death. Many other crimes were investigated as well.[265]

266.    Any effort by Ms. O'Rourke to determine whether a criminal investigation was ongoing was inadequate, as reports of the investigation were widespread in the media. Ms. O'Rourke was aware of those news reports (and other information) because Mr. Gallagher had made her aware. In denying that a criminal investigation was in process, Ms. O'Rourke acted (at a minimum) in reckless disregard of the truth.[266]

---

[261] Gov't Resp. to CVRA Mot., DE 58 at 23; anticipated testimony of DOJ representative; anticipated testimony of Boeing representative.
[262] *See* Boeing Form 10-K for Fiscal Year 2019 at Item 1A (Jan. 31, 2020), available at https://www.sec.gov/ix?doc=/Archives/edgar/data/12927/000001292720000014/a201912dec3110k.htm; Anticipated testimony of DOJ representative; Anticipated testimony of Boeing representative.
[263] Anticipated testimony of DOJ representative; 18 U.S.C. § 38(a)(3).
[264] Anticipated testimony of DOJ representative; 18 U.S.C. § 1112
[265] Anticipated testimony of DOJ Representative; 18 U.S.C. § 371.
[266] *See* Gallagher Aff., Ex. 16, Appx. 064-65.

4

267.   Ms. O'Rourke has never apologized for providing inaccurate information or corrected the inaccurate information that she provided.[267]

268.   Ms. McCabe has never apologized for providing inaccurate information or corrected the inaccurate information that she provided.[268]

269.   Justice Department policy is that its responsibilities to crime victims begin as soon as possible after the detection of a crime at which those responsibilities may be undertaken without interfering in the investigation. Generally, this point in time is defined by the opening of a criminal investigation.[269]

270.   Justice Department policy is that, after an investigative agency opens a case, a responsibility official in the agency should provide victims with general information, including general information about the criminal justice process.[270]

271.   Justice Department policy is that, during a criminal investigation, a responsible official for the investigative agency shall provide the victims with the earliest possible notice concerning the status of the investigation of the crime, to the extent that it is appropriate and will not interfere with the investigation.[271]

272.   In February 2020, providing notice to the 737 MAX victims' families of the Department's criminal investigation into Boeing's crimes would have been appropriate and would not have interfered with the investigation. Boeing was already well aware that an investigation was underway by that time.[272]

---

[267] Anticipated testimony of Ms. O'Rourke.
[268] Anticipated testimony of Ms. McCabe.
[269] Attorney General Guidelines for Victim and Witness Assistance: 2011 ed. at 26 (Rev. May 2012).
[270] *Id.* at 27-28.
[271] *Id.* at 28.
[272] DPA at 4-5; anticipated testimony of DOJ representative; anticipated testimony of Boeing representative.

273.    The Justice Department never advised the victims' families at any point of its criminal investigation into the crashes before January 7, 2021, when the DOJ entered into a Deferred Prosecution Agreement (DPA) with Boeing.[273]

274.    By keeping the victims' families in the dark, the Government effectively foreclosed any possibility of victims' families conferring with the prosecutors working on the case.[274]

275.    The Justice Department recently apologized for not meeting and conferring with the victims' families.[275]

276.    Conferring with the victims' families in this case would not have been difficult, and the Justice Department is now enacting policies to make sure that such concealment of a DPA never happens again.[276]

277.    Boeing was aware that the victims' families had not been conferred with and that the DPA was being kept secret from them.[277]

## XV.    The Justice Department and Boeing Negotiate a Rotten DPA

278.    The DPA followed an extensive criminal investigation by the Justice Department which lasted more than two years.[278]

279.    After describing Boeing's conspiracy crime, the DPA states that "the misconduct was neither pervasive across the organization, nor undertaken by a large number of employees, *nor facilitated by [Boeing's] senior mismanagement*." This exonerating language is extraordinary, as it is not typically included in Justice Department DPAs.[279]

---

[273]  Dkt. 58 at 1-2, 7.
[274]  DE 52 at 10.
[275]  DE 58 at 1.
[276]  DE 58 at 8.
[277]  Anticipated testimony of DOJ representative; Anticipated testimony of Boeing representative.
[278]  Boeing Resp. to Victims' Families Motions, DE 62 at 8.
[279]  DPA at ¶ 4(h) (emphasis added); Victims Reply on Supervisory Powers Mot., DE 65 at 2.

