# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT FOR THE

NORTHERN DISTRICT OF TEXAS

Fort Worth Division

**FILED**

**January 7, 2021**

KAREN MITCHELL

CLERK, U.S. DISTRICT

COURT <sup>bb</sup>

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) ) ) ) ) | 4:21-CR-005-O |
| v. | ) ) ) | |
| THE BOEING COMPANY, | ) ) ) | |
| Defendant. | ) ) ) ) ) | |

## DEFERRED PROSECUTION AGREEMENT

Defendant The Boeing Company (the "Company"), pursuant to authority granted by the Company's Board of Directors reflected in Attachment B, the United States Department of Justice, Criminal Division, Fraud Section (the "Fraud Section"), and the United States Attorney's Office for the Northern District of Texas (the "USAO-NDTX") enter into this deferred prosecution agreement (the "Agreement"). The terms and conditions of this Agreement are as follows:

### Criminal Information and Acceptance of Responsibility

1.      The Company acknowledges and agrees that the Fraud Section will file the attached one-count criminal Information in the United States District Court for the Northern District of Texas charging the Company with Conspiracy to Defraud the United States, in violation of Title 18, United States Code, Section 371 (the "Information"). In so doing, the Company: (a) knowingly waives any right it may have to indictment on this charge, as well as all rights to a

speedy trial pursuant to the Sixth Amendment to the United States Constitution, Title 18, United States Code, Section 3161, and Federal Rule of Criminal Procedure 48(b); and (b) knowingly waives any objection with respect to venue to any charges by the United States arising out of the conduct described in the Statement of Facts attached hereto as Attachment A (the "Statement of Facts") and consents to the filing of the Information, as provided under the terms of this Agreement, in the United States District Court for the Northern District of Texas. The Fraud Section agrees to defer prosecution of the Company pursuant to the terms and conditions described below.

2.      The Company admits, accepts, and acknowledges that it is responsible under United States law for the acts of its officers, directors, employees, and agents as charged in the Information, and as set forth in the Statement of Facts, and that the allegations described in the Information and the facts described in the Statement of Facts are true and accurate. The Company agrees that, effective as of the date it signs this Agreement, in any prosecution that is deferred by this Agreement, it will not dispute the Statement of Facts set forth in this Agreement, and, in any such prosecution, the Statement of Facts shall be admissible as: (a) substantive evidence offered by the government in its case-in-chief and rebuttal case; (b) impeachment evidence offered by the government on cross-examination; and (c) evidence at any sentencing hearing or other hearing. In addition, in connection therewith, the Company agrees not to assert any claim under the United States Constitution, Rule 410 of the Federal Rules of Evidence, Rule 11(f) of the Federal Rules of Criminal Procedure, Section 1B1.1(a) of the United States Sentencing Guidelines ("USSG" or "Sentencing Guidelines"), or any other federal rule that the Statement of Facts should be suppressed or is otherwise inadmissible as evidence in any form.

-2-

## **Term of the Agreement**

3.      This Agreement is effective for a period beginning on the date on which the Information is filed and ending three years from that date (the "Term").  The Company agrees, however, that, in the event the Fraud Section determines, in its sole discretion, that the Company has knowingly violated any provision of this Agreement or has failed to completely perform or fulfill each of its obligations under this Agreement, an extension or extensions of the Term may be imposed by the Fraud Section, in its sole discretion, for up to a total additional time period of one year, without prejudice to the right of the Fraud Section to proceed as provided in Paragraphs 26-30 below.  Any extension of the Agreement extends all terms of this Agreement, including the terms of the reporting requirement in Attachment D, for an equivalent period.  Conversely, in the event the Fraud Section finds, in its sole discretion, that there exists a change in circumstances sufficient to eliminate the need for the reporting requirement in Attachment D, and that the other provisions of this Agreement have been satisfied, the Agreement may be terminated early.  If the Court refuses to grant exclusion of time under the Speedy Trial Act, Title 18, United States Code, Section 3161(h)(2), the Term shall be deemed to have not begun, and all the provisions of this Agreement shall be deemed null and void, except that the statute of limitations for any prosecution relating to the conduct described in the Statement of Facts shall be tolled from the date on which this Agreement is signed until the date the Court refuses to grant the exclusion of time plus six months, and except for the provisions contained within Paragraph 2 of this Agreement.

