# EXHIBIT B

## ATTACHMENT A

## STATEMENT OF FACTS

1.      The following Statement of Facts is incorporated by reference as part of the Deferred Prosecution Agreement (the "Agreement") between the United States Department of Justice, Criminal Division, Fraud Section (the "Fraud Section"), the United States Attorney's Office for the Northern District of Texas (the "USAO-NDTX") and The Boeing Company ("Boeing" or the "Company").  The Company hereby agrees and stipulates that the following information is true and accurate.  The Company admits, accepts, and acknowledges that it is responsible for the acts of its officers, directors, employees, and agents as set forth below.  Should the Fraud Section or the USAO-NDTX pursue the prosecution that is deferred by this Agreement, the Company agrees that it will neither contest the admissibility of, nor contradict, this Statement of Facts in any such proceeding.  The following facts establish beyond a reasonable doubt the charge set forth in the Information attached to this Agreement:

### Background

At all times relevant to this Statement of Facts, with all dates being approximate and inclusive:

*Boeing's New Airplane:  The 737 MAX*

2.      The Boeing Company ("Boeing") was a U.S.-based multinational corporation that designed, manufactured, and sold commercial airplanes to airlines worldwide.  Boeing operated from various locations, including in and around Seattle, Washington.

3.      Boeing's airline customers included major U.S.-based airlines headquartered in the Northern District of Texas and elsewhere.

A-1

4.     The Boeing 737 was a commercial airplane that could seat approximately 200 passengers and was one of Boeing's best-selling airplane models.  Boeing began designing, manufacturing, and selling the Boeing 737 in the 1960s.  Over time, Boeing designed, manufactured, and sold new versions of the Boeing 737 to its airline customers, including major U.S.-based airlines.

5.     In or around June 2011, Boeing began developing and marketing a new version of its Boeing 737 called the 737 MAX.  The 737 MAX was designed by Boeing as a competitive answer to a new version of an airplane developed by one of Boeing's top rivals in commercial airplanes, Company-1.  Like the new version of Company-1's airplane, the 737 MAX promised increased fuel efficiency over its prior version, the 737 Next Generation ("737 NG").  With this increased efficiency, the 737 MAX offered fuel-cost savings for airlines.

*The FAA AEG's Role in Determining Pilot "Differences Training" for New Airplanes*

6.     Before any U.S.-based airline could operate a new commercial airplane, U.S. regulations required the Federal Aviation Administration ("FAA"), an organization within the United States Department of Transportation, to evaluate and approve the airplane for commercial use.  Without this approval, a U.S.-based airline would not be permitted to operate the airplane.

7.     As part of this evaluation and approval process, the FAA had to make two distinct determinations: (i) whether the airplane met U.S. federal airworthiness standards; and (ii) what minimum level of pilot training would be required for a pilot to fly the airplane for a U.S.-based airline.  These two determinations were made by entirely different groups within the FAA that were composed of different personnel with different organizational structures and different reporting lines.

A-2

8.      The FAA Aircraft Evaluation Group ("AEG") was principally responsible for determining the minimum level of pilot training required for a pilot to fly the airplane for a U.S.-based airline.  To make that determination, the FAA AEG compared the new version of the airplane (such as the 737 MAX) to a similar, prior version of the airplane (such as the 737 NG). After evaluating the differences between the new and prior versions of the airplane, the FAA AEG mandated the minimum level of pilot training, known as "differences training," for the new version.

9.      Based on the nature and extent of the differences between the new and prior version of the airplane, the FAA AEG assigned a level of differences training ranging from "Level A" through "Level E."  These levels of differences training ranged in rigor, with "Level A" being the least intensive and "Level E" the most intensive.  As relevant here, "Level B" differences training generally included computer-based training ("CBT") training, and "Level D" differences training generally included full-flight simulator training.

10.     At the conclusion of the FAA's evaluation of the new version of the airplane, the FAA AEG published a Flight Standardization Board Report ("FSB Report").  Among other things, the FSB Report contained relevant information about certain airplane systems and parts that the airplane manufacturer was required to incorporate into airplane manuals and pilot-training materials for all U.S.-based airlines that would fly the airplane.  The FSB Report also contained the FAA AEG's differences-training determination.

A-3

## Boeing's 737 MAX Chief Technical Pilots

11.     Boeing's 737 MAX Flight Technical Team was principally responsible for identifying and providing to the FAA AEG all information that was relevant to the FAA AEG in connection with the FAA AEG's publication of the 737 MAX FSB Report.  The 737 MAX Flight Technical Team was separate and distinct from another group within Boeing that was responsible for providing information to the FAA for certification of whether the airplane met U.S. federal airworthiness standards.

12.     From in or around early 2012 until in or around early 2014, Boeing Employee-1 was a Technical Pilot for Boeing's 737 MAX Flight Technical Team.  In or around early 2014, Boeing Employee-1 became Boeing's 737 MAX Chief Technical Pilot.  In that role, Boeing Employee-1 led the 737 MAX Flight Technical Team.  In or around July 2018, Boeing Employee-1 left Boeing to work for a major U.S.-based airline.

