IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | No. 4:21-CR-00005-O |
| THE BOEING COMPANY | |

**THE UNITED STATES OF AMERICA'S RESPONSE TO THE MOTION OF
POLSKIE LINIE LOTNICZE LOT S.A. FOR FINDINGS THAT THE DEFERRED
PROSECUTION AGREEMENT WAS NEGOTIATED IN VIOLATION OF
THE VICTIM'S RIGHTS AND FOR REMEDIES FOR THOSE VIOLATIONS**

The United States of America (the "Government") opposes the motion of Polskie Linie Lotnicze Lot S.A. ("LOT") requesting crime-victim status under the Crime Victims' Rights Act (the "CVRA" or "Act"), 18 U.S.C. § 3771, and certain remedies under that Act. Consistent with the Government's prior briefing, this Court should deny LOT's request for crime-victim status. It should also decline to grant LOT's proposed remedies of re-opening the Deferred Prosecution Agreement (the "DPA") between the Government and The Boeing Company ("Boeing") or placing any DPA in this case under judicial monitoring, as those remedies are neither legally authorized nor factually warranted.

## FACTUAL BACKGROUND

This Court's prior opinions have recounted this case's history. *See United States v. Boeing Co.*, No. 21-cr-5-O, 2022 WL 13829875 (N.D. Tex. Oct. 21, 2022); *United States v. Boeing Co.*, No. 21-cr-5-O, 2022 WL 2972231 (N.D. Tex. Jul. 27, 2022). The Government therefore notes here only those additional facts that uniquely pertain to LOT.

LOT is a Polish state-owned enterprise and airline that purportedly leased several Boeing 737 MAX aircraft in 2016. *See* Dkt. 120 at 6. After the Lion Air Flight 610 and Ethiopian Airlines Flight 302 plane crashes, LOT's European regulator grounded all 737 MAX aircraft operating in European Union airspace. *Id.* at 26. LOT claims to have suffered hundreds of millions of dollars in losses as a result. *Id.* at 6; *see also generally Polskie Linie Lotnicze Lot S.A. v. Boeing Co.*, No. 21-cv-1449, *First Am. Compl. for Damages Filed Under Seal*, Dkt. 49 (W.D. Wash. Nov. 14, 2022).

LOT learned about the DPA on January 7, 2021, when the Government publicly filed that agreement with this Court. Dkt. 120 at 6-7. The Government did not confer with LOT before executing or filing the DPA but did ensure that Boeing would pay over $1.7 billion to its airline

customers as a condition of deferred prosecution. Dkt. 4 ¶ 4(j). LOT represents that Boeing declined to compensate LOT for its losses through that $1.7 billion fund. Dkt. 120 at 6.

On December 30, 2021, nearly a year after the Government filed the DPA, LOT's attorneys sent a letter to the Government. Dkt. 120 at 20-28. They wrote "to bring to [the Government's] attention . . . Boeing's bad faith negotiations with LOT" and its "conduct in the litigation LOT commenced" against Boeing. *Id.* at 20. They claimed that Boeing's conduct violated "the purpose, if not the letter, of the [DPA]" in this case. *Id.* LOT then "request[ed] that [the Government] examine Boeing's conduct" as described in that letter, "its breaches of the DPA, and consider and determine what penalties Boeing's conduct merits, including re-opening the DPA to add to Boeing's customer airline compensation requirement." *Id.* at 27. But LOT did not in that letter claim crime-victim status, assert any rights under the CVRA, or allege that the Government had violated any rights that LOT may have held under the CVRA. LOT's letter also did not request or indicate a need for a response from the Government.

On October 28, 2022—a week after this Court issued its causation opinion concerning the crime-victim status of certain individual crash victims in this case and 22 months after the Government filed the DPA—LOT claimed crime-victim status in this case for the first time. Dkt. 120. LOT's motion asserts that the Government violated the CVRA by executing and filing the DPA without notifying or conferring with LOT. *Id.* at 10-11. As remedies for that alleged violation, LOT requests that this Court issue an order that: (1) re-opens the DPA and instructs the Government to include LOT in any future negotiations regarding a revised DPA or other agreement in this case; (2) exercises this Court's supervisory power to impose a judicial monitorship over the existing or revised DPA; (3) requires the Government to confer with LOT

regarding other means of holding Boeing accountable for its fraud; and (4) provides any other appropriate remedy. *Id.* at 4, 11.

