## UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF TEXAS
## FORT WORTH DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| *Plaintiff* | ) | |
| | ) | |
| v. | ) | Case No. 4:21-cr-005-O-1 |
| | ) | |
| THE BOEING COMPANY, | ) | |
| | ) | |
| *Defendant.* | ) | |
| ———————————————————— | ) | |

## STATEMENT BY NAOISE CONNOLLY RYAN, ET AL. REGARDING PROPOSED COURT-IMPOSED CONDITIONS OF RELEASE ON BOEING UNDER 18 U.S.C. § 3142

/s/ Warren T. Burns
Warren T. Burns (Texas Bar No. 24053119)
Burns Charest, LLP
wburns@burnscharest.com

Darren P. Nicholson
Burns Charest, LLP
icholson@burnscharest.com

Kyle Kilpatrick Oxford
Burns Charest LLP
koxford@burnscharest.com

Chase Hilton
Burns Charest LLP
chilton@burnscharest.com

/s/ Paul G. Cassell
Paul G. Cassell (Utah Bar No. 06078)
(Counsel of Record)
Utah Appellate Project
S.J. QUINNEY COLLEGE OF LAW
University of Utah
cassellp@law.utah.edu
(no institutional endorsement implied)

Tracy A. Brammeier
Clifford Law Offices PC
tab@cliffordlaw.com

Erin R. Applebaum
Kreindler & Kreindler LLP
eapplebaum@kreindler.com

Pablo Rojas
Podhurst Orseck PA
projas@podhurst.com

*Attorneys for Victims' Representatives*

i

## TABLE OF CONTENTS

Table of Authorities.................................................................................................iii

Introduction ........................................................................................................... 1

I.      The Court Should Broadly Consider Boeing's Dangerousness in Setting
        Conditions of Release. ................................................................................. 3

II.     Boeing's Criminal Conduct Demands Aggressive Oversight to Protect Public
        Safety and Transparency in the Process....................................................... 5

        A.  Boeing Concealed Safety Issues from the FAA and Its Airline Customers. ............... 6

        B.  Boeing's Criminal Conspiracy Led Directly and Proximately to the Lion
            Air Crash. ............................................................................................ 10

        C.  Boeing Continued to Conceal Safety Issues After the Lion Air Crash. .................... 11

        D.  Boeing's Coverup Continued Through a Board of Directors Meeting. .................... 14

        E.  Boeing's Lies Led to the Ethiopian Airlines Crash.................................. 16

        F.  Conclusions About Boeing's Criminal Conduct. ...................................... 18

III.    The Court Should Impose Independent Monitoring of and Greater Transparency
        to Boeing's DPA Compliance Efforts. ............................................................ 18

        A.  The Court Should Impose the Standard Condition of Release that
            Boeing  Shall Commit No New Crimes..................................................... 22

        B.  The Court Should Impose a Condition of Release that Boeing's Safety
            and  Ethics Practices Will Be Subject to a Judicial Monitor...................... 22

        C.  The Court Should Impose a Condition of Release that the Substance of
            Boeing's DPA Compliance Efforts are Made Available to the Victims'
            Representatives' Experts and, in Properly Redacted Form, to the
            General   Public to Assure that the Efforts are Effective. ........................ 30

IV.     The Court Should Ask the Government to Disclose Its Information Relevant to
        Conditions of Release. ................................................................................. 34

V.      The Court Should Ask Boeing Which Facts in the Victims' Families Proffer Are
        Disputed and What the Specific Factual Basis is for Any Dispute................. 37

**Conclusion** ........................................................................................................ 38

# TABLE OF AUTHORITIES

## Cases

*Curtis v. M&S Petroleum, Inc.*,
174 F.3d 661, 674 (5th Cir. 1999) ................................................................................. 38

*In re Peregrine Financial Group Customer Litigation*,
2015 WL 1344466, at \*13 (N.D. Ill. Mar. 20, 2015) ...................................................... 33

*SEC v. Prudential Sec., Inc.*,
No. 93 Civ. 2164, 1993 WL 473189, at \*2-3 (D.D.C. Oct. 21, 1993) ............................ 25

*United States v. Aziz*,
No. 21-40878, 2022 WL 1056102, at \*3 (5th Cir. 2022) ................................................ 22

*United States v. Call*,
874 F. Supp. 2d 969, 979 (D. Nev. 2012) ...................................................................... 22

*United States v. Computer Associates International, Inc.*,
Crim. No. 04-837 (ILG) (E.D.N.Y. Sept. 22, 2004) ....................................................... 28

*United States v. Coppola*,
788 F.2d 303, 308 (5th Cir. 1986) .................................................................................. 38

*United States v. Emakoji*,
990 F.3d 885, 892 (5th Cir. 2021) .................................................................................... 3

*United States v. Fortna*,
769 F.2d 243, 250 (5th Cir. 1985) .................................................................................... 4

*United States v. Jefferson*,
258 F.3d 405, 413 (5th Cir. 2001) .................................................................................. 38

*United States v. Jimenez*,
622 F.2d 735 (5th Cir. 1980) .......................................................................................... 11

*United States v. Marcello*,
370 F. Supp. 2d 745 (N.D. Ill. 2005) ............................................................................... 5

*United States v. Montemayor*,
666 F.2d 235, 2367 (5th Cir. 1982) .................................................................................. 4

*United States v. Smith*,
79 F.3d 1208 (D.C. Cir. 1996) (per curiam) ..................................................................... 4

*United States v. Turner*,
367 F. Supp. 2d 319, 333 (E.D.N.Y. 2005) ...................................................................... 5

*United States v. USPLABS, LLC,*
No. 3:15-cr-00496-L, Dkt. 139 at 2 (N.D. Tex. 2016) .................................................. 3

*United States v. Walker,*
No. 2:18-CR-37-FL-1, 2019 WL 4412909, at *5 (E.D.N.C. 2019) ............................... 4

*United States v. ZTE Corp.,*
No. 3:17-CR-0120-K (N.D. Tex. Mar. 7, 2017) .......................................................... 26

Statutes

18 U.S.C. § 1001 ........................................................................................................... 9

18 U.S.C. § 3142 ................................................................................................... passim

18 U.S.C. § 3142(b) ..................................................................................................... 19

18 U.S.C. § 3142(b)(3) ................................................................................................... 9

18 U.S.C. § 3142(c) ............................................................................................... passim

18 U.S.C. § 3142(c)(3) .................................................................................................... 3

18 U.S.C. § 3142(c)(1)(B) ........................................................................ 3, 19, 22, 32, 33

18 U.S.C. § 3142(c)(1)(B)(xiv) ............................................................................... 19, 22

18 U.S.C. § 3142(e)(1) .................................................................................................... 3

18 U.S.C. § 371 ........................................................................................................... 8, 9

18 U.S.C. § 3771(a)(5) .................................................................................................... 1

18 U.S.C. § 3771(c) ...................................................................................................... 39

18 U.S.C. § 38(a) ............................................................................................................ 9

Other Authorities

ABA Standards for Criminal Justice: Monitors (August 2015), at 12,
    http://www.americanbar.org/content/dam/aba/images/abanews/2015annualresol
    utions/108a.pdf ........................................................................................................26

BLOOMBERG LAW, *Deadliest Corporate Crime in the U.S. Will End with 84 Guilty
    Pleas* (June 15, 2020).................................................................................................1

Boeing Current Products & Services (January 22, 2003),
    https://www.boeing.com/commercial/ ......................................................................20

Brandon L. Garrett, *Globalized Corporate Prosecutions*, 97 Va. L. Rev. 1775, 17777 (2011)............................................................................................................25

Brandon L. Garrett, *The Public Interest in Corporate Settlements*, 58 B.C. L. Rev. 1483, 1529-30 (2017) ......................................................................................26

BRANDON L. GARRETT, TOO BIG TO JAIL: HOW PROSECUTORS COMPROMISE WITH CORPORATIONS 15 (Harv. Univ. Press 2014) ....................................25, 27, 29, 34

Comment, *Judicial Review of Corporate Non-Prosecution and Deferred Prosecution Agreements: A Narrow Path to Checking Prosecutorial Discretion*, 3 CORP. & BUS. L.J. 212, 220 (2022)....................................................................25

Corporate Crime Reporter, *Columbia Law Professor John Coffee Says Boeing Deferred Prosecution Agreement One of the Worst* (Feb. 23, 2021) .........................................2

Memorandum from Craig S. Morford, Acting Deputy Att'y Gen., for Heads of Dep't Components and U.S. Att'ys (Mar. 7, 2008), at 4, http://www.justice.gov/dag/morford-useofmonitorsmemo-03072008.pdf.............................27

Memorandum from Paul J. McNulty, Deputy Att'y Gen., to Heads of Dep't Components & United States Att'ys 2 (Dec. 12, 2006)......................................................20

Paul G. Cassell, *Balancing the Scales of Justice: The Case for and the Effects of Utah's Victims' Rights Amendment*, 1994 Utah L. Rev. 1373, 1394 ...............................5

*Pretrial Overview*, U.S. Probation and Pretrial Services, Northern District of Texas, https://www.txnp.uscourts.gov/content/pretrial-overview ................................36

Senate Commerce Hearing on 737 MAX Crashes (Oct. 29, 2019)................................16

Veronica Root Martinez, *Public Reporting of Monitorship Outcomes*, 136 HARV. L. REV. 757, 765-66, 821-22 (2023)............................................................26

Vikramaditya Khanna & Timothy L. Dickson, *The Corporate Monitor: The New Corporate Czar?*, 105 MICH. L. REV. 1713, 1717 n.17 (2007) ...........................25, 27

Rules

Fed. R. Crim. P. 10.........................................................................................23

Fed. R. Evid. 1101(d)(3) ................................................................................4

Treatises

4 WAYNE R. LAFAVE ET AL., CRIMINAL PROCEDURE § 12.1(d) (Nov. 2022 update).......................4

U.S. SENTENCING GUIDELINES MANUAL § 8D1.1 ...................................................25

U.S.S.G. § 8C2.5(g)(3) ...................................................................................25

**STATEMENT BY NAOISE CONNOLLY RYAN, ET AL. REGARDING PROPOSED COURT-IMPOSED CONDITIONS OF RELEASE ON BOEING UNDER 18 U.S.C. § 3142**

## Introduction

Naoise Connolly Ryan et al.[1] (the "victims' representatives"), through undersigned counsel, file this statement regarding conditions of release that the Court should impose pursuant to its authority under 18 U.S.C. § 3142. This brief is authorized under the Crime Victims' Rights Act (CVRA), which provides that the crime victims (and their representatives) are entitled to be "reasonably heard" regarding the "release" of a criminal defendant—such as The Boeing Company. 18 U.S.C. § 3771(a)(5). This Court has also authorized the victims' representatives to be heard in an earlier order. ECF No. 162 at 4-5.

