UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Criminal Action No. 4:21-cr-5-O |
| | § | |
| THE BOEING COMPANY, | § | |
| | § | |
| Defendant. | § | |

## THIRD MEMORANDUM OPINION & ORDER

Before the Court are the Crime Victims' Representatives'[1] Motion for Exercise of the Court's Supervisory Power over the Deferred Prosecution Agreement (ECF No. 17), filed December 16, 2021; the United States' Response (ECF No. 60), filed February 11, 2022; the Representatives' Reply  to the United States (ECF No. 65), filed February 18, 2022; Boeing's Combined Response (ECF No. 62), filed February 11, 2022; the Representatives' Reply to Boeing (ECF No. 66), filed February 18, 2022; and Senator Ted Cruz's Amicus Brief in Support of the Representatives (ECF No. 90), filed April 29, 2022. Also before the Court are the Representatives' Motion for Leave to Re-File Proffer of Facts Supporting Their Position on Remedies and Request for Evidentiary Hearing (ECF No. 124), filed November 7, 2022; the United States' Response (ECF No. 134), filed November 21, 2022; Boeing's Response (ECF No. 135), filed November 21, 2022; the United States' Supplemental Response Concerning Remedies (ECF No. 128), filed November 11, 2022; Boeing's Supplemental Response Regarding Remedies in Response to Court Order (ECF No. 129), filed November 11, 2022; the Representatives' Supplemental Reply

---

[1] The family members and legal representatives of those who died onboard Lion Air Flight 610 and Ethiopian Airlines Flight 302 are referenced interchangeably herein as "original movants," "crime victims' representatives," "representatives," or "families." *See generally* Second Opinion, ECF No. 116.

Regarding Remedies for the Government's CVRA Violation (ECF No. 140), filed November 22, 2022; the Representatives' Motion for a Finding that the Government has Violated the Crime Victims' Rights Act by Failing to Confer Before Filing its Remedies Brief, to Strike the Government's Remedies Brief, and for an Accelerated Decision (ECF No. 130), filed November 14, 2022; and the United States' Response (ECF No. 142), filed November 28, 2022.

Before the Court are also several motions filed in recent months by foreign carriers Polskie Linie Lotnicze LOT S.A. ("LOT") and Smartwings, A.S. ("Smartwings"), and by additional family members of fifty-five individuals who died in the Lion Air Flight 610 and Ethiopian Airlines Flight 302 crashes.[2] Related briefing includes the Motion of Polskie Linie Lotnicze LOT S.A. Pursuant to the Crime Victims' Rights Act for Findings that the Proposed Boeing Deferred Prosecution Agreement was Negotiated in Violation of the Victim's Rights and for Remedies for Those Violations (ECF No. 120), filed October 28, 2022; the United States' Response (ECF No. 145), filed December 2, 2022; Boeing's Response (ECF No. 150), filed December 12, 2022; LOT's Reply (ECF No. 153), filed December 22, 2022; the Motion of Marti Faidah, et al. to Seek Remedies Pursuant to Crime Victims' Rights Act (ECF No. 138), filed November 22, 2022; the United States' Response (ECF No. 147), filed December 6, 2022; Boeing's Response (ECF No. 146), filed December 6, 2022; Marti Faidah, et al.'s Reply (ECF No. 152), filed December 19, 2022; Smartwings' Motion to be Designated as a Crime Victim Under the CVRA and for an Accounting of the "Airline Compensation Amount" in Boeing's Deferred Prosecution Agreement (ECF No. 141), filed November 28, 2022; the United States' Response (ECF No. 149), filed December 12, 2022; Boeing's Response (ECF No. 151), filed December 12, 2022; and Smartwings' Reply (ECF No. 160), filed January 6, 2023.

---

[2] Collectively, the Court refers to the carriers and the additional family members as the "2022 Movants."

On October 21, 2022, this Court ruled in favor of the original movants, holding that the crash victims of Lion Air Flight 610 and Ethiopian Airlines Flight 302 are "crime victims" for purposes of the Crime Victims' Rights Act ("CVRA") and that their lawful representatives are therefore entitled to assert rights under the Act.[3] The Court reserved the question of remedies for later resolution, which it takes up in Section III.A of this Opinion. The Court takes up the 2022 Movants' pending motions in Section III.B.

The parties have provided initial and supplemental briefing regarding appropriate remedies and the motions are ripe for review. Having considered the briefing and applicable law, and for the reasons discussed herein, the Court **DENIES** the crime victims' representatives' requested relief and **DENIES** the 2022 Movants' motions for recognition as crime victims and associated remedies.

## I.    FACTUAL & PROCEDURAL BACKGROUND[4]

On October 29, 2018, a Boeing 737 MAX aircraft operating as Lion Air Flight 610 crashed shortly after taking off from Indonesia. None of the 189 passengers and crew members onboard survived. Less than six months later, on March 10, 2019, another 737 MAX operating as Ethiopian Airlines Flight 302 crashed shortly after taking off from Ethiopia. Again, all 157 passengers and crew members onboard died.

Three days after the second crash, the President ordered the grounding of all 737 MAX aircrafts operating in the United States. Initial investigations by the United States Federal Aviation Administration's ("FAA") Aircraft Evaluation Group ("AEG") subsequently revealed that a system Boeing had installed in its 737 MAX aircrafts—the Maneuvering Characteristics

---

[3] Second Opinion, ECF No. 116.
[4] The factual and procedural background is taken from portions of the record in this case. Additional background information is set out exhaustively in the Court's prior Opinions. *See* First Opinion, ECF No. 96; Second Opinion, ECF No. 116.

Augmentation System ("MCAS")—activated during both flights. The AEG, the group responsible for determining minimum levels of training required for U.S.-based airline pilots to fly a new version of an aircraft ("differences training"), began investigating the operation of MCAS in connection with pilot training.

Shortly after the second crash, the U.S. Department of Justice began investigating Boeing. Though initially uncooperative, Boeing eventually aided the Justice Department's investigation by identifying relevant documents and witnesses.[5] In February 2020, while that investigation was ongoing, Thomas Gallagher, a representative of the Flight 302 crash victims' families, reached out to the Justice Department seeking information about possible investigations.[6] The Justice Department's Victims' Rights Ombudsman informed Gallagher that the Federal Bureau of Investigation had advised her that it was not investigating the crash, nor was it aware of any open cases at the Justice Department.[7] She told Gallagher, "If criminal charges are filed at some point, victims will be advised of that and notified of their rights under the [Crime Victims' Rights Act]."[8] Gallagher then reached out to the FBI Victim-Witness Office, and a victim specialist informed Gallagher that she, too, was unaware of any FBI investigations.[9]

The Justice Department's investigation ultimately revealed that, during Boeing's development of the 737 MAX, two Boeing Technical Pilots had misled the AEG about the aircraft's MCAS operational capabilities in order to affect the AEG's pilot differences training determination.[10] This deception prompted the AEG to authorize a lower level of training for the

---

[5] Deferred Prosecution Agreement ("DPA") 5, ECF No. 4.
[6] *See* Movants' App. 62–65, Ex. 16, Decl. of Thomas Gallagher, ECF No. 16-1.
[7] *Id.* at 64.
[8] *Id.*
[9] *Id.* at 65.
[10] *See generally* DPA, ECF No. 4.

