**RECEIVED**
*By Tamara Ellis at 4:33 pm, Feb 24, 2023*

No. ___23-10168___

*In the*

# United States Court of Appeals

*for the*

# Fifth Circuit

In Re Naoise Connolly Ryan, Emily Chelangat Babu and Joshua Mwazo Babu,
Catherine Berthet, Huguette Debets, Luca Dieci, Bayihe Demissie, Sri Hartati,
Zipporah Kuria, Javier de Luis, Nadia Milleron and Michael Stumo, Chris Moore,
Paul Njoroge, Yuke Meiske Pelealu, John Karanja Quindos, and Guy Daud
Iskandar Zen S.,

*Crime Victims' Representatives-Petitioners.*

**PETITION FOR A WRIT OF MANDAMUS PURSUANT TO
THE CRIME VICTIMS' RIGHTS ACT, 18 U.S.C. § 3771(d)(3)**

**Mandamus from the
United States District Court for the
Northern District of Texas
Case No. 4:21-cr-005-O**

Warren T. Burns
Darren P. Nicholson
Kyle Oxford
Chase Hilton
Burns Charest LLP
900 Jackson Street, Suite 500
Dallas, Texas 75202
wburns@burnscharest.com
nicholson@burnscharest.com
koxford@burnscharest.com
chilton@burnscharest.com

Paul G. Cassell (Utah Bar No. 06078)
(Counsel of Record)
Utah Appellate Project
S.J. QUINNEY COLLEGE OF LAW
University of Utah
383 S. Univ. St.
Salt Lake City, UT 84112
Telephone: (801) 585-5202
cassellp@law.utah.edu
(no institutional endorsement implied)

*Additional counsel on signature page.*
*Attorneys for Crime Victims' Representatives-Petitioners*

### CERTIFICATE OF INTERESTED PARTIES AND CORPORATE DISCLOSURE STATEMENT

No. ___

In Re Naoise Connolly Ryan, Emily Chelangat Babu and Joshua Mwazo Babu, Catherine Berthet, Huguette Debets, Luca Dieci, Bayihe Demissie, Sri Hartati, Zipporah Kuria, Javier de Luis, Nadia Milleron and Michael Stumo, Chris Moore, Paul Njoroge, Yuke Meiske Pelealu, John Karanja Quindos, and Guy Daud Iskandar Zen S., Crime Victim Rights Act Petitioners.

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made so the judges of this Court may evaluate possible disqualification or recusal.

**Petitioners**

The underlying Crime Victims' Rights Act (CVRA) petition arises out of the crashes of two Boeing 737 MAX aircraft: (1) the crash of Lion Air Flight 610 into the Java Sea near Jakarta, Indonesia, on October 29, 2018, which killed all 189 passengers and crew on board; and (2) the crash of Ethiopian Airlines Flight 302 near Ejere, Ethiopia, on March 10, 2019, which killed all 157 passengers and crew on board. The families of the 346 persons killed in the two crashes have an interest in this case.

The CVRA petition below was filed by a subset of the crashes victims' families—specifically fifteen families, who assumed rights as representatives of their family members who were killed:

**Naoise Connolly Ryan,** who had her husband, Mick Ryan, taken from her in the crash of ET Flight 302.
**Emily Chelangat Babu and Joshua Mwazo Babu** had their son, Jared Babu Mwazo, taken from them in the crash of ET Flight 302.
**Catherine Berthet** had her daughter, Camille Geoffroy, taken from her in the crash of ET Flight 302.
**Huguette Debets** had the father of her two young children, Jackson Musoni, taken from her in the crash of ET Flight 302.
**Bayihe Demissie** had his wife, Elsabet Minwuyelet Wubete, taken from him in the crash of ET Flight 302.

i

**Luca Dieci** had his brother, Paolo Dieci, taken from him in the crash of ET Flight 302.

**Sri Hartati** had her husband, Eryanto, taken from her in the crash of Lion Air Flight JT610.

**Zipporah Muthoni Kuria** had her father, Joseph Kuria Waithaka, taken from her in the crash of ET Flight 302.

**Javier de Luis** had his sister, Graziella de Luis, taken from him in the crash of ET Flight 302.

**Nadia Milleron and Michael Stumo** had their daughter, Samya Stumo, taken from them in the crash of ET Flight 302.

**Chris Moore** had his daughter, Danielle Moore, taken from him in the crash of ET Flight 302.

**Paul Njoroge** had his wife, Carolyne Nduta Karanja, and his three children, Ryan Njuguna Njoroge, Kelli W. Pauls, and Rubi W. Pauls, taken from him in the crash of ET Flight 302.

**Yuke Meiske Pelealu** had her husband, Rudolf Petrus Sayers, taken from her in the crash of Lion Air Flight JT 610.

**John Karanja Quindos** had his wife, Anne Wangui Karanja, taken from him in the crash of ET Flight 302.  John also lost his daughter, Carolyne Nduta Karanja, and her children in the crash.

**Guy Daud Iskandar Zen S**. had his daughter, Fiona Zen, taken from him in the crash of Lion Air Flight JT 610.

These families are the petitioners in this case, proceeding as representatives of their family members killed in the crashes.

**Counsel for Petitioners**:

**Paul G. Cassell** (lead counsel)
**Robert A. Clifford**
**Tracy A. Brammeier**
**Erin R. Applebaum**
**Pablo Rojas**
**Warren T. Burns**
**Darren P. Nicholson**
**Kyle Kilpatrick Oxford**
**Chase Hilton**

**Counsel for Other Crashes Victims:**

Counsel have also entered an appearance for other crash victims who did not file the petition at issue. These counsel are:

**Adrian Vuckovich**

**Jason Robert Marlin**

The families bringing this petition have also received amicus support.

**Amicus Senator Ted Cruz:**

United State Senator Ted Cruz from Texas filed an amicus brief in support of petitioners below.

**Counsel for Ted Cruz**

**Nicholas Jon Ganjei**

**Respondent United States**

One respondent is the **United States.** The underlying deferred prosecution agreement at issue was negotiated by attorneys for the United States Department of Justice, Criminal Division, Fraud Section, and United States Attorney's Office for the Northern District of Texas.

**Counsel for the United States**

**Chad E. Meacham**
**Alex C. Lewis**
**Allan Jonathan Medina**
**Carlos Antonio Lope**
**Cory E. Jacobs**
**Jerrob Duffy**
**Lorinda Laryea**
**Michael T. O'Neill**
**Scott Philip Armstrong**
**Daniel S. Kahn**
**Erin Nealy Cox**

**Movant Erin Nealy Cox**

Erin Nealy Cox filed a motion below.

**Counsel for Erin Nealy Cox**

**Marianne Auld.**

**Respondent The Boeing Company**

Another Respondent is **The Boeing Company.** The Boeing Company has no parent corporations and is publicly traded on the NYSE (BA). However, as of December 31, 2012, State Street Corporation, a publicly held company whose subsidiary, State Street Bank and Trust Company, acts as trustee of the Boeing Company Employee Savings Plan Master Trust, has a beneficial ownership of 10% or more of the outstanding stock of The Boeing Company.

**Counsel for The Boeing Company**

**Richard B. Roper, III**
**Benjamin L. Hatch**
**Brandon M. Santos**
**Craig S. Primis**
**Ian Brinton Hatch**
**Jeremy A. Fielding**
**Mark Filip**
**Patrick Haney**
**Richard Cullen**

**Movant Polskie Linie Lotnicze Lot S.A.**

Polish Airlines, legally incorporated as Polskie Linie Lotnicze LOT S.A. is wholly owned by Polish Aviation Group (Polish: Polska Grupa Lotnicza S. A.), a Polish state-owned holding company. It filed a motion in the case below.

**Counsel for LOT**

**Anthony U. Battista**
**Evan Kwarta**
**Jeffrey W. Hellberg**
**Colin Patrick Benton**

iv

**Mary Dow**
**David J. Drez, III**
**Diana Gurfel Shapiro**

**Movant Smartwings A.S.**

Smartwings, A.S. filed a motion in the case below. It is a European-based airline with its headquarters in the Czech Republic.

**Counsel for Smartwings A.S.**

**David M. Schoeggl**
**Jeffrey Richard Gilmore**
**Katherine A. Staton**
**Katie D. Bass**
**Callie A. Castillo**

**Respondent U.S. District Court for the Northern District of Texas**

Because this is a mandamus petition filed under the Crime Victims' Rights Act, the United States District Court for the Northern District of Texas (O'Connor, J.) is technically a nominal respondent.

## <u>STATEMENT REGARDING ORAL ARGUMENT</u>

In view of the importance of the issues the petition presents to the proper administration of the Crime Victims' Rights Act, petitioners respectfully request oral argument.

## TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PARTIES AND CORPORATE DISCLOSURE STATEMENT ................................................................. i

TABLE OF CONTENTS ............................................................... vii

TABLE OF AUTHORITIES ............................................................ ix

STATEMENT OF THE RELIEF SOUGHT ................................................. 1

ISSUE PRESENTED ................................................................. 2

FACTS NECESSARY TO UNDERSTAND THE ISSUES PRESENTED ....... 3

    I.    Boeing's Conspiracy to Defraud the FAA Kills 346 People. ........... 3

    II.    The Government Covertly Negotiates a Secret Deferred Prosecution Agreement with Boeing. ................................. 4

    III.    The Government and Boeing Avoid Any Substantive Proceeding Before the District Court. ............................... 7

    IV.    The District Court Finds That the Government Violated the Victims' Rights to Confer with the Prosecutors About the Deferred Prosecution Agreement. ................................... 8

    V.    After More Than a Year of Litigation, the District Court Denies the Victims Enforcement of Their Promised CVRA Rights ........................................................ 12

STANDARD OF REVIEW ............................................................ 13

STATEMENT OF THE REASONS WHY THE WRIT SHOULD ISSUE ..... 14

    I.    Under the CVRA's Plain Language, the District Court Was Required to Ensure That the Crashes Victims' Families Were Afforded Three CVRA Rights. ................................ 15

        A. The Government Violated the Families' CVRA Right to Confer. ............. ……………………………………………………16

        B. The Government Violated the Families' CVRA Right to Timely Notice of a Deferred Prosecution Agreement ............. 17

C. The Government Violated the Families' CVRA Right to Be Treated with Fairness. ........................................... 19

II.      The CVRA's Judicial Enforcement Provision Required the District Court to Ensure That the Victims' Families Were Afforded Their Three CVRA Rights. ........................... 20

III.     In Refusing to Enforce the Families' CVRA Rights, the District Court Failed to Follow This Court's Decision in *In Re Dean.* ..................................................................... 25

IV.      The District Court Erroneously Concluded That Post-Hoc "Listening Sessions" Satisfied the Victims' Families Right to Confer. ........................................................................ 27

V.       The District Court Erroneously Concluded That Its Inherent and Other Authority Did Not Allow It to Vindicate Congressionally Conferred CVRA Rights. ......................... 29

CONCLUSION ........................................................................... 33

CERTIFICATE OF COMPLIANCE WITH RULE 32(a) ............................ 35

CERTIFICATE OF SERVICE ............................................................ 36

# TABLE OF AUTHORITIES

**Cases**

461 U.S. at 505 ................................................................................. 36

*Baker v. Raymond Intern., Inc.*, 656 F.2d 173, 182 (5th Cir. 1981) ...................... 35

*Bank of Nova Scotia v. United States*, 487 U.S. 250, 265 (1988) .......................... 36

*Doe 1 v. United States*, 411 F. Supp. 3d 1321 (S.D. Fla. 2019) ............................ 22

*Does 1 & 2 v. United States*, 359 F.Supp.3d 1201, 1218 (S.D. Fla. 2019) ............. 27

*Franklin v. Gwinnett County Public Schools,* 503 U.S. 60, 66 (1992) ................... 34

*In re Crocker*, 941 F.3d 206, 213 (5th Cir. 2019) ............................................... 23

*In re Dean*, 527 F.3d 391 (5th Cir. 2008), .............................................. 13, 16, 19, 29

*In re Doe*, 57 F.4th 667, 672-73 (9th Cir. 2022) ............................................. 14, 15

*In re OCA, Inc.*, 552 F.3d 413, 422 (5th Cir. 2008) ............................................. 35

*In re W.R. Huff Asset Mgmt. Co., LLC*, 409 F.3d 555, 564 (2d Cir. 2005) ............. 32

*In re Wild*, 955 F.3d 1196 (11th Cir. 2020), *on reh'g en banc*, 994 F.3d 1244 (11th
    Cir. 2021) .................................................................................. 22, 28

*In re Wild*, 994 F.3d 1244, 1252-63 (11th Cir. en banc 2021) ........................... 14, 18

*Jane Does 1 & 2 v. United States*, 950 F.Supp.2d 1262, 1267 (S.D. Fla. 2013)..... 28

*Kenna v. U.S. Dist. Court for the C.D. of Cal.*, 435 F.3d 1011, 1013 (9th Cir. 2006)
    ................................................................................................ 17, 23

*Marbury v. Madison*, 5 U.S. 137, 163 (1803) ........................................................ 34

*Moreno v. Consolidated Rail Corp.*, 99 F.3d 782, 784 (6th Cir. 1996).................. 34

*Swann v. Charlotte-Mecklenburg Board of Education*, 402 U.S. 1, 16 (1971) ...... 17

*United States v. Atl. States Cast Iron Pipe Co.*, 612 F.Supp.2d 453, 458 (D.N.J.
    2009) ................................................................................................. 23

*United States v. Hastings*, 461 U.S. 499, 505 (1983) ........................................... 36

*United States v. Long,* 722 F.3d 257, 262 (5th Cir. 2013).................................... 34

*United States v. McVeigh*, 106 F.3d 325, 335 (10th Cir. 1997)............................ 24

*United States v. Sheinbaum*, 136 F.3d 443, 448 (5th Cir. 1998) .......................... 35

*United States v. Strouse*, 286 F.3d 767, 772 (5th Cir. 2002) ................................ 37

*United States v. Walker*, 98 F.3d 944, 947 (7th Cir. 1996)................................... 35

*Wise v. Wilkie*, 955 F.3d 430, 439 (5th Cir. 2020)................................................ 35

**Statutes**

18 U.S.C. § 3771(a)(2). ..................................................................... 17

18 U.S.C. § 3771(a)(5) ............................................................. 1, 13, 14, 15

18 U.S.C. § 3771(a)(8) ..................................................................... 18

18 U.S.C. § 3771(a)(9) ................................................................. 13, 16

18 U.S.C. § 3771(b)(1) ......................................................... 10, 13, 19, 21

18 U.S.C. § 3771(d)(3) ........................................................................... passim
18 U.S.C. § 3771(d)(5) ................................................................................. 20
18 U.S.C. § 3771(e)(2) ................................................................................... 8
18 U.S.C. § 3773(b)(1) ................................................................................. 26
28 U.S.C. § 1651............................................................................................. 1

## Other Authorities

150 Cong. Rec. 7303 (Apr. 22, 2004) ......................................................... 18
150 Cong. Rec. 22953 (Oct. 9, 2004) ......................................................... 20
150 Cong. Rec. S4269 (Apr. 22, 2004) ....................................................... 25
Department of Justice Office of Public Affairs, Boeing Charged with 737 Max
    Fraud Conspiracy and Agrees to Pay over $2.5 Billion (Jan. 7, 2021),
    https://www.justice.gov/opa/pr/boeing-charged-737-max-fraud-conspiracy-and-
    agrees-pay-over-25-billion ..................................................................... 7
GAO Rep. at 61–63 ..................................................................................... 16
H.R. Rep. No. 114-17 at 7 (Jan. 27, 2015) ................................................ 17
Paul G. Cassell et al., Circumventing the Crime Victims' Rights Act: A Critical
    Analysis of the Eleventh Circuit's Decision Upholding Jeffrey Epstein's Secret
    Non-Prosecution Agreement, 2021 Mich. St. L. Rev. 211 ..................... 15

## Rules

Fed. R. Crim. P. 11(c)(5)............................................................................. 23

## Treatises

Attorney General Guidelines for Victim and Witness Assistance,
    Art. IV.H, 28 (May 2012) ........................................................................ 4
Bryan A. Garner, Garner's Dictionary of Legal Usage 199 (3d ed. 2011) ............ 25

## Regulations

Pub. L. 114-22, Title I, § 1123(c)(2), May 29, 2015............................... 12

**TO THE HONORABLE COURT OF APPEALS:**

Petitioners, Ms. Naoise Connolly Ryan, et al. (hereinafter "victims' families" or "families"), respectfully submit this Petition for a Writ of Mandamus Pursuant to the Crime Victims' Rights Act (CVRA), 18 U.S.C. § 3771(d)(3), as well as the All Writs Act, 28 U.S.C. § 1651.

