**FILED**

December 18, 2023

KAREN MITCHELL
CLERK, U.S. DISTRICT
COURT

# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

December 15, 2023

Lyle W. Cayce
Clerk

No. 23-10168

———————————

In re Naoise Connolly Ryan; Emily Chelangat Babu; Joshua Mwazo Babu; Catherine Berthet; Huguette Debets; Bayihe Demissie; Luca Dieci; Sri Hartati; Zipporah Muthoni Kuria; Javier de Luis; Nadia Milleron; Michael Stumo; Chris Moore; Paul Njoroge; Yuke Meiske Pelealu; John Karanja Quindos; Guy Daud Iskandar Zen S; Polskie Linie Lotnicze Lot S.A.; Smartwings, a.s.,

*Petitioners.*

———————————

Petition for a Writ of Mandamus
to the United States District Court
for the Northern District of Texas
USDC No. 4:21-CR-5-1

———————————

## PUBLISHED ORDER

Before Clement, Southwick, and Higginson, *Circuit Judges*.

Stephen A. Higginson, *Circuit Judge*:

Petitioners, representatives of plane-crash victims and foreign airlines, seek a writ of mandamus directing the district court to afford them remedies pursuant to the Crime Victims' Rights Act ("CVRA"), 18 U.S.C. § 3771.

No. 23-10168

I.

On October 29, 2018 and again on March 10, 2019, relatively new Boeing 737 Max planes crashed shortly after takeoff. In both Lion Air Flight 610 and Ethiopian Airlines Flight 302, the crashes tragically claimed the lives of all passengers and crew onboard. In the following uncertainty regarding the cause of the crashes, all 737 Max aircraft were grounded in the United States.

Subsequently, investigations revealed that a software function, known as the Maneuvering Characteristics Augmentation System ("MCAS"), had activated during both flights. MCAS, which was added to the 737 Max to account for the aircraft's design and counterbalance its particular aerodynamics, causes the nose of the airplane to pitch downwards when activated. Initially, MCAS was intended to activate only in circumstances outside of what would be considered the aircraft's normal operating envelope (i.e., during wind-up turns of high speed of Mach 0.6 to Mach 0.8). It was with that understanding that the Federal Aviation Administration's (FAA) Aircraft Evaluation Group ("AEG"), the subgroup responsible for determining the minimum level of training required of U.S.-based pilots to fly a new aircraft model (known as "differences training"), provisionally authorized the second least-intensive level of training (Level B).[1]

But the design was later changed, such that MCAS could activate in speeds as low as Mach 0.2, which included takeoff and landing. Boeing intentionally withheld this information from the AEG. As a result, the AEG made

_____

[1] Differences training—the "training required for U.S.-based airline pilots to fly a new version of an aircraft"—ranges from Level A (least intensive) to Level E (most intensive), with the training becoming more expensive as it becomes more intensive. Level B training includes computer-based training that can be completed on a tablet; whereas Level D training requires full-flight simulator training that might involve traveling to wherever that simulator was offered. The difference between these training levels could be stark—including amounting to a cost differential of "tens of millions of dollars."

No. 23-10168

its final report that included the Level B differences training for the 737 Max—and made no mention of MCAS. Due to standard industry practice of reliance upon the FAA's guidance, this led to global adoption of equivalent training standards and materials, meaning that pilots did not receive adequate information or training regarding MCAS.

The Department of Justice ("DOJ") Criminal Fraud Section ("Fraud Section") was integral in these investigations. Following indications in the news that the DOJ was investigating, a representative (Thomas Gallagher) of the Flight 302 crash victims' families reached out to the DOJ to secure a meeting. But the DOJ's Victims' Rights Ombudsman, Marie A. O'Rourke, responded on February 20, 2020 that "[t]he FBI ha[d] advised . . . that they do not have a criminal investigation into this crash, nor are they aware of any open cases at the Department of Justice."[2] The Ombudsman further stated that "[i]f criminal charges are filed at some point, victims will be advised of that and notified of their rights under the CVRA."

On January 7, 2021, the Government charged Boeing by information with conspiracy to defraud the United States under 18 U.S.C. § 371, and simultaneously filed in federal court a Deferred Prosecution Agreement ("DPA"), an agreement between Boeing and the Government.[3] In the DPA, Boeing admitted to a statement of facts, accepted responsibility for the acts

---

[2] Gallagher also telephoned the FBI Victims' Witness Office a day later, and the victim specialist who returned his call, Katie McCabe, also was not aware of any FBI investigation.

[3] The criminal information was filed by the then-Acting Chief of the Fraud Section, along with the then-United States Attorney for the Northern District of Texas. The DPA was agreed to by those same two government attorneys, along with the President of Boeing and Boeing's counsel. However, neither of those two government lawyers is likely to participate for the Department of Justice in the ultimate criminal-case resolution as both have since left government service.

