## UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF TEXAS
Fort Worth Division

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | 4:21-cr-5-O |
| | ) | |
| v. | ) | Violation: |
| | ) | |
| THE BOEING COMPANY, | ) | 18 U.S.C. § 371 |
| | ) | |
| Defendant. | ) | |
| | ) | |

### PLEA AGREEMENT

The United States of America, by and through the Department of Justice, Criminal Division, Fraud Section (the "Fraud Section") and the United States Attorney's Office for the Northern District of Texas ("USAO-NDTX") (collectively, the "Offices"), and the Defendant, The Boeing Company (the "Defendant"), by and through its undersigned attorneys, and through its authorized representatives, pursuant to authority granted by the Defendant's Board of Directors, hereby submit and enter into this plea agreement (the "Agreement"), pursuant to Rule 11(c)(1)(C) of the Federal Rules of Criminal Procedure. The terms and conditions of this Agreement are as follows:

### The Defendant's Agreement

1.     Pursuant to Rule 11(c)(1)(C) of the Federal Rules of Criminal Procedure, the Defendant agrees to plead guilty to Conspiracy to Defraud the United States, in violation of Title 18, United States Code, Section 371, as described in Paragraph 1 of the Deferred Prosecution Agreement ("DPA") (ECF No. 4) and charged in the pending one-count Criminal Information that accompanied the DPA (the "Information") (ECF No. 1). The Defendant further agrees to persist

1

in that plea through sentencing and to cooperate fully with the Offices as set forth in Paragraph 11. The Defendant is subject to prosecution for this offense following the determination by the Offices that the Defendant breached the DPA, which the Defendant entered into with the Offices on January 7, 2021. Specifically, as described in the Offices' Factual Basis for Breach attached to this Agreement as Attachment A-1, the Offices determined that the Defendant breached the terms of the DPA by failing to sufficiently design, implement, and enforce a compliance and ethics program to prevent and detect violations of the U.S. fraud laws throughout its operations.

2.      The Defendant understands that, to be guilty of this offense, the following essential elements of the offense must be satisfied:

Count One

a.      That the Defendant, through its employees, made an agreement to defraud the government or one of its agencies by impairing, obstructing, defeating, and interfering with, by dishonest means, the lawful function of the Federal Aviation Administration Aircraft Evaluation Group ("FAA AEG") within the United States Department of Transportation, as charged in the Information;

b.      That the Defendant, through its employees, knew that the purpose of the agreement was to defraud the government and joined in it willfully, that is, with the intent to defraud; and

c.      That at least one of the conspirators during the existence of the conspiracy knowingly committed at least one of the overt acts described in the Information, in order to accomplish some object or purpose of the conspiracy.

3.      The Defendant understands and agrees that this Agreement is between the Offices and the Defendant and does not bind any other Division or Section of the Department of Justice or

any other federal, state, or local prosecuting, administrative, or regulatory authority. Nevertheless, the Offices will bring this Agreement and the nature and quality of the conduct, cooperation, and remediation of the Defendant, its direct or indirect affiliates, subsidiaries, and joint ventures, to the attention of other prosecuting authorities or other agencies, as well as debarment authorities, if requested by the Defendant.

4. The Defendant agrees that this Agreement will be executed by an authorized corporate representative. The Defendant further agrees that a resolution duly adopted by the Defendant's Board of Directors in the form attached to this Agreement as Attachment B ("Certificate of Corporate Resolutions"), authorizes the Defendant to enter into this Agreement and take all necessary steps to effectuate this Agreement, and that the signatures on this Agreement by the Defendant and its counsel are authorized by the Defendant's Board of Directors, on behalf of the Defendant.

5. The Defendant agrees that it has the full legal right, power, and authority to enter into and perform all of its obligations under this Agreement.

6. The Offices enter into this Agreement based on their assessment of the individual facts and circumstances presented by this case, including:

a. the Offices' determination that the Defendant breached the terms of the DPA by failing to design, implement, and enforce a compliance and ethics program, including failing to sufficiently integrate its ethics and compliance program with its safety and quality programs, as necessary to prevent and detect violations of the U.S. fraud laws throughout its operations, as described in the Factual Basis for Breach attached to this Agreement as Attachment A-1;

b.       the nature and seriousness of the offense conduct, as described in the Statement of Facts attached to this Agreement as Attachment A-2, which involved the Defendant, through its employees, deceiving the FAA AEG about the Boeing 737 MAX's Maneuvering Characteristics Augmentation System ("MCAS") that impacted its flight control system. Through this deception, the Company interfered with the FAA AEG's lawful function to evaluate MCAS and determine whether to include information about MCAS in the 737 MAX FSB Report, and fraudulently obtained from the FAA AEG a differences-training determination for the 737 MAX that was based on incomplete and inaccurate information about MCAS;

c.       although the Defendant had inadequate anti-fraud controls and an inadequate anti-fraud compliance program during the period of conduct charged in the Information, the Defendant took considerable steps to enhance its compliance program through structural and leadership changes, including but not limited to steps to enhance the independence, capability, and effectiveness of its compliance program; steps to enhance its annual Compliance Risk Management process; and steps to integrate compliance efforts across its business, and has committed to continuing to implement and test further enhancements to ensure that its compliance program satisfies the minimum elements set forth in Attachment C to this Agreement ("Corporate Compliance Program");

d.       however, based on the state of the Defendant's compliance program and the progress of its remediation, including the fact that the Defendant's anti-fraud compliance program and internal controls have not been fully implemented or tested to demonstrate that they would prevent and detect similar misconduct in the future, and because of the deficiencies in the Defendant's anti-fraud compliance program and internal controls as determined by the Offices and as described in the Factual Basis for Breach attached to this Agreement as Attachment A-1, the

Defendant has agreed to the imposition of an independent compliance monitor (the "Independent Compliance Monitor") to reduce the risk of misconduct (as set forth in Paragraphs 29-37 and Attachment D to this Agreement);

e.     the Defendant has agreed to continue to cooperate with the Offices as described in Paragraph 11, below;

f.     the Defendant has agreed to pay lawful restitution owed to the heirs, relatives, and/or legal beneficiaries of the crash victims of Lion Air Flight 610 and Ethiopian Airlines Flight 302 (collectively, "Crash Victim Families"). The amount owed shall be determined by the Court and subject to any timely and proper appeal; and

g.     based on these and other relevant considerations, and pursuant to Paragraph 26 of the DPA, the Offices believe that the appropriate resolution of the Defendant's breach of the DPA is for the Defendant to plead guilty to Count One of the Information; the imposition of an Independent Compliance Monitor as set forth in Paragraphs 29-37 and Attachment D to this Agreement; to make a sustained monetary investment in its compliance and safety programs of at least $455,000,000, which, on an annualized basis, is an amount equal to at least approximately 75% more than the Company's expenditure on compliance in fiscal year 2024; and to pay an overall criminal monetary fine of $487,200,000, which reflects a fine at the top of the applicable Sentencing Guidelines fine range and the maximum fine allowable under Title 18, United States Code, Sections 371 and 3571(c). As required by Paragraph 11 of the DPA, the Offices will recommend to the Court when imposing sentence that it credit $243,600,000 previously paid by the Defendant pursuant to the DPA, resulting in a remaining criminal penalty owed by the Company of $243,600,000, because the United States Sentencing Guidelines calculation set forth

in this Agreement and in the DPA are the same and the penalty the Defendant paid pursuant to the DPA was based on this Guidelines calculation.

7.    The Defendant agrees to abide by all terms and obligations of this Agreement as described herein, including, but not limited to, the following:

a.    to plead guilty as set forth in this Agreement;

b.    to abide by all sentencing stipulations contained in this Agreement;

c.    to appear, through its duly appointed representatives, as ordered for all court appearances, and obey any other ongoing court order in this matter, consistent with all applicable U.S. and foreign laws, procedures, and regulations;

d.    to commit no further crimes;

e.    to be truthful at all times with the Court;

f.    to pay the applicable fine and special assessment;

g.    during the term of probation imposed pursuant to this Agreement, to make a sustained monetary investment in its compliance and safety programs of at least $455,000,000;

h.    to facilitate and conduct a meeting between the Defendant's Board of Directors and the Crash Victim Families and their counsel as described in Paragraph 25(h);

i.    to cooperate fully with the Offices as described in Paragraph 11;

j.    to accept the appointment of and retain an Independent Compliance Monitor; and

k.    to implement a compliance and ethics program reasonably designed to prevent and detect violations of the U.S. fraud laws throughout its operations, including integration of the ethics and compliance program with the Company's safety and quality programs as necessary to prevent and detect violations of the U.S. fraud laws throughout its operations. This

program will also include, but not be limited to, implementation of the minimum elements set forth in Attachment C of this Agreement.

8.      The Defendant represents that it has endeavored to implement and will continue to implement a compliance and ethics program reasonably designed, implemented, and enforced to prevent and detect violations of U.S. fraud laws throughout its operations, including those of its affiliates, agents, and joint ventures, and those of its contractors and subcontractors whose responsibilities relate to the Defendant's interactions with any domestic or foreign government agency (including the FAA), regulator, or any of its airline customers, including, but not limited to, the minimum elements set forth in Attachment C. On the date the Term (as defined in Paragraph 14) expires, the Defendant, by its Chief Executive Officer and Chief Compliance Officer, will certify to the Offices, in the form of executing the document attached as Attachment F to this Agreement, that the Defendant has met its compliance obligations pursuant to this Agreement. This certification will be deemed a material statement and representation by the Defendant to the executive branch of the United States for purposes of 18 U.S.C. § 1001, and it will be deemed to have been made in the judicial district in which this Agreement is filed. In assessing the Defendant's compliance program, the Offices may consider the Independent Compliance Monitor's certification decision.

9.      In order to address any deficiencies in its internal controls, policies, and procedures, the Defendant represents that it has undertaken, and will continue to undertake in the future, in a manner consistent with all of its obligations under this Agreement, a review of its existing internal controls, compliance policies, and procedures regarding compliance with U.S. federal fraud laws, including the adequacy of the controls, compliance policies, and procedures to address safety-related fraud risks. Where necessary and appropriate, the Defendant will adopt new or modify

existing internal controls, compliance policies, and procedures in order to ensure that the Defendant maintains an effective compliance program reasonably designed to effectively detect and deter violations of U.S. federal fraud laws, including the integration of its ethics and compliance program with its safety and quality programs as necessary to reasonably prevent violations of U.S. fraud laws or policies. The compliance program will include, but not be limited to, the minimum elements set forth in Attachment C.

10.     Except as may otherwise be agreed by the parties in connection with a particular transaction, the Defendant agrees that in the event that, during the Term (as defined in Paragraph 14), the Defendant undertakes any change in corporate form, including if it sells, merges, or transfers business operations that are material to the Defendant's consolidated operations, or to the operations of any subsidiaries or affiliates involved in the conduct described in Attachment A-2 of the Agreement attached hereto, as they exist as of the date of this Agreement, whether such sale is structured as a sale, asset sale, merger, transfer, or other change in corporate form, it shall include in any contract for sale, merger, transfer, or other change in corporate form a provision binding the purchaser, or any successor in interest thereto, to the obligations described in this Agreement. The purchaser or successor in interest must also agree in writing that the Offices' ability to breach under this Agreement is applicable in full force to that entity. The Defendant agrees that the failure to include these provisions in the transaction will make any such transaction null and void. The Defendant shall provide notice to the Offices at least thirty (30) days prior to undertaking any such sale, merger, transfer, or other change in corporate form. The Offices shall notify the Defendant prior to such transaction (or series of transactions) if they determine that the transaction(s) will have the effect of circumventing or frustrating the enforcement purposes of this Agreement. If at any time during the Term (as defined in Paragraph 14) the Defendant engages in a transaction(s)

that has the effect of circumventing or frustrating the enforcement purposes of this Agreement, the Offices may deem it a breach of this Agreement pursuant to Paragraphs 38-43. Nothing herein shall restrict the Defendant from indemnifying (or otherwise holding harmless) the purchaser or successor in interest for penalties or other costs arising from any conduct that may have occurred prior to the date of the transaction, so long as such indemnification does not have the effect of circumventing or frustrating the enforcement purposes of this Agreement, as determined by the Offices.

11.     The Defendant shall cooperate fully with the Offices in any and all matters relating to the conduct described in this Agreement and Attachment A-2 and any other conduct under investigation by the Offices, or any other component of the Department of Justice at any time during the Term (as defined in Paragraph 14), until the later of the date upon which all investigations and prosecutions arising out of such conduct are concluded, or the end of the Term (as defined in Paragraph 14). At the request of the Offices, the Defendant shall also cooperate fully with other domestic or foreign law enforcement and regulatory authorities and agencies in any investigation of the Defendant, its parent company or its affiliates, or any of its present or former officers, directors, employees, agents, and consultants, or any other party, in all matters relating to the conduct described in this Agreement and the attached Statement of Facts and any other conduct. The Defendant's cooperation pursuant to this Paragraph is subject to applicable law and regulations as well as valid claims of attorney-client privilege or attorney work product doctrine; however, the Defendant must provide to the Offices a log of any information or cooperation that is not provided based on an assertion of law, regulation, or privilege, and the Defendant bears the burden of establishing the validity of any such assertion. The Defendant agrees that its cooperation pursuant to this Paragraph shall include, but not be limited to, the following:

a.    The Defendant represents that it has truthfully disclosed (1) all factual information with respect to its activities, those of its subsidiaries and affiliates, and those of its present and former directors, officers, employees, agents, and consultants, relating to the conduct described in this Agreement and Attachment A-2, and (2) all factual information with respect to its activities, those of its affiliates, and those of its present and former directors, officers, employees, agents, and consultants related to the conduct described in this Agreement or Attachment A-2 about which the Defendant shall gain any knowledge or about which the Offices have inquired or may inquire. This obligation of truthful disclosure includes, but is not limited to, the obligation of the Defendant to provide to the Offices, upon request, any document, record, or other tangible evidence about which the Offices may inquire of the Defendant, including evidence that is responsive to any requests made prior to the execution of this Agreement.

b.    Upon request of the Offices, the Defendant shall designate knowledgeable employees, agents, or attorneys to provide to the Offices the information and materials described in Paragraph 11(a) above on behalf of the Defendant. It is further understood that the Defendant must at all times provide complete, truthful, and accurate information.

c.    The Defendant shall use its best efforts to make available for interviews or testimony, as requested by the Offices, present or former officers, directors, employees, agents, and consultants of the Defendant. This obligation includes, but is not limited to, sworn testimony before a federal grand jury or in federal trials, as well as interviews with domestic or foreign law enforcement and regulatory authorities. Cooperation under this Paragraph shall include identification of witnesses who, to the knowledge of the Defendant, may have material information regarding the matters under investigation.

d.      With respect to any information, testimony, documents, records, or other tangible evidence provided to the Offices pursuant to this Agreement, the Defendant consents to any and all disclosures to other governmental authorities, including United States authorities and those of a foreign government, of such materials as the Offices, in their sole discretion, shall deem appropriate.

