IN THE UNITED STATES DISTRICT COURT FOR THE

NORTHERN DISTRICT OF TEXAS

Fort Worth Division

| | |
|---|---|
| UNITES STATES OF AMERICA | |
| v. | 4:21-CR-00005-O |
| THE BOEING COMPANY, | |
| Defendant. | |

**CERTAIN CRIME VICTIMS' SUBMISSION REGARDING PROPOSED PLEA AGREEMENT BETWEEN THE UNITED STATES GOVERNMENT AND BOEING**

COME Arfiyandi, Idha Susanti, Kodjo Glato, Shella, Megali Abdel Hamid Farrag, Liu Chandra, Rio Nanda Pratama, Daniel Widjaya, Abdul Effendi, Maherru, Indra Bayu Aji, Mawar Sariati, Christy Artyna Prabowo, Ambo Malibone, Herjuno Darpito, Muhammad Ravi, HK Junaidi, Mie Nie, Kasan, Nurul Rezkiyanti, Martua Sahata, Fauzan Azima, Karmin, Witaseriani, Njat Ngo, Tami Julian, Sui Khiun, Rivandi Pranata, Imam Riyanto, Mack Stanly, Mohamad Wahjoe Noegrohantoro, Dicky Jatnika, Dodi Junaidi, Murita, Sui Di, Ariawan Komardy, Ubaidillah Salabi, Savitri Wulurastuti, Kyara Aurine Daniendra, Sahabudin, Noerwito Desi Putra Rabagus, Darwin Haryanto, Radika Widjaya, Rafezha Widjaya, Yoga Perdana, Yunita Sapitri, Hedy, Filzaladi, Shintia Melina, Riyan Aryandi, Martono, Trie Gautama, Ervina Jayanti, Berly Pranata Boen, Deryl Fida Febrianto, Sukandar Panky Pradana, Janry Efriyanto Sianturi, Fita Damayanti, Rangga Adirana, Akbp Mito, Nikky Bagus Santoso, Permadi Anggrimulja, Rudolf Sayersz, Grace Muguri, Candra Kirana, Cici Ariska, Asep Saripudin, by their attorneys, and for their Submission Regarding Proposed Plea Agreement Between the United States Government and Boeing, state as follows:

**INTRODUCTION**

The parties who are making this submission to the Court are all Crime Victims as defined by statute and as determined by this Court (collectively "Certain Crime Victims"). *18 U.S.C. section 3771;* ECF No. 96; ECF No. 116 at 2. These Crime Victims are all family members of passengers who were on Lion Air Flight 610 and needlessly killed because of Boeing's misconduct.

We recognize that the Court's decision of whether to accept a plea agreement is a discretionary decision. *In re Morgan,* 506 F. 3d 705, 711-12 (9th Cir. 2007). A court should scrutinize every sentence of the bargain presented for approval. *Id.* at 711-12. In doing so, the Court may consider the nature and factual circumstances of the criminal charge. *18 U.S.C. section 3553(a)(1).*

In the proposed plea agreement, Boeing and the Government have agreed to allow Boeing to plead to one charge, conspiracy to defraud the Government, apparently hoping to avoid the obvious truth, that Boeing knowingly engaged in conduct which caused the death of 346 people. Presumably, it is the hope of Boeing and the Government that the Court will accept this fiction for purpose of favorably evaluating the plea agreement and the propriety of the proposed sentencing conditions. However, Boeing's guilt has already been decided by this Court.

On October 21, 2022, this Court entered a Memorandum and Order. In the Order, the Court framed the issue, stating: "[t]he Court must decide whether, but for Boeing's conspiracy to defraud the FAA AEG of relevant information regarding the MCAS system's low speed expansion capabilities, the 346 passengers and crew on Lion Air Flight 610 and Ethiopian Airlines Flight 302 would have died in the crashes." This Court answered the question, concluding: "[o]n the evidence produced, the Court finds that without Boeing's fraud the crashes would not have occurred." ECF No. 116 at 11.

Therefore, regardless of the label the contracting parties place on Boeing's misconduct, it is undisputed that Boeing's conduct (even given its most favorable spin by Boeing and the Government) caused the death of 346 passengers. ECF No. 116 at 11. Corporate criminals like Boeing should not be permitted to escape the truth or the consequences of their actions, particularly in circumstances such as this case where the charged offense "resulted in death…or involved a foreseeable risk of death…" *U.S.S.G. section 8C4.2.*

As set forth below, there is established precedent for imposing significant fines on corporate criminals, even without evidence that the corporate defendant has caused any deaths as in this case. We respectfully request the Court consider this precedent and the matters set forth below in evaluating the proposed plea agreement.

## STATEMENT OF FACTS

This Statement of Facts is taken from the Court's prior ruling and the facts contained in the Deferred Prosecution Agreement entered into between the Government and Boeing.

In or around June 2011, Boeing began developing and marketing a new version of its Boeing 737 called the 737 MAX. The 737 MAX was designed by Boeing as a competitive answer to a new version of an airplane developed by one of Boeing's top rivals in commercial airplanes, Company-1. Like the new version of Company-1's airplane, the 737 MAX promised increased fuel efficiency over its prior version, the 737 Next Generation ("737 NG"). With this increased efficiency, the 737 MAX offered fuel-cost savings for airlines.

The FAA Aircraft Evaluation Group ("AEG") was principally responsible for determining the minimum level of pilot training required for a pilot to fly the airplane for a U.S.-based airline. To make that determination, the FAA AEG compared the new version of the airplane (such as the 737 MAX) to a similar, prior version of the airplane (such as the 737 NG). After evaluating the

differences between the new and prior versions of the airplane, the FAA AEG mandated the minimum level of pilot training, known as "differences training," for the new version.

Based on the nature and extent of the differences between the new and prior version of the airplane, the FAA AEG assigned a level of differences training ranging from "Level A" through "Level E." These levels of differences training ranged in rigor, with "Level A" being the least intensive and "Level E" the most intensive. As relevant here, "Level B" differences training generally included computer-based training ("CBT") training, and "Level D" differences training generally included full-flight simulator training.

Boeing's 737 MAX Flight Technical Team was principally responsible for identifying and providing to the FAA AEG all information that was relevant to the FAA AEG in connection with the FAA AEG's publication of the 737 MAX FSB Report. The 737 MAX Flight Technical Team was separate and distinct from another group within Boeing that was responsible for providing information to the FAA for certification of whether the airplane met U.S. federal airworthiness standards.

Boeing Employee-1 and Boeing Employee-2 understood that the FAA AEG relied on them, as members of Boeing's 737 MAX Flight Technical Team, to identify and provide to the FAA AEG all information that was relevant to the FAA AEG in connection with the FAA AEG's publication of the 737 MAX FSB Report, including information that could impact the FAA AEG's differences-training determination.

Boeing Employee-1 and Boeing Employee-2 also understood that, because flight controls were vital to flying modern commercial airplanes, differences between the flight controls of the 737 NG and the 737 MAX were especially important to the FAA AEG for purposes of its publication of the 737 MAX FSB Report and the FAA AEG's differences-training determination.

4

From at least in and around November 2016 through at least in and around December 2018, in the Northern District of Texas and elsewhere, Boeing, through Boeing Employee-1 and Boeing Employee-2, knowingly, and with intent to defraud, conspired to defraud the FAA AEG.

At all times during the conspiracy, Boeing Employee-1 and Boeing Employee-2 were acting within the scope of their employment and with the intention, at least in part, to benefit Boeing. The purpose of the conspiracy was to defraud the FAA AEG by impairing, obstructing, defeating, and interfering with the lawful function of the FAA AEG by dishonest means in connection with its publication of the 737 MAX FSB Report and its differences-training determination for the Boeing 737 MAX, in order to bring about a financial gain to Boeing and to benefit Boeing Employee-1 and Boeing Employee-2 in connection with the Boeing 737 MAX.

As Boeing knew, "Level B" differences training was significantly less expensive for airlines to complete than "Level D." For example, a pilot could complete "Level B" differences training from anywhere in the world in a matter of hours using a computer or tablet. In contrast, a pilot could complete "Level D" differences training only by appearing in person wherever the pilot's airline operated a full-flight simulator. Apart from the cost of acquiring one or more multimillion-dollar simulators and other related expenses, airlines that were required by the FAA AEG to train pilots on a full-flight simulator could also lose revenue that the pilot might otherwise have generated from flying airline passengers during that time. Accordingly, if the FAA AEG required a less rigorous level—such as "Level B"—of differences training for the 737 MAX in the 737 MAX FSB Report, the 737 MAX would be a more attractive option for Boeing's airline customers already flying the 737 NG than switching to an entirely new airplane, such as the new version of Company-1's airplane, as such customers would save significant money in pilot-training costs by transitioning to the 737 MAX.

Boeing's stated objectives in designing the 737 MAX included securing the FAA AEG's determination to require no greater than "Level B" differences training in the 737 MAX FSB Report. Boeing Employee-1 and Boeing Employee-2 understood as much. For example, in or around November 2014, Boeing Employee-2 wrote in an internal Boeing electronic chat communication to Boeing Employee-1 that "nothing can jepordize [sic] level b[.]" In or around December 2014, Boeing Employee-1 wrote in an email to another Boeing employee that "if we lose Level B [it] will be thrown squarely on my shoulders. It was [Boeing Employee-1], yes [Boeing Employee-1]! Who cost Boeing tens of millions of dollars!"

To achieve its promised fuel efficiency, the 737 MAX used larger engines than the 737 NG. These larger engines, and their placement under the airplane's wings, meant that the aerodynamics of the 737 MAX differed from those of the 737 NG.

These different aerodynamics created a new handling characteristic for the 737 MAX that caused the 737 MAX's nose to pitch up during a certain flight maneuver called a high-speed, wind-up turn. A high-speed, wind-up turn generally involved sharply turning the airplane at high speed (approximately Mach 0.6-0.8) in a corkscrew-like pattern.

A high-speed, wind-up turn was a "certification" maneuver, that is, a maneuver outside the limits of what the 737 MAX would be expected to encounter during a normal commercial passenger flight. Nevertheless, if Boeing did not fix the 737 MAX's pitch-up characteristic in high-speed, wind-up turns, the FAA could determine that the 737 MAX did not meet U.S. federal airworthiness standards.

To fix this pitch-up characteristic, Boeing created MCAS and incorporated it as a part of the 737 MAX's flight controls. MCAS was an aircraft "part" within the meaning of Title 18, United States Code, Sections 31(a)(7) and 38. In operation, MCAS would automatically cause the

6

airplane's nose to pitch down by adjusting the 737 MAX's horizontal stabilizer (a horizontal tail located near the rear of the airplane). As originally designed, MCAS could only activate during a high-speed, wind-up turn.

On or about August 16, 2016, before the FAA AEG published the 737 MAX FSB Report, the FAA AEG issued a provisional "Level B" differences-training determination for the 737 MAX. At the time of this provisional determination, the FAA AEG was unaware that Boeing had expanded MCAS's operational scope.

On or about the same day, Boeing Employee-1 recognized Boeing's achievement in an email to Boeing employees, including Boeing Employee-2, and wrote that the FAA AEG's provisional determination "culminates more than 3 years of tireless and collaborative efforts across many business units" and that the 737 MAX program management "is VERY happy."

As Boeing Employee-1 and Boeing Employee-2 knew, the FAA AEG based its provisional "Level B" differences training for the 737 MAX in part on its understanding that MCAS could only activate during the limited operational scope of a high-speed, wind up turn.

Boeing Employee-1 and Boeing Employee-2 also understood, as Boeing Employee-1 acknowledged in his email on or about August 16, 2016, that the FAA AEG's "Level B" differences determination for the 737 MAX was only a "provisional approval [. . .] assuming no significant systems changes to the airplane."

On or about November 15, 2016, during a test flight of the 737 MAX in a simulator, Boeing Employee-1 experienced what Boeing Employee-1 recognized as MCAS operating at lower speed. Boeing Employee-1 further recognized that this lower-speed operation was different from what Boeing had briefed and described to the FAA AEG.

On or about that same day, Boeing Employee-1 and Boeing Employee-2 discussed MCAS in an internal Boeing electronic chat communication, writing in part:

> Boeing Employee-1: Oh shocker alerT! [sic] / MCAS is now active down to [Mach] .2 / It's running rampant in the sim on me / at least that's what [a Boeing simulator engineer] thinks is happening
>
> Boeing Employee-2: Oh great, that means we have to update the speed trim description in vol 2
>
> Boeing Employee-1: so I basically lied to the regulators (unknowingly)
>
> Boeing Employee-2: it wasn't a lie, no one told us that was the case

At this point, Boeing Employee-1 and Boeing Employee-2 recognized that the FAA AEG was under the misimpression that MCAS operated only during a high-speed, wind up turn and could not operate at lower Mach speeds, such as at Mach 0.2. Boeing Employee-1 and Boeing Employee-2 therefore knew, at least as of the time of this chat communication, that the FAA AEG's provisional "Level B" differences-training determination had been based in part on outdated and inaccurate information about MCAS.

Despite knowing that the FAA AEG had issued its provisional "Level B" determination without any awareness that MCAS's operational scope had been expanded to include high angle of attack conditions in nearly the entire speed range of ordinary commercial flight, Boeing Employee-1 and Boeing Employee-2 did not correct the FAA AEG's understanding of MCAS's operational scope or otherwise ensure that the FAA AEG's "Level B" determination was based on an accurate understanding of MCAS's operation. Instead, Boeing—through Boeing Employee-1 and Boeing Employee-2—intentionally withheld and concealed from the FAA AEG their knowledge of MCAS's expanded operational scope.

8

For example, shortly after the simulated test flight described in paragraph 30, Boeing Employee-1 talked with FAA AEG Employee-1, who asked Boeing Employee-1 about the simulated test flight. Boeing Employee-1 intentionally withheld and concealed from FAA AEG Employee-1 the fact that MCAS's operational scope had been expanded beyond what the FAA AEG relied upon when it issued its provisional "Level B" differences-training determination for the 737 MAX.

On or about November 22, 2016, the other Boeing employee emailed the draft 737 MAX FSB Report back to the FAA AEG with proposed edits. Boeing Employee-1 and Boeing Employee-2 were included on this email. Boeing Employee-1 included a proposed edit to delete a reference to MCAS, and wrote, "We agreed not to reference MCAS since it's outside normal operating envelope." Neither Boeing Employee-1 nor Boeing Employee-2 shared the fact of MCAS's expanded operational scope with the FAA AEG or otherwise corrected the FAA AEG's misimpression that MCAS's operational scope was limited to high-speed, wind-up turns.

On or about January 17, 2017, Boeing Employee-1 again reminded the FAA AEG in an email to delete any reference to MCAS from the forthcoming 737 MAX FSB Report, and wrote, "Flight Controls: Delete MCAS, recall we decided we weren't going to cover it [. . .] since it's way outside the normal operating envelope." Again, Boeing Employee-1 deceived the FAA AEG into believing that the basis upon which the FAA AEG had initially "decided" to remove any information about MCAS from the 737 MAX FSB Report—that MCAS could only activate during the limited operational scope of a high-speed, wind-up turn—remained the same.

By concealing MCAS's expanded operational scope from the FAA AEG, Boeing, through Boeing Employee-1 and Boeing Employee-2, defrauded, impaired, obstructed, defeated, and

interfered with the FAA AEG's lawful function to evaluate MCAS and to include information about MCAS in the 737 MAX FSB Report.

Based on Boeing's misleading statements, half-truths, and omissions to the FAA AEG about MCAS, and in reliance on those statements and omissions, the FAA AEG agreed to delete all information about MCAS from the 737 MAX FSB Report.

On or about July 5, 2017, the FAA AEG published the first 737 MAX FSB Report, which included the FAA AEG's "Level B" differences-training determination for the 737 MAX.

Because of Boeing's intentional withholding of information from the FAA AEG, the final version of the 737 MAX FSB Report lacked information about MCAS, and relevant portions of this 737 MAX FSB Report were materially false, inaccurate, and incomplete. In turn, airplane manuals and pilot-training materials for U.S.-based airlines lacked information about MCAS, and relevant portions of these manuals and materials were similarly materially false, inaccurate, and incomplete as a result.

After the FAA AEG published the final version of the 737 MAX FSB Report, Boeing continued to sell, and Boeing's U.S.-based airline customers were permitted to fly, the 737 MAX. Pilots flying the 737 MAX for Boeing's airline customers were not provided any information about MCAS in their airplane manuals and pilot-training materials.

On October 29, 2018, Lion Air Flight 610, a Boeing 737 MAX, crashed shortly after takeoff into the Java Sea near Indonesia. All 189 passengers and crew on board died.

Also, in and around the same time, Boeing Employee-2 caused Boeing to present a false and misleading presentation to the FAA AEG about MCAS. Boeing investigated, among other things, what information Boeing Employee-1 and Boeing Employee-2 provided to the FAA AEG about MCAS. In connection with this investigation, Boeing Employee-2 caused Boeing to

represent in a presentation to the FAA AEG that, during the training-evaluation process, Boeing and the FAA AEG had "discussed and agreed on [the] removal of MCAS" from the 737 MAX FSB Report and associated materials. This representation was misleading because Boeing Employee-2 had failed to disclose the "shocker alert" chat communication and the fact that the FAA AEG was deprived of relevant information about MCAS.

On March 10, 2019, Ethiopian Airlines Flight 302, a Boeing 737 MAX, crashed shortly after takeoff near Ejere, Ethiopia. All 157 passengers and crew on board died. Following the Ethiopian Airlines crash, the FAA AEG learned that MCAS activated during the flight and may have played a role in the crash.

On October 21, 2022, this Court determined that but for Boeing's fraud, the crashes would not have occurred. ECR No. 116 at 11-13.

### Is the Proposed Plea Agreement an Arms-Length Transaction?

From the outset of the "prosecution" against Boeing, there has been criticism that the prosecution is favorable to Boeing and that conflicts of interest exist. These concerns were raised by outside commentators when the Deferred Prosecution Agreement was first signed. The concerns were only heightened by the apparently hurried transaction which excluded crime victims from the process. **Exhibit 1**.

Allegations of conflict of interest arose a second time with respect to the proposed plea agreement, in which it was discovered that the number two person at the Department of Justice represented Boeing approximately four years ago, while Boeing was being investigated by the Justice Department. The reaction of the Justice Department was to downplay the person's involvement with Boeing. **Exhibit 2.** It should have been to screen the lawyer from this

11

prosecution from the outset of her coming to the Justice Department, not an after the fact excuse after the conflict of interest was exposed.

Outside commentators aside, proof of the apparent conflict of interest can be found in the Government's actions (admissions) which reveal the favorable treatment that Boeing has received. For example, in the DFA, the Government admitted that the fine contained in the DFA was at the lowest level, demonstrating a questionable degree of leniency for a Defendant who caused the deaths of 346 people. DFA at 7; ECF No. 4 at 7. It was also reported that some of the fine contained in the DFA included payments Boeing was required to make to airlines or was money which would ultimately benefit Boeing and its business relationships.

Even this Court was forced to address the Government's incredulous arguments that Boeing's misconduct was not the cause of the 737 AirMax crashes and that there were "intervening causes" which lead to the crash of Lion Air Flight 610 and that the Lion Air Crash was an intervening cause with respect to the second crash, Ethiopian Air Flight 302. ECF No. 116 at 14-15.

An ongoing conflict of interest is also demonstrated by the amount of business between Boeing and the Government. The average amount of money the Government agreed to pay Boing from 2016-2022 exceeded 21 billion dollars. Boeing was in the top five government contractors for years as determined by the United States General Services Administration. **Exhibit 3.**

Despite clearly siding against the Crime Victims and defending Boeing's conduct, the proposed plea agreement is claimed to be the product of a good faith negotiation. It is not surprising that the proposed agreement weakly charges Boeing with conspiracy to defraud the government. To actually charge Boeing and its senior management with the actual crimes committed, including

12

the homicide of 346 passengers, would make any explanation of ongoing business dealings difficult and uncomfortable, particularly in an election year.

Consistent with its past approach, the Government is advocating for a plea agreement which ignores the involvement of high-level management and instead applies a mid-level corporate factor in the proposed sentencing. This approach ignores the active participation of Boeing's senior management in the criminal conduct, contrary to clear facts. And, this approach allows for a level 2 enhancement instead of a level 5 enhancement in the sentencing process, again favoring Boeing and ignoring the tragic circumstances caused by Boeing's misconduct.

**The Loss Calculation Ignores the Undisputed Fact that Boeing's Admitted Misconduct Caused the Deaths of 346 Passengers.**

Boeing and the Government have agreed to a fine of $243,600.00 which is the **net** amount to be paid after an agreed credit of $243,600,000.00. This net fine amount is described in the proposed agreement to be a "fine at the top of the applicable Sentencing Guideline fine range and the maximum fine allowable under Title 18, United States Code, Sections 371 and 3571(c)." (Doc-221-1 at 5). No basis for the calculation is provided, nor is there an explanation for the use of pecuniary gain as the basis for the fine. We suspect the reason that gain is used rather than loss is to avoid an awkward discussion of the 346 deaths caused by Boeing and the soft terms of the proposed plea agreement.  Moreover, the pecuniary gain figure was provided by Boeing. There is no statement or evidence that the Government did anything to verify the financial information which Boeing provided to calculate the pecuniary gain.

The failure to verify Boeing's financial information is troubling, given Boeing's proven history of deception and failure to respect the law. Boeing has admitted that it intentionally mislead FAA officials both before and after the Lion Air and Ethiopian Air crashes. ECF No. 4 at 39-58. Boeing also violated the DFA, which even the Government reluctantly acknowledged. Previously,

Boeing was found to have defrauded the government by improperly obtaining competitor information which allowed it to be awarded a government contract worth billions of dollars. **Exhibit 4.** Based on Boeing's history of fraud, there is no reason to accept its financial information.

Significantly, the same fine amount which is contained in the proposed plea agreement also appeared in the DFA. However, unlike the current description in the plea agreement (top of the guideline), in the DFA, the Government and Boeing agreed that $243,600,000.00 was "at the low end of the otherwise-applicable Sentencing Guideline fine range." DFA (ECF No. 4 at 7). The parties' own words confirm the inadequacy of the proposed fine.

The Government has deliberately chosen to avoid reference to the statute which would provide for a larger penalty to be ordered. Specifically, 18 U.S.C. section 3571(d) allows for a criminal fine of the greater of twice the amount of the pecuniary gain from the offense or twice the amount of the pecuniary loss to a person other than the Defendant. *18 U.S.C. section 3571(d).*

Further, the proposed plea agreement, which uses Boeing's pecuniary gain figure to measure the fine, the Sentencing Guidelines require the fine to be based on loss, not gain unless loss cannot be reasonably calculated. *U.S. v. Haas,* 171 F. 3d 259, 268-69 (5th Cir. 1999); *USSG section 2B1.1.* As stated above, there is no explanation for the Government's refusal to use a loss calculation. We understand Boeing's desire to not use a loss calculation and to use its own unverified gain figure.

The sentencing Guidelines define "loss" as the greater of actual loss or intended loss**.** *United States v. Moss***,** 34 F. 4th 1176, 1190 (11th Cir. 2022). Loss need not be calculated with precision and is distinct from restitution. *United States v. Masek,* 588 F. 3d 1283, 1287 (10th Cir. 2009); *United States v. Kuhrt,* 788 F. 3d 403, 423 (5th Cir. 2015).

Significantly, a "loss" calculation includes a consideration of all relevant conduct, including charged and uncharged conduct and can include losses suffered by third parties. *United States v. Hoffman-Vaile,* 568 F.3d 1335, 1343-44 (11th Cir. 2009); *USSG section 1B1.3(a)(1)(B).*

The uncharged conduct is the real story. Boeing and its senior management could easily have been charged with homicide. If considered by this Court, then the loss calculation would be clearly ascertainable. There are credible studies which have quantified the cost of murder to society. This form of calculation ranges from $8,649,216.00 per murder to $17,250,000.00 million per murder. **Exhibits 5 and 6.** This results in losses of $2,992,628,736.00 and $5,968,500,000.00 based on 346 deaths, respectively, before being doubled per the above statute.

There are other losses suffered by third parties. This Court can, and should, consider the fact that in addition to the Crime Victims, numerous third parties suffered losses because of Boeing's conduct, including investors, airlines and the aviation industry as a whole, after grounding orders were implemented. DFA at A-16; ECF No. 4 at 43. These other losses include $1,770,000.00 for airline compensation, referenced in the DFA and an additional loss of $8,757,999,000.00 to Boeing's customers.

Taken together, the losses range from $11,752,397,736 ($23,504,795,472) to $14,728,269,000 and $29,456,538,000 when 18 U.S.C. section 3571(d) is applied.
If USSG section 8C4.2 is applied, the loss calculation is in the range of $47,009,590,944.00 to $58,913,076,000. These figures demonstrate the absurdity of the proposed fine.

A court may consider losses caused by others, if they were part of the illegal scheme. *United States v. Robinson,* 603 F. 3d 230, 234 (3d Cir. 2010)*; United States v. Offill,* 666 F. 3d 168, 180 (4th Cir. 2011). Here, the facts stipulated between Boeing and the Government concede the fact that two unknown individuals from Boeing knew about the fraud and failed to disclose it to the

FAA, even while the investigation was occurring. Boeing admitted the two individuals refused to accurately disclose the flaws in the aircraft system to the FAA AEG in order to save Boeing money. DFA at A-4 through A-14, paras. 11-44; ECF No. 4 at 31-41.

The plea agreement fails to account for any of these facts/factors, all of which should result in a lawful, significantly larger and more meaningful penalty than that proposed by the Government and Boeing.

There is precedent for substantial penalties being imposed (and agreed upon) by criminal corporate Defendants, including Boeing. By comparison, the proposed fine in the plea agreement is a fraction of what should be paid by Boeing.

For example, in healthcare fraud cases, in which only money was the issue, not the senseless deaths of 346 people, fines in excess of one billion dollars have been paid. Likewise, Banks have been required to pay billions of dollars because of financial fraud, including a 25 billion dollar settlement in 2012 involving JP Morgan Chase, Wells Fargo, Bank of America and GMAC and separately, a 16 billion dollar settlement paid by Bank of America in 2014. **Exhibit 7.** In a fraud case involving Boeing, in which Boeing obtained insider information from a United States Government official which it then used to obtain a government contract worth billions (in exchange for Boeing employing the official's family and later the official, Boeing paid $615,000,000 in a civil settlement and $50,000,000.00 for potentially criminal conduct. **Exhibit 4.**

Nobody died in the healthcare fraud and bank fraud matters or the Boeing fraud case, referenced above. These cases were only about money. Without question, Boeing caused the death of 346 people. ECF No. 116 at 11-13. The proposed fine is improperly calculated, incorrectly disregards a loss calculation, fails to account for the value of lost lives, fails to account for many

16

of the other factors which may be taken into account in calculating a fine, is contrary to precedent and fails to achieve the purpose of a criminal fine.

Boeing is receiving an enormous benefit in being allowed to plead guilty to a one count, white collar corporate criminal charge. Under the circumstances, we suggest that Boeing should be required to pay a substantial fine which recognizes the value of each of the 346 people killed, the substantial harm to others and pay a fine which is consistent with fines paid by other corporate criminal defendants who have engaged in extreme criminal conduct.

### Even if a Gain Calculation is Used, Boeing Should Pay a Larger Fine.

In the alternative to the above argument concerning a loss calculation, if a gain based calculation is used, the Boeing's pecuniary gain figure is understated and inaccurate in addition to being unverified.

Pecuniary gain can be determined by quantifying Boeing's profit on the sale of AirMax Aircraft. According to the DFA, Boeing began selling the 737 AirMax aircraft. DFA at A-13 (ECR No. 4 at 40). The sales price of a Boeing 737 AirMax 8, the type of aircraft at issue, is $121,000,000.00. **Exhibit 8.** Boeing reported an average profit of $10,750,000 per aircraft. In 2017 and 2018, Boeing sold and delivered 330 of the 737 AirMax aircraft and approximately another 330 aircraft in the period of 2019-2021. **Exhibit 9.** Accordingly, the pecuniary gain would be $7,095,000,000.00 and $14,190,000,000.00 if the amount is doubled according to the applicable statute. However, this is likely understated because much of this information is based on Boeing's figures which were created at a time when it was lying to the FAA, both before and after the crashes at issue.

### The Restitution Process Favors Boeing, Allows For Considerable Delay And a Set-Off Which Renders Any Right of the Crime Victims to Restitution as Meaningless.

The Crime Victims Act sets forth the rights of Crime Victims. These include the right to restitution, as provided by law and the right to proceedings free from delay. *18 U.S.C. section 3771(a)*

The restitution provision in the proposed plea agreement allows for delay of payment until "completion" of an appeal. That will delay any disputed restitution for years and it is nearly 6 years since the Lion Air crash.

Worse, the restitution provides for a set-off of other amounts Boeing has paid to crime victims, allowing Boeing to dispute and delay any restitution payment and effectively negating the restitution provision in the agreement in contradiction to the Crime Victims Act. The set-off contained in the proposed agreement is not limited to recoveries in civil cases. The "any other" amount language is clearly intended to include funds paid by Boeing to Victims' funds and monies paid to Crime Victims from fines paid by Boeing. If the Government and Boeing have their way, the Crime Victims, families of passengers killed by Boeing, there will be no restitution or perhaps, the Crime Victims can pay Boeing. Not surprisingly, there is no statement that the Government will support any restitution claim because there is no restitution to receive and because the Government supports Boeing.

As written, the restitution provision in the proposed agreement does not provide for actual restitution.

### The Independent Monitor Should be Truly Independent.

Given the obvious and ongoing conflicts of interest between the Department of Justice and Boeing, any monitor appointed by the Court should be truly independent.

The Court should select a monitor without input from the Department of Justice or Boeing because of the long term and ongoing business relationship between the parties. Ideally, the person

would be a former member of the United States Military who can report to the Court periodically or as needed and has the authority to obtain all necessary information from Boeing and the Government to perform the function of an objectively independent monitor. The Court should also set the parameters of payment so as to reduce Boeing's ability to control the monitor through financial leverage.

## Other Considerations.

In addition to a properly calculated fine based on losses, meaningful restitution and truly independent monitor, an escrow fund should be created for future Boeing crashes, for a period of seven years. Additionally, Boeing should agree to waive any right to file and prosecute a *forum non conveniens* motion for the purpose of having lawsuits transferred from the United States to other foreign jurisdictions. These motions are routinely brought by Boeing in order to transfer cases to forums in which there are limits on damages or the judicial systems are corrupt and Boeing can exercise its economic and political clout to obtain favorable outcomes. Boeing should be required to address any claims arising from plane crashes in the Unites States.

Dated: July 31, 2024

      /s/ Adrian Vuckovich
      Attorney for Certain Crime Victims

Adrian Vuckovich (6207978)
av@cb-law.com
Collins Bargione & Vuckovich
One N. LaSalle Street, Suite 300
Chicago, Illinois 60602
(312) 372-7813


Ribbeck Law Chartered
Manuel von Ribbeck
Monica R. Kelly
505 N. Lake Shore Drive, Suite 102
Chicago, Illinois 60611
(312) 973-0146