# Exhibit 1

# Harvard Law School Forum on Corporate Governance

## Nosedive: Boeing and the Corruption of the Deferred Prosecution Agreement

*Posted by John C. Coffee (Columbia University), on Wednesday, May 25, 2022*

**Tags:** Boeing, Corporate crime, Corporate liability, Corporate Social Responsibility, Deferred prosecution agreements, DOJ, Jurisdiction, Misconduct, Yates memo
**More from:** John Coffee

Editor's Note: John C. Coffee Jr. is the Adolf A. Berle Professor of Law at Columbia University Law School. This post is based on his recent paper.

For public corporations, the deferred prosecution agreement (or "DPA") has become the default rule. Whatever the crisis or scandal—foreign corrupt practices, securities fraud, opioids—the response of the public corporation is to cut a deal with the U.S. Attorney under which it conducts an internal investigation, agrees to a joint "Statement of Facts" describing the misconduct, pays a substantial fine, and possibly agrees to some modest governance and monitoring reforms. The payoff to the defendant is that it is not indicted, and if it can avoid another similar episode for a short probation period, the charges will be effectively erased at the end of that period.

Such a resolution is attractive for each side: the prosecution can "declare a victory" in a case where it lacked the manpower or budget to dig deeply or proceed on its own; the defendant corporation avoids the reputational damage associated with a trial and also escapes the collateral civil liability (from follow-on class actions) that would likely ensue if it plead guilty to a crime. Who loses? The short answer is the public, which is denied transparency and the truth. Although a "Statement of Facts" will typically accompany a DPA, its disclosures are heavily edited and sanitized by defense counsel. In fact, both sides have a strong incentive to massage the facts to make themselves look good.

Few examples better illustrate this tendency than the DPA entered into by the Department of Justice ("DOJ") and The Boeing Corporation ("Boeing") on January 7, 2021. The DOJ alleged that Boeing had misled the Federal Aviation Administration ("FAA") about its new model 737 MAX, which had markedly different flight characteristics than its predecessors. Had the FAA known more, it would have almost certainly mandated more extensive flight simulator training. This failure to alert the FAA to these changes may have been a proximate cause of two 737 MAX crashes in 2018 and 2019 that killed 346 passengers.

Boeing was in trouble, and it needed a gentle, quiet exit with little publicity. But the penalty also had to look sufficiently tough that it would not strike the public as a sellout. This was a difficult balance to strike, and it required a cooperative U.S. Attorney.

Watch now how Boeing solves this problem:

## Step One: Forum Shop for the Best Jurisdiction

Boeing is based in the State of Washington, has its executive offices in Chicago, and is incorporated in Delaware. But the DOJ sued it in the Fort Worth Division of the Northern District of Texas. This lack of connection to the forum would normally have been a barrier, but Boeing's defense counsel, Mark Filip, had been Deputy Attorney General (and then Acting Attorney General) at the end of President George W. Bush's Administration, and he had authored the Filip Memorandum, which for several years had been DOJ's guidebook for DPAs. Not only did he know how to maneuver

around the federal courts, but his law firm, Kirkland & Ellis, had former partners sitting in multiple high positions within the DOJ. Indeed, Attorney General William Barr had once been of counsel at Kirkland & Ellis. This does not prove collusion, but it does set the stage for highly cooperative discussions.

An even more important advantage of the choice of the Fort Worth Division was that it effectively had only one judge: Reed O' Connor. Judge O' Connor was well known for his ideological positions and had been regularly chosen by the Texas Attorney General when it wished to challenge federal legislation (for example, Judge O' Connor had enjoined Obamacare as unconstitutional). Thus, if one sued in the Fort Worth Division, one effectively opted for Judge O' Connor. Finally, the U.S. Attorney in the Northern District of Texas was also a conservative Republican who served on Attorney General Barr's Advisory Committee. Everyone knew everyone.

## Step Two: Inflate the Penalty

Although the DOJ announced that Boeing would pay a $2.5 billion penalty, this was exaggerated because only $243.6 million of this amount was a criminal fine (or less than 10%). Indeed, this fine was at the low end of the applicable sentencing guidelines. Not only would the remainder of the $2.5 billion be presumptively tax deductible, but Boeing was independently obligated to pay roughly these amounts (or had already done so). To illustrate, $1.77 billion (or over 70% of the $2.5 billion total) was to be paid to "airline customers." Who were they? Answer: primarily the large U.S. airlines who purchased the 737 MAX in quantity and who could easily sue on their own. In fact, given their market power, they could demand that Boeing settle with them. The remaining balance ($500 million) was to be paid to crash victims and their families. $500 million for 346 lives is not high, and Boeing could offset this $500 million against any amount Boeing incurred in private tort litigation over the crashes. *Bottom line:* this was a relatively cheap settlement with the DOJ using the private claims to inflate the total amount to $2.5 billion.

## Step Three: Finding a Scapegoat

Boeing needed to explain how the crime occurred in the "Statement of Facts" that is attached to a DPA. For this role, Boeing selected Mark Forkner, its former "Chief Technical Pilot," who had just left Boeing. Actually, Forkner was neither a test pilot nor an engineer, but he handled the flight simulators that Boeing used for pilot training. He was under pressure (as his emails showed) to ensure that the FAA did not require any additional flight training for this significantly redesigned airplane. At no point, did the Statement of Facts discuss any other officer or employee's interactions with the FAA. Forkner was indicted, but following a brief three day trial, the jury acquitted him after only two hours of deliberations. Apparently, the jury bought his defense that he was a scapegoat.

## Step Four: Ignoring the Victims

Under the Crime Victims' Rights Act (18 U.S.C. § 3771), the prosecutor is required to consult with the victims of the crime. The Boeing prosecutors ducked this obligation by taking the position that those who died in the 737 MAX crashes were not true "crime victims" because, in their view, the only victim was the FAA. Section 3771(c) of the Act defines "crime victim" broadly as "a person who is directly and proximately harmed." This issue is currently being litigated, an action now before Judge O' Connor.

## Step Five: A Final Footnote

Shortly after the Boeing DPA was signed on January 7, 2021 (the day after President Trump's "rally" in Washington), the U.S. Attorney resigned (as is customary on a change of Administration), and months later, she joined a new firm as partner—Kirkland & Ellis. Well, it's a small world.

# Conclusion

The facts just discussed do not prove criminal misbehavior. Nor do I infer that. What should concern us, however, is the ability of a large public corporation to manipulate the DPA negotiation process to present itself in a very favorable and misleading light. Moreover, because judicial oversight is limited and courts are not constitutionally permitted, at present, to

reject a DPA that they consider inadequate (see *U.S. v. Fokker Services B.V.*, 818 F. 3d 773 (D.C. Cir. 2016)), reforms limiting their use need to be adopted by the DOJ. I discuss the possibilities in a **paper posted on SSRN**. In particular, DPAs should not be the default outcome, as they appear to be today whenever the corporation has adopted a compliance plus (as virtually all do). Although leniency at sentencing, used as an incentive, can be an important tool for the DOJ, the prosecutors should gain something valuable in return. Our contemporary practice with respect to public corporations in the criminal justice system has reached the point where the DOJ is offering virtually all carrots and no sticks.

The complete paper is available for download **here**.

Trackbacks are closed, but you can **post a comment**.