280.    In reaching its conclusion that Boeing's conspiracy crime was not facilitated by Boeing's senior management, the Justice Department did not question under oath (or even interview) every member of Boeing's senior management.[280]

281.    The DPA provides that the Government "will not bring any criminal or civil case against [Boeing] relating to any of the conduct as described in the attached Statement of Facts or the Information filed pursuant to this Agreement." The DPA offers no reason for this broad shall-not-file-charges provision.[281]

282.    The DPA also provides that "that any prosecution of [Boeing] for the conduct set forth in the attached Statement of Facts or Information will be and hereby is deferred for the Term…. Six months after the Agreement's expiration, the [Government] shall seek dismissal with prejudice of the [Criminal] Information filed against [Boeing] … and agree[s] not to file charges in the future against [Boeing] based on the conduct described in this Agreement, the attached Statement of Facts, or the Information."[282]

283.    The universe of federal criminal offenses that could not be filed against Boeing under the shall-not-file-charges provision described in the previous paragraph is huge.  It includes, for example, federal manslaughter crimes or federal conspiracy crimes that result in death.[283]

284.    The universe of federal criminal offenses that could not be filed against Boeing includes, for example, fraud involving aircraft parts whose failure results in death.[284]

285.    In its January 7, 2021, press release announcing the DPA, the Justice Department told that world that "Boeing will pay a total criminal monetary amount of over $2.5 billion,

---

[280]  Anticipated Testimony of DOJ Representative; Anticipated testimony of Boeing representative.
[281]  DPA ¶ 20; DE 65 at 5.
[282]  DPA ¶¶ 24-25.
[283]  *See* 18 U.S.C. § 1112, § 371.
[284]  *See* 18 U.S.C. § 38(b)(3).

composed of … compensation payments to Boeing's 737 MAX airline customers of $1.77 billion." Yet on close inspection, the DPA states that the "Airline Compensation Amount shall be offset by any payments already made by the Company, as of the date this Agreement is fully executed, to any of its airline customers for the direct pecuniary harm that its airline customers incurred as a result of the grounding of the Company's 737 MAX." DPA ¶ 12. Thus, both the DPA and the press release ignore the fact that, as was reported in the media one year before, Boeing had already settled at least $1.4 billion in customer compensation claims and "projected a total bill of $8.8 billion, excluding potential payments to victims' families or the results of multiple probes being conducted by authorities."[285]

286.    The Justice Department deceptively tried to take credit for payments in the DPA that were not only owed contractually and independent of its investigation but had also been paid by the time the DPA was executed.[286]

287.    The Government and Boeing negotiated together to come up with a $500 million crash victims' compensation fund. But they never talked about the size of the fund with the people who were most affected—the victims' families. And the victims' families also possessed the most information about this valuation—information about such subjects as lost income, pain and suffering, and other factors that would necessarily need to be considered in arriving at a fair and just figure.[287]

## XVI.  Subsequent Events Concerning Lack of an Arraignment, Lack of Conditions of Release, and the Need for Remedies

288.    The Criminal Information and DPA in this case were filed on January 7, 2021.[288]

---

[285] Dkt. 65 at 7-9.
[286] Dkt. 65 at 8.
[287] Appx. 1-32.
[288] Dkt. 1, 4.

289.    The Government never gave timely notice (or any notice) to any of the victims' families (or hundreds of other persons similarly situated) about the DPA before it was finalized and filed in the Fort Worth Division of the Northern District of Texas. .[289]

290.    The Government never conferred with any of the victims' families (or hundreds of other persons similarly situated) about the DPA.[290]

291.    The victims' families did not obtain legal counsel to challenge the DPA until around late November 2021. Their legal counsel (Professor Cassell) is proceeding pro bono.[291]

292.    After obtaining pro bono legal counsel, the victims' families moved rapidly and filed their challenges to the DPA within about one month.[292]

293.    The same day that the victims' families filed their motions (December 16, 2021), they wrote to the Justice Department seeking its support.[293]

294.    On January 10, 2022, undersigned counsel and other representatives of the victims' families had a Zoom conference call with representatives of the Fraud Section of the U.S. Department of Justice about this case.  During the call, the Fraud Section's representatives refused to confer with the families' representatives about this case, including whether the families represented "crime victims" within the meaning of the CVRA. Instead, the Fraud Section took the position that that the call was merely a "listening session" for the Department to learn about the concerns of the victims' families.[294]

---

[289] Dkt. 58 at 1-7.
[290] *Id.*
[291] *See, e.g.,* Appx. 2 (Naoise Ryan secured counsel in this criminal case on November 23, 2021).
[292] Dkt. 16.
[293] Anticipated testimony of Victim Family Representative.
[294] *Id.*

295.    On January 14, 2022, undersigned counsel and other representatives of the victims' families had a Zoom conference call with representatives of the Criminal Division of the U.S. Department of Justice about this case, including the Assistant Attorney General for the Criminal Division, Kenneth A. Polite, Jr.  During the call, the Criminal Division's representatives refused to confer with the families' representatives about this case, including whether the families represented "crime victims" within the meaning of the CVRA. Instead, the Division took the position that that the call was merely a "listening session" for the Department to learn about the concerns of the victims' families.[295]

296.    On January 26, 2022, undersigned counsel and other representatives of the victims' families had a Zoom conference call with Attorney General Merrick Garland and more than a dozen other attorneys working on the case. During the call, as had been required by representatives of the Attorney General before the call, the Attorney General and other Department attorneys declined to confer with the families' representatives about this case, including whether the families represented "crime victims" within the meaning of the CVRA. Instead, the Attorney General took the position that that the call was merely a "listening session" for the Department to learn about the concerns of the victims' families.[296]

297.    On February 4, 2022, counsel for the victims' families, the Justice Department, and Boeing held a meet-and-confer via telephone regarding future scheduling. At that meeting, the Department revealed that it would be opposing the victims' families' position with a forty-page opposition. The Department, however, refused to answer any questions about what its opposition

---

[295] *Id.*
[296] *Id.*

would say. The Department also refused to provide any information about why it would be opposing the families' motions.[297]

298.    At the February 4 meet-and-confer, the victims' families' counsel asked the Department's lawyer whether, even if the Department believed it was not legally obligated to produce such supporting information, it would nonetheless voluntarily provide it to the victims' families. The lawyer indicated that he was not authorized to discuss that subject.[298]

299.    On February 6, 2022, the victims' families followed up with a written request to the Attorney General and other Department attorneys for information helpful to the families' position.[299]

300.    On February 11, 2022, the victims' families sent another communication to the Department, requesting that it voluntarily produce information helpful to the victims' families' position. That same day, the Department's lawyer responded briefly that the Government's position remained that it opposed any such request.[300]

301.    During their meetings with the Justice Department and in several emails and letters, the victims' families have asked the Department to produce its factual information that would help them support the "crime victim" status of their loved ones. The Department has not denied that it possesses such information. Instead, it has repeatedly refused to provide any information to the families that it possesses that would help establish "crime victim" status.[301] More recently, the Department has refused to provide information that would help the families to help establish their position on remedies.

---

[297] Dkt. 57 at 2.
[298] Anticipated testimony of Victims' Family Representative.
[299] *Id.*
[300] *Id.*
[301] *Id.*

302.     During their meetings with and in other communications to the Justice Department, the victims' families have provided the Department with factual information and legal arguments about why they are protected "crime victims" under the CVRA.[302] More recently, the families have present the Department with factual information and legal arguments about why they are entitled to remedies that they seek.

303.     The Government possesses information tending to establish that in and around February 2020, the Government was criminally investigating the two crashes.[303]

304.     The Government possesses information tending to establish that during its criminal investigation of Boeing, the Government investigated the possibility of filing charges for manslaughter or other forms of federal negligent homicide against Boeing and collected evidence supporting such charges.[304]

305.     The Government possesses information tending to establish that Boeing was aware that the Government was concealing the deferred prosecution agreement (DPA) from the victims' families until it was filed in court.[305]

306.     The Government possesses information tending to establish that the FAA's certification of the 737 MAX and the approval of only Level B differences training (i.e., no flight simulator training) had worldwide effects because of the deference that other countries provide to the FAA's determinations.[306]

---

[302] *Id.*
[303] Anticipated testimony of DOJ Representative.
[304] *Id.*
[305] *Id.*
[306] *Id.*

307.    The Government possesses information tending to establish that but for Boeing's conspiracy to defraud the FAA AEG, Lion Air flight 610 and Ethiopian Airlines flight 302 would not have crashed.[307]

308.    The Government possesses information tending to establish that Boeing could reasonably foresee that its conspiracy would result in safety risks to—and crashes of—737 MAX aircraft.[308]

309.    The Government possesses information tending to establish if the FAA AEG had not been deceived by Boeing's conspiracy, before October 28, 2018, it would have ordered that pilot manuals for the 737 MAX must include an explanation of MCAS and how pilots should address an unintended activation, and that 737 MAX pilots should undergo simulator training on MCAS and how to mitigate an MCAS-generated emergency.[309]

310.    The Government possesses information tending to establish that if the FAA AEG had not been deceived by Boeing's conspiracy, the pilot manuals for the 737 MAX used by foreign carriers (including Lion Air and Ethiopian Airlines) would have included an explanation of MCAS and how pilots should address an unintended MCAS activation it before the two crashes. [310]

311.    The Government possesses information tending to establish that if the FAA AEG had not been deceived by Boeing's conspiracy, the pilot training for the 737 MAX used by foreign carriers (including Lion Air and Ethiopian Airlines) would have included simulator training on MCAS and how to mitigate an MCAS-generated emergency before the two crashes.[311]

---

[307] *Id.*
[308] *Id.*
[309] *Id.*
[310] *Id.*
[311] *Id.*

312. The Government possesses information tending to establish that if the pilots flying Lion Air Flight 610 and Ethiopian Airlines Flight 302 had received simulator training on MCAS and how to mitigate an MCAS-generated emergency, it would have reduced the risk that the two flights would crash.[312]

313. The Government possesses information tending to establish that if the pilots flying Lion Air Flight 610 and Ethiopian Airlines Flight 302 had been given an aircraft operating manual and training material for the 737 MAX explaining MCAS and how to address an unintended MCAS activation, it would have reduced the risk that the two flights would crash.[313]

314. The Government possesses information tending to establish that it was a necessary part of Boeing's conspiracy that Lion Air and Ethiopian Airlines to remain unaware of the full scope of MCAS's capabilities; if those airlines (and their pilots) had been told about the full scope of MCAS, that information would have inevitably found its way back to the FAA—defeating the purpose of the conspiracy.[314]

315. The Government possesses information tending to establish that after the two crashes, the FAA AEG ultimately decided that pilot manuals for the 737 MAX must include an explanation of MCAS and how pilots should address an unintended MCAS activation and that 737 MAX pilots should undergo simulator training on the effects of MCAS.[315]

316. Boeing has never been arraigned on the charges filed against it.[316]

317. Boeing has never had conditions of release set, pursuant to law, for the period during which the DPA will be pending.[317]

---

[312] *Id.*
[313] *Id.*
[314] *Id.*
[315] *Id.*
[316] Dkt. 66 at 6.
[317] Dkt. 66 at 8-9.

318.     If given the opportunity to make a presentation to the Court, several of the victims' family members would urge that one of the conditions of release that should be imposed on Boeing is a corporate monitor in charge of monitoring the safety of the aircraft Boeing is producing.[318]

319.     If Boeing were publicly arraigned, some of the victims' families would attend the arraignment.[319]

320.     If the Court directs the Justice Department to meet and confer with the victims' families about its decision to not to prosecute Boeing, a number of the victims' families would attend such a meeting.[320]

321.     If the Court directs the Justice Department to provide documents or other information related to Boeing's crime, the victims' families would review that information and find it helpful to their understanding of how their loved ones were killed—and how the proceedings in this case have unfolded.[321]

322.     If given an opportunity to address the Court about whether to accept the DPA as written, a number of the victims' families would address the Court and raise arguments against accepting the DPA as written.[322]

323.     If the Court excises or otherwise invalidates the "shall-not-file-charges" provision in the DPA barring further prosecution of Boeing, a number of the victims' families would exercise their right to confer with the Department about further prosecution of Boeing.[323]

324.     If this Court finds that the victims' families represent CVRA "crime victims," a number of the victims' families would exercise their rights under the CVRA, including their rights

---

[318] Dkt. 66 at 11 n.6.
[319]  Dkt. 66 at 15.
[320] Anticipated testimony of victim representative.
[321] Anticipated testimony of victim representative.
[322]  Anticipated testimony of victim representative.
[323]  Anticipated testimony of victim representative.

to receive notice, to seek reasonable protection from a defendant, to confer with prosecutors, and to be treated with fairness.[324]

## XVII.  Boeing's Senior Management was Involved in Deceiving the FAA

325.    Boeing's corporate push to expedite the production, certification, and release of the 737 MAX directly contributed to aircraft safety problems and the two 737 MAX crashes. A broad group of Boeing employees, officers, and directors—including the company's top leadership— actively and knowingly misled the public, Boeing's airline customers, and regulators regarding the safety of the MAX.[325]

326.    Among other things, Boeing's senior management and Board of Directors facilitated the misconduct giving rise to the MAX crashes by providing no oversight, ignoring red flags, concealing wrongdoing from the FAA, and attempting to cover up their abdication of responsibility.[326]

327.    To ensure it remained blissfully unaware, Boeing neglected to implement procedures for employees and management to voice safety concerns to its Board of Directors. And when safety concerns were raised, employee warnings were either explicitly rejected by management or just ignored entirely.[327]

328.    Boeing's conspiracy to deceive the FAA was part of a pattern. Both Mark Forkner and Boeing Employee-2 were driven by the "Program Directive" to minimize pilot training

---

[324] Anticipated testimony of victim representative.
[325] Dkt. 52 at 14.
[326] *Id.*; *see also* anticipated testimony of Boeing representative.
[327] Dkt. 52 at 14.

requirements for the MAX, and both were subject to financial pressures that broadly affected many other Boeing employees involved in the MAX project.[328]

329.    For example, a Boeing engineering manager complained to Boeing's Director of Global Operations about impossible deadlines and economic pressures, admitting: "I don't know how to fix these things . . . it's systemic. It's culture."[329]

330.    Boeing's Board and leadership allowed severe, endemic safety issues to fester by consciously maintaining a position of willful ignorance. Because Boeing's Board did not have an adequate reporting mechanism in place, many complaints of safety concerns simply never made it to the attention of the Board. On the rare occasion that concerns made it to the Board's attention, the reports were "one-sided at best and false at worst, conveying only favorable and optimistic safety updates and assurances that the quality of Boeing's aircraft would drive production and revenue."[330]

331.    Most alarmingly, Boeing's Board of Directors *knew* of the 737 MAX's safety issues before the second crash and still failed to take meaningful action. By February 2019, the Board was aware that there was a Justice Department investigation underway. Nevertheless, at their February Board meeting, "the Board affirmatively decided to delay its investigation into the 737 MAX, notwithstanding publicly reported concerns about the airplane's safety."[331]

332.    The Board's official policy was to bury its head in the sand.  And there is ample evidence that the Board publicly lied about if and how it monitored the 737 MAX's safety. In short,

---

[328] *Id.*
[329] *Id.*
[330] *Id.* at 15.
[331] *Id.*; anticipated testimony of Boeing representative.

Boeing's leadership directly participated in the type of deceit for which Mr. Forkner has now been indicted—and could fully understand the risks to public safety of the deception.[332]

## XVIII. Boeing's Senior Management Deceived the Public About MCAS.

*Boeing's Safety Review Board Determines that MCAS Poses a Safety Issue that Requires Remediation, and Boeing Engineers Begin Work on a Software Redesign.*

333.    The Lion Air Crash occurred on October 29, 2018. Soon after the crash, investigators identified repeated unintended activations of MCAS triggered by erroneous AoA [angle of attack] data as a cause of the accident.[333]

334.    In the weeks following the Lion Air Crash, Boeing convened a series of meetings of its Safety Review Board ("SRB") – an internal body comprised of Boeing personnel that evaluate in-service aircraft safety issues – on November 4, 2018, November 6, 2018, and November 15, 2018, to assess the ongoing safety of the 737 MAX in light of the Lion Air Crash.[334]

335.    The SRB determined that the high crew workload required to counter repeated unintended MCAS activation triggered by erroneous AoA data, and the limited amount of time a crew might have to do so before the airplane became unrecoverable (as happened on the Lion Air Crash flight) posed an "airplane safety issue" that required remediation. The crew workload issue was compounded by the presence of other distracting visual, auditory, and tactile alerts and warnings associated with a damaged or malfunctioning AoA sensor on the 737 MAX.[335]

336.    On November 6, 2018, Boeing issued a bulletin to operators of 737 MAX aircraft informing them that erroneous AoA data could cause uncommanded nose-down movements of the

---

[332] *Id.*

[333] *In the Matter of The Boeing Company*, Order Instituting Cease-and-Desist Proceedings Pursuant to Section 8A of the Securities Act of 1933 at ¶ 32, Making Findings, and Imposing a Cease-and-Desist Order, Securities and Exchange Comm'n, Admin. Proc. File No. 3021140 (Sept. 26, 2022); anticipated testimony of Boeing representative; anticipated materials available in the Justice Department files (hereinafter cited, collectively, as "SEC Cease-and-Desist Order" and referencing the appropriate paragraph in the order).

[334] SEC Cease-and-Desist Order at ¶ 33.

[335] *Id.* at ¶ 34.

aircraft (without mentioning MCAS by name). The bulletin instructed pilots to follow the procedures in the flight manuals for a "runaway stabilizer" – a type of malfunction that could present as similar to repeated unintended MCAS activations on the 737 MAX – in the event of uncommanded nose-down movement.[336]

337.    On November 7, 2018, the FAA issued a public emergency airworthiness directive (AD) to airlines operating the 737 MAX, informing them of the potential for repeated nose-down movements of the aircraft which, "if not addressed, could cause the flight crew to have difficulty controlling the airplane … and [could result in] possible impact with terrain." The airworthiness directive identified the issue as an "unsafe condition" on the 737 MAX, and, as an "interim action" pending further analysis, referred crews to the runaway stabilizer procedures described in Boeing's November 6 bulletin.[337]

338.    At the request of Boeing, the FAA's AD did not mention MCAS, depriving MAX pilots of important information.[338]

339.    Even in the wake of the Lion Air crash Boeing continued to obscure information related to the 737 MAX rather than being straightforward, transparent, and complete in the data they provided.[339]

340.    On or about November 15, 2018, Boeing safety engineers concluded that, in light of the SRB's findings, the MCAS software should be redesigned and re-installed on the 737 MAX fleet to remediate the high crew workload "airplane safety issue." They believed (erroneously) that the software redesign had to be completed within approximately 27 months, but that the 737 MAX

---

[336] *Id.* at ¶ 35.
[337] *Id.* at ¶ 36.
[338] House Comm. Rep. at p. 196.
[339] *Id.*

fleet could continue to operate in the interim in light of Boeing's bulletin and the FAA emergency airworthiness directive.[340]

341.    Around the same time, the FAA conducted its own safety analysis and reached conclusions similar to those reached by the Boeing SRB, including that the Boeing 737 MAX could continue to operate pending remediation of the MCAS-related crew workload issue; however, the FAA review concluded that a software redesign would have to be completed within approximately 8 months (later shortened to approximately 7 months).[341]

***Boeing Assures the Public that the 737 MAX is "as Safe as Any Airplane that has Ever Flown the Skies" while Working to Remediate the "Airplane Safety Issue."***

342.    On or about November 15, 2018, senior executives at Boeing, including Muilenburg, were informed that the SRB had identified the crew workload issue associated with unintended MCAS activation due to erroneous AoA data as an "airplane safety issue" that required remediation, and that Boeing engineers were working on redesigning the MCAS software to address the issue.[342]

343.    Also, on or about November 15, 2018, Boeing's Communications team began working with senior Boeing engineers and lawyers, among others, to draft a press release to update the public following the Lion Air Crash (the "Draft Press Release"), which would evolve to become the November 2018 Press Release.[343]

344.    Early versions of the Draft Press Release generally confirmed the plane's safety, stating that the 737 MAX was either a "safe airplane" or that it "continue[d] to be safe to fly."

---

[340] SEC Cease-and-Desist Order at ¶ 37.
[341] *Id.* at ¶ 38.
[342] *Id.* at ¶ 39.
[343] *Id.* at ¶ 40.

Certain versions also noted that Boeing was working with the FAA to "expedite the development and certification of a flight control software update" for MCAS.[344]

345.     During this time period, Boeing was the subject of extensive negative media coverage over allegations that Boeing had withheld information from pilots, airlines, regulators and the general public regarding MCAS. Other articles raised concerns about MCAS being too powerful and/or relying on a single sensor, and about the integrity of the certification process for the 737 MAX.[345]

346.     Boeing's stock price was also dropping during this time. By November 20, 2018, Boeing's stock price had fallen by 11.6% since the Lion Air Crash.[346]

347.     On November 20, 2018, Muilenburg expressed disappointment in Boeing's response to the negative post-crash media coverage, stating in an email that "[w]e are spending too much time playing defense… [we] need to start playing some offense."[347]

348.     The next day, an official at the U.S. National Transportation Safety Board ("NTSB") emailed Boeing a draft of the preliminary report on the Lion Air accident investigation (the "Lion Air Preliminary Report"), which was expected to be released to the public by the Indonesian government within the coming days.[348]

349.     Later that day, the Communications team sent Muilenburg and other executives an updated version of the Draft Press Release. After reviewing the draft, Muilenburg directed that the Draft Press Release be modified to incorporate a discussion of facts drawn from the Lion Air

---

[344] *Id.* at ¶ 41.
[345] *Id.* at ¶ 42.
[346] *Id.* at ¶ 43.
[347] *Id.* at ¶ 44.
[348] *Id.* at ¶ 45.

Preliminary Report, and also suggested removing discussion of the planned MCAS software redesign from the Draft Press Release.[349]

350.    On November 24, 2018, the Communications team began revising the Draft Press Release in accordance with Muilenburg's instructions. As a result, the Draft Press Release underwent significant changes as its focus shifted to the Lion Air Preliminary Report.[350]

351.    From that point forward, the Draft Press Release no longer mentioned the development of an "MCAS software update," and also stated that Boeing's customers and passengers "have [Boeing's] assurance that the 737 MAX is as safe as any airplane that has ever flown the skies." In the days that followed, Muilenburg and other executives worked with the Communications team to further revise the Draft Press Release.[351]

352.    On the afternoon of November 27, 2018, Muilenburg approved the issuance of the November 2018 Press Release via email, writing, "Looks great – factual, and sticks to the report while making our key points. Good to go here …." The November 2018 Press Release was published on Boeing's website that evening, just after the public release of the Lion Air Preliminary Report by the Indonesian government.[352]

353.    The November 2018 Press Release highlighted certain facts from the Lion Air Preliminary Report suggesting that pilot error and poor airplane maintenance by Lion Air had contributed to the crash. The November 2018 Press Release deceptively failed to mention that the SRB had identified an ongoing "airplane safety issue" associated with MCAS or the planned software redesign – indeed, it did not mention MCAS at all. The final November 2018 Press Release also contained the false statement: "As our customers and their passengers continue to fly

---

[349] *Id.* at ¶ 46.
[350] *Id.* at ¶ 47.
[351] *Id.* at ¶ 48.
[352] *Id.* at ¶ 49.

the 737 MAX to hundreds of destinations around the world every day, they have our assurance that the 737 MAX is as safe as any airplane that has ever flown the skies."[353]

354.     Prior to the issuance of the November 2018 Press Release, Boeing provided drafts to the FAA and NTSB for informational purposes, and those drafts contained the "as safe as any airplane that has ever flown the skies" language. After the November 2018 Press Release was published, a senior official at the NTSB complained to Boeing, via email, that the November 2018 Press Release was not appropriate given Boeing's involvement in the crash investigation, and that "the omission of certain facts and the highlighting of other facts [in the November 2018 Press Release] leads the reader to Boeing's analytical conclusion."[354] Nonetheless, Boeing did not retract the Press Release.

355.     On November 28, 2018, the first trading day following the public release of the Lion Air Preliminary Report and Boeing's after-hours publication of the November 2018 Press Release, Boeing's stock closed at $333.5, up 4.8% from the prior day's close (compared to a 2% gain for the S&P 500).[355]

356.     The November 2018 Press Release – in particular, the statement that "the 737 MAX is as safe as any airplane that has ever flown the skies" – was misleading under the circumstances absent any discussion of an "airplane safety issue" that required remediation by fixing the MCAS software. Accordingly, Boeing failed to exercise reasonable care to avoid deceiving the public, investors, and its airline customers in connection with the November 2018 Press Release.[356]

357.     A reasonable reader would have considered the statement in the November 2018 Press Release that "the 737 MAX is as safe as any airplane that has ever flown the skies," as well

[353] *Id.* at ¶ 50.
[354] *Id.* at ¶ 51.
[355] *Id.* at ¶ 52.
[356] *Id.* at ¶ 53.

as contrary facts set forth above that were omitted from the November 2018 Press Release, to be material to decisions regarding the 737 MAX, including decisions made by Boeing's airline customers to continue flying the aircraft.[357]

358.    In or around February 2019, Boeing offered and sold $1.5 billion of debt securities to investors. At the time of the offers and sales, Boeing had neither retracted nor modified the materially misleading statement contained in the November 2018 Press Release.


***The Boeing Certification Compliance Review and Discovery of "Concerning" Documents Relating to MCAS Differences Training and Manuals as Boeing's Compliance Review Identifies Documentation Gaps and Inconsistencies in the Certification Process Relating to MCAS.***

359.    On or about November 21, 2018, Boeing senior management assembled a team to review the 737 MAX certification process with a particular focus on MCAS (the "MCAS Certification Compliance Review"), led by a senior Boeing engineer who was familiar with the 737 MAX design, but who had not been directly involved in the certification process. The MCAS Certification Compliance Review team was specifically directed to include in its review aspects of the certification process relating to differences training and flight manuals.[358]

360.    The MCAS Certification Compliance Review team presented its initial findings and conclusions to Boeing senior engineering and compliance personnel, together with representatives of the FAA, on or about December 17, 2018, in a live presentation accompanied by a written report. Muilenburg was briefed on the core findings around this time as well. While the written report was further reviewed over the next several months, the core findings and conclusions did not change.[359]

---

[357] *Id.* at ¶ 54.
[358] *Id.* at ¶ 55.
[359] *Id.* at ¶ 56.

361.    The MCAS Certification Compliance Review ultimately concluded that the certification process with respect to MCAS was compliant with FAA regulations. However, the written report identified several documentation gaps and inconsistencies relating to MCAS and the certification process, including a lack of adequate supporting documentation for the assumption, used by Boeing engineers and test pilots throughout the design and testing process, that repeated unintended MCAS activations (as the crew of Lion Air Flight 610 experienced) would be no more hazardous than a single unintended MCAS activation – an assumption that was later called into doubt by the SRB.[360]

362.    The MCAS Certification Compliance Review report also noted that the supporting rationale for the decision to remove MCAS from the differences training and flight manuals was not properly documented and had been made contemporaneously with the MCAS Expansion. These findings raised questions as to whether the FAA-AEG had been made aware of, and had an opportunity to evaluate, the MCAS Expansion when it agreed to Boeing's proposal to remove MCAS from the differences training and manuals.[361]

363.    The MCAS Certification Compliance Review team was not aware of the November 15, 2016 Chat. Consequently, the November 15, 2016 Chat was not referenced in the MCAS Certification Compliance Review report and did not factor into its findings and conclusions.[362]

***Boeing's Senior Officers are Briefed on the November 15, 2016 Chat.***

364.    In the wake of the Lion Air Crash, the Justice Department (DOJ) began an investigation into the 737 MAX certification process. In January 2019, while collecting documents in connection with the DOJ's investigation, members of Boeing's Legal Department uncovered a

---

[360] *Id.* at ¶ 57.
[361] *Id.* at ¶ 58.
[362] *Id.* at ¶ 59.

series of communications that raised questions about the disclosures made to the FAA-AEG concerning the differences training and manuals certification, including the November 15, 2016 Chat in which Boeing Chief Test Pilot Mark Forkner wrote that he had "lied to regulators (unknowingly)" about MCAS.[363]

365.　In or around January 2019, Boeing's in-house counsel informed Muilenburg and other senior Boeing executives about the existence of the November 15, 2016 Chat. Following that communication, Muilenburg understood the November 15, 2016 Chat to be "concerning."[364]

366.　The November 15, 2016 Chat – like the documentation issues highlighted in the MCAS Certification Compliance Review report – raised significant questions concerning the adequacy of Boeing's disclosures about MCAS in connection with the FAA-AEG's review and approval of pilot training requirements and flight manuals for the 737 MAX, including the omission of MCAS from the differences training and the flight manuals. Yet Boeing did remedy those inadequacies between January 2019 and March 10, 2019.[365]

367.　On March 10, 2019, Ethiopian Airlines Flight 302 crashed shortly after takeoff from Addis Ababa, Ethiopia, killing all 157 passengers and crew on board.[366]

368.　The Justice Department possesses significant information in its files supporting the allegations in ¶¶ 325-67 above but has refused to make those materials available to the victims' families' representatives.[367]

### *Conclusion*

---

[363] *Id.* at ¶ 60.
[364] *Id.* at ¶ 61.
[365] *Id.* at ¶ 62.
[366] DPA SOF at ¶ 53.
[367] Anticipated testimony of victims' representatives' witness.

On information and belief, the victims' families' representatives could prove the foregoing if provided an evidentiary hearing regarding these issues. The families reserve the right to supplement the foregoing if they receive additional information relevant to these facts or if they receive from the Government specific concerns about the proffer.

Dated: November 7, 2022

Respectfully submitted,

/s/ Warren T. Burns                              /s/ Paul G. Cassell
Warren T. Burns (Texas Bar No. 24053119)         Paul G. Cassell (Utah Bar No. 06078)
Burns Charest, LLP                               (Counsel of Record)
wburns@burnscharest.com                          Utah Appellate Project
                                                 S.J. QUINNEY COLLEGE OF LAW
Darren P. Nicholson                              University of Utah
Burns Charest, LLP                               cassellp@law.utah.edu
dnicholson@burnscharest.com                      (no institutional endorsement implied)

Kyle Kilpatrick Oxford
Burns Charest LLP                                Tracy A. Brammeier
koxford@burnscharest.com                         Clifford Law Offices PC
                                                 tab@cliffordlaw.com

                                                 Erin Ressa Applebaum
                                                 Kreindler & Kreindler LLP
                                                 eapplebaum@kreindler.com

                                                 Pablo Rojas
                                                 Podhurst Orseck PA
                                                 projas@podhurst.com

*Attorneys for Victims' Representatives*