**Relevant Considerations**

4.    The Fraud Section enters into this Agreement based on the individual facts and circumstances presented by this case and by the Company, including:

a.    The nature and seriousness of the offense conduct, which involved two of the Company's 737 MAX Flight Technical Pilots deceiving the Federal Aviation Administration's Aircraft Evaluation Group ("FAA AEG") about an important aircraft part called the Maneuvering Characteristics Augmentation System ("MCAS") that impacted the flight control system of Boeing's 737 MAX.  Through this deception, the Company interfered with the FAA AEG's lawful function to evaluate MCAS and to include information about MCAS in the 737 MAX FSB Report, and fraudulently obtained from the FAA AEG a differences-training determination for the 737 MAX that was based on incomplete and inaccurate information about MCAS;

b.    The Company did not receive voluntary disclosure credit pursuant to the Corporate Enforcement Policy in the Department of Justice Manual 9-47.120, or pursuant to the Sentencing Guidelines, because it did not timely and voluntarily disclose to the Fraud Section the offense conduct described in the Statement of Facts;

c.    The Company received partial credit for its cooperation with the Fraud Section's investigation into the Company's above-described deception of the FAA AEG; the Company's cooperation ultimately included voluntarily and proactively identifying to the Fraud Section potentially significant documents and Company witnesses and voluntarily organizing voluminous evidence that the Company was obligated to produce; such cooperation, however, was delayed and only began after the first six months of the

-4-

Fraud Section's investigation, during which time the Company's response frustrated the Fraud Section's investigation;

d.        The Company engaged in remedial measures after the offense conduct, including:  (i) creating a permanent aerospace safety committee of the Board of Directors to oversee the Company's policies and procedures governing safety and its interactions with the FAA and other government agencies and regulators; (ii) creating a Product and Services Safety organization to strengthen and centralize the safety-related functions that were previously located across the Company; (iii) reorganizing the Company's engineering function to have all Boeing engineers, as well as the Company's Flight Technical Team, report through the Company's chief engineer rather than to the business units; and (iv) making structural changes to the Company's Flight Technical Team to increase the supervision, effectiveness, and professionalism of the Company's Flight Technical Pilots, including moving the Company's Flight Technical Team under the same organizational umbrella as the Company's Flight Test Team, and adopting new policies and procedures and conducting training to clarify expectations and requirements governing communications between the Company's Flight Technical Pilots and regulatory authorities, including specifically the FAA AEG.  The Company also made significant changes to its top leadership since the offense occurred;

e.        The Company ultimately provided to the Fraud Section all relevant facts known to it, including information about the individuals involved in the conduct described in the attached Statement of Facts and conduct disclosed prior to the Agreement;

f.        The Company's prior history of misconduct includes a criminal conviction from 1989 for an employee illegally obtaining confidential military planning documents,

and a criminal non-prosecution agreement from 2006 for an employee engaging in procurement fraud. The Company's history also includes a civil FAA settlement agreement from 2015 related to safety and quality issues concerning the Company's Boeing Commercial Airplanes business unit;

g. After the offense conduct, the Company undertook the remedial efforts described above and enhanced and has committed to continuing to enhance its compliance program and internal controls, including ensuring that its compliance program satisfies the minimum elements set forth in Attachment C to this Agreement (Corporate Compliance Program);

h. The Fraud Section determined that an independent compliance monitor was unnecessary based on the following factors, among others: (i) the misconduct was neither pervasive across the organization, nor undertaken by a large number of employees, nor facilitated by senior management; (ii) although two of the Company's 737 MAX Flight Technical Pilots deceived the FAA AEG about MCAS by way of misleading statements, half-truths, and omissions, others in the Company disclosed MCAS's expanded operational scope to different FAA personnel who were responsible for determining whether the 737 MAX met U.S. federal airworthiness standards; (iii) the state of the Company's remedial improvements to its compliance program and internal controls; and (iv) the Company's agreement to meet with and report to the Fraud Section as set forth in Attachment D to this Agreement (Enhanced Reporting Requirements);

i. The Company has agreed to continue to cooperate with the Fraud Section as described in Paragraph 5, below;

j.      Accordingly, after considering (a) through (i) above, the Fraud Section believes that the appropriate resolution in this case is a Deferred Prosecution Agreement with the Company; a criminal monetary penalty in the amount of $243,600,000, which reflects a fine at the low end of the otherwise-applicable Sentencing Guidelines fine range; $1,770,000,000 in compensation to the Company's airline customers; $500,000,000 in additional compensation to the heirs, relatives, and/or legal beneficiaries of the crash victims of Lion Air Flight 610 and Ethiopian Airlines Flight 302; and the Company's agreement to meet with and report to the Fraud Section as set forth in Attachment D to this Agreement.

## Future Cooperation and Disclosure Requirements

5.      The Company and its subsidiaries and affiliates shall cooperate fully with the Fraud Section in any and all matters relating to the conduct described in this Agreement and the attached Statement of Facts and other conduct under investigation by the Fraud Section, until the later of the date upon which all investigations and prosecutions arising out of such conduct are concluded, or the end of the Term.  At the request of the Fraud Section, the Company and its subsidiaries and affiliates shall also cooperate fully with other domestic or foreign law enforcement and regulatory authorities and agencies in any investigation of the Company, its subsidiaries, affiliates, or any of their present or former officers, directors, employees, and agents in any and all matters relating to the conduct described in this Agreement and the attached Statement of Facts and other conduct. The Company's and its subsidiaries' and affiliates' cooperation pursuant to this Paragraph is subject to applicable law and regulations, as well as valid claims of attorney-client privilege or attorney work product doctrine; however, the Company and its subsidiaries and affiliates must provide to the Fraud Section a log of any information or cooperation that is not provided based on

an assertion of law, regulation, or privilege, and the Company and its subsidiaries and affiliates bear the burden of establishing the validity of any such assertion. The Company and its subsidiaries and affiliates agree that their cooperation pursuant to this paragraph shall include, but not be limited to, the following:

      a.      Upon request of the Fraud Section, the Company and its subsidiaries and affiliates shall truthfully disclose all factual information with respect to their activities and those of their present and former directors, officers, employees, agents, and consultants, including any evidence or allegations and internal or external investigations, about which the Company and its subsidiaries and affiliates have any knowledge or about which the Fraud Section may inquire. This obligation of truthful disclosure includes, but is not limited to, the obligation of the Company and its subsidiaries and affiliates to provide to the Fraud Section, upon request, any document, record or other tangible evidence about which the Fraud Section may inquire of the Company and its subsidiaries and affiliates.

      b.      Upon request of the Fraud Section, the Company and its subsidiaries and affiliates shall designate knowledgeable employees, agents, or attorneys to provide to the Fraud Section the information and materials described in Paragraph 5(a) above on behalf of the Company and its subsidiaries and affiliates. It is further understood that the Company and its subsidiaries and affiliates must at all times provide complete, truthful, and accurate information.

      c.      The Company and its subsidiaries and affiliates shall use their best efforts to make available for interviews or testimony, as requested by the Fraud Section, present or former officers, directors, employees, agents, and consultants of the Company and its subsidiaries and affiliates. This obligation includes, but is not limited to, sworn testimony

before a federal grand jury or in federal trials, as well as interviews with domestic or foreign law enforcement and regulatory authorities. Cooperation under this Paragraph shall include identification of witnesses who, to the knowledge of the Company and its subsidiaries and affiliates, may have material information regarding the matters under investigation.

d.     With respect to any information, testimony, documents, records, or other tangible evidence provided to the Fraud Section pursuant to this Agreement, the Company and its subsidiaries and affiliates consent to any and all disclosures to other governmental authorities, including United States authorities and those of a foreign government of such materials as the Fraud Section, in its sole discretion, shall deem appropriate.

6.     In addition to the obligations in Paragraph 5, during the Term, should the Company learn of any evidence or allegation of a violation of U.S. fraud laws committed by the Company's employees or agents upon any domestic or foreign government agency (including the FAA), regulator, or any of the Company's airline customers, the Company shall promptly report such evidence or allegation to the Fraud Section.

## Total U.S. Criminal Monetary Amount

7.     The Company and the Fraud Section agree that the Total U.S. Criminal Monetary Amount to be paid by the Company pursuant to this Agreement is $2,513,600,000, which comprises the following components as further described below:  (i) a criminal monetary penalty of $243,600,000 (the "Criminal Monetary Penalty"); (ii) $1,770,000,000 in compensation to Boeing's airline customers (the "Airline Compensation Amount"); and (iii) $500,000,000 in compensation to the heirs, relatives, and/or legal beneficiaries of the crash victims of Lion Air

Flight 610 and Ethiopian Airlines Flight 302 (the "Crash-Victim Beneficiaries Compensation Amount").

8.      The Company acknowledges that no tax deduction may be sought in connection with the payment of the Criminal Monetary Penalty.  The Company shall not seek or accept directly or indirectly reimbursement or indemnification from any source with regard to the Criminal Monetary Penalty or any other agreement entered into with any other enforcement authority or a regulator concerning the facts set forth in the Statement of Facts.

### **Payment of Criminal Monetary Penalty**

9.      The Fraud Section and the Company agree that application of the Sentencing Guidelines to determine the applicable fine range yields the following analysis:

a.      The 2018 USSG are applicable to this matter.

b.      <u>Offense Level</u>.  Based upon USSG § 2B1.1, the total offense level is 34, calculated as follows:

| (a)(2) | Base Offense Level | 6 |
|---|---|---|
| (b)(1)(N) | Gain of More Than $150,000,000 | +26 |
| (b)(10) | Sophisticated Means | +2 |
| **TOTAL** | | 34 |

<u>Base Fine</u>.  Based upon USSG § 8C2.4(a)(2), which imposes a base fine equal to the pecuniary gain to the organization from the offense if such gain is greater than the amount indicated in the Offense Level Fine Table, the base fine is $243,600,000 (representing Boeing's cost-savings, based on Boeing's assessment of the cost associated with the implementation of full-flight simulator training for the 737 MAX).

-10-

c. <u>Culpability Score</u>. Based upon USSG § 8C2.5, the culpability score is 5, calculated as follows:

| | | |
|---|---|---|
| (a) | Base Culpability Score | 5 |
| (b)(4) | The organization had 50 or more employees and an individual within substantial authority personnel participated in, condoned, or was willfully ignorant of the offense | +2 |
| (g)(2) | The organization cooperated in the investigation, and clearly demonstrated recognition and affirmative acceptance of responsibility for its criminal conduct | -2 |
| **TOTAL** | | 5 |

<u>Calculation of Fine Range</u>:

| | |
|---|---|
| Base Fine | $243,600,000 |
| Multipliers | 1.0 (min) / 2.0 (max) |
| Fine Range | $243,600,000 / $487,200,000 |

10. The Company agrees to pay the Criminal Monetary Penalty of $243,600,000 to the United States Treasury no later than ten (10) business days after the Agreement is fully executed pursuant to payment instructions provided by the Fraud Section in its sole discretion. The Fraud Section and the Company agree that the Criminal Monetary Penalty is appropriate given the facts and circumstances of this case, including the Relevant Considerations described in Paragraph 4.

11. The Criminal Monetary Penalty is final and shall not be refunded. Furthermore, nothing in this Agreement shall be deemed an agreement by the Fraud Section that $243,600,000 is the maximum penalty that may be imposed in any future prosecution, and the Fraud Section is not precluded from arguing in any future prosecution that the Court should impose a higher fine, although the Fraud Section agrees that under those circumstances, it will recommend to the Court

that any amount paid under this Agreement should be offset against any fine the Court imposes as part of a putative future judgment.

## Payment of Airline Compensation Amount

12.     The Company agrees to pay a total Airline Compensation Amount of $1,770,000,000 to its airline customers for the direct pecuniary harm that its airline customers incurred as a result of the grounding of the Company's 737 MAX. The Airline Compensation Amount shall be offset by any payments already made by the Company, as of the date this Agreement is fully executed, to any of its airline customers for the direct pecuniary harm that its airline customers incurred as a result of the grounding of the Company's 737 MAX. The Company shall pay any remaining amounts due under the Airline Compensation Amount to its airline customers by the end of the Term and shall provide documentation to the Fraud Section evidencing the amounts paid.

## Payment of Crash-Victim Beneficiaries Compensation Amount

13.     The Company agrees to pay a total Crash-Victim Beneficiaries Compensation Amount of $500,000,000 to the heirs, relatives, and/or legal beneficiaries of the crash victims of Lion Air Flight 610 and Ethiopian Airlines Flight 302. No later than ten (10) business days after the filing of the Information, the Company shall establish an escrow account ("Escrow Account") into which it shall deposit the full Crash-Victim Beneficiaries Compensation Amount. No monies will be paid out of the Escrow Account without prior approval by the Fraud Section.

14.     The parties agree that the appointment of a Crash-Victim Beneficiaries Compensation Claims Administrator (the "Administrator") is appropriate and necessary to determine the proper administration and disbursement of the Crash-Victim Beneficiaries Compensation Amount that the Company will pay to the beneficiaries of the crash victims.

-12-

15.     The Administrator, consistent with a process imposed and required by the Fraud Section, will make recommendations to the Fraud Section regarding:  (a) the individuals who should receive payments from the Crash-Victim Beneficiaries Compensation Amount; and (b) the compensation amounts that these individuals should receive.  Only the Fraud Section shall be empowered to make final decisions regarding:  (a) the individuals who should receive the victim payments from the Crash-Victim Beneficiaries Compensation Amount; and (b) the compensation amounts that these individuals should receive.

16.     The Company agrees to pay for all costs, fees, and expenses incurred by the Administrator.  The Company shall execute an engagement letter with the Administrator that must be approved, in advance of execution, by the Fraud Section.

17.     Within twenty (20) business days after the filing of the Information, the Company shall submit a written proposal identifying three (3) candidates to serve as the Administrator, setting forth the candidates' qualifications and credentials.  The Fraud Section retains the right, in its sole discretion, to choose the Administrator from among the candidates proposed by the Company.  Any submission or selection of the Administrator by either the Company or the Fraud Section shall be made without unlawful discrimination against any person or class of persons.  The Fraud Section and the Company will use their best efforts to complete the selection process within thirty (30) calendar days of the execution of this Agreement.

18.     The Company agrees that it will not employ or be affiliated with the Administrator for a period of not less than two years from the date on which the Administrator's term expires.  Nor will the Company discuss with the Administrator the possibility of further employment or affiliation during the Administrator's term.  Upon agreement by the parties, this prohibition will

not apply to other claims administration responsibilities that the Administrator may undertake in connection with resolutions with foreign or other domestic authorities.

19.      The Company agrees that it will not use the fact that any beneficiary of the crash victims of Lion Air Flight 610 and Ethiopian Airlines Flight 302 seeks or receives any compensation from the Crash-Victim Beneficiaries Compensation Amount to seek to preclude such beneficiary from pursuing any other lawful claim that such beneficiary might have against the Company.

## Conditional Release from Liability

20.      Subject to Paragraphs 26-30, the Fraud Section agrees, except as provided in this Agreement, that it will not bring any criminal or civil case against the Company relating to any of the conduct as described in the attached Statement of Facts or the Information filed pursuant to this Agreement.  The Fraud Section, however, may use any information related to the conduct described in the attached Statement of Facts against the Company:  (a) in a prosecution for perjury or obstruction of justice; (b) in a prosecution for making a false statement; (c) in a prosecution or other proceeding relating to any crime of violence; or (d) in a prosecution or other proceeding relating to a violation of any provision of Title 26 of the United States Code.

a.      This Agreement does not provide any protection against prosecution for any future conduct by the Company.

b.      In addition, this Agreement does not provide any protection against prosecution of any individuals, regardless of their affiliation with the Company.

## Corporate Compliance Program

21.      The Company represents that it has implemented and will continue to implement a compliance and ethics program designed, implemented, and enforced to prevent and detect

-14-

violations of the U.S. fraud laws throughout its operations, including those of its subsidiaries, affiliates, agents, and joint ventures, and those of its contractors and subcontractors whose responsibilities relate to the Company's interactions with any domestic or foreign government agency (including the FAA), regulator, or any of its airline customers, including, but not limited to, the minimum elements set forth in Attachment C.

22.    In order to address any deficiencies in its internal controls, policies, and procedures, the Company represents that it has undertaken, and will continue to undertake in the future, in a manner consistent with all of its obligations under this Agreement, a review of its existing internal controls, policies, and procedures regarding compliance with U.S. fraud laws, focusing on the Company's interactions with domestic or foreign government agencies (including the FAA), regulators, and any of its airline customers.  Where necessary and appropriate, the Company agrees to adopt a new compliance program, or to modify its existing one, including internal controls, compliance policies, and procedures in order to ensure that it maintains an effective compliance program, including a system of internal controls, designed to effectively detect and deter violations of U.S. fraud laws.  The compliance program, including the internal controls system, will include, but not be limited to, the minimum elements set forth in Attachment C.

### Enhanced Corporate Compliance Reporting

23.    The Company agrees that it will report to the Fraud Section periodically, at no less than three-month intervals during the Term, regarding remediation, implementation, and testing of its compliance program and internal controls, policies, and procedures described in Attachment C. During the Term, the Company shall (i) conduct an initial review and submit an initial report, and (ii) conduct and prepare at least two follow-up reviews and reports, as described in Attachment D.

-15-

**Deferred Prosecution**

24.     In consideration of the undertakings agreed to by the Company herein, the Fraud Section agrees that any prosecution of the Company for the conduct set forth in the attached Statement of Facts or Information will be and hereby is deferred for the Term.  To the extent there is conduct disclosed by the Company that is not set forth in the attached Statement of Facts or Information, such conduct will not be exempt from further prosecution and is not within the scope of or relevant to this Agreement.

25.     The Fraud Section further agrees that if the Company fully complies with all of its obligations under this Agreement, the Fraud Section will not continue the criminal prosecution against the Company described in Paragraph 1 and, at the conclusion of the Term, this Agreement shall expire.  Six months after the Agreement's expiration, the Fraud Section shall seek dismissal with prejudice of the Information filed against the Company described in Paragraph 1, and agree not to file charges in the future against the Company based on the conduct described in this Agreement, the attached Statement of Facts, or the Information.  If, however, the Fraud Section determines during this six-month period that the Company breached the Agreement during the Term, as described in Paragraphs 26-30, the Fraud Section's ability to extend the Term, as described in Paragraph 3, or to pursue other remedies, including those described in Paragraphs 26-30, remains in full effect.

**Breach of the Agreement**

26.     If, during the Term, (a) the Company commits any felony under U.S. federal law; (b) the Company provides in connection with this Agreement deliberately false, incomplete, or misleading information, including in connection with its disclosure of information about individual culpability; (c) the Company or its subsidiaries and affiliates fail to cooperate as set forth in

Paragraphs 5 and 6 of this Agreement; (d) the Company fails to implement a compliance program as set forth in Paragraphs 21-22 of this Agreement and Attachment C; or (e) the Company and its subsidiaries and affiliates otherwise fail to completely perform or fulfill each of their obligations under the Agreement, regardless of whether the Fraud Section becomes aware of such a breach after the Term is complete, the Company and its subsidiaries and affiliates shall thereafter be subject to prosecution for any federal criminal violation of which the Fraud Section has knowledge, including, but not limited to, the charges in the Information described in Paragraph 1, which may be pursued by the Fraud Section in the United States District Court for the Northern District of Texas or any other appropriate venue. Determination of whether the Company has breached the Agreement and whether to pursue prosecution of the Company and its subsidiaries and affiliates shall be in the Fraud Section's sole discretion. Any such prosecution may be premised on information provided by the Company, its subsidiaries and affiliates, or their personnel. Any such prosecution relating to the conduct described in the attached Statement of Facts or relating to conduct known to the Fraud Section prior to the date on which this Agreement was signed that is not time-barred by the applicable statute of limitations on the date of the signing of this Agreement may be commenced against the Company, or its subsidiaries and affiliates, notwithstanding the expiration of the statute of limitations, between the signing of this Agreement and the expiration of the Term plus one year. Thus, by signing this Agreement, the Company agrees that the statute of limitations with respect to any such prosecution that is not time-barred on the date of the signing of this Agreement shall be tolled for the Term plus one year. In addition, the Company agrees that the statute of limitations as to any violation of U.S. federal law that occurs during the Term will be tolled from the date upon which the violation occurs until the earlier of the date upon which the Fraud Section is made aware of the violation or the duration of the Term plus five years, and that

this period shall be excluded from any calculation of time for purposes of the application of the statute of limitations.

27.     In the event the Fraud Section determines that the Company has breached this Agreement, the Fraud Section agrees to provide the Company with written notice of such breach prior to instituting any prosecution resulting from such breach.  Within thirty days of receipt of such notice, the Company shall have the opportunity to respond to the Fraud Section in writing to explain the nature and circumstances of such breach, as well as the actions the Company has taken to address and remediate the situation, which explanation the Fraud Section shall consider in determining whether to pursue prosecution of the Company.

28.     In the event that the Fraud Section determines that the Company has breached this Agreement:  (a) all statements made by or on behalf of the Company or its subsidiaries and affiliates to the Fraud Section or to the Court, including the attached Statement of Facts, and any testimony given by the Company or its subsidiaries and affiliates before a grand jury, a court, or any tribunal, or at any legislative hearings, whether prior or subsequent to this Agreement, and any leads derived from such statements or testimony, shall be admissible in evidence in any and all criminal proceedings brought by the Fraud Section against the Company or its subsidiaries and affiliates; and (b) the Company or its subsidiaries and affiliates shall not assert any claim under the United States Constitution, Rule 11(f) of the Federal Rules of Criminal Procedure, Rule 410 of the Federal Rules of Evidence, Section 1B1.1(a) of the USSG, or any other federal rule that any such statements or testimony made by or on behalf of the Company prior or subsequent to this Agreement, or any leads derived therefrom, should be suppressed or are otherwise inadmissible. The decision whether conduct or statements of any current director, officer, or employee, or any person acting on behalf of, or at the direction of, the Company or its subsidiaries and affiliates will

-18-

be imputed to the Company for the purpose of determining whether the Company has violated any provision of this Agreement shall be in the sole discretion of the Fraud Section.

29.     The Company acknowledges that the Fraud Section has made no representations, assurances, or promises concerning what sentence may be imposed by the Court if the Company breaches this Agreement and this matter proceeds to judgment.  The Company further acknowledges that any such sentence is solely within the discretion of the Court and that nothing in this Agreement binds or restricts the Court in the exercise of such discretion.

30.     On the date that the period of deferred prosecution specified in this Agreement expires, the Company, by the Chief Executive Officer of the Company and the Chief Financial Officer of the Company, will submit the certification set forth in Attachment E and certify to the Fraud Section that the Company has met its disclosure obligations pursuant to Paragraph 6 of this Agreement.  Each certification will be deemed a material statement and representation by the Company to the executive branch of the United States for purposes of Title 18, United States Code, Sections 1001 and 1519, and it will be deemed to have been made in the judicial district in which this Agreement is filed.

## Sale, Merger, or Other Change in Corporate Form of the Company

31.     Except as may otherwise be agreed by the parties in connection with a particular transaction, the Company agrees that in the event that, during the Term, it undertakes any change in corporate form, including if it sells, merges, or transfers business operations that are material to the Company's operations, or to the operations of any subsidiaries or affiliates involved in the conduct described in the attached Statement of Facts, as they exist as of the date of this Agreement, whether such sale is structured as a sale, asset sale, merger, transfer, or other change in corporate form, it shall include in any contract for sale, merger, transfer, or other change in corporate form

a provision binding the purchaser, or any successor in interest thereto, to the obligations described in this Agreement. The purchaser or successor in interest must also agree in writing that the Fraud Section's ability to breach under this Agreement is applicable in full force to that entity. The Company agrees that the failure to include these provisions in the transaction will make any such transaction null and void. The Company shall provide notice to the Fraud Section at least thirty (30) days prior to undertaking any such sale, merger, transfer, or other change in corporate form. The Fraud Section shall notify the Company prior to such transaction (or series of transactions) if it determines that the transaction(s) will have the effect of circumventing or frustrating the enforcement purposes of this Agreement. At any time during the Term the Company engages in a transaction(s) that has the effect of circumventing or frustrating the enforcement purposes of this Agreement, the Fraud Section may deem it a breach of this Agreement pursuant to Paragraphs 26-30 of this Agreement. Nothing herein shall restrict the Company from indemnifying (or otherwise holding harmless) the purchaser or successor in interest for penalties or other costs arising from any conduct that may have occurred prior to the date of the transaction, so long as such indemnification does not have the effect of circumventing or frustrating the enforcement purposes of this Agreement, as determined by the Fraud Section.

## Public Statements by the Company

32.     The Company expressly agrees that it shall not, through present or future attorneys, officers, directors, employees, agents, or any other person authorized to speak for the Company make any public statement, in litigation or otherwise, contradicting the acceptance of responsibility by the Company set forth above or the facts described in the attached Statement of Facts. Any such contradictory statement shall, subject to cure rights of the Company described below, constitute a breach of this Agreement, and the Company thereafter shall be subject to prosecution

as set forth in Paragraphs 26-30 of this Agreement.  The decision whether any public statement by any such person contradicting a fact contained in the attached Statement of Facts will be imputed to the Company for the purpose of determining whether it has breached this Agreement shall be at the sole discretion of the Fraud Section.  If the Fraud Section determines that a public statement by any such person contradicts, in whole or in part, a statement contained in the attached Statement of Facts, the Fraud Section shall so notify the Company, and the Company may avoid a breach of this Agreement by publicly repudiating such statement(s) within five business days after notification.  The Company shall be permitted to raise defenses and to assert affirmative claims in other proceedings relating to the matters set forth in the attached Statement of Facts provided that such defenses and claims do not contradict, in whole or in part, a statement contained in the attached Statement of Facts.  This Paragraph does not apply to any statement made by any present or former officer, director, employee, or agent of the Company in the course of any criminal, regulatory, or civil case initiated against such individual, unless such individual is speaking on behalf of the Company.

33.     The Company agrees that if it, or any of its direct or indirect subsidiaries or affiliates, issues a press release or holds any press conference in connection with this Agreement, the Company shall first consult with the Fraud Section to determine (a) whether the text of the release or proposed statements at the press conference are true and accurate with respect to matters between the Fraud Section and the Company; and (b) whether the Fraud Section has any objection to the release.

34.     The Fraud Section agrees, if requested to do so, to bring to the attention of law enforcement and regulatory authorities the facts and circumstances relating to the nature of the conduct underlying this Agreement, including the nature and quality of the Company's cooperation and remediation.  By agreeing to provide this information to such authorities, the Fraud Section is not agreeing to advocate on behalf of the Company, but rather is agreeing to provide facts to be evaluated independently by such authorities.

### Limitations on Binding Effect of the Agreement

35.     This Agreement is binding on the Company, the Fraud Section, and the USAO-NDTX, but specifically does not bind any other component of the United States Department of Justice, other federal agencies, or any state, local or foreign law enforcement or regulatory agencies, or any other authorities, although the Fraud Section will bring the cooperation of the Company and its compliance with its other obligations under this Agreement to the attention of such agencies and authorities if requested to do so by the Company.

### Notice

36.     Any notice to the Fraud Section under this Agreement shall be given by personal delivery, overnight delivery by a recognized delivery service, or registered or certified mail, addressed to the Chief of the Market Integrity and Major Frauds Unit, United States Department of Justice, Criminal Division, Fraud Section, 1400 New York Avenue N.W., Washington, D.C., 20005.  Any notice to the Company under this Agreement shall be given by personal delivery, overnight delivery by a recognized delivery service, or registered or certified mail, addressed to Brett C. Gerry, Chief Legal Officer and Executive Vice President, Global Compliance, The Boeing Company, 100 North Riverside Plaza, Chicago, Illinois 60606.  Notice shall be effective upon actual receipt by the Fraud Section or the Company.

## **Complete Agreement**

37.     This Agreement, including its attachments, sets forth all the terms of the agreement between the Company, the Fraud Section, and the USAO-NDTX.  No amendments, modifications, or additions to this Agreement shall be valid unless they are in writing and signed by the Fraud Section, the USAO-NDTX, the attorneys for the Company, and duly authorized representatives of the Company.

\*        \*        \*

**AGREED:**

**FOR THE BOEING COMPANY:**

Date: 1/6/2021     By: _____
David L. Calhoun
President and Chief Executive Officer
THE BOEING COMPANY

Date: 1/6/2021     By: _____
Brett C. Gerry
Chief Legal Officer and
Executive Vice President, Global Compliance
THE BOEING COMPANY

Date: 1/6/2021     By: _____
Mark Filip
Craig S. Primis
Patrick Haney
KIRKLAND & ELLIS LLP
*Counsel for The Boeing Company*

Date: 1/6/2021     By: _____
Richard Cullen
Benjamin L. Hatch
Brandon M. Santos
MCGUIREWOODS LLP
*Counsel for The Boeing Company*

-24-

**AGREED:**

**FOR THE UNITED STATES DEPARTMENT OF JUSTICE:**

DANIEL S. KAHN
Acting Chief, Fraud Section
Criminal Division

Date: ___1 / 6 / 21___          By: _____

Cory E. Jacobs
Trial Attorney

Date: ___1 / 6 / 21___          By: _____

Michael T. O'Neill
Assistant Chief

Date: ___1 / 6 / 21___          By: _____

Scott Armstrong
Trial Attorney

ERIN NEALY COX
United States Attorney
Northern District of Texas

Date: ___1 / 6 / 21___          By: _____

Chad E. Meacham
Assistant U.S. Attorney

-25-

## COMPANY OFFICER'S CERTIFICATE

I have read the Agreement and carefully reviewed its terms and attachments with inside and outside counsel for The Boeing Company (the "Company"). I understand the terms of the Agreement and voluntarily agree, on behalf of the Company, to each of its terms. Before signing the Agreement, I consulted inside and outside counsel for the Company. Counsel fully advised me of the rights of the Company, of possible defenses, of the Sentencing Guidelines' provisions, and of the consequences of entering into this Agreement.

With the assistance of the Company's Chief Legal Officer, I have provided the Agreement for review by the Company's Board of Directors, who have been briefed on its principal terms and who have delegated authority to approve the Agreement to a subgroup of the Board of Directors, as set forth and described in the Certificate of Corporate Approval. I have advised and caused outside counsel for the Company to advise the duly authorized subgroup of the Company's Board of Directors fully of the rights of the Company, of possible defenses, of the Sentencing Guidelines' provisions, and of the consequences of entering into the Agreement.

No promises or inducements have been made other than those contained in the Agreement. Furthermore, no one has threatened or forced me, or to my knowledge any person authorizing the Agreement on behalf of the Company, in any way to enter into the Agreement. I am also satisfied with outside counsels' representation in this matter. I certify that I am the President and Chief Executive Officer for the Company and that I have been duly authorized by the Company to execute the Agreement on behalf of the Company.


Date: 1/6/2021          By: David L. Calhoun

David L. Calhoun
President and Chief Executive Officer
THE BOEING COMPANY

-26-

## CERTIFICATE OF COUNSEL FOR THE BOEING COMPANY

I am counsel for The Boeing Company (the "Company") in the matter covered by this Agreement. In connection with such representation, I have examined relevant Company documents and have discussed them with the Company's Corporate Secretary and the subgroup of the Company's Board of Directors to which the Board delegated the authority to approve execution of the Agreement after review of the final documents and terms. Based on my review of the foregoing materials and discussions, I am of the opinion that the representative of the Company has been duly authorized to enter into the Agreement on behalf of the Company and that the Agreement has been duly and validly authorized, executed, and delivered on behalf of the Company and is a valid and binding obligation of the Company. Further, I have carefully reviewed the terms of the Agreement with the subgroup of the Board referenced above and the Company's President and Chief Executive Officer. I have fully advised them of the rights of the Company, of possible defenses, of the Sentencing Guidelines' provisions and of the consequences of entering into the Agreement. To my knowledge, the decision of the Company to enter into the Agreement, based on the authorization of the Board of Directors, is an informed and voluntary one.

Date: _____1/6/2021_____     By: _____
Mark Filip
Craig S. Primis
Patrick Haney
KIRKLAND & ELLIS LLP
*Counsel for The Boeing Company*

Date: _____1/6/2021_____     By: _____
Richard Cullen
Benjamin L. Hatch
Brandon M. Santos
MCGUIREWOODS LLP
*Counsel for The Boeing Company*

-27-