13.     From in or around mid-2014 until in or around July 2018, Boeing Employee-2 was a Technical Pilot for Boeing's 737 MAX Flight Technical Team.  In or around July 2018, after Boeing Employee-1 left Boeing, Boeing Employee-2 became Boeing's 737 MAX Chief Technical Pilot.  In that role, Boeing Employee-2 led the 737 MAX Flight Technical Team.

14.     Boeing Employee-1 and Boeing Employee-2 understood that the FAA AEG relied on them, as members of Boeing's 737 MAX Flight Technical Team, to identify and provide to the FAA AEG all information that was relevant to the FAA AEG in connection with the FAA AEG's publication of the 737 MAX FSB Report, including information that could impact the FAA AEG's differences-training determination.

A-4

15.     Boeing Employee-1 and Boeing Employee-2 also understood that, because flight controls were vital to flying modern commercial airplanes, differences between the flight controls of the 737 NG and the 737 MAX were especially important to the FAA AEG for purposes of its publication of the 737 MAX FSB Report and the FAA AEG's differences-training determination.

## Overview of the Conspiracy to Defraud the FAA AEG

16.     From at least in and around November 2016 through at least in and around December 2018, in the Northern District of Texas and elsewhere, Boeing, through Boeing Employee-1 and Boeing Employee-2, knowingly, and with intent to defraud, conspired to defraud the FAA AEG.

17.     At all times during the conspiracy, Boeing Employee-1 and Boeing Employee-2 were acting within the scope of their employment and with the intention, at least in part, to benefit Boeing.  The purpose of the conspiracy was to defraud the FAA AEG by impairing, obstructing, defeating, and interfering with the lawful function of the FAA AEG by dishonest means in connection with its publication of the 737 MAX FSB Report and its differences-training determination for the Boeing 737 MAX, in order to bring about a financial gain to Boeing and to benefit Boeing Employee-1 and Boeing Employee-2 in connection with the Boeing 737 MAX.

## Lead-Up to the Conspiracy and Scheme to Defraud

*Boeing's Financial Incentive to Secure No Greater than "Level B" Differences Training in the 737 MAX FSB Report*

18.     As Boeing knew, "Level B" differences training was significantly less expensive for airlines to complete than "Level D."  For example, a pilot could complete "Level B" differences training from anywhere in the world in a matter of hours using a computer or tablet.  In contrast, a

A-5

pilot could complete "Level D" differences training only by appearing in person wherever the pilot's airline operated a full-flight simulator. Apart from the cost of acquiring one or more multimillion-dollar simulators and other related expenses, airlines that were required by the FAA AEG to train pilots on a full-flight simulator could also lose revenue that the pilot might otherwise have generated from flying airline passengers during that time. Accordingly, if the FAA AEG required a less rigorous level—such as "Level B"—of differences training for the 737 MAX in the 737 MAX FSB Report, the 737 MAX would be a more attractive option for Boeing's airline customers already flying the 737 NG than switching to an entirely new airplane, such as the new version of Company-1's airplane, as such customers would save significant money in pilot-training costs by transitioning to the 737 MAX.

19.    Principally for this reason, Boeing's stated objectives in designing the 737 MAX included securing the FAA AEG's determination to require no greater than "Level B" differences training in the 737 MAX FSB Report. Boeing Employee-1 and Boeing Employee-2 understood as much. For example, in or around November 2014, Boeing Employee-2 wrote in an internal Boeing electronic chat communication to Boeing Employee-1 that "nothing can jepordize [sic] level b[.]" In or around December 2014, Boeing Employee-1 wrote in an email to another Boeing employee that "if we lose Level B [it] will be thrown squarely on my shoulders. It was [Boeing Employee-1], yes [Boeing Employee-1]! Who cost Boeing tens of millions of dollars!"

*The Maneuvering Characteristics Augmentation System ("MCAS")*

20.    To achieve its promised fuel efficiency, the 737 MAX used larger engines than the 737 NG.  These larger engines, and their placement under the airplane's wings, meant that the aerodynamics of the 737 MAX differed from those of the 737 NG.

21.    These different aerodynamics created a new handling characteristic for the 737 MAX that caused the 737 MAX's nose to pitch up during a certain flight maneuver called a high-speed, wind-up turn.  A high-speed, wind-up turn generally involved sharply turning the airplane at high speed (approximately Mach 0.6-0.8) in a corkscrew-like pattern.

22.    A high-speed, wind-up turn was a "certification" maneuver, that is, a maneuver outside the limits of what the 737 MAX would be expected to encounter during a normal commercial passenger flight.  Nevertheless, if Boeing did not fix the 737 MAX's pitch-up characteristic in high-speed, wind-up turns, the FAA could determine that the 737 MAX did not meet U.S. federal airworthiness standards.

23.    To fix this pitch-up characteristic, Boeing created MCAS and incorporated it as a part of the 737 MAX's flight controls.  MCAS was an aircraft "part" within the meaning of Title 18, United States Code, Sections 31(a)(7) and 38.  In operation, MCAS would automatically cause the airplane's nose to pitch down by adjusting the 737 MAX's horizontal stabilizer (a horizontal tail located near the rear of the airplane).  As originally designed, MCAS could only activate during a high-speed, wind-up turn.

*Boeing Employee-1 and Other Boeing Employees Told the FAA AEG that MCAS was Limited to High-Speed, Wind-Up Turns*

24.     In or around June 2015, Boeing Employee-1 and other Boeing employees briefed the FAA AEG on MCAS. During this briefing, Boeing described MCAS as a system that could only activate during a high-speed, wind-up turn. After the briefing, Boeing Employee-1 and another Boeing employee further discussed MCAS with an FAA AEG employee ("FAA AEG Employee-1") and reiterated to FAA AEG Employee-1 the limited operational scope of MCAS.

*Boeing Subsequently Expanded MCAS's Operational Scope Beyond High-Speed, Wind-Up Turns*

25.     Subsequently, Boeing expanded MCAS's operational scope, including the speed range within which MCAS could activate, significantly altering its original design. Among other things, when the airplane registered a high angle of attack, the change expanded the speed range within which MCAS could activate from approximately Mach 0.6-0.8 to approximately Mach 0.2-0.8—that is, from only high-speed flight to nearly the entire speed range for the 737 MAX, including low-speed flight, which generally occurs at a lower altitude and in and around takeoff and landing. Boeing disclosed this expansion to FAA personnel, but only to those personnel who were responsible for determining whether the 737 MAX met U.S. federal airworthiness standards. Boeing did not disclose the expansion to the FAA AEG personnel responsible for publishing the 737 MAX FSB Report and making the training-related determination.

*Boeing Advocated for the FAA AEG to Publish the 737 MAX FSB Report with No Greater than "Level B" Differences Training*

26.     On or about August 16, 2016, before the FAA AEG published the 737 MAX FSB Report, the FAA AEG issued a provisional "Level B" differences-training determination for the

A-8

737 MAX. At the time of this provisional determination, the FAA AEG was unaware that Boeing had expanded MCAS's operational scope.

27.     On or about the same day, Boeing Employee-1 recognized Boeing's achievement in an email to Boeing employees, including Boeing Employee-2, and wrote that the FAA AEG's provisional determination "culminates more than 3 years of tireless and collaborative efforts across many business units" and that the 737 MAX program management "is VERY happy."

28.     As Boeing Employee-1 and Boeing Employee-2 knew, the FAA AEG based its provisional "Level B" differences training for the 737 MAX in part on its understanding that MCAS could only activate during the limited operational scope of a high-speed, wind up turn.

29.     Boeing Employee-1 and Boeing Employee-2 also understood, as Boeing Employee-1 acknowledged in his email on or about August 16, 2016, that the FAA AEG's "Level B" differences determination for the 737 MAX was only a "provisional approval [. . .] assuming no significant systems changes to the airplane."

30.     For example, in an email to Boeing employees including Boeing Employee-2 discussing a potential change to another part of the 737 MAX's flight controls on or about November 10, 2016, Boeing Employee-1 emphasized that "[o]ne of the Program Directives we were given was to not create any differences [. . .]. This is what we sold to the regulators who have already granted us the Level B differences determination. To go back to them now, and tell them there is in fact a difference [. . .] would be a huge threat to that differences training determination."

A-9

## The Conspiracy Begins

### *"Shocker Alert": Boeing Employee-1 and Boeing Employee-2 Discovered MCAS's Expanded Operational Scope*

31.     On or about November 15, 2016, during a test flight of the 737 MAX in a simulator, Boeing Employee-1 experienced what Boeing Employee-1 recognized as MCAS operating at lower speed.  Boeing Employee-1 further recognized that this lower-speed operation was different from what Boeing had briefed and described to the FAA AEG.

32.     On or about that same day, Boeing Employee-1 and Boeing Employee-2 discussed MCAS in an internal Boeing electronic chat communication, writing in part:

> Boeing Employee-1:  Oh shocker alerT! [sic] / MCAS is now active down to [Mach] .2 / It's running rampant in the sim on me / at least that's what [a Boeing simulator engineer] thinks is happening

> Boeing Employee-2:  Oh great, that means we have to update the speed trim description in vol 2

> Boeing Employee-1:   so I basically lied to the regulators (unknowingly)

> Boeing Employee-2:  it wasn't a lie, no one told us that was the case

33.     At this point, Boeing Employee-1 and Boeing Employee-2 recognized that the FAA AEG was under the misimpression that MCAS operated only during a high-speed, wind up turn and could not operate at lower Mach speeds, such as at Mach 0.2.  Boeing Employee-1 and Boeing Employee-2 therefore knew, at least as of the time of this chat communication, that the FAA AEG's provisional "Level B" differences-training determination had been based in part on outdated and inaccurate information about MCAS.

A-10

34.     Boeing Employee-1 and Boeing Employee-2 also knew that MCAS's expanded operational scope was relevant to the FAA AEG's decisions about the content of the 737 MAX FSB Report, including whether to include information about MCAS.  Boeing Employee-1 and Boeing Employee-2 similarly understood that it was their responsibility to update the FAA AEG about any relevant changes to the 737 MAX's flight controls—such as MCAS's expanded operational scope.

35.     Despite knowing that the FAA AEG had issued its provisional "Level B" determination without any awareness that MCAS's operational scope had been expanded to include high angle of attack conditions in nearly the entire speed range of ordinary commercial flight, Boeing Employee-1 and Boeing Employee-2 did not correct the FAA AEG's understanding of MCAS's operational scope or otherwise ensure that the FAA AEG's "Level B" determination was based on an accurate understanding of MCAS's operation.  Instead, Boeing—through Boeing Employee-1 and Boeing Employee-2—intentionally withheld and concealed from the FAA AEG their knowledge of MCAS's expanded operational scope.

*Boeing, through Boeing Employee-1 and Boeing Employee-2, Deceived the FAA AEG about MCAS's Operational Scope and Told the FAA AEG to Delete MCAS from the 737 MAX FSB Report*

36.     For example, shortly after the simulated test flight described in paragraph 30, Boeing Employee-1 talked with FAA AEG Employee-1, who asked Boeing Employee-1 about the simulated test flight.  Boeing Employee-1 intentionally withheld and concealed from FAA AEG Employee-1 the fact that MCAS's operational scope had been expanded beyond what the FAA AEG relied upon when it issued its provisional "Level B" differences-training determination for the 737 MAX.

37.   Around the time that Boeing Employee-1 and Boeing Employee-2 discussed MCAS's expanded operational scope, Boeing Employee-1 asked a Boeing senior engineer assigned to the 737 MAX program about MCAS's operational scope.   The senior engineer confirmed to Boeing Employee-1 that MCAS could activate beyond the limited operational scope of a high-speed, wind-up turn.   The senior engineer suggested that Boeing Employee-1 contact certain subject-matter experts at Boeing for more specific information about MCAS's operational scope.

38.   On or about November 17, 2016, the FAA AEG emailed three Boeing employees, including Boeing Employee-1, Boeing Employee-2, and another Boeing employee, a draft of the forthcoming 737 MAX FSB Report.   That same day, Boeing Employee-1 asked Boeing Employee-2 and the other Boeing employee to review the draft 737 MAX FSB Report "for any glaring issues."

39.   On or about November 22, 2016, the other Boeing employee emailed the draft 737 MAX FSB Report back to the FAA AEG with proposed edits.   Boeing Employee-1 and Boeing Employee-2 were included on this email.   Boeing Employee-1 included a proposed edit to delete a reference to MCAS, and wrote, "We agreed not to reference MCAS since it's outside normal operating envelope."   Neither Boeing Employee-1 nor Boeing Employee-2 shared the fact of MCAS's expanded operational scope with the FAA AEG or otherwise corrected the FAA AEG's misimpression that MCAS's operational scope was limited to high-speed, wind-up turns.

40.   In doing so, Boeing Employee-1 and Boeing Employee-2 deceived the FAA AEG into believing that the basis upon which the FAA AEG had initially "agreed" to remove any information about MCAS from the 737 MAX FSB Report—that MCAS could only activate during

A-12

the limited operational scope of a high-speed, wind-up turn—remained the same.  Boeing

Employee-1 and Boeing Employee-2 withheld their knowledge of MCAS from the FAA AEG to

avoid risking the FAA AEG taking any action that could threaten the differences-training

determination for the 737 MAX.

41.     On or about January 17, 2017, Boeing Employee-1 again reminded the FAA AEG

in an email to delete any reference to MCAS from the forthcoming 737 MAX FSB Report, and

wrote, "Flight Controls:  Delete MCAS, recall we decided we weren't going to cover it [. . .] since

it's way outside the normal operating envelope."  Again, Boeing Employee-1 deceived the FAA

AEG into believing that the basis upon which the FAA AEG had initially "decided" to remove any

information about MCAS from the 737 MAX FSB Report—that MCAS could only activate during

the limited operational scope of a high-speed, wind-up turn—remained the same.

42.     By concealing MCAS's expanded operational scope from the FAA AEG, Boeing,

through Boeing Employee-1 and Boeing Employee-2, defrauded, impaired, obstructed, defeated,

and interfered with the FAA AEG's lawful function to evaluate MCAS and to include information

about MCAS in the 737 MAX FSB Report.

43.     Based on Boeing's misleading statements, half-truths, and omissions to the FAA

AEG about MCAS, and in reliance on those statements and omissions, the FAA AEG agreed to

delete all information about MCAS from the 737 MAX FSB Report.

44.     From in or around January 2017 through in or around July 2017 (when the 737

MAX FSB Report was published), Boeing Employee-1 and Boeing Employee-2 sent and caused

to be sent emails to representatives of various Boeing airline customers that had agreed to purchase

the 737 MAX, including major U.S.-based airlines.  In these emails, Boeing Employee-1 and

Boeing Employee-2 or members of their 737 MAX Flight Technical Team referenced and included drafts of the forthcoming 737 MAX FSB Report and airplane manuals and pilot-training materials for Boeing's 737 MAX airline customers.  None of these items contained any information about MCAS, consistent with Boeing Employee-1's and Boeing Employee-2's efforts to deceive the FAA AEG into deleting information about MCAS.

*The FAA AEG Published the 737 MAX FSB Report Without Any Information about MCAS and Required No Greater than "Level B" Differences Training*

45.     On or about July 5, 2017, the FAA AEG published the first 737 MAX FSB Report, which included the FAA AEG's "Level B" differences-training determination for the 737 MAX.

46.     Because of Boeing's intentional withholding of information from the FAA AEG, the final version of the 737 MAX FSB Report lacked information about MCAS, and relevant portions of this 737 MAX FSB Report were materially false, inaccurate, and incomplete.  In turn, airplane manuals and pilot-training materials for U.S.-based airlines lacked information about MCAS, and relevant portions of these manuals and materials were similarly materially false, inaccurate, and incomplete as a result.

47.     After the FAA AEG published the final version of the 737 MAX FSB Report, Boeing continued to sell, and Boeing's U.S.-based airline customers were permitted to fly, the 737 MAX.  Pilots flying the 737 MAX for Boeing's airline customers were not provided any information about MCAS in their airplane manuals and pilot-training materials.

*Lion Air Flight 610:  The First 737 MAX Crash Exposed MCAS's Operational Scope*

48.     On October 29, 2018, Lion Air Flight 610, a Boeing 737 MAX, crashed shortly after takeoff into the Java Sea near Indonesia.  All 189 passengers and crew on board died.

A-14

49.     Following the Lion Air crash, the FAA AEG learned that MCAS activated during the flight and may have played a role in the crash.  The FAA AEG also learned for the first time about MCAS's expanded operational scope.

50.     In and around the same time, Boeing employees, including Boeing Employee-2, met with personnel from the FAA AEG to discuss, among other things, MCAS's operational scope.  After that meeting, Boeing Employee-2 told FAA AEG Employee-1 that he was previously unaware of MCAS's expanded operational scope and otherwise misled FAA AEG Employee-1 about Boeing Employee-2's prior knowledge of MCAS.

51.     Also, in and around the same time, Boeing Employee-2 caused Boeing to present a false and misleading presentation to the FAA AEG about MCAS.  Boeing investigated, among other things, what information Boeing Employee-1 and Boeing Employee-2 provided to the FAA AEG about MCAS.  In connection with this investigation, Boeing Employee-2 caused Boeing to represent in a presentation to the FAA AEG that, during the training-evaluation process, Boeing and the FAA AEG had "discussed and agreed on [the] removal of MCAS" from the 737 MAX FSB Report and associated materials.  This representation was misleading because Boeing Employee-2 had failed to disclose the "shocker alert" chat communication and the fact that the FAA AEG was deprived of relevant information about MCAS.

52.     Following the Lion Air crash, Boeing proposed changes to the operational scope of MCAS, and the FAA AEG worked with Boeing to evaluate these changes to MCAS for purposes of pilot training.

_Ethiopian Airlines Flight 302:  The Second 737 MAX Crash and the Grounding of the Fleet_

53.     On March 10, 2019, Ethiopian Airlines Flight 302, a Boeing 737 MAX, crashed shortly after takeoff near Ejere, Ethiopia.  All 157 passengers and crew on board died.  Following the Ethiopian Airlines crash, the FAA AEG learned that MCAS activated during the flight and may have played a role in the crash.

54.     On March 13, 2019, the 737 MAX was officially grounded in the United States, indefinitely halting further flights of this airplane by any U.S.-based airline.

*       *       *

## ATTACHMENT B

## CERTIFICATE OF CORPORATE APPROVAL FOR

## THE BOEING COMPANY

WHEREAS, The Boeing Company (the "Company") has been engaged in discussions with the United States Department of Justice, Criminal Division, Fraud Section (the "Fraud Section") regarding issues arising in relation to the Fraud Section's investigation of violations of U.S. fraud laws by certain of the Company's employees;

WHEREAS, in order to resolve such discussions, it is proposed that the Company enter into a deferred prosecution agreement with the Fraud Section (the "Agreement");

WHEREAS, the Board of Directors of the Company (the "Board") has been extensively briefed on discussions with the Fraud Section regarding an agreement to resolve this matter;

WHEREAS, the Board was informed of the principal terms of the Agreement by the Chief Legal Officer of the Company and agreed that the Company should enter into an agreement on those terms, and delegated to a subgroup of the Board the authority to approve execution of the Agreement after review of the final documents and terms;

WHEREAS, the Board has been provided with the Agreement and its attachments for review; and

WHEREAS, the subgroup of the Board to which this task was delegated has reviewed documents relevant to the Agreement, and has discussed the final terms of the Agreement with David L. Calhoun, the Company's President and Chief Executive Officer, together with inside and outside counsel for the Company; and such counsel have advised Mr. Calhoun and the subgroup of the Company's rights, possible defenses, the Sentencing Guidelines' provisions, and the consequences of entering into the Agreement with the Fraud Section; and such counsel have

further advised the subgroup that the material terms of the final documents are consistent with the terms of the Agreement previously described to the Board;

Therefore, the subgroup of the Board of Directors to which the Board delegated authority has provided its approval as to the following:

1.      The Company (a) acknowledges the filing of the one-count Information (as such term is described/defined in the Agreement) charging the Company with one count of Conspiracy to Defraud the United States, in violation of Title 18, United States Code, Section 371; (b) waives indictment on such charges and enters into a deferred prosecution agreement with the Fraud Section; and (c) agrees to pay a Total U.S. Criminal Monetary Amount of $2,513,600,000 under the Agreement with respect to the conduct described in the Information;

2.      The Company accepts the terms and conditions of the Agreement, including, but not limited to, (a) a knowing waiver of its rights to a speedy trial pursuant to the Sixth Amendment to the United States Constitution, Title 18, United States Code, Section 3161, and Federal Rule of Criminal Procedure 48(b); and (b) a knowing waiver for purposes of the Agreement and any charges by the United States arising out of the conduct described in the Statement of Facts attached to the Agreement of any objection with respect to venue and consents to the filing of the Information, as provided under the terms of the Agreement, in the United States District Court for the Northern District of Texas; and (c) a knowing waiver of any defenses based on the statute of limitations for any prosecution relating to the conduct described in the Statement of Facts attached to the Agreement and Information or relating to conduct known to the Fraud Section prior to the date on which the Agreement is signed that is not time-barred by the applicable statute of limitations on the date of the signing of this Agreement;

B-2

3.      Mr. Calhoun is authorized, empowered and directed, on behalf of the Company, to execute the Agreement substantially in such form as reviewed by the duly authorized subgroup of the Board with such changes as Mr. Calhoun may approve;

4.      Mr. Calhoun is hereby authorized, empowered and directed to take any and all actions as may be necessary or appropriate and to approve the forms, terms or provisions of any agreement or other documents as may be necessary or appropriate, to carry out and effectuate the purpose and intent of the foregoing approval; and

5.      All of the actions of Mr. Calhoun, whose actions would have been authorized by the foregoing approval except that such actions were taken prior to the adoption of such approval, are hereby severally ratified, confirmed, approved, and adopted as actions on behalf of the Company.

Date:    1/5/2021_____   By:   _____

Grant M. Dixton
Corporate Secretary
THE BOEING COMPANY

B-3

## ATTACHMENT C

## CORPORATE COMPLIANCE PROGRAM

In order to address any deficiencies in its internal controls, compliance program, policies, and procedures relating to violations of U.S. fraud laws in connection with interactions with any domestic or foreign government agency (including the FAA), regulator, or any of its airline customers, The Boeing Company (the "Company") agrees to continue to conduct, in a manner consistent with all of its obligations under this Agreement, appropriate reviews of its existing internal controls, policies, and procedures.

Where necessary and appropriate, the Company agrees to adopt a new or to modify its existing compliance program, including internal controls, compliance policies, and procedures in order to ensure that it maintains an effective compliance program that is designed, implemented, and enforced to effectively deter and detect violations of U.S. fraud laws. At a minimum, this should include, but not be limited to, the following elements to the extent they are not already part of the Company's existing internal controls, compliance program, policies, and procedures:

*Commitment to Compliance*

1.      The Company will ensure that its directors and senior management provide strong, explicit, and visible support and commitment to its corporate policy against violations of U.S. fraud laws and its compliance codes, and demonstrate rigorous adherence by example. The Company will also ensure that middle management, in turn, reinforces those standards and encourages employees to abide by them. The Company will create and foster a culture of ethics and compliance with the law in its day-to-day operations.

C-1

*Policies and Procedures*

2.      The Company will develop and promulgate clearly articulated and visible corporate policies against violations of U.S. fraud laws, which policies shall be memorialized in a written compliance code.

3.      The Company will develop and promulgate compliance policies and procedures designed to reduce the prospect of violations of U.S. fraud laws and the Company's compliance code, and the Company will take appropriate measures to encourage and support the observance of ethics and compliance policies and procedures against violation of U.S. fraud laws by personnel at all levels of the Company.  These policies and procedures shall apply to all directors, officers, and employees and, where necessary and appropriate, outside parties acting on behalf of the Company, including, but not limited to, agents, consultants, and joint venture partners (collectively, "agents and business partners").  The Company shall notify all employees that compliance with the policies and procedures is the duty of individuals at all levels of the Company.

*Periodic Risk-Based Review*

4.      The Company will develop these compliance policies and procedures on the basis of a periodic risk assessment addressing the individual circumstances of the Company.

5.      The Company shall review its compliance policies and procedures regarding U.S. fraud laws no less than annually and update them as appropriate to ensure their continued effectiveness, taking into account relevant developments in the field and evolving industry standards.

C-2

*Proper Oversight and Independence*

6.      The Company will assign responsibility to one or more senior corporate executives of the Company for the implementation and oversight of the Company's compliance code, policies, and procedures regarding U.S. fraud laws.  Such corporate official(s) shall have the authority to report directly to independent monitoring bodies, including internal audit, the Company's Board of Directors, or any appropriate committee of the Board of Directors, and shall have an adequate level of stature and autonomy from management as well as sufficient resources and authority to maintain such autonomy.

*Training and Guidance*

7.      The Company will implement mechanisms designed to ensure that its compliance code, policies, and procedures regarding U.S. fraud laws are effectively communicated to all directors, officers, employees, and, where necessary and appropriate, agents and business partners. These mechanisms shall include:  (a) periodic training for all directors and officers, all employees in positions of leadership or trust, any positions that require such training (*e.g.*, internal audit, sales, legal, compliance, finance), and, where necessary and appropriate, agents and business partners; and (b) corresponding certifications by all such directors, officers, employees, agents and business partners, certifying compliance with the training requirements.  The Company will conduct training in a manner tailored to the audience's size, sophistication, or subject matter expertise and, where appropriate, will discuss prior compliance incidents.

8.      The Company will maintain, or where necessary establish, an effective system for providing guidance and advice to directors, officers, employees, and, where necessary and appropriate, agents and business partners, on complying with the Company's compliance code, policies, and procedures regarding U.S. fraud laws, including when they need advice on an urgent basis.

### *Internal Reporting and Investigation*

9.      The Company will maintain, or where necessary establish, an effective system for internal and, where possible, confidential reporting by, and protection of, directors, officers, employees, and, where appropriate, agents and business partners concerning violations of U.S. fraud laws or the Company's compliance code, policies, and procedures regarding U.S. fraud laws.

10.     The Company will maintain, or where necessary establish, an effective and reliable process with sufficient resources for responding to, investigating, and documenting allegations of violations of U.S. fraud laws or the Company's compliance code, policies, and procedures regarding U.S. fraud laws.  The Company will handle the investigations of such complaints in an effective manner, including routing the complaints to proper personnel, conducting timely and thorough investigations, and following up with appropriate discipline where necessary.

### *Enforcement and Discipline*

11.     The Company will implement mechanisms designed to effectively enforce its compliance code, policies, and procedures, including appropriately incentivizing compliance and disciplining violations.

12.     The Company will institute appropriate disciplinary procedures to address, among other things, violations of U.S. fraud laws and the Company's compliance code, policies, and procedures regarding the U.S. fraud laws by the Company's directors, officers, and employees.

Such procedures should be applied consistently and fairly, and in a manner consistent with the violation, regardless of the position held by, or perceived importance of, the director, officer, or employee.   The Company shall implement procedures to ensure that where misconduct is discovered, reasonable steps are taken to remedy the harm resulting from such misconduct, and to ensure that appropriate steps are taken to prevent further similar misconduct, including assessing the internal controls, compliance code, policies, and procedures and making modifications necessary to ensure the overall compliance program regarding U.S. fraud laws is effective.

*Mergers and Acquisitions*

13.     The Company will develop and implement policies and procedures for mergers and acquisitions requiring that the Company conduct appropriate risk-based due diligence on potential new business entities, including appropriate due diligence regarding U.S. fraud laws by legal, accounting, and compliance personnel.

14.     The Company will ensure its compliance code, policies, and procedures regarding U.S. fraud laws apply as quickly as is practicable to newly-acquired businesses or entities merged with the Company, and will promptly (a) train the directors, officers, employees, agents, and business partners consistent with Paragraphs 7-8; and (b) where warranted, conduct an audit of all newly acquired or merged businesses as quickly as is practicable concerning compliance with U.S. fraud laws.

*Monitoring, Testing, and Remediation*

15.     In order to ensure that its compliance program does not become stale, the Company will conduct periodic reviews and testing of its compliance code, policies, and procedures regarding U.S. fraud laws designed to evaluate and improve their effectiveness in preventing and detecting violations of U.S. fraud laws and the Company's code, policies, and procedures

regarding U.S. fraud laws, taking into account relevant developments in the field and evolving industry standards.   The Company will ensure that compliance and control personnel have sufficient direct and indirect access to relevant sources of data to allow for timely and effective monitoring and/or testing.   Based on such review and testing and its analysis of any prior misconduct, the Company will conduct a thoughtful root cause analysis and timely and appropriately remediate to address the root causes.

**ATTACHMENT D**

**ENHANCED REPORTING REQUIREMENTS**

The Boeing Company (the "Company") agrees that it will report to the United States Department of Justice, Criminal Division, Fraud Section (the "Fraud Section") periodically, at no less than three-month intervals during the Term, regarding remediation, implementation, and testing of its compliance program and internal controls, policies, and procedures described in Attachment C.  During the Term, the Company shall (i) conduct an initial review and submit an initial report, and (ii) conduct and prepare at least two follow-up reviews and reports, as described below:

1.      In undertaking the reviews, the Company shall undertake the following activities, among others:  (a) inspection of relevant documents, including the Company's current policies, procedures, and training materials concerning compliance with U.S. fraud laws; (b) inspection and testing of selected systems and procedures of the Company at sample sites, including record-keeping and internal audit procedures; (c) meetings with, and interviews of, relevant current and, where appropriate, former directors, officers, employees, business partners, agents, and other persons at mutually convenient times and places; and (d) analyses, studies, and, most importantly, comprehensive testing of the Company's compliance program.

*Written Work Plans and Reports*

2.      To carry out its enhanced self-reporting obligations, the Company shall conduct an initial review and prepare an initial report, followed by at least two follow-up reviews and reports.

3.      With respect to the initial review and report, after consultation with the Fraud Section, the Company shall prepare the first written work plan within sixty (60) calendar days of

the date this Agreement is executed, and the Fraud Section shall provide comments within thirty (30) calendar days after receipt of the written work plan.

4.      With respect to each follow-up review and report, after consultation with the Fraud Section, the Company shall prepare a written work plan within forty-five (45) calendar days of the submission of the prior report, and the Fraud Section shall provide comments within thirty (30) calendar days after receipt of the written work plan.

5.      Any disputes between the Company and the Fraud Section with respect to any written work plan shall be decided by the Fraud Section in its sole discretion.

6.      All written work plans shall identify with reasonable specificity the activities the Company plans to undertake in execution of the enhanced self-reporting obligations.

7.      By no later than one year from the date this Agreement is executed, the Company shall submit to the Fraud Section a written report setting forth a complete description of its remediation efforts to date, the results of its testing of its compliance program, and its proposals to ensure that its compliance program is reasonably designed, implemented and enforced so that the program is effective in deterring and detecting violations of U.S. fraud laws.  The report shall be transmitted to:

>Sally B. Molloy
>Cory E. Jacobs
>Michael T. O'Neill
>Scott Armstrong
>United States Department of Justice
>Criminal Division, Fraud Section
>1400 New York Avenue N.W.
>Washington, D.C. 20005

The Company may extend the time period for issuance of the initial report with prior written approval of the Fraud Section.

8.      The Company shall undertake at least two follow-up reviews and reports, incorporating the views of the Fraud Section on the Company's prior reviews and reports, to further monitor and assess whether the Company's compliance program is reasonably designed, implemented, and enforced so that it is effective at deterring and detecting violations of U.S. fraud laws.

9.      The first follow-up report shall be completed by no later than one year after the initial report is submitted to the Fraud Section.

10.      The second follow-up report shall be completed and delivered to the Fraud Section no later than thirty (30) days before the end of the Term.

### *Meetings During the Term*

11.      The Company shall meet with the Fraud Section within thirty (30) calendar days after providing each report to the Fraud Section to discuss the report.

12.      At least quarterly, and more frequently if the Fraud Section deems it appropriate in its sole discretion, representatives from the Company and the Fraud Section will meet to discuss the status of the review and enhanced self-reporting obligations, and any suggestions, comments, or improvements the Company may wish to discuss with or propose to the Fraud Section.

### *Contemplated Confidentiality of Reports*

13.      The reports will likely include proprietary, financial, confidential, and competitive business information.  Moreover, public disclosure of the reports could discourage cooperation, impede pending or potential government investigations and thus undermine the objectives of the reporting requirement.  For these reasons, among others, the reports and the contents thereof are intended to remain and shall remain non-public, except as otherwise agreed to by the parties in

writing, or except to the extent that the Fraud Section determines in its sole discretion that disclosure would be in furtherance of the Fraud Section's discharge of its duties and responsibilities or is otherwise required by law.

14.     The Company may extend the time period for submission of any of the follow-up reports with prior written approval of the Fraud Section.

**ATTACHMENT E**

**CERTIFICATION**

To:   United States Department of Justice
      Criminal Division, Fraud Section
      Attention:  Chief of the Fraud Section

Re:   Deferred Prosecution Agreement Disclosure Certification

The undersigned certify, pursuant to Paragraph 30 of the Deferred Prosecution Agreement

("DPA") filed on January _____, 2021 in the United States District Court for the Northern District

of Texas, by and between the United States of America and The Boeing Company (the

"Company"), that undersigned are aware of the Company's disclosure obligations under Paragraph

6 of the DPA, and that the Company has disclosed to the United States Department of Justice,

Criminal Division, Fraud Section (the "Fraud Section") any and all evidence or allegations of

conduct required pursuant to Paragraph 6 of the DPA, which includes evidence or allegations of

any violation of U.S. fraud laws committed by the Company's employees and agents upon any

domestic or foreign government agency (including the FAA), regulator, or any of the Company's

airline customers ("Disclosable Information").  This obligation to disclose information extends to

any and all Disclosable Information that has been identified through the Company's compliance

and controls program, whistleblower channel, internal audit reports, due diligence procedures,

investigation process, or other processes.  The undersigned further acknowledge and agree that the

reporting requirements contained in Paragraph 6 and the representations contained in this

certification constitute a significant and important component of the DPA and of the Fraud

Section's determination whether the Company has satisfied its obligations under the DPA.

E-1

The undersigned hereby certify that they are the Chief Executive Officer and the Chief Financial Officer of the Company, respectively, and that each has been duly authorized by the Company to sign this Certification on behalf of the Company.

This Certification shall constitute a material statement and representation by the undersigned and by, on behalf of, and for the benefit of, the Company to the executive branch of the United States for purposes of 18 U.S.C. § 1001, and such material statement and representation shall be deemed to have been made in the Northern District of Texas.  This Certification shall also constitute a record, document, or tangible object in connection with a matter within the jurisdiction of a department and agency of the United States for purposes of 18 U.S.C. § 1519, and such record, document, or tangible object shall be deemed to have been made in the Northern District of Texas.

Date: _____        Name (Printed): _____



                                    Name (Signed): _____
                                    Chief Executive Officer
                                    THE BOEING COMPANY



Date: _____        Name (Printed): _____



                                    Name (Signed): _____
                                    Chief Financial Officer
                                    THE BOEING COMPANY

E-2