## ARGUMENT

**I.     LOT Is Not a Crime Victim.**

The CVRA affords certain enumerated rights to a "crime victim." 18 U.S.C. § 3771(a). However, putative CVRA movants bear the burden to establish by a preponderance of the evidence that they qualify as a "crime victim." *Boeing*, 2022 WL 13829875 at *5.

To establish crime-victim status under the CVRA, a movant must show that they are "a person directly and proximately harmed as a result of the commission of a Federal offense or an offense in the District of Columbia." 18 U.S.C. § 3771(e)(1). "A person is directly harmed by the commission of a federal offense where that offense is a but-for cause of the harm." *In re Fisher*, 640 F.3d 645, 648 (5th Cir. 2011). Proximate cause, meanwhile, is a "flexible concept" that "generally refers to the basic requirement that there must be some direct relation between the injury asserted and the injurious conduct alleged." *Paroline v. United States*, 572 U.S. 434, 444 (2014) (citations and internal quotation marks omitted). Mere foreseeability, however, will not suffice to establish proximate cause under the CVRA because many "Federal offense[s]," 18 U.S.C. § 3771(e)(1), "cause ripples of harm to flow far beyond the defendant's misconduct," *Bank of Am. Corp. v. City of Miami, Fla.*, 137 S. Ct. 1296, 1306 (2017) (holding that "foreseeability" is insufficient to establish proximate cause under the Fair Housing Act for this reason); *see also* 1 W. LaFave, *Substantive Criminal Law* § 6.4(c) (3d ed., Oct. 2022 Update) (noting that, although proximate cause concepts in tort law and criminal law are "closely analogous," criminal law's conception of proximate cause arguably requires "a closer relationship between the result achieved and that intended or hazarded").

The Government acknowledges this Court's prior opinion concerning the causal chains in this CVRA litigation. For purposes of preserving future arguments on appeal, the Government respectfully incorporates its prior causation arguments here and maintains that LOT does not meet the standard for causation. Indeed, LOT's claimed harm—the grounding of its planes in the wake of the Lion Air and Ethiopian Airlines plane crashes—depends on the subsequent actions of LOT's European regulator, which grounded the planes in order to conduct an independent safety assessment. That proposed chain of causation, however, relies on "ripples of harm" that "flow far beyond" Boeing's misconduct, *Bank of Am. Corp.*, 137 S. Ct. at 1306, and relies on the independent and discretionary decisions of yet another actor. It cannot satisfy the direct and proximate cause requirements of the CVRA.

## II.     LOT's Proposed DPA-Related Remedies Are Unauthorized.

Even assuming that LOT was a crime victim of the Federal offense charged here, no legal authority authorizes a federal court to re-open or monitor the DPA. This Court should decline to award LOT these proposed remedies.

### A.     The CVRA Does Not Authorize Re-opening or Monitoring a DPA.

To enforce their rights under the CVRA, crime victims may file a "motion for relief" with the district court in which a defendant is being prosecuted. 18 U.S.C. § 3771(d)(3). Such motions generally permit modest relief that does not threaten prosecutorial prerogatives or overturn final judgments. "[F]or instance, a victim complaining that government lawyers set a hearing without properly notifying her, *see* 18 U.S.C. § 3771(a)(2)–(4), will ask the court to delay the hearing." *In re Wild*, 994 F.3d 1244, 1262 (11th Cir. 2021) (en banc). Or "[a] victim who asserts that prosecutors struck a plea deal without consulting her, *see id*. § 3771(a)(5), will ask the court to reject the agreement[,]" given its "substantial discretion over whether to accept or reject a plea deal." *Id*. These forms of relief, given the district court's inherent power over scheduling and

significant discretion concerning plea agreements, are "marginal impairment[s] of prosecutorial discretion." *Id.* They therefore comport with the CVRA's command that nothing in the statute "shall be construed to impair the prosecutorial discretion of the Attorney General or any officer under his direction." 18 U.S.C. § 3771(d)(6).

By contrast, re-opening, modifying, or monitoring a DPA as a remedy for a CVRA violation is inconsistent with the statute's text and structure. "[I]t is an elemental canon of statutory construction that where a statute expressly provides a particular remedy or remedies, a court must be chary of reading others into it." *Transamerica Mortg. Advisors, Inc. v. Lewis*, 444 U.S. 11, 19 (1979). That principle applies here because the CVRA explicitly authorizes a crime victim to move to "re-open a plea or sentence" in limited circumstances, 18 U.S.C. § 3771(d)(5), but by contrast, does not authorize the re-opening, modification, or rejection of a DPA. That choice of remedies is notable; after all, Congress specifically referred to "deferred prosecution agreement[s]" elsewhere in the CVRA. *Id.* § 3771(a)(9). And that choice also accounts for the differences between a court's authority over deferred prosecution agreements compared to pleas or sentences. *See United States v. Fokker Servs. B.V.*, 818 F.3d 733, 746 (D.C. Cir. 2016) (noting that in the context of a DPA, "[t]he court never exercises its coercive power by entering a judgment of conviction or imposing a sentence" and that "a DPA involves no formal judicial action imposing or adopting its terms").[1]

---

[1] The CVRA authorizes the re-opening of a plea or sentence only based on a denial of the CVRA "right to be heard" at a plea or sentencing proceeding, 18 U.S.C. § 3771(d)(5)(A), which is different from "the right to confer" with the prosecutor, *compare id.* § 3771(a)(4) *with id.* § 3771(a)(5). That the CVRA explicitly authorizes a re-opening of a plea or sentencing based only on the denial of a "right to be heard" suggests that a denial of some other CVRA right will not justify that relief. Therefore, even if one understood the word "plea" in § 3771(d)(5) to somehow mean "deferred prosecution agreement," LOT still has not made out a case for a re-opening of the DPA under the CVRA because it has never asserted a violation of the CVRA "right to be heard."

If more were needed, separation of powers principles—both those referenced in the CVRA's text and those that form the backdrop for congressional statutes more generally—would foreclose interpreting the CVRA to authorize LOT's proposed DPA remedies. The CVRA itself forbids reading the statute in a manner that will "impair the prosecutorial discretion of the Attorney General or any officer under his direction." 18 U.S.C. § 3771(d)(6). And courts must also read the CVRA against the presumption "that Congress 'acted against the backdrop of long-settled understandings about the independence of the Executive with regard to charging decisions.'" *Wild*, 994 F.3d at 1269 (quoting *Fokker Servs.*, 818 F.3d at 738). Accordingly, if in the CVRA and "in the context of DPAs, Congress intended to rejigger the historical allocation of authority between the courts and the Executive" by allowing a court to re-open, modify, or monitor those agreements,[2] "we would expect [Congress] to do so rather clearly. Congress, at least as a general matter, does not 'hide elephants in mouseholes.'" *HSBC Bank*, 863 F.3d at 138 (quoting *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001)). The CVRA contains no such clear statement.[3]

**B.      This Court's Supervisory Powers Do Not Authorize These Remedies.**

"[T]he supervisory power doctrine is an extraordinary one which should be 'sparingly exercised.'" *HSBC Bank*, 863 F.3d at 136 (quoting *United States v. Jones*, 433 F.2d 1176, 1181-82 (D.C. Cir. 1970)); *accord Chambers v. NASCO, Inc.*, 501 U.S. 32, 44 (1991). It permits federal

---

[2] As explained *infra* at 8, congressional authorization to re-open, modify, or monitor a DPA would "amount to an unwarranted impairment of [the Executive Branch] in the performance of its constitutional duties." *Fokker Servs.*, 818 F.3d at 750 (citation and internal quotation marks omitted).

[3] The CVRA also does not permit a nonparty crime victim to participate in negotiations between the Government and a criminal defendant regarding the resolution of a criminal prosecution. *See In re Amy Unknown*, 701 F.3d 749, 755-56 (5th Cir. 2012) (en banc) (characterizing a crime victim as a nonparty to the underlying criminal prosecution), *abrogated on other grounds sub nom. Paroline*, 572 U.S. 434. LOT's request for an order requiring its participation in future negotiations between Boeing and the Government, Dkt. 120 at 4, lacks merit for this reason as well.

courts, in limited circumstances, to "1) implement a remedy for violation of a recognized right, 2) to preserve judicial integrity by insuring that the conviction [of a defendant] rests on appropriate consideration validly before the jury and 3) as a remedy designed to deter further illegal conduct." *United States v. Ornelas-Rodriguez*, 12 F.3d 1339, 1349 (5th Cir. 1994). These powers "deal strictly with the courts' power to control their *own* procedures," *United States v. Williams*, 504 U.S. 36, 45-46 (1992), and therefore are usually invoked when "a defendant raises a purported impropriety in the federal criminal proceedings and seeks the court's redress of the impropriety," *HSBC Bank*, 863 F.3d at 136 (citation omitted).

By contrast, federal courts' supervisory power over "prosecutorial activities that take place outside the courthouse is extremely limited, if it exists at all." *HSBC Bank*, 863 F.3d at 136 (citation omitted). And whatever the scope of that power, it does not permit a court to alter the separation of powers or to undermine the Constitution's delegation of charging authority to the Executive Branch. *See United States v. Tsarnaev*, 142 S. Ct. 1024, 1036 (2022) (explaining that the exercise of supervisory power "cannot conflict with or circumvent a constitutional provision or federal statute"); *see also Williams*, 504 U.S. at 50 (noting that this power "would not permit reshaping of the grand jury institution" and "substantially altering the traditional relationships between the prosecutor, the constituting court, and the grand jury itself"); *United States v. Payner*, 447 U.S. 727, 736 (1980) (supervisory power may not be applied to override Fourth Amendment standing doctrine).

That matters because "a DPA . . . concerns the prosecution's core prerogative to dismiss criminal charges" and carry out the Executive Branch's unique constitutional "duty under Article II to see that the laws are faithfully executed." *Fokker Servs.*, 818 F.3d at 743. A DPA represents the Executive's considered judgment that, should a defendant abide by certain conditions,

"additional prosecution or punishment would not serve the public interest." *Id.* As here, such agreements are executed without the court's involvement and are carried out without calling upon a court's "coercive powers" to impose judgment or sentence on a defendant. *Id.* at 746; *see also id.* at 744 (noting that "although charges remain pending on the court's docket under a DPA, the court plays no role in monitoring the defendant's compliance with the DPA's conditions").

Against this backdrop, the DPA-related relief that LOT seeks would interfere with the constitutional separation of powers and thus lies beyond the scope of a federal court's supervisory powers. A judicial "re-opening" of a DPA for further negotiations between the Government and defendant would essentially vitiate the Executive Branch's constitutionally delegated judgment regarding when and on what terms criminal prosecution of a defendant is appropriate. Meanwhile, courts "play[] no role in monitoring the defendant's compliance with the DPA's conditions" because "the prosecution—and the prosecution alone" has the constitutional authority to determine "whether the defendant's conduct [under the DPA] warrants dismissal of the pending charges." *Fokker Servs.*, 818 F.3d at 744; *see also HSBC Bank*, 863 F.3d at 137 ("[T]he district court has no freestanding supervisory power to monitor the implementation of a DPA."). An order re-opening a DPA or placing a DPA under a judicial monitorship would thus "amount to a substantial and unwarranted intrusion on the Executive Branch's fundamental prerogatives." *Fokker Servs.*, 818 F.3d at 744. The federal supervisory power does not authorize that result.

Indeed, "[p]erhaps the most telling indication of a severe constitutional problem" with LOT's proposed supervisory-power remedies "is a lack of historical precedent to support [them]." *Seila Law LLC v. Consumer Fin. Prot. Bureau*, 140 S. Ct. 2183, 2201 (2020). Neither the Supreme Court nor any court of appeals has ever endorsed a court exercising its supervisory power over a DPA in the ways that LOT proposes. And the two district courts that attempted to assert statutory

or supervisory authority to review or monitor DPAs despite Executive primacy in this area were reversed on appeal or through a writ of mandamus. *See HSBC Bank*, 863 F.3d at 142; *Fokker Servs.*, 818 F.3d at 751.

Courts have at most left open the possibility that egregious government misconduct in the execution or implementation of a DPA could lead to the remedies that LOT now seeks. *See HSBC Bank*, 863 F.3d at 137 & n.6; *Fokker Servs.*, 818 F.3d at 747; *cf. United States v. Swenson*, 894 F.3d 677, 684 (5th Cir. 2018) ("[T]he supervisory authority of the district court includes the power to impose the extreme sanction of dismissal with prejudice only in extraordinary situations and only where the government's misconduct has prejudiced the defendant." (citation omitted)). But no such misconduct exists here; rather, as explained below, *see infra* at 16, at all times the Government acted in good faith in negotiating the DPA in this case.[4]

### III.   LOT's Proposed Remedies Are Unwarranted.

Even if this Court could grant LOT the remedies it seeks, it should refrain from doing so. Both equitable principles and the facts of this case counsel against such extraordinary relief.

#### A.   Laches Bars LOT's Proposed DPA Relief.

"[L]aches is a defense developed by courts of equity; its principal application was, and remains, to claims of an equitable cast for which the Legislature has provided no fixed time limitation." *Petrella v. Metro-Goldwyn-Mayer, Inc.*, 572 U.S. 663, 678 (2014). A successful laches defense bars a party from obtaining equitable relief if that party's unreasonable delay in asserting a right has prejudiced the one against whom the relief is sought. *SCA Hygiene Prod. Aktiebolag v. First Quality Baby Prod., LLC*, 137 S. Ct. 954, 960 (2017).

---

[4] LOT has not cited the Speedy Trial Act, 18 U.S.C. § 3161(h)(2), as a source of authority for this Court to re-open or monitor the current DPA. In any event, the Speedy Trial Act confers no such authority, as the Second and D.C. Circuits have explained. *HSBC Bank*, 863 F.3d at 137-39; *Fokker Servs.*, 818 F.3d at 743-47.

       1.      <u>Laches Applies to CVRA Disputes.</u>

The application of laches in the CVRA context is consistent with the statute's text and structure. The CVRA's text reflects Congress's overarching concern for both speed[5] and finality[6] in litigating and resolving claims under the statute in order to appropriately balance the rights of victims against the rights of criminal defendants and the public. Those same principles are fundamental to our criminal justice system as a whole. *See Calderon v. Thompson*, 523 U.S. 538, 555 (1998) ("Finality is essential to both the retributive and the deterrent functions of criminal law."); *Doggett v. United States*, 505 U.S. 647, 654 (1992) (explaining the risks attending "unreasonable delay between formal accusation and trial"). Applying laches is thus consistent with the text and structure of the CVRA and general equitable principles. *See In re Allen*, 701 F.3d 734, 735 n.1 (5th Cir. 2012) (acknowledging that laches did not bar a victim's motion filed "a few weeks" before sentencing, but reserving whether laches would apply to "a more inconvenient delay").

Laches may bar claims for relief sounding in equity, including where, as here, a putative crime victim asks this Court to re-open (*i.e.*, void) an existing contractual agreement between the Government and a criminal defendant and to oversee the implementation of a DPA. *See Sommers Drug Stores Co. Emp. Profit Sharing Tr. v. Corrigan Enters., Inc.*, 793 F.2d 1456, 1463 (5th Cir. 1986) ("'Equitable or remedial' relief generally includes all of the kinds of relief available to restore the plaintiff's losses or protect him from future harm—recission, e.g."); *Reg'l Props., Inc.*

---

[5] *See* 18 U.S.C. § 3771(d)(3) (district court to rule on a crime victim's motion "forthwith"); *id.* (appellate court to rule within 72 hours, absent a stipulation between litigants); *id.* (no stay or continuance of proceedings "for more than five days for purposes of enforcing [the CVRA]").

[6] *See* 18 U.S.C. § 3771(d)(5) (ruling out new trials and, for CVRA movants who fail to act quickly, any motion to re-open a defendant's plea or sentence).

*v. Fin. & Real Est. Consulting Co.*, 678 F.2d 552, 562 (5th Cir. 1982) ("[H]istorically, a suit to void a contract sounded in equity, and . . . in suits in equity, equitable defenses, such as laches, estoppel, etc., may be raised."); Dan Dobbs & Caprice Roberts, *Law of Remedies: Damages, Equity, Restitution* § 1.2, at 9 (3d ed. 2018) (explaining that "[t]he injunction and most other coercive remedies were equitable" and that even declaratory relief is "widely regarded as a hybrid" of relief at law and equity).

To be sure, laches does not often apply in criminal cases. But that is because "laches may not be asserted as a defense against the United States when it is acting in its sovereign capacity to enforce a public right or protect the public interest." *United States v. Popovich*, 820 F.2d 134, 136 (5th Cir. 1987). Accordingly, a criminal defendant cannot assert laches against the United States. *See United States v. Batson*, 608 F.3d 630, 633 n.3 (9th Cir. 2010); *United States v. Milstein*, 401 F.3d 53, 63 (2d Cir. 2005). But no similar principle stands in the way of asserting a laches defense against a nonparty CVRA movant's belated petition for extraordinary equitable relief.

    2.    <u>Laches Applies Here.</u>

A laches defense requires the party asserting it to "show: (1) a delay in asserting a right or claim; (2) that the delay was not excusable; and (3) that there was undue prejudice to the party against whom the claim is asserted." *Envt'l Def. Fund v. Alexander*, 614 F.2d 474, 478 (5th Cir. 1980) (citation and internal quotation marks omitted). A laches defense will always "depend[] upon the circumstances" of a case. *Id.* Furthermore, the requirements that trigger laches are "interrelated," *Armco, Inc. v. Armco Burglar Alarm Co., Inc.*, 683 F.2d 1155, 1161 (5th Cir. 1982), meaning that "the decision to apply the doctrine of laches lies on a sliding scale," *Smith v. Caterpillar, Inc.*, 338 F.3d 730, 734 (7th Cir. 2003). The longer the delay of the moving party, the less prejudice the party asserting laches must show. *Id.* And the inverse is also true: when a

newly asserted right threatens significant prejudice, even a relatively short delay can sustain a laches defense. *See id.*; *accord Armco*, 683 F.2d at 1161.

Here, LOT delayed seeking to re-open or impose a monitorship over the DPA for 21 months. That delay brings laches into play, particularly given that the CVRA emphasizes the need for finality and speedy resolution of victims' claims and that the DPA in this case lasts only for 36 months. *See Czaplicki v. The Hoegh Silvercloud*, 351 U.S. 525, 533 (1956) (delay necessary to support laches varies with context); *cf. Norris v. United States*, 257 U.S. 77, 80-81 (1921) (finding no reasonable diligence where plaintiff waited 11 months); *Oliveira v. United States*, 827 F.2d 735, 740 (Fed. Cir. 1987) ("[L]itigation delays ranging from 11 months to 4 years 5 months have provided sufficient grounds upon which the doctrine of laches has been invoked.").[7]

LOT's delay does not have any apparent excuse. It learned of the well-publicized DPA on January 7, 2021, Dkt. 120 at 6-7, and had retained its current counsel and contemplated a "re-opening [of] the DPA" no later than December 30, 2021, *id.* at 20, 27. Yet LOT did not then join the ongoing CVRA litigation between the Government, certain crash victims, and Boeing. Instead, it waited to seek relief until October 28, 2022—a week after this Court ruled that the crash victims and their families' harms were directly and proximately caused by the federal offense in this case. No excuse exists for that delay. *See Nat'l Ass'n of Gov't Emps. v. City Pub. Serv. Bd. of San Antonio, Tex.*, 40 F.3d 698, 709 (5th Cir. 1994) (finding no reason "why Plaintiffs' counsel

---

[7] The delay here is far more "inconvenient" than the one in *In re Allen*. Critically, the petitioners there were prospectively asserting their "right to be heard" at a sentencing hearing that had not yet taken place, *see In re Allen*, No. 12-40954, Br. for Petition for a Writ of Mandamus, at 15 (5th Cir. Sept. 4, 2012), and nothing about the assertion of that right a few weeks before sentencing was sufficiently disruptive to bring laches into play, *In re Allen*, 701 F.3d at 735 n.1. Indeed, the CVRA's text expressly considers such a request timely. *See* 18 U.S.C. § 3771(d)(5) (suggesting that a movant need only assert right to be heard at sentencing "before or during" the sentencing hearing).

did not pursue this litigation, or why Plaintiffs should not be charged with their counsels' neglect"); *Hefner v. New Orleans Pub. Serv., Inc.*, 605 F.2d 893, 898 (5th Cir. 1979) (litigant did not claim to have been "unaware of the terms of" the challenged consent decree or fraudulently or accidentally misled about its existence); *Save Our Wetlands, Inc. (SOWL) v. U.S. Army Corps of Engr's*, 549 F.2d 1021, 1028 (5th Cir. 1977) ("Given the visibility and publicity of the [challenged project] . . . the plaintiffs' delay in bringing this litigation was inexcusable.").

Finally, LOT's 21-month delay in seeking to re-open or impose a monitorship over the DPA unfairly prejudices the Government and Boeing. When LOT filed its CVRA motion, those parties (as well as the recipients of Boeing's money) had already "built up expectations based on over [21 months] of experience with the terms of" a 36-month DPA. *Hefner*, 605 F.2d at 828. Indeed, during that time period, the Government and Boeing expended substantial time and significant resources carrying out the terms of the DPA. *Cf. Alexander*, 614 F.2d at 480 (acknowledging that wasted efforts and funds counts toward prejudice); *Hefner*, 605 F.2d at 828 (agreeing that parties being forced "to incur additional expenses solely because of plaintiff's delay" factored into prejudice analysis).

A rule allowing a CVRA movant such a lengthy period of time before invoking its rights, during which a criminal defendant has performed under an agreement to its detriment, would have "enormous practical consequences for the government's ability to negotiate future [DPAs]." *Fokker Servs.*, 818 F.3d at 750 (citation and internal quotation marks omitted). Indeed, if a claimant were able to appear well into a DPA's lifespan to demand its recission or modification, it could create a cloud of uncertainty that "could have potentially far-reaching consequences for prosecutors' ability to pursue—and fashion the terms of—DPAs," *id.*, In short, LOT's 21-month delay in seeking to unravel the DPA will, if the motion succeeds, diminish the effectiveness of

DPAs—an "important tool in the government's efforts to hold defendants accountable," *id.*; *cf. Hefner*, 605 F.2d at 898 (noting when barring suit on grounds of laches that allowing belated suits challenging consent decrees "would severely undercut the strong policy in favor of reaching voluntary settlements to resolve Title VII actions").

### B. This Court Should Decline To Exercise Its Discretion, If Any, To Grant LOT's Requested Relief.

Even if this Court could authorize the equitable remedies that LOT seeks, it should decline to exercise its discretion to do so for two additional reasons. *Cf. Dietz v. Bouldin*, 579 U.S. 40, 46 (2016) ("[T]he exercise of an inherent [supervisory] power must be a reasonable response to the problems and needs confronting the court's fair administration of justice," and "cannot be contrary to any express grant of or limitation on the district court's power contained in a rule or statute."); *Waller v. Georgia*, 467 U.S. 39, 50 (1984) (cautioning in the context of an improper court closure that a "remedy should be appropriate to the violation" and not "a windfall for the defendant," which is "not in the public interest"). These reasons are more fully explained in the Government's November 11, 2022 filing, Dkt. 128, but the Government briefly summarizes those arguments below for the Court's convenience.

*First*, neither re-opening nor monitoring the DPA is in the public interest. Re-opening the DPA would risk the concrete gains and concessions that the Government secured from Boeing through the DPA. Namely, Boeing agreed to and has in fact (1) paid nearly $500 million to the beneficiaries of individual crash victims and more than $1.7 billion to Boeing's 737 MAX airline customers, without any limitation on any of these individuals and entities' ability to seek further compensation from Boeing through civil litigation; (2) made significant factual admissions that bind the company in those civil proceedings; and (3) submitted to enhanced compliance requirements that are designed to ensure that Boeing's fraudulent misconduct never recurs. But if

the DPA is re-opened, the Government would lose its leverage to ensure that Boeing follows through with these promises. Boeing would have no obligation to continue with a variety of compliance reforms, and crash victims and certain airlines would potentially lose the benefit of Boeing's admissions in civil litigation and risk that any civil judgments they might obtain are offset against the millions Boeing has paid them under the DPA.

The Government may also lack leverage to bring Boeing back to the negotiating table during a re-opening of the DPA. Once the DPA went into effect, it constituted an agreement against any further prosecution relating to any of the conduct described in the Statement of Facts attached to the DPA or the Information filed pursuant to the DPA upon compliance by Boeing with the DPA's terms and payment of the families of the individual victims from the compensation fund over the course of the agreement. *See United States v. Garcia*, 519 F.2d 1343, 1345 (9th Cir. 1975) (holding that the Government may not constitutionally prosecute a defendant in contravention of the terms of an executed DPA where defendant complies with agreement's terms); *see also United States v. Hicks*, 693 F.2d 32, 33 (5th Cir. 1982) (implying the same). Because so much of the DPA's term has now passed and Boeing has so significantly complied with its obligations under that agreement (including completing payments to crash-victims and airlines customers), Boeing could argue that any attempt by the Government to pursue criminal charges would constitute a material breach of the agreement. Re-opening the DPA thus poses grave risks to the public interest.

Monitoring the DPA is also not in the public interest. Nothing about the DPA's terms and conditions is illegal, unethical, or suggests governmental impropriety. And for 21 months, the Government has used its expertise, without incident, to review Boeing's ongoing efforts to fulfill

its monetary and compliance obligations under the DPA. The facts of this case do not warrant displacing the Government from that role.

*Second*, the DPA-related remedies that LOT seeks are inappropriate because the Government has acted in good faith throughout the execution of the DPA and the litigation in this case. The already-discussed terms of the DPA demonstrate the Government's good faith efforts to obtain recourse for the crash victims and Boeing's airline customers and to enhance public safety through a revamped compliance program at Boeing. Meanwhile, although the Government has not viewed LOT as a crime victim under the CVRA—and therefore did not consult with it before the DPA was filed—that belief stems from its understanding of the direct and proximate cause requirements underlying the CVRA's definition of a "crime victim." *See Swenson*, 894 F.3d at 685 ("[M]ere error or oversight is neither gross negligence nor intentional misconduct." (citation and internal quotation marks omitted)). And even still, the Government has engaged with LOT when requested and will continue to do so in a reasonable and fair fashion. And finally, the Government has revised its Attorney General Guidelines for Victim and Witness Assistance ("Attorney General Guidelines") to refine and expand the Justice Department's responsibilities to crime victims as well as to other persons or entities who may fall outside the statutory definition of a crime victim but who were still significantly, even if indirectly, harmed by the criminal conduct under investigation, ultimately charged, or addressed in a plea or case-resolution agreement. These efforts demonstrate the Government's good-faith intentions to treat entities such as LOT fairly.

## **CONCLUSION**

For these reasons, this Court should decline to grant LOT's request for crime-victim status and its proposed remedies.

Respectfully submitted,

| | |
|---|---|
| KENNETH A. POLITE, JR.<br>Assistant Attorney General<br>Criminal Division<br>United States Department of Justice | CHAD E. MEACHAM<br>United States Attorney<br>Northern District of Texas |
| By: *s/ Kenneth A. Polite, Jr.*<br>Assistant Attorney General<br>Pennsylvania Bar No. 326446<br>kenneth.polite@usdoj.gov | By: *s/ Chad E. Meacham*<br>United States Attorney<br>Texas Bar No. 00784584<br>chad.meacham@usdoj.gov |
| United States Department of Justice<br>Criminal Division<br>950 Pennsylvania Ave., NW<br>Washington, D.C. 20530<br>202-514-2000 | United States Attorney's Office<br>Northern District of Texas<br>801 Cherry Street, 17th Floor<br>Fort Worth, TX 76102<br>817-252-5200 |

**Certificate of Service**

       I certify that on December 2, 2022, I electronically filed this pleading with the clerk of the court for the U.S. District Court, Northern District of Texas, using the Court's electronic case filing system, which will send a notification of electronic filing to notify counsel of record for Defendant Boeing and LOT.

                                        *s/ Cory E. Jacobs*
                                        Cory E. Jacobs
                                        Assistant Chief, Fraud Section
                                        New York Bar No. 4761953