Hearing from the victims' representatives' is particularly important in this extraordinary case. This Court has now determined that, as a direct and proximate result of Boeing's crime, 346 people died. ECF 116 at 16 ("In sum, but for Boeing's criminal conspiracy to defraud the FAA, 346 people would not have lost their lives in the crashes."). This defendant in this case thus committed the deadliest corporate crime in U.S. history.[2]

---

[1] In addition to Ms. Ryan, the other victims' family members filing this motion are Emily Chelangat Babu and Joshua Mwazo Babu, Catherine Berthet, Huguette Debets, Luca Dieci, Bayihe Demissie, Sri Hartati, Zipporah Kuria, Javier de Luis, Nadia Milleron and Michael Stumo, Chris Moore, Paul Njoroge, Yuke Meiske Pelealu, John Karanja Quindos, Guy Daud Iskandar Zen S., and others similarly situated. They are supported by more than one hundred other families.

[2] According to Bloomberg Law, PG&E's 2020 plea to 84 separate involuntary manslaughter counts in connection with a wildfire in Paradise, California, was "the deadliest corporate crime in U.S. history." BLOOMBERG LAW, *Deadliest Corporate Crime in the U.S. Will End with 84 Guilty Pleas* (June 15, 2020). With this Court's recent finding that that Boeing criminally caused the deaths of 346 people, this case became the deadliest corporate crime in our nation's history.

And yet, despite the deaths of hundreds, the Justice Department[3] appears to believe that this case did not even warrant *any* conditions of release being imposed on Boeing. Working hand-in-glove with an admitted corporate criminal, the Department contrived to avoid an arraignment—and thus effectively prevented this Court from imposing even the standard conditions of release on Boeing. Through its covert—and illegal[4]—deferred prosecution agreement (DPA), the Department proposed to effectively immunize Boeing from any criminal responsibility for what it has done. And by including in the DPA extraneous—and unsupportable language—about the lack of facilitation of Boeing's crime by its senior management (ECF 4 at 6),[5] the DPA attempts to block individuals from being held accountable. Little wonder that knowledgeable independent observers have uniformly condemned this DPA. *See, e.g.,* Amicus Br. of Senator Ted Cruz, DE 90 at 2 ("It is important that the government does not walk away from this case with a mere slap on the wrist, especially since … collusive settlements are an increasing problem in federal enforcement"); Corporate Crime Reporter, *Columbia Law Professor John Coffee Says Boeing Deferred Prosecution Agreement One of the Worst* (Feb. 23, 2021) (quoting Professor Coffee as concluding this "is an egregious case and one of the worst deferred prosecution agreements I have seen").

---

[3] All references in this brief to the "Justice Department" refer to the "Main Justice" in Washington, D.C.—specifically the Criminal Division's Fraud Section—not the career prosecutors in the U.S. Attorney's Office for the Northern District of Texas.

[4] This Court has previously found that, in negotiating behind closed doors without informing the victims' representatives, the Department violated its obligations under the CVRA. ECF No. 116 at 16-17. The matter of what remedy the Court should impose for those violations is currently pending. *See* ECF No. 140 (victims' representatives' brief explaining why the only way to enforce their CVRA rights is to rescind the immunity provisions in the DPA).

[5] *See* Corporate Crime Reporter, *Columbia Law Professor John Coffee Says Boeing Deferred Prosecution Agreement One of the Worst* (Feb. 23, 2021) (quoting Professor Coffee as concluding that this language exonerating senior management is "without precedent" and that the Department "cannot know that").

The issue before this Court now is what conditions of release it should impose on Boeing. As outlined in this brief, given the clear evidence of criminal intent to conceal safety problems with the MAX—both by Boeing and its then-corporate leadership—this Court should impose three specific conditions of release: (1) A standard condition that Boeing commit no new crimes; (2) a condition that Boeing cooperate with an independent corporate monitor who will evaluate Boeing's compliance with the DPA; and (3) a condition that the substance of Boeing's corporate compliance efforts adopted in light of the DPA be made public to the fullest extent possible.

## I.     The Court Should Broadly Consider Boeing's Dangerousness in Setting Conditions of Release.

A person charged with an offense may be released pending trial subject to, the "least restrictive … combination of conditions" that a judicial officer determines "will reasonably assure ... the safety of any other person and the community." 18 U.S.C § 3142(c)(1)(B). Accordingly, this Court must make an assessment of what conditions will reasonably assure the safety of the community.

The fact that The Boeing Company is a corporation, not an individual, provides no reason for special treatment. Indeed, the U.S. Attorney's Office for the Northern District of Texas has previously argued to this Court that "conditions of release can be applied to a corporate entity to ensure the safety of the community." *United States v. USPLABS, LLC*, No. 3:15-cr-00496-L, Dkt. 139 at 2 (N.D. Tex. 2016) (citing 18 U.S.C. § 3142). Here, the Court must make its safety assessment against the backdrop that this case involves Boeing—the deadliest corporate criminal in U.S. history.

Although § 3142 "requires a hearing before a court detains a defendant, § 3142(e)(1), the [section] allows a court '*at any time*' to 'impose additional or different conditions of release.' § 3142(c)(3) (emphasis added)." *United States v. Emakoji*, 990 F.3d 885, 892 (5th Cir. 2021)

(affirming order of this Court). In making a release determination, this Court is not constrained by the rules of evidence. *See* Fed. R. Evid. 1101(d)(3) (rules of evidence do not apply when court is "considering whether to release on bail or otherwise"); *United States v. Montemayor*, 666 F.2d 235, 2367 (5th Cir. 1982) (rules of evidence do not apply to detention hearings before the district court); *United States v. Walker*, No. 2:18-CR-37-FL-1, 2019 WL 4412909, at *5 (E.D.N.C. 2019) ("because the evidentiary hearing on defendant's motions is analogous to a detention hearing, it is a "miscellaneous proceeding" to which the Rules of Evidence do not apply."). Commonly district courts receive information concerning release by way of proffer. *See, e.g., United States v. Smith*, 79 F.3d 1208 (D.C. Cir. 1996) (per curiam) (holding defendant's Confrontation Clause rights were not violated at pretrial detention hearing when government proceeded by proffer). In setting conditions of release, the standard of proof is "the simple preponderance standard." *United States v. Fortna*, 769 F.2d 243, 250 (5th Cir. 1985).

When considering the conditions of release, the Court is not limited to dangerous conduct described in a pending indictment and often will consider other criminal conduct committed by a defendant. As a matter of general practice, prosecutors customarily "supply such facts as defendant's prior bad record in order to show that the defendant's bail should be higher or the conditions of his release more strict than would typically be true for a person so charged…." 4 WAYNE R. LAFAVE ET AL., CRIMINAL PROCEDURE § 12.1(d) (Nov. 2022 update).

Here, the victims' representatives provide important information bearing on the Court's determination of release conditions. As a leading criminal procedure treatise explains, the victim's right to be heard at a bail hearing can "contribute information that has a direct bearing upon the questions before the judge on that occasion, which involve the terms and conditions of release …." 4 WAYNE R. LAFAVE ET AL., CRIMINAL PROCEDURE § 12.1(f) (Nov. 2022 update) (citing Paul G.

Cassell, *Balancing the Scales of Justice: The Case for and the Effects of Utah's Victims' Rights Amendment*, 1994 Utah L. Rev. 1373, 1394)). In considering release issues, there are "at least three matters to which [a] victim's statement might … [be] relevant or material …: the strength of the case against defendants, the seriousness of the crimes they are alleged to have committed, and the reasonable apprehension of danger to the victim." *United States v. Marcello,* 370 F. Supp. 2d 745 (N.D. Ill. 2005). The CVRA requires that "the victim to be given an opportunity actually to be 'heard' rather than afforded some alternate means of communicating her views. 'Indeed, the very purpose of this section is to allow the victim to appear personally and directly address the court. This section would fail in its intent if courts determined that written, rather than oral communication, could generally satisfy this right.'" *United States v. Turner*, 367 F. Supp. 2d 319, 333 (E.D.N.Y. 2005) (quoting CVRA Senate Debate at S4268 (statement of Sen. Kyl)).

## II. Boeing's Criminal Conduct Demands Aggressive Oversight to Protect Public Safety and Transparency in the Process.

Simply put, The Boeing Company is one of the most dangerous criminals to ever appear before this Court. Boeing's corporate crime is undoubtedly the deadliest ever committed within this District. But it is important to understand the full scope of Boeing's criminality for the Court to craft appropriate conditions that will assure the safety of the community.

Consistent with normal practice in hearings of this type, the victims' representatives proffer the following facts, which they represent they could establish at an evidentiary hearing.[6] Many of

---

[6] The Court will immediately recognize that many of these facts were previously proffered by the victims' representatives. *See* ECF No. 72-1. In earlier proceedings involving the "crime victim" issue, the Court found it unnecessary to consider all of the points advanced in the proffer; it was able to resolve that issue based on a limited part of that proffer—specifically, expert testimony from Vickie Norton and Christopher Keyes. In the separate CVRA remedies briefing currently pending before the Court, the victims' representatives have filed a motion for leave to re-file that proffer of facts and for an evidentiary hearing. ECF No. 124. That motion is opposed and remains pending. In addition, victims' representatives have filed a motion to supplement the record

these facts are currently in the record in this case—and in the public record.[7] In addition, the victims' representatives believe that the Justice Department possesses in its files significant information corroborating the factual allegations that follow. Unfortunately, however, the Department has decided not to provide that information to the Court. The victims discuss the Department's failure to provide relevant information to the Court in Part IV, below.

### A. Boeing Concealed Safety Issues from the FAA and Its Airline Customers.

Turning to the relevant facts surrounding this case, the Court begins with the Criminal Information that has been filed. ECF No. 1. But in determining what conditions of release to impose, as just discussed, the Court's inquiry is broadly the safety of community—an inquiry that necessarily extends beyond the four corners of the charging document and the connected DPA. Indeed, given earlier proceedings, it is clear that Boeing's crime charged in the Criminal Information directly and proximately produced the deaths of 346 people. Accordingly, this Court must determine conditions of release for a corporation that is criminally responsible for 346 deaths.

The Criminal Information and connected DPA do not fully disclose all of Boeing's criminal behavior. Indeed, at various points, the DPA almost seems to have been designed to obfuscate Boeing's responsibility. For example, the Court will notice that the DPA's Statement of Facts contains few facts about what Boeing did after the Lion Air crash. *See* ¶¶ 48-52. And yet, this is

---

in this case regarding remedies with findings relevant to Boeing's dangerousness made by the SEC. ECF No. 107. If the Court grants these motions in connection with the remedies issues, then the victims' representatives would rely on all those facts for purposes of determining release conditions. Alternatively and in addition, the victims' representatives simply request an evidentiary hearing if that Court believes that it requires additional facts to impose the release conditions that the families seek.

[7] *See, e.g.,* Evidentiary Hearing (Aug. 5, 2022), Families Ex. 4 (Final Committee Report: House Committee on Transportation and Infrastructure: The Design, Development & Certification of the Boeing 737 MAX (Sept. 2020)); Families Exhibit 2 (Indonesian crash report); Families Exhibit 3 (Ethiopian interim crash report).

certainly one of the time periods when Boeing's criminal conspiracy was most active, as it tried to conceal the MAX's unsafe design from the public and pilots.

In this brief, the victims' representatives will provide to the Court information pointing to a broader understanding of the scope of Boeing's criminality. Data obtained from both airplanes show that the pilots were engaged in a terrifying tug-of-war with the planes' Maneuvering Characteristics Augmentation System (MCAS), an aircraft part[8] related to a flight control built into the Boeing 737 MAX's flight control computer. Pilots of both Flight 302 and Flight 610 ultimately lost their fight with Boeing's MCAS.

The MCAS was a disaster waiting to happen born out of Boeing's and its leadership's criminality. Boeing's motive for its crimes was a desperate race with its major competitor in the commercial aviation market, Airbus SE ("Airbus"). To compete with the latest Airbus aircraft, the A320neo, Boeing thought that it needed a more fuel-efficient aircraft of its own. Boeing rejected developing a new, state-of-the-art aircraft, as proposed by its engineers, because of the cost. Instead, Boeing and its leadership made the fateful decision to attach larger and more fuel-efficient engines to the wings of the decades-old 737, creating the 737 MAX via the Federal Aviation Administration's (FAA) Supplemental Type Certification process.

Adding larger engines caused aerodynamic handling problems and made the 737 MAX operate differently than earlier 737 models. Since the 737 MAX handled differently than its predecessors, it would require training for pilots, which would reduce the 737 MAX's profit margins as it competed with the A320neo. This profit loss was unacceptable to Boeing's leadership. Rather than fix the aircraft's known, design-induced, inherent aerodynamic instability, Boeing

---

[8] Boeing has stipulated that MCAS is an aircraft "part" within the meaning of 18 U.S.C. § 31(a)(7) and 38. *See* ECF No. 4 at A-7.

instead introduced MCAS in a deceptive effort to replicate more closely the handling characteristics of the previous 737 models.

MCAS had not been used on prior 737 aircraft; accordingly, Boeing knew its introduction could potentially trigger new pilot training requirements and certification issues. This presented Boeing with a disastrous Catch-22: on the one hand, without MCAS, the MAX could not be certified utilizing the airplane's Supplemental Type Certification process, because the MAX's handling characteristics would not replicate the handling characteristics of previous 737 airplanes. And on the other hand, by introducing a new flight control system, regulators would likely require operators to incorporate additional needed pilot training and require Boeing to conduct additional flight testing. Either outcome could hurt the 737 MAX's sales and profitability. Boeing's criminal solution was to incorporate MCAS but illegally conceal its characteristics not only from the FAA, but also other worldwide aviation authorities and its MAX customers. As part of its criminal conspiracy, Boeing falsely told the FAA that MCAS was just a minor addition to an existing flight control system on the 737NG and that it "only operates WAY outside of the normal operating envelope" so that it would rarely, if ever, activate.

As documented at length in the DPA's Statement of Facts (ECF No. 4), Boeing's representations to the FAA were criminally fraudulent and an illegal conspiracy in violation of 18 U.S.C. § 371. Boeing knew that the MCAS was more powerful and had a much broader operational envelope but deliberately withheld this information from the FAA, its airline customers, and the pilots flying those planes to avoid scrutiny of the MCAS and minimize pilot training requirements.

Boeing's top-down criminal conspiracy against the FAA—and the direct and proximate fraud against its airline customers and those flying on the planes—was just one piece in Boeing's criminal conspiracy of concealment. Driven to maintain market share, Boeing made the decision

to haphazardly rush the 737 MAX to market to keep up with Airbus without requiring necessary safety processes or systems of oversight. Fearful that transparency and disclosure would delay certification and airplane delivery, Boeing resorted to misleading the FAA, its airline customers, their pilots, and the public by actively concealing the MCAS's defects. After each MAX crash, The Boeing Company continued the conspiracy of concealment, illegally covering up the deadly risk-taking that led to the two crashes and minimizing the role of MCAS. Indeed, Boeing delayed producing evidence to the Justice Department for the first six months of the Department's investigation, thereby frustrating and delaying the investigation. DPA, ¶ 4(c), ECF No. 4 at 4-5.

Boeing's strategy to deceive the FAA and sneak the misrepresented MCAS part past the regulator was successful, in part because it was the largest aircraft manufacturer in the world. Under pressure to reach certification date targets, Boeing not only conspired to impede the FAA (in violation of 18 U.S.C. § 371), but it also made false statements to the FAA (in violation of 18 U.S.C. § 1001). It also engaged in fraud involving aircraft parts—fraud that resulting in death (in violation of and punishable by 18 U.S.C. § 38(a) & (b)(3)). More broadly—and obviously relevant to determining conditions of release—Boeing consciously and recklessly disregarded the lives of others at numerous points leading up to the crashes, including by: designing an airplane with the powerful automated MCAS susceptible to catastrophic failure in the event of a single defective angle of attack sensor; failing to conduct a proper hazard analysis of the new MCAS design; failing to mitigate patent and latent hazards in the new MCAS design; failing to conduct adequate human factor evaluations of pilot reactions to erroneous activation of MCAS; failing to evaluate the aerodynamic loads on the manual stabilizer trim wheel when MCAS is activated; failing to identify MCAS as a safety critical system; failing to properly inform pilots about the new system; failing to educate and train pilots in all aspects of its operation; failing to properly address the MCAS in

the airplane's flight manual; failing to include key safety features or redundant systems of protection; deceptively obtaining from the FAA an exemption for certification of the 737 MAX allowing Boeing to obtain certification of the airplane without including a robust cockpit alert system; delivering 737 MAX airplanes with a version of the flight control system that was materially different from the flight control system presented to the FAA during certification; and concealing the 737 MAX's safety issues from the FAA, airlines, pilots, and the public.

### B. Boeing's Criminal Conspiracy Led Directly and Proximately to the Lion Air Crash.

Boeing's failures were not simply engineering mistakes; they were the natural result of the criminal conspiracy that Boeing has admitted. As Senator Cruz aptly explained in his amicus brief in this case, "This is not a mine-run fraud case where some low-level employee lied or committed a technical violation; it is a long-running conspiracy that directly led to some of the worst air travel disasters of the 21st century." Amicus Brief of Sen. Ted Cruz, ECF No. 78 at 6. It is impossible for the conspiracy to have been limited to two persons and a couple of emails and chat messages. This was one of America's largest employers—with thousands of employees, many of whom were involved with engineering, design and testing with checks and approvals of work, over a period from 2011 to 2018 and beyond, with clear leadership direction to avoid pilot training and keep up with Airbus to increase the organization's stock price.

Boeing fully understood the deadly risks it was taking. Boeing was warned about the defects in the MCAS system by its own employees and was aware that it was misleading the public and the FAA. But Boeing criminally conspired to conceal what it was doing because it knew that disclosing (or properly fixing) the defects would likely delay certification and production of the 737 MAX. Boeing had opportunities time and time again to do the right thing and either give engineers the time they needed to make the airplane safe or come clean with the public about its

10

flaws. Undeterred, Boeing refused to deviate from its plan to increase its stock price by ignoring safety obligations, leading to the tragic crash of Lion Air Flight JT 610 which plunged into the Java Sea on October 29, 2018.

### C.  Boeing Continued to Conceal Safety Issues After the Lion Air Crash.

Shortly after the Lion Air crash, Boeing learned that the MCAS was the likely cause, but again chose to protect its bottom line rather than the flying public. Boeing engaged in a concerted coverup campaign to illegally deceive the FAA, pilots, airlines, and the public about the 737 MAX's defects, the MCAS, and its role in the Lion Air crash. Boeing proceeded to blame the foreign pilots for the crash while denying the role of its own defective airplane and its responsibility for causing pilots to receive no real training on MCAS. As a result of this criminal cover-up, Boeing convinced the FAA to permit the 737 MAX to continue flying.

The Criminal Information in this case is somewhat vague about exactly when Boeing's conspiracy ended. The Information indicates that conspiracy operated "[f]rom at least in or around November 2016 through *at least* in or around December 2018 …." Criminal Information, ECF No. 1 at 1 (emphasis added). But Boeing's conspiracy obviously extended beyond December 2018. The objectives of the conspiracy (to illegally gain profit for Boeing) clearly extended beyond that time. And nothing in record suggests (much less proves) that Boeing "took affirmative acts inconsistent with the object of the conspiracy and communicated in a manner reasonably calculated to reach co-conspirators." *United States v. Jimenez*, 622 F.2d 735 (5th Cir. 1980) (cleaned up).

Rather than terminate its conspiracy, Boeing doubled down on it. Boeing again and again put profits over safety with repeated claims—in furtherance of the conspiracy—that the Boeing 737 MAX was so similar to the 737NG that it did not require significant additional training for pilots familiar with the older generation of 737s. Even after Lion Air Flight 610 crashed, Boeing

11

falsely insisted that pilot simulator training was not required while paradoxically blaming "poorly trained" foreign pilots. Boeing's misrepresentations gave airlines a false sense of security about the airplane's safety and avoided grounding of the 737 MAX. This in turn provided a false sense of security to the flying public that the airplane was safe to fly.

Boeing's criminal cover-up was led by its then-CEO, Dennis Muilenburg, who took the reins of Boeing's response to the Lion Air crash. Shortly after the crash, Muilenburg was contacted at his Chicago-area home and informed about the incident. His first decision was opting not to ground the immensely profitable 737 MAX. He and Boeing knew the risks they were taking but preferred running them to endangering Boeing's substantial profit margins on the MAX. In furtherance of the conspiracy's financial objectives, in December 2018, less than two months after the Lion Air crash, and at a time that Muilenburg was assuring everyone that the MAX was safe, Boeing authorized a huge cash dividend to investors—as well as a $13 million bonus for Muilenburg.

Instead of ending its Boeing's conspiracy, Muilenburg initiated an illegal coverup campaign aimed at professing the safety of the airplane while concealing its problems, pointing the finger at Lion Air's pilots and maintenance practices, and pressuring the FAA not to take corrective action. On November 6, 2018, Boeing issued a preemptive Flight Crew Operations Manual ("FCOM") Bulletin vaguely referencing "an AOA failure condition" and uncommanded "nose down stabilizer trim movement." The following day, the FAA issued an Emergency Airworthiness Directive ("AD"), identifying the potential danger presented by the flight control system, but not providing clear instruction on what pilots should do in the event of an AOA failure. In response, Muilenburg emailed Boeing employees, warning the mandate might harm

productivity: "[w]e need to be careful that the [airplane flight manual] doesn't turn into a compliance item that restricts near-term deliveries."

Both the FCOM Bulletin omitted the MCAS and the role it played in the Lion Air crash. The AD from the FAA was also deficient—due to Boeing's conspiracy. The AD failed to mention important information known to Boeing that the control column cutout function was disabled when MCAS was operational, that MCAS is only active in flaps up manual flight, that MCAS would reactive within 5 seconds of pilot trim input, or that a pilot would have less than 10 seconds to follow the runaway stabilizer procedure to avoid a catastrophic risk to the airplane.

On November 7, 2018, Boeing issued an official statement on the Operations Manual Bulletin, in which it again referenced "existing flight crew procedures" for pilots to address circumstances where there is "erroneous input from an AOA sensor." This press release did not reference MCAS or the inoperable AOA disagree alert.

Boeing's CEO Muilenburg himself continued to be in direct control over the concealment conspiracy. On November 13, 2018, the *Wall Street Journal* published an article criticizing Boeing for adding new "flight-control systems" on the 737 MAX which were not disclosed in training materials. That day, Muilenburg wrote to the Boeing Board, claiming that the article was "categorically false." In an internal message sent to Boeing employees in November 2018, Muilenburg stated: "The relevant function is described in the Flight Crew Operations Manual and we routinely engage with our customers about how to operate our airplanes safely." The claim that MCAS' "relevant function" was already described in the FCOM is false. Several years later, Boeing finally admitted in the Deferred Prosecution Agreement that the flight manuals were "materially false, inaccurate, and incomplete."

On about November 13, 2018, Muilenburg was interviewed on Fox Business Network. Muilenburg claimed that "the airplane is safe, we know how to fly it safely, and we're very confident in that." These statements (and other like them) were materially false. Muilenburg concealed that Boeing knew MCAS was vulnerable to failure and that pilots were not informed about MCAS.

On about November 28, 2018, Boeing issued a statement in response to the release of the Lion Air Flight 610 Preliminary Report. In the statement, Boeing asserted that passengers "have our assurance that the 737 MAX is as safe as any airplane that has ever flown the skies." Notably absent from Boeing's press release is any reference to MCAS or explanation on how exactly the system failed. Boeing and Muilenburg were well aware at that time that Boeing's internal Safety Review Board had identified an ongoing "airplane safety issue" associated with MCAS and that a needed redesign was planned. The National Transportation Safety Board even contacted Boeing to complain that the statement was misleading. But Boeing failed and refused to correct its statement, recognizing that being truthful would reduce profits.

Later, the Securities and Exchange Commission would find that Boeing's statements—in particular the statement that "the 737 MAX is as safe as any airplane that has ever flown the skies"—was misleading under the circumstances, absent any discussion of an "airplane safety issue" that CEO Muilenburg was aware had been found and was undergoing remediation by redesigning the MCAS software. On November 28, 2018, one day after the press release was issued, Boeing's stock closed up 4.8% at $333.5 per share.

**D.  Boeing's Coverup Continued Through a Board of Directors Meeting.**

In the wake of the Lion Air Crash, the DOJ began an investigation into the 737 MAX certification process. In January 2019, while collecting documents in connection with the DOJ's

investigation, members of Boeing's Legal Department uncovered communications that raised questions about the disclosures made to the FAA concerning the differences training and manuals certification, including (as the Court is aware) the November 15, 2016 Chat in which Forkner wrote that he had "lied to regulators (unknowingly)" about MCAS. In or around January 2019, Boeing's in-house counsel informed Muilenburg and other senior executives about the existence of the November 15, 2016 Chat. Following that communication, Muilenburg understood the November 15, 2016 Chat to be "concerning." This knowledge should have prevented Muilenburg from approving the November 27, 2018 press release falsely claiming that no safety (e.g., MCAS) issues existed, Muilenburg knowingly moved forward with the misrepresentation.

The November 15, 2016, Chat—like the documentation issues highlighted in the MCAS Certification Compliance Review report—raised significant questions concerning the adequacy of Boeing's disclosures about MCAS in connection with the FAA's review and approval of pilot training requirements and flight manuals for the 737 MAX, including the omission of MCAS from the differences training and the flight manuals. And yet, rather than take the lawfully required actions, Boeing continued its coverup.

Senator Ted Cruz has taken a leading role in exposing Boeing's criminal behavior. During investigative hearing on the two crashes, Senator Cruz exposed what Boeing had done through pointed questions to CEO Muilenburg:

> The testimony here today has been quite dismaying. I want to focus on the text exchange that has been referred to and has been publicly reported on. There was a text exchange between Mark Forkner, who was then Boeing's technical pilot for the MAX—chief technical pilot for the MAX—and Mr. Gustavsson, who in 2018 was promoted to be Boeing's 737 chief technical pilot."
>
> Mr. Forkner: [...] MCAS is now active down to M .2. It's running rampant in the sim on me
> Mr. Gustavsson: Oh great, that means we have to update the speed trim description in vol 2

15

Mr. Forkner: so I basically lied to the regulators (unknowingly) [...] granted, I suck at flying, but even this was egregious/

That exchange describes what happened in Lion Air and Ethiopian Air. The men and women who are gathered here with the photos of your loved ones— 346 people are dead because [of] what these chief pilots described as 'egregious' and 'crazy' - that's their language. That's Boeing's internal language in this exchange.

Now what I find truly stunning—Boeing handed this exchange over to the Department of Justice in February. In March, I chaired a hearing of the aviation subcommittee on these two crashes. Boeing did not see fit to give this committee that exchange. Nor did Boeing give it to the FAA or the Department of Transportation.

After Muilenburg said he had not been made aware of these documents until a few weeks ago, Sen. Cruz continued:

You're the CEO—the buck stops with you. Did you read this document? And how did your team not put it in front of you? Run in with their hair on fire saying 'We've got a real problem here?' How did that not happen? And what does that say about the culture at Boeing if they didn't give it to you? And you didn't read it? And if you didn't say 'I want to read and see what happened?' Your testimony here earlier today is 'Well, we're not sure what they were talking about because he's not at Boeing anymore.' How did you not in February set out a nine alarm fire to say 'We need to figure out exactly what happened, not after all the hearings, not after the pressure, but because 346 people have died and we don't want another person to die?'

Senate Commerce Hearing on 737 MAX Crashes (Oct. 29, 2019).

**E.  Boeing's Lies Led to the Ethiopian Airlines Crash.**

On March 10, 2019, Ethiopian Airlines Flight 302 crashed shortly after takeoff from Addis Ababa Bole International Airport, killing all 157 passengers and crew on board. Boeing's hidden MCAS system was—again—responsible.

Shockingly, according to a very recently completed final accident investigation report on the Ethiopian Airlines crash, Ethiopian Airlines pilots had contacted Boeing before the crash with questions about the MCAS system. However, rather than answer those questions, Boeing declined to respond, implausibly claiming that they were unable to provide information about MCAS due

to the on-going Lion Air crash investigation.[9] As Boeing well knew, accident investigations do not preclude releasing safety-related information. The real reason that Boeing declined to answer the questions about MCAS is that truthful answers would have revealed that additional pilot training was required for pilots transitioning to the 737 MAX.

After the ET302 crash, Muilenburg continued to knowingly and deliberately conceal what he and Boeing knew about MCAS, its needed redesign, and the problems with disclosures to the FAA about pilot training requirements and flight manuals. Remarkably, on April 28, 2019, he told investors in an earnings call that "[t]here is no technical slip or gap here .… We know that both accidents were a series of events…. In this case, there was erroneous angle of attack information that came into the airplane for multiple causes. But I can tell you with the confidence that we understood our airplane, we understood how the design was accomplished, how the certification was accomplished, and remain fully confident in the product that we put into the field. But there was no surprise or gap or unknown here or something that somehow slipped through the certification process. Quite the opposite."

Again, on April 29, 2019, during a press conference following Boeing's annual shareholders meeting, Muilenburg redoubled his lies. He said "we have gone back and confirmed again …. That we follow exactly the steps in our design and certification process is that consistently produce safe airplanes. It was designed for our standards. It was designed for our standards."

The SEC later found both statements were misleading given the CEOs direct and personal knowledge to the contrary.

---

[9] *See* Fed. Democratic Republic of Ethiopia, Ministry of Transport and Logistics, Aircraft Accident Investigation Bureau, Investigation Report on Accident to the B737-MAX8 ET-AVJ Operated by Ethiopian Airlines at 289 (Dec. 23, 2022), attached as Exhibit 1 to this filing.

17

### F.  Conclusions About Boeing's Criminal Conduct.

The above-recounted facts are just a part of the evidence of Boeing's criminal concealment of safety issues related to the 737 MAX. Through its criminal conspiracy, Boeing knowingly risked people's lives—and ultimately killed hundreds of people—merely for an improved bottom line and corporate enrichment. Boeing knew that the 737 MAX was defective from the start. It then made an already dangerous airplane even more deadly when it added the recklessly conceived MCAS. Boeing criminally conspired to conceal these known dangers from the FAA throughout the cnspiracy to obtain regulatory approval through a rigged self-certification process. Lion Air Flight JT 610 crashed as a direct and proximate result—killing 189 people.

The airplane's flaws and deadly consequences were undeniable after Lion Air Flight JT 610 crashed—and the FAA's own analysis in December 2018 found the MCAS design flaw, if left uncorrected, would result in an additional approximately 15 fatal crashes over the life of the fleet— yet Boeing still fought any effort to ground the airplane. Instead, Boeing engaged in a criminal cover-up and conspired to convince the FAA to keep the airplanes flying across the globe, without additional pilot training or safety precautions. Boeing intentionally and criminally chose to expose flight crews and passengers to the known risks of another catastrophic accident and, predictably, a further 157 lives were lost in the Ethiopian Airlines Flight 302 disaster as a direct result.

In light of this past criminal conduct—and risk of future similar conduct—this Court should impose stringent conditions of release on Boeing, pursuant to its authority under 18 U.S.C. § 3142.

### III.  The Court Should Impose Independent Monitoring of and Greater Transparency to Boeing's DPA Compliance Efforts.

The crime before this Court is "a long-running conspiracy that directly led to some of the worst air travel disasters of the 21st century." Amicus Brief of Sen. Ted Cruz, ECF No. 78 at 6. The parties have reached *their* DPA—although they did so illegally, in violation of the CVRA. The

issue of what remedy the Court should adopt to enforce the CVRA is the subject of separate briefing.

But the scheduled arraignment now results in what is a traditionally judicial function: the Court's selection of appropriate conditions of release. In adopting 18 U.S.C. § 3142, Congress has codified that *judicial* role. Under the statute, the Court first decides whether release on a personal recognizance bond will endanger the safety of the community. 18 U.S.C. § 3142(b). It would seem to go without saying that, in the deadliest corporate crime in U.S. history, something more than the minimum is required. Thus, under 18 U.S.C. § 3142(c), the Court must make its own, independent determination regarding the "least restrictive further conditions, or combination of conditions, that such *judicial* officer [i.e., in this case, the district judge] determines will reasonably assure … the safety of any other person [than the defendant] and the community." 18 U.S.C. § 3142(c)(1)(B). The conditions that the judiciary can deploy include, generally, "any other" condition of release "reasonably necessary … to assure … the safety of any other person and the community." 18 U.S.C. § 3142(c)(1)(B)(xiv).

As this Court has previously found, Boeing's criminal conspiracy directly and proximately killed 346 people. Many of the representatives for those victims have filed impact statements with the Court. Other representatives will deliver their victim impact statements in-court following the arraignment. Those statements begin to reveal the full and tragic sweep of the harm from Boeing's crime. At the arraignment, after hearing from the representatives, the Court must then make its own, independent determination of what conditions will "reasonably assure" community safety. Those conditions must consider the stark reality that Boeing's future conduct—and particularly any future criminal conduct—could potentially kill literally hundreds of people in a catastrophic crash. And any systemic failure across an aircraft type (such as the 737 MAX) could have

undeniably devastating consequences. For example, according to Boeing's website, today more than 10,000 commercial Boeing jetliners fly in service globally. Boeing Current Products & Services (January 22, 2003), https://www.boeing.com/commercial/. Ensuring the safety of the community flying on Boeing planes must be regarded as a highest priority. *Cf.* Memorandum from Paul J. McNulty, Deputy Att'y Gen., to Heads of Dep't Components & United States Att'ys 2 (Dec. 12, 2006) (stating that "certain crimes that carry with them a substantial risk of great public harm . . . are by their nature most likely to be committed by businesses").

To ensure the safety of "the community"—and specifically the flying public—during the remaining term of the DPA, the victims' representatives ask this Court to impose the following three conditions of release on Boeing, pursuant to the Court's authority under 18 U.S.C. § 3142:

<u>No New Crimes</u>

1. Boeing shall not commit a Federal, State, or local crime during the period of release.

<u>Appointment of an Independent Corporate Monitor</u>

2. Boeing will cooperate with a court-selected monitor (i.e., a corporate monitor) to determine whether Boeing is in compliance with its DPA obligations. The Court will select the monitor from a list of names of candidates (and their qualifications) provided within ten days after the Court imposes this condition by the Department, Boeing, and any victims' representatives. The monitor shall operate independently and must disclose any potential conflicts of interest. The parties (i.e., the Department, Boeing, and victims' representatives) shall meet-and-confer before submitting their respective lists in an effort to identify mutually agreeable candidates. The Court may require the parties to submit additional candidates. Boeing shall pay reasonable expenses of the monitor. The monitor is authorized to obtain any necessary assistance, including hiring consultants, experts, and others.
The monitor shall have reasonable access to Boeing's books and records connected with DPA compliance, as determined by the monitor. The monitor shall maintain the confidentiality of any non-public business and financial information, but shall prepare a report indicating the substance of the monitor's conclusions. The monitor may undertake any other actions that are necessary to discharge his or her monitoring duties.

20

The monitor shall issue a report to the Court regarding Boeing's compliance with the terms of the DPA on or before December 6, 2023—i.e., one month before the conclusion of the DPA. The report shall indicate the monitor's conclusions regarding Boeing's compliance with the DPA. The report shall also address any additional measures that the Court should impose—or that Boeing should follow— to reduce the risks to the public from Boeing's past or potential future criminal misconduct, including evaluating Boeing's internal controls and corporate ethics and compliance programs. The monitor's report will quickly be made public to the maximum extent possible, with limited redactions only as required to safeguard legitimately confidential material. The Court may consider the full monitors' report in connection with any proceedings in this case.

<u>Transparency in Boeing's Corporate Compliance Reforms</u>

3. The substance of Boeing's efforts to comply with its DPA obligations shall be provided to victims' representatives experts and the general public as follows:

Within thirty days, Boeing shall disclose the substance of its DPA compliance efforts to three experts selected by the victims' families' representatives, with the approval of the Court. Boeing and the Government may provide to the Court their assessment of the expert's qualifications and suitability for the role. The Government shall review Boeing's disclosures for accuracy. At this time, the representatives anticipate that they will provide the reports to: (1) Vickie Norton; (2) Rune Storesund; and (3) Javier de Luis.[10] Boeing's disclosure will be provided to the experts under an appropriate confidentiality order, to be drafted by the parties and approved by the Court. The experts will then review the materials and provide recommendations to the Court, the Department, and Boeing as may be useful for promoting safety and corporate compliance. Boeing will pay all reasonable expenses of the three experts.

The substance of Boeing's disclosure will be reviewed by the three experts above, who will prepare appropriate redacted copies of the disclosure (or summaries thereof) to be released to the public. The proposed redactions will be shared with the Department and Boeing. Any disputes about redactions will then be resolved by the Court. After the Court's approval, appropriately redacted reports will be released to the victims' representatives and the general public. The expert's recommendations will similarly be provided to the public, with necessary redactions to protect confidentiality.

---

[10] Mr. de Luis is a lecturer in aeronautics at the Massachusetts Institute of Technology. He is one of the family representatives who is filing this motion, as his sister, Graziella de Luis Ponce, as killed in the Ethiopian Flight 302 crash. Earlier this month, the FAA appointed Mr. de Luis to an FAA safety panel examining safety practices at Boeing.

The Court clearly has authority to impose each of these three conditions under 18 U.S.C. § 3142, which includes a long list of permissible conditions—including 18 U.S.C. § 3142(c)(1)(B)(xiv) (court may require a defendant to "satisfy any other condition that is reasonably necessary … to assure the safety of any other person and the community"). Moreover, that list of conditions is "non-exhaustive." *United States v. Aziz*, No. 21-40878, 2022 WL 1056102, at *3 (5th Cir. 2022). Indeed, it is common "for courts to impose conditions of pretrial release that attempt to prevent or reduce the risk that the defendant will engage in similar or related criminal activities to those charged in the complaint or indictment." *United States v. Call*, 874 F. Supp. 2d 969, 979 (D. Nev. 2012).

Each of the three conditions is justified for the following reasons.

**A.    The Court Should Impose the Standard Condition of Release that Boeing Shall Commit No New Crimes.**

The no-new-crimes requirement is required by federal law, as the victims' representatives explained in their filings on the arraignment issue. *See* ECF No. 66 at 8 (citing 18 U.S.C. § 3142(c)). The parties do not contend otherwise. Accordingly, the court should impose this condition.

**B.    The Court Should Impose a Condition of Release that Boeing's Safety and Ethics Practices Will Be Subject to a Judicial Monitor.**

The Court should appoint an independent corporate monitor to evaluate Boeing's DPA compliance. Only an independent monitor—the proverbial second set of eyes—can begin to restore confidence in Boeing and ensure safety of the community.

In its DPA, Boeing itself undertook to conduct "appropriate reviews of its existing internal controls, policies, and procedures" to ensure compliance with federal criminal laws, including compliance during its interactions with the FAA, other regulatory authorities, and its airline

customers. DPA at Attachment C, ECF No. 4 at C-1. Boeing then goes on to promise that it will take various steps that "will create and foster a culture of ethics and compliance with the law in its day-to-day operations." *Id.*

As the Court will immediately understand, the victims' representatives are skeptical of Boeing's promises—promises obviously designed to help it secure lenient treatment from federal prosecutors for its deadly criminal conspiracy. The victims' representatives wonder why the lives of their 346 loved ones had to be sacrificed before Boeing would agree to follow the law.

As part of Boeing now creating its "culture of ethics," the DPA requires Boeing to file quarterly reports on its efforts with the Justice Department. *See* DPA at Attachment D, ECF No. 4 at D-1 et seq. But, for the victims' families, this is not true oversight. The Department and Boeing worked together secretly—and in violation of the CVRA—to concoct one of the worst DPAs in our nation's history. The victims' representatives—and, no doubt, many members of the public—doubt whether the Department can be trusted to hold Boeing to its promises. Now that the DPA has been so heavily criticized—and, indeed, found to be illegally negotiated—no doubt the Department has a strong incentive to pretend that the agreement is working well.

This arraignment hearing is itself evidence of this accountability problem. If the Department and Boeing intended transparency, they would have structured their DPA to provide for an immediate arraignment of Boeing—something that Fed. R. Crim. P. 10's text plainly requires. *See* ECF No. 162 at 4 ("A plain reading of Rule 10's unconditional language supports a mandatory arraignment."). Instead, they contrived to avoid an arraignment—thereby delaying for two years the opportunity for the victims' representatives to see Boeing stand in the dock. And that violation of the rules comes on top of the Department's and Boeing's previous egregious violation of the CVRA (ECF No. 116 at 18 (granting motion for finding violation of the CVRA)—and the

23

Department's concealment of its long-running criminal investigation from the representatives (*id.* at 5 (describing false statements by the Department to the victims' representatives)).

The DPA requires Boeing to take steps to "create and foster a culture of ethics." But the judge of whether Boeing is successful in creating that culture is the Justice Department—Boeing's negotiating partner in the illegal DPA. The accountability problem with the DPA is well-described by Senator Ted Cruz in his amicus brief in this case. *See* ECF No. 78. Senator Cruz explained that "[m]aybe the[DPA] compliance program will be good; maybe it won't, *but what is certain is that all the important decisions will be made behind closed doors, away from public accountability.*" *Id.* at 8 (emphasis added).

Simply put, given the troubling circumstances of this case, the Justice Department cannot be trusted to monitor Boeing—or, at the very least, cannot secretly monitor Boeing in a way that brings public confidence to the outcome. An independent assessment of Boeing's DPA compliance is required.

To be clear, in this arraignment-and-release proceeding, the victims' representatives are *not* asking this Court to rework the DPA. Instead, the representatives seek appropriate conditions of release imposed by the Court in the discharge of *its* duties under § 3142. And, of course, the Court is exercising its duties in the context of a truly extraordinary case—a case involving an illegal DPA crafted secretly for a defendant who killed 346 people. This case is—truly—unprecedented.

To the extent that the Court is looking for precedents for the conditions that the victims' representatives propose, independent corporate monitors have a long history in connection with deferred prosecution agreements, dating back to the landmark 1994 Prudential Securities case. *See* Vikramaditya Khanna & Timothy L. Dickson, *The Corporate Monitor: The New Corporate Czar?*, 105 MICH. L. REV. 1713, 1717 n.17 (2007) (citing *SEC v. Prudential Sec., Inc.*, No. 93 Civ. 2164,

1993 WL 473189, at *2-3 (D.D.C. Oct. 21, 1993)). The federal sentencing guidelines allow for appointment of special masters and corporate monitors as part of court-ordered probation. *See* U.S. SENTENCING GUIDELINES MANUAL § 8D1.1. In addition, such probation can be more actively monitored if "special conditions" are imposed to ensure "changes are made within the organization to reduce the likelihood of future criminal conduct." U.S.S.G. § 8C2.5(g)(3).

Monitoring is particularly important in a corporate criminal context. After all, corporations such as Boeing cannot literally be jailed. Fines may be borne by shareholders or passed on through price increases to consumers, without affecting the officers or employees involved in the crimes. Corporate monitoring is one effort to ensure corporations subjected to criminal penalties follow the law. *See* Brandon L. Garrett, *Globalized Corporate Prosecutions*, 97 VA. L. REV. 1775, 17777 (2011).

It is common for DPAs to be enforced through a monitor. While calculations about the frequency of monitors may vary, one article reports that "about half of DPAs make a provision for a corporate monitor." *See* Comment, *Judicial Review of Corporate Non-Prosecution and Deferred Prosecution Agreements: A Narrow Path to Checking Prosecutorial Discretion*, 3 CORP. & BUS. L.J. 212, 220 (2022). Another scholarly effort, using a different data set, reports that about 25% of federal prosecution agreements (deferred prosecution agreements and non-prosecution agreements) employed monitors. BRANDON L. GARRETT, TOO BIG TO JAIL: HOW PROSECUTORS COMPROMISE WITH CORPORATIONS 15 (Harv. Univ. Press 2014). Presumably those DPAs without monitors did not involve criminal conduct resulting in 346 deaths. Independent corporate monitors have also been used within this District. *See, e.g., United States v. ZTE Corp.*, No. 3:17-CR-0120-K (N.D. Tex. Mar. 7, 2017) (plea agreement requiring appointment of "an *independent*, third-party

25

compliance monitor" to monitor the defendant corporation's compliance with U.S. Export Control Laws (emphasis added)).

In cases involving monitors, a subsequent issue is whether a monitor's report should be made public. The best-informed view is that, subject to appropriate redactions, monitors reports should be made public. *See, e.g.,* Brandon L. Garrett, *The Public Interest in Corporate Settlements*, 58 B.C. L. REV. 1483, 1529-30 (2017) ("[T]he reports of monitors should be made public, so affected parties have enough information to know whether to intervene if compliance is lacking"); *see also* Veronica Root Martinez, *Public Reporting of Monitorship Outcomes*, 136 HARV. L. REV. 757, 765-66 (2023) ("at the conclusion of all monitorships, the public should receive an accounting that details whether the firm has or has not engaged in a successful remediation effort."). To facilitate public disclosure, in 2015 the American Bar Association adopted standards on the subject of corporate monitors. While those standards take no position on whether monitor reports should or should not be made public, they set out a process for making a monitor's report public:

> If a written report may be publicly disclosed or provided to third parties, the Monitor should consult with the Government and Host Organization, or if appointed by a court, the court, for purposes of protecting against the disclosure of sensitive or disparaging information concerning individuals who may be named in the report, and the disclosure of proprietary, confidential, or competitive business information.

ABA Standards for Criminal Justice: Monitors (August 2015), at 12, http://www.americanbar.org/content/dam/aba/images/abanews/2015annualresolutions/108a.pdf. The ABA Standards provide that the relevant court order "should state whether the Monitor's report is to be confidential or whether it is to be made available to the public, in part or in whole." *Id.*

Public transparency in a case like this is particularly important. Perhaps the most important stage of a corporate prosecution is the implementation of the agreement. Corporate prosecutions

invariably settle, and some of the most significant cases have settled with DPAs. *See* BRANDON L. GARRETT, TOO BIG TO JAIL, *supra* at 62. The role of the monitor in evaluating DPA compliance uniquely serves the public interest. The Justice Department's "Morford Memorandum" observes that the monitor is not an "agent of the corporation or of the Government." Memorandum from Craig S. Morford, Acting Deputy Att'y Gen., for Heads of Dep't Components and U.S. Att'ys (Mar. 7, 2008), at 4, http://www.justice.gov/dag/morford-useofmonitorsmemo-03072008.pdf. A properly functioning monitor is thus independent and serves the public interest.

A type of case where a corporate monitor can be especially useful is one involving "great harm." Khanna & Dickson, *supra*, 105 MICH. L. REV. at 1730. Where a crime has caused substantial harm, a fine imposed at sentencing might be insufficient to deter a defendant' from committing future crimes: "When the highest-imposable cash fine does not generate the desired level of deterrence, other sanctions, such as corporate monitors, merit consideration. In such situations, a monitor may be desirable if the net gains of having a monitor are greater than the net gains of other kinds of sanctions. The net gains are the additional deterrence gains from having a monitor less the costs of requiring a monitor." *Id.* at 1729. The need for additional deterrence can be particularly important where wrongdoing "causes a great deal of harm because then it is more likely that the highest imposable cash fine may not suffice for deterrence. Corporate monitors and other kinds of ongoing supervisors seem more justifiable for wrongdoing that causes a great deal of harm." *Id.*

This description of the circumstances warranting independent corporate monitoring fits this case well. The Court is generally aware of the hundreds of deaths Boeing has caused. In addition, the Court will hear during the release hearing from several victims' representatives, who will further explain the enormous destruction from Boeing's crime. Again, it must never be forgotten

27

that this case involves the deadliest corporate crime in U.S. history, so the need to deter a similar a crime in the future is undeniably vital. On the other hand, the costs associated with a corporate monitor are very low—a tiny fraction of the cost that might occur if another Boeing commercial airliner crashes. And the fine in this case is at the low end of the guidelines[11] and is incommensurate with the total costs of Boeing's crime[12]—which is, in part, why this DPA has been so widely criticized.

Turning to the issue of selecting the independent monitor, in many DPA cases, the Justice Department makes the selection. In this case, however, the Court should independently make the selection. The Department has lost the trust of the victims' representatives—and, we assume, of the general public—by violating the CVRA and orchestrating an illegal agreement. Allowing the Department to make the selection of an allegedly "independent" monitor will only compound suspicion in this case that "the fix is in." A court-selected monitor (from lists submitted by the parties) is the only way to respond to that concern and provide public confidence in the process. This process has been employed in other cases. *See, e.g.,* Deferred Prosecution Agreement at 15, *United States v. Computer Associates International, Inc.*, Crim. No. 04-837 (ILG) (E.D.N.Y. Sept. 22, 2004) (setting out process for the parties—i.e., the defendant, prosecutors, and the SEC—to jointly propose three candidates to the court; "The Court shall select the Independent Examiner from the three approved candidates …. If the Court rejects all three approved candidates, the procedure … will be repeated until such time as the Court approves an independent examiner"). Commentators have pointed out that "[j]udges should select monitors, allaying concerns that

---

[11] *See* DPA at ¶ 9, ECF No. 4 at 11. To secure this low-end fine, Boeing represented that it "clearly demonstrated recognition and affirmative acceptance of responsibility." *Id.*

[12] The fine of $243 million is far below the cost of human life. *See* ECF No. 65 at 18.

prosecutors offer these plum positions mostly to former colleagues, by supervising a competition process …." BRANDON L. GARRETT, TOO BIG TO JAIL, *supra*, at 284.

This case now stands in an unusual posture. The arraignment is occurring about two years into the three-year period of the DPA. If an arraignment had been held at the outset, the victims' representatives would have proposed a corporate monitor at that time. This case is further unique in that it involves a proven violation of the CVRA. If the Government and Boeing had complied with the CVRA, the victims' representatives could have proposed a corporate monitor be included in the DPA before it was finalized and presented to the Court. And—again, and most important— this case involves a crime resulting in 346 deaths.

Because of these unusual circumstances, the victims' representatives propose to capitalize on the fact that this Court's determination of release conditions is occurring well into the DPA's term. At this point, Boeing's efforts to create a "culture of ethics" should be almost completed. Accordingly, the victims' families propose that an independent corporate monitor enter the case with a limited purpose: To evaluate Boeing's compliance with its DPA obligations. The monitor would evaluate the steps Boeing has taken to meet its DPA commitments and then report back to the Court—and the public—about the success of those efforts. The report would be due with this Court one month before the DPA concludes. Accordingly, the Court would be well-positioned to discharge its duties as the DPA comes up for final review.[13]

Unlike many other corporate monitors, the monitor that the victims' representatives propose as a release condition will have a very short existence and precisely focused mission. The

---

[13] As the Court knows, the victims' representatives currently have pending a motion to rescind the DPA's "immunity" provisions so that Boeing can be criminally prosecuted. But retrospective criminal prosecution for past crimes and prospective creation of a culture of ethics are separate issues. Accordingly, the Court should grant *both* of the victims' representatives' requests.

representatives propose that the monitor complete the review in a limited time—less than eleven months—at the conclusion of which the monitor would file a publicly available report.

Finally and most important, the monitor would simply review existing compliance measures that Boeing has already (supposedly) undertaken as part of its DPA obligations. To be clear, the victims' representatives are not asking that the monitor take over Boeing's safety processes. Thus, criticisms that are sometimes made that monitors are discharging functions beyond competence have no salience whatsoever here. The monitor would not impose any new duties on the company; instead, the monitor would solely evaluate—independently—how the company has done in fulfilling *its* promises. This narrow and sensible approach would help restore public confidence in the processes used in this case—and also assure safety of the public flying on Boeing aircraft.

In closing this section, the victims' representatives reiterate that they are not asking (in this statement) for the Court to somehow revise or reevaluate the wisdom of the DPA. Instead, the representatives ask the Court to discharge its independent obligation under § 3142 to assure the safety of the community. For all the reasons provided in this section, the Court should impose, as a condition of release, an independent court-selected monitor who will evaluate whether Boeing is truly creating the "culture of ethics" that it has promised in its DPA.

C.   **The Court Should Impose a Condition of Release that the Substance of Boeing's DPA Compliance Efforts are Made Available to the Victims' Representatives' Experts and, in Properly Redacted Form, to the General Public to Assure that the Efforts are Effective.**

As a final condition of release, the Court should require that Boeing produce to the victims' representatives' experts—and ultimately to the general public—the substance of its DPA compliance efforts. This is the only way to assure transparency about how the illegal DPA has been

enforced over the last two years. And a review of Boeing's efforts will help to assure that Boeing's efforts are fully effective in protecting the public.

Again, the key problem with the DPA was well-described by Senator Cruz in his amicus brief, where he explained that "[m]aybe the [DPA] compliance program will be good; maybe it won't, *but what is certain is that all the important decisions will be made behind closed doors, away from public accountability.*" *Id.* at 8 (emphasis added). The conclusion of Senator Cruz's amicus brief was that this "troubling" DPA should "receive careful judicial attention free from the presumption—too common in federal criminal law—that 'the government always wins.'" ECF No. 78 at 9.

As the Court is aware, the victims' representatives currently have pending several briefs regarding the appropriate remedies that should be available to them to enforce their CVRA rights. *See, e.g.,* ECF No. 140. But separately in connection with conditions of release, to reasonably ensure the safety of the community, the Court should respond to the fact, as Senator Cruz precisely puts it, that "all the important decisions will be made behind closed doors, away from public accountability."

It is important to recall the unique posture of this case. In an ordinary case, some accountability would exist through the crime victims' CVRA right to confer with prosecutors *before* a DPA is finalized. But here, the Department and Boeing illegally finalized the DPA without following that CVRA safeguard. They then presented their DPA to this Court as a *fait accompli.*

These extraordinary circumstances (which hopefully will never be repeated) require a considered and heightened response. An illegal process for creating a DPA cannot guarantee public safety. Indeed, by definition, the DPA that the parties have presented to the Court pays insufficient attention to public safety. The Court will recall that for more than a year now, both the Department

31

and Boeing have insisted that Boeing's conspiracy did not directly and proximately result in the deaths of 346 people. The Court has ruled otherwise. So, by definition, the DPA was crafted by parties who did not fully appreciate the deadly consequences of Boeing's crime. The Court must consider that fact in determining conditions of release to assure public safety.

In addition to appointing an independent monitor, a direct way to ensure public accountability is to require, as a condition of release under 18 U.S.C. § 3142(c)(1)(B), that Boeing provide the substance of its efforts regarding corporate compliance to the victims' representatives' experts—and, ultimately (after appropriate redactions), to the general public. Boeing's efforts can then be critiqued and any defects remedied.

Boeing has purportedly reformed it corporate culture to a "culture of ethics" that is no longer a threat to public safety. But the victims' representatives—and the public—cannot know whether this is true without seeing the substance of those efforts. Former President Reagan's dictum is applicable here: Trust but verify. This Court should not blindly accept sanguine assurances from the parties—the Department and Boeing. Too many lives are at stake. Indeed, the need for verification is particularly high, because the Department is concealing information from this Court about the full extent of Boeing's crime. *See* Part IV, below.

Of course, it is always possible that Boeing and the Department have overlooked something in secretly working together on these compliance issues. Indeed, the possibility that victims' interests have been ignored seems particularly high, given the way in which the parties illegally crafted the DPA without any victim input.

Neither Boeing nor the Government can reasonably object to providing the substance of Boeing's compliance efforts to the victims' representatives' experts and ultimately the public. This Court has the power to impose conditions that "will reasonably assure . . . the safety of any other

person and the community." 18 U.S.C § 3142(c)(1)(B). Greater review of those efforts will help to assure the safety of the community, by guaranteeing that Boeing's reform efforts are carefully and publicly scrutinized—and any deficiencies corrected.

To be sure, the DPA before the Court contains a confidential reporting process to transmit reports to the Justice Department confidentiality. *See* DPA, ECF No. 4, Attachment D. But the fact that certain reports are themselves confidential does not transmute Boeing's underlying efforts into confidential material. For example, under the Bank Secrecy Act, banks are required to make confidential reports of suspicious activities to regulators. But while those reports are confidential, the underlying activities are not. *See, e.g., In re Peregrine Financial Group Customer Litigation*, 2015 WL 1344466, at *13 (N.D. Ill. Mar. 20, 2015).

And the victims' representatives propose a process that will protect any legitimate confidentiality interest of Boeing. Boeing's efforts will first be disclosed under a confidentiality agreement to the representatives' experts, who will then propose redactions to address any legitimate confidentiality concerns. Thereafter, the Department and Boeing can propose any such additional redactions as they believe might be necessary. Finally, the Court will rule and disclose the appropriately redacted materials to the public.

This approach will bring accountability and transparency to the process, with the result that Boeing's (purported) efforts to reform its corporate compliance processes will be more likely to succeed and assure the safety of the flying public. A recent comprehensive article on monitors pointed out that "[a] primary criticism levied against the use of monitorships has been concerns about potential capture—capture of the monitor herself or capture of the entity or entities also engaged in the monitoring relationship (for example, the government or court)—by the monitored organization. Increased transparency and disclosure are often the responses to concerns about

capture. Requiring a public report that provides high-level details regarding the results of the monitorship process may help to curb these concerns." Veronica Root Martinez, *Public Reporting of Monitorship Outcomes*, 136 HARV. L. REV. 757, 821-22 (2023). Here, of course, the problem of "capture" described above are compounded by the fact that Boeing is not reporting to a disinterested monitor, but to the Justice Department. Even assuming good faith, the Department does not have any strong incentive to find that its (widely criticized) DPA is failing to work properly. Some additional measure of public transparency is indispensable.

Moreover, the core of the problem is that the Department has not explained how it will determine if Boeing is "successful." This is a broader problem in DPAs. As a book-length review of the Department's DPAs and NPAs has concluded, the Justice Department "has adopted no guidance on what compliance to require or how to ensure it is effective." BRANDON L. GARRETT, TOO BIG TO JAIL, *supra*, at 284. But whatever may be the case for the Department's internal review of DPA compliance, this Court cannot out-source its own, independent judicial obligation to determine that conditions are in place on Boeing that "reasonable assure" the safety of the community. 18 U.S.C. § 3142(c). The public process that the victims' representatives propose will provide that assurance.

### IV. The Court Should Ask the Government to Disclose Its Information Relevant to Conditions of Release.

In determining conditions of release in this case, this Court needs to be aware the Justice Department is withholding evidence relevant to the Court's determination. Specifically, the Justice Department has not made available to the Court (or its Pretrial Services Office) relevant information about Boeing's conspiracy and related criminal conduct. In response, this Court should ask the Department during the release hearing to disclose this information. The Court should also

give less deference to the Department than it would in proceedings where the Department has made more fulsome disclosures.

On January 22, 2023, during a telephone conference call with the prosecutors handling this case from the Department's Fraud Section, the victims' representatives legal counsel specifically asked the Department whether it would be providing to the Court the Department's information relevant to release issues. Victims' counsel explained that, in a release hearing, it is important for the Court to have all pertinent information that the Government knows in determining appropriate conditions of release. Victims' counsel indicated that, in this case, a duty of candor to the Court should compel the Department to disclose information in the Department's possession that is relevant to the Court's decision on conditions of release. *Cf.* ECF No. 72 (victims' representatives brief discussing Government obligations of disclosure in a CVRA hearing); ECF No. 75 (same).

In response, the Fraud Section's representative directly stated that the Section was not going to provide that information—unless the Court specifically asked for it.[14] The Fraud Section doubled down on that position in a conference call with victims' representatives on January 24, indicating that was not going to provide information about Boeing beyond that in the DPA.

---

[14] In the victims' representatives' discussions with the Department, the Department also claimed that all the facts surrounding the crashes have already come to light through the DPA and through the criminal case of United States v. Forkner, 4:21-cr-00268-O (N.D. Tex. 2021). These two claims are disingenuous.

The DPA is a carefully curated set of facts—seemingly written by Boeing's lawyers—to place Boeing in the best possible light. This brief provide a more fulsome set of facts, which demonstrate that the DPA barely scratches the surface in describing Boeing's criminal conspiracy.

And with regard to the Forkner case, the Department filed a superseding indictment on the eve of trial and then urged this Court to "reject [Forkner's] attempts to imbue the trial with a sideshow about plane crashes" and urged that the "[t]he crashes … are simply irrelevant to that charged conduct." ECF No. 143 at 3. Clearly the Forkner trial shed little light on the issues surrounding culpability for the crashes—a critical issue in determining appropriate conditions of release.

Given the Department's refusal to provide relevant information unless specifically asked, the victims' representatives ask the Court to specifically ask the Department for a summary of the pertinent and material information regarding the appropriate conditions of Boeing's release, including information about the dangerousness of Boeing's conspiracy and related criminal conduct. As part of that inquiry, the Court should also ask the Department specifically which (if any) of the above-recited facts the Department disputes and the specific factual basis for any dispute.

Inquiries to the Department about Boeing's crimes and dangerousness are particularly important because it appears that the Court will not have before it a report from its Probation and Pretrial Services Office. According to the Court's website, in an ordinary criminal case, during the pretrial phase, a Pretrial Services Officer "will gather information about the defendant through interviews and record checks. The pretrial services officer reports the information to the judge, so the judge can decide whether the defendant can be released on pretrial supervision or should be detained." *Pretrial Overview*, U.S. Probation and Pretrial Services, Northern District of Texas, https://www.txnp.uscourts.gov/content/pretrial-overview. In an ordinary case, as this Court is well aware, the Department communicates to the Pre-Trial Services Office relevant parts of its investigation that bear on pre-trial release issues. Once again, Boeing appears to have weaseled out of processes that apply to other accused felons who appear before this Court.

To be clear, the victims' representatives are not criticizing that Office in any way. And the victims' representatives recognizes that the Pretrial Services Office is busy with multiple other cases. But the fact remains that this Court does not have the normal information that it would typically receive through that process in determining release conditions for Boeing—including

information from crime victims.[15] The absence of that information makes it all the more important that the Department disclose to the Court the pertinent information that it possesses bearing on pretrial release issues, so that the conditions the Court selects are responsive to Boeing's dangerousness.

### V.     The Court Should Ask Boeing Which Facts in the Victims' Families Proffer Are Disputed and What the Specific Factual Basis is for Any Dispute.

In addition to asking the Department which facts it disputes, the Court should make a similar inquiry to Boeing. The victims' representatives do not believe that Boeing can provide persuasive evidence to reasonably dispute the facts recounted in Part II, above.

In the context of a release hearing, ordinarily such inquiries to a criminal defendant might involve issues regarding whether the defendant is, in fact, guilty. But here, we assume Boeing will accept responsibility (as it has promised in the DPA) and plead guilty at its arraignment. In its DPA, Boeing has already admitted it is guilty of conspiring to interfere with the FAA. *See* DPA at ¶ 2, ECF No. 4 ("The Company admits, accepts, and acknowledges that it is responsible under United States law for the acts of its officers, directors, employees, and agents as charged in the Information, and as set forth in the Statement of Facts, and that the allegations described in the Information and the facts described in the Statement of Facts are true and accurate."). In its DPA, Boeing also promised that it never make any public statement contradicting its acceptance of responsibility. DPA at ¶ 32 ("The Company expressly agrees that it shall not, through present or future attorneys, officers, directors, employees, agents, or any other person authorized to speak for

---

[15] Typically, a Pretrial Services Report will include information from the Government's files, which will in turn recount relevant victim information. Here, many of the victims' representatives have attempted to provide information to the Court. But they have been hampered in doing so by the Government's failure to reasonably confer with them. *See* ECF No. 130 (representatives' motion for finding that the Government violated the CVRA by failing to confer before filing its remedies brief).

the Company make any public statement, in litigation or otherwise, contradicting the acceptance of responsibility by the Company set forth above or the facts described in the attached Statement of Facts."). Indeed, Boeing actually monetized its acceptance of responsibility, by receiving a two-level reduction from the Sentencing Guideline calculations for that acceptance of responsibility—a credit worth millions and millions of dollars. *See* DPA, ECF No. 4 at 11 (fine calculation based on two-level reduction for Boeing's "acceptance of responsibility for its criminal conduct").

Nor would such inquiries from the Court to Boeing create Fifth Amendment issues of self-incrimination. Corporate entities (such as Boeing) lack any Fifth Amendment rights. *See United States v. Coppola*, 788 F.2d 303, 308 (5th Cir. 1986) ("the corporation itself has no fifth amendment privilege"); *Curtis v. M&S Petroleum, Inc.*, 174 F.3d 661, 674 (5th Cir. 1999) (noting that the corporate does not have the benefits of a Fifth Amendment privilege). Because the Court can probe a corporate defendant regarding its criminal behavior—and whether it truly accepts responsibility for its criminal behavior[16]—it would be useful for the Court to probe the extent (if any) of Boeing's dispute of the facts above.

## <u>Conclusion</u>

This Court has previously apologized to the victims' families for not making more inquiries into the DPA's victim implications. *See* Trans. (May 3, 2022) at 136. The victims' representatives very much appreciated that gesture—and the Court's thoroughness in reviewing issues brought before it.

But the victims' representatives do not blame the Court for the fact that Boeing has skated through this process—without the standard procedures being followed. The victims'

---

[16] Typically this probing would be through the Court's Pretrial Services Office, sometimes in connection with a pre-sentence report. *See, e.g., United States v. Jefferson*, 258 F.3d 405, 413 (5th Cir. 2001).

representatives know that the blame lies with the Department and its negotiating partner, Boeing. The Department and Boeing have contrived through the covertly crafted DPA to essentially sweep away any real accountability.

In now imposing appropriate conditions of release on Boeing, this Court must reasonably assure the safety of the public. 18 U.S.C. § 3771(c). Boeing is an admitted corporate felon whose crime killed hundreds of innocent passengers and crew in two deadly crashes. A third would be horrific.

The Court's conditions of release must ensure that other families never suffer the same devastation that the victims' representatives have suffered. To that end, the Court should impose on Boeing the conditions of release specifically described by the victims' representatives above: (1) a no-new-crimes condition; (2) a corporate monitor to transparently evaluate Boeing's DPA compliance; and (3) public release of the substance of Boeing's DPA compliance efforts.

Dated: January 25, 2023

/s/ Warren T. Burns
Warren T. Burns (Texas Bar No. 24053119)
Burns Charest, LLP
wburns@burnscharest.com

Darren P. Nicholson
Burns Charest, LLP
dnicholson@burnscharest.com

Kyle Kilpatrick Oxford
Burns Charest LLP
koxford@burnscharest.com

Respectfully submitted,

/s/ Paul G. Cassell
Paul G. Cassell (Utah Bar No. 06078)
(Counsel of Record)
Utah Appellate Project
S.J. QUINNEY COLLEGE OF LAW
University of Utah
cassellp@law.utah.edu
(no institutional endorsement implied)

Tracy A. Brammeier
Clifford Law Offices PC
tab@cliffordlaw.com

Erin Ressa Applebaum
Kreindler & Kreindler LLP
eapplebaum@kreindler.com

Pablo Rojas
Podhurst Orseck PA
projas@podhurst.com

*Attorneys for Victims' Representatives*

40

## **CERTIFICATE OF SERVICE**

I certify that on January 25, 2023, the foregoing document was served on the parties to the proceedings via the Court's CM/ECF filing system.


/s/ Paul G. Cassell
Paul G. Cassell