737 MAX, resulting in the promulgation of inadequate pilot training worldwide, in turn leading to the catastrophic plane crashes that cost 346 individuals their lives.[11]

On January 7, 2021, the Government charged Boeing with conspiracy to defraud the United States under 18 U.S.C. § 371.[12] The Government alleges that Boeing conspired to defraud the AEG in connection with the AEG's evaluation of the Boeing 737 MAX aircraft's MCAS, the agency's pilot differences training determination, and related reporting.[13] The same day, the Government filed a deferred prosecution agreement ("DPA")[14] and a Joint Motion for Exclusion of Time Under the Speedy Trial Act, which allows the parties to defer impending criminal trial proceedings upon the Court's approval of the agreement.[15] In the DPA, Boeing admitted to the Government's statement of facts and accepted responsibility for the acts charged.[16] On January 24, 2021, this Court approved the DPA and suspended the Speedy Trial Act's time requirements for a period of three and a half years.[17]

The DPA obligates Boeing to pay a criminal monetary penalty of $243.6 million, which the DPA says "reflects a fine at the low end of the otherwise-applicable Sentencing Guidelines fine range."[18] Boeing also must pay $1.77 billion in compensation to its airline customers and set up a fund of an additional $500 million to be paid to the heirs, relatives, and beneficiaries of those who died in the two airplane crashes.[19] The DPA requires Boeing to meet with and report to the Justice Department's Fraud Section to ensure Boeing's compliance with the DPA and other federal

---

[11] *See generally* Second Opinion, ECF No. 116.
[12] *See* Criminal Information, ECF No. 1.
[13] *Id.*
[14] DPA, ECF No. 4.
[15] Joint Mot. for Exclusion of Time, ECF No. 5; 18 U.S.C. § 3161(h)(2).
[16] DPA ¶¶ 1–2, ECF No. 4.
[17] Order, ECF No. 13.
[18] DPA 7, ECF No. 4.
[19] *Id.*

laws.[20] In exchange, the DPA immunizes Boeing from criminal prosecution for all conduct described in the statement of facts.[21] If, in the DOJ's sole discretion, Boeing complies with its obligations under the DPA for three years, the Government will dismiss the charge with prejudice.[22] If, on the other hand, Boeing breaches or fails to comply with any provision, the Government may prosecute Boeing for the crime charged.[23]

On December 16, 2021, eleven months after the DPA was filed, certain family members of those who died onboard Lion Air Flight 610 and Ethiopian Airlines Flight 302, moved this Court for a determination that the United States had negotiated the DPA in violation of the Crime Victims' Rights Act, 18 U.S.C. § 3771, and for appropriate remedies.[24] First, they argued (and the Court agreed) that the Government and Boeing violated the CVRA by negotiating the DPA behind closed doors, without conferring with the families.[25] As a remedy, they now request that the Court supervise implementation of the DPA to ensure the crime victims' rights under the CVRA are adequately protected.[26] Despite the substantial fines imposed and DOJ's continued oversight of Boeing's interim conduct, the victims' families maintain that the DPA is grossly inadequate and should be rejected or substantially modified. Third, they asked for (and received) an arraignment of Boeing at which they would have an opportunity to be heard on the company's conditions of release.[27] As an additional remedy, the representatives also ask this Court to order the Government to disclose information about Boeing's crimes and the DPA's negotiation history.[28]

---

[20] *Id.* at 7–9, Attachment D.
[21] *Id.* at 14.
[22] *Id.* at 3, 16.
[23] *Id.* at 16–19.
[24] *See generally* Supervisory Mot., ECF No. 17; Arraignment Mot., ECF No. 18; CVRA Mot., ECF No. 52; Disclosure Mot., ECF No. 72.
[25] *See generally* CVRA Mot., ECF No. 52.
[26] *See generally* Supervisory Mot., ECF No. 17.
[27] *See generally* Arraignment Mot., ECF No. 18.
[28] *See generally* Disclosure Mot., ECF No. 72; Representatives' Supp. Remedies Reply 17, ECF No. 140.

In January 2022, before the families' legal status as crime victims' representatives had been recognized, the Justice Department held several meetings at which the representatives were given the opportunity to voice their concerns over the DPA. The United States Attorney General personally attended one of those meetings. Still, after listening to the families' perspectives, the Government reiterated its position to stand by the DPA. The families insist these meetings inadequately fulfilled their rights under the CVRA.

On May 3, 2022, the Court held a hearing regarding several of the families' motions.[29] Following that hearing, on July 27, 2022, this Court issued its first Memorandum Opinion & Order in which it held that the CVRA's definition of "crime victims" included the crash victims; meaning their legal representatives could assert rights under the Act provided they could establish the crash victims were "directly and proximately harmed" by Boeing's criminal conspiracy to defraud the United States.[30] In its Second Memorandum Opinion & Order, issued October 21, 2022, this Court determined that the families had in fact established direct and proximate causation and granted their motion for findings that the DPA was negotiated in violation of the victims' rights.[31] Thus, the crime victims' lawful representatives are entitled to assert the victims' rights under the Act.[32] The Court permitted the parties to supplement their briefing regarding appropriate remedies in light of its ruling.[33]

Following that decision, the Justice Department held two additional meetings for the newly identified "crime victims' representatives." The latter occurred on November 18, 2022, during which the Government, over the course of five hours, discussed appropriate remedies with several

---

[29] *See* May 3, 2022 Minute Entry, ECF No. 94.
[30] First Opinion 7–8, 17–21, ECF No. 96.
[31] Second Opinion 17–18, ECF No. 116.
[32] *Id.*
[33] *Id.*

hundred of the victims' family members.[34] As a result of those discussions, the Government agreed to support the representatives' request for Boeing's arraignment and filed its motion shortly thereafter.[35]

On January 26, 2023, the Court held a three-hour public arraignment at which Boeing appeared and the crime victims' representatives were permitted to speak personally or through counsel.[36] Thirteen of the crash victims' representatives offered in person testimony and several dozen more filed written statements on the docket.[37] Counsel for the crime victims' representatives, the Government, and Boeing presented argument regarding appropriate conditions of Boeing's release. The Court imposed the sole condition that Boeing not commit another Federal, State, or local crime for the term of its release but reserved the decision to impose any additional conditions for further consideration.[38] Having considered the parties' briefing regarding additional conditions of release,[39] the Court is of the view that no factual record exists to justify a finding that Boeing—while subject to the Government's continued supervision—currently presents an ongoing threat to public safety such that imposition of additional conditions of release pursuant to 18 U.S.C. § 3142 are necessary. In this Opinion, the Court takes up the remaining issue of remedies and resolves the pending motions of the 2022 Movants.

## II.     LEGAL BACKGROUND

The Speedy Trial Act generally requires courts to begin criminal trial proceedings within seventy days of a defendant being charged with a crime. *See* 18 U.S.C. § 3161(c)(1). The parties

---

[34] United States' Resp. to Second CVRA Mot. 3, ECF No. 142.
[35] *Id.*
[36] *See* Order 3–5, ECF No. 162; January 26, 2023 Minute Entry, ECF No. 174.
[37] *See* App. of Victim Statements, ECF No. 171-1; Statement on Arraignment of The Boeing Company, ECF No. 172; Exhibit to Statement on Arraignment of The Boeing Company, ECF No. 173; App. of Additional Victim Statements, ECF No. 176-1.
[38] Arraignment Hr'g Tr. 130:8–10, ECF No. 175.
[39] *See generally* ECF Nos. 167, 170, 178–81.

may seek an exemption from that general timeline, however, if the Government, in exercise of its prosecutorial discretion, opts to negotiate a deferred prosecution agreement. *See id.* § 3161(h)(2). Upon negotiating and reaching an agreement, the Government and the defendant file the DPA with the district court for "approval." *Id*. The statutory language setting out this deferral of prosecution provides that:

> (h) The following periods of delay shall be excluded in computing the time within which an information or an indictment must be filed, or in computing the time within which the trial of any such offense must commence: . . .

> (2) Any period of delay during which prosecution is deferred by the attorney for the Government pursuant to written agreement with the defendant, *with the approval of the court*, for the purpose of allowing the defendant to demonstrate his good conduct.

*Id.* (emphasis added). While that process generally satisfies the requirements of the Speedy Trial Act, if the crime affected victims, the Government and the Court must take additional steps to afford those crime victims their statutory rights.

The Crime Victims' Rights Act, 18 U.S.C. § 3771, guarantees crime victims certain rights in criminal proceedings. Among those are the right to timely notice of proceedings involving the release, plea, sentencing, or parole of the defendant; the right not to be excluded from and to be heard at any such proceeding; the right to confer with the Government attorney in the case; the "right to full and timely restitution as provided in law"; the "right to be treated with fairness and respect for the victim's dignity and privacy"; and the right to be timely informed of any deferred prosecution agreement.[40] *Id.* § 3771(a).

---

[40] Other rights under the Crime Victims' Rights Act include the following:

(1) The right to be reasonably protected from the accused.
(2) The right to reasonable, accurate, and timely notice of any public court proceeding, or any parole proceeding, involving the crime or of any release or escape of the accused.
(3) The right not to be excluded from any such public court proceeding, unless the court, after receiving clear and convincing evidence, determines that testimony by the victim would be materially altered if the victim heard other testimony at that proceeding.

The CVRA requires the Government to make its "best efforts to see that crime victims are notified of, and accorded, [their statutory] rights." *Id.* § 3771(c)(1). It also imposes duties on district courts. In any relevant proceedings, "the court *shall ensure* that the crime victim is afforded the rights described in subsection (a) . . . [and that] [t]he reasons for any decision denying relief under this chapter shall be clearly stated on the record." *Id.* § 3771(b)(1) (emphasis added). And the district court "shall take up and decide any motion asserting a victim's right forthwith." *Id.* § 3771(d)(3). Finally, the crime victim, the crime victim's representative, or the Government attorney may assert the victim's rights under the Act. *Id.* § 3771(d)(1).

## III.     DISCUSSION

### A.

Having decided that the Government negotiated the DPA in violation of the crime victims' rights, the Court takes up the issue of remedies. Among other requested remedies, the representatives ask the Court to exercise its supervisory authority, whether statutory or inherent, to "withhold its approval of the DPA" or to specifically "excise from the DPA" the immunity provisions that block Boeing from prosecution.[41] Ultimately, the representatives attack the DPA

---

(4) The right to be reasonably heard at any public proceeding in the district court involving release, plea, sentencing, or any parole proceeding.
(5) The reasonable right to confer with the attorney for the Government in the case.
(6) The right to full and timely restitution as provided in law.
(7) The right to proceedings free from unreasonable delay.
(8) The right to be treated with fairness and with respect for the victim's dignity and privacy.
(9) The right to be informed in a timely manner of any plea bargain or deferred prosecution agreement.
(10) The right to be informed of the rights under this section and the services described in section 503(c) of the Victims' Rights and Restitution Act of 1990 (42 U.S.C. 10607(c)) and provided contact information for the Office of the Victims' Rights Ombudsman of the Department of Justice.

18 U.S.C. § 3771(a).
[41] Reply to Supervisory Mot. 24, ECF No. 65; Representatives' Supp. Remedies Reply 20, ECF No. 140.

on grounds that it is grossly inadequate and should be rejected or reformed until it is commensurate with the severity of Boeing's crime—perhaps the deadliest corporate crime in our nation's history.[42] They also present arguments that DPAs are inherently problematic, raising significant separation of powers concerns, and urge the Court to invoke its supervisory powers on that basis.[43]

The representatives also ask the Court to order the Government to confer with them about "other ways to hold Boeing accountable for its crimes beyond the provisions in the existing DPA" and to disclose evidence and information about Boeing's crimes and the DPA negotiation process.[44] Though the Court will refer to this request as relating to the representatives' "conferral rights," the Court notes that throughout their briefing the victims' representatives claim they are entitled to this remedy based also on their rights to full and timely restitution, to be treated with fairness, and to timely notice of the DPA.[45] Finally, the representatives ask the Court to refer the Government to the appropriate investigative authorities for its violations of the CVRA.[46]

Thus, the representatives' several requested remedies are best organized into three categories that ask the Court to: (1) exercise its statutory or inherent supervisory authority over the DPA; (2) enforce the victims' conferral rights; and (3) refer the Government to appropriate investigative authorities.[47] And, only if necessary for the Court to rule in their favor, the representatives request an evidentiary hearing to prove the Government's bad faith in excluding them from the DPA negotiation process.[48] The Government and Boeing oppose the

---

[42] Reply to Supervisory Mot. 24, ECF No. 65; Representatives' Supp. Remedies Reply 9 n.10, 20, ECF No. 140.

[43] Supervisory Mot. 5–9, ECF No. 17.

[44] CVRA Mot. 27, ECF No. 52; Representatives' Supp. Remedies Reply 15–17, ECF No. 140.

[45] *See* Disclosure Mot. 12–18, ECF No. 72; Representatives' Supp. Remedies Reply 20, ECF No. 140; 18 U.S.C. § 3771(a)(6), (a)(8), (a)(9).

[46] CVRA Mot. 27–28, ECF No. 52 (identifying several requested remedies).

[47] *See generally* Supervisory Mot., ECF No. 17; CVRA Mot, ECF No. 52; Reply to Supervisory Mot., ECF No. 65; Representatives' Supp. Remedies Reply, ECF No. 140.

[48] Representatives' Supp. Remedies Reply 19, ECF No. 140.

representatives' requested relief on several grounds, namely: (1) that the Court lacks statutory and inherent authority to supervise, and thereby reject or modify, the DPA; (2) the Court has no inherent authority or alternative legal basis for awarding the other remedies that the representatives seek; and, (3) even if it does possess such authority, equitable and other legal considerations counsel against granting the representatives' requested relief.[49]

In short, the parties' disagreement is principally over the scope of this Court's judicial authority, i.e., does it have the power to award the remedies the crime victims' representatives claim they are entitled to. Settling this dispute requires the Court to decide two questions:

1.  Whether the Court has statutory or inherent authority to provide the remedies the representatives seek; and

2.  If indeed it does have authority to provide such remedies, whether it must.

Because the answer to both questions is no, the Court **DENIES** the representatives' requested relief.

###    i.    The Court Does Not Possess Statutory Authority Permitting it to Exercise Substantive Supervision Over the DPA

As noted, the Speedy Trial Act permits the Government and a criminal defendant to negotiate a DPA and thereby delay, for an interim period, the seventy-day timeline by which criminal proceedings must ordinarily begin. 18 U.S.C. § 3161(h)(2). The relevant statutory text provides that "[a]ny period of delay during which prosecution is deferred by the attorney for the Government pursuant to written agreement with the defendant, *with the approval of the court*, for

---

[49] United States' Resp. to CVRA Mot., ECF No. 58; United States' Resp. to Supervisory Mot., ECF No. 60; United States' Resp. to Disclosure Mot., ECF No. 73; United States' Supplemental Remedies Resp., ECF No. 128; Boeing's Combined Resp., ECF No. 62; Boeing's Supplemental Remedies Resp., ECF No. 129.

the purpose of allowing the defendant to demonstrate his good conduct," shall be excluded from the Act's strict timeliness requirements. *Id.* § 3161(h)(2) (emphasis added).

The Court begins with the pertinent statutory text, "with the approval of the court," to decide whether the Speedy Trial Act confers substantive supervisory authority. The representatives apply the nearest-reasonable-referent canon to the statutory language, arguing that the nearest reasonable referent to "with the approval of the court" is "written agreement."[50] This, the representatives contend, means the "written agreement" is subject to "the approval of the court."[51] This, apparently by implication, evinces Congress' intent to confer on the district court authority to substantively review (and approve or disapprove) the written terms of any DPA that comes before it.[52] But the Court does not find this persuasive. Even if the canon properly applies in this instance, it says nothing about the *ambit* of the court's approval authority. Moreover, "canons are not mandatory rules. They are guides that need not be conclusive." *Chickasaw Nation v. United States*, 534 U.S. 84, 94 (2001) (cleaned up). And "[e]ach may be overcome by the strength of differing principles that point in other directions." Antonin Scalia and Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 70 (2012). Such principles undoubtedly apply here.

The representatives argue that, as a general matter, deferred prosecution agreements present constitutional separation of powers concerns.[53] "Relegating courts to a mere rubber-stamp role on DPAs effectively grants prosecutors [combined] judicial and legislative powers," by giving them the power to both discipline and attempt to reshape corporate governance.[54] However, the

---

[50] Reply to Supervisory Mot. 12, ECF No. 65 (citing Antonin Scalia and Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 152 (2012)).
[51] *Id.*
[52] *See id.* at 12 ("Thus, the congressional syntax makes clear that what requires court approval is the 'written agreement.'").
[53] Supervisory Mot. 5–9, ECF No. 17.
[54] *Id.* at 6 (citing *Criminal Law—Separation of Powers—D.C. Circuit Holds that Courts May Not Reject Deferred Prosecution Agreements Based on the Inadequacy of Charging Decisions or Agreement*

same separation of powers principles the representatives urge this Court to protect also restrain it from stepping beyond its judicial purview to reform Congress' legitimate legislative enactment. Indeed, an attempt by the judiciary to weigh in on the Executive's DPA presents an even more worrisome separation of powers concern than does the Executive's *congressionally authorized* consolidation of power the representatives say is inherent to deferred prosecution agreements.[55] Given this tension, the constitutional-doubt canon is particularly apt here. This canon dictates that "[a] statute should be interpreted in a way that avoids placing its constitutionality in doubt." Scalia & Garner, *Reading Law* 214 (quoting *United States ex rel. Attorney General v. Delaware & Hudson Co.*, 213 U.S. 366, 408 (1909) (White, J.) ("[W]here a statute is susceptible of two constructions, by one of which grave and doubtful constitutional questions arise and by the other of which such questions are avoided, our duty is to adopt the latter.")). Applying these principles here, the Court cannot accept the representatives' interpretation of the statute.

The D.C. and Second Circuits interpret this provision to mean that a court's statutorily conferred supervisory authority over a DPA consists principally of determining whether the agreement was reached for a legitimate or illegitimate purpose. *United States v. Fokker Servs., B.V.*, 818 F.3d 733, 744–45, 747 (D.C. Cir. 2016); *United States v. HSBC Bank USA, N.A.*, 863 F.3d 125, 129 (2d Cir. 2017).

In *United States v. Fokker Services*, the D.C. Circuit said it understands a court's supervisory role with respect to a DPA "to have a particular focus: i.e., to assure that the DPA in fact is geared to enabling the defendant to demonstrate compliance with the law, and is not instead a pretext intended merely to evade the Speedy Trial Act's time constraints." 818 F.3d at 744.

---

*Conditions*—United States v. Fokker Services B.V., 130 Harv. L. Rev. 1048, 1054–55 (2017) and Brandon L. Garrett, *Structural Reform Prosecution*, 93 Va. L. Rev. 853, 936 (2007)).

[55] And, importantly, the representatives have not raised a constitutional challenge to § 3161(h)(2), so the Court has no occasion to decide that question here.

Therefore, under *Fokker*, a district court has no authority under the Speedy Trial Act to withhold its approval of a DPA because the court disagrees with the agreement's substantive terms or the Government's decision to negotiate such an agreement. *Id.* at 738, 740–41, 743, 746–47. Similarly, in *United States v. HSBC Bank*, the Second Circuit held that, barring evidence of misconduct or impropriety, a district court's role in supervising a DPA is confined to arraigning the defendant, ensuring the agreement is *bona fide* (not for purposes of evading the Speedy Trial Act clock), and adjudicating related motions or disputes as they arise. 863 F.3d at 129, 137–38.

The representatives argue that *Fokker* only prohibits district courts from rejecting a DPA based on disagreement with the Government's "charging decisions."[56] And, in addition to its being merely persuasive, they say *Fokker* is inapplicable to this case because of its distinguishable procedural posture—i.e., the Court is not asked to question the prosecution's *charging decisions*, but to evaluate the substance of the agreement against the particular facts of this case.[57]

But the Court disagrees with such a narrow reading of that case. Hints throughout the *Fokker* opinion suggest its reasoning applies more broadly to any attempt at judicial review of the substantive terms or implementation of a DPA, not just the prosecution's charging decisions. *See, e.g., Fokker Servs.*, 818 F.3d at 747 ("The court instead denied the exclusion of time under § 3161(h)(2) based on a belief that the prosecution had been unduly lenient in its charging decisions *and in the conditions agreed to in the DPA*. The court significantly overstepped its authority in doing so.") (emphasis added); *id.* at 744 ("The Judiciary's lack of competence to review the prosecution's initiation and dismissal of charges equally applies to review of the prosecution's decision to pursue a DPA *and the choices reflected in the agreement's terms*.") (emphasis added) (cleaned up).

---

[56] Reply to Supervisory Mot. 12–15, ECF No. 65.
[57] *Id.*

The *HSBC Bank* opinion confirms this broader reading. There, the Second Circuit interpreted *Fokker* as denying a district court's authority to disapprove a speedy trial waiver "based on its view that the DPA at issue was too lenient." *HSBC Bank*, 863 F.3d at 137. Relying on its reading of *Fokker*, the Second Circuit went on to hold that "in the absence of any clear indication that Congress intended courts to evaluate the *substantive merits* of a DPA or to supervise a DPA's out-of-court implementation, the relative functions and competence of the executive and judicial branches counsel against [the opposite] interpretation." *Id.* at 138 (emphasis added) Thus, contrary to the position the representatives urge the Court to adopt, both the D.C. and Second Circuits believe district courts lack statutory authority to substantively review and withhold approval of a DPA based on disagreement with its terms or leniency. *Fokker Servs.*, 818 F.3d at 738, 740–41, 743, 746–47; *HSBC Bank*, 863 F.3d at 129, 137–38. This Court agrees. Although the Fifth Circuit has not yet offered binding interpretive guidance on the meaning of § 3161(h)(2), the Court sees no reason to depart from these persuasive authorities and accept an alternate reading of the statute, as the representatives advocate.

In sum, based on its understanding of 18 U.S.C. § 3161(h)(2), the Court holds that it lacks statutory authority to supervise, or substantively review and reject, the subject DPA. Because district courts do not possess authority to *disapprove* of DPAs based on their substantive terms, it follows that the Court may not *modify* the DPAs terms to adequately reflect the Court's assessment that doing so would better effect justice for the crime victims.

### ii.    Nor May the Court Supervise the DPA by Relying on its Inherent Authority

Statutory authority aside, Courts also possess a degree of inherent authority over the proceedings that come before them. *Bank of Nova Scotia v. United States*, 487 U.S. 250, 264 (1988) (Scalia, J., concurring). This inherent authority permits a federal court to "supervise the

administration of criminal justice among the parties before the bar." *HSBC Bank*, 863 F.3d at 135 (cleaned up). Traditionally, exercise of this supervisory power has been for the purposes of "implement[ing] a remedy for violation of recognized rights; . . . preserv[ing] judicial integrity by ensuring that a conviction rests on appropriate considerations validly before the jury; and . . . deter[ing] illegal conduct." *Id*. (quoting *United States v. Hasting*, 461 U.S. 499, 505 (1983)). Thus, the scope of a court's inherent supervisory authority is itself inherently limited to those three discrete purposes.

The Court's inherent authority provides no basis upon which the Court may exercise supervisory authority over the DPA. The representatives are correct that, in some cases, a district court may invoke its inherent authority to "monitor the implementation of the DPA or take other appropriate action." *Id.* at 137. However, exercising this inherent supervisory authority over a DPA is likely only appropriate when the agreement "so transgresses the bounds of lawfulness or propriety as to warrant judicial intervention to protect the integrity of the Court" or when there is clear evidence of bad faith or misconduct on the part of the Government. *Id*. at 136; *see also Fokker*, 818 F.3d at 747 (noting use of inherent authority may be appropriate when the DPA's terms are expressly illegal or clearly unethical).

Here, the representatives urge the Court to invoke its inherent authority on grounds that the Government has acted with impropriety warranting judicial intervention and on purported evidence of bad faith. They argue, first, that the DPA is necessarily marked by "impropriety" in light of this Court's ruling that the Government violated the CVRA.[58] "Acting illegally is, by definition, acting with impropriety."[59] To overlook this impropriety and approve the DPA would, they argue, lend a judicial imprimatur to the Government's wrongdoing and threaten this Court's

---

[58] Representatives' Supp. Remedies Reply 6, ECF No. 140.
[59] *Id*. at 6.

own "judicial integrity."[60] But a court may invoke its supervisory powers in the name of "judicial integrity" only for the specific purpose of "ensuring that a conviction rests on appropriate considerations validly before the jury." *Hasting*, 461 U.S. at 505. Not based upon a vague notion that it must "restore respect for the law."[61] Because there is neither conviction nor jury at issue here, there is no basis to use judicial integrity as a justification for invoking this Court's inherent authority.

The representatives also claim the Government acted in bad faith by secretly negotiating the DPA and excluding the crime victims' representatives from the process.[62] In support, they point to the uncontested facts that the DOJ's Victims' Rights Ombudsman and a victim specialist from the FBI's Victim-Witness Office "provided inaccurate information to the victims' families about its investigation into the two crashes."[63] Among a host of other proffered facts, they also claim the Government has refused to disclose requested information related to its prosecutorial charging decisions and its negotiation process with Boeing.[64]

Even if ultimately proven, none of the representatives' proffered evidence meets the exacting standard for a showing of impropriety or bad faith that justifies exercising the Court's inherent supervisory authority over the DPA.[65] *In re Moore*, 739 F.3d 724, 729–30 (5th Cir. 2014) (requiring clear and convincing evidence of "bad faith or willful abuse of the judicial process" to

---

[60] *Id*. at 3–4.

[61] Representatives' Supp. Remedies Reply 5, ECF No. 140.

[62] *Id*. at 19–20.

[63] Ex. 1 of Mot. to Re-File Proffer of Facts ¶¶ 253–77, ECF No. 124-1; *see also* United States' Supplemental Remedies Resp. 9–10, ECF No. 128 (acknowledging the Victim Rights' Ombudsman's incorrect statements were the result of "regrettable and inadvertent internal miscommunication" within the DOJ).

[64] Representatives' Supp. Remedies Reply 15–17, ECF No. 140; Ex. 1 of Mot. to Re-File Proffer of Facts ¶¶ 294–315, 368, ECF No. 124-1 (offering potential evidence of the Government's misinformation, the inadequacy of the DPA, the Government's engagement with the representatives, and other proffered facts pertaining to Boeing's misconduct).

[65] For this reason, the Court need not hold another evidentiary hearing to develop the factual record.

support invocation of inherent authority). Indeed, "[l]eveling an extraordinary claim of bad faith against a coordinate branch of government requires an extraordinary justification." *In re Dep't of Commerce*, 139 S. Ct. 16, 17 (2018) (Gorsuch, J., concurring in part). None exists here.

It is true that the Government violated the CVRA. By denying the crime victims' representatives their rights to confer prior to reaching an agreement with Boeing, the Government transgressed its statutory obligations under the CVRA. But the Government avers it excluded the representatives from the DPA negotiation process based on its bona fide—albeit errant— assessment that the crash victims were not legal "crime victims" of Boeing's conspiracy to defraud the United States.[66] And the false statements made by the Ombudsman and FBI victim specialist about any ongoing DOJ investigations were purportedly a result of "regrettable and inadvertent internal miscommunication," not a willful attempt to deceive the victims' representatives.[67]

A showing of bad faith requires substantially more than legal error. *Crowe v. Smith*, 261 F.3d 558, 563 (5th Cir. 2001) ("A court abuses its discretion when its finding of bad faith is based on an erroneous view of the law or a clearly erroneous assessment of the evidence."); *see also Gate Guard Servs., L.P. v. Perez*, 792 F.3d 554, 561 (5th Cir. 2015) (explaining that bad faith, in the context of litigation-related misbehavior justifying an award of attorneys' fees, requires *willful* misconduct or improper motive such as the intent to harass another party).

Importantly, even if it were established that the Government acted in bad faith, it is unclear (doubtful even) that this Court may legitimately wield judicial sanctions to discipline Executive misconduct that occurred in the course of exclusively Executive functions like those at issue here (i.e., criminal investigation and pre-prosecutorial negotiations). Doing so would likely violate separation of powers principles this Court is duty-bound to preserve. "Indeed, 'the federal

---

[66] *See, e.g.*, United States' Supplemental Remedies Resp. 8, ECF No. 128.
[67] *Id*. at 9–10.

19

judiciary's supervisory powers over prosecutorial activities that take place *outside* the courthouse is extremely limited, *if it exists at all*.'" *HSBC Bank*, 863 F.3d at 136 (emphasis added) (quoting *United States v. Lau Tung Lam*, 714 F.2d 209, 210 (2d Cir. 1983)).

Nevertheless, the Government's historic engagement with the families undercuts arguments that it dealt with them in bad faith. Before the families were ever recognized as representatives of "crime victims" for purposes of the CVRA, the Government hosted several meetings at which the representatives could advocate their positions regarding the DPA. Attorney General Merrick Garland personally attended one of those meetings. Despite their complaint that these listening sessions were inadequate, that the victims' representatives were offered several meetings and a personal conference with the United States' chief law enforcement officer amplifies DOJ's good faith efforts to treat the families with dignity and respect.[68] Moreover, following this Court's recent decision, the Government hosted an additional meet and confer with the newly classified "crime victims' representatives" and took other remedial steps (e.g., revising internal guidelines for engaging with victims and witnesses to ensure future compliance with the Act).[69] Though these measures do not alter the fact that the families were originally denied their legal status and associated rights as crime victims' representatives, they evince the Government's good faith—not the opposite.

The Court is of the view that, regrettably, legal error on the Government's part is what occurred here, not bad faith or impropriety that warrants the Court's acting to preserve judicial integrity. Therefore, no justification exists to reach the extraordinary finding of bad faith or impropriety necessary for this Court to invoke its inherent supervisory authority over the DPA and reject or excise select provisions of the same.

---

[68] Representatives' Supp. Remedies Reply 17, ECF No. 140.
[69] United States' Supplemental Remedies Resp. 6–10, ECF No. 128.

### iii.     The Representatives are Not Entitled to their Other Requested Remedies

Finally, while the representatives' remaining forms of relief likely fall within the scope of this Court's broad remedial powers, other legal considerations counsel against granting their requests. Here, the representatives ask the Court to enforce their conferral rights by ordering the Government to turn over evidence and information about Boeing's crimes and the DPA's negotiation history.[70] Importantly, the representatives concede that, at this point in time, the Government has in fact conferred with them.[71] Nonetheless, the representatives seek remedies for the prior violations of their right to confer.[72] The representatives also contend their conferral rights were violated by the Government's refusal to provide requested information before it filed its remedies briefing in this case.[73] Additionally, they ask the Court to refer the Government to appropriate investigative authorities for its violations of the CVRA.[74] Because the Court finds that the crime victims' statutory rights have already been substantially and meaningfully satisfied, further judicial relief is inappropriate under the circumstances.

In conjunction with their somewhat circumscribed inherent judicial authority, discussed above, district courts possess broad remedial powers that permit them to vindicate rights that have been violated. Indeed, "[o]nce a right and a violation have been shown, the scope of a district court's equitable powers to remedy past wrongs is broad, for breadth and flexibility are inherent equitable remedies." *Swann v. Charlotte-Mecklenburg Bd. of Ed.*, 402 U.S. 1, 15 (1971); *see also Marbury v. Madison*, 5 U.S. 137, 163 (1803) ("where there is a legal right, there is also a legal remedy"); *Fed. Sav. & Loan Ins. Corp. v. Dixon*, 835 F.2d 554, 561 (5th Cir. 1987) (noting that

---

[70] Representatives' Supp. Remedies Reply 17, ECF No. 140.
[71] *Id*. ("*Until just a few days ago*, the Government had failed to confer with the families.") (emphasis added).
[72] *Id.*
[73] *See generally* Second CVRA Mot., ECF No. 130.
[74] CVRA Mot. 27, ECF No. 52.

"the full range of equitable remedies [is] traditionally available to [district courts]"). Of course, "[a]s with any equity case, the nature of the violation determines the scope of the remedy." *Swann*, 402 U.S. at 16. Consequently, any exercise of a court's broad remedial powers originating from its inherent supervisory authority must be tempered by the knowledge that such supervisory power is to be "sparingly exercised" with "restraint and discretion." *HSBC Bank*, 863 F.3d at 136 (quoting *United States v. Jones*, 433 F.2d 1176, 1181–82 (D.C. Cir. 1970) and *Chambers v. NASCO, Inc.*, 501 U.S. 32, 44 (1991)).[75]

Again, it is true the Government violated the crime victims' rights under the CVRA, including the right to confer with counsel for the Government *before* a DPA was executed. And, certainly, district courts have broad remedial powers to vindicate rights that have been violated. Yet, for several reasons, the fact that these rights were offended does not necessitate the remedies the representatives propose. Chief among these reasons is that the victims' statutory rights have been substantially and meaningfully realized.

In another case involving victims' rights under the CVRA, the Fifth Circuit declined to issue a writ of mandamus—even though the district court had clearly violated the Act—because the victims' rights to notice and to confer were eventually meaningfully recognized. *In re Dean*, 527 F.3d 391 (5th Cir. 2008). Though *In re Dean* is procedurally distinguishable and involved the more stringent standard for issuance of a writ, the Court finds the Circuit's reasoning applicable to the instant case. Here, the victims' representatives have had several meetings with DOJ, including one with the Attorney General himself. As in *In re Dean*, these meetings occurred too late in the process and after the DPA had already been negotiated. *See id.* at 395–96. The

---

[75] This may be particularly true with regard to supervision of a deferred prosecution agreement—a dynamic that would raise serious separation of powers concerns should the judiciary's exercise of oversight intrude upon the Executive's ultimate prerogatives.

representatives were also given the opportunity to speak at Boeing's arraignment or to submit written statements.[76] Thirteen representatives testified in person at the arraignment, several others through counsel.[77] Though testimony at the arraignment was intended to address conditions of release, the thirteen representatives who testified in person presented moving victim impact statements while dozens more filed victim impact statements on the docket.[78] And while these opportunities to be heard do not cure the prior violation, they give meaningful effect to those rights. Additionally, the Court disagrees with the representatives' claim that the Government illegally refused to confer by offering only "listening sessions" rather than a more substantive exchange of information.[79] Citing Webster's Dictionary, they say the right to "confer" means "to compare view or take counsel: consult."[80] In the context of a DPA, however, the reasonable right to confer is the right "to communicate meaningfully with the government, personally or through counsel, before a deal [is] struck." *In re Dean*, 527 F.3d at 395. As noted, the Fifth Circuit has considered this right vindicated when victims or their representatives are "allowed substantial and meaningful participation" in *post hoc* conferral meetings or judicial proceedings. *Id.* at 395–96. Other Circuits have held there was no CVRA violation of the conferral right where a victim "had received ample opportunities to speak with the government counsel about the alleged [crime]." *In re Rivers*, 832 Fed. App'x 204, 204 (4th Cir. 2020). Indeed, the right to confer requires only

---

[76] *See* Order, ECF No. 162; Order Regarding Arraignment Hearing, ECF No. 165.

[77] *See generally* Arraignment Hr'g Tr., ECF No. 175.

[78] *See generally* Representatives' Statement on Conditions of Release, ECF No. 170; App. of Victim Statements, ECF No. 171-1; Statement on Arraignment of The Boeing Company, ECF No. 172; Exhibit to Statement on Arraignment of The Boeing Company, ECF No. 173; App. of Additional Victim Statements, ECF No. 176-1.

[79] Representatives' Supp. Remedies Reply 17, ECF No. 140 ("But, as the Government knows, it repeatedly refused to *confer . . .* and instead agreed only to a 'listening session' to hear from the victims").

[80] *Id.* (citing *Merriam-Webster's Collegiate Dictionary* 260 (11th ed. 2006)).

that victims are provided "an opportunity to be heard concerning a proposed settlement agreement." *See In re W.R. Huff Asset Mgmt. Co.*, 409 F.3d 555, 564 (2d Cir. 2005).

None of these decisions suggest that the right to confer includes mandatory disclosure of information on the Government's part. And as the Eleventh Circuit put it in a similar case involving victims' rights under the CVRA, "[i]t is hard to imagine a more significant impairment of prosecutorial discretion than a district court's . . . affirmatively ordering government lawyers (presumably on pain of contempt) to conduct their prosecution of a particular matter in a particular manner." *In re Wild*, 994 F.3d 1244, 1262 (11th Cir. 2021), *cert. denied sub nom. Wild v. United States Dist. Ct. for S. Dist. of Fla.*, 142 S. Ct. 1188 (2022). *In re Wild* involved the point at which the right to confer attaches, but the Eleventh Circuit's reasoning applies equally to a case, like this one, in which the Court is asked to dictate precisely *how* and *about what* the Government must confer with the representatives. For this reason, a finding that the Government violated its conferral rights by refusing to disclose certain information, or by filing its remedies briefing before conferring, is unwarranted.

Nor is the Court persuaded that the representatives' rights to "full and timely restitution," or "to be treated with fairness" justifies mandatory disclosure of such information.[81] A line of cases from other circuits affirms this understanding. *See, e.g.*, *United States v. Hunter*, 548 F.3d 1308, 1317 (10th Cir. 2008) ("The district court and this court have already held that the CVRA does not provide 'victims' with a right of access to the government's files."); *United States v. Moussaoui*, 483 F.3d 220, 224 (4th Cir. 2007) (holding that neither a district court's statutory authority under

---

[81] Disclosure Mot. 12–18, ECF No. 72; Reply to Disclosure Mot. 12–19, ECF No. 75; Representatives' Supp. Remedies Reply 20, ECF No. 140; 18 U.S.C. § 3771(a)(6), (a)(8).

the CVRA nor its inherent authority permit ordering the Government to disclose non-public information to victims).[82]

Thus, based on the record before it, the Court finds that the crime victims' rights have been given meaningful effect. The Court knows of no other victims' rights case in which victims' representatives were offered the ear of the United States Attorney General, even before their legal status as such had been confirmed. Regrettably, this occurred too late in the process after the DPA had already been entered and approved.[83] Still, to award a novel remedy (i.e., by obligating the Government to turn over evidence or disclose specific information to the victims' representatives) under these circumstances is precisely the opposite of a sparing and restrained exercise of inherent remedial authority.

Finally, even if referring DOJ to appropriate investigative authorities for its violations of the CVRA is permissible in this case, it is not warranted. Here again, the DOJ's good faith engagement with the crime victims' representatives before and after this Court's recent determination that the Government violated the Act invalidates the need for such a referral. Moreover, members of the Congressional committees that may provide such oversight are already well aware of this case—at least one Senate Judiciary Committee member has written in support of the crime victims' representatives as amici.[84] As the representatives point out, Boeing's crime may properly be considered the deadliest corporate crime in U.S. history.[85] Indeed, news of the

---

[82] *See also* United States' Resp. to Disclosure Mot. 4–9, ECF No. 73 (collecting cases).

[83] *See generally* DPA, ECF No. 4; Joint Mot. for Exclusion of Time, ECF No. 5; Order, ECF No. 13.

[84] Amicus Br. of Senator Ted Cruz, ECF No. 90.

[85] Representatives' Supp. Remedies Reply 9, 9 n.10, ECF No. 140 ("According to Bloomberg Law, PG&E's 2020 plea to 84 separate involuntary manslaughter counts in connection with a wildfire in Paradise, California, was 'the deadliest corporate crime in U.S. history.' Bloomberg Law, *Deadliest Corporate Crime in the U.S. Will End with 84 Guilty Pleas* (June 15, 2020). With this Court's recent finding that 'but for Boeing's criminal conspiracy 346 people would not have lost their lives in the crashes' (Dkt. 116), this case has tragically become the deadliest corporate crime in our nation's history.").

tragic accidents and of DOJ's DPA with Boeing has made headlines worldwide. Should Congress wish to take further action with respect to the Government's conduct in this matter, or with respect to DPAs more generally, it is well positioned to do so without this Court's referral to investigative authorities.

*     *     *     *

The Court holds that it lacks both statutory and inherent authority that would permit any substantive review and disapproval or modification of the DPA at issue in this case. Thus, even if it held legitimate concerns about the substance of the Government's negotiated agreement, the Court has no occasion to address whether the DPA is in fact grossly incommensurate with Boeing's egregious criminal conduct. With respect to the remaining remedies, the Court finds that the crime victims' rights have been meaningfully recognized and that awarding the relief sought under the circumstances would be an unjustified exercise of this Court's remedial powers. For these reasons, the Court **DENIES** the representatives' requested relief.

### B.

Next, the Court turns to the 2022 Movants' pending motions. Following this Court's October 21, 2022 Opinion recognizing those who died in the crashes as "crime victims" for purposes of the CVRA, foreign carriers LOT and Smartwings moved for victim status and remedies under the Act.[86] The additional family members of fifty-five individuals who died in the Boeing crashes—already recognized as crime victims' representatives in light of that October Opinion—also moved to assert their rights in this proceeding for the first time.[87] They do not

---

[86] Second Opinion, ECF No. 116; LOT Mot., ECF No. 120; Smartwings Mot., ECF No. 141.
[87] Mot. of Marti Faidah, et al., ECF No. 138; Reply of Marti Faidah, et al., ECF No. 152.

identify which remedies they seek, however, and wish to preserve the issue for subsequent decision.[88]

Laches—which the Government invokes only as against foreign carrier LOT—applies to the 2022 Movants' pending motions.[89] The doctrine of laches functions to bar equitable claims when Congress has imposed no statutory timeline for seeking relief. *See Petrella v. Metro-Goldwyn-Mayer, Inc.*, 572 U.S. 663, 678 (2014). A party may assert the defense of laches when another party's unreasonable delay in seeking redress of its rights prejudices the party asserting the defense. *SCA Hygiene Prods. Aktiebolag v. First Quality Baby Prods., LLC*, 580 U.S. 328, 333 (2017); *Radiator Specialty Co. v. Pennzoil-Quaker State Co.*, 207 Fed. App'x 361, 362 (5th Cir. 2004). Whether laches should apply is a question ultimately left to the district court's discretion. *Nat'l Ass'n of Gov't Employees v. City Public Serv. Bd. of San Antonio, Tex.*, 40 F.3d 698, 707 (5th Cir. 1994).

Here, the 2022 Movants seek forms of equitable relief through recognition as "crime victims" under the CVRA, judicial oversight of the DPA's implementation, and other novel remedies not expressly provided for in the statute.[90] However, they did not pursue their requested relief until nearly two years after the Government filed the DPA in this case, ten months after the original movants sought recognition of rights, and now only fifteen months before the subject DPA is set to expire. Only after this Court's favorable ruling for the original movants have these

---

[88] Mot. of Marti Faidah, et al., ECF No. 138; Reply of Marti Faidah, et al., ECF No. 152. Importantly, as noted above, the Government has acted in accordance with this Court's October 21 Opinion, and has invited the family members to conferral meetings in an effort to afford these victims' representatives their statutory rights under the CVRA.

[89] United States' Resp. to LOT Mot., ECF No. 145.

[90] *See generally* LOT Mot., ECF No. 120 (asserting notice and conferral rights and proposing judicial supervision of the DPA); Mot. of Marti Faidah, et al., ECF No. 138 (asserting the right to seek unspecified remedies under the Act); Smartwings Mot., ECF No. 141 (seeking victim status and a public accounting of the Airline Fund created via the DPA).

2022 Movants chosen to assert their rights in this proceeding. They make no claim that this substantial delay resulted from a lack of knowledge about the proceedings, incapacity, or other reason justifying the lethargic pace at which they decided to act. Indeed, all took earlier legal action against Boeing in other forums.[91] This two-year delay is therefore without excuse.

Allowing the 2022 Movants to seek their requested legal status and remedies this late into the proceedings is prejudicial to the current parties. The Government and Boeing have spent the last fourteen months litigating the original movants' status as crime victims and desired remedies. To start that process over again now with a new set of purported crime victims would likely prolong resolution of the DPA well beyond its expected expiration date. Such a result would prejudice the Government by forcing further expenditure of resources on a DPA it wishes to conclude and Boeing by disrupting reliance interests it has established throughout the term of its DPA and by protracting resolution of its criminal case.

Importantly, the Court does not believe the Fifth Circuit's timeliness analysis in *In re Allen* is applicable in this case. 701 F.3d 734, 734–35 (5th Cir. 2012) (per curiam). There, the Circuit held that the movants' four-year delay in seeking recognition as crime victims was not barred by laches because the defendant's criminal sentencing hearing was still two months away. *Id.* Under the Act, those movants would have been entitled to be heard at such proceedings. 18 U.S.C. § 3771(a)(4). In this case, however, the DPA has already been entered and approved, the Court is without authority to reject or oversee its implementation, and no public proceedings or trial are pending at which these late-arriving crime victims would be able to assert their rights. Thus, the period in which 2022 Movants' statutorily conferred rights (e.g., the right to notice and conferral prior to entry of the DPA) would have been recognized has long since expired. And in light of its

---

[91] LOT Mot. 4, ECF No. 120; LOT Mot., Ex. A, ECF No. 120 at 20–28; Mot. of Marti Faidah, et al. 6–7, ECF No. 138; Smartwings Mot., ECF No. 141 at 4.

prior reasoning regarding its limited supervisory power over the DPA, the Court lacks authority to afford the novel remedies (e.g., public accounting of the DPA Airline Fund) these late coming movants propose. Nor can the Court afford remedies the parties have yet to identify or request.[92]

Given these circumstances, the Court holds that the motions are inexcusably delayed and prejudicial such that laches bars their consideration or, in the case of the individual family members, are not ripe for decision. Therefore, without reaching the merits of the foreign carriers' motions, the Court **DENIES** their requested relief as inexcusably delayed and prejudicial to the parties before the Court. The Court **DENIES** the motion of Marti Faideh, et al. for unspecified remedies.

## IV.      CONCLUSION

This Court has immense sympathy for the victims and loved ones of those who died in the tragic plane crashes resulting from Boeing's criminal conspiracy. Had Congress vested this Court with sweeping authority to ensure that justice is done in a case like this one, it would not hesitate. But neither the Speedy Trial Act nor this Court's inherent supervisory powers provide a means to remedy the incalculable harm that the victims' representatives have suffered. And no measure of sympathy nor desire for justice to be done would legitimize this Court's exceeding the lawful scope of its judicial authority.

The Speedy Trial Act gives the Executive exclusive discretion to negotiate deferred prosecution agreements without judicial oversight, even in response to the most heinous crimes. Despite increasing and perhaps legitimate criticism of these agreements, Congress—not the courts—is the appropriate venue to redress the inadequacies of this statutory enactment. In our system of justice, a judge's role is constitutionally confined to interpreting and applying the law,

---

[92]Mot. of Marti Faidah, et al., ECF No. 138 (asserting the right to seek unspecified remedies under the Act).

not revising it. For this Court to step outside those constitutional bounds in an attempt to remedy wrongs it has no legitimate authority to correct would compound injustice, not see justice through.

*      *      *      *

For these reasons, the Court **DENIES** the representatives' motions for remedies under the CVRA (ECF Nos. 17, 124, 130). The Court **DENIES** the motions of LOT S.A., Smartwings, A.S., and Marti Faideh, et al. as untimely barred by the doctrine of laches or as unripe (ECF Nos. 120, 141, 138).

**SO ORDERED** this **9th day** of **February, 2023**.

Reed O'Connor
**UNITED STATES DISTRICT JUDGE**