## STATEMENT OF THE RELIEF SOUGHT

The victims' families represent eighteen persons killed in the crashes of two Boeing 737 MAX aircraft.[1] Under a secretly-negotiated deferred prosecution agreement (DPA) between the Government and Boeing, various "immunity provisions" prevent Boeing from being prosecuted for its crime of conspiring to defraud the Federal Aviation Administration (FAA) about the safety of the 737 MAX. Boeing's crime directly and proximately caused the two crashes and killed 346 passengers and crew. In the proceedings below, the district court found that the families represented "victims" of Boeing's crime under the Crime Victims' Rights Act (CVRA). The district court also found that the Government violated the families' rights to confer under the CVRA, 18 U.S.C. § 3771(a)(5), by covertly entering into the immunizing DPA. But the district court ultimately concluded it was powerless to

---

[1] In the district court, they were supported by more than one hundred other, similarly-situated families. Appx. 307.

enforce the families' CVRA rights. Opinion ("Op.") 29-30, Exhibit 1.[2] The district court stated that it had "immense sympathy for the victims and loved ones of those who died in the tragic plane crashes resulting from Boeing's criminal conspiracy." Op. 29.  But the Court concluded that it lacked authority to enforce the families' CVRA rights to ensure that "justice was done." Op. 29.

As specifically authorized by the CVRA, *see* 18 U.S.C. § 3771(d)(3), the families now come to this Court to see that justice is done—i.e., that they are afforded the CVRA rights that Congress promised them. Specifically, the families ask this Court to direct the district court to (among other things) afford them their rights to confer, by excising from the DPA the immunity provisions blocking Boeing's prosecution. This relief will then afford the families their CVRA right to confer with the prosecutors handling the case. The families also ask for other remedies to enforce their CVRA rights. Appx. 098-099, 604-609.

## ISSUE PRESENTED

Did the district court err by failing to ensure that the victims' families were afforded their CVRA rights—including their right to confer with prosecutors before a deferred prosecution agreement is finalized?

---

[2] In addition to the opinion below, the victims' families have filed relevant documents in an appendix ("Appx."). References to other documents found in the district court's docket are denoted by docket entry, e.g., "Dkt. 1."

## FACTS NECESSARY TO UNDERSTAND THE ISSUES PRESENTED

### I.    Boeing's Conspiracy to Defraud the FAA Kills 346 People.

This case arises out of "the deadliest corporate crime in our nation's history." Op. 25. On October 29, 2018, a Boeing 737 MAX aircraft operating as Lion Air Flight 610 crashed shortly after taking off from Indonesia. All 189 passengers and crew members onboard were killed. Less than six months later, on March 10, 2019, another 737 MAX operating as Ethiopian Airlines Flight 302 crashed shortly after taking off from Ethiopia. Again, all 157 passengers and crew members onboard were killed. Appx. 451-452.

The two crashes involved strikingly similar circumstances. Investigations subsequently revealed that Boeing had secretly built into its 737 MAX aircraft a software system—the Maneuvering Characteristics Augmentation System ("MCAS")—that improperly activated during both flights. Data later obtained from flight recorders on both airplanes show that the pilots were engaged in a terrifying tug-of-war with Boeing's MCAS—a fight they ultimately lost because they did not know what they were up against. Appx. 460-461.

Around the time of the second crash, the U.S. Department of Justice began investigating Boeing for concealing safety-related information about MCAS. The Justice Department's Fraud Section led the investigation. This criminal investigation lasted for many months, including much of 2019 and all of 2020. At first, Boeing

deliberately refused to cooperate. Boeing only began to reveal what it had done after successfully delaying the Department's criminal investigation for six months. Appx. 006-007.

The Justice Department's criminal investigation ultimately revealed that, during the development of the 737 MAX, Boeing conspired to deliberately mislead the FAA about MCAS's operational capabilities to increase profits. Because the 737 MAX handled differently than its predecessors, Boeing introduced MCAS in a deceptive effort to replicate more closely the handling characteristics of the previous 737 models. But Boeing knew that introducing MCAS could potentially trigger costly new pilot training requirements. Boeing's criminal solution was to incorporate MCAS but to illegally conceal its expansive characteristics, not only from the FAA but also from other worldwide aviation authorities and pilots flying the MAX. Appx. 030-045.[3] Boeing's conspiracy to conceal MCAS extended to the company's highest levels. Appx. 492-500.

## II.   The Government Covertly Negotiates a Secret Deferred Prosecution Agreement with Boeing.

After overcoming Boeing's efforts to fraudulently conceal the 737 MAX's safety issues, the Justice Department began negotiating with Boeing's high-powered

---

[3] In the proceedings below, the district court accepted into evidence the U.S. HOUSE TRANSPORTATION COMMITTEE, FINAL COMMITTEE REPORT: THE DESIGN, DEVELOPMENT & CERTIFICATION OF THE BOEING 737 MAX (Sept. 2020), which describes at length how Boeing "gambled with the public's safety." *Id.* at 28.

attorneys about Boeing's crime. The Justice Department's own regulations require contact with victims and their families "at the earliest opportunity after detection of a crime at which it may be done without interfering with an investigation . . . ." Attorney General Guidelines for Victim and Witness Assistance, Art. IV.H at 28 (May 2012). But the Government never contacted the victims' families at *any* point during the investigation. Appx. 383.

As early as May 2019, the victims' families read media reports indicating that the Justice Department was criminally investigating Boeing. Appx. 378. In February 2020, having heard nothing from the Justice Department (or federal investigators), the victims' families contacted the Department to see what was happening. Appx. 378-379. The Department's Victims' Rights Ombudsperson responded that the Department did not have a criminal investigation into the two crashes. Appx. 379. Shortly thereafter, an FBI victim-witness coordinator gave the families the same information. *Id.*

The Government's representations that it was not criminally investigating Boeing were false and deceptive. Naturally, it was distressing for the victims' families, trying to understand the deaths of their loved ones, to be told one thing by the Justice Department's Victims' Rights Ombudsman and the FBI while reading the opposite in the news. By keeping the victims' families in the dark, the Government

misled them and effectively foreclosed any possibility of the victims' families conferring with the prosecutors. Appx. 139-140.

While the Government blocked the victims' families from any conferral with the prosecutors, Boeing had no such difficulty. Represented by multiple, well-connected law firms, during the last weeks of 2020 and the first week of 2021, Boeing's attorneys covertly rushed to obtain from the Justice Department an extraordinarily generous DPA. *See generally* Professor John C. Coffee, *Nosedive: Boeing and the Corruption of the Deferred Prosecution Agreement* (May 11, 2022).[4] This DPA provided numerous benefits for the company. For example, the DPA deceptively counted funds that Boeing was already contractually obligated to pay to its airline customers as a "penalty." Appx. 482. Most important, the DPA immunized Boeing from criminal prosecution for all conduct listed in the Statement of Facts, which included the two crashes. Appx. 016. And in "unprecedented" language not found in any previous DPA, the DPA exonerated Boeing's senior management for any involvement in the crashes—without any clear factual basis for that conclusion. App. 008.

Additionally, the DPA contained an uncommon provision providing for a payment of $500 million to the "heirs, relatives, and/or legal beneficiaries of the crash victims of Lion Air Flight 610 and Ethiopian Airlines Flight 302." Appx. 014.

---

[4] Available at https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4105514.

Boeing and the Government have never explained how they calculated this number for victim compensation. The one thing that is clear is that the Government and Boeing excluded from their negotiations the people most affected by it.

### III. The Government and Boeing Avoid Any Substantive Proceeding Before the District Court.

After the Government and Boeing reached their secret agreement, on January 7, 2021, the Government first publicly disclosed it by filing it with the Fort Worth Division of the U.S. District Court for the Northern District of Texas. Appx. 003-060.[5] While the Justice Department had negotiated for months with Boeing's expansive legal team, it did not take the same care with the 346 victims' families. At no point did the Department inform them about the criminal investigation—much less confer with them. Appx. 108-190. Boeing knew the DPA was being kept secret from the families. Appx. 480.

After filing the DPA, the Justice Department did not turn its attention to informing the victims' families about the agreement. Instead, the Department turned to its Office of Public Affairs to pat itself on the back through a congratulatory press

---

[5] None of the fraudulent conduct specifically described in the Statement of Facts occurred in the Northern District of Texas. The Government has refused to answer the families' questions regarding whether more appropriate venues existed for filing the DPA, such as the Western District of Washington (where Boeing did take substantial action related to the 737 MAX), the Northern District of Illinois (where Boeing was headquartered in 2021), or the District of Columbia (where the FAA is located).

release. *See* Justice Department, Office of Public Affairs, *Boeing Charged with 737 Max Fraud Conspiracy* (Jan. 7, 2021).[6] And so, the victims' families first learned that the Government had immunized the company that killed their loved ones from social media. *See*, *e.g.,* Appx. 139.

A few weeks later, the district court approved the DPA. Op. 5.

## IV.    The District Court Finds That the Government Violated the Victims' Rights to Confer with the Prosecutors About the Deferred Prosecution Agreement.

Because the Government failed to notify the victims' families about their CVRA rights, the families never knew that they could challenge the secret negotiating process. In November 2021, however, the families secured the undersigned pro bono legal counsel to enforce their rights. Appx. 109-183. Shortly thereafter, on December 16, 2021, the families filed three motions in the district court, as authorized by the CVRA. *See* 18 U.S.C. § 3771(d)(3).[7] The families' three motions sought (1) to enforce their CVRA rights to confer with prosecutors, to timely notice of a DPA, and to be treated with fairness; (2) to have the district court exercise its inherent authority over the illegal DPA; and (3) to have the district court arraign Boeing. Appx. 066-230. Over the following weeks, the families tried to confer with

---

[6] Available at https://www.justice.gov/opa/pr/boeing-charged-737-max-fraud-conspiracy-and-agrees-pay-over-25-billion.

[7] Because the families represent those who died in the crashes, they stand in the crash victims' shoes as their CVRA representatives. *See* 18 U.S.C. § 3771(e)(2)(B).

the Government about the case. But in three separate meetings, the Government specifically refused to confer, stating instead it would only hold "listening sessions." Appx. 483-484.

Ultimately, the Government sided with Boeing and opposed the victims' families' motions. The Government apologized for not conferring with the families and for providing "inaccurate information" about its investigation. Dkt. 58 at 1-2, 18. But, the Government maintained, because Boeing had admitted only to conspiring to defraud the FAA, the only "victims" of the deadliest corporate crime in history were FAA bureaucrats. *Id.* at 9-14. Boeing argued that the district court had no authority to do anything about the secretly-consummated deal. Dkt. 62.

The victims' families replied that Boeing's crime directly and proximately caused the two crashes. Appx. 261-299. Accordingly, because of that direct and proximate connection, the families represented CVRA "crime victims." *See* 18 U.S.C. § 3771(e)(2) (defining a "crime victim" as "a person directly and proximately harmed" by a federal crime). The victims also made a detailed proffer in support of a direct and proximate causal connection between Boeing's crime and the 346 deaths. Appx. 334-389.

U.S. Senator Ted Cruz also filed an amicus brief supporting the families. He explained that the Department had taken the "nonsensical" position of treating the families as representing crime victims in the DPA but then opposing them in court

when they asserted their crime victims' rights: "The Justice Department's attempt to have it both ways now is simply not credible." Appx. 423.

On May 3, 2022, the district court held a hearing on the families' pending motions and ultimately entered an order allowing the families to call expert witnesses to support their "victim" argument. Appx. 427-447. In August, the families presented two days of expert witness testimony. The Government and Boeing presented no evidence. Appx. 449.

After the evidentiary hearing, on October 21, 2022, the district court entered factual findings that, through their well-qualified experts, the families had established that they represented "crime victims" under the CVRA. Appx. 448-465. Specifically, the court found that if Boeing had not committed its crime, the FAA would have required flight simulator training for 737 MAX operators and would have directed that information related to MCAS be included in the relevant aircraft training materials. As a result, foreign regulators—including Indonesian and Ethiopian authorities—would have issued similar training certifications and required similar instructional materials. And ultimately, foreign operators of the 737 MAX— including the pilots on the two doomed flights—would have received training adequate to respond to the uncommanded MCAS activation. In sum, the district court found that "but for Boeing's criminal conspiracy to defraud the FAA, 346 people would not have lost their lives in the crashes." Appx. 463.

Turning next to the CVRA's application, the district court held that the families had standing to assert CVRA conferral rights and, accordingly, that the Government had violated their rights by negotiating the agreement in secret. Appx. 465. The district court then directed further briefing on how to cure the proven CVRA violations. Appx. 465.

Thereafter, the Government and Boeing argued against any remedy for the violations. Appx. 503-537. The victims' families responded, reaffirming their earlier request that (among other things), the district court should excise the DPA's "immunity" provisions to allow the families the opportunity to meaningfully confer with the Justice Department about prosecuting Boeing. Appx. 586-613. The families repeatedly referenced the district court's mandatory CVRA obligation to "ensure" that victims are afforded their CVRA rights. 18 U.S.C. § 3771(b)(1) (cited in Appx. 591, 592, 597). The families also argued that, to the extent that the Government's "good faith" was at issue, they were entitled an evidentiary hearing. Appx. 015-016; Dkt. 124.

On January 26, 2023, the district court arraigned Boeing. Despite Boeing having signed a DPA predicated on its "acceptance of responsibility" for defrauding the FAA, Boeing pleaded "not guilty"—thereby violating its DPA obligations. Dkt. 179. Thirteen of the victims' family members also gave victim impact statements

about the heartbreaking losses they suffered when their loved ones died because of Boeing's crime. Op. 23 (citing Dkt. 175).

## V.    After More Than a Year of Litigation, the District Court Denies the Victims Enforcement of Their Promised CVRA Rights.

On February 9, 2023, the district court issued an order denying any enforcement of the victims' families' CVRA rights. The district court did not directly address its CVRA enforcement authority. Instead of turning to the CVRA, the district court held that it lacked statutory authority to respond to the rights violations under the Speedy Trial Act. Op.10-16. And the district court concluded that it did not have inherent authority to respond to protect "judicial integrity." Op. 16-26. The district court also stated that, in its view, the Government had not acted in bad faith. Without holding a hearing or inquiring into the facts, the district court accepted at face value the Government's representations that it had simply made a mistake about the "crime victim" status of the crash victims. Op. 19.

The district court also pointed to what it called the Government's "historic engagement" (Op. 20) with the victims' families *after* they filed their lawsuit, noting the Government met with the families to listen to their concerns. The district court acknowledged that "it is true the Government violated the crime victims' rights under the CVRA, including the right to confer with counsel for the Government *before* a DPA was executed." Op. 22. Yet "the fact that these rights were offended does not necessitate the remedies the [families] propose." Op. 22.

12

The district court acknowledged this Court's decision in *In re Dean*, 527 F.3d 391 (5th Cir. 2008), which held that the Government violated the CVRA in failing to confer with victims before a plea deal was finalized. But the district court believed it was significant here that the victims' families talked to prosecutors after the DPA had been finalized and accepted. Op. 23.

The families now file this timely petition for review, as the CVRA provides. 18 U.S.C. § 3771(d)(3).

## **STANDARD OF REVIEW**

The victims' families are entitled to ordinary appellate review of their claims under a new law enacted by Congress. In 2008, this Court disagreed with the Second and Ninth Circuits and held that a highly deferential standard of review applies to a CVRA mandamus petition. *See In re Dean*, 527 F.3d 391, 394-96 (5th Cir. 2008). In 2015, Congress rejected this Circuit's narrow approach to CVRA appellate review, amending the CVRA to give crime victims "ordinary standards of appellate review." *See* 18 U.S.C. § 3771(d)(3) (added by Pub. L. 114-22, Title I, § 1123(c)(2), May 29, 2015); *see In re Doe*, 57 F.4th 667, 672-73 (9th Cir. 2022) (citing *In re Wild*, 994 F.3d 1244, 1254 n.10 (11th Cir. en banc 2021) (noting Congress resolving the circuit split in favor of expansive victim protection)).

The ordinary standard of appellate review applicable here is *de novo* review because the district court's decision below rests on a legal conclusion that it lacks

enforcement power under the CVRA. *See In re Doe*, 57 F.4th at 672-73 (de novo review applies to the district court's legal conclusions about applying the CVRA).

## STATEMENT OF THE REASONS WHY THE WRIT SHOULD ISSUE

This case arises out of "the deadliest corporate crime in our nation's history." Op. 25. As the district court found, Boeing's conspiracy to defraud the FAA directly and proximately killed 346 people—leaving behind 346 grieving families. Congress gave those families rights under the Crime Victims' Rights Act. But the Government cared more about protecting Boeing's reputation than the families' rights.  It misled the families as to whether a criminal investigation existed and then secretly cut a deferred prosecution deal without informing the families at all.

Among the rights that Congress protected was a victim's "reasonable right to confer" with prosecutors. 18 U.S.C. § 3771(a)(5). And in 2015, Congress reinforced this right, by mandating that a victim has "[t]he right to be informed in a timely manner of any . . . deferred prosecution agreement." 18 U.S.C. § 3771(a)(9). And Congress has broadly protected crime victims' rights "to be treated with fairness." 18 U.S.C. § 3771(a)(8).

The reason Congress established these rights is straightforward. As this Court explained in *In re Dean*, 527 F.3d 391 (5th Cir. 2008), "[i]n passing the Act, Congress made the policy decision—which we are bound to enforce—that the victims have a

right to inform the plea negotiation process by conferring with prosecutors *before a plea agreement is reached*." *Id.* at 395 (emphasis added).

In this case, the victims' families were denied these promised rights—as the district court specifically found. Appx. 465. But then, the district did nothing. In doing nothing, the district court failed to discharge its CVRA obligation that it "*shall ensure* that . . . crime victim[s] are afforded the rights described in [the CVRA]." 18 U.S.C. § 3771(b)(1) (emphasis added). Rather than follow the CVRA's plain language requiring it to "ensure" that the families were afforded their rights, the district court held that meaningless, post hoc "listening sessions" could substitute for the meaningful, pre-charging conferral that Congress mandated. Op. 20.

The district court abdicated its CVRA responsibility to "ensure" that the victims' families were afforded their rights. In the CVRA, Congress promised the families that they would have the opportunity to take part in shaping the scope of Boeing's DPA by conferring with prosecutors *before* they finalized the DPA. This Court should grant the families' petition and enforce Congress's command.

## I.   Under the CVRA's Plain Language, the District Court Was Required to Ensure That the Crashes Victims' Families Were Afforded Three CVRA Rights.

The district court found that the Government violated three of the families' CVRA rights. Appx. 465**.** The violation of each of these rights is important to

understand, because "the nature of the violation determines the scope of the remedy." *Swann v. Charlotte-Mecklenburg Board of Education*, 402 U.S. 1, 16 (1971).

### A.  The Government Violated the Families' CVRA Right to Confer.

The first right that the Government violated was the families' reasonable right to "confer" with prosecutors about Boeing's deferred prosecution agreement. Given Congress's goal to make "victims independent participants in the criminal justice process," *Kenna v. U.S. Dist. Court for the C.D. of Cal.*, 435 F.3d 1011, 1013 (9th Cir. 2006), it is unsurprising to find that the CVRA requires prosecutors to confer with victims during negotiations to resolve criminal cases. *See* 18 U.S.C. § 3771(a)(5) (extending the "reasonable right to confer" with prosecutors). Addressing facts similar to those here, this Court held in *In re Dean* that "Congress made the policy decision—which we are bound to enforce—that the victims have a right to inform the plea negotiation process by conferring with prosecutors *before a plea agreemen*t *is reached*." 527 F.3d at 395 (emphasis added). In reaching that conclusion, this Court began by holding that "[t]here are clearly rights under the CVRA that apply before any prosecution is underway." *Id.* at 394 (internal citation omitted). "Logically," this Court explained, these pre-charging rights include the

CVRA's "reasonable right" for victims "to confer with the attorney for the Government." *Id.* at 394 (citing 18 U.S.C. § 3771(a)(5)).[8]

### B. The Government Violated the Families' CVRA Right to Timely Notice of a Deferred Prosecution Agreement.

The district court also found that the Government violated the families' right to "timely notice" of a deferred prosecution agreement. Some history is helpful here: In 2004, Congress passed the CVRA. In May 2008, this Court decided in *In re Dean*, holding that the CVRA required prosecutors to confer with victims before resolving a case. In December 2008, the Government Accountability Office (GAO) reported to Congress about how courts had construed the CVRA. The GAO explained that courts had "interpreted the CVRA in different ways," contrasting this Court's decision in *Dean* with a few district court decisions that had seemingly concluded that CVRA did not apply before charges were filed. *See* GAO, CRIME VICTIMS'

---

[8] The Eleventh Circuit has recently decided that, in a case where no criminal charges were ever filed, crime victims cannot seek to vindicate their CVRA right to confer in a freestanding civil action. *In re Wild*, 994 F.3d 1244, 1252-63 (11th Cir. en banc 2021), *cert denied*, 142 S. Ct. 1188 (2022). But the Eleventh Circuit specifically distinguished this Court's decision in *Dean*, explaining that "the question we answer is different from the one presented in *Dean* . . . ." *Id.* at 1252 n.7 (noting that it was not reaching the issue of whether a victim could seek to vindicate CVRA rights in "an ongoing criminal prosecution"). Here, the victims' families are asserting their rights in an ongoing criminal prosecution—e.g., United States v. Boeing, Case No. 4:21-cr-005-O-1 (N.D. Tex. 2021)—and are thus entitled to enforce their rights under *Dean*. *See* Paul G. Cassell et al., *Circumventing the Crime Victims' Rights Act: A Critical Analysis of the Eleventh Circuit's Decision Upholding Jeffrey Epstein's Secret Non-Prosecution Agreement*, 2021 MICH. ST. L. REV. 211, 239-42 (discussing *Dean*).

RIGHTS ACT: INCREASING AWARENESS, MODIFYING THE COMPLAINT PROCESS, AND ENHANCING COMPLIANCE MONITORING WILL IMPROVE IMPLEMENTATION OF THE ACT 61-63 (2008).

In 2015, Congress amended the CVRA to resolve that split in authority in favor of this Circuit's position. The amendment codified *Dean*'s holding and reinforced that the Act applies before charging by giving victims the "right to be informed in a *timely manner* of any plea bargain or deferred prosecution agreement." 18 U.S.C. § 3771(a)(9) (emphasis added). This right necessarily applied before charging. It would not be "timely" for victims to learn about (for example) a deferred prosecution agreement after the agreement had already been concluded—rendering any victim involvement irrelevant.

Any other reading would make the 2015 CVRA amendment meaningless. Before the 2015 amendment, the CVRA promised victims a "right to reasonable, accurate, and timely notice of any public court proceeding . . . involving the crime." *See* 18 U.S.C. § 3771(a)(2). And, as the GAO had noted, this Circuit in *Dean* had made clear that Congress had made the policy choice of requiring prosecutors to confer with victims before resolving a case. If Congress's 2015 amendment about providing notice about a deferred prosecution agreement in a "timely manner" only required notice after a court filing, then the new provision would have been superfluous.

18

While the 2015 amendment's plain text makes clear that victims are entitled to confer with prosecutors before a DPA is finalized, the legislative history also confirms this conclusion. As specifically explained in the House Report accompanying the Justice for Victims of Trafficking Act, "[T]his section clarifies Congress's intent that crime victims be notified of plea agreements or deferred prosecution agreements, including those that may take place *prior to* a formal charge." H.R. Rep. No. 114-17 at 7 (Jan. 27, 2015) (emphasis added).

Here, as the district court found, the victims' families were not afforded their CVRA "right to be informed in a timely manner" of the DPA, 18 U.S.C. § 3771(a)(9)—i.e., timely notice that would have permitted them to confer with the Government before the agreement was finalized. The families only received notice after the deal was finalized—when they learned about it through social media. Appx. 383.

## C. The Government Violated the Families' CVRA Right to Be Treated with Fairness.

The district court also found that the Government had violated a third right— the CVRA's right "to be treated with fairness." 18 U.S.C. § 3771(a)(8). To add insult to injury, not only did the Government fail to confer with the victims' families but it also recklessly misled the families about the existence of its criminal investigation.

19

Appx. 478.[9] In February 2020, the Justice Department—ironically speaking through its Victims' Rights Ombudsman and an FBI victim specialist—assured the families that no such investigation existed. Under the CVRA, at a minimum, "When the Government gives information to victims, it cannot be misleading*." Doe 1 v. United States*, 411 F. Supp. 3d 1321 (S.D. Fla. 2019), *mandamus denied sub nom.*, *In re Wild*, 955 F.3d 1196 (11th Cir. 2020), *on reh'g en banc*, 994 F.3d 1244 (11th Cir. 2021). Whatever else "fairness" might mean, it must at least mean that the Government is obligated to keep the victims properly informed. *See* 150 CONG. REC. 7303 (Apr. 22, 2004) (statement of Sen. Kyl) (describing the right to fairness in broad terms).

## II.   The CVRA's Judicial Enforcement Provision Required the District Court to Ensure That the Victims' Families Were Afforded Their Three CVRA Rights.

After the district court found that the victims' families had been denied their three CVRA rights, the families asked the court to vindicate those rights. Appx. 590-609. The primary statutory authority that the families cited was the CVRA's judicial

---

[9] The district court found that the Department provided false information. But, relying upon an unsworn statement in the Government's brief, the district concluded that the Government's two separate false statements were "a result of 'regrettable and inadvertent internal miscommunication.'" Op. 19 (*quoting* Appx. 512-513). The victims' families had proffered that they could establish that the Justice Department's statements were, at a minimum, made in reckless disregard of the truth. Appx. 478. Because the district court refused the families an evidentiary hearing on this point, this Court should assume the truth of the families' allegations here.

enforcement provision, 18 U.S.C. § 3771(b)(1). That provision directly requires that a district court "shall ensure" that the victims' families are "afforded the rights described in the [CVRA]." *See United States v. Atl. States Cast Iron Pipe Co.*, 612 F.Supp.2d 453, 458 (D.N.J. 2009) (the CVRA specifically "places responsibility on the [district] court for its implementation, requiring that '*the court shall ensure* that the crime victim is afforded [those] rights'" (emphasis added)). Indeed, as the CVRA's Senate co-sponsor explained, "it is the clear intent and expectation of Congress that the district . . . courts will establish procedures that will . . . giv[e] meaning to the rights we establish." 150 CONG. REC. 22953 (Oct. 9, 2004) (statement of Sen. Kyl). *See, e.g., Kenna*, 435 F.3d at 1017 (when a victim is denied his right to speak at a sentencing hearing, "the only way to give effect to [the victim's CVRA] right to speak . . . is to vacate the sentence and hold a new sentencing hearing").

The CVRA's statutory history demonstrates this provision's broad sweep. *See In re Crocker*, 941 F.3d 206, 213 (5th Cir. 2019) (noting legitimacy of looking to "[e]nacted revisions in the wording of statutes"). Congress crafted the CVRA to replace the ineffective Victims' Rights and Restitution Act of 1990 (VRRA). *See* Paul G. Cassell, *Recognizing Victims in the Federal Rules of Criminal Procedure: Proposed Amendments in Light of the Crime Victims' Rights Act*, 2005 BYU L. REV. 835, 844-52. The VRRA listed rights similar to those contained in the CVRA, including a right to "confer with [the] attorney for the Government in the case." 42

U.S.C. § 10606(b)(5) (replaced by the CVRA in 2004). But those rights proved to be unenforceable in court in the Oklahoma City bombing case. *See United States v. McVeigh*, 106 F.3d 325, 335 (10th Cir. 1997) ("[t]he district court judge, a judicial officer not bound in any way by [the VRRA] . . . [rights], could not violate the Act.").

Seven years later, Congress enacted the CVRA and rejected *McVeigh.* The CVRA was "meant to correct, not continue, the legacy of the poor treatment of crime victims in the criminal process" by replacing "cases like the *McVeigh* case, where victims of the Oklahoma City bombing were effectively denied the right to attend the trial …." 150 CONG. REC. S4269 (Apr. 22, 2004) (statement of Sen. Feinstein). Thus, the CVRA moved victims' rights directly into Title 18 and added specific language—the judicial enforcement provision—obligating district courts to enforce CVRA rights. 18 U.S.C. § 3771(b)(1). The plain and mandatory language of that provision—"shall ensure"—reflects Congress's understanding that courts "will be responsible for enforcing [the CVRA] rights." 150 CONG. REC. S4269 (Apr. 22, 2004) (statement of Sen. Feinstein in colloquy with Senator Kyl).

Judicial enforcement of the CVRA does not intrude on prosecutorial discretion. As Senator Cruz explained in his *amicus* brief below, "the problem here is not that the Justice Department exercised its discretion, but that it did so in violation of Congressionally mandated procedural requirements that ensure that prosecutorial decisions are informed by the experiences of crime victims. It is

important that the government not walk away from this case with a mere slap on the wrist . . . ." Appx. 423.

In the district court below, the victims' families explained that neither the Government nor Boeing had ever contested the families' argument based on the CVRA's judicial enforcement provision. Appx. 591 (*citing*, *e.g.*, Appx. 075, 089, 097, 269, 289). Because of the Government's and Boeing's failures to respond, the families explained that it was undisputed that the district court was required, by 18 U.S.C. § 3771(b)(1), to excise the DPA's immunity provisions to "ensure" that the families are given their CVRA right to confer about prosecuting Boeing. Appx. 592. The families concluded that, as "a matter of fairness," the district court should "decide this case on this *undisputed premise*" and protect the families' right to confer by striking the DPA's immunity provisions. Appx. 592 (emphasis in original).

But remarkably, the district court did not proceed based on this undisputed premise. Instead, it recharacterized the families' CVRA enforcement position as resting primarily on different grounds—i.e., the Speedy Trial Act and the district court's inherent supervisory authority. *See* Op. 10-26. While the district court quoted the CVRA's enforcement provision once (in the "background" section of its order, Op. 10), it never discussed the families' central argument.

The district court's legal error in failing to recognize its authority under the CVRA's judicial enforcement provision by itself requires this Court to grant the

families' petition. But this Court should also conclude that the only way to "ensure" that the victims' families receive their CVRA rights to confer, to timely notice of a DPA, and to fairness is through rescission of the DPA's immunity provisions. In the court below, the families sought a "tightly focused order"—an order excising from the DPA the immunity provisions to permit the victims' families the unfettered ability to exercise their CVRA right to confer with the Government about prosecuting Boeing. Appx. 590-592. That is the only way to afford the families their CVRA right to confer; it is the only way to give them the unfettered opportunity to confer with the Justice Department and to try to convince it to do the right thing— i.e., to prosecute Boeing for the deadliest corporate crime in our nation's history.

The only other court to face CVRA violations comparable to those here is the U.S. District Court for the Southern District of Florida. That Florida court faced the issue of how to enforce victims' CVRA rights where prosecutors illegally negotiated a secret non-prosecution agreement for notorious sex trafficker Jeffrey Epstein. The district court held that a permissible remedy to afford Epstein's crime victims their right to confer would be a rescission of the non-prosecution provisions, thereby giving the victims an "unfettered" opportunity to confer about prosecuting Epstein. Appx. 591-592 (discussing *Does 1 & 2 v. United States*, 359 F.Supp.3d 1201, 1218 (S.D. Fla. 2019) (quoting 950 F.Supp.2d at 1267)). As the Florida district court explained, in enacting the CVRA, Congress included a narrow "limitations on relief"

section, restricting the circumstances in which victims could seek the relief of "re-open[ing] a plea or sentence." 18 U.S.C. § 3771(d)(5). Given the limitations-on-relief section's narrow scope, the Florida district court held that in situations outside that scope, this CVRA language is "properly interpreted impliedly to authorize a 're-opening' or setting aside of pre-charge prosecutorial agreements made in derogation of the government's CVRA conferral obligations." *Jane Does 1 & 2*, 950 F.Supp.2d at 1267.[10] The district court here erred in concluding (without discussing the applicable CVRA language) that it lacked any authority to "re-open" the DPA to the limited degree necessary to protect the families' CVRA rights. And, for similar reasons, the district court erred in refusing to use its CVRA enforcement power to grant the families their other requested remedies. Appx. 098-099, 604-609.

### III.   In Refusing to Enforce the Families' CVRA Rights, the District Court Failed to Follow This Court's Decision in *In Re Dean*.

The district court's decision that it lacked the power to enforce CVRA's right also violates *In re Dean*, 527 F.3d 391 (5th Cir. 2008). *Dean* involved analogous facts, where the Government failed to confer with victims before reaching a plea agreement with a corporate defendant. This Court held that, in enacting the CVRA, "Congress made the policy decision—*which [courts] are bound to enforce*—that the

---

[10]  In later proceedings in that case, the Eleventh Circuit specifically recognized that "Congress has given crime victims a specific means of judicial enforcement, a 'motion'—which . . . denotes a vehicle *for seeking relief within the context of a preexisting case.*" 994 F.3d at 1259 (emphasis added).

victims have a right to inform the plea negotiation process by conferring with prosecutors *before a plea agreement is reached*." *Id.* at 395 (emphases added).

Here, the district court did not discuss *Dean*'s controlling language that courts are "bound to enforce" the CVRA's conferral requirement. Instead, the district court pointed to the fact that *Dean* declined to grant mandamus relief. Op. 23. But in 2008, *Dean* applied a very deferential mandamus review. Now, in the wake of Congress's 2015 amendment, appellate courts "shall apply ordinary standards of appellate review" to a CVRA petition. 18 U.S.C. § 3771(d)(3).

The district court here also pointed to subsequent district court proceedings in *Dean.* But the district court misunderstood *Dean*'s different procedural posture. In *Dean*, after this Court found a CVRA violation and remanded, the subsequent proceedings involved the district court's decision of whether or not to approve the plea agreement. *See* Fed. R. Crim. P. 11(c)(5) (noting that the district court can "reject[] the plea agreement"). Here, in contrast, the district court has affirmatively stated at length that, because of its narrow interpretation of the CVRA, it will *not* consider rejecting the DPA. *See* Dkt. 185 at 29 ("Had Congress vested this Court with sweeping authority to ensure that justice is done in a case like this one, it would not hesitate.").

**IV.    The District Court Erroneously Concluded That Post-Hoc "Listening Sessions" Satisfied the Victims' Families' Right to Confer.**

The district court also misconstrued *Dean* in concluding that the right to confer is "vindicated when victims . . . are 'allowed substantial and meaningful participation' in *post hoc* conferral meetings or judicial proceedings." Op. 23 (citing *Dean* at 395-96). *Dean* did not hold that CVRA rights were "vindicated" by *post hoc* conferral. *See* 527 F.3d at 396 ("we conclude that these victims *should have been heard at an earlier stage*" (emphasis added)). Moreover, whatever the posture of that case involving proceedings about whether to *reject* a plea, here no such "meaningful" meetings or proceedings have taken place—or could take place.

Turning first to the meetings with the Department, the victims' families have made clear that their overriding objective is to have Boeing criminally prosecuted for killing their loved ones. But such prosecution is currently *impossible* under the DPA. *See* Appx. 016. Therefore, the families' discussions with the Government can have no impact on the central issue in this case. *Cf.* 150 Cong. Rec. S4269 (Apr. 22, 2004) (statement by Sen. Kyl) ("We are far past the point where lip service to victims' rights is acceptable. The enforcement provisions of this bill ensure that never again are victims' rights provided in word but not in reality.").

In addition, the three meetings with the Department were not "conferral" meetings about prosecuting Boeing. Initially after filing their motions, the victims'

families specifically asked to "confer." The Department refused. Instead, the Department agreed only to only engage in "listening sessions." Appx. 383-384. By definition, listening to someone is not the same as "conferring" with them. *See* BRYAN A. GARNER, GARNER'S DICTIONARY OF LEGAL USAGE 199 (3d ed. 2011) (noting that to "confer" comes from Latin and means "to compare" and that today it means "to come together to take counsel and exchange views"). What the district court described as "historical engagement" (Op. 20) with the families was meaningless, after-the-fact window dressing.

Eleven months after the families filed suit—and after the district court ruled that the families represented CVRA "crime victims"—the Government held a videoconference call with the families. But shortly before the call, the Government filed its brief on remedies, back-tracking on a promise to hold off filing until it had talked to the families. Appx. 540-585.  And that call merely added insult to injury, by highlighting for the families the futility of attempting to confer with the Department. In response to repeated questions from the families, the Department said "that it was legally bound to follow the DPA and therefore legally could not consider Boeing's prosecution for crimes covered by the statement of facts . . . ." Appx. 611.

Likewise, the arraignment that the district court belatedly held last month was no substitute for the families' right to confer with prosecutors. The hearing was not

an opportunity to address a district court about a settlement that had yet to be approved. *Cf. In re W.R. Huff Asset Mgmt. Co., LLC,* 409 F.3d 555, 564 (2d Cir. 2005) (CVRA rights afforded to victims when "the court provide[s] victims with an opportunity to be heard concerning a *proposed* settlement agreement" (emphasis added)). Moreover, nothing that the victims' families could have said to the district court would have led to Boeing's prosecution. The district court could not prosecute Boeing. And, in any event, the district court specifically concluded that the victim impact statements presented at the arraignment "do not cure the prior violation[s]." Op. 23.

In sum, as *amicus* Senator Cruz powerfully explained, "Belated meetings and an apology are no substitute for following the law, and this Court should say so." Appx. 423.

## V.    The District Court Erroneously Concluded That Its Inherent and Other Authority Did Not Allow It to Vindicate Congressionally Conferred CVRA Rights.

For all the reasons just explained, this Court should direct the district court to ensure that the victims' families receive their CVRA rights pursuant to the CVRA's judicial enforcement provision, 18 U.S.C. § 3773(b)(1). But the district court also erred in concluding that it did not have inherent and other authority to vindicate the families' CVRA rights.

To review the facts briefly: the Government and Boeing came to the district court, placing the DPA on the court's docket. Appx. 004-060. The court then "approved" the DPA. Op. 5. But in later proceedings, it became clear that the DPA had been negotiated in violation of the victims' families' CVRA rights. Appx. 465. At that point, the district court had inherent authority to act—and should have acted—to enforce the CVRA.

Since our nation's earliest days, settled law requires that "where there is a legal right, there is also a legal remedy . . . ." *Marbury v. Madison*, 5 U.S. 137, 163 (1803) (internal quotation omitted). When a violation of federal law is established, "federal courts generally have the power to grant any appropriate relief in a cognizable cause of action brought pursuant to a federal statute." *Moreno v. Consolidated Rail Corp.*, 99 F.3d 782, 784 (6th Cir. 1996) (internal quotation omitted). Federal courts should "presume the availability of all appropriate remedies unless Congress has expressly indicated otherwise." *Franklin v. Gwinnett County Public Schools,* 503 U.S. 60, 66 (1992).

A deferred prosecution agreement is a contract between a criminal defendant and the Government; thus, it is governed by applicable contract law principles. *See United States v. Long,* 722 F.3d 257, 262 (5th Cir. 2013) (discussing plea agreement). One such fundamental principle is that a contract entered into in violation of the law does not create enforceable legal rights. *See, e.g., In re OCA, Inc.*, 552 F.3d 413, 422

(5th Cir. 2008). As this Court has repeatedly held, "illegal promises will not be enforced in cases controlled by the federal law." *Wise v. Wilkie*, 955 F.3d 430, 439 (5th Cir. 2020) (internal quotation omitted). And a court cannot enforce an illegal agreement to the detriment of an innocent third party. *See Baker v. Raymond Intern., Inc.*, 656 F.2d 173, 182 (5th Cir. 1981).

Here, the DPA's immunity provisions are procedurally illegal because the Government and Boeing violated the CVRA by secretly negotiating the deal. Appx. 465. It is well settled that "the law will not tolerate privately negotiated end runs around the criminal justice system." *United States v. Sheinbaum*, 136 F.3d 443, 448 (5th Cir. 1998) (internal quotation omitted). Just as the Government cannot agree to an illegal sentence, *see United States v. Walker*, 98 F.3d 944, 947 (7th Cir. 1996), so too here it cannot illegally agree to defer prosecuting Boeing without first conferring with the victims' families. Accordingly, the immunity provisions are void for illegality, and this Court should direct the district court to set them aside as the only appropriate way to fully enforce the families' CVRA conferral rights.

The district court refused to act to protect the families' CVRA rights, believing that its inherent authority extended only to reviewing issues involving the integrity of jury convictions. *See* Op. 18 (citing *United States v. Hasting*, 461 U.S. 499, 505 (1983)). But the district court's powers are not limited to correcting deficient jury procedures. *See Bank of Nova Scotia v. United States*, 487 U.S. 250, 265 (1988)

31

(Scalia, J., concurring) ("[E]very United States court has an inherent supervisory authority over the proceedings conducted before it[.]"). Even *Hasting*—the very case cited by the district court as limiting its authority—specifically acknowledged judicial power to "implement a remedy for violation of *recognized rights*[.]" 461 U.S. at 505 (emphasis added); *see also United States v. Strouse*, 286 F.3d 767, 772 (5th Cir. 2002) (recognizing the inherent judicial power "'to implement a remedy for violation of recognized rights'" (*quoting Hasting*))*.* The district court should have used its power to implement a remedy for the Government's violation of the victims' families' "recognized" CVRA rights.

The Speedy Trial Act provision that the Government relies upon to craft DPAs, 18 U.S.C. § 3161(h)(2), fortifies the conclusion that the district court should have acted. As this district court acknowledged, § 3161(h)(2) contains language requiring "the approval of the court." Op. 12-16. The district court believed that this language did not authorize it to "withhold approval of a DPA based on disagreement with its terms or leniency." Op. 16. But the victims asked for something very different—i.e., for the district court to withhold approval of one part of the DPA because it had been negotiated illegally in violation of recognized CVRA rights*.* The prosecutors' purported "good faith" in somehow accidentally denying the families their CVRA rights for nearly two years is irrelevant to this calculus. If Congress's

"with the approval of the court" language means anything, it must mean that a district court should withhold its approval of a provision negotiated unlawfully.

## CONCLUSION

This case may be the most important in the CVRA's nearly twenty-year history. If the Government can get away with violating the 346 families' CVRA rights to confer in a case involving 346 deaths, then Congress enacted a dead letter.

For all the reasons above, this Court should grant the petition. In enacting the CVRA, Congress gave crime victims enforceable rights in the criminal justice process. The district court shirked its duty to carry out that command. This Court should remand with instructions that the district court shall give the families (among other remedies) their promised, unfettered opportunity to confer with prosecutors about holding Boeing criminally accountable for its deadly crime.

Dated: February 23, 2023                Respectfully submitted,

                                        /s/ Paul G. Cassell

Warren T. Burns                         Paul G. Cassell (Utah Bar No. 06078)
(Texas Bar No. 24053119)                (Counsel of Record)
Darren P. Nicholson                     Utah Appellate Project
Kyle Kilpatrick Oxford                  S.J. QUINNEY COLLEGE OF LAW
Chase Hilton                            University of Utah
BURNS CHAREST LLP                       383 S. Univ. St.
900 Jackson Street, Suite 500           Salt Lake City, UT 84112
Dallas, Texas 75202                     Telephone: (801) 585-5202
Telephone: (469) 904-5002               cassellp@law.utah.edu
wburns@burnscharest.com                 (no institutional endorsement implied)
nicholson@burnscharest.com
koxford@burnscharest.com
chilton@burnscharest.com                Robert A. Clifford
                                        Tracy A. Brammeier
                                        CLIFFORD LAW OFFICES PC
Erin R. Applebaum                       120 North LaSalle Street, 36th Floor
KREINDLER & KREINDLER                   Chicago, Illinois 60602
LLP                                     Telephone: (312) 625-6192
485 Lexington Avenue, 28th Floor        rac@cliffordlaw.com
New York, New York 10017                tab@cliffordlaw.com
Telephone: (212) 687-8181
eapplebaum@kreindler.com

Pablo Rojas
PODHURST ORSECK PA
1 SE 3rd Avenue, Suite 2300
Miami, Florida 33131
projas@podhurst.com

*Attorneys for Crime Victims' Representatives-Petitioners*

## CERTIFICATE OF COMPLIANCE WITH RULE 32(a)

This brief complies with the type-volume limitation of Fed. R. Appx. P. 32(a)(7)(B) because this brief contains fewer than 7,800 words, as provided in Fed. R. App. P. 21(d)(1).

This brief complies with the typeface requirements of Fed. R. Appx. P. 32(a)(5) and the type-style requirements of Fed R. Appx. P. 32(a)(6) because this brief has been prepared in a proportionally spaced Time New Roman typeface using 14-point Times New Roman type.

*/s/ Paul G. Cassell*

Paul G. Cassell

*Attorney for Crime Victims' Representatives-Petitioners*

## <u>CERTIFICATE OF SERVICE</u>

I certify that on February 23, 2023, the foregoing document was served on the parties to the proceedings below (i.e., the Government and The Boeing Company) through their counsel of record, and on the U.S. District Court for the Northern District of Texas (O'Connor, J.), via e-mail to the following addresses:

*Counsel for the United States*

>    glenn.leon@usdoj.gov
>    lorinda.laryea@usdoj.gov
>    cory.jacobs@usdoj.gov
>    allan.medina@usdoj.gov
>    chad.meacham@usdoj.gov
>    jeremy.sanders@usdoj.gov
>    william.winn@usdoj.gov
>    sean.tonolli@usdoj.gov

*Counsel for The Boeing Company*

>    paul.clement@clementmurphy.com
>    bhatch@mcguirewoods.com
>    mark.filip@kirkland.com

*U.S. District Court for the Northern District of Texas*

>    O'Connor_Orders@txnduscourts.gov

>    */s/ Paul G. Cassell*
>    _____
>    Paul G. Cassell

>    *Attorney    for    Crime    Victims'*
>    *Representatives-Petitioners*

# EXHIBIT 1

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
## FORT WORTH DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **Criminal Action No. 4:21-cr-5-O** |
| | § | |
| **THE BOEING COMPANY,** | § | |
| | § | |
| **Defendant.** | § | |

### THIRD MEMORANDUM OPINION & ORDER

Before the Court are the Crime Victims' Representatives'[1] Motion for Exercise of the Court's Supervisory Power over the Deferred Prosecution Agreement (ECF No. 17), filed December 16, 2021; the United States' Response (ECF No. 60), filed February 11, 2022; the Representatives' Reply to the United States (ECF No. 65), filed February 18, 2022; Boeing's Combined Response (ECF No. 62), filed February 11, 2022; the Representatives' Reply to Boeing (ECF No. 66), filed February 18, 2022; and Senator Ted Cruz's Amicus Brief in Support of the Representatives (ECF No. 90), filed April 29, 2022. Also before the Court are the Representatives' Motion for Leave to Re-File Proffer of Facts Supporting Their Position on Remedies and Request for Evidentiary Hearing (ECF No. 124), filed November 7, 2022; the United States' Response (ECF No. 134), filed November 21, 2022; Boeing's Response (ECF No. 135), filed November 21, 2022; the United States' Supplemental Response Concerning Remedies (ECF No. 128), filed November 11, 2022; Boeing's Supplemental Response Regarding Remedies in Response to Court Order (ECF No. 129), filed November 11, 2022; the Representatives' Supplemental Reply

---

[1] The family members and legal representatives of those who died onboard Lion Air Flight 610 and Ethiopian Airlines Flight 302 are referenced interchangeably herein as "original movants," "crime victims' representatives," "representatives," or "families." *See generally* Second Opinion, ECF No. 116.

Regarding Remedies for the Government's CVRA Violation (ECF No. 140), filed November 22, 2022; the Representatives' Motion for a Finding that the Government has Violated the Crime Victims' Rights Act by Failing to Confer Before Filing its Remedies Brief, to Strike the Government's Remedies Brief, and for an Accelerated Decision (ECF No. 130), filed November 14, 2022; and the United States' Response (ECF No. 142), filed November 28, 2022.

Before the Court are also several motions filed in recent months by foreign carriers Polskie Linie Lotnicze LOT S.A. ("LOT") and Smartwings, A.S. ("Smartwings"), and by additional family members of fifty-five individuals who died in the Lion Air Flight 610 and Ethiopian Airlines Flight 302 crashes.[2] Related briefing includes the Motion of Polskie Linie Lotnicze LOT S.A. Pursuant to the Crime Victims' Rights Act for Findings that the Proposed Boeing Deferred Prosecution Agreement was Negotiated in Violation of the Victim's Rights and for Remedies for Those Violations (ECF No. 120), filed October 28, 2022; the United States' Response (ECF No. 145), filed December 2, 2022; Boeing's Response (ECF No. 150), filed December 12, 2022; LOT's Reply (ECF No. 153), filed December 22, 2022; the Motion of Marti Faidah, et al. to Seek Remedies Pursuant to Crime Victims' Rights Act (ECF No. 138), filed November 22, 2022; the United States' Response (ECF No. 147), filed December 6, 2022; Boeing's Response (ECF No. 146), filed December 6, 2022; Marti Faidah, et al.'s Reply (ECF No. 152), filed December 19, 2022; Smartwings' Motion to be Designated as a Crime Victim Under the CVRA and for an Accounting of the "Airline Compensation Amount" in Boeing's Deferred Prosecution Agreement (ECF No. 141), filed November 28, 2022; the United States' Response (ECF No. 149), filed December 12, 2022; Boeing's Response (ECF No. 151), filed December 12, 2022; and Smartwings' Reply (ECF No. 160), filed January 6, 2023.

---

[2] Collectively, the Court refers to the carriers and the additional family members as the "2022 Movants."

2

On October 21, 2022, this Court ruled in favor of the original movants, holding that the

crash victims of Lion Air Flight 610 and Ethiopian Airlines Flight 302 are "crime victims" for

purposes of the Crime Victims' Rights Act ("CVRA") and that their lawful representatives are

therefore entitled to assert rights under the Act.[3] The Court reserved the question of remedies for

later resolution, which it takes up in Section III.A of this Opinion. The Court takes up the 2022

Movants' pending motions in Section III.B.

The parties have provided initial and supplemental briefing regarding appropriate remedies

and the motions are ripe for review. Having considered the briefing and applicable law, and for

the reasons discussed herein, the Court **DENIES** the crime victims' representatives' requested

relief and **DENIES** the 2022 Movants' motions for recognition as crime victims and associated

remedies.

## I.      FACTUAL & PROCEDURAL BACKGROUND[4]

On October 29, 2018, a Boeing 737 MAX aircraft operating as Lion Air Flight 610 crashed

shortly after taking off from Indonesia. None of the 189 passengers and crew members onboard

survived. Less than six months later, on March 10, 2019, another 737 MAX operating as Ethiopian

Airlines Flight 302 crashed shortly after taking off from Ethiopia. Again, all 157 passengers and

crew members onboard died.

Three days after the second crash, the President ordered the grounding of all 737 MAX

aircrafts operating in the United States. Initial investigations by the United States Federal Aviation

Administration's ("FAA") Aircraft Evaluation Group ("AEG") subsequently revealed that a

system Boeing had installed in its 737 MAX aircrafts—the Maneuvering Characteristics

---

[3] Second Opinion, ECF No. 116.
[4] The factual and procedural background is taken from portions of the record in this case. Additional background information is set out exhaustively in the Court's prior Opinions. *See* First Opinion, ECF No. 96; Second Opinion, ECF No. 116.

Augmentation System ("MCAS")—activated during both flights. The AEG, the group responsible for determining minimum levels of training required for U.S.-based airline pilots to fly a new version of an aircraft ("differences training"), began investigating the operation of MCAS in connection with pilot training.

Shortly after the second crash, the U.S. Department of Justice began investigating Boeing. Though initially uncooperative, Boeing eventually aided the Justice Department's investigation by identifying relevant documents and witnesses.[5] In February 2020, while that investigation was ongoing, Thomas Gallagher, a representative of the Flight 302 crash victims' families, reached out to the Justice Department seeking information about possible investigations.[6] The Justice Department's Victims' Rights Ombudsman informed Gallagher that the Federal Bureau of Investigation had advised her that it was not investigating the crash, nor was it aware of any open cases at the Justice Department.[7] She told Gallagher, "If criminal charges are filed at some point, victims will be advised of that and notified of their rights under the [Crime Victims' Rights Act]."[8] Gallagher then reached out to the FBI Victim-Witness Office, and a victim specialist informed Gallagher that she, too, was unaware of any FBI investigations.[9]

The Justice Department's investigation ultimately revealed that, during Boeing's development of the 737 MAX, two Boeing Technical Pilots had misled the AEG about the aircraft's MCAS operational capabilities in order to affect the AEG's pilot differences training determination.[10] This deception prompted the AEG to authorize a lower level of training for the

---

[5] Deferred Prosecution Agreement ("DPA") 5, ECF No. 4.
[6] *See* Movants' App. 62–65, Ex. 16, Decl. of Thomas Gallagher, ECF No. 16-1.
[7] *Id.* at 64.
[8] *Id*.
[9] *Id.* at 65.
[10] *See generally* DPA, ECF No. 4.

737 MAX, resulting in the promulgation of inadequate pilot training worldwide, in turn leading to the catastrophic plane crashes that cost 346 individuals their lives.[11]

On January 7, 2021, the Government charged Boeing with conspiracy to defraud the United States under 18 U.S.C. § 371.[12] The Government alleges that Boeing conspired to defraud the AEG in connection with the AEG's evaluation of the Boeing 737 MAX aircraft's MCAS, the agency's pilot differences training determination, and related reporting.[13] The same day, the Government filed a deferred prosecution agreement ("DPA")[14] and a Joint Motion for Exclusion of Time Under the Speedy Trial Act, which allows the parties to defer impending criminal trial proceedings upon the Court's approval of the agreement.[15] In the DPA, Boeing admitted to the Government's statement of facts and accepted responsibility for the acts charged.[16] On January 24, 2021, this Court approved the DPA and suspended the Speedy Trial Act's time requirements for a period of three and a half years.[17]

The DPA obligates Boeing to pay a criminal monetary penalty of $243.6 million, which the DPA says "reflects a fine at the low end of the otherwise-applicable Sentencing Guidelines fine range."[18] Boeing also must pay $1.77 billion in compensation to its airline customers and set up a fund of an additional $500 million to be paid to the heirs, relatives, and beneficiaries of those who died in the two airplane crashes.[19] The DPA requires Boeing to meet with and report to the Justice Department's Fraud Section to ensure Boeing's compliance with the DPA and other federal

---

[11] *See generally* Second Opinion, ECF No. 116.
[12] *See* Criminal Information, ECF No. 1.
[13] *Id.*
[14] DPA, ECF No. 4.
[15] Joint Mot. for Exclusion of Time, ECF No. 5; 18 U.S.C. § 3161(h)(2).
[16] DPA ¶¶ 1–2, ECF No. 4.
[17] Order, ECF No. 13.
[18] DPA 7, ECF No. 4.
[19] *Id.*

laws.[20] In exchange, the DPA immunizes Boeing from criminal prosecution for all conduct described in the statement of facts.[21] If, in the DOJ's sole discretion, Boeing complies with its obligations under the DPA for three years, the Government will dismiss the charge with prejudice.[22] If, on the other hand, Boeing breaches or fails to comply with any provision, the Government may prosecute Boeing for the crime charged.[23]

On December 16, 2021, eleven months after the DPA was filed, certain family members of those who died onboard Lion Air Flight 610 and Ethiopian Airlines Flight 302, moved this Court for a determination that the United States had negotiated the DPA in violation of the Crime Victims' Rights Act, 18 U.S.C. § 3771, and for appropriate remedies.[24] First, they argued (and the Court agreed) that the Government and Boeing violated the CVRA by negotiating the DPA behind closed doors, without conferring with the families.[25] As a remedy, they now request that the Court supervise implementation of the DPA to ensure the crime victims' rights under the CVRA are adequately protected.[26] Despite the substantial fines imposed and DOJ's continued oversight of Boeing's interim conduct, the victims' families maintain that the DPA is grossly inadequate and should be rejected or substantially modified. Third, they asked for (and received) an arraignment of Boeing at which they would have an opportunity to be heard on the company's conditions of release.[27] As an additional remedy, the representatives also ask this Court to order the Government to disclose information about Boeing's crimes and the DPA's negotiation history.[28]

---

[20] *Id.* at 7–9, Attachment D.

[21] *Id.* at 14.

[22] *Id.* at 3, 16.

[23] *Id.* at 16–19.

[24] *See generally* Supervisory Mot., ECF No. 17; Arraignment Mot., ECF No. 18; CVRA Mot., ECF No. 52; Disclosure Mot., ECF No. 72.

[25] *See generally* CVRA Mot., ECF No. 52.

[26] *See generally* Supervisory Mot., ECF No. 17.

[27] *See generally* Arraignment Mot., ECF No. 18.

[28] *See generally* Disclosure Mot., ECF No. 72; Representatives' Supp. Remedies Reply 17, ECF No. 140.

In January 2022, before the families' legal status as crime victims' representatives had been recognized, the Justice Department held several meetings at which the representatives were given the opportunity to voice their concerns over the DPA. The United States Attorney General personally attended one of those meetings. Still, after listening to the families' perspectives, the Government reiterated its position to stand by the DPA. The families insist these meetings inadequately fulfilled their rights under the CVRA.

On May 3, 2022, the Court held a hearing regarding several of the families' motions.[29] Following that hearing, on July 27, 2022, this Court issued its first Memorandum Opinion & Order in which it held that the CVRA's definition of "crime victims" included the crash victims; meaning their legal representatives could assert rights under the Act provided they could establish the crash victims were "directly and proximately harmed" by Boeing's criminal conspiracy to defraud the United States.[30] In its Second Memorandum Opinion & Order, issued October 21, 2022, this Court determined that the families had in fact established direct and proximate causation and granted their motion for findings that the DPA was negotiated in violation of the victims' rights.[31] Thus, the crime victims' lawful representatives are entitled to assert the victims' rights under the Act.[32] The Court permitted the parties to supplement their briefing regarding appropriate remedies in light of its ruling.[33]

Following that decision, the Justice Department held two additional meetings for the newly identified "crime victims' representatives." The latter occurred on November 18, 2022, during which the Government, over the course of five hours, discussed appropriate remedies with several

---

[29] *See* May 3, 2022 Minute Entry, ECF No. 94.
[30] First Opinion 7–8, 17–21, ECF No. 96.
[31] Second Opinion 17–18, ECF No. 116.
[32] *Id.*
[33] *Id.*

hundred of the victims' family members.[34] As a result of those discussions, the Government agreed to support the representatives' request for Boeing's arraignment and filed its motion shortly thereafter.[35]

On January 26, 2023, the Court held a three-hour public arraignment at which Boeing appeared and the crime victims' representatives were permitted to speak personally or through counsel.[36] Thirteen of the crash victims' representatives offered in person testimony and several dozen more filed written statements on the docket.[37] Counsel for the crime victims' representatives, the Government, and Boeing presented argument regarding appropriate conditions of Boeing's release. The Court imposed the sole condition that Boeing not commit another Federal, State, or local crime for the term of its release but reserved the decision to impose any additional conditions for further consideration.[38] Having considered the parties' briefing regarding additional conditions of release,[39] the Court is of the view that no factual record exists to justify a finding that Boeing—while subject to the Government's continued supervision—currently presents an ongoing threat to public safety such that imposition of additional conditions of release pursuant to 18 U.S.C. § 3142 are necessary. In this Opinion, the Court takes up the remaining issue of remedies and resolves the pending motions of the 2022 Movants.

## II.     LEGAL BACKGROUND

The Speedy Trial Act generally requires courts to begin criminal trial proceedings within seventy days of a defendant being charged with a crime. *See* 18 U.S.C. § 3161(c)(1). The parties

---

[34] United States' Resp. to Second CVRA Mot. 3, ECF No. 142.
[35] *Id.*
[36] *See* Order 3–5, ECF No. 162; January 26, 2023 Minute Entry, ECF No. 174.
[37] *See* App. of Victim Statements, ECF No. 171-1; Statement on Arraignment of The Boeing Company, ECF No. 172; Exhibit to Statement on Arraignment of The Boeing Company, ECF No. 173; App. of Additional Victim Statements, ECF No. 176-1.
[38] Arraignment Hr'g Tr. 130:8–10, ECF No. 175.
[39] *See generally* ECF Nos. 167, 170, 178–81.

may seek an exemption from that general timeline, however, if the Government, in exercise of its

prosecutorial discretion, opts to negotiate a deferred prosecution agreement. *See id.* § 3161(h)(2).

Upon negotiating and reaching an agreement, the Government and the defendant file the DPA with

the district court for "approval." *Id*. The statutory language setting out this deferral of prosecution

provides that:

> (h) The following periods of delay shall be excluded in computing the time within
> which an information or an indictment must be filed, or in computing the time
> within which the trial of any such offense must commence: . . .
>
> (2) Any period of delay during which prosecution is deferred by the attorney for
> the Government pursuant to written agreement with the defendant, *with the
> approval of the court*, for the purpose of allowing the defendant to demonstrate his
> good conduct.

*Id.* (emphasis added). While that process generally satisfies the requirements of the Speedy Trial

Act, if the crime affected victims, the Government and the Court must take additional steps to

afford those crime victims their statutory rights.

The Crime Victims' Rights Act, 18 U.S.C. § 3771, guarantees crime victims certain rights

in criminal proceedings. Among those are the right to timely notice of proceedings involving the

release, plea, sentencing, or parole of the defendant; the right not to be excluded from and to be

heard at any such proceeding; the right to confer with the Government attorney in the case; the

"right to full and timely restitution as provided in law"; the "right to be treated with fairness and

respect for the victim's dignity and privacy"; and the right to be timely informed of any deferred

prosecution agreement.[40] *Id.* § 3771(a).

---

[40] Other rights under the Crime Victims' Rights Act include the following:

    (1) The right to be reasonably protected from the accused.
    (2) The right to reasonable, accurate, and timely notice of any public court proceeding, or
any parole proceeding, involving the crime or of any release or escape of the accused.
    (3) The right not to be excluded from any such public court proceeding, unless the court,
after receiving clear and convincing evidence, determines that testimony by the victim
would be materially altered if the victim heard other testimony at that proceeding.

The CVRA requires the Government to make its "best efforts to see that crime victims are notified of, and accorded, [their statutory] rights." *Id.* § 3771(c)(1). It also imposes duties on district courts. In any relevant proceedings, "the court *shall ensure* that the crime victim is afforded the rights described in subsection (a) . . . [and that] [t]he reasons for any decision denying relief under this chapter shall be clearly stated on the record." *Id.* § 3771(b)(1) (emphasis added). And the district court "shall take up and decide any motion asserting a victim's right forthwith." *Id.* § 3771(d)(3). Finally, the crime victim, the crime victim's representative, or the Government attorney may assert the victim's rights under the Act. *Id.* § 3771(d)(1).

## III.   DISCUSSION

### A.

Having decided that the Government negotiated the DPA in violation of the crime victims' rights, the Court takes up the issue of remedies. Among other requested remedies, the representatives ask the Court to exercise its supervisory authority, whether statutory or inherent, to "withhold its approval of the DPA" or to specifically "excise from the DPA" the immunity provisions that block Boeing from prosecution.[41] Ultimately, the representatives attack the DPA

---

(4) The right to be reasonably heard at any public proceeding in the district court involving release, plea, sentencing, or any parole proceeding.

(5) The reasonable right to confer with the attorney for the Government in the case.

(6) The right to full and timely restitution as provided in law.

(7) The right to proceedings free from unreasonable delay.

(8) The right to be treated with fairness and with respect for the victim's dignity and privacy.

(9) The right to be informed in a timely manner of any plea bargain or deferred prosecution agreement.

(10) The right to be informed of the rights under this section and the services described in section 503(c) of the Victims' Rights and Restitution Act of 1990 (42 U.S.C. 10607(c)) and provided contact information for the Office of the Victims' Rights Ombudsman of the Department of Justice.

18 U.S.C. § 3771(a).

[41] Reply to Supervisory Mot. 24, ECF No. 65; Representatives' Supp. Remedies Reply 20, ECF No. 140.

on grounds that it is grossly inadequate and should be rejected or reformed until it is commensurate with the severity of Boeing's crime—perhaps the deadliest corporate crime in our nation's history.[42] They also present arguments that DPAs are inherently problematic, raising significant separation of powers concerns, and urge the Court to invoke its supervisory powers on that basis.[43]

The representatives also ask the Court to order the Government to confer with them about "other ways to hold Boeing accountable for its crimes beyond the provisions in the existing DPA" and to disclose evidence and information about Boeing's crimes and the DPA negotiation process.[44] Though the Court will refer to this request as relating to the representatives' "conferral rights," the Court notes that throughout their briefing the victims' representatives claim they are entitled to this remedy based also on their rights to full and timely restitution, to be treated with fairness, and to timely notice of the DPA.[45] Finally, the representatives ask the Court to refer the Government to the appropriate investigative authorities for its violations of the CVRA.[46]

Thus, the representatives' several requested remedies are best organized into three categories that ask the Court to: (1) exercise its statutory or inherent supervisory authority over the DPA; (2) enforce the victims' conferral rights; and (3) refer the Government to appropriate investigative authorities.[47] And, only if necessary for the Court to rule in their favor, the representatives request an evidentiary hearing to prove the Government's bad faith in excluding them from the DPA negotiation process.[48] The Government and Boeing oppose the

---

[42] Reply to Supervisory Mot. 24, ECF No. 65; Representatives' Supp. Remedies Reply 9 n.10, 20, ECF No. 140.

[43] Supervisory Mot. 5–9, ECF No. 17.

[44] CVRA Mot. 27, ECF No. 52; Representatives' Supp. Remedies Reply 15–17, ECF No. 140.

[45] See Disclosure Mot. 12–18, ECF No. 72; Representatives' Supp. Remedies Reply 20, ECF No. 140; 18 U.S.C. § 3771(a)(6), (a)(8), (a)(9).

[46] CVRA Mot. 27–28, ECF No. 52 (identifying several requested remedies).

[47] See generally Supervisory Mot., ECF No. 17; CVRA Mot, ECF No. 52; Reply to Supervisory Mot., ECF No. 65; Representatives' Supp. Remedies Reply, ECF No. 140.

[48] Representatives' Supp. Remedies Reply 19, ECF No. 140.

representatives' requested relief on several grounds, namely: (1) that the Court lacks statutory and inherent authority to supervise, and thereby reject or modify, the DPA; (2) the Court has no inherent authority or alternative legal basis for awarding the other remedies that the representatives seek; and, (3) even if it does possess such authority, equitable and other legal considerations counsel against granting the representatives' requested relief.[49]

In short, the parties' disagreement is principally over the scope of this Court's judicial authority, i.e., does it have the power to award the remedies the crime victims' representatives claim they are entitled to. Settling this dispute requires the Court to decide two questions:

1. Whether the Court has statutory or inherent authority to provide the remedies the representatives seek; and

2. If indeed it does have authority to provide such remedies, whether it must.

Because the answer to both questions is no, the Court **DENIES** the representatives' requested relief.

### i.    The Court Does Not Possess Statutory Authority Permitting it to Exercise Substantive Supervision Over the DPA

As noted, the Speedy Trial Act permits the Government and a criminal defendant to negotiate a DPA and thereby delay, for an interim period, the seventy-day timeline by which criminal proceedings must ordinarily begin. 18 U.S.C. § 3161(h)(2). The relevant statutory text provides that "[a]ny period of delay during which prosecution is deferred by the attorney for the Government pursuant to written agreement with the defendant, *with the approval of the court*, for

---

[49] United States' Resp. to CVRA Mot., ECF No. 58; United States' Resp. to Supervisory Mot., ECF No. 60; United States' Resp. to Disclosure Mot., ECF No. 73; United States' Supplemental Remedies Resp., ECF No. 128; Boeing's Combined Resp., ECF No. 62; Boeing's Supplemental Remedies Resp., ECF No. 129.

the purpose of allowing the defendant to demonstrate his good conduct," shall be excluded from the Act's strict timeliness requirements. *Id.* § 3161(h)(2) (emphasis added).

The Court begins with the pertinent statutory text, "with the approval of the court," to decide whether the Speedy Trial Act confers substantive supervisory authority. The representatives apply the nearest-reasonable-referent canon to the statutory language, arguing that the nearest reasonable referent to "with the approval of the court" is "written agreement."[50] This, the representatives contend, means the "written agreement" is subject to "the approval of the court."[51] This, apparently by implication, evinces Congress' intent to confer on the district court authority to substantively review (and approve or disapprove) the written terms of any DPA that comes before it.[52] But the Court does not find this persuasive. Even if the canon properly applies in this instance, it says nothing about the *ambit* of the court's approval authority. Moreover, "canons are not mandatory rules. They are guides that need not be conclusive." *Chickasaw Nation v. United States*, 534 U.S. 84, 94 (2001) (cleaned up). And "[e]ach may be overcome by the strength of differing principles that point in other directions." Antonin Scalia and Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 70 (2012). Such principles undoubtedly apply here.

The representatives argue that, as a general matter, deferred prosecution agreements present constitutional separation of powers concerns.[53] "Relegating courts to a mere rubber-stamp role on DPAs effectively grants prosecutors [combined] judicial and legislative powers," by giving them the power to both discipline and attempt to reshape corporate governance.[54] However, the

---

[50] Reply to Supervisory Mot. 12, ECF No. 65 (citing Antonin Scalia and Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 152 (2012)).
[51] *Id.*
[52] *See id.* at 12 ("Thus, the congressional syntax makes clear that what requires court approval is the 'written agreement.'").
[53] Supervisory Mot. 5–9, ECF No. 17.
[54] *Id.* at 6 (citing *Criminal Law—Separation of Powers—D.C. Circuit Holds that Courts May Not Reject Deferred Prosecution Agreements Based on the Inadequacy of Charging Decisions or Agreement*

same separation of powers principles the representatives urge this Court to protect also restrain it from stepping beyond its judicial purview to reform Congress' legitimate legislative enactment. Indeed, an attempt by the judiciary to weigh in on the Executive's DPA presents an even more worrisome separation of powers concern than does the Executive's *congressionally authorized* consolidation of power the representatives say is inherent to deferred prosecution agreements.[55] Given this tension, the constitutional-doubt canon is particularly apt here. This canon dictates that "[a] statute should be interpreted in a way that avoids placing its constitutionality in doubt." Scalia & Garner, *Reading Law* 214 (quoting *United States ex rel. Attorney General v. Delaware & Hudson Co.*, 213 U.S. 366, 408 (1909) (White, J.) ("[W]here a statute is susceptible of two constructions, by one of which grave and doubtful constitutional questions arise and by the other of which such questions are avoided, our duty is to adopt the latter.")). Applying these principles here, the Court cannot accept the representatives' interpretation of the statute.

The D.C. and Second Circuits interpret this provision to mean that a court's statutorily conferred supervisory authority over a DPA consists principally of determining whether the agreement was reached for a legitimate or illegitimate purpose. *United States v. Fokker Servs., B.V.*, 818 F.3d 733, 744–45, 747 (D.C. Cir. 2016); *United States v. HSBC Bank USA, N.A.*, 863 F.3d 125, 129 (2d Cir. 2017).

In *United States v. Fokker Services*, the D.C. Circuit said it understands a court's supervisory role with respect to a DPA "to have a particular focus: i.e., to assure that the DPA in fact is geared to enabling the defendant to demonstrate compliance with the law, and is not instead a pretext intended merely to evade the Speedy Trial Act's time constraints." 818 F.3d at 744.

---

*Conditions*—United States v. Fokker Services B.V., 130 HARV. L. REV. 1048, 1054–55 (2017) and Brandon L. Garrett, *Structural Reform Prosecution*, 93 VA. L. REV. 853, 936 (2007)).

[55] And, importantly, the representatives have not raised a constitutional challenge to § 3161(h)(2), so the Court has no occasion to decide that question here.

Therefore, under *Fokker*, a district court has no authority under the Speedy Trial Act to withhold its approval of a DPA because the court disagrees with the agreement's substantive terms or the Government's decision to negotiate such an agreement. *Id.* at 738, 740–41, 743, 746–47. Similarly, in *United States v. HSBC Bank*, the Second Circuit held that, barring evidence of misconduct or impropriety, a district court's role in supervising a DPA is confined to arraigning the defendant, ensuring the agreement is *bona fide* (not for purposes of evading the Speedy Trial Act clock), and adjudicating related motions or disputes as they arise. 863 F.3d at 129, 137–38.

The representatives argue that *Fokker* only prohibits district courts from rejecting a DPA based on disagreement with the Government's "charging decisions."[56] And, in addition to its being merely persuasive, they say *Fokker* is inapplicable to this case because of its distinguishable procedural posture—i.e., the Court is not asked to question the prosecution's *charging decisions*, but to evaluate the substance of the agreement against the particular facts of this case.[57]

But the Court disagrees with such a narrow reading of that case. Hints throughout the *Fokker* opinion suggest its reasoning applies more broadly to any attempt at judicial review of the substantive terms or implementation of a DPA, not just the prosecution's charging decisions. *See, e.g., Fokker Servs.*, 818 F.3d at 747 ("The court instead denied the exclusion of time under § 3161(h)(2) based on a belief that the prosecution had been unduly lenient in its charging decisions *and in the conditions agreed to in the DPA*. The court significantly overstepped its authority in doing so.") (emphasis added); *id.* at 744 ("The Judiciary's lack of competence to review the prosecution's initiation and dismissal of charges equally applies to review of the prosecution's decision to pursue a DPA *and the choices reflected in the agreement's terms*.") (emphasis added) (cleaned up).

---

[56] Reply to Supervisory Mot. 12–15, ECF No. 65.
[57] *Id.*

15

The *HSBC Bank* opinion confirms this broader reading. There, the Second Circuit interpreted *Fokker* as denying a district court's authority to disapprove a speedy trial waiver "based on its view that the DPA at issue was too lenient." *HSBC Bank*, 863 F.3d at 137. Relying on its reading of *Fokker*, the Second Circuit went on to hold that "in the absence of any clear indication that Congress intended courts to evaluate the *substantive merits* of a DPA or to supervise a DPA's out-of-court implementation, the relative functions and competence of the executive and judicial branches counsel against [the opposite] interpretation." *Id.* at 138 (emphasis added) Thus, contrary to the position the representatives urge the Court to adopt, both the D.C. and Second Circuits believe district courts lack statutory authority to substantively review and withhold approval of a DPA based on disagreement with its terms or leniency. *Fokker Servs.*, 818 F.3d at 738, 740–41, 743, 746–47; *HSBC Bank*, 863 F.3d at 129, 137–38. This Court agrees. Although the Fifth Circuit has not yet offered binding interpretive guidance on the meaning of § 3161(h)(2), the Court sees no reason to depart from these persuasive authorities and accept an alternate reading of the statute, as the representatives advocate.

In sum, based on its understanding of 18 U.S.C. § 3161(h)(2), the Court holds that it lacks statutory authority to supervise, or substantively review and reject, the subject DPA. Because district courts do not possess authority to *disapprove* of DPAs based on their substantive terms, it follows that the Court may not *modify* the DPAs terms to adequately reflect the Court's assessment that doing so would better effect justice for the crime victims.

### ii.    Nor May the Court Supervise the DPA by Relying on its Inherent Authority

Statutory authority aside, Courts also possess a degree of inherent authority over the proceedings that come before them. *Bank of Nova Scotia v. United States*, 487 U.S. 250, 264 (1988) (Scalia, J., concurring). This inherent authority permits a federal court to "supervise the

administration of criminal justice among the parties before the bar." *HSBC Bank*, 863 F.3d at 135 (cleaned up). Traditionally, exercise of this supervisory power has been for the purposes of "implement[ing] a remedy for violation of recognized rights; . . . preserv[ing] judicial integrity by ensuring that a conviction rests on appropriate considerations validly before the jury; and . . . deter[ing] illegal conduct." *Id*. (quoting *United States v. Hasting*, 461 U.S. 499, 505 (1983)). Thus, the scope of a court's inherent supervisory authority is itself inherently limited to those three discrete purposes.

The Court's inherent authority provides no basis upon which the Court may exercise supervisory authority over the DPA. The representatives are correct that, in some cases, a district court may invoke its inherent authority to "monitor the implementation of the DPA or take other appropriate action." *Id.* at 137. However, exercising this inherent supervisory authority over a DPA is likely only appropriate when the agreement "so transgresses the bounds of lawfulness or propriety as to warrant judicial intervention to protect the integrity of the Court" or when there is clear evidence of bad faith or misconduct on the part of the Government. *Id*. at 136; *see also Fokker*, 818 F.3d at 747 (noting use of inherent authority may be appropriate when the DPA's terms are expressly illegal or clearly unethical).

Here, the representatives urge the Court to invoke its inherent authority on grounds that the Government has acted with impropriety warranting judicial intervention and on purported evidence of bad faith. They argue, first, that the DPA is necessarily marked by "impropriety" in light of this Court's ruling that the Government violated the CVRA.[58] "Acting illegally is, by definition, acting with impropriety."[59] To overlook this impropriety and approve the DPA would, they argue, lend a judicial imprimatur to the Government's wrongdoing and threaten this Court's

---

[58] Representatives' Supp. Remedies Reply 6, ECF No. 140.
[59] *Id*. at 6.

own "judicial integrity."[60] But a court may invoke its supervisory powers in the name of "judicial integrity" only for the specific purpose of "ensuring that a conviction rests on appropriate considerations validly before the jury." *Hasting*, 461 U.S. at 505. Not based upon a vague notion that it must "restore respect for the law."[61] Because there is neither conviction nor jury at issue here, there is no basis to use judicial integrity as a justification for invoking this Court's inherent authority.

The representatives also claim the Government acted in bad faith by secretly negotiating the DPA and excluding the crime victims' representatives from the process.[62] In support, they point to the uncontested facts that the DOJ's Victims' Rights Ombudsman and a victim specialist from the FBI's Victim-Witness Office "provided inaccurate information to the victims' families about its investigation into the two crashes."[63] Among a host of other proffered facts, they also claim the Government has refused to disclose requested information related to its prosecutorial charging decisions and its negotiation process with Boeing.[64]

Even if ultimately proven, none of the representatives' proffered evidence meets the exacting standard for a showing of impropriety or bad faith that justifies exercising the Court's inherent supervisory authority over the DPA.[65] *In re Moore*, 739 F.3d 724, 729–30 (5th Cir. 2014) (requiring clear and convincing evidence of "bad faith or willful abuse of the judicial process" to

---

[60] *Id.* at 3–4.

[61] Representatives' Supp. Remedies Reply 5, ECF No. 140.

[62] *Id.* at 19–20.

[63] Ex. 1 of Mot. to Re-File Proffer of Facts ¶¶ 253–77, ECF No. 124-1; *see also* United States' Supplemental Remedies Resp. 9–10, ECF No. 128 (acknowledging the Victim Rights' Ombudsman's incorrect statements were the result of "regrettable and inadvertent internal miscommunication" within the DOJ).

[64] Representatives' Supp. Remedies Reply 15–17, ECF No. 140; Ex. 1 of Mot. to Re-File Proffer of Facts ¶¶ 294–315, 368, ECF No. 124-1 (offering potential evidence of the Government's misinformation, the inadequacy of the DPA, the Government's engagement with the representatives, and other proffered facts pertaining to Boeing's misconduct).

[65] For this reason, the Court need not hold another evidentiary hearing to develop the factual record.

support invocation of inherent authority). Indeed, "[l]eveling an extraordinary claim of bad faith against a coordinate branch of government requires an extraordinary justification." *In re Dep't of Commerce*, 139 S. Ct. 16, 17 (2018) (Gorsuch, J., concurring in part). None exists here.

It is true that the Government violated the CVRA. By denying the crime victims' representatives their rights to confer prior to reaching an agreement with Boeing, the Government transgressed its statutory obligations under the CVRA. But the Government avers it excluded the representatives from the DPA negotiation process based on its bona fide—albeit errant—assessment that the crash victims were not legal "crime victims" of Boeing's conspiracy to defraud the United States.[66] And the false statements made by the Ombudsman and FBI victim specialist about any ongoing DOJ investigations were purportedly a result of "regrettable and inadvertent internal miscommunication," not a willful attempt to deceive the victims' representatives.[67]

A showing of bad faith requires substantially more than legal error. *Crowe v. Smith*, 261 F.3d 558, 563 (5th Cir. 2001) ("A court abuses its discretion when its finding of bad faith is based on an erroneous view of the law or a clearly erroneous assessment of the evidence."); *see also Gate Guard Servs., L.P. v. Perez*, 792 F.3d 554, 561 (5th Cir. 2015) (explaining that bad faith, in the context of litigation-related misbehavior justifying an award of attorneys' fees, requires *willful* misconduct or improper motive such as the intent to harass another party).

Importantly, even if it were established that the Government acted in bad faith, it is unclear (doubtful even) that this Court may legitimately wield judicial sanctions to discipline Executive misconduct that occurred in the course of exclusively Executive functions like those at issue here (i.e., criminal investigation and pre-prosecutorial negotiations). Doing so would likely violate separation of powers principles this Court is duty-bound to preserve. "Indeed, 'the federal

---

[66] *See, e.g.*, United States' Supplemental Remedies Resp. 8, ECF No. 128.
[67] *Id.* at 9–10.

judiciary's supervisory powers over prosecutorial activities that take place *outside* the courthouse is extremely limited, *if it exists at all.*'" *HSBC Bank*, 863 F.3d at 136 (emphasis added) (quoting *United States v. Lau Tung Lam*, 714 F.2d 209, 210 (2d Cir. 1983)).

Nevertheless, the Government's historic engagement with the families undercuts arguments that it dealt with them in bad faith. Before the families were ever recognized as representatives of "crime victims" for purposes of the CVRA, the Government hosted several meetings at which the representatives could advocate their positions regarding the DPA. Attorney General Merrick Garland personally attended one of those meetings. Despite their complaint that these listening sessions were inadequate, that the victims' representatives were offered several meetings and a personal conference with the United States' chief law enforcement officer amplifies DOJ's good faith efforts to treat the families with dignity and respect.[68] Moreover, following this Court's recent decision, the Government hosted an additional meet and confer with the newly classified "crime victims' representatives" and took other remedial steps (e.g., revising internal guidelines for engaging with victims and witnesses to ensure future compliance with the Act).[69] Though these measures do not alter the fact that the families were originally denied their legal status and associated rights as crime victims' representatives, they evince the Government's good faith—not the opposite.

The Court is of the view that, regrettably, legal error on the Government's part is what occurred here, not bad faith or impropriety that warrants the Court's acting to preserve judicial integrity. Therefore, no justification exists to reach the extraordinary finding of bad faith or impropriety necessary for this Court to invoke its inherent supervisory authority over the DPA and reject or excise select provisions of the same.

---

[68] Representatives' Supp. Remedies Reply 17, ECF No. 140.
[69] United States' Supplemental Remedies Resp. 6–10, ECF No. 128.

### iii.    The Representatives are Not Entitled to their Other Requested Remedies

Finally, while the representatives' remaining forms of relief likely fall within the scope of this Court's broad remedial powers, other legal considerations counsel against granting their requests. Here, the representatives ask the Court to enforce their conferral rights by ordering the Government to turn over evidence and information about Boeing's crimes and the DPA's negotiation history.[70] Importantly, the representatives concede that, at this point in time, the Government has in fact conferred with them.[71] Nonetheless, the representatives seek remedies for the prior violations of their right to confer.[72] The representatives also contend their conferral rights were violated by the Government's refusal to provide requested information before it filed its remedies briefing in this case.[73] Additionally, they ask the Court to refer the Government to appropriate investigative authorities for its violations of the CVRA.[74] Because the Court finds that the crime victims' statutory rights have already been substantially and meaningfully satisfied, further judicial relief is inappropriate under the circumstances.

In conjunction with their somewhat circumscribed inherent judicial authority, discussed above, district courts possess broad remedial powers that permit them to vindicate rights that have been violated. Indeed, "[o]nce a right and a violation have been shown, the scope of a district court's equitable powers to remedy past wrongs is broad, for breadth and flexibility are inherent equitable remedies." *Swann v. Charlotte-Mecklenburg Bd. of Ed.*, 402 U.S. 1, 15 (1971); *see also Marbury v. Madison*, 5 U.S. 137, 163 (1803) ("where there is a legal right, there is also a legal remedy"); *Fed. Sav. & Loan Ins. Corp. v. Dixon*, 835 F.2d 554, 561 (5th Cir. 1987) (noting that

---

[70] Representatives' Supp. Remedies Reply 17, ECF No. 140.
[71] *Id.* ("*Until just a few days ago*, the Government had failed to confer with the families.") (emphasis added).
[72] *Id.*
[73] *See generally* Second CVRA Mot., ECF No. 130.
[74] CVRA Mot. 27, ECF No. 52.

"the full range of equitable remedies [is] traditionally available to [district courts]"). Of course, "[a]s with any equity case, the nature of the violation determines the scope of the remedy." *Swann*, 402 U.S. at 16. Consequently, any exercise of a court's broad remedial powers originating from its inherent supervisory authority must be tempered by the knowledge that such supervisory power is to be "sparingly exercised" with "restraint and discretion." *HSBC Bank*, 863 F.3d at 136 (quoting *United States v. Jones*, 433 F.2d 1176, 1181–82 (D.C. Cir. 1970) and *Chambers v. NASCO, Inc.*, 501 U.S. 32, 44 (1991)).[75]

Again, it is true the Government violated the crime victims' rights under the CVRA, including the right to confer with counsel for the Government *before* a DPA was executed. And, certainly, district courts have broad remedial powers to vindicate rights that have been violated. Yet, for several reasons, the fact that these rights were offended does not necessitate the remedies the representatives propose. Chief among these reasons is that the victims' statutory rights have been substantially and meaningfully realized.

In another case involving victims' rights under the CVRA, the Fifth Circuit declined to issue a writ of mandamus—even though the district court had clearly violated the Act—because the victims' rights to notice and to confer were eventually meaningfully recognized. *In re Dean*, 527 F.3d 391 (5th Cir. 2008). Though *In re Dean* is procedurally distinguishable and involved the more stringent standard for issuance of a writ, the Court finds the Circuit's reasoning applicable to the instant case. Here, the victims' representatives have had several meetings with DOJ, including one with the Attorney General himself. As in *In re Dean*, these meetings occurred too late in the process and after the DPA had already been negotiated. *See id.* at 395–96. The

---

[75] This may be particularly true with regard to supervision of a deferred prosecution agreement—a dynamic that would raise serious separation of powers concerns should the judiciary's exercise of oversight intrude upon the Executive's ultimate prerogatives.

representatives were also given the opportunity to speak at Boeing's arraignment or to submit written statements.[76] Thirteen representatives testified in person at the arraignment, several others through counsel.[77] Though testimony at the arraignment was intended to address conditions of release, the thirteen representatives who testified in person presented moving victim impact statements while dozens more filed victim impact statements on the docket.[78] And while these opportunities to be heard do not cure the prior violation, they give meaningful effect to those rights. Additionally, the Court disagrees with the representatives' claim that the Government illegally refused to confer by offering only "listening sessions" rather than a more substantive exchange of information.[79] Citing Webster's Dictionary, they say the right to "confer" means "to compare view or take counsel: consult."[80] In the context of a DPA, however, the reasonable right to confer is the right "to communicate meaningfully with the government, personally or through counsel, before a deal [is] struck." *In re Dean*, 527 F.3d at 395. As noted, the Fifth Circuit has considered this right vindicated when victims or their representatives are "allowed substantial and meaningful participation" in *post hoc* conferral meetings or judicial proceedings. *Id.* at 395–96. Other Circuits have held there was no CVRA violation of the conferral right where a victim "had received ample opportunities to speak with the government counsel about the alleged [crime]." *In re Rivers*, 832 Fed. App'x 204, 204 (4th Cir. 2020). Indeed, the right to confer requires only

---

[76] *See* Order, ECF No. 162; Order Regarding Arraignment Hearing, ECF No. 165.

[77] *See generally* Arraignment Hr'g Tr., ECF No. 175.

[78] *See generally* Representatives' Statement on Conditions of Release, ECF No. 170; App. of Victim Statements, ECF No. 171-1; Statement on Arraignment of The Boeing Company, ECF No. 172; Exhibit to Statement on Arraignment of The Boeing Company, ECF No. 173; App. of Additional Victim Statements, ECF No. 176-1.

[79] Representatives' Supp. Remedies Reply 17, ECF No. 140 ("But, as the Government knows, it repeatedly refused to *confer . . .* and instead agreed only to a 'listening session' to hear from the victims").

[80] *Id.* (citing *Merriam-Webster's Collegiate Dictionary* 260 (11th ed. 2006)).

that victims are provided "an opportunity to be heard concerning a proposed settlement agreement." *See In re W.R. Huff Asset Mgmt. Co.*, 409 F.3d 555, 564 (2d Cir. 2005).

None of these decisions suggest that the right to confer includes mandatory disclosure of information on the Government's part. And as the Eleventh Circuit put it in a similar case involving victims' rights under the CVRA, "[i]t is hard to imagine a more significant impairment of prosecutorial discretion than a district court's . . . affirmatively ordering government lawyers (presumably on pain of contempt) to conduct their prosecution of a particular matter in a particular manner." *In re Wild*, 994 F.3d 1244, 1262 (11th Cir. 2021), *cert. denied sub nom. Wild v. United States Dist. Ct. for S. Dist. of Fla.*, 142 S. Ct. 1188 (2022). *In re Wild* involved the point at which the right to confer attaches, but the Eleventh Circuit's reasoning applies equally to a case, like this one, in which the Court is asked to dictate precisely *how* and *about what* the Government must confer with the representatives. For this reason, a finding that the Government violated its conferral rights by refusing to disclose certain information, or by filing its remedies briefing before conferring, is unwarranted.

Nor is the Court persuaded that the representatives' rights to "full and timely restitution," or "to be treated with fairness" justifies mandatory disclosure of such information.[81] A line of cases from other circuits affirms this understanding. *See, e.g.*, *United States v. Hunter*, 548 F.3d 1308, 1317 (10th Cir. 2008) ("The district court and this court have already held that the CVRA does not provide 'victims' with a right of access to the government's files."); *United States v. Moussaoui*, 483 F.3d 220, 224 (4th Cir. 2007) (holding that neither a district court's statutory authority under

---

[81] Disclosure Mot. 12–18, ECF No. 72; Reply to Disclosure Mot. 12–19, ECF No. 75; Representatives' Supp. Remedies Reply 20, ECF No. 140; 18 U.S.C. § 3771(a)(6), (a)(8).

the CVRA nor its inherent authority permit ordering the Government to disclose non-public information to victims).[82]

Thus, based on the record before it, the Court finds that the crime victims' rights have been given meaningful effect. The Court knows of no other victims' rights case in which victims' representatives were offered the ear of the United States Attorney General, even before their legal status as such had been confirmed. Regrettably, this occurred too late in the process after the DPA had already been entered and approved.[83] Still, to award a novel remedy (i.e., by obligating the Government to turn over evidence or disclose specific information to the victims' representatives) under these circumstances is precisely the opposite of a sparing and restrained exercise of inherent remedial authority.

Finally, even if referring DOJ to appropriate investigative authorities for its violations of the CVRA is permissible in this case, it is not warranted. Here again, the DOJ's good faith engagement with the crime victims' representatives before and after this Court's recent determination that the Government violated the Act invalidates the need for such a referral. Moreover, members of the Congressional committees that may provide such oversight are already well aware of this case—at least one Senate Judiciary Committee member has written in support of the crime victims' representatives as amici.[84] As the representatives point out, Boeing's crime may properly be considered the deadliest corporate crime in U.S. history.[85] Indeed, news of the

---

[82] *See also* United States' Resp. to Disclosure Mot. 4–9, ECF No. 73 (collecting cases).

[83] *See generally* DPA, ECF No. 4; Joint Mot. for Exclusion of Time, ECF No. 5; Order, ECF No. 13.

[84] Amicus Br. of Senator Ted Cruz, ECF No. 90.

[85] Representatives' Supp. Remedies Reply 9, 9 n.10, ECF No. 140 ("According to Bloomberg Law, PG&E's 2020 plea to 84 separate involuntary manslaughter counts in connection with a wildfire in Paradise, California, was 'the deadliest corporate crime in U.S. history.' Bloomberg Law, *Deadliest Corporate Crime in the U.S. Will End with 84 Guilty Pleas* (June 15, 2020). With this Court's recent finding that 'but for Boeing's criminal conspiracy 346 people would not have lost their lives in the crashes' (Dkt. 116), this case has tragically become the deadliest corporate crime in our nation's history.").

tragic accidents and of DOJ's DPA with Boeing has made headlines worldwide. Should Congress wish to take further action with respect to the Government's conduct in this matter, or with respect to DPAs more generally, it is well positioned to do so without this Court's referral to investigative authorities.

*   *   *   *

The Court holds that it lacks both statutory and inherent authority that would permit any substantive review and disapproval or modification of the DPA at issue in this case. Thus, even if it held legitimate concerns about the substance of the Government's negotiated agreement, the Court has no occasion to address whether the DPA is in fact grossly incommensurate with Boeing's egregious criminal conduct. With respect to the remaining remedies, the Court finds that the crime victims' rights have been meaningfully recognized and that awarding the relief sought under the circumstances would be an unjustified exercise of this Court's remedial powers. For these reasons, the Court **DENIES** the representatives' requested relief.

## B.

Next, the Court turns to the 2022 Movants' pending motions. Following this Court's October 21, 2022 Opinion recognizing those who died in the crashes as "crime victims" for purposes of the CVRA, foreign carriers LOT and Smartwings moved for victim status and remedies under the Act.[86] The additional family members of fifty-five individuals who died in the Boeing crashes—already recognized as crime victims' representatives in light of that October Opinion—also moved to assert their rights in this proceeding for the first time.[87] They do not

---

[86] Second Opinion, ECF No. 116; LOT Mot., ECF No. 120; Smartwings Mot., ECF No. 141.
[87] Mot. of Marti Faidah, et al., ECF No. 138; Reply of Marti Faidah, et al., ECF No. 152.

identify which remedies they seek, however, and wish to preserve the issue for subsequent decision.[88]

Laches—which the Government invokes only as against foreign carrier LOT—applies to the 2022 Movants' pending motions.[89] The doctrine of laches functions to bar equitable claims when Congress has imposed no statutory timeline for seeking relief. *See Petrella v. Metro-Goldwyn-Mayer, Inc.*, 572 U.S. 663, 678 (2014). A party may assert the defense of laches when another party's unreasonable delay in seeking redress of its rights prejudices the party asserting the defense. *SCA Hygiene Prods. Aktiebolag v. First Quality Baby Prods., LLC*, 580 U.S. 328, 333 (2017); *Radiator Specialty Co. v. Pennzoil-Quaker State Co.*, 207 Fed. App'x 361, 362 (5th Cir. 2004). Whether laches should apply is a question ultimately left to the district court's discretion. *Nat'l Ass'n of Gov't Employees v. City Public Serv. Bd. of San Antonio, Tex.*, 40 F.3d 698, 707 (5th Cir. 1994).

Here, the 2022 Movants seek forms of equitable relief through recognition as "crime victims" under the CVRA, judicial oversight of the DPA's implementation, and other novel remedies not expressly provided for in the statute.[90] However, they did not pursue their requested relief until nearly two years after the Government filed the DPA in this case, ten months after the original movants sought recognition of rights, and now only fifteen months before the subject DPA is set to expire. Only after this Court's favorable ruling for the original movants have these

---

[88] Mot. of Marti Faidah, et al., ECF No. 138; Reply of Marti Faidah, et al., ECF No. 152. Importantly, as noted above, the Government has acted in accordance with this Court's October 21 Opinion, and has invited the family members to conferral meetings in an effort to afford these victims' representatives their statutory rights under the CVRA.

[89] United States' Resp. to LOT Mot., ECF No. 145.

[90] *See generally* LOT Mot., ECF No. 120 (asserting notice and conferral rights and proposing judicial supervision of the DPA); Mot. of Marti Faidah, et al., ECF No. 138 (asserting the right to seek unspecified remedies under the Act); Smartwings Mot., ECF No. 141 (seeking victim status and a public accounting of the Airline Fund created via the DPA).

2022 Movants chosen to assert their rights in this proceeding. They make no claim that this substantial delay resulted from a lack of knowledge about the proceedings, incapacity, or other reason justifying the lethargic pace at which they decided to act. Indeed, all took earlier legal action against Boeing in other forums.[91] This two-year delay is therefore without excuse.

Allowing the 2022 Movants to seek their requested legal status and remedies this late into the proceedings is prejudicial to the current parties. The Government and Boeing have spent the last fourteen months litigating the original movants' status as crime victims and desired remedies. To start that process over again now with a new set of purported crime victims would likely prolong resolution of the DPA well beyond its expected expiration date. Such a result would prejudice the Government by forcing further expenditure of resources on a DPA it wishes to conclude and Boeing by disrupting reliance interests it has established throughout the term of its DPA and by protracting resolution of its criminal case.

Importantly, the Court does not believe the Fifth Circuit's timeliness analysis in *In re Allen* is applicable in this case. 701 F.3d 734, 734–35 (5th Cir. 2012) (per curiam). There, the Circuit held that the movants' four-year delay in seeking recognition as crime victims was not barred by laches because the defendant's criminal sentencing hearing was still two months away. *Id.* Under the Act, those movants would have been entitled to be heard at such proceedings. 18 U.S.C. § 3771(a)(4). In this case, however, the DPA has already been entered and approved, the Court is without authority to reject or oversee its implementation, and no public proceedings or trial are pending at which these late-arriving crime victims would be able to assert their rights. Thus, the period in which 2022 Movants' statutorily conferred rights (e.g., the right to notice and conferral prior to entry of the DPA) would have been recognized has long since expired. And in light of its

---

[91] LOT Mot. 4, ECF No. 120; LOT Mot., Ex. A, ECF No. 120 at 20–28; Mot. of Marti Faidah, et al. 6–7, ECF No. 138; Smartwings Mot., ECF No. 141 at 4.

prior reasoning regarding its limited supervisory power over the DPA, the Court lacks authority to afford the novel remedies (e.g., public accounting of the DPA Airline Fund) these late coming movants propose. Nor can the Court afford remedies the parties have yet to identify or request.[92]

Given these circumstances, the Court holds that the motions are inexcusably delayed and prejudicial such that laches bars their consideration or, in the case of the individual family members, are not ripe for decision. Therefore, without reaching the merits of the foreign carriers' motions, the Court **DENIES** their requested relief as inexcusably delayed and prejudicial to the parties before the Court. The Court **DENIES** the motion of Marti Faideh, et al. for unspecified remedies.

## IV.    CONCLUSION

This Court has immense sympathy for the victims and loved ones of those who died in the tragic plane crashes resulting from Boeing's criminal conspiracy. Had Congress vested this Court with sweeping authority to ensure that justice is done in a case like this one, it would not hesitate. But neither the Speedy Trial Act nor this Court's inherent supervisory powers provide a means to remedy the incalculable harm that the victims' representatives have suffered. And no measure of sympathy nor desire for justice to be done would legitimize this Court's exceeding the lawful scope of its judicial authority.

The Speedy Trial Act gives the Executive exclusive discretion to negotiate deferred prosecution agreements without judicial oversight, even in response to the most heinous crimes. Despite increasing and perhaps legitimate criticism of these agreements, Congress—not the courts—is the appropriate venue to redress the inadequacies of this statutory enactment. In our system of justice, a judge's role is constitutionally confined to interpreting and applying the law,

---

[92]Mot. of Marti Faidah, et al., ECF No. 138 (asserting the right to seek unspecified remedies under the Act).

not revising it. For this Court to step outside those constitutional bounds in an attempt to remedy wrongs it has no legitimate authority to correct would compound injustice, not see justice through.

*     *     *     *

For these reasons, the Court **DENIES** the representatives' motions for remedies under the CVRA (ECF Nos. 17, 124, 130). The Court **DENIES** the motions of LOT S.A., Smartwings, A.S., and Marti Faideh, et al. as untimely barred by the doctrine of laches or as unripe (ECF Nos. 120, 141, 138).

    **SO ORDERED** this **9th day** of **February, 2023**.

Reed O'Connor

**UNITED STATES DISTRICT JUDGE**