No. 23-10168

charged, and agreed to abide by several conditions that would be monitored by the Fraud Section, including the payment of $1.77 billion in compensation to airline customers and the establishment of a $500 million fund specifically for the heirs, relatives, and beneficiaries of those who died in the two airplane crashes.[4] In exchange, and only after Boeing's successful compliance with the DPA's conditions, the Government agreed it would request court dismissal of Boeing's felony charge, with prejudice, and would provide a conditional release from criminal prosecution for conduct described in the DPA. In the DPA, Boeing "acknowledges the filing of the one-count Information," and throughout acknowledges that the criminal prosecution commenced in court could proceed to final resolution in court.

Because they had been neither informed nor consulted before Boeing was charged in a single felony count, and also because they were neither informed nor consulted before the Government and Boeing agreed to the possibility that that charge would be dismissed, representatives of the crash victims' families ("victims' families") filed suit on December 16, 2021, alleging that their rights under the CVRA had been violated. The CVRA rights that they alleged had been violated included "[t]he reasonable right to confer with the attorney for the Government in the case," 18 U.S.C. § 3771(a)(5); "[t]he right to be treated with fairness and with respect for the victim's dignity and privacy," 18 U.S.C. § 3771(a)(8); and "[t]he right to be informed in a timely manner of any plea bargain or deferred prosecution agreement." 18 U.S.C. § 3771(a)(9).

Soon afterward, in January 2022, the Government had several meetings with representatives of the victims' families, but decided to stand by the

---

[4] The DPA noted that, although Boeing was uncooperative for the initial six months after the investigation began, it ultimately assisted by voluntarily and proactively identifying relevant and significant evidence, for which it received "partial credit."

4

No. 23-10168

DPA as it had been structured. The victims' families therefore maintained their suit, in which they requested the district court grant a host of remedies "for Boeing's illegal behavior and the illegal agreement," including:

1. [A]n order directing the Government to meet and confer with the victims' families about its evidence against Boeing and its decision to grant Boeing immunity from further criminal prosecution;

2. An order directing the Government to provide to the victims' families its documents and related evidence of Boeing's crimes;

3. Exercising the Court's supervisory powers over the DPA;

4. Requiring that Boeing appear for a public arraignment and that the victims be heard concerning appropriate conditions of release during the term of the DPA;

5. An order that the DPA's "immunity" provision be excised, permitting the victim families to exercise their CVRA right to confer with prosecutors about pursuing further criminal prosecution of Boeing;

6. An order that the victim families be permitted to confer with prosecutors about other ways to hold Boeing accountable for its crimes beyond the provisions in the existing DPA;

7. A referral of the Government's illegal behavior in reaching the DPA to appropriate investigative authorities, including the House and Senate Committees with authority over the issue and the Department of Justice's Office of Professional Responsibility; and

8. All other appropriate remedies to protect the victims' families' rights and assure transparency and accountability in this criminal case.

The Government opposed on several grounds—including, initially, on the ground that the crash victims were not "crime victims" under the

No. 23-10168

CVRA. In its First Opinion and Order in the matter, the district court identified the relevant offense for the purposes of the CVRA as conspiracy to defraud the United States, and scheduled an evidentiary hearing on the issue of whether the victims suffered direct and proximate harm from that charged conspiracy. After this hearing, which occurred over the course of two days on August 5, 2022 and August 26, 2022, the district court found in its Second Opinion and Order that the victim's families had satisfied their burden in establishing both direct and proximate causation, and therefore had standing to assert rights under the CVRA. But it left open the question of what remedy, if any, could be afforded.

On January 19, 2023, the district court granted the victims' families motion for a public arraignment of Boeing, which occurred on January 26, 2023.

On February 9, 2023, after considering a round of supplemental briefing on remedies, the district court found in its Third Opinion and Order—the subject before us—that it had no choice but to deny the victims' families requested relief. In particular, the district court found that it had no statutory authority (via the Speedy Trial Act ("STA")) or inherent supervisory authority to exercise substantive supervision over the DPA. It also declined the victims' families' requests to order the Government to turn over its Boeing investigation evidence and DPA negotiation history and to refer the DOJ to investigative authorities, finding that neither was warranted based on either the law or the facts before it. Ultimately, the district court concluded:

> This Court has immense sympathy for the victims and loved ones of those who died in the tragic plane crashes resulting from Boeing's criminal conspiracy. Had Congress vested this Court with sweeping authority to ensure that justice is done in a case like this one, it would not hesitate. But neither the Speedy Trial Act nor this Court's inherent supervisory powers

No. 23-10168

provide a means to remedy the incalculable harm that the victims' representatives have suffered. And no measure of sympathy nor desire for justice to be done would legitimize this Court's exceeding the lawful scope of its judicial authority.

Separately, after the district court's Second Opinion and Order deeming the crash victims to be crime victims under the CVRA, foreign airline carriers Polskie Linie Lotnicze LOT S.A. ("LOT") and Smartwings, A.S. ("Smartwings") (together, the "Subsequent Movants"[5]), filed motions for findings that their CVRA rights had been violated and seeking appropriate remedies.[6] In its Third Opinion and Order, the district court denied the Subsequent Movants' motions for recognition as crime victims and associated remedies, finding that they were barred by laches.

## II.

Enacted in 2004, the CVRA details a number of rights afforded to crime victims, charges the government to use "best efforts" to accord those rights, and allows crime victims or their lawful representatives to assert those rights in federal court. 18 U.S.C. § 3771(a), (c), (d). In turn, district courts "shall ensure that the crime victim is afforded the rights described" in the CVRA. 18 U.S.C. § 3771(b)(1). If relief requested under the CVRA is denied by a district court, movants may "petition [a] court of appeals for a writ of mandamus" pursuant to 18 U.S.C. § 3771(d)(3). *In re Dean,* 527 F.3d 391, 394 (5th Cir. 2008).

---

[5] Though additional family members of fifty-five individuals who died in the Lion Air and Ethiopian flight crashes also filed similar motions, unlike LOT and Smartwings, they did not file a mandamus petition and therefore their claims are not analyzed here.

[6] This included, in a motion by Smartwings, a request for an accounting of the airline compensation amount established pursuant to the DPA.

No. 23-10168

In evaluating whether the district court erred, the CVRA instructs us to "apply ordinary standards of appellate review." 18 U.S.C. § 3771(d)(3). Thus, we review the district court's legal conclusions de novo, its factual conclusions for clear error, and its discretionary judgments for abuse of discretion. *See In re Doe*, 57 F.4th 667, 672-73 (9th Cir. 2023) (citing *In re Wild*, 994 F.3d 1244, 1254 n.10 (11th Cir. 2021) (en banc)).

III.

A.

Before us are petitions from both the victims' families and LOT. In their mandamus petition, the victims' families ask that the conditional-release provisions for Boeing be excised from the DPA and also reiterate their request for other remedies "to enforce their CVRA rights."

We begin by noting general accord with the district court's holding that courts lack authority to exercise substantive review over DPAs. "It is a bedrock principle of our system of government that the decision to prosecute is made, not by judges or crime victims, but by officials in the executive branch. And so it is not the province of the judiciary to dictate to executive branch officials who shall be subject to investigation or prosecution." *Lefebure v. D'Aquilla*, 15 F.4th 650, 654 (5th Cir. 2021); *see also United States v. Fokker Servs. B.V.*, 818 F.3d 733, 737 (D.C. Cir. 2016) ("The Constitution allocates primacy in criminal charging decisions to the Executive Branch. The Executive's charging authority embraces decisions about whether to initiate charges, whom to prosecute, which charges to bring, and whether to dismiss charges once brought. It has long been settled that the Judiciary generally lacks authority to second-guess those Executive determinations, much less to impose its own charging preferences. The courts instead take the prosecution's charging decisions largely as a given, and assume a more active role

No. 23-10168

in administering adjudication of a defendant's guilt and determining the appropriate sentence.").

In light of the respective roles of the Executive and the Judiciary, which render "judicial authority . . . at its most limited when reviewing the Executive's exercise of discretion over charging determinations," *Fokker*, 818 F.3d at 741 (internal quotation marks and citations omitted), the victims' families' central request for *substantive* changes to the DPA negotiated between the Government and Boeing—as distinct from the felony information pending in district court—would require affirmative authority for judicial action.

As the district court correctly concluded, however, the STA does not convey that authority. The STA "assure[s] . . . speedy trial[s]" by establishing time limits for a trial to commence once criminal charges have been filed. *See* 18 U.S.C. § 3161. It is true that the STA provides a role for courts in exclusions resulting from deferred prosecution. *See* 18 U.S.C. § 3161(h)(2) ("Any period of delay during which prosecution is deferred by the attorney for the Government pursuant to written agreement with the defendant, *with the approval of the court*, for the purpose of allowing the defendant to demonstrate his good conduct." (emphasis added)). But as our sister circuits have noted, this language appears "to have a particular focus" on rooting out requests for exclusion that served as "a pretext intended merely to evade the Speedy Trial Act's time constraints," rather than imbuing courts with the power to "second-guess charging decisions." *Fokker*, 818 F.3d at 744; *see also United States v. HSBC Bank USA, N.A.*, 863 F.3d 125, 138 (2d Cir. 2017). This interpretation is supported by both the absence of clear congressional direction to alter the "historical allocation of authority between the courts and the Executive," *see HSBC*, 863 F.3d at 138, as well legislative history describing the rationale of the "approval of the court" phrasing, *see* S. Rep. No. 93-1021, at 37 (1974) (explaining that § 3161(h)(2) "now requires that

No. 23-10168

exclusion for diversion only be allowed where deferral of prosecution is conducted 'with approval of the court,'" which "assures that the court will be involved in the decision to divert and that the procedure will not be used by prosecutors and defense counsel to avoid the speedy trial time limits"). Where, as here, victims' families do not contend that the DPA between the Government and Boeing was entered into for the purpose of circumventing the speedy-trial time limits, 18 U.S.C. § 3161(h)(2) does not provide a basis for the court to withhold its approval.[7]

Due respect for separation of powers likewise confirms that the district court correctly concluded that the requested CVRA relief was not authorized by the court's authority "to supervise 'the administration of criminal justice' among the parties." *United States v. Payner*, 447 U.S. 727, 735 n.7 (1980) (quoting *McNabb v. United States*, 318 U.S. 332, 340 (1943)). This inherent supervisory power, under which "federal courts may, *within limits*, formulate procedural rules not specifically required by the Constitution or the Congress," has been understood to serve a "threefold" purpose: "to implement a remedy for violation of recognized rights; to preserve judicial integrity by ensuring that a conviction rests on appropriate considerations validly before the jury; and finally, as a remedy designed to deter illegal conduct." *United States v. Hasting*, 461 U.S. 499, 505 (1983) (emphasis added) (internal citations omitted). The victims' families contend that the first of the three—implementing a remedy for violation of recognized rights—is implicated here. But the Supreme Court has instructed that "[t]he supervisory power is applied with some caution," *Payner*, 447 U.S. at 734, and should be "exercised with restraint and discretion," *Chambers v. NASCO, Inc.*, 501 U.S. 32, 44 (1991); *see also HSBC*, 863 F.3d at 136 ("[T]he supervisory power

---

[7] *But see* Brandon L. Garrett, *The Public Interest in Corporate Settlements*, 58 B.C. L. Rev. 1483, 1500-1510 (2017).

No. 23-10168

doctrine is an extraordinary one which should be 'sparingly exercised.'" (quoting *United States v. Jones*, 433 F.2d 1176, 1181–82 (D.C. Cir. 1970)).

Intervention under the supervisory authority for the remedies that the victims' families seek, however, would be inappropriate. In their requests to excise the conditional-release provision for Boeing, for example, the victims' families ask the court to parse the DPA by preserving most of the agreement negotiated between the parties, while simultaneously nullifying what likely was the primary consideration Boeing received from the agreement. Significantly, in the parallel guilty-plea context, this type of judicial line-item veto is foreclosed by Federal Rule of Criminal Procedure 11, binding circuit caselaw, and principles of fairness fundamental to the plea-agreement process. *See United States v. Brooks*, 78 F.4th 138, 142–43 (5th Cir. 2023); *see also United States v. Serrano-Lara*, 698 F.3d 841, 844–45 (5th Cir. 2012) (instructing that "a court choosing to accept a plea agreement does not then have the option to perform a judicial line-item veto, striking a valid appeal waiver or modifying any other terms"). We discern no meaningful difference when judicial intervention is sought to rewrite an agreement negotiated between the government and a defendant outside the judicially enforceable regime of Rule 11.

B.

We must still address the district court's additional conclusion that, despite its "immense sympathy" for the crime victims here, it lacks legitimate authority "to remedy the incalculable harm" those victims have suffered. To the extent that this conclusion determinatively denies application of the CVRA, that is inconsistent with the statute, the criminal rules, and court authority to resolve criminal proceedings commenced in court.

Clarification of the courts' ongoing CVRA responsibility is especially significant in the context of DPAs, which have enjoyed surgent popularity in

No. 23-10168

the last two decades yet have been given scant attention in the caselaw. Although originally conceived with the intent of "giv[ing] prosecutors the ability to defer prosecution of individuals charged with certain non-violent criminal offenses to encourage rehabilitation," *United States v. Saena Tech Corp.*, 140 F. Supp. 3d 11, 22–23 (D.D.C. 2015), and thereby "avoid draconian effects" on first-time offenders, particularly for "relatively minor offenses," David M. Uhlmann, *Deferred Prosecution and Non-Prosecution Agreements and the Erosion of Corporate Criminal Liability*, 72 Md. L. Rev. 1295, 1303, 1304 (2013), DPAs have now become "the predominant procedure for resolving certain kinds of federal prosecutions of corporations," Frederick T. Davis, *Judicial Review of Deferred Prosecution Agreements: A Comparative Study*, 60 Colum. J. Transnat'l L. 751, 753 (2022). By one estimate, there have been over 300 deferred corporate prosecutions since 1992. *See* Brandon L. Garrett and Jon Ashley, *Corporate Prosecution Registry*, Duke Univ. Sch. Of L. et Al., https://corporate-prosecution-registry.com/browse (last visited Dec. 14, 2023).

Indeed, often imposing penalties of millions if not billions of dollars, modern corporate DPAs are a recognized tool in corporate defense and often evince a size and scale wholly unrecognizable from the DPA's humble provenance. And, increasingly, the complexities that DPAs present to courts are evident even in the noncorporate context. *See, e.g., In re Flynn*, 961 F.3d 1215, 1228–29 (D.C. Cir. 2020) ("[T]he question at hand is not whether or under what circumstances a district court may *deny* a Rule 48(a) motion, but whether it may give consideration to such a motion before ruling on it. It should come as no surprise that, before today, neither we nor any other Court of Appeals has ever read Rule 48(a)'s 'leave of court' provision to mean that a district court may not even consider such a motion before giving its 'leave.'") (Wilkins, J., dissenting in part), *reh'g en banc granted, order vacated*, No. 20-5143, 2020 WL 4355389 (D.C. Cir. July 30, 2020), and *on reh'g en*

No. 23-10168

*banc*, 973 F.3d 74 (D.C. Cir. 2020); *cf.* Plea Hearing Transcript at 48:13–16, *United States v. Biden*, No. 1:23-cr-61 (D. Del. Jul. 26, 2023), ECF No. 16 ("The Court: So I don't mean to violate the separation of powers or do anything unconstitutional. I'm trying to figure out what my role is and what the appropriate rule is that applies to this."); Glenn Thrust et al., *Judge Puts Hunter Biden's Plea Deal on Hold, Questioning Its Details*, N.Y. TIMES (July 26, 2023), https://www.nytimes.com/2023/07/26/us/politics/hunter-biden-plea-deal-charges.html.[8]

(1)

As set forth above, in any criminal prosecution commenced in court, Congress commands that district courts use Article III authority to implement the CVRA, giving procedural guarantees to crime victims which the Government failed to respect here. *See* 18 U.S.C. § 3771(b)(1) ("In any court proceeding involving an offense against a crime victim, the court *shall ensure* that the crime victim is afforded the rights described . . . ." (emphasis added)). We have said so clearly when parties seek to resolve a criminal case by plea agreement, *In re Dean*, 527 F.3d at 395, and the same obligation extends, explicitly, to DPAs. *See* 18 U.S.C. § 3771(a)(9).

(2)

Correspondingly, the district court exercised—and still retains—authority over this criminal case according to the same criminal rules

---

[8] In light of the expansion in use of DPAs and the concomitant difficulties that may arise (as this case demonstrates), we echo the call to Congress "to consider implementing legislation" to provide for clear mechanisms and standards for judicial review of such arrangements. *HSBC*, 863 F.3d at 143 (Pooler, J., concurring). That is particularly true because Federal Rule of Criminal Procedure 60, pertaining to victims' rights generally, has limitations on relief pertaining to guilty pleas, sentencing and trials, but does not speak to full criminal case dismissals, where victims' concerns arguably are most acute. *See* Fed. R. Crim. P. 60(b)(5), (6).

No. 23-10168

applicable to all other felony criminal prosecutions. Chronologically: the Government commenced felony prosecution, thereby submitting itself to court authority pursuant to Federal Rule of Criminal Procedure 7, just as Boeing submitted itself to the same authority, as a charged defendant, through its waiver of prosecution by indictment "in open court . . . after being advised of the nature of the charge and of [its] rights." Fed. R. Crim. P. 7(b). The Government thus exercised its near plenary charging authority when it brought a single charge by felony information, instead of by, for example, contractual agreement declining prosecution altogether, so staying outside the criminal justice system and courts entirely. *See In re Wild*, 994 F.3d at 1247 ("Because the government never filed charges against Epstein, there was no preexisting proceeding in which Ms. Wild could have moved for relief under the CVRA, and the Act does not sanction her stand-alone suit.").

Having submitted a prosecution to the courts for resolution, no separation-of-powers friction exists when a district court, in turn, first publicly arraigned Boeing pursuant to Federal Rule of Criminal Procedure 10, assuring the crime victims' families' presence. And no friction existed when the district court then proceeded to resolve preliminary motions, notably here postponing trial and excluding time, both consistent with the STA, while assessing, and ultimately denying, the crime victim families' contention of Government bad faith. As in any criminal case after initial appearance and arraignment, the parties to a criminal proceeding have numerous corollary obligations, all subordinate to judicial authority, such as the government's ongoing duty to comply with *Brady* obligations, and a defendant's duty to adhere to pretrial conditions imposed by a court.

That the parties draw a court's attention to, and indeed, file, their DPA agreement anticipating a motion, in the future, to dismiss the criminal case entirely, does not diminish a district court's authority as to any of the above. Instead, common to all criminal cases submitted for judicial

No. 23-10168

resolution, a district court generally next will determine whether and how the parties intend to resolve the matter. Broadly speaking, this will be by guilty plea and sentencing (pursuant to Federal Rules of Criminal Procedure 11 and 32); by trial and, upon a guilty verdict, entry of judgment (pursuant to Federal Rules of Criminal Procedure 23 and 32); or by government motion to dismiss the prosecution (pursuant to Federal Rule of Criminal Procedure 48(a)).

(3)

This settled sequence of federal courts' authority to resolve criminal prosecutions submitted to them aligns with, and is undiminished by, contractual agreements between the government and defendants. This is certainly true of party agreements filed with the court requesting that a court accept or reject a guilty plea to resolve the prosecution, pursuant to Rule 11, just as it is true of party agreements disclosed to the court that indicate an intention to request dismissal of the prosecution pursuant to Rule 48(a). The latter frequently are termed DPAs but, importantly, they derogate neither court authority nor statutory rights, here rights conferred in the CVRA.

Stated differently, in terms of judicial responsibility, DPAs are as dissimilar to non-prosecution agreements (NPAs) as they are similar to Rule 11 guilty plea agreements. An NPA is just that: no prosecution commences in court. Courts are uninvolved, so accountability for the (declination) decision not to prosecute lies squarely on the government. *See* U.S. Dep't of Just., Just. Manual § 9-28.1100. Contrastingly, a criminal prosecution that *is* submitted to courts to resolve, regardless of any party intention in the future to move to dismiss, receives judicial imprimatur,[9] and hence is close kin to a

---

[9] If dismissal is granted, of course, a DPA and an NPA achieve, in eventuality, the same outcome that no criminal record exists. Significantly, however, charges were commenced in court, criminal conduct was admitted to, yet a court resolution confirms the defendant actually will not receive the criminal conviction. The public and crime victims,

No. 23-10168

guilty-plea agreement submitted pursuant to Rule 11(c)(1)(A), where the government commits to dismiss charges. When the government and a defendant agree to resolve a case pursuant to Rule 11 involving dismissed charges, no one disputes that that agreement will be reviewed and can be rejected by a district court. Fed. R. Crim. P. 11(c)(5); *see, e.g.*, *United States v. Foy*, 28 F.3d 464, 472 (5th Cir. 1994) ("A court may properly reject a plea agreement based on undue leniency."); *Santobello v. New York*, 404 U.S. 257, 262 (1971) ("A court may reject a plea *in exercise of sound judicial discretion*.") (emphasis added); *Missouri v Frye*, 566 U.S. 134, 148–49 (2012); *United States v. Sandoval-Enrique*, 870 F.3d 1207, 1213–20 (10th Cir. 2017); *United States v. Lewis*, 633 F.3d 262, 270 (4th Cir. 2011); *United States v. Harris*, 679 F.3d 1179, 1182 (9th Cir. 2012).

The emphasis we note, therefore, is that in both circumstances—full dismissal of charges to resolve a criminal prosecution or partial dismissal of charges to resolve a prosecution by guilty plea—courts retain adjudicatory responsibility, including an obligation to apply the CVRA. Public perception and confidence in the criminal justice system assume that when criminal charges are submitted for judicial resolution, the courts vigilantly will enforce the public interest, including Congress' command that crime victims are heard and protected.

The salient difference in criminal case resolution between a judicially approved Rule 11(c)(1)(A) guilty plea agreement and a judicially approved Rule 48(a) case dismissal is that the charged defendant who pleads guilty with charges dismissed still is adjudicated by courts to be a convicted criminal. The factual basis supporting that defendant's conviction is entered as part of

---

not to mention the government and defendants, necessarily and correctly see accountability with Article III from start to finish.

No. 23-10168

the court's judgment and that judgment, in turn, leads to Rule 32 sentencing and, often, mandatory, court-ordered and supervised restitution for crime victims. By contrast, when defendants, typically corporations, negotiate a DPA, they bargain for a period of extended, unofficial probation, whereafter the government agrees it will request full dismissal of the criminal case pending in court. The DPA defendant then would not end up a convicted criminal.

But in both cases—an accepted/rejected Rule 11 guilty plea *or* a granted/denied Rule 48(a) dismissal—the public interest, especially that of crime victims, rests crucially on court-approval. In short, the judicial role stays present and constant throughout, and courts must validate the public interest, above all, including rights that Congress has given to crime victims.

(4)

With the above in mind, the logic of our court's decision in *In re Dean*, is instructive and, in application here, determinative.[10] As in *Dean*, the victims' families "should have been notified of the ongoing [DPA]

_____

[10] The Government devotes more attention to the D.C. Circuit's decision in *Fokker* than to our court's decision in *Dean*, but *Dean* is binding on us and, regardless, we deem *Fokker* to be inapt. Most importantly, *Fokker* did not concern the CVRA, much less acknowledged violations of the CVRA. This distinction is crucial because, in the CVRA, Congress explicitly directs that victims receive timely notification of "any . . . deferred prosecution agreement." 18 U.S.C. § 3771(a)(9). Second, the D.C. Circuit in *Fokker* overturned a district court's denial of a joint motion for exclusion of time under the STA, which is analysis that we apply ourselves. Third, even in the context of the STA, the D.C. Circuit rested its decision on the impropriety of a district court critically assessing the terms of the DPA, calling it "grossly disproportionate to the gravity of [the defendant's] conduct." *United States v. Fokker Servs., B.V.*, 79 F. Supp. 3d 160, 167 (D.D.C. 2015), *vacated and remanded*, 818 F.3d 733 (D.C. Cir. 2016). Explicitly, therefore, the *Fokker* district court judge not only reached out to reject the terms of the DPA, but also, in doing so, engaged in prohibited "second-guess[ing]" of "[e]xecutive determinations" and "impose[d] its own charging preferences." *Fokker*, 818 F.3d at 737.

Case: 23-10168     Document: 00517004339     Page: 18     Date Filed: 12/15/2023
Case 4:21-cr-00005-O     Document 197     Filed 12/18/23     Page 18 of 23     PageID 3671

No. 23-10168

discussions and should have been allowed to communicate meaningfully with the government . . . before a deal was struck." 527 F.3d at 395. That is particularly true if the deal, in ultimate outcome *as approved by federal court*, means no company, and no executive and no employee, ends up convicted of any crime, despite the Government and Boeing's DPA agreement about criminal wrongdoing leading, the district court has found, to the deaths of 346 crash victims.

As in *Dean*, "[t]he unfortunate fact is that the . . . agreement was reached without the victims' being able to participate by conferring in advance." *Id.* For that reason, we made clear that when the Government and the defendant in that criminal proceeding submitted their Rule 11 guilty plea (resulting in a criminal judgment), judicial approval would require that victims were heard. *Id.* at 396. Similarly here, the district court has yet to resolve the criminal prosecution still pending before it and, applying the logic of *Dean*, we clarify that if judicial approval is sought to resolve the instant case, the district court has an ongoing obligation to uphold the public interest and apply the CVRA. That authority continues, therefore, regardless of the resolution method ultimately pursued to resolve the criminal proceedings, whether Rule 23 trial, Rule 11 guilty plea, or Rule 48 dismissal order.[11]

More specifically, if the Government concludes, independent of court supervision, that Boeing has *not* complied with the DPA, the case will instead proceed to trial or to Rule 11 guilty plea resolution, both assuring CVRA victim protection. On the other hand, if the Government assesses that Boeing *has* complied sufficiently with the DPA's terms and asks the district court to dismiss criminal proceedings, then, "in passing on any government motion

---

[11] The Government and Boeing in their negotiated DPA necessarily acknowledge that court resolution may result other than through a Rule 48(a) requested case dismissal.

No. 23-10168

under Rule 48(a) . . . the court will expect to see the prosecutor recount that the victim has been consulted on the dismissal and what the victim's views were on the matter." *United States v. Heaton*, 458 F. Supp. 2d 1271, 1273 (D. Utah 2006).

For this reason, as it was in *Dean*, we decide that mandamus intercession is premature. Thus far, the district court has demonstrated careful competence that, whereas it cannot substantively revise the DPA between the Government and Boeing, it nonetheless must uphold crime victims' statutory rights at every stage of the court's criminal proceedings. If a sought-for final stage is a Government motion to dismiss, we are confident, as in *Dean*, that the district court will assess the public interest according to caselaw as well as the CVRA, including violations already admitted to, as well as any other circumstances brought to its attention by the victims' families. *See United States v. Hamm*, 659 F.2d 624, 629 (5th Cir. Unit A Oct. 1981) (en banc) (reiterating Supreme Court and prior Fifth Circuit precedent that district judges are empowered to deny dismissal when "clearly contrary to manifest public interest" as assessed "at the time of the decision to dismiss"); *see also United States v. Romero*, 360 F.3d 1248, 1251–52 (10th Cir. 2004) (noting courts may refuse to dismiss charges if dismissal is "clearly contrary to manifest public interest" and discussing Fifth Circuit cases); *United States v. Garcia-Valenzuela*, 232 F.3d 1003, 1007–08 (9th Cir. 2000) (same); *cf. United States v. Carrigan*, 778 F.2d 1454, 1463 (10th Cir. 1985) (observing that although "a court's discretion is more limited under Rule 48(a) than . . . under Rule 11(e)," courts are not required to grant Rule 48(a) motions to dismiss if "clearly contrary to manifest public interest," and citing Fifth Circuit cases).[12]

---

[12] While the Supreme Court indicated that "[t]he principal object" of the "leave of court" required for dismissals pursuant to Rule 48(a) was "to protect a defendant against

No. 23-10168

IV.

As to the Subsequent Movants, the district court dismissed their claims due to laches, finding that they "did not pursue their requested relief until nearly two years after the Government filed the DPA in this case," and "ten months after the original movants sought recognition of rights." Though both LOT and Smartwings filed mandamus petitions, Smartwings was dismissed following an unopposed motion to withdraw its petition. Therefore, only LOT's petition remains.

We review the district court's decision concerning the availability of laches de novo, any relevant factual findings for clear error, and its fact-specific application of laches for an abuse of discretion. *See SCA Hygiene Products Aktiebolag v. First Quality Baby Products, LLC*, 580 U.S. 328, 334-36 (2017); *Retractable Techs., Inc. v. Becton Dickinson & Co.*, 842 F.3d 883, 900 (5th Cir. 2016).

Laches, an affirmative "defense developed by courts of equity" potentially applicable to statutes in "which the Legislature has provided no fixed time limitation," *Petrella v. Metro-Goldwyn-Mayer, Inc.*, 572 U.S. 663, 678 (2014), is intended to "protect defendants against unreasonable,

---

prosecutorial harassment," *Rinaldi v. United States*, 434 U.S. 22, 29 n.15 (1977), the Court also acknowledged—and expressly left open—courts' use of Rule 48(a) to deny dismissals when "prompted by considerations clearly contrary to the public interest." *Id.* (citing, *inter alia*, *United States v. Cowan*, 524 F.2d 504 (5th Cir. 1975)). Indeed, with the history of Rule 48 in mind, we have observed that "[i]t seems manifest that the Supreme Court intended to . . . vest[] in the courts the power and the duty to exercise a discretion for the protection of the public interest," and have noted that early case law interpreting Rule 48(a) "supports this theory." *Cowan*, 524 F.2d at 511; *see also* Thomas Ward Frampton, *Why Do Rule 48(a) Dismissals Require "Leave of Court"?*, 73 Stan. L. Rev. Online 28, 32–37 (2020) (analyzing debates and votes of the Rule's drafting Advisory Committee to show that its "text was understood as vesting district judges with the power to limit unwarranted dismissals by corruptly motivated prosecutors"); *see generally* Garrett, *supra* note 8.

No. 23-10168

prejudicial delay in commencing suit." *Aktiebolag*, 580 U.S. at 333 (quotation marks and citation omitted). To establish laches, a defendant must show inexcusable delay that causes undue prejudice. *Env't Def. Fund, Inc. v. Alexander*, 614 F.2d 474, 478 (5th Cir. 1980). "Whether laches bars an action in a given case depends upon the circumstances of that case and is a question primarily addressed to the discretion of the trial court." *Id.* (quotation marks and citation omitted).

LOT argues that laches cannot be applied in a criminal context, and points to the dearth of cases demonstrating otherwise. Yet the general absence of the application of laches in criminal cases is understandable, given that "laches may not be asserted as a defense against the United States when it is acting in its sovereign capacity to enforce a public right or protect the public interest." *United States v. Popovich*, 820 F.2d 134, 136 (5th Cir. 1987); *see also United States v. Milstein*, 401 F.3d 53, 63 (2d Cir. 2005). Here, by contrast, laches is invoked not to avoid prosecution, but to bar CVRA claims—and so the general rule against laches in criminal contexts is not determinative.

LOT next argues that laches should have been unavailable due to unclean hands. Yet we find no abuse of discretion in the district court's decision to the contrary, in light of both the implications of the argument in the context of DPAs and the district court's finding of no Government bad faith. The former, in particular, is instructive. DPAs, by definition, involve the admission of and acceptance of responsibility for misconduct. Finding that admitted misconduct to constitute unclean hands, as LOT urges, would mean that laches could never be invoked, an outcome that we do not accept.

Finally, LOT argues that the text and purpose of the CVRA foreclose laches, noting that the statute itself does not set any time limitations, and emphasizing that the CVRA was intended to *afford* victims rights, not restrict or

No. 23-10168

narrow them. However, the CVRA does contain several, specific time limitations—such as those that govern when a victim can seek to reopen a plea or sentence, 18 U.S.C. § 3771(d)(3)—even if none explicitly relates to a "time limit within which putative crime victims must seek relief in the district court," *In re Allen*, 701 F.3d 734, 735 (5th Cir. 2012) (per curiam). Indeed, we expressly left the door open to the possibility that a particularly "inconvenient delay . . . could trigger the doctrine of laches or some other legal principle that might bar a request for crime victim status" under the CVRA. *Id.* And the Second Circuit has determined that laches can apply under the CVRA, although declined to apply it under the facts of the particular case. *Fed. Ins. Co. v. United States*, 882 F.3d 348, 365–66 (2d Cir. 2018).

For these reasons, we do not perceive an abuse of discretion in the district court's application of laches to LOT's petition inasmuch as it pertains to the Government's failure to confer, almost two years earlier, before the criminal complaint against Boeing was filed. We therefore deny the mandamus petition as to LOT. This is without prejudice, however, to any effort LOT may urge to be heard as a CVRA victim when this criminal case comes to resolution. *See In re Allen*, 701 F.3d at 735 (granting mandamus to preserve opportunity to assert CVRA claims pre-sentencing rather than to reopen determinations already made).

V.

For the reasons discussed above, we DENY mandamus relief without prejudice, confident that the district court will uphold victims' CVRA rights throughout the instant criminal proceedings, above all when, how, and if judicial approval is sought to resolve this case.

No. 23-10168

EDITH BROWN CLEMENT, *Circuit Judge*, concurring:

I concur in the majority opinion in full. I write separately to note that our decision should not be read as holding that the district court was *prohibited* from setting aside the DPA at an earlier stage of these proceedings—including upon motion from the victims' families—after finding that the victims' CVRA rights had been violated. *Cf.* RESTATEMENT (SECOND) OF CONTRACTS § 178 (providing that contracts entered in violation of public policy are void and unenforceable). Otherwise, we would be inviting criminal defendants and the government to violate victims' CVRA rights by negotiating DPAs in secret and taking their chances that the district court will accept Rule 48(a) dismissal years down the line.

Our holding is only that the district court was not *required* to do so. After all, the CVRA's "shall ensure" provision grants the district court discretion as to *how* it ensures that crime victims are afforded their statutory rights. *See, e.g.*, 150 CONG. REC. S4269 (Apr. 22, 2004) (statement of Sen. Feinstein) (stating that the "shall ensure" provision "is critical because . . . it is the courts that will be responsible for enforcing" victims' CVRA rights); 150 CONG. REC. 22953 (Oct. 9, 2004) (statement of Sen. Kyl) (explaining that the "clear intent and expectation of Congress" was for district courts to "giv[e] meaning to the [CVRA] rights we establish"). And here, we are confident that the district court will ensure that the victims' families are afforded such rights prior to passing on any Rule 48(a) motion. *Ante* at 18–19.