12.      In addition to the obligations provided for in Paragraph 11 of the Agreement, during the Term (as defined in Paragraph 14), should the Defendant learn of any evidence or allegation of a violation of U.S. fraud laws committed by the Defendant's employees or agents upon any domestic or foreign government agency (including the FAA), regulator, or any of the Defendant's airline customers, the Defendant shall promptly report such evidence or allegation to the Offices. On the date the Term (as defined in Paragraph 14) expires, the Defendant, by the Chief Executive Officer of the Defendant and the Chief Financial Officer of the Defendant, will certify to the Offices in the form of executing the document attached as Attachment E to this Agreement that the Defendant has met its disclosure obligations pursuant to this Paragraph. Each certification will be deemed a material statement and representation by the Defendant to the executive branch of the United States for purposes of 18 U.S.C. § 1001, and it will be deemed to have been made in the judicial district in which this Agreement is filed.

13.      The Defendant agrees that any fine imposed by the Court will be due and payable as specified in Paragraph 25 below, and that any restitution owed will be due and payable in accordance with the Court's order upon the completion of any timely and properly noticed appeal. The Defendant further agrees to pay the Clerk of the Court for the United States District Court for the Northern District of Texas the mandatory special assessment of $400 within ten (10) business days of the date of sentencing.

## Term of the Defendant's Obligations Under the Agreement

14.     Except as otherwise provided in Paragraph 11 above in connection with the Defendant's cooperation obligations, the Defendant's obligations under the Agreement shall be effective for a period beginning on the date on which this Agreement is entered and ending three years from the later of the date on which this Agreement is entered or the date on which the Independent Compliance Monitor is retained by the Defendant, as described in Paragraphs 29-37 below (the "Term"). The Defendant agrees, however, that in the event the Offices determine, in their sole discretion, that the Defendant has knowingly violated any provision of this Agreement or failed to completely perform or fulfill each of the Defendant's obligations under this Agreement, the Offices, in their sole discretion, may impose an extension or extensions of the Term for up to a total additional time period of one year, without prejudice to the Offices' right to proceed as provided in Paragraphs 38-43 below. Any extension of the Term extends all terms of this Agreement, including the Independent Compliance Monitor terms described in Attachment D, except for the term of probation, which may be extended only with approval from the Court. Conversely, in the event the Offices find, in their sole discretion, that there exists a change in circumstances sufficient to eliminate the need for the Independent Compliance Monitor prior to the Defendant having served three years of the term of probation, the parties will submit a joint motion to modify the conditions of probation to eliminate the special condition that the Company retain an Independent Compliance Monitor. Defendant will then continue on probation until it has served the full three-year term of probation, absent Court approval for early termination of probation. In addition, in the event the Offices determine, in their sole discretion, to extend the term of the Independent Compliance Monitor beyond three years, or the term of probation is scheduled to end before the term of the Independent Compliance Monitor is complete, the Court

will determine whether to extend the Defendant's term of probation, consistent with 18 U.S.C. § 3565, to run concurrent with all or part of the term of the Independent Compliance Monitor.

### The United States' Agreement

15.     In exchange for the guilty plea of the Defendant and the complete fulfillment of all of its obligations under this Agreement, the Offices agree that they will not file additional criminal charges against the Defendant or any of its direct or indirect affiliates, subsidiaries, or joint ventures relating to any of the conduct described in Attachment A-2. This Agreement does not provide any protection against, and the Offices may use any information related to the conduct described in Attachment A-2 against Defendant in, any prosecution or other proceeding relating to (a) obstruction of justice; (b) perjury or making a false statement; (c) any crime of violence or terrorism-related offense; or (d) a violation of any provision of Title 26 of the United States Code. This Agreement does not provide any protection against prosecution for any past or ongoing conduct not included in Attachment A-2 or for future conduct by the Defendant or any of its direct or indirect subsidiaries and affiliates. The Defendant agrees that nothing in this Agreement is intended to release the Defendant from any and all of the Defendant's tax liabilities and reporting obligations for any and all income not properly reported and/or legally or illegally obtained or derived.

16.     In addition, this Agreement does not provide any protection against prosecution of any individuals, regardless of their affiliation with the Defendant.

### Factual Basis

17.     The Defendant is pleading guilty because it is guilty of the charge contained in the Information. The Defendant admits, agrees, and stipulates that the factual allegations set forth in the Information and Attachment A-2 are true and correct, that it is responsible for the acts of its

officers, directors, employees, and agents described in the Information and Attachment A-2, and that the Information and Attachment A-2 accurately reflect the Defendant's criminal conduct. The Defendant stipulates to the admissibility of the Statement of Facts in Attachment A-2 in any proceeding by the Offices, including any trial, guilty plea, or sentencing proceeding, and will not contradict anything in the Statement of Facts in Attachment A-2 at any such proceeding. The parties stipulate that the representations and views in Attachment A-1 belong to the Offices.

## The Defendant's Waiver of Rights, Including the Right to Appeal

18.    Federal Rule of Criminal Procedure 11(f) and Federal Rule of Evidence 410 limit the admissibility of statements made in the course of plea proceedings or plea discussions in both civil and criminal proceedings, if the guilty plea is later withdrawn. The Defendant expressly warrants that it has discussed these rules with its counsel and understands them. Solely to the extent set forth below, the Defendant voluntarily waives and gives up the rights enumerated in Federal Rule of Criminal Procedure 11(f) and Federal Rule of Evidence 410. The Defendant agrees that, effective as of the date the Court accepts this Agreement and the Defendant signs this Agreement in connection with that acceptance, the Defendant will not dispute the Statement of Facts set forth in Attachment A-2 to this Agreement, and that the Statement of Facts set forth in Attachment A-2 shall be admissible against the Defendant in any criminal case involving the Offices and the Defendant, as: (a) substantive evidence offered by the government in its case-in-chief and rebuttal case; (b) impeachment evidence offered by the government on cross-examination; and (c) evidence at any sentencing hearing or other hearing. In addition, the Defendant also agrees not to assert any claim under the Federal Rules of Evidence (including Rule 410 of the Federal Rules of Evidence), the Federal Rules of Criminal Procedure (including Rule 11 of the Federal Rules of Criminal Procedure), or the United States Sentencing Guidelines ("Sentencing Guidelines," "Guidelines,"

or "U.S.S.G.") (including U.S.S.G. § 1B1.1(a)) that the Statement of Facts set forth in Attachment A-2 to this Agreement should be suppressed or is otherwise inadmissible as evidence (in any form). Specifically, the Defendant understands and agrees that any statements that it makes in the course of its guilty plea or in connection with the Agreement are admissible against it for any purpose in any U.S. federal criminal proceeding if, even though the Offices have fulfilled all of their obligations under this Agreement and the Court has accepted the guilty plea, the Defendant nevertheless withdraws its guilty plea.

19.     The Defendant is satisfied that the Defendant's attorneys have rendered effective assistance. The Defendant understands that by entering into this agreement, the Defendant surrenders certain rights as provided in this agreement. The Defendant understands that the rights of criminal defendants include the following:

a.     the right to plead not guilty and to persist in that plea;

b.     the right to a jury trial;

c.     the right to be represented by counsel – and if necessary have the court appoint counsel – at trial and at every other stage of the proceedings;

d.     the right at trial to confront and cross-examine adverse witnesses, to testify and present evidence, and to compel the attendance of witnesses; and

e.     pursuant to Title 18, United States Code, Section 3742, the right to appeal the sentence imposed.

20.     The Defendant knowingly waives the right to appeal or collaterally attack the conviction and any sentence within the statutory maximum set forth in this agreement (or the manner in which that sentence was determined) on any ground whatsoever except those specifically excepted in this Agreement, in exchange for the commitments made by the United

States in this Agreement. This Agreement does not affect the rights or obligations of the United States as set forth in Title 18, United States Code, Section 3742(b). The Defendant hereby waives all rights, whether asserted directly or by a representative, to request or receive from any department or agency of the United States any records pertaining to the investigation or prosecution of this case, including without limitation any records that may be sought under the Freedom of Information Act, Title 5, United States Code, Section 552, or the Privacy Act, Title 5, United States Code, Section 552a. The Defendant waives all defenses based on the statute of limitations and venue with respect to any prosecution related to the conduct described in Attachment A-2 or the Information, including any prosecution that is not time-barred on the date that this Agreement is signed in the event that: (a) the conviction is later vacated for any reason; (b) the Defendant violates this Agreement; or (c) the plea is later withdrawn, provided such prosecution is brought within one year of any such vacation of conviction, violation of agreement, or withdrawal of plea plus the remaining time period of the statute of limitations as of the date that this Agreement is signed. The Offices are free to take any position on appeal or any other post-judgment matter. The Defendant recognizes that the Court has found that the Crash Victim Families were directly and proximately harmed by the Defendant's conduct as charged in the Information, *see* 4:21-cr-5-O (ECF No. 116), and are entitled to rights under the Crime Victims' Rights Act ("CVRA"). The Defendant further recognizes that the Offices will continue to accord the Crash Victim Families their rights as representatives of crime victims under the CVRA, including the right to full and timely restitution, as provided by the law, and will not challenge the Offices' ability to do so.

21.    Nothing in the foregoing waiver of appellate and collateral review rights shall preclude the Defendant from (a) appealing any restitution order the Court imposes; (b) appealing

the criminal fine if the Court does not credit the $243,600,000 previously paid by the Defendant pursuant to the DPA; or (c) raising a claim of ineffective assistance of counsel in an appropriate forum.

### Penalty

22.     The statutory maximum sentence that the Court can impose for a violation of Title 18, United States Code, Section 371, is a fine of $500,000 or twice the pecuniary gross gain or pecuniary gross loss resulting from the offense, whichever is greatest, Title 18, United States Code, Section 371 and Title 18, United States Code, Section 3571(c), (d); five years' probation, Title 18, United States Code, Section 3561(c)(1); and a mandatory special assessment of $400, Title 18, United States Code, Section 3013(a)(2)(B). In this case, the parties agree that the gross pecuniary gain resulting from the offense is $243,600,000. Therefore, pursuant to Title 18, United States Code, Section 3571(d), the parties agree the maximum fine that may be imposed is $487,200,000.

### Sentencing Recommendation

23.     The parties agree that pursuant to *United States v. Booker*, 543 U.S. 220 (2005), the Court must determine an advisory Sentencing Guidelines range. The Court will then determine a reasonable sentence within the statutory range after considering the advisory Sentencing Guidelines range and the factors listed in Title 18, United States Code, Section 3553(a). The parties' agreement herein to any Guideline sentencing factors constitutes proof of those factors sufficient to satisfy the applicable burden of proof. The Defendant also understands that if the Court accepts this Agreement, the Court is bound by the sentencing provisions in Paragraph 25.

24.     The Offices and the Defendant agree that a faithful application of the Sentencing Guidelines to determine the applicable fine range yields the following analysis:

a.     The 2018 U.S.S.G. are applicable to this matter.

b.   <u>Offense Level</u>. Based upon U.S.S.G. § 2B1.1, the total offense level is 34, calculated as follows:

| | | |
|---|---|---|
| (a)(2) | Base Offense Level | 6 |
| (b)(1)(N) | Amount of Loss/Gain | +26 |
| (b)(10) | Sophisticated Means | +2 |
| **TOTAL** | | 34 |

c.   <u>Base Fine</u>. Based upon U.S.S.G. § 8C2.4(a)(2), which imposes a base fine equal to the pecuniary gain to the organization from the offense if such gain is greater than the amount indicated in the Offense Level Fine Table, the base fine is $243,600,000 (representing Boeing's cost-savings, associated with the implementation of full-flight simulator training for the 737 MAX).

d.   <u>Culpability Score</u>. Based upon U.S.S.G. § 8C2.5, the culpability score is 5, calculated as follows:

| | | |
|---|---|---|
| (a) | Base Culpability Score | 5 |
| (b)(4) | the organization had 50 or more employees and an individual within substantial authority personnel participated in, condoned, or was willfully ignorant of the offense | +2 |
| (g)(2) | The organization cooperated in the investigation, and clearly demonstrated recognition and affirmative acceptance of responsibility for its criminal conduct | -2 |
| **TOTAL** | | 5 |

<u>Calculation of Fine Range</u>:

| | |
|---|---|
| Base Fine | $243,600,000 |
| Multipliers | 1.0 (min) / 2.0 (max) |
| Fine Range | $243,600,000 (min) / $487,200,000 (max) |

25.     Pursuant to Rule 11(c)(1)(C) of the Federal Rules of Criminal Procedure, the Offices and the Defendant agree that the following represents the appropriate sentence of the case:

a.      Disposition. The appropriate criminal fine is $487,200,000. This penalty reflects a fine at the top of the applicable Sentencing Guidelines fine range, which in this case is the statutory maximum fine. The parties recommend that when imposing sentence, the Court credit $243,600,000 previously paid by the Defendant pursuant to the DPA, resulting in a remaining criminal monetary penalty of $243,600,000 (the "Total Criminal Fine"), because the United States Sentencing Guidelines calculation set forth in this Agreement and in the DPA are the same and the penalty the Company paid pursuant to the DPA was based on this Guidelines calculation. The Defendant shall pay the fine imposed by the Court in full at the time of the entry of judgment following such sentencing hearing ("the recommended sentence").

b.      Mandatory Special Assessment. The Defendant shall pay to the Clerk of the Court for the United States District Court for the Northern District of Texas within ten (10) days of the time of sentencing the mandatory special assessment of $400.

c.      Restitution. Based on the offense charged in the Information, and the factual allegations establishing that offense set forth in the Information and Attachment A-2, restitution is discretionary pursuant to Title 18, United States Code, Section 3663, and not mandatory pursuant to Title 18, United States Code, Section 3663A. The Court will determine whether restitution is owed to any Crash Victim Family, whom the Court previously determined were directly and proximately harmed by the Defendant's conduct as charged in the Information, see 4:21-cr-5-O (ECF No. 116). The Offices retain the right to support any legally authorized claim for restitution presented by a Crash Victim Family. The Defendant retains the right to contest any restitution claim and make any argument related thereto, including but not limited to the argument that, with

respect to any restitution amount the Court determines the Defendant owes a Crash Victim Family, the Court should credit, and thus deduct from the restitution amount, any other amount the Defendant has previously paid to the Crash Victim Family. Any restitution ordered by the Court will be due and payable in accordance with the Court's order upon the completion of any timely and properly noticed appeal. The parties agree that no mandatory restitution is owed to such parties, and that the Court shall not order the Defendant to pay any restitution amount to the Defendant's airline entity customers, or any third parties asserting a restitution claim on behalf of an airline entity customer or derivative of a restitution claim of an airline entity customer, or any other third parties that may assert a restitution claim.

      d.     <u>Forfeiture</u>. Forfeiture is not applicable to the offense charged.

      e.     <u>Probation</u>. The Defendant shall serve a three-year term of organizational probation imposed pursuant to Title 18, United States Code, Sections 3551(c)(1) and 3561(c)(1). In the event the Offices find, in their sole discretion pursuant to Paragraph 14, that there exists a change in circumstances sufficient to eliminate the need for the Independent Compliance Monitor during the term of probation, the parties will submit a joint motion to modify the special conditions of probation to eliminate the special condition that the Company retain an Independent Compliance Monitor. Defendant will continue on probation until it has served the full three years, unless the Court approves early termination of probation. Conversely, in the event the Offices determine, in their sole discretion pursuant to Paragraph 14, to extend the term of the Independent Compliance Monitor beyond three years, the Court will determine whether to extend the Defendant's term of probation, consistent with Title 18, United States Code, Section 3565, to run concurrent with all or part of the extended term of the Independent Compliance Monitor. Pursuant to U.S.S.G. §§

8B1.2, 8D1.3, and 8D1.4, the term of probation shall include as conditions the obligations set forth in Paragraphs 7(a)-(j), 11, and 12 above and Paragraphs 25(a)-(h).

       f.       <u>Probation Condition – Retention of Independent Compliance Monitor</u>. A condition of probation shall be that the Defendant retain an Independent Compliance Monitor, as provided in Paragraph 7(j). However, the condition of probation is limited to the retention of the Independent Compliance Monitor—not oversight of the Independent Compliance Monitor or the Company's compliance with the Independent Compliance Monitor's recommendations. Rather, the Independent Compliance Monitor will report to and be overseen by the Offices. The Independent Compliance Monitor's selection process, mandate, duties, review, and certification as described in Paragraphs 29-37 and Attachment D, and the Defendant's compliance obligations as described in Paragraphs 7(k), 8, and 9 and Attachment C, are not conditions of probation.

       g.       <u>Probation Condition – Safety and Compliance Investment</u>. A condition of probation shall be that over the term of probation, the Defendant shall invest in its compliance, quality, and safety programs, a total of at least $455,000,000, representing on an average annual basis an increase of approximately 75% above the Defendant's previously planned expenditures on its corporate compliance program for fiscal year 2024.[1] The Defendant shall periodically, and no less than annually, provide proof of the accumulated investment amounts to the Offices and the Probation Office. Expenditures the Defendant makes to implement internal support to, or the recommendations of, the Independent Compliance Monitor are qualifying investments, but not the fees and costs the Defendant pays for the services of the Independent Compliance Monitor and the Independent Compliance Monitor's team.

---

[1] Nothing in this Agreement can be construed as establishing, interpreting, or modifying any aviation safety standard or requirement applicable to Defendant's operations or products that exist under federal law, regulation, and guidance, or as otherwise established and overseen by the Federal Aviation Administration.

h.      <u>Probation Condition – Meeting Between Board of Directors and Crash Victim Families</u>. A condition of probation shall be that the Defendant ensure that its Board of Directors holds a meeting with the Crash Victim Families, should they wish to attend, and their legal representatives within four (4) months after the Defendant is sentenced. The Defendant shall meet and confer with the representatives of the Crash Victim Families in a good faith effort to select a mutually agreeable date and location for the meeting. To facilitate the in-person attendance of the greatest number of attendees practicable, the meeting will be scheduled to occur near in time with a regularly scheduled meeting of the Board of Directors. The meeting will be held in person with an option for Crash Victim Families and their legal representatives and Boeing Board members located outside the United States to join virtually if they choose not to attend in person, though at least 80 percent of Boeing Board members must attend in person. The Defendant shall arrange and pay for interpreters to provide translation services during the meeting for the following languages, if needed: Amharic, Bahasa, French, German, Mandarin and Norwegian. The Boeing Board members shall be present for the entirety of the meeting. The purpose of the meeting is for the Board of Directors to hear from the Crash Victim Families about the impact of the Defendant's conduct and recommendations for the Defendant to improve its compliance, safety, and quality programs. Within three (3) business days after the meeting, the Defendant shall confirm to the Offices and the Probation Office that the meeting took place.

26.     This Agreement is presented to the Court pursuant to Rule 11(c)(1)(C) of the Federal Rules of Criminal Procedure. The Defendant understands that, if the Court rejects this Agreement, the Court must: (a) inform the parties that the Court rejects the Agreement; (b) advise the Defendant's counsel that the Court is not required to follow the Agreement and afford the Defendant the opportunity to withdraw its plea; and (c) advise the Defendant that if the plea is not

withdrawn, the Court may dispose of the case less favorably toward the Defendant, if the Defendant ultimately were prosecuted and convicted, than the Agreement contemplated. The Defendant further understands that if the Court refuses to accept any provision of this Agreement, neither party shall be bound by the provisions of the Agreement.

27.     The Defendant and the Offices waive the preparation of a Pre-Sentence Investigation Report ("PSR") and intend to seek a sentencing by the Court immediately following the Rule 11 hearing in the absence of a PSR. The Defendant understands that the decision whether to proceed with the sentencing proceeding without a PSR is exclusively that of the Court. In the event the Court directs the preparation of a PSR, the Offices will fully inform the preparer of the PSR and the Court of the facts and law related to the Defendant's case.

28.     Notwithstanding the preceding Paragraph, for the purposes of addressing restitution, the Defendant and the Offices intend to request that the Court (a) order the Probation Officer to prepare a report with information sufficient for the Court to exercise its discretion in fashioning a restitution order, pursuant to Title 18, United States Code, Section 3664(a); and (b) schedule a restitution hearing to be held no more than ninety (90) days after sentencing for the Court to make a final determination of any restitution amount the Defendant owes, pursuant to Title 18, United States Code, Section 3664(d)(5).

**Independent Compliance Monitor**

29.     Promptly after the Offices' selection pursuant to Paragraph 35 below, the Defendant agrees to retain an Independent Compliance Monitor for the Term specified in Paragraph 14. The Independent Compliance Monitor's duties and authority, and the obligations of the Defendant with respect to the Independent Compliance Monitor and the Offices, are set forth in Attachment D, which is incorporated by reference into this Agreement.

30.     On the date this Agreement is accepted by the Court, the Offices will solicit applications for Independent Compliance Monitor candidates on its public website. Independent Compliance Monitor candidates shall have fourteen (14) days after the publication of the solicitation to submit a written application to the Offices, providing, at a minimum, the following:

a.      a description of the candidate's qualifications and credentials in support of the evaluative considerations and factors listed below;

b.      proposed members of the monitorship team and their qualifications and credentials in support of the minimum requirements listed below;

c.      proposed methodology for testing and review to carry out the Independent Compliance Monitor's mandate as articulated in Attachment D;

d.      proposed rates for each member of the monitorship team and estimated cost of the monitorship based on the Independent Compliance Monitor mandate articulated in Attachment D;

e.      a written certification by the candidate (and each proposed member of the monitorship team) that he/she will not be employed by or be affiliated with the Defendant for a period of not less than three years from the date of the termination of the monitorship;

f.      a written certification by the candidate (and each proposed member of the monitorship team) that he/she has no personal, professional, or financial interest in the Defendant or any legal matters involving the Defendant;

g.      a written response to a conflict/ethics questionnaire, including disclosing whether the candidate (and each proposed member of the monitorship team) is a current or prior employee, agent, or representative of the Defendant, its competitors, its customers, the crash victims or their families, or any individuals involved in a safety incident involving the Defendant,

or holds a personal, professional, or financial interest in, or has a relationship with, or is involved in any legal matters involving the Defendant, its subsidiaries, affiliates, or related entities, or its employees, officers, or directors, its competitors, its customers, the crash victims or their families, or any individuals involved in a safety incident involving the Defendant. This disclosure will also address whether any applicant has taken—or is a member of or affiliated with any organization that has taken—a position or issued any public statement concerning Boeing or the Lion Air Flight 610 and Ethiopian Airlines Flight 302 accidents; and

       h.    a written certification by the candidate that he/she (and each proposed member of the monitorship team) has either obtained written informed consent from any clients that the candidate (and each proposed member of the monitorship team) represents in a matter involving the Offices to apply to be an Independent Compliance Monitor, and if selected, to serve as an Independent Compliance Monitor or has withdrawn as counsel in the other matter(s).

    31.    The Independent Compliance Monitor candidates and their team members shall have, at a minimum, the following qualifications (additional preferred qualifications will be articulated in the posting):

       a.    demonstrated expertise with respect to U.S. fraud laws, including experience counseling on anti-fraud compliance issues;

       b.    previous service as an independent compliance monitor or other substantial demonstrated experience designing, evaluating, or administrating corporate compliance programs and internal controls, including anti-fraud policies, procedures, and internal controls, for a publicly traded company;

       c.    the ability to access and deploy resources as necessary to discharge the Independent Compliance Monitor's duties as described in the Agreement; and

d.        sufficient independence from the Defendant, its competitors, and any individuals involved in a safety incident involving the Defendant, among others, to ensure effective and impartial performance of the Independent Compliance Monitor's duties as described in the Agreement.

32.    The Offices shall select six (6) candidates that meet the requirements in Paragraphs 30 and 31 above. Each of the six candidates will meet with the Defendant, and the Offices would then solicit feedback from the candidates and the Defendant. If the Defendant believes in good faith that any of the six candidates do not meet the requirements in Paragraphs 30 and 31 above or is an otherwise inappropriate selection, and the Offices concur, the Offices will identify another candidate or candidates and the process will continue until the Offices have a pool of six qualified candidates.

33.    The Defendant shall have the opportunity to strike one (1) of the six (6) candidates from the final pool identified by the Offices. The Offices retain the right, in their sole discretion, to select the Independent Compliance Monitor from the remaining pool of at least five (5) Independent Compliance Monitor candidates. Independent Compliance Monitor selections shall be made in keeping with the Department's commitment to diversity and inclusion. The Offices will use their best efforts to complete the selection process within ninety (90) days of the execution of this Agreement. If the Independent Compliance Monitor resigns or is otherwise unable to fulfill his or her obligations as set out herein and in Attachment D, the Offices shall within thirty (30) days choose a replacement from the remaining pool of candidates. The term, however, will run from the date the first Independent Compliance Monitor was retained.

34.    The process for ultimate approval of the Independent Compliance Monitor candidate and monitorship team will include voting by the Criminal Division's Standing

Committee on Monitor Selection, review of the selection by the head of the Criminal Division, and approval by the Office of the Deputy Attorney General, consistent with Sections E.3 through E.6 of the Criminal Division's Revised Memorandum on Selection of Monitors in Criminal Division Matters, dated March 1, 2023, *available at* https://www.justice.gov/criminal/criminal-fraud/file/1100366/dl.

35.     The Offices will notify the Court under seal of their intent to select a certain candidate as Independent Compliance Monitor; and after ten (10) days, the Offices will finalize the selection and appoint the Independent Compliance Monitor.

36.     The Independent Compliance Monitor's term shall be three years from the date on which the Independent Compliance Monitor is retained by the Defendant, subject to extension or early termination as described in Paragraph 14.

37.     The Independent Compliance Monitor's powers, duties, and responsibilities, as well as additional circumstances that may support an extension of the Independent Compliance Monitor's term, are set forth in Attachment D. The Defendant agrees that it will not employ or be affiliated with the Independent Compliance Monitor (and each proposed member of the monitorship team) or the Independent Compliance Monitor's employer (and the employer for each proposed member of the monitorship team) for a period of not less than three years from the date on which the Independent Compliance Monitor's term expires. Nor will the Defendant discuss with the Independent Compliance Monitor (and each proposed member of the monitorship team) or the Independent Compliance Monitor's employer (and the employer for each proposed member of the monitorship team) the possibility of further employment or affiliation during the Independent Compliance Monitor's term. Upon agreement by the parties, this prohibition will not apply to other monitorship responsibilities that the Independent Compliance Monitor or the

Independent Compliance Monitor's firm may undertake in connection with related resolutions with foreign or other domestic authorities.

**Breach of Agreement**

38.     If, during the term, the Defendant (a) commits any felony under U.S. federal law; (b) provides in connection with this Agreement deliberately false, incomplete, or misleading information; (c) fails to cooperate as set forth in Paragraphs 11 and 12 of this Agreement; (d) fails to implement a compliance program as set forth in Paragraphs 8 and 9 of this Agreement and Attachment C; (e) commits any acts that, had they occurred within the jurisdictional reach of the U.S. fraud laws, would be a violation of the U.S. fraud laws; or (f) otherwise fails specifically to perform or to fulfill completely each of the Defendant's obligations under the Agreement, and is found to have breached the Agreement by the Court pursuant to Paragraph 39 or by the Offices pursuant to Paragraph 40, regardless of whether the Offices become aware of such a breach after the Term, the Defendant shall thereafter be subject to prosecution for any federal criminal violation of which the Offices have knowledge, including, but not limited to, additional charges arising out of the conduct described in the Statement of Facts attached as Attachment A-2, distinct from the charges in the Information described in Paragraph 1, as well as charges related to any additional criminal conduct, if appropriate. Such charges may be pursued by the Offices in the U.S. District Court for the Northern District of Texas or any other appropriate venue. Determination of whether the Defendant has breached the Agreement and whether to pursue prosecution of the Defendant shall be in the Offices' sole discretion. Any such prosecution may be premised on information provided by the Defendant or its personnel. Any such prosecution relating to the conduct described in the Statement of Facts attached to this Agreement as Attachment A-2 or relating to conduct known to the Offices prior to the date on which this Agreement was signed that is not time-barred

28

by the applicable statute of limitations on the date of the signing of this Agreement may be commenced against the Defendant, notwithstanding the expiration of the statute of limitations, between the signing of this Agreement and the expiration of the Term plus one year. Thus, by signing this Agreement, the Defendant agrees that the statute of limitations with respect to any such prosecution that is not time-barred on the date of the signing of this Agreement shall be tolled for the Term plus one year. The Defendant gives up all defenses based on the statute of limitations, any claim of pre-indictment delay, or any speedy trial claim with respect to any such prosecution or action, except to the extent that such defenses existed as of the date of the signing of this Agreement. In addition, the Defendant agrees that the statute of limitations as to any violation of federal law that occurs during the term of the cooperation obligations provided for in Paragraph 11 of the Agreement will be tolled from the date upon which the violation occurs until the earlier of the date upon which the Offices are made aware of the violation or the duration of the term plus five years, and that this period shall be excluded from any calculation of time for purposes of the application of the statute of limitations.

39.    If the Offices determine that the Defendant has breached any obligations that are also conditions of probation—specifically Paragraphs 7(a)–(j), 11, 12, or 25—the Offices will notify the Defendant, and the Defendant will have the ability to respond as described in Paragraph 41. If, after review of the Defendant's response, the Offices maintain that the Defendant has breached, they will notify the Probation Office and the Court. If the Court finds that such a breach and corresponding probation violation occurred, the Offices may pursue prosecution of the Defendant as discussed in Paragraph 38.

40.    Determination of whether the Defendant has breached any other obligations—that are not also conditions of probation—shall be in the sole discretion of the Offices.

41.     In the event that the Offices determine that the Defendant has breached this Agreement—whether the breach is of a condition of probation or not—the Offices agree to provide the Defendant with written notice of such breach prior to instituting any prosecution resulting from such breach. Within thirty (30) days of receipt of such notice, the Defendant shall have the opportunity to respond to the Offices in writing to explain the nature and circumstances of such breach, as well as the actions the Defendant has taken to address and remediate the situation, which explanation the Offices shall consider in determining next steps pursuant to Paragraph 38.

42.     In the event that the Offices determine that the Defendant has breached this Agreement: (a) all statements made by or on behalf of the Defendant to the Offices or to the Court, including the Statement of Facts attached hereto as Attachment A-2, and any testimony given by the Defendant before a grand jury, a court, or any tribunal, or at any legislative hearings, whether prior or subsequent to this Agreement, and any leads derived from such statements or testimony, shall be admissible in evidence in any and all criminal proceedings brought by the Offices against the Defendant; and (b) the Defendant shall not assert any claim under the United States Constitution, Rule 11(f) of the Federal Rules of Criminal Procedure, Rule 410 of the Federal Rules of Evidence, or any other federal rule that any such statements or testimony made by or on behalf of the Defendant prior or subsequent to this Agreement, or any leads derived therefrom, should be suppressed or are otherwise inadmissible. The decision whether conduct or statements of any current director, officer or employee, or any person acting on behalf of, or at the direction of, the Defendant, will be imputed to the Defendant for the purpose of determining whether the Defendant has violated any provision of this Agreement shall be in the sole discretion of the Offices.

43.     The Defendant acknowledges that the Offices have made no representations, assurances, or promises concerning what sentence may be imposed by the Court if the Defendant

breaches this Agreement and is subsequently prosecuted for any crime, or if the breach constitutes a violation of the Defendant's probation. The Defendant further acknowledges that any such sentence is solely within the discretion of the Court and that nothing in this Agreement binds or restricts the Court in the exercise of such discretion.

## Public Statements by the Defendant

44.     The Defendant expressly agrees that it shall not, through present or future attorneys, officers, directors, employees, agents or any other person authorized to speak for the Defendant make any public statement, in litigation or otherwise, contradicting the acceptance of responsibility by the Defendant set forth above or the facts described in the Information and Attachment A-2. Any such contradictory statement shall, subject to cure rights of the Defendant described below, constitute a breach of this Agreement, and the Defendant thereafter shall be subject to prosecution as set forth in Paragraphs 38-43 of this Agreement. The decision whether any public statement by any such person contradicting a fact contained in the Information or Attachment A-2 will be imputed to the Defendant for the purpose of determining whether it has breached this Agreement shall be at the sole discretion of the Offices. If the Offices determine that a public statement by any such person contradicts in whole or in part a statement contained in the Information or Attachment A-2, the Offices shall so notify the Defendant, and the Defendant may avoid a breach of this Agreement by publicly repudiating such statement(s) within five (5) business days after notification. The Defendant shall be permitted to raise defenses and to assert affirmative claims in other proceedings relating to the matters set forth in the Information and Attachment A-2 provided that such defenses and claims do not contradict, in whole or in part, a statement contained in the Information or Attachment A-2. This Paragraph does not apply to any statement made by any present or former officer, director, employee, or agent of the Defendant in the course of any

criminal, regulatory, or civil case initiated against such individual, unless such individual is speaking on behalf of the Defendant.

45.     The Defendant agrees that if it or any of its direct or indirect subsidiaries or affiliates over which the Defendant exercises control issues a press release or holds any press conference in connection with this Agreement, the Defendant shall first consult the Offices to determine (a) whether the text of the release or proposed statements at the press conference are true and accurate with respect to matters between the Offices and the Defendant; and (b) whether the Offices have any objection to the release or statement.

## **Complete Agreement**

46.     This document states the full extent of the Agreement between the parties. There are no other promises or agreements, express or implied. Any modification of this Agreement shall be valid only if set forth in writing in a supplemental or revised plea agreement signed by all parties.

**AGREED:**

**FOR THE BOEING COMPANY:**

Date: _____          By:    _____
                                   [NAME]
                                   President and Chief Executive Officer
                                   THE BOEING COMPANY

Date: _____          By:    _____
                                   [NAME]
                                   Chief Legal Officer and Executive Vice
                                   President, Global Compliance
                                   THE BOEING COMPANY

Date: _____          By:    _____
                                   [OUTSIDE COUNSEL FOR COMPANY]
                                   [LAW FIRM]

Outside counsel for [COMPANY]

Date: _____        By: _____
                                  [OUTSIDE COUNSEL FOR COMPANY]
                                  [LAW FIRM]
                                  Outside counsel for [COMPANY]


**FOR THE DEPARTMENT OF JUSTICE:**


Date:                            GLENN S. LEON
                                 Chief, Fraud Section, Criminal Division
                                 United States Department of Justice


                             By: _____
                                  [TRIAL ATTORNEY]


Date:                            LEIGHA SIMONTON
                                 United States Attorney
                                 Northern District of Texas


                             By: _____
                                  [ASSISTANT U.S. ATTORNEY]

**ATTACHMENT A-1**

**FACTUAL BASIS FOR BREACH**

1.      The United States' Factual Basis for the Breach of the January 7, 2021 Deferred Prosecution Agreement (the "DPA"), which DPA was between the United States Department of Justice, Criminal Division, Fraud Section (the "Fraud Section") and the United States Attorney's Office for the Northern District of Texas (the "USAO-NDTX") (collectively, the "Offices"), and the Defendant, The Boeing Company ("Defendant," "Boeing," or the "Company") is incorporated by reference as part of the plea agreement, dated [ ] between the Offices and Boeing. The parties stipulate that the representations and views herein belong to the Offices.

## I.     Background and Relevant DPA Obligations

2.      On January 7, 2021, the United States filed a one-count criminal Information (the "Information") in the United States District Court for the Northern District of Texas, charging Boeing with one count of conspiracy to defraud the United States, in violation of Title 18, United States Code, Section 371, that is, knowingly and willfully, and with the intent to defraud, conspired and agreed together with others to defraud the United States by impairing, obstructing, defeating, and interfering with, by dishonest means, the lawful function of a United States government agency, to wit, the Federal Aviation Administration Aircraft Evaluation Group ("FAA AEG") within the United States Department of Transportation, in connection with the FAA AEG's evaluation of the Boeing 737 MAX airplane's Maneuvering Characteristics Augmentation System, including for purposes of the 737 MAX Flight Standardization Board Report and the 737 MAX differences-training determination. *See United States v. The Boeing Company*, 21-cr-00005-O (ECF No. 1).

3. The same day, the United States also filed the DPA between the United States and Boeing. *See* ECF No. 4. In exchange for Boeing agreeing, among other things, "to implement a compliance and ethics program designed, implemented, and enforced to prevent and detect violations of the U.S. fraud laws throughout its operations," the United States agreed to defer prosecution of Boeing for the conduct set forth in the Statement of Facts attached to the DPA, including the conspiracy charged in the Information, for the three-year term of the DPA. *Id*. ¶¶ 21, 22, 24. The United States further agreed that, if Boeing complied fully with the terms of the DPA, the United States would move to dismiss the Information described in Paragraph 1 of the DPA six months after the term of the DPA expired. *Id*. ¶ 25. The DPA provided, however, that if the United States determined during the six-month period following the end of the term of the DPA that Boeing had breached the DPA during the DPA term, the United States could pursue remedies for the breach, including by prosecuting the Company for any federal criminal violation of which the Offices have knowledge, including, but not limited to, the charges in the Information. *Id*. ¶¶ 25–26. As part of the DPA, the Company also agreed, among other things, to pay a criminal monetary penalty of $243,600,000, an Airline Compensation Amount of $1,770,000,000, and a Crash-Victim Beneficiaries Compensation Amount of $500,000,000 to the heirs, relatives, and/or legal beneficiaries of the crash victims of Lion Air Flight 610 and Ethiopian Airlines Flight 302. *Id*. ¶¶ 10, 12, 13.

4. Relevant to the United States' breach determination, Paragraphs 21 and 22 of the DPA state:

> 21. The Company represents that it has implemented and will continue to implement a compliance and ethics program designed, implemented, and enforced to prevent and detect violations of the U.S. fraud laws throughout its operations, including those of its subsidiaries, affiliates, agents, and joint ventures, and those of its contractors and subcontractors whose responsibilities relate to the

Company's interactions with any domestic or foreign government agency (including the FAA), regulator, or any of its airline customers, including, but not limited to, the minimum elements set forth in Attachment C.

22.     In order to address any deficiencies in its internal controls, policies, and procedures, the Company represents that it has undertaken, and will continue to undertake in the future, in a manner consistent with all of its obligations under this Agreement, a review of its existing internal controls, policies, and procedures regarding compliance with U.S. fraud laws, focusing on the Company's interactions with domestic or foreign government agencies (including the FAA), regulators, and any of its airline customers. Where necessary and appropriate, the Company agrees to adopt a new compliance program, or to modify its existing one, including internal controls, compliance policies, and procedures in order to ensure that it maintains an effective compliance program, including a system of internal controls, designed to effectively detect and deter violations of U.S. fraud laws. The compliance program, including the internal controls system, will include, but not be limited to, the minimum elements set forth in Attachment C [which outlined the requirements for the Company's compliance program].

## II.     The United States' Breach Determination

5.      At the time of the conduct described in Attachment A-2, Boeing did not have a centralized compliance function. Boeing appointed its first Global Chief Compliance Officer ("CCO") and established its Global Compliance function ("Global Compliance" or "Compliance") in May of 2020. During the term of the DPA, Boeing took considerable steps to enhance the independence, capability, and effectiveness of its compliance program. Among other things, Boeing enhanced its annual Compliance Risk Management process, including in ways that strengthened compliance controls with respect to potential safety and quality risks, and took steps to integrate compliance efforts across its business. As direct remediation of the charged misconduct, Boeing implemented policies and procedures to manage and coordinate the formal communication of information between Boeing and its regulators and customers and mandatory training regarding transparency in interactions with regulators and customers. Despite these

enhancements, in the Offices' view, Boeing failed to sufficiently extend its anti-fraud ethics and compliance program over its quality and manufacturing process before the end of the DPA term. As a result, the Department determined that Boeing's anti-fraud compliance program still has significant gaps.

6.      The United States, in an exercise of the discretion conferred upon it by the agreed upon terms of the DPA (namely, Paragraph 26 of the DPA), has determined that Boeing violated Paragraphs 21 and 22 and Attachment C of the DPA and declared a breach of the DPA on May 14, 2024. Relevant considerations in arriving at that determination and making that declaration include the following:

- Boeing failed to fully satisfy the requirement to "create and foster a culture of ethics and compliance with the law in its day-to-day operations," Attachment C ¶ 1, by failing to mitigate known manufacturing and quality risks;

- Boeing failed to fully satisfy the requirement to implement "compliance policies and procedures designed to reduce the prospect of violations of U.S. fraud laws and the Company's compliance code," Attachment C ¶ 3, by failing to design a compliance and ethics program that included sufficient anti-fraud oversight of Boeing's quality and safety processes;

- Boeing failed to fully satisfy the requirement to implement "compliance policies and procedures designed to reduce the prospect of violations of U.S. fraud laws and the Company's compliance code," Attachment C ¶ 3, by failing to implement sufficient controls concerning the risk that Boeing's airworthiness certifications to the FAA could be incomplete, inaccurate, false and/or fraudulent;

- Boeing failed to fully satisfy the requirement to implement "compliance policies and procedures designed to reduce the prospect of violations of U.S. fraud laws and the Company's compliance code," Attachment C ¶ 3, by failing to implement sufficient controls concerning the risk of incomplete, inaccurate, false and/or fraudulent statements in Boeing's manufacturing records; and

- Boeing failed to fully satisfy the requirement to appropriately develop and adjust "compliance policies and procedures on the basis of a periodic risk assessment addressing the individual circumstances of the Company," Attachment C ¶ 4, and to review and update such policies "as appropriate to ensure their continued effectiveness," Attachment C ¶ 5, in light of known manufacturing and quality risks,

and the attendant risks of incomplete, inaccurate, false, and/or fraudulent statements to the FAA.

**III.**   **Failure to Extend Anti-Fraud Compliance Program Over Quality and Manufacturing Processes**

7.      Before delivering a 737 MAX aircraft to a U.S. customer, Boeing must apply to the FAA for a U.S. Airworthiness Certificate for each aircraft. In so doing, Boeing certifies to the FAA "that the aircraft has been inspected and is airworthy," meaning, "the aircraft conforms to its type design and is in a condition for safe operation." FAA Form 8130-6; 14 C.F.R. § 3.5. A Boeing employee makes this certification in reliance on the completeness, accuracy, and truthfulness of the Company's build records and the effectiveness of related manufacturing and quality processes. Although Boeing knew about manufacturing, quality, safety, and anti-fraud risks capable of undermining the completeness, accuracy, and truthfulness of those records, Boeing did not implement additional or sufficient controls concerning the risk that its certifications of airworthiness to the FAA could be incomplete, inaccurate, false and/or fraudulent and that aircraft delivered to its customers "conforms to its type design and is in a condition for safe operation." The Department has determined that these failures breached the DPA, as set forth above and below.

**A.**   **Out-of-Sequence Work**

8.      Boeing's instructions for aircraft assembly require assembly to occur in a particular sequence. When a sequenced step is performed inadequately or not completed, it may be discovered and corrected at a later stage. Correction of the inadequate or incomplete work must then be done "out-of-sequence." Out-of-sequence work is more difficult to perform, increases the risk that defects in manufacturing will occur, and may require installed parts to be removed and later re-installed.

9.      Between 2021 and 2023, Boeing conducted several Safety Risk Management assessments that identified out-of-sequence work as a risk factor that could cause the delivery of

an "unairworthy" or non-conforming aircraft to Boeing's customers. Despite the acknowledgement of this risk, the Safety Risk Management assessments did not sufficiently consider measures to reduce out-of-sequence work. Boeing senior executives prioritized the movement of aircraft through Boeing's factories over reducing out-of-sequence work to ensure production quality. Boeing did not implement sufficient policies or procedures to mitigate the risk posed by out-of-sequence work.

10.     Moreover, although fraud is an inherent risk in production and quality compliance activities, Boeing's Safety Risk Management assessments also failed to identify out-of-sequence risk as a fraud risk or consider enhanced production procedures, or preventive or detective controls, to mitigate the risk. Boeing's Global Compliance function, which is responsible for Boeing's anti-fraud ethics and compliance program, was not involved in the Safety Risk Assessments. Compliance therefore did not evaluate fraud risks associated with out-of-sequence work, including the risk of incomplete, inaccurate, false, and/or fraudulent statements to the FAA.

11.     The United States has determined that Boeing's failure to identify and adjust its ethics and compliance program to address the anti-fraud risks attendant to out-of-sequence work violated its obligation to meet the compliance program standards required by DPA Attachment C, including Paragraphs 1, 4, and 5.

### B.     Completeness of Records

12.     Boeing's airworthiness certifications to the FAA rely on the completeness and accuracy of Boeing's build records and the effectiveness of related manufacturing and quality processes. If installed parts are later removed during manufacturing, Boeing policy requires Boeing employees to document the removal in certain written records. The creation of a removal record initiates a process to ensure proper reinstallation of the part and record the individuals involved in removal, reinstallation, and reinspection. If a removal record was not completely

resolved in Boeing's computer systems, including reinstallation and reinspection, a Boeing employee would not certify an aircraft as airworthy to the FAA.

13.     A failure to create a removal record prevents Boeing from verifying that parts are correctly or completely re-installed and that its certification stating that the plane is "airworthy" is accurate. This recordkeeping failure could also undermine Boeing's processes for effectively responding to, investigating, and remediating potential allegations of violations of the U.S. fraud laws or the Company's compliance code, policies, and procedures, in part because Boeing could lack records of who was involved in removing, reinstalling, and reinspecting disturbed installations and what they did. *See* DPA Attachment C ¶ 10.

14.     Boeing received numerous reports of incidents of non-compliance with its policy governing removals throughout the DPA term. In addition, since 2019, the FAA has issued numerous formal or informal actions to Boeing related to Boeing's policy governing removals. Compliance was not sufficiently involved in root cause analysis, remediation, or risk mitigation related to this process, notwithstanding the (1) impact non-compliance with Boeing's policy governing removals could have on Boeing's representations regarding its aircraft, and (2) recordkeeping consequences. Boeing failed to meet the compliance program standards required by DPA Attachment C, including Paragraphs 3, 4, and 5.

### C.     Stamping Issues in Build Records

15.     Throughout the build process, Boeing mechanics and inspectors affirm (or "stamp") that they have completed work in conformance with requirements. Stamped manufacturing and quality records are important for Boeing's certification to the FAA that an aircraft is airworthy. All build plans and required inspections must be stamped by Boeing employees as complete to requirements before a Boeing employee certifies an aircraft as airworthy to the FAA. Boeing relies on those build and quality stamping records to certify to the FAA that an aircraft is airworthy. False

statements in Boeing's build records pose a fraud risk because they could undermine the completeness, accuracy, and truthfulness of Boeing's representations and certifications to the FAA regarding its aircraft, among other issues. Boeing received hundreds of reports of stamping non-compliance through its internal reporting channels. Boeing Compliance identified this anti-fraud risk during the DPA term and issued training and communications throughout the Company in response to the risk. Despite awareness of stamping non-compliance reports, Boeing did not conduct sufficient testing to evaluate whether its stamping integrity communications and training efforts were effective in practice and stamping issues persisted.

16.     In or around April 2024, Boeing disclosed to the Fraud Section false stamping during the DPA term at the Boeing 787 manufacturing facility in Charleston, South Carolina. The false stamps caused Boeing's quality management systems to reflect that all required steps were complete, when they were not. Employees involved in the false stamping did not understand Boeing's stamping policy, were not familiar with its requirements, and were not effectively trained on it. Because the build and quality records are the cornerstone of Boeing's certification that aircraft conform to their approved type design, the lack of understanding by Boeing employees of the importance of and requirements for stamping integrity calls into question the effectiveness of Boeing's anti-fraud compliance program with respect to the certifications.

17.     These reported stamping issues highlighted several shortcomings in Boeing's anti-fraud compliance program with respect to stamping integrity, including the following weaknesses:

- Boeing did not effectively evaluate its stamping policy to ensure it was effective. Specifically, Boeing failed to measure employee understanding of the policy, including whether employees understood that stamping, build, and quality records were the basis for Boeing's certification to the FAA of airworthiness.

- Boeing did not effectively ensure compliance with its stamping policy.

- Boeing did not implement enhanced or remedial controls to prevent or detect stamping policy violations. Rather, Boeing continued to rely on its existing build

and inspection record process to support its certification to the FAA of aircraft airworthiness.

18.     Complete, accurate, and truthful build records are the basis for Boeing's certification of airworthiness to the FAA. In the face of known manufacturing, quality, safety, and anti-fraud risks which undermine the completeness, accuracy, and truthfulness of those records, Boeing failed to implement additional or sufficient controls concerning the risk that certifications of airworthiness to the FAA could be incomplete, inaccurate, false and/or fraudulent and that aircraft delivered to its customers "conform[] to its type design and is in a condition for safe operation," in violation of the compliance program standards required by DPA Attachment C, including Paragraphs 3, 4, and 5.

**ATTACHMENT A-2**

**STATEMENT OF FACTS**

1.      The following Statement of Facts is incorporated by reference as part of the Plea Agreement between the United States Department of Justice, Criminal Division, Fraud Section (the "Fraud Section"), the United States Attorney's Office for the Northern District of Texas (the "USAO-NDTX") and The Boeing Company ("Boeing" or the "Company").  The Company hereby agrees and stipulates that the following information is true and accurate.  The Company admits, accepts, and acknowledges that it is responsible for the acts of its officers, directors, employees, and agents as set forth below.  The following facts establish beyond a reasonable doubt the offense with which Boeing is charged in the criminal Information, Conspiracy to Defraud the United States, in violation of Title 18, United States Code, Section 371, as well as the pecuniary gross gain the Company derived from committing the offense:

**Background**

At all times relevant to this Statement of Facts, with all dates being approximate and inclusive:

*Boeing's New Airplane:  The 737 MAX*

2.      Boeing was a U.S.-based multinational corporation that designed, manufactured, and sold commercial airplanes to airlines worldwide.  Boeing operated from various locations, including in and around Seattle, Washington.

3.      Boeing's airline customers included major U.S.-based airlines headquartered in the Northern District of Texas and elsewhere.

4.      The Boeing 737 was a commercial airplane that could seat approximately 200 passengers and was one of Boeing's best-selling airplane models.  Boeing began designing,

manufacturing, and selling the Boeing 737 in the 1960s. Over time, Boeing designed, manufactured, and sold new versions of the Boeing 737 to its airline customers, including major U.S.-based airlines.

5.       In or around June 2011, Boeing began developing and marketing a new version of its Boeing 737 called the 737 MAX. The 737 MAX was designed by Boeing as a competitive answer to a new version of an airplane developed by one of Boeing's top rivals in commercial airplanes, Company-1. Like the new version of Company-1's airplane, the 737 MAX promised increased fuel efficiency over its prior version, the 737 Next Generation ("737 NG"). With this increased efficiency, the 737 MAX offered fuel-cost savings for airlines.

*The FAA AEG's Role in Determining Pilot "Differences Training" for New Airplanes*

6.       Before any U.S.-based airline could operate a new commercial airplane, U.S. regulations required the Federal Aviation Administration ("FAA"), an organization within the United States Department of Transportation, to evaluate and approve the airplane for commercial use. Without this approval, a U.S.-based airline would not be permitted to operate the airplane.

7.       As part of this evaluation and approval process, the FAA had to make two distinct determinations: (i) whether the airplane met U.S. federal airworthiness standards; and (ii) what minimum level of pilot training would be required for a pilot to fly the airplane for a U.S.-based airline. These two determinations were made by entirely different groups within the FAA that were composed of different personnel with different organizational structures and different reporting lines.

8.       The FAA Aircraft Evaluation Group ("AEG") was principally responsible for determining the minimum level of pilot training required for a pilot to fly the airplane for a U.S.-based airline. To make that determination, the FAA AEG compared the new version of the

airplane (such as the 737 MAX) to a similar, prior version of the airplane (such as the 737 NG). After evaluating the differences between the new and prior versions of the airplane, the FAA AEG mandated the minimum level of pilot training, known as "differences training," for the new version.

9.     Based on the nature and extent of the differences between the new and prior version of the airplane, the FAA AEG assigned a level of differences training ranging from "Level A" through "Level E."  These levels of differences training ranged in rigor, with "Level A" being the least intensive and "Level E" being the most intensive.  As relevant here, "Level B" differences training generally included computer-based training ("CBT") training, and "Level D" differences training generally included full-flight simulator training.

10.     At the conclusion of the FAA's evaluation of the new version of the airplane, the FAA AEG published a Flight Standardization Board Report ("FSB Report").  Among other things, the FSB Report contained relevant information about certain airplane systems and parts that the airplane manufacturer was required to incorporate into airplane manuals and pilot-training materials for all U.S.-based airlines that would fly the airplane.  The FSB Report also contained the FAA AEG's differences-training determination.

## Boeing's 737 MAX Chief Technical Pilots

11.     Boeing's 737 MAX Flight Technical Team was principally responsible for identifying and providing to the FAA AEG all information that was relevant to the FAA AEG in connection with the FAA AEG's publication of the 737 MAX FSB Report.  The 737 MAX Flight Technical Team was separate and distinct from another group within Boeing that was responsible for providing information to the FAA for certification of whether the airplane met U.S. federal airworthiness standards.

12.     From in or around early 2012 until in or around early 2014, Boeing Employee-1 was a Technical Pilot for Boeing's 737 MAX Flight Technical Team.  In or around early 2014, Boeing Employee-1 became Boeing's 737 MAX Chief Technical Pilot.  In that role, Boeing Employee-1 led the 737 MAX Flight Technical Team. In or around July 2018, Boeing Employee-1 left Boeing to work for a major U.S.-based airline.

13.     From in or around mid-2014 until in or around July 2018, Boeing Employee-2 was a Technical Pilot for Boeing's 737 MAX Flight Technical Team.  In or around July 2018, after Boeing Employee-1 left Boeing, Boeing Employee-2 became Boeing's 737 MAX Chief Technical Pilot.  In that role, Boeing Employee-2 led the 737 MAX Flight Technical Team.

14.     Boeing Employee-1 and Boeing Employee-2 understood that the FAA AEG relied on them, as members of Boeing's 737 MAX Flight Technical Team, to identify and provide to the FAA AEG all information that was relevant to the FAA AEG in connection with the FAA AEG's publication of the 737 MAX FSB Report, including information that could impact the FAA AEG's differences-training determination.

15.     Boeing Employee-1 and Boeing Employee-2 also understood that, because flight controls were vital to flying modern commercial airplanes, differences between the flight controls of the 737 NG and the 737 MAX were especially important to the FAA AEG for purposes of its publication of the 737 MAX FSB Report and the FAA AEG's differences-training determination.

## Overview of the Conspiracy to Defraud the FAA AEG

16.     From at least in and around November 2016 through at least in and around December 2018, in the Northern District of Texas and elsewhere, Boeing, through Boeing Employee-1 and Boeing Employee-2, knowingly, and with intent to defraud, conspired to defraud the FAA AEG.

17.      At all times during the conspiracy, Boeing Employee-1 and Boeing Employee-2 were acting within the scope of their employment and with the intention, at least in part, to benefit Boeing. The purpose of the conspiracy was to defraud the FAA AEG by impairing, obstructing, defeating, and interfering with the lawful function of the FAA AEG by dishonest means in connection with its publication of the 737 MAX FSB Report and its differences-training determination for the Boeing 737 MAX, in order to bring about a financial gain to Boeing and to benefit Boeing Employee-1 and Boeing Employee-2 in connection with the Boeing 737 MAX.

**Lead-Up to the Conspiracy and Scheme to Defraud**

*Boeing's Financial Incentive to Secure No Greater than "Level B" Differences Training in the 737 MAX FSB Report*

18.      As Boeing knew, "Level B" differences training was significantly less expensive for airlines to complete than "Level D." For example, a pilot could complete "Level B" differences training from anywhere in the world in a matter of hours using a computer or tablet. In contrast, a pilot could complete "Level D" differences training only by appearing in person wherever the pilot's airline operated a full-flight simulator. Apart from the cost of acquiring one or more multimillion-dollar simulators and other related expenses, airlines that were required by the FAA AEG to train pilots on a full-flight simulator could also lose revenue that the pilot might otherwise have generated from flying airline passengers during that time. Accordingly, if the FAA AEG required a less rigorous level—such as "Level B"—of differences training for the 737 MAX in the 737 MAX FSB Report, the 737 MAX would be a more attractive option for Boeing's airline customers already flying the 737 NG than switching to an entirely new airplane, such as the new version of Company-1's airplane, as such customers would save significant money in pilot-training costs by transitioning to the 737 MAX.

19.     Principally for this reason, Boeing's stated objectives in designing the 737 MAX included securing the FAA AEG's determination to require no greater than "Level B" differences training in the 737 MAX FSB Report.  Boeing Employee-1 and Boeing Employee-2 understood as much.  For example, in or around November 2014, Boeing Employee-2 wrote in an internal Boeing electronic chat communication to Boeing Employee-1 that "nothing can jepordize [sic] level b[.]"  In or around December 2014, Boeing Employee-1 wrote in an email to another Boeing employee that "if we lose Level B [it] will be thrown squarely on my shoulders.  It was [Boeing Employee-1], yes [Boeing Employee-1]!  Who cost Boeing tens of millions of dollars!"

*The Maneuvering Characteristics Augmentation System ("MCAS")*

20.     To achieve its promised fuel efficiency, the 737 MAX used larger engines than the 737 NG.  These larger engines, and their placement under the airplane's wings, meant that the aerodynamics of the 737 MAX differed from those of the 737 NG.

21.     These different aerodynamics created a new handling characteristic for the 737 MAX that caused the 737 MAX's nose to pitch up during a certain flight maneuver called a high-speed, wind-up turn.  A high-speed, wind-up turn generally involved sharply turning the airplane at high speed (approximately Mach 0.6-0.8) in a corkscrew-like pattern.

22.     A high-speed, wind-up turn was a "certification" maneuver, that is, a maneuver outside the limits of what the 737 MAX would be expected to encounter during a normal commercial passenger flight.  Nevertheless, if Boeing did not fix the 737 MAX's pitch-up characteristic in high-speed, wind-up turns, the FAA could determine that the 737 MAX did not meet U.S. federal airworthiness standards.

23.     To fix this pitch-up characteristic, Boeing created MCAS and incorporated it as a part of the 737 MAX's flight controls.  In operation, MCAS would automatically cause the

airplane's nose to pitch down by adjusting the 737 MAX's horizontal stabilizer (a horizontal tail located near the rear of the airplane).  As originally designed, MCAS could only activate during a high-speed, wind-up turn.

*Boeing Employee-1 and Other Boeing Employees Told the FAA AEG that MCAS was Limited to High-Speed, Wind-Up Turns*

24.     In or around June 2015, Boeing Employee-1 and other Boeing employees briefed the FAA AEG on MCAS.  During this briefing, Boeing described MCAS as a system that could only activate during a high-speed, wind-up turn.  After the briefing, Boeing Employee-1 and another Boeing employee further discussed MCAS with an FAA AEG employee ("FAA AEG Employee-1") and reiterated to FAA AEG Employee-1 the limited operational scope of MCAS.

*Boeing Subsequently Expanded MCAS's Operational Scope Beyond High-Speed, Wind-Up Turns*

25.     Subsequently, Boeing expanded MCAS's operational scope, including the speed range within which MCAS could activate, significantly altering its original design.  Among other things, when the airplane registered a high angle of attack, the change expanded the speed range within which MCAS could activate from approximately Mach 0.6-0.8 to approximately Mach 0.2-0.8—that is, from only high-speed flight to nearly the entire speed range for the 737 MAX, including low-speed flight, which generally occurs at a lower altitude and in and around takeoff and landing.  Boeing disclosed this expansion to FAA personnel, but only to those personnel who were responsible for determining whether the 737 MAX met U.S. federal airworthiness standards.  Boeing did not disclose the expansion to the FAA AEG personnel responsible for publishing the 737 MAX FSB Report and making the training-related determination.

*Boeing Advocated for the FAA AEG to Publish the 737 MAX FSB Report with No Greater Than "Level B" Differences Training*

26.     On or about August 16, 2016, before the FAA AEG published the 737 MAX FSB Report, the FAA AEG issued a provisional "Level B" differences-training determination for the 737 MAX. At the time of this provisional determination, the FAA AEG was unaware that Boeing had expanded MCAS's operational scope.

27.     On or about the same day, Boeing Employee-1 recognized Boeing's achievement in an email to Boeing employees, including Boeing Employee-2, and wrote that the FAA AEG's provisional determination "culminates more than 3 years of tireless and collaborative efforts across many business units" and that the 737 MAX program management "is VERY happy."

28.     As Boeing Employee-1 and Boeing Employee-2 knew, the FAA AEG based its provisional "Level B" differences training for the 737 MAX in part on its understanding that MCAS could only activate during the limited operational scope of a high-speed, wind up turn.

29.     Boeing Employee-1 and Boeing Employee-2 also understood, as Boeing Employee-1 acknowledged in his email on or about August 16, 2016, that the FAA AEG's "Level B" differences determination for the 737 MAX was only a "provisional approval [. . .] assuming no significant systems changes to the airplane."

30.     For example, in an email to Boeing employees including Boeing Employee-2 discussing a potential change to another part of the 737 MAX's flight controls on or about November 10, 2016, Boeing Employee-1 emphasized that "[o]ne of the Program Directives we were given was to not create any differences [. . .]. This is what we sold to the regulators who have already granted us the Level B differences determination. To go back to them now, and tell them there is in fact a difference [. . .] would be a huge threat to that differences training determination."

**The Conspiracy Begins**

*"Shocker Alert":  Boeing Employee-1 and Boeing Employee-2 Discovered MCAS's Expanded Operational Scope*

31.     On or about November 15, 2016, during a test flight of the 737 MAX in a simulator, Boeing Employee-1 experienced what Boeing Employee-1 recognized as MCAS operating at lower speed.  Boeing Employee-1 further recognized that this lower-speed operation was different from what Boeing had briefed and described to the FAA AEG.

32.     On or about that same day, Boeing Employee-1 and Boeing Employee-2 discussed MCAS in an internal Boeing electronic chat communication, writing in part:

> Boeing Employee-1:  Oh shocker alerT! [sic] / MCAS is now active down to [Mach] .2 / It's running rampant in the sim on me / at least that's what [a Boeing simulator engineer] thinks is happening
>
> Boeing Employee-2:  Oh great, that means we have to update the speed trim description in vol 2
>
> Boeing Employee-1:  so I basically lied to the regulators (unknowingly)
>
> Boeing Employee-2:  it wasn't a lie, no one told us that was the case

33.     At this point, Boeing Employee-1 and Boeing Employee-2 recognized that the FAA AEG was under the misimpression that MCAS operated only during a high-speed, wind up turn and could not operate at lower Mach speeds, such as at Mach 0.2.  Boeing Employee-1 and Boeing Employee-2 therefore knew, at least as of the time of this chat communication, that the FAA AEG's provisional "Level B" differences-training determination had been based in part on outdated and inaccurate information about MCAS.

34.     Boeing Employee-1 and Boeing Employee-2 also knew that MCAS's expanded operational scope was relevant to the FAA AEG's decisions about the content of the 737 MAX

FSB Report, including whether to include information about MCAS.  Boeing Employee-1 and Boeing Employee-2 similarly understood that it was their responsibility to update the FAA AEG about any relevant changes to the 737 MAX's flight controls—such as MCAS's expanded operational scope.

35.     Despite knowing that the FAA AEG had issued its provisional "Level B" determination without any awareness that MCAS's operational scope had been expanded to include high angle of attack conditions in nearly the entire speed range of ordinary commercial flight, Boeing Employee-1 and Boeing Employee-2 did not correct the FAA AEG's understanding of MCAS's operational scope or otherwise ensure that the FAA AEG's "Level B" determination was based on an accurate understanding of MCAS's operation.  Instead, Boeing—through Boeing Employee-1 and Boeing Employee-2—intentionally withheld and concealed from the FAA AEG their knowledge of MCAS's expanded operational scope.

*Boeing, Through Boeing Employee-1 and Boeing Employee-2, Deceived the FAA AEG About MCAS's Operational Scope and Told the FAA AEG to Delete MCAS from the 737 MAX FSB Report*

36.     For example, shortly after the simulated test flight described in paragraph 30, Boeing Employee-1 talked with FAA AEG Employee-1, who asked Boeing Employee-1 about the simulated test flight.  Boeing Employee-1 intentionally withheld and concealed from FAA AEG Employee-1 the fact that MCAS's operational scope had been expanded beyond what the FAA AEG relied upon when it issued its provisional "Level B" differences-training determination for the 737 MAX.

37.     Around the time that Boeing Employee-1 and Boeing Employee-2 discussed MCAS's expanded operational scope, Boeing Employee-1 asked a Boeing senior engineer assigned to the 737 MAX program about MCAS's operational scope.  The senior engineer

confirmed to Boeing Employee-1 that MCAS could activate beyond the limited operational scope of a high-speed, wind-up turn.  The senior engineer suggested that Boeing Employee-1 contact certain subject-matter experts at Boeing for more specific information about MCAS's operational scope.

38.     On or about November 17, 2016, the FAA AEG emailed three Boeing employees, including Boeing Employee-1, Boeing Employee-2, and another Boeing employee, a draft of the forthcoming 737 MAX FSB Report.  That same day, Boeing Employee-1 asked Boeing Employee-2 and the other Boeing employee to review the draft 737 MAX FSB Report "for any glaring issues."

39.     On or about November 22, 2016, the other Boeing employee emailed the draft 737 MAX FSB Report back to the FAA AEG with proposed edits.  Boeing Employee-1 and Boeing Employee-2 were included on this email.  Boeing Employee-1 included a proposed edit to delete a reference to MCAS, and wrote, "We agreed not to reference MCAS since it's outside normal operating envelope."  Neither Boeing Employee-1 nor Boeing Employee-2 shared the fact of MCAS's expanded operational scope with the FAA AEG or otherwise corrected the FAA AEG's misimpression that MCAS's operational scope was limited to high-speed, wind-up turns.

40.     In doing so, Boeing Employee-1 and Boeing Employee-2 deceived the FAA AEG into believing that the basis upon which the FAA AEG had initially "agreed" to remove any information about MCAS from the 737 MAX FSB Report—that MCAS could only activate during the limited operational scope of a high-speed, wind-up turn—remained the same.  Boeing Employee-1 and Boeing Employee-2 withheld their knowledge of MCAS from the FAA AEG to avoid risking the FAA AEG taking any action that could threaten the differences-training determination for the 737 MAX.

41.     On or about January 17, 2017, Boeing Employee-1 again reminded the FAA AEG in an email to delete any reference to MCAS from the forthcoming 737 MAX FSB Report, and wrote, "Flight Controls:  Delete MCAS, recall we decided we weren't going to cover it [. . .] since it's way outside the normal operating envelope."  Again, Boeing Employee-1 deceived the FAA AEG into believing that the basis upon which the FAA AEG had initially "decided" to remove any information about MCAS from the 737 MAX FSB Report—that MCAS could only activate during the limited operational scope of a high-speed, wind-up turn—remained the same.

42.     By concealing MCAS's expanded operational scope from the FAA AEG, Boeing, through Boeing Employee-1 and Boeing Employee-2, defrauded, impaired, obstructed, defeated, and interfered with the FAA AEG's lawful function to evaluate MCAS and to include information about MCAS in the 737 MAX FSB Report.

43.     Based on Boeing's misleading statements, half-truths, and omissions to the FAA AEG about MCAS, and in reliance on those statements and omissions, the FAA AEG agreed to delete all information about MCAS from the 737 MAX FSB Report.

44.     From in or around January 2017 through in or around July 2017 (when the 737 MAX FSB Report was published), Boeing Employee-1 and Boeing Employee-2 sent and caused to be sent emails to representatives of various Boeing airline customers that had agreed to purchase the 737 MAX, including major U.S.-based airlines.  In these emails, Boeing Employee-1 and Boeing Employee-2 or members of their 737 MAX Flight Technical Team referenced and included drafts of the forthcoming 737 MAX FSB Report and airplane manuals and pilot-training materials for Boeing's 737 MAX airline customers.  None of these items contained any information about MCAS, consistent with Boeing Employee-1's and Boeing Employee-2's efforts to deceive the FAA AEG into deleting information about MCAS.

*The FAA AEG Published the 737 MAX FSB Report Without Any Information about MCAS and Required No Greater than "Level B" Differences Training*

45.     On or about July 5, 2017, the FAA AEG published the first 737 MAX FSB Report, which included the FAA AEG's "Level B" differences-training determination for the 737 MAX.

46.     Because of Boeing's intentional withholding of information from the FAA AEG, the final version of the 737 MAX FSB Report lacked information about MCAS, and relevant portions of this 737 MAX FSB Report were materially false, inaccurate, and incomplete.  In turn, airplane manuals and pilot-training materials for U.S.-based airlines lacked information about MCAS, and relevant portions of these manuals and materials were similarly materially false, inaccurate, and incomplete as a result.

47.     After the FAA AEG published the final version of the 737 MAX FSB Report, Boeing continued to sell, and Boeing's U.S.-based airline customers were permitted to fly, the 737 MAX.  Pilots flying the 737 MAX for Boeing's airline customers were not provided any information about MCAS in their airplane manuals and pilot-training materials.

*Lion Air Flight 610:  The First 737 MAX Crash Exposed MCAS's Operational Scope*

48.     On October 29, 2018, Lion Air Flight 610, a Boeing 737 MAX, crashed shortly after takeoff into the Java Sea near Indonesia.  All 189 passengers and crew on board died.

49.     Following the Lion Air crash, the FAA AEG learned that MCAS activated during the flight and may have played a role in the crash.  The FAA AEG also learned for the first time about MCAS's expanded operational scope.

50.     In and around the same time, Boeing employees, including Boeing Employee-2, met with personnel from the FAA AEG to discuss, among other things, MCAS's operational scope.  After that meeting, Boeing Employee-2 told FAA AEG Employee-1 that he was previously

unaware of MCAS's expanded operational scope and otherwise misled FAA AEG Employee-1 about Boeing Employee-2's prior knowledge of MCAS.

51.     Also, in and around the same time, Boeing Employee-2 caused Boeing to present a false and misleading presentation to the FAA AEG about MCAS.  Boeing investigated, among other things, what information Boeing Employee-1 and Boeing Employee-2 provided to the FAA AEG about MCAS.  In connection with this investigation, Boeing Employee-2 caused Boeing to represent in a presentation to the FAA AEG that, during the training-evaluation process, Boeing and the FAA AEG had "discussed and agreed on [the] removal of MCAS" from the 737 MAX FSB Report and associated materials.  This representation was misleading because Boeing Employee-2 had failed to disclose the "shocker alert" chat communication and the fact that the FAA AEG was deprived of relevant information about MCAS.

52.     Following the Lion Air crash, Boeing proposed changes to the operational scope of MCAS, and the FAA AEG worked with Boeing to evaluate these changes to MCAS for purposes of pilot training.

*Ethiopian Airlines Flight 302:  The Second 737 MAX Crash and the Grounding of the Fleet*

53.     On March 10, 2019, Ethiopian Airlines Flight 302, a Boeing 737 MAX, crashed shortly after takeoff near Ejere, Ethiopia.  All 157 passengers and crew on board died.  Following the Ethiopian Airlines crash, the FAA AEG learned that MCAS activated during the flight and may have played a role in the crash.

54.     On March 13, 2019, the 737 MAX was officially grounded in the United States, indefinitely halting further flights of this airplane by any U.S.-based airline.

_Boeing's Pecuniary Gross Gain_

55.     Boeing derived a pecuniary gross gain of $243,600,000 by committing the offense with which it is charged in the criminal Information. This amount represents Boeing's cost-savings from its above-described conduct associated with the implementation of full-flight simulator training for the 737 MAX.

*       *       *

## ATTACHMENT C

## CORPORATE COMPLIANCE PROGRAM

In order to address any deficiencies in its internal controls, compliance code, policies, and procedures regarding compliance with U.S. fraud laws in connection with interactions with any domestic or foreign government agency, including the integration of its ethics and compliance program with its safety and quality programs as designed to deter violations of anti-fraud laws or policies, The Boeing Company (the "Company") agrees to continue to conduct, in a manner consistent with all of its obligations under this Agreement, appropriate reviews of its existing internal controls, policies, and procedures.

Where necessary and appropriate, the Company agrees to modify its compliance program, including internal controls, compliance policies, and procedures in order to maintain: (a) an effective system of internal controls designed to ensure the completeness and accuracy of records pertaining to interactions with any domestic or foreign government agency; and (b) a rigorous anti-fraud compliance program that incorporates relevant internal controls, compliance policies, and procedures in order to maintain an effective compliance program that is designed, implemented, and enforced to effectively deter and detect violations of U.S. fraud laws. The contemplated improvements to the Company's ethics and compliance program discussed herein include a commitment by the Company to the integration of its ethics and compliance program with its safety and quality programs for the purpose of deterring violations of anti-fraud laws or policies. At a minimum, this should include, but not be limited to, the following elements, to the extent they are not already part of the Company's existing internal controls, compliance code, policies, and procedures:

*Commitment to Compliance*

1.     The Company will ensure that its directors and senior management provide strong, explicit, and visible support and commitment to compliance with its corporate policy against violations of U.S. fraud laws, its compliance policies, and its Code of Conduct, and demonstrate rigorous support for compliance principles via their actions and words.

2.     The Company will ensure that mid-level management throughout its organization reinforce leadership's commitment to compliance policies and principles and encourage employees to abide by them. The Company will create and foster a culture of ethics and compliance with the law in their day-to-day operations at all levels of the Company.

*Periodic Risk Assessment and Review*

3.     The Company will implement a risk management process to identify, analyze, and address the individual circumstances of the Company, in particular the fraud risks facing the Company.

4.     On the basis of its periodic risk assessment, the Company shall take appropriate steps to design, implement, or modify each element of its compliance program to reduce the risk of violations of U.S. fraud laws, its compliance policies, and its Code of Conduct.

*Policies and Procedures*

5.     The Company will develop and promulgate a clearly articulated and visible corporate policy against violations of U.S. fraud laws, which shall be memorialized in a written compliance policy or policies.

6.     The Company will develop and promulgate compliance policies and procedures designed to reduce the prospect of violations of U.S. fraud laws and the Company's compliance policies and Code of Conduct, and the Company will take appropriate measures to encourage and

C-2

support the observance of ethics and compliance policies and procedures against violations of U.S. fraud laws by personnel at all levels of the Company. These anti-fraud policies and procedures shall apply to all directors, officers, and employees and, where necessary and appropriate, outside parties acting on behalf of the Company, including all agents and business partners. The Company shall notify all employees that compliance with the policies and procedures is the duty of individuals at all levels of the Company.

7.    The Company will ensure that it has a system of internal controls reasonably designed to ensure the completeness and accuracy of records pertaining to interactions with any domestic or foreign government agency.

8.    The Company shall review its anti-fraud compliance policies and procedures as necessary to address changing and emerging risks and update them as appropriate to ensure their continued effectiveness, taking into account relevant developments in the field and evolving international and industry standards.

*Independent, Autonomous, and Empowered Oversight*

9.    The Company will assign responsibility to one or more senior corporate executives of the Company for the implementation and oversight of the Company's anti-fraud compliance policies and procedures. Such corporate official(s) shall have the authority to report directly to independent monitoring bodies, including internal audit, the Company's Board of Directors, or any appropriate committee of the Company's Board of Directors, and shall have an adequate level of autonomy from management as well as sufficient resources, authority, and support from senior leadership to maintain such autonomy.

*Training and Guidance*

10.    The Company will implement mechanisms designed to ensure that its Code of Conduct and anti-fraud compliance policies and procedures are effectively communicated to all directors, officers, employees, and, where necessary and appropriate, agents and business partners. These mechanisms shall include: (a) periodic training for all directors and officers, all employees in positions of leadership or trust, positions that require such training (e.g., internal audit, sales, legal, compliance, finance), or positions that otherwise pose a fraud risk to the Company, and, where necessary and appropriate, agents and business partners; and (b) metrics for measuring knowledge retention and effectiveness of the training. The Company will conduct training in a manner tailored to the audience's size, sophistication, or subject matter expertise and, where appropriate, will discuss prior compliance incidents.

11.    The Company will maintain, or where necessary establish, an effective system for providing guidance and advice to directors, officers, employees, and, where necessary and appropriate, agents and business partners, on complying with the Company's anti-fraud compliance policies and procedures, including when they need advice on an urgent basis.

*Confidential Reporting Structure and Investigation of Misconduct*

12.    The Company will maintain, or where necessary establish, an effective system for internal and, where possible, confidential reporting concerning violations of the Company's Code of Conduct or anti-fraud compliance policies and procedures and protection of directors, officers, employees, and, where appropriate, agents and business partners, who make such reports. To ensure effectiveness, the Company commits to following applicable anti-retaliation and whistleblower protection laws, and to appropriately training employees on such laws.

13.     The Company will maintain, or where necessary establish, an effective and reliable process with sufficient resources for responding to, investigating, and documenting allegations of violations of U.S. fraud laws or the Company's anti-fraud compliance policies and procedures.

*Compensation Structures and Consequence Management*

14.     The Company will implement clear mechanisms to incentivize behavior amongst all directors, officers, employees, and, where necessary and appropriate, parties acting on behalf of the Company that comply with its corporate policy against violations of the anti-fraud laws, its compliance policies, and its Code of Conduct. These incentives shall include, but shall not be limited to, the implementation of criteria related to compliance in the Company's compensation and bonus system.

15.     The Company will institute appropriate disciplinary procedures to address, among other things, violations of the anti-fraud laws and the Company's Code of Conduct and anti-fraud compliance policies and procedures by the Company's directors, officers, and employees. Such procedures should be applied consistently and fairly, regardless of the position held by, or perceived importance of, the director, officer, or employee. The Company shall implement procedures designed to ensure that where misconduct is discovered, reasonable steps are taken to remedy the harm resulting from such misconduct, and designed to ensure that appropriate steps are taken to prevent further similar misconduct, including assessing the internal controls, Code of Conduct, and compliance policies and procedures and making modifications necessary to ensure the overall anti-fraud compliance program is effective.

*Third-Party Management*

16.     The Company will institute appropriate risk-based due diligence and compliance requirements pertaining to the retention and oversight of all agents and business partners, including:

        a.      properly documented due diligence pertaining to the hiring and appropriate and regular oversight of agents and business partners;

        b.      informing agents and business partners of the Company's commitment to abiding by U.S. fraud laws, and of the Company's Code of Conduct and anti-fraud compliance policies and procedures; and

        c.      seeking a reciprocal commitment from agents and business partners.

17.     Where necessary and appropriate, the Company will include standard provisions in agreements, contracts, and renewals thereof with all agents and business partners that are reasonably calculated to prevent violations of U.S. fraud laws, which may, depending upon the circumstances, include: (a) representations and undertakings relating to compliance with U.S. fraud laws; (b) rights to conduct audits of the records of the agent or business partner to promote compliance with the foregoing; and (c) rights to terminate an agent or business partner as a result of any breach of U.S. fraud laws, the Company's Code of Conduct or compliance policies or procedures, or the representations and undertakings related to such matters.

*Mergers and Acquisitions*

18.     The Company will develop and implement policies and procedures for mergers and acquisitions requiring that the Company conduct appropriate risk-based due diligence on potential new business entities, including appropriate U.S. fraud law due diligence by legal, accounting, and compliance personnel.

19.    The Company will apply its Code of Conduct and compliance policies and procedures regarding U.S. fraud laws as quickly as is practicable to newly acquired businesses or entities merged with the Company and will promptly:

a.    train the directors, officers, employees, agents, and business partners consistent with Paragraph 10 above on U.S. fraud laws and the Company's compliance policies and procedures regarding U.S. fraud laws;

b.    where warranted, conduct a fraud-specific audit of all newly acquired or merged businesses as quickly as practicable; and

c.    where warranted, establish a plan to integrate the acquired businesses or entities into the Company's enterprise resource planning systems as quickly as practicable.

*Monitoring and Testing*

20.    The Company will conduct periodic reviews and testing of all elements of its compliance program to evaluate and improve their effectiveness in preventing and detecting violations of U.S. fraud laws and the Company's Code of Conduct and anti-fraud compliance policies and procedures, taking into account relevant developments in the field and evolving international and industry standards.

21.    The Company will ensure that compliance and control personnel have sufficient direct or indirect access to relevant sources of data to allow for timely and effective monitoring and/or testing of transactions.

*Analysis and Remediation of Misconduct*

22.    The Company will conduct a root cause analysis of misconduct, including prior misconduct, to identify any systemic issues and/or any control failures. The Company will timely and appropriately remediate the root causes of misconduct. The Company will ensure that root

C-7

causes, including systemic issues and control failures, and relevant remediations are shared with management as appropriate.

## ATTACHMENT D

## INDEPENDENT COMPLIANCE MONITOR

The duties and authority of the Independent Compliance Monitor, and the obligations of The Boeing Company (the "Company"), on behalf of itself and its subsidiaries and affiliates, with respect to the Independent Compliance Monitor and the United States Department of Justice, Criminal Division, Fraud Section (the "Fraud Section") and the United States Attorney's Office for the Northern District of Texas ("USAO-NDTX") (collectively, the "Offices"), are as described below:

1.     It shall be a special condition of probation that the Company retain the Independent Compliance Monitor. However, it is not a condition of probation that the Court oversee the Independent Compliance Monitor. Rather, the Independent Compliance Monitor will report to and be overseen by the Offices. The Independent Compliance Monitor's selection process, mandate, duties, review, and certification as described herein, and the Defendant's compliance obligations as described in Paragraphs 7(k), 8, and 9 and Attachment C are not conditions of probation.

2.     The Company will retain the Independent Compliance Monitor for a period of three years (the "Term of the Monitorship") unless the early termination provision of Paragraph 36 of the Plea Agreement (the "Agreement") is triggered.

*Independent Compliance Monitor's Mandate*

3.     The Independent Compliance Monitor's primary responsibility is to assess and monitor the Company's compliance with Paragraph 7(k) of the Agreement, including the Corporate Compliance Program in Attachment C, as necessary to address and reduce the risk of any recurrence of the Company's misconduct, as described in Attachment A-2, and to address the Offices' basis for breach, as described in Attachment A-1. During the Term of the Monitorship,

the Independent Compliance Monitor will evaluate, in the manner set forth below, the effectiveness of the Company's compliance program and internal controls, record-keeping, policies, and procedures as they relate to the Company's current and ongoing compliance with U.S. fraud laws, particularly in connection with interactions with any domestic or foreign government agency, with a focus on the integration of its compliance program with its safety and quality programs as necessary to detect and deter violations of anti-fraud laws or policies, and take such reasonable steps as, in his or her view, may be necessary to fulfill the foregoing mandate (the "Mandate"). This Mandate shall include an assessment of the Board of Directors' and senior management's commitment to, and effective implementation of, the corporate compliance program described in Attachment C of the Agreement as necessary to address and reduce the risk of any recurrence of the Company's misconduct, as described in Attachment A-2, and to address the Offices' basis for breach, as described in Attachment A-1.

4.      The Independent Compliance Monitor's Mandate is not intended to supplant the oversight authority of the Federal Aviation Administration (FAA)—or that of any pertinent foreign aviation regulator, e.g., the European Union Aviation Safety Agency—including over matters related to design, engineering, manufacturing, and safety. The same is true as to the authority of the National Transportation Safety Board ("NTSB"). As a result, the Independent Compliance Monitor's Mandate does not include substantive review of the Company's design, engineering, or manufacturing processes and decisions, or of the correctness of any of the Company's decisions relating to compliance with the FAA's regulatory regime.

*Company's Obligations*

5.      The Company shall cooperate fully with the Independent Compliance Monitor, and the Independent Compliance Monitor shall have the authority to take such reasonable steps as, in

his or her view, may be necessary to be fully informed about the Company's compliance program in accordance with the principles set forth herein and subject to applicable law, including applicable data protection and labor laws and regulations. To that end, the Company shall: facilitate the Independent Compliance Monitor's access to the Company's documents and resources; not limit such access, except as provided in Paragraphs 7-8; and provide guidance on applicable local law (such as relevant data protection and labor laws). The Company shall provide the Independent Compliance Monitor with access to all information, documents, records, facilities, and employees, as reasonably requested by the Independent Compliance Monitor, that fall within the scope of the Mandate of the Independent Compliance Monitor under the Agreement. The Company shall use its best efforts to provide the Independent Compliance Monitor with access to the Company's former employees and its third-party vendors, agents, and consultants. Fees and costs associated with the Monitorship shall be expressly unallowable costs for government contract accounting purposes.

6.      Any disclosure by the Company to the Independent Compliance Monitor concerning evidence or allegations of violations of U.S. fraud laws shall not relieve the Company of any otherwise applicable obligation to truthfully disclose such matters to the Offices, pursuant to the Agreement. Notwithstanding any other provision of this Attachment D, the Company shall retain its attorney-client privilege and work-product protections and in no event shall be required to waive its attorney-client privilege.

*Withholding Access*

7.      The parties agree that no attorney-client relationship shall be formed between the Company and the Independent Compliance Monitor. In the event that the Company seeks to withhold from the Independent Compliance Monitor access to information, documents, records,

facilities, or current or former employees of the Company that may be subject to a claim of attorney-client privilege or to the attorney work-product doctrine, or where the Company reasonably believes production would otherwise be inconsistent with applicable law, the Company shall work cooperatively with the Independent Compliance Monitor to resolve the matter to the satisfaction of the Independent Compliance Monitor.

8.     If the matter cannot be resolved, at the request of the Independent Compliance Monitor, the Company shall promptly provide written notice to the Independent Compliance Monitor and the Offices. Such notice shall include a general description of the nature of the information, documents, records, facilities, or current or former employees that are being withheld, as well as the legal basis for withholding access. The Offices may then consider whether to make a further request for access to such information, documents, records, facilities, or employees.

*Independent Compliance Monitor's Coordination with the*
*Company and Review Methodology*

9.     In carrying out the Mandate, to the extent appropriate under the circumstances, the Independent Compliance Monitor should coordinate with Company personnel, including in-house counsel, compliance personnel, and internal auditors, on an ongoing basis. The Independent Compliance Monitor may rely on the product of the Company's processes, such as the results of studies, reviews, sampling and testing methodologies, audits, and analyses conducted by or on behalf of the Company, as well as the Company's internal resources (e.g., legal, compliance, and internal audit), which can assist the Independent Compliance Monitor in carrying out the Mandate through increased efficiency and Company-specific expertise, provided that the Independent Compliance Monitor has confidence in the quality of those resources.

10.    The Independent Compliance Monitor's reviews should use a risk-based approach, and thus, the Independent Compliance Monitor is not expected to conduct a comprehensive review

of all business lines, all business activities, or all markets. In carrying out the Mandate, the Independent Compliance Monitor should consider, for instance, risks presented by: (a) the industries in which the Company operates; (b) business interactions with government officials, including the amount of government regulation and oversight of the Company in conducting its business affairs—but note, as stated in Paragraph 4 above, that the mandate does not include review of the correctness of any of the Company's decisions relating to compliance with the FAA's regulatory regime; (c) current and future business opportunities and transactions; and (d) current and potential business partners, including third parties and joint ventures, and the business rationale for such relationships.

11.     In undertaking the reviews to carry out the Mandate, the Independent Compliance Monitor shall formulate conclusions based on, among other things: (a) inspection of relevant documents, including the Company's current policies and procedures governing compliance with U.S. fraud laws; (b) on-site observation of selected systems and procedures of the Company at sample sites, including internal accounting controls, record-keeping, and internal audit procedures; (c) meetings with, and interviews of, relevant current and, where appropriate, former directors, officers, employees, business partners, agents, and other persons at mutually convenient times and places; and (d) analyses, studies, and testing of the Company's compliance program.

*Independent Compliance Monitor's Written Work Plans*

12.     To carry out the Mandate, during the Term of the Monitorship, the Independent Compliance Monitor shall conduct an initial ("first") review and prepare a first report, followed by at least two follow-up reviews and reports as described in Paragraphs 19-26 below. With respect to the first report, after consultation with the Company and the Offices, the Independent Compliance Monitor shall prepare the first written work plan within sixty (60) calendar days of

being retained, and the Company and the Offices shall provide comments within thirty (30) calendar days after receipt of the written work plan. The Offices' comments shall ensure that the Independent Compliance Monitor's review is within the Mandate. With respect to each follow-up report, after consultation with the Company and the Offices, the Independent Compliance Monitor shall prepare a written work plan at least thirty (30) calendar days prior to commencing a review, and the Company and the Offices shall provide comments within twenty (20) calendar days after receipt of the written work plan. Any disputes between the Company and the Independent Compliance Monitor with respect to any written work plan shall be decided by the Offices in their sole discretion. All written work plans shall identify with reasonable specificity the activities the Independent Compliance Monitor plans to undertake in execution of the Mandate, including a written request for documents. The Independent Compliance Monitor's work plan for the first review shall include such steps as are reasonably necessary to conduct an effective first review in accordance with the Mandate, including by developing an understanding, to the extent the Independent Compliance Monitor deems appropriate, of the facts and circumstances surrounding any violations that may have occurred before the date of the Agreement. In developing such understanding, the Independent Compliance Monitor is to rely, to the extent possible, on available information and documents provided by the Company. It is not intended that the Independent Compliance Monitor will conduct his or her own inquiry into the historical events that gave rise to the Agreement.

*First Review and Report*

13.     The first review shall commence no later than one hundred twenty (120) calendar days from the date of the engagement of the Independent Compliance Monitor (unless otherwise agreed by the Company, the Independent Compliance Monitor, and the Offices). The Independent

Compliance Monitor shall issue a written report within one hundred fifty calendar (150) days of commencing the first review, setting forth the Independent Compliance Monitor's assessment and, if necessary, making recommendations within the scope of the Mandate reasonably designed to improve the effectiveness of the Company's program for ensuring compliance with U.S. fraud laws. The Independent Compliance Monitor should consult with the Company concerning his or her findings and recommendations on an ongoing basis and should consider the Company's comments and input to the extent the Independent Compliance Monitor deems appropriate. The Independent Compliance Monitor may also choose to share a draft of his or her reports with the Company prior to finalizing them. The Independent Compliance Monitor's reports need not recite or describe comprehensively the Company's history or compliance policies, procedures and practices. Rather, the reports should focus on areas the Independent Compliance Monitor has identified as requiring recommendations for improvement or which the Independent Compliance Monitor otherwise concludes merit particular attention. The Independent Compliance Monitor shall provide the report to the Board of Directors of the Company and contemporaneously transmit copies to:

> Deputy Chief – MIMF Unit
> Deputy Chief – CECP Unit
> Criminal Division, Fraud Section
> U.S. Department of Justice
> 1400 New York Avenue N.W.
> Bond Building, Fourth Floor
> Washington, D.C. 20005
>
> Chief – Fraud and Public Corruption Section
> United States Attorney's Office
> Northern District of Texas
> 1100 Commerce Street, Third Floor
> Dallas, TX 75242

After consultation with the Company, the Independent Compliance Monitor may extend the time period for issuance of the first report for a brief period of time with prior written approval of the Offices.

14.     The Independent Compliance Monitor shall, at the time the first written report is issued, provide the Company and the Offices with a proposed executive summary of the report. The Company and the Offices shall have fourteen (14) days to provide comments on the executive summary. Comments shall be limited to factual inaccuracies, confidential information, or personal identifying information that should not be part of the public record.

15.     Within thirty (30) calendar days of issuing the first written report, the Independent Compliance Monitor shall file an executive summary of the report on the public court docket.

16.     Within one hundred fifty (150) calendar days after receiving the Independent Compliance Monitor's first report, the Company shall adopt and implement all recommendations in the report. If the Company considers any recommendations unduly burdensome, inconsistent with applicable law or regulation, impractical, excessively expensive, or otherwise inadvisable, it must notify the Independent Compliance Monitor and the Offices of any such recommendations in writing within sixty (60) calendar days of receiving the report. The Company need not adopt those recommendations within the one hundred fifty (150) calendar days of receiving the report but shall propose in writing to the Independent Compliance Monitor and the Offices an alternative policy, procedure, or system designed to achieve the same objective or purpose. As to any recommendation on which the Company and the Independent Compliance Monitor do not agree, such parties shall attempt in good faith to reach an agreement within forty-five (45) calendar days after the Company serves the written notice.

17.     In the event the Company and the Independent Compliance Monitor are unable to agree on an acceptable alternative proposal, the Company shall promptly consult with the Offices. The Offices may consider the Independent Compliance Monitor's recommendation and the Company's reasons for not adopting the recommendation in determining whether the Company has fully complied with its obligations under the Agreement. Pending such determination, the Company shall not be required to implement any contested recommendation(s).

18.     With respect to any recommendation that the Independent Compliance Monitor determines cannot reasonably be implemented within one hundred fifty (150) calendar days after receiving the report, the Independent Compliance Monitor may extend the time period for implementation with prior written approval of the Offices.

*Follow-Up Reviews and Reports*

19.     A follow-up review shall commence no later than one hundred and eighty (180) calendar days after the issuance of the first report (unless otherwise agreed by the Company, the Independent Compliance Monitor, and the Offices). The Independent Compliance Monitor shall issue a written follow-up ("second") report within one hundred twenty (120) calendar days of commencing the second review, setting forth the Independent Compliance Monitor's assessment and, if necessary, making recommendations within the scope of the Mandate in the same fashion as set forth in Paragraph 13 with respect to the first review. After consultation with the Company, the Independent Compliance Monitor may extend the time period for issuance of the second report for a brief period of time with prior written approval of the Offices.

20.     Within thirty (30) calendar days of issuing the second report, the Independent Compliance Monitor shall file an executive summary of the report on the public court docket. The Independent Compliance Monitor, the Offices, and the Company shall follow the same process

outlined in Paragraph 14, above, for review and comment on the executive summary prior to the filing of the executive summary on the public court docket.

21.     Within one hundred twenty (120) calendar days after receiving the Independent Compliance Monitor's second report, the Company shall adopt and implement all recommendations in the report, unless, within thirty (30) calendar days after receiving the report, the Company notifies in writing the Independent Compliance Monitor and the Offices concerning any recommendations that the Company considers unduly burdensome, inconsistent with applicable law or regulation, impractical, excessively expensive, or otherwise inadvisable. With respect to any such recommendation, the Company need not adopt that recommendation within the one hundred twenty (120) calendar days of receiving the report but shall propose in writing to the Independent Compliance Monitor and the Offices an alternative policy, procedure, or system designed to achieve the same objective or purpose. As to any recommendation on which the Company and the Independent Compliance Monitor do not agree, such parties shall attempt in good faith to reach an agreement within thirty (30) calendar days after the Company serves the written notice.

22.     In the event the Company and the Independent Compliance Monitor are unable to agree on an acceptable alternative proposal, the Company shall promptly consult with the Offices. The Offices may consider the Independent Compliance Monitor's recommendation and the Company's reasons for not adopting the recommendation in determining whether the Company has fully complied with its obligations under the Agreement. Pending such determination, the Company shall not be required to implement any contested recommendation(s). With respect to any recommendation that the Independent Compliance Monitor determines cannot reasonably be implemented within one hundred twenty (120) calendar days after receiving the report, the

Independent Compliance Monitor may extend the time period for implementation with prior written approval of the Offices.

23.     The Independent Compliance Monitor shall undertake a second follow-up ("third") review not later than one hundred fifty (150) days after the issuance of the second report. The Independent Compliance Monitor shall issue a third report within one hundred and twenty (120) days of commencing the review, and recommendations shall follow the same procedures described in Paragraphs 16-18.

24.     Within thirty (30) calendar days of issuing the third report, the Independent Compliance Monitor shall file an executive summary of the report on the public court docket. The Independent Compliance Monitor, the Offices, and the Company shall follow the same process outlined in Paragraph 14, above, for review and comment on the executive summary prior to the filing of the executive summary on the public court docket.

25.     Following the third review, the Independent Compliance Monitor shall certify whether the Company's compliance program, including its policies, procedures, and internal controls, is reasonably designed and implemented to prevent and detect violations of U.S. fraud laws. The final review and report shall be completed and delivered to the Offices no later than sixty (60) days before the end of the Term.

26.     Within thirty (30) calendar days of issuing the final report, the Independent Compliance Monitor shall file an executive summary of the report on the public court docket. The Independent Compliance Monitor, the Offices, and the Company shall follow the same process outlined in Paragraph 14, above, for review and comment on the executive summary prior to the filing of the executive summary on the public court docket.

*Independent Compliance Monitor's Discovery of Potential or Actual Misconduct*

27.    (a)    Except as set forth below in sub-paragraphs (b), (c) and (d), should the Independent Compliance Monitor discover during the course of his or her engagement that the Company may have engaged in unlawful activity in violation of U.S. laws ("Potential Misconduct"), the Independent Compliance Monitor shall immediately report the Potential Misconduct to the Company's General Counsel, Chief Compliance Officer, and/or Audit Committee for further action, unless the Potential Misconduct was already so disclosed. The Independent Compliance Monitor also may report Potential Misconduct to the Offices at any time, and shall report Potential Misconduct to the Offices when they request the information.

(b)    In some instances, the Independent Compliance Monitor should immediately report Potential Misconduct directly to the Offices and not to the Company. The presence of any of the following factors militates in favor of reporting Potential Misconduct directly to the Offices and not to the Company, namely, where the Potential Misconduct: (1) poses a risk to public health or safety or the environment; (2) involves senior management of the Company; (3) involves obstruction of justice; or (4) otherwise poses a substantial risk of harm.

(c)    If the Independent Compliance Monitor believes that any Potential Misconduct has occurred and/or may constitute a crime ("Actual Misconduct"), the Independent Compliance Monitor shall immediately report the Actual Misconduct to the Offices. When the Independent Compliance Monitor discovers Actual Misconduct, the Independent Compliance Monitor shall disclose the Actual Misconduct solely to the Offices, and, in such cases, disclosure of the Actual Misconduct to the General Counsel, Chief Compliance Officer, and/or the Audit Committee of the Company should occur as the Offices and the Independent Compliance Monitor deem appropriate under the circumstances.

(d)     The Independent Compliance Monitor shall address in his or her reports the appropriateness of the Company's response to disclosed Potential Misconduct or Actual Misconduct, whether previously disclosed to the Offices or not.

(e)     Further, if the Company or any entity or person working directly or indirectly for or on behalf of the Company withholds information necessary for the performance of the Independent Compliance Monitor's responsibilities and the Independent Compliance Monitor believes that such withholding is without just cause, the Independent Compliance Monitor shall also immediately disclose that fact to the Offices and address the Company's failure to disclose the necessary information in his or her reports.

(f)     Neither the Company nor anyone acting on its behalf shall take any action to retaliate against the Independent Compliance Monitor for any such disclosures or for any other reason.

*Meetings During the Term of the Monitorship*

28.     The Independent Compliance Monitor shall meet with the Offices within thirty (30) calendar days after providing each report to the Offices to discuss the report, to be followed by a meeting between the Offices, the Independent Compliance Monitor, and the Company.

29.     At least annually, and more frequently if appropriate, representatives from the Company and the Offices will meet to discuss the Monitorship and any suggestions, comments, or improvements the Company may wish to discuss with or propose to the Offices, including with respect to the scope or costs of the Monitorship.

*Confidentiality of Independent Compliance Monitor's Reports*

30.     The Independent Compliance Monitor's reports will likely include proprietary, financial, confidential, and competitive business information. Moreover, public disclosure of the

reports could discourage cooperation, or impede pending or potential government investigations and thus undermine the objectives of the Monitorship. For these reasons, among others, the reports and the contents thereof are intended to remain and shall remain non-public, except as otherwise agreed to by the parties in writing, or except to the extent that the Offices determine in their sole discretion that disclosure would be in furtherance of the Offices' discharge of their duties and responsibilities or is otherwise required by law. As set forth above, however, within thirty (30) calendar days of issuing each report, the Independent Compliance Monitor shall file an executive summary of the report on the public court docket.

## ATTACHMENT E

## <u>CERTIFICATION</u>

To:     United States Department of Justice
        Criminal Division, Fraud Section

        United States Attorney's Office
        Northern District of Texas

Re:     Plea Agreement Disclosure Certification


The undersigned certify, pursuant to Paragraph 12 of the plea agreement ("the Agreement") filed on [DATE] in the United States District Court for the Northern District of Texas, by and between the United States of America and The Boeing Company (the "Company"), that undersigned are aware of the Company's disclosure obligations under Paragraph 12 of the Agreement, and that the Company has disclosed to the United States Department of Justice, Criminal Division, Fraud Section and the United States Attorney's Office for the Northern District of Texas (collectively, "the Offices") any and all evidence or allegations of conduct required pursuant to Paragraph 12 of the Agreement, which includes evidence or allegations of any violation of U.S. fraud laws committed by the Company's employees or agents upon any domestic or foreign government agency ("Disclosable Information"). This obligation to disclose information extends to any and all Disclosable Information that has been identified through the Company's compliance and controls program, whistleblower channel, internal audit reports, due diligence procedures, investigation process, or other processes. The undersigned further acknowledge and agree that the reporting requirements contained in Paragraph 12 and the representations contained in this certification constitute a significant and important component of the Agreement and of the Offices' determination whether the Company has satisfied its obligations under the Agreement.

The undersigned hereby certify that they are the Chief Executive Officer and the Chief Financial Officer of the Company, respectively, and that each has been duly authorized by the Company to sign this Certification on behalf of the Company.

This Certification shall constitute a material statement and representation by the undersigned and by, on behalf of, and for the benefit of, the Company to the executive branch of the United States for purposes of 18 U.S.C. § 1001, and such material statement and representation shall be deemed to have been made in the Northern District of Texas. This Certification shall also constitute a record, document, or tangible object in connection with a matter within the jurisdiction of a department and agency of the United States for purposes of 18 U.S.C. § 1519, and such record, document, or tangible object shall be deemed to have been made in the Northern District of Texas.

Date: _____      Name (Printed): _____

Name (Signed): _____
Chief Executive Officer
The Boeing Company

Date: _____      Name (Printed): _____

Name (Signed): _____
Chief Financial Officer
The Boeing Company

E-2

**ATTACHMENT F**

**COMPLIANCE CERTIFICATION**

To:     United States Department of Justice
            Criminal Division, Fraud Section

            United States Attorney's Office
            Northern District of Texas

Re:     Plea Agreement Certification

The undersigned certify, pursuant to Paragraph 8 of the Plea Agreement filed on [DATE], in the United States District Court for the Northern District of Texas, by and between the United States of America and The Boeing Company (the "Company") (the "Agreement"), that the undersigned are aware of the Company's compliance obligations under Paragraphs 8 and 9 of the Agreement, and that, based on the undersigned's review and understanding of the Company's anti-fraud compliance program, the Company has implemented an anti-fraud compliance program that meets the requirements set forth in Attachment C to the Agreement. The undersigned certify that such compliance program is reasonably designed to detect and prevent violations of the U.S. fraud laws throughout the Company's operations.

The undersigned hereby certify that they are respectively the Chief Executive Officer of the Company and the Chief Compliance Officer of the Company and that each has been duly authorized by the Company to sign this Certification on behalf of the Company.

This Certification shall constitute a material statement and representation by the undersigned and by, on behalf of, and for the benefit of, the Company to the executive branch of the United States for purposes of 18 U.S.C. § 1001, and such material statement and representation shall be deemed to have been made in the Northern District of Texas. This Certification shall also constitute a record, document, or tangible object in connection with a matter within the jurisdiction

of a department and agency of the United States for purposes of 18 U.S.C. § 1519, and such record,

document, or tangible object shall be deemed to have been made in the Northern District of Texas.


Date: _____          Name (Printed): _____


                                      Name (Signed): _____
                                      Chief Executive Officer
                                      The Boeing Company


Date: _____          Name (Printed): _____


                                      Name (Signed): _____
                                      Chief Compliance Officer
                                      The Boeing Company

F-2