## UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF TEXAS
Fort Worth Division

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )   4:21-cr-00005-O |
| | ) |
| THE BOEING COMPANY | ) |
| | ) |
| Defendant. | ) |
| | ) |

## GOVERNMENT'S CONSOLIDATED RESPONSE
## IN SUPPORT OF THE PROPOSED PLEA AGREEMENT

GLENN S. LEON                                    LEIGHA SIMONTON
Chief, Fraud Section, Criminal Division           United States Attorney
United States Department of Justice               Northern District of Texas


By: _s/ Sean P. Tonolli_                          By: _s/ Chad E. Meacham_
Sean P. Tonolli                                   Chad E. Meacham
Senior Deputy Chief                               Assistant United States Attorney
D.C. Bar No. 503346                               Texas Bar No. 00784584
sean.tonolli@usdoj.gov                            chad.meacham@usdoj.gov


United States Department of Justice               United States Attorney's Office
Criminal Division, Fraud Section                  Northern District of Texas
1400 New York Avenue, N.W.                         801 Cherry Street, 17th Floor
Washington, D.C. 20005                            Fort Worth, TX 76102
202-514-2000                                       817-252-5200

## TABLE OF CONTENTS

I.   INTRODUCTION ........................................................................................................ 1

II.  FACTUAL BACKGROUND ..................................................................................... 4

     A.   The Government Has Conferred with the Families and Airline Entity Customers ..........5

     B.   What Trial and Sentencing Would Look Like Absent a Guilty Plea ...............................8

     C.   Clarifying the Record on Certain Terms of the Agreement ............................................12

III. LEGAL STANDARD............................................................................................... 17

IV.  ARGUMENT ........................................................................................................... 18

     A.   An Individualized Assessment of the Agreement Supports Accepting Boeing's
          Guilty Plea .....................................................................................................................20

     B.   The Agreement Should Be Accepted Because It Holds Boeing Fully Accountable
          for Its Criminal Conduct ...............................................................................................22

     C.   The Agreement Is Consistent with the Court's CVRA Ruling and Was Fashioned
          Based on Feedback Obtained Through CVRA Conferrals .............................................26

     D.   The Agreement, Which Imposes the Statutory Maximum Fine, Comports with
          the Sentencing Guidelines..............................................................................................28

     E.   The Agreement Provides for Full Restitution to the Families and Does Not
          Prejudice the One Objecting Airline Entity Customer from Pursuing
          Civil Remedies................................................................................................................30

          i.   Restitution is discretionary as a matter of law ....................................................... 31

          ii.  The Agreement allows full restitution for the Families, and the process is
               the same under the Agreement as it would be after trial ....................................... 34

          iii. The restitution process for LOT, the only Airline Entity Customer to oppose
               the Agreement, would be complex and prolonged ................................................. 35

     F.   The Agreement Should Be Accepted Because It Provides for an Independent
          Compliance Monitorship That Is Appropriately Scoped and Overseen by the
          Government......................................................................................................................40

# TABLE OF AUTHORITIES

## <u>Cases</u>

*Bank of Am. Corp. v. City of Miami, Fla.*, 581 U.S. 189 (2017)..................................................... 36

*Blackledge v. Allison*, 431 U.S. 63 (1977). .................................................................................. 18

*Blakely v. Washington*, 542 U.S. 296 (2004)................................................................................. 11

*Cleveland v. United States*, 531 U.S. 12 (2000)............................................................................. 32

*Hammerschmidt v. United States*, 265 U.S. 182 (1924). ............................................................... 31

*Hughes v. United States*, 584 U.S. 675 (2018)............................................................................... 28

*In re Morgan*, 506 F.3d 705 (9th Cir. 2007)............................................................................ 18, 20

*In re Ryan*, 88 F.4th 614 (5th Cir. 2023). ..................................................................................... 23

*Kelly v. United States*, 590 U.S. 391 (2020). ........................................................................... 32, 33

*Lefebure v. D'Aquilla*, 15 F.4th 650 (5th Cir. 2021)..................................................................... 23

*McNally v. United States*, 483 U.S. 350 (1987). ........................................................................... 31

*Pasquantino v. United States*, 544 U.S. 349 (2005)...................................................................... 33

*Santobello v. New York*, 404 U.S. 257 (1971). ............................................................................. 18

*Southern Union v. United States*, 567 U.S. 343 (2012). ............................................................... 11

*United States v. Aegerion Pharm., Inc.*, 280 F. Supp. 3d 217 (D. Mass. 2017)............................. 21

*United States v. Armstrong*, 517 U.S. 456 (1996). ....................................................................... 24

*United States v. Bean*, 564 F.2d 700 (5th Cir. 1977)..................................................................... 17

*United States v. Blaszczak*, 56 F.4th 230 (2d Cir. 2022). .............................................................. 31

*United States v. BP Prod. N. Am. Inc.*, 610 F. Supp. 2d 655 (S.D. Tex. 2009). ..................... passim

*United States v. Bundy*, 359 F. Supp. 2d 535 (W.D. Va. 2005). .................................................... 17

*United States v. Crowell*, 60 F.3d 199 (5th Cir. 1995). ................................................................. 25

*United States v. Elliott*, 600 F. App'x 225 (5th Cir. 2015). ........................................................... 11

*United States v. Fesler*, 781 F.2d 384 (5th Cir. 1986).................................................................... 9

*United States v. Forkner*, 584 F. Supp. 3d 180 (N.D. Tex. 2022). ................................................. 10

*United States v. Foy*, 28 F.3d 464 (5th Cir. 1994). .......................................................................... 17

*United States v. Gallant*, 537 F.3d 1202 (10th Cir. 2008). ............................................................. 38

*United States v. Gonzalez*, 62 F.4th 954 (5th Cir. 2023). ............................................................... 28

*United States v. Guzman-Rendon*, 864 F.3d 409 (5th Cir. 2017). .................................................. 29

*United States v. Haga*, 821 F.2d 1036 (5th Cir. 1987). .................................................................. 31

*United States v. Herman*, 997 F.3d 251 (5th Cir. 2021). ............................................................... 31

*United States v. Kones*, 77 F.3d 66 (3d Cir. 1996). ........................................................................ 38

*United States v. Malone*, 747 F.3d 481 (7th Cir. 2014). ................................................................ 39

*United States v. Miller*, 722 F.2d 562 (9th Cir. 1983). ................................................................... 20

*United States v. Nixon*, 418 U.S. 683 (1974). ................................................................................ 23

*United States v. Pfaff*, 619 F.3d 172 (2d Cir. 2010). ...................................................................... 11

*United States v. Sandle*, 123 F.3d 809 (5th Cir. 1997). ................................................................. 29

*United States v. Serrano-Lara*, 698 F.3d 841 (5th Cir. 2012). ...................................................... 18

*United States v. Shah*, 95 F.4th 328 (5th Cir. 2024). ..................................................................... 31

*United States v. Smith*, 417 F.3d 483 (5th Cir. 2005). .............................................................. 25, 28

*United States v. Wild*, 92 F.3d 304 (5th Cir. 1996). ...................................................................... 17

*Wayte v. United States*, 470 U.S. 598 (1985). ................................................................................ 23

**Statutes**

18 U.S.C. § 1112(b) ............................................................................................................................ 9

18 U.S.C. § 31(a)(7) .......................................................................................................................... 10

18 U.S.C. § 3553(a) ........................................................................................................................ 4, 28

18 U.S.C. § 3663 .......................................................................................................................... 31, 39

18 U.S.C. § 3663 (a)(1)(B)(ii) ........................................................................................................... 38

18 U.S.C. § 3663A(c)(1)(A)(ii) ......................................................................................................... 31

18 U.S.C. § 3663A(c)(3)(B) ............................................................................... 38

18 U.S.C. § 3664(a) ............................................................................................ 39

18 U.S.C. § 371 ............................................................................................ 9, 31

18 U.S.C. § 3771 (a)(4) ...................................................................................... 23

18 U.S.C. § 3771(a)(5) ....................................................................................... 23

18 U.S.C. § 3771(a)(9) ....................................................................................... 23

18 U.S.C. § 3771(c)(1) ........................................................................................ 23

18 U.S.C. § 3771(d)(6) ....................................................................................... 23

18 U.S.C. § 38 ..................................................................................................... 10

18 U.S.C. § 38(a) .................................................................................................. 9

18 U.S.C. § 38(b)(3) .............................................................................................. 9

18 U.S.C. § 7 ......................................................................................................... 9

49 U.S.C. § 44701 .............................................................................................. 41

Federal Aviation Act of 1958, Pub. L. 85-726 (August 23, 1958) ................................. 41

## Rules

Fed. R. Crim. P. 11(c)(1) ………………………………………………………………8

Fed. R. Crim. P. 11(c)(1)(A) ............................................................................... 28

Fed. R Crim. P. 11(c)(1)(C)........................................................................... passim

## Other Authorities

EASA Boeing 737 MAX Return to Service Report, January 27, 2021, at 17, *available at*
    https://www.easa.europa.eu/sites/default/files/dfu/B737_Max_Return_to_Service_Report.pdf.
    ................................................................................................................ 36

EASA declares Boeing 737 MAX safe to return to service in Europe, January 27, 2021, *available
    at* https://www.easa.europa.eu/en/newsroom-and-events/press-releases/easa-declares-boeing-
    737-max-safe-return-service-europe#. ........................................................ 36

https://www.faa.gov/sites/faa.gov/files/2022-
    08/737_MAX_Rescission_of_Grounding_Order.pdf. .................................... 36

https://www.lot.com/pl/pl/biuro-prasowe/informacje-prasowe/pll-lot-z-miliardem-zysku-za-rok-2023)........................................................................................................................ 35

U.S. Department of Justice, Justice Manual § 9-27.000 (*Principles of Federal Prosecution*), *available at* https://www.justice.gov/jm/jm-9-27000-principles-federal-prosecution. .......... 3, 10

U.S. Department of Justice, Justice Manual § 9-28.000 (*Principles of Federal Prosecution of Business Organizations*), *available at* https://www.justice.gov/jm/jm-9-28000-principles-federal-prosecution-business-organizations. .................................................................. 3, 10, 41

List of Independent Compliance Monitors for Active and Previous Fraud Section Monitorships, Fraud Section, *available at* https://www.justice.gov/criminal/criminal-fraud/monitorships. ... 16

LOT Polish Airlines Reports Record-Breaking 2023 Results, AirlineGeeks.com (July 15, 2024), *available at* https://airlinegeeks.com/2024/07/15/lot-polish-airlines-reports-record-breaking-2023-results/ ...................................................................................................................... 35

Ownership Structure, LOT Polish Airlines, *available at* https://www.lot.com/us/en/corporate/ownership-structure ....................................................... 35

Revised Memorandum on Selection of Monitors in Criminal Division Matters, at 5 (March 1, 2023), *available at* https://www.justice.gov/criminal/criminal-fraud/file/1100366/dl. ............ 42

Thomas W. Hutchinson, et al., Federal Sentencing Law and Practice § 6B1.2 (2009). ............... 18

U.S.S.G. § 6B1.2 cmt. ................................................................................................................ 18

U.S.S.G. § 6B1.2(c) .................................................................................................................... 28

U.S.S.G. § 6B1.2(c), cmt. ........................................................................................................... 28

U.S.S.G. § 8C3.1(a) ................................................................................................................... 29

## I.      INTRODUCTION

The United States of America (the "Government") respectfully submits this Consolidated Response in Support of the Proposed Plea Agreement with Defendant The Boeing Company ("Boeing" or the "Company") (ECF No. 222-1, the "Agreement"), in opposition to the motions requesting that the Court reject the Agreement submitted pursuant to Federal Rule of Criminal Procedure 11(c)(1)(C). Four of those motions are filed on behalf of certain family members of the victims of the Lion Air Flight 610 and Ethiopian Airlines Flight 302 airplane crashes ("Families").[1] The other is filed on behalf of one of Boeing's airline entity customers that purchased the 737 MAX airplane ("Airline Entity Customers"), specifically Polskie Linie Lotnicze LOT S.A. ("LOT," collectively with the moving Families, the "Movants"). LOT also seeks recognition as a "crime victim," pursuant to the Crime Victims' Rights Act, 18 U.S.C. § 3771 ("CVRA").[2]

The Agreement is a strong and significant resolution that holds Boeing accountable and serves the public interest. It holds Boeing to account for the most serious, readily provable offense—conspiracy to obstruct and impede the lawful operation of the Federal Aviation Administration Aircraft Evaluation Group ("FAA AEG"), a federal felony—and for breaching the terms of its prior Deferred Prosecution Agreement ("DPA") with the Government. The Agreement requires Boeing to accept the statutory maximum fine of $487.2 million, on top of the billions the Company has already paid in connection with the DPA and prior or ongoing civil lawsuits. And

---

[1] Motion by Naoise Connolly Ryan, et al. (ECF No. 232 (unredacted), No. 234 (redacted)) ("Ryan Mot."); Motion by Arfiyandi, et al. (ECF No. 233) ("Arfiyandi Mot."); Motion by Manfredi Family (ECF No. 236) ("Manfredi Mot."); and Motion by Rini Eka A. Soegiyono, et al. (ECF No. 238) ("Soegiyono Mot."). *See also* Notice by Naoise Connolly Ryan, et al. (ECF No. 242) (identifying other Family members supporting the Ryan Motion).

[2] Motion by LOT (ECF No. 235) ("LOT Mot."). Mr. Anthony Keyter also filed a motion in opposition to the Agreement (ECF No. 229 (amended)). The Government respectfully requests that the Court enter an order similar to its order disposing of his first motion. (ECF No. 192).

the Agreement resolves liability *only* for the conduct described in the Statement of Facts and does not provide immunity for any other misconduct, including the Alaska Airlines 1282 incident.

The Agreement further provides the Families, who were determined by the Court to be victims under the CVRA, with all legally available remedies. It ensures that Boeing pays any and all lawful, Court-ordered restitution to the Families, and does not include a monetary cap on the amount of restitution that the Court can impose. At the Families' request, the Agreement also requires that Boeing's Board of Directors meet with the Families to hear directly from them about the impact of Boeing's criminal conduct and how the Company can improve its compliance and safety practices and culture.

The Agreement also secures benefits immediately, and over and above what the Government might obtain if the Government proceeded to trial and secured a conviction on the pending Criminal Information (ECF No. 1). In addition to requiring a statutory maximum fine of $487.2 million, the Agreement requires Boeing to make a further investment of $455 million to strengthen its compliance, safety, and quality programs over three years of court-supervised probation. These enhancements will directly benefit the public by reducing the risk of the recurrence of Boeing's fraudulent misconduct and ensuring that the company effectively integrates its safety and compliance programs.

Finally, the Agreement includes an essential mechanism for preventing future wrongdoing: the imposition of an independent compliance monitor ("Monitor"). This Monitor will ensure that Boeing implements the controls necessary to detect and deter both the criminal conduct charged in the Information, as described in Attachment A-2 of the Agreement, and the conduct that formed the basis for the DPA breach, as described in Attachment A-1 of the Agreement. By evaluating the Company's integration of its safety and compliance programs, the Monitor will assess whether

Boeing has adequately mitigated the risk of providing false or fraudulent information to the FAA and other government regulators—helping to ensure that those entities can effectively carry out their regulatory mandate and protect the flying public. And given the importance of selecting the most qualified candidate possible to serve as Monitor, the Agreement strikes a careful balance: it establishes an open process for soliciting Monitor candidates—addressing a concern voiced by the Families during the consultation process—while maintaining orderly, transparent selection procedures that ensure the Monitor complements, and does not supplant, the role of domestic and international safety regulators.

In the Government's judgment, the Agreement is fair and just, as well as a strong resolution of this matter that serves the public interest. And ultimately, the Government's decision to enter into this Agreement is dictated by what it can prove in court and what it cannot. The Government can prove beyond a reasonable doubt that Boeing defrauded the FAA, and that this fraud caused a gain of $243.6 million. For that conduct, the Government has secured the best criminal resolution possible. Yet despite exhaustive investigation—both prior to the 2021 DPA and more recently—the Government cannot prove beyond a reasonable doubt that Boeing's fraud directly and proximately caused the 737 MAX plane crashes, and it cannot prove beyond a reasonable doubt that the loss (or gain) arising from Boeing's fraudulent activity exceeded $243.6 million.[3] Guided by the law, the evidence, and the Department's *Principles of Federal Prosecution*,[4] the

---

[3] The Government respects and does not challenge the Court's prior determination on direct and proximate causation under the CVRA. Second Memorandum Opinion and Order, ECF No. 116 (Oct. 21, 2022). But as discussed further below, that ruling was based on a lower burden of proof (preponderance of the evidence) and an evidentiary record consisting of expert testimony that was not subject to *Daubert* or the Federal Rules of Evidence. *See infra* Section III.D.

[4] U.S. Department of Justice, Justice Manual ("JM") § 9-27.000 (*Principles of Federal Prosecution*), *available at* https://www.justice.gov/jm/jm-9-27000-principles-federal-prosecution; JM § 9-28.000 (*Principles of Federal Prosecution of Business Organizations*), *available at* https://www.justice.gov/jm/jm-9-28000-principles-federal-prosecution-business-organizations.

Government has obtained a resolution that sets out the facts it could prove at trial and carries a proposed sentence that satisfies each of the factors this Court must consider under 18 U.S.C. § 3553(a).

The Government has considered the views of the Families and Airline Entity Customers, and has met with them multiple times over the past several months as the Government considered potential resolutions of this matter. Since April, the Government has hosted three multi-hour consultation sessions and reviewed hundreds of pages in submissions from the Families and Airline Entity Customers. These consultations did not simply shape the Government's overall approach to negotiations with Boeing; they also provided the basis for several important elements of the resolution, including the Monitor selection process and the mandatory meeting of Boeing's Board with victim families. The Government has the deepest respect for the victims and their passionate advocacy in this matter. Yet in the end, after years of investigation, the Government has not found the one thing that underlies the families' most passionate objections to the proposed resolution: evidence that could prove beyond a reasonable doubt that Boeing's fraud caused the deaths of their loved ones. The Government thus respectfully asks the Court to accept a plea agreement that secures the best possible resolution given the facts of this tragic case.

## II.    FACTUAL BACKGROUND

To better frame the reasons why the Court should accept the Agreement, below is a discussion of relevant facts organized into three parts: the Government's conferrals with the Families and Airline Entity Customers; what a trial and sentencing of Boeing would look like if the Court rejected the Agreement; and clarification of certain terms of the Agreement.

A.      **The Government Has Conferred with the Families and Airline Entity Customers**

The Court previously held that after the Families came forward in this case, the Government dealt with them in good faith and in satisfaction of the CVRA.[5] The Government has continued to engage with the Families in that manner, as set forth in the accompanying Declaration and supporting exhibits.[6] The Government recognizes the extraordinary pain that the Families have experienced as a result of the 2018 and 2019 airplane crashes, and the Government has sought their guidance in an effort to provide the most fair and just resolution possible under the circumstances.

In short, since the DPA expired, the Government has met with the Families and their counsel, and the Airline Entity Customers, on numerous occasions,[7] in addition to reviewing hundreds of pages of written submissions from them and having numerous email exchanges and other calls with counsel.[8] The Government was represented at each conferral by the Chief of the Criminal Division's Fraud Section and the Chief of the Fraud and Public Corruption Section of the U.S. Attorney's Office for the Northern District of Texas ("USAO-NDTX"), as well as line prosecutors from the Fraud Section.[9] Also attending certain of the conferrals were senior leaders from the Office of the Deputy Attorney General, the Criminal Division, and the U.S. Attorney's Office for the Northern District of Texas.[10] Feedback from the conferrals and written submissions,

---

[5] Third Memorandum Opinion and Order, ECF No. 185, at 20, 25 (Feb. 9, 2023).

[6] *See generally* Exhibit 1, Declaration of Sean P. Tonolli ("Gov't Decl."), and accompanying Exhibits 2-42.

[7] *See* Gov't Decl. ¶¶ 19, 22-24, 35, 37, 51, 62.

[8] *Id*. ¶ 34, 50, 56, 64.

[9] *Id*. ¶¶ 23-24, 38, 52.

[10] *Id*. ¶¶ 23-24, 52.

and other engagement with counsel, informed the Government's plea offer, the terms of which the Government told the Families and Airline Entity Customers in a conferral before telling Boeing,[11] and which terms the Government further modified after extending the initial offer to Boeing in order to more extensively incorporate their feedback regarding the monitorship process and restitution terms based on feedback during that conferral.[12]

The bottom line is that senior Department leadership and career line prosecutors have repeatedly and extensively consulted with the Families and Airline Entity Customers at the important junctures of the case, including to discuss the terms of a plea agreement. Their voices have been heard, considered, and incorporated into the Government's decision-making.

Indeed, none of the Movants argues that the Government failed to satisfy the CVRA's obligation to confer about and provide timely notice of the Agreement (because the Government has satisfied its obligations), let alone that the Court should reject the Agreement because of a CVRA violation (because there has been no violation). Only the Ryan Motion nods at a *possible* argument—that the Government supposedly failed "to ever specifically discuss the proposed agreement's terms"—but then expressly disavows and waives it.[13] And for good reason. Some of the Agreement's terms came from feedback by Ms. Ryan's counsel himself: the meeting between the Board of Directors and the Families;[14] Boeing's required investment in its compliance, safety, and quality programs;[15] requiring a Monitor;[16] requiring the Monitor to file on the public docket

---

[11] *Id*. ¶ 51-54.

[12] *Id*. ¶¶ 51-58.

[13] Ryan Mot. at 2-3.

[14] Gov't Decl. ¶ 46.

[15] *Id*.

[16] *Id*.

executive summaries of his or her annual reports to the Government in order to give the Families and the public visibility into the Monitor's work;[17] a Monitor selection process in which Boeing does not select the candidate pool;[18] and the Government's support of lawful restitution claims by the Families.[19] Indeed, the latter two terms reflect changes to the plea offer that the Government implemented after considering counsel's "vigorous[] object[ions]" during the June 30, 2024, conferral session about the offer terms.[20] And contrary to the suggestion that the scheduling of the June 30th conferral was hurried and improper,[21] it was Ms. Ryan's counsel who offered that the Families would make themselves available within 24 hours' notice to confer once the Government decided on a plea offer—a request the Government honored.[22]

      With the benefit of the conferrals, the Government proceeded in the normal course to make the plea offer and to negotiate the Agreement.[23] Some of the Families portray the negotiation process as inappropriate because they were not involved.[24] Whether a defendant is a company or an individual, however, the Government negotiates plea agreements the same way—through discussions with the defendant via their counsel. These discussions are not conducted in public or with third party involvement, but in routine exchanges among counsel over the phone, in writing, and in person. It is not Department practice to involve crime victims or their counsel directly in

---

[17] Families Statement Regarding Proposed Court-Imposed Conditions of Release, ECF No. 170, at 26 (Jan. 25, 2023).

[18] Gov't Decl. ¶¶ 46, 53.

[19] *Id*. ¶ 53.

[20] *Id*. ¶ 58; Ryan Mot. at 2.

[21] Ryan Mot. at 2-3; Arfiyandi Mot. at 11.

[22] Gov't Decl. ¶ 42.

[23] *Id*. ¶¶ 55, 63.

[24] *See e.g.*, Ryan Mot. 2-3.

these discussions or to share the content of those discussions with them, nor is that required by the CVRA. The Government's negotiations with Boeing's counsel were standard and proper.[25]

As for the Families' suggestions about the Government's motives and conduct more broadly, these too lack a factual basis.[26] The Government has repeatedly acknowledged and apologized for its mistake in not conferring before entering the DPA. That mistake—which the Court determined was a good-faith legal error[27]—is not a valid reason to question the integrity and professionalism of the Government's attorneys. Furthermore, the line attorneys and leadership over the Department components responsible for this case have nearly completely turned over since the parties entered into the DPA in January 2021, and at every juncture, the attorneys assigned to the case have dispassionately evaluated the facts, the law, and the submissions from the Families and the Airline Entity Customers, to determine how best to proceed, consistent with the Department's *Principles of Federal Prosecution*.[28]

### B.      What Trial and Sentencing Would Look Like Absent a Guilty Plea

The Government is bound by the facts and the law, which dictated several conclusions in this case: first, that Boeing breached the DPA; second, that prosecution is warranted; and finally, that the Agreement is a fair and just resolution that serves the public interest. And as the Government has explained to the Families, it did not reach these conclusions lightly. This case

---

[25] The text of Rule 11 of the Federal Rules of Criminal Procedure does not contemplate involvement of any parties aside from the defendant and the government in plea discussions. It provides that: "[a]n attorney for the government and the defendant's attorney, or the defendant when proceeding *pro se*, may discuss and reach a plea agreement. The court must not participate in these discussions." *See* Fed. R. Crim. P. 11(c)(1). Moreover, the CVRA provides that victims have the right to confer with the Government and to be informed in a timely manner of any plea bargain, but not the right to participate in plea discussions. 18 U.S.C. § 3771.

[26] *See e.g.*, Ryan Mot. 8-10.

[27] Third Memorandum Opinion and Order, ECF No. 185, at 20 (Feb. 9, 2023).

[28] JM §§ 9-27.000, 9-28.000.

resulted from an extensive criminal investigation, in which the Government conducted approximately 200 interviews and related contacts with more than 120 individual witnesses and collected more than 15 million documents.[29] The Government carefully considered the evidence with a view towards pursuing the most serious readily provable charges, consistent with the gravity of these events.

When evaluating a potential resolution in this case, the Government considered, among other things, how this case would proceed were Boeing not to plead guilty and the case were set for trial. These considerations all underscore why this Agreement is the best available resolution, given the facts and the law.

*First,* the charges and trial against Boeing would prove more limited than the Families suggest. As the Government has explained to the Families, it would prosecute Boeing for conspiring to defraud the FAA AEG, in violation of 18 U.S.C. § 371, and not for two more serious federal charges: manslaughter, in violation of 18 U.S.C. § 1112(b), or death-resulting fraud involving aircraft parts, in violation of 18 U.S.C. §§ 38(a), (b)(3). The Government has communicated to the Families that federal manslaughter charges are not legally available because Boeing's crime did not occur within the "special maritime and territorial jurisdiction of the United States," 18 U.S.C. § 1112(b); *see id.* § 7 (defining that phrase), and the Government does not believe that the evidence would prove the essential elements of that offense beyond a reasonable doubt, *see, e.g.*, *United States v. Fesler*, 781 F.2d 384, 393 (5th Cir. 1986). Similarly, the Government has concluded that a prosecution for aircraft parts fraud is not viable in light of the dismissal of similar charges against Boeing's Chief Technical Pilot two years ago. *See United*

---

[29] Gov't Decl. ¶ 6.

*States v. Forkner*, 584 F. Supp. 3d 180, 186-89 (N.D. Tex. 2022) (holding that MCAS is not an aircraft "part" for the purposes of 18 U.S.C. §§ 31(a)(7), 38).

A trial of Boeing for conspiring to defraud the FAA would not therefore materially differ from the trial of Boeing's former Chief Technical Pilot. At the core of the Families' objections is the presumption that if the Court rejects the Agreement, the Government will present a more expansive case at trial (or at sentencing post-trial) that reveals a criminal conspiracy that reached to the highest levels of the Company, and proves that Boeing is criminally responsible for the deaths of their loved ones and exposed to a fine in the tens of billions of dollars. But the reality presented by the evidence and the law—and the Government has explained this during conferrals[30]—is that the Government could not, consistent with Department policy and its ethical and professional obligations, put on such a case.[31] The testimony and evidence the Government can seek to introduce against Boeing would track the Statement of Facts accompanying the Agreement and overlap to a substantial degree with the testimony and evidence the Government introduced in the trial of Boeing's former Chief Technical Pilot.[32]

The Government's case at trial would, in all material respects, be a repeat of the prior trial— centered on and bounded by the lies to the FAA by the former Chief Technical Pilot before the crashes. As in that trial, the Government would not put on evidence about the causes of the crashes or the groundings. That is because the Government does not have sufficient evidence (i) to charge Boeing with a federal criminal offense with an offense element relating to the deaths; (ii) to allege and prove beyond a reasonable doubt that any other Boeing personnel, including senior executives

---

[30] *Id*. ¶¶ 39-40, 52.

[31] *Id*. ¶¶ 6-14; JM §§ 9-27.000, 9-28.000.

[32] Gov't Decl. ¶ 14.

and board members, conspired with the former Chief Technical Pilot and the other Technical Pilot; or (iii) to allege and prove beyond a reasonable doubt a pecuniary gross gain or loss amount greater than the $243.6 million in training-cost savings Boeing derived.[33]

*Second*, if Boeing were convicted at trial, the highest the statutory maximum fine could be is $487.2 million, but it could be as low as $500,000. "In *Southern Union* [*v. United States*, 567 U.S. 343 (2012)], the [Supreme] Court held that *Apprendi* applies to the imposition of criminal fines[.]" *United States v. Elliott*, 600 F. App'x 225, 227 (5th Cir. 2015).[34] "[T]he 'statutory maximum' for *Apprendi* purposes is the maximum sentence a judge may impose *solely on the basis of the facts reflected in the jury verdict or admitted by the defendant*." *Blakely v. Washington*, 542 U.S. 296, 303 (2004) (emphasis in original). Because at trial the Government's evidence on pecuniary gain or loss would be limited to the training-related cost savings, the highest gain or loss amount the jury could find would be $243.6 million.[35] But it would be the prerogative of the jury to find a lower amount, and the jury's determinations could lead to a statutory maximum lower than that set forth in the Agreement. The Agreement, by contrast, guarantees that Boeing pays the

---

[33] Gov't Decl. ¶¶ 6-14.

[34] The Families relegate *Southern Union* to a footnote and suggest it only requires indicting Boeing as to "the specific gain or loss amount." Ryan Mot. 30 n.27. That is an untenable reading of *Southern Union* and *Apprendi*'s progeny. Boeing would escape with a $500,000 fine after its inevitable appeal if, as the Families advocate, *see id.* at 21-22, 24, 30 n.27, the Court increased the statutory maximum fine at sentencing based on facts not proven at trial or admitted by Boeing. *See United States v. Pfaff*, 619 F.3d 172, 175-76 (2d Cir. 2010) (vacating Section 3571(d) fine imposed in such a manner).

[35] Gov't Decl. ¶ 11.

highest possible statutory maximum fine consistent with the evidence the Government would present at trial: $487.2 million.[36]

*Finally*, notwithstanding the strength of the Government's case, conviction at trial is not guaranteed—as is true in any matter that the Government must prove beyond a reasonable doubt. The Government would not proceed against Boeing on the DPA Statement of Facts alone—even the Movants do not suggest as much—and would need to call witnesses and introduce corroborating evidence. The Court observed for itself how the prior trial proceeded, which ended in acquittal, and has commented on potential vulnerabilities in the Government's evidence.[37] Given these and other issues, Boeing could challenge the admissibility of the DPA Statement of Facts and the factual foundation for at least certain of the assertions in the document. The Movants do not sufficiently account for the fact that, as in all cases, particularly those tried before juries, the Government would therefore face litigation risk at trial.[38] And if Boeing were acquitted, there would be no finding that the Company is guilty of any crime, and the Company would escape further accountability and oversight.

### C.    Clarifying the Record on Certain Terms of the Agreement

The Families question the meaning of or misinterpret certain terms in the Agreement, which the Government wishes to clarify.

<u>Restitution</u>. The Families point to ¶ 25(c), "The Offices retain the right to support any legally authorized claim for restitution presented by a Crash Victim Family," and question whether

---

[36] In addition, the Agreement secures a remedial order, pursuant to U.S.S.G. § 8B1.2, that requires the Company to invest a further $455 million in its compliance, safety, and quality programs during the three-year term of probation—a condition that could be subject to litigation were the Court to impose after trial a remedial order that exceeded the statutory maximum fine.

[37] *See e.g.*, Evidentiary H'rg Tr. at 35:9-16, 36:2, 37:1-5 (Aug. 26, 2022).

[38] *See* Ryan Mot. at 10.

the Government actually will support such claims.[39] The Government will.[40] A term of the original plea offer was that the Government would stay neutral on restitution.[41] But when the Government's position changed, reflecting feedback from the Families (and particularly Ms. Ryan's counsel),[42] it incorporated the language in question to ensure that it was clear to Boeing that the Government no longer agrees to stay neutral. That said, based on discussions during the conferral process, the Government and at least some Families are not likely to be in complete agreement on what constitutes a "legally authorized claim."

Independent Compliance Monitorship. *First*, the Agreement does not place "the monitoring of Boeing squarely in the Department's hands."[43] To be sure, the Monitor will report to and be overseen by the Government.[44] That posture is not unique or unusual to this case. To the contrary, as discussed in more detail below, the Criminal Division's well-established practice is to appoint and oversee monitors directly under all forms of corporate criminal resolution agreements, including plea agreements. But it is the Monitor who will be responsible for monitoring the Company and will be independent of the Government, Boeing, and of any other actual or apparent conflicts of interest.[45] The Monitor will conduct the review of the Company's compliance program, issue reports, make recommendations, and test the implementation of those recommendations.[46] It is the Monitor, not the Government, who will ultimately make the determination of whether to

---

[39] *Id*. at 45; Arfiyandi Mot. at 18.

[40] Gov't Decl. ¶ 58.

[41] *Id*. ¶ 52(e).

[42] *Id*. ¶ 58.

[43] Ryan Mot. at 37.

[44] Agreement ¶ 25(f).

[45] *See id*. ¶¶ 30-31.

[46] *See generally id*., Attachment D.

certify that the Company has implemented a compliance program that is reasonably designed and implemented to prevent and detect violations of U.S. fraud laws.[47] The Monitor will exercise his or her independent, professional judgment about how to carry out their duties and will file annual executive summaries of their work with the Court.[48] Those executive summaries will be publicly available, a departure from the Criminal Division's standard practice made in response to feedback from the Families.[49]

*Second*, the Agreement does not exclude the Families from the selection process.[50] They can encourage and support the applications of however many qualified candidates they identify. The Government would welcome the views of the Families on the candidates they support. Indeed, the Government changed its selection process because of their objection to the Government's standard process, under which Boeing would have selected the candidate pool and the Families would have had no involvement.[51]

*Third*, the Agreement does not exclude the Court from the selection process.[52] When the Government identifies the qualified candidate it believes should be appointed, it will notify the

---

[47] *Id*. ¶ 25.

[48] *Id*. ¶¶ 15, 20, 24, 26.

[49] The Agreement provides that the Monitor will submit periodic, written work plans and reports to the Government, in accordance with Attachment D. In the course of his or her review, it is expected that the Monitor may review Boeing's proprietary, financial, confidential, and competitive business information. For the Monitorship to be successful, Boeing must be candid and transparent with the Monitor, without fear that proprietary or competitively sensitive information may become public. Similarly, the Monitor must be able to report fully to the Department, without stripping from their reports subject matter involving potentially confidential information. For these reasons, the Monitor's work plans and written reports must remain confidential within the Department.

[50] Ryan Mot. at 37. *See* Agreement ¶ 30.

[51] Gov't Decl. ¶ 58.

[52] Ryan Mot. at 37; Agreement ¶ 35.

Court and wait 10 days before making the appointment. The purpose of that delay is to allow the Court to provide feedback, whether that be a concern, question, or the like. The Government will take the Court's feedback into consideration before making the appointment. This, too, is a change in the Criminal Division's standard process, by which it would have appointed the candidate immediately upon selection, and the change was in direct response to the Families' expressed concerns.[53]

*Fourth*, the Agreement is clear that Boeing must abide by all the obligations in the document.[54] Certain of those are defined as conditions of probation, and others are not, such as the obligation to implement the Monitor's recommendations and the compliance obligations in Attachment C.[55] But there are meaningful accountability measures for failure to satisfy either type. A failure to satisfy the non-probation obligations would trigger the Government's authority to find the Company in breach, subjecting it to the possibility of further prosecution and/or extension of the term of the Agreement (and the monitorship) by up to one year.[56] The Government, of course, has demonstrated its commitment to holding Boeing accountable by exercising its authority under the DPA to find Boeing in breach and to proceed with prosecuting the Company.

*Fifth*, and finally, this is not the first corporate plea agreement that excludes from probation conditions the implementation of the Monitor's recommendations and the compliance obligations

---

[53] Gov't Decl. ¶ 58.

[54] Ryan Mot. at 39; Agreement ¶¶ 7, 14, 38.

[55] Agreement ¶¶ 39-40.

[56] *Id*. ¶¶ 14, 38, 40.

in Attachment C.[57] But the Agreement's language on this point is new, and the purpose simply is to make that carveout clearer for the benefit of the Court and the Probation Office. The reason for the carveout is that under the Agreement, the Government is responsible for determining whether Boeing has met its compliance obligations, informed by the Monitor's reports on, and certification (or not) of, whether the Company has a compliance program that is reasonably designed and implemented to prevent and detect violations of U.S. fraud laws. As discussed more below, the Fraud Section has deep expertise with monitorships, having appointed and managed numerous monitors in similar cases, and with evaluating corporate compliance programs, which it does in every corporate case it brings.[58]

<u>Investment in Compliance, Safety, and Quality</u>. Finally, the Families mischaracterize the $455 million investment as unenforceable.[59] That is incorrect. The Government and the Probation Office will receive the Company's reports on its expenditures, which the Government is confident both entities can adequately assess.[60] Of course, should either require the assistance or perspective of the Monitor, the Agreement does not prohibit consultation; it just does not require Boeing to submit the reports to the Monitor in the first instance. And if the Company fails to adequately

---

[57] Ryan. Mot. at 38-39; Agreement ¶ 25(f). *See e.g.*, Plea Agreement, ECF 28-1 at ¶ 22(d), *United States v. Telefonaktiebolaget LM Ericsson*, 1:19-cr-884 (S.D.N.Y. Mar. 2, 2023) (providing that ¶¶ 8(a)-(g), 12, 13, and 22(a) are conditions of probation; ¶¶ 8(h)-(i), 9, and 10 are not); Plea Agreement, ECF No. 18 at ¶ 21(f), *United States v. Glencore Ltd*, No. 3:22-cr-71 (D. Conn. May 24, 2022) (providing that ¶¶ 10, 11, and 21(a) are conditions of probation; ¶¶ 6(h)-(i) and 7 are not).

[58] List of Independent Compliance Monitors for Active and Previous Fraud Section Monitorships, Fraud Section, *available at* https://www.justice.gov/criminal/criminal-fraud/monitorships.

[59] Ryan Mot. at 41; Agreement ¶ 25(g).

[60] Agreement ¶ 25(g).

invest, that would constitute a breach of both the Agreement and a condition of probation, allowing the Government and the Court to take corrective action.[61]

As for the Families' contention that Boeing is getting credit for money it would have already spent, again, that is incorrect.[62] For one, the required investment will ensure funds are dedicated to developing internal capacity to support the Monitor's efforts and to implement his or her recommendations. This is directly responsive to feedback from Ms. Ryan's counsel.[63] Beyond that, the required investment will ensure that Boeing can continue to fund its compliance program at or above its current funding level, which grew considerably over the DPA term, and otherwise devote additional funds to support safety and quality programs.

## III.    LEGAL STANDARD

"A district court possesses broad discretion in deciding whether to accept or reject a guilty plea," *United States v. Wild*, 92 F.3d 304, 308 (5th Cir. 1996), including a plea pursuant to Federal Rule of Criminal Procedure 11(c)(1)(C), *United States v. BP Prod. N. Am. Inc.*, 610 F. Supp. 2d 655, 674 (S.D. Tex. 2009). In exercising its discretion whether to accept or reject a plea agreement, a district court should consider the public interest, *United States v. Bean*, 564 F.2d 700, 704 (5th Cir. 1977), and severity of the proposed sentence, *United States v. Foy*, 28 F.3d 464, 472 (5th Cir. 1994), but should also, as a district court within this circuit has recognized, "take into account 'the exigencies of plea bargaining from the government's point of view,' including 'limited resources and uncertainty of result.'" *BP Prod.*, 610 F. Supp. 2d at 674 (quoting *United States v. Bundy*, 359 F. Supp. 2d 535, 538 (W.D. Va. 2005)). Plea agreements are no miscarriage of justice; rather, they

---

[61] *Id.* ¶¶ 14, 38-40.

[62] Ryan Mot. 42-43.

[63] Gov't Decl. ¶ 46.

are "an essential component of the administration of justice," "to be encouraged" as "highly desirable for many reasons." *Santobello v. New York*, 404 U.S. 257, 260-61 (1971). Not only do plea agreements allow for prompt and final disposition, *id.*, but they give the defendant "the chance to acknowledge his guilt" and "can benefit all concerned." *Blackledge v. Allison*, 431 U.S. 63, 71 (1977).

Although a district court's discretion in this area may be broad, "[t]here are limits on a court's discretion," *BP Prod.*, 610 F. Supp. 2d at 675, and that discretion "is not unbounded." *In re Morgan*, 506 F.3d 705, 710 (9th Cir. 2007). A "court may not use its discretion to accept or reject a Rule 11(c)(1)(C) plea to intrude into the plea-bargaining process." *BP Prod.*, 610 F. Supp. 2d at 675; *see also United States v. Serrano-Lara*, 698 F.3d 841, 844-45 (5th Cir. 2012) ("[A] court choosing to accept a plea agreement does not then have the option to perform a judicial line-item veto, striking a valid appeal waiver or modifying any other terms."). Nor may a court reject the plea "on the grounds that it fails to charge a sufficiently severe crime, provided that the government has not made its decision not to charge a higher offense contingent on the defendant's acceptance of the plea bargain." *BP Prod.*, 610 F. Supp. 2d at 675. This is because "[t]he government has wide prosecutorial discretion to bring appropriate charges, and the court must 'defer to the government's position except under extraordinary circumstances.'" *Id.* (quoting Thomas W. Hutchinson, et al., Federal Sentencing Law and Practice § 6B1.2 (2009)). "A court may not 'intrude upon the charging discretion of the prosecutor.'" *Id.* (quoting U.S.S.G. § 6B1.2 cmt.).

## IV.    ARGUMENT

The Agreement ensures Boeing is held fully accountable for its criminal conduct and the financial benefits the Company reaped from that conduct (and for breaching a prior agreement)—requiring a guilty plea to the pending felony charge, which is the most serious readily provable offense, and payment of the statutory maximum fine. The Agreement further allows, and the

Government will support, the Families receiving all lawful restitution to which they are entitled, with no cap on the amount the Court can order in its full discretion. The Agreement also protects the American public—requiring Boeing to make historic additional investments in compliance and safety, of nearly half a billion dollars over the next three years; imposing a three-year Monitor to ensure that, among other things, the Company better integrates quality and safety risks into its compliance and ethics function; and subjecting Boeing to three years of Court-supervised probation. It also requires the Boeing Board of Directors to meet with the Families. For all these reasons and more, the Court should accept the Agreement and take Boeing's guilty plea.

Rejecting the Agreement will not bring the Families what they seek. The Families fault the Agreement for not holding Boeing and its senior executives criminally responsible for the deaths of their loved ones (separate and apart from restitution) or subjecting Boeing to a fine in the tens of billions of dollars for those deaths. But if the case went to trial instead of being resolved by plea, the Government would put on the case that is consistent with the facts and the law, the Department's ethical and professional obligations, and the *Principles of Federal Prosecution*. That trial would track the prior trial of Boeing's former Chief Technical Pilot. It would not be about the crashes or the groundings. It would be about his and the other Technical Pilot's lies to the FAA and the $243.6 million the Company saved in training-related costs. In other words, assuming there was a conviction, the trial would place Boeing in the same position it is in under the Agreement in terms of the scope of its criminal culpability, fine exposure, and restitution obligations to the Families. The Families' desire for the Government to prosecute a different case is therefore not a valid argument for rejecting the Agreement. Nor are the remaining arguments about restitution and the monitorship, which the Government takes in turn. But first, the Government addresses the

Families' argument that the Court should reject the Agreement "without considering its merits" because it is presented under Rule 11(c)(1)(C).

## A. An Individualized Assessment of the Agreement Supports Accepting Boeing's Guilty Plea

Consistent with the law and the exercise of its sound discretion, the Court can accept the Agreement only if it presents, in the Court's judgment, a fair and just sentence that is in the public interest. It is of little moment, then, that the Families cite cases where courts rejected agreements. With the discretion afforded under Rule 11(c)(1)(C), it is to be expected that courts have not uniformly accepted or rejected agreements.[64] *See BP Prod.*, 610 F. Supp. 2d at 674 (citing *United States v. Miller*, 722 F.2d 562, 565 (9th Cir. 1983)) ("A court may not apply categorical rules in deciding whether to accept or reject a plea agreement under Rule 11(c)(1)(C) because 'the existence of discretion requires its exercise.'"). That is because a "court must make an 'individualized assessment' of the plea agreement." *Id*. at 674-75 (quoting *In re Morgan*, 506 F.3d at 712 ("[D]istrict courts must consider individually every sentence bargain presented to them and must set forth, on the record, the court's reasons in light of the specific circumstances of the case for rejecting the bargain.").

There are legitimate reasons Rule 11(c)(1)(C) is commonly used for corporate guilty pleas, and courts regularly accept them.[65] Companies, especially publicly traded companies like Boeing, have "employees, investors, pensioners, and customers, many of whom may, depending on the

---

[64] Ryan Mot. at 5.

[65] In the past decade, the Criminal Division has secured over 30 corporate guilty pleas under Rule 11(c)(1)(C). *E.g.*, *United States v. Trafigura Beheer B.V.*, 1:23-cr-20476 (S.D. Fla.); *United States v. Binance Holdings Ltd.*, 2:23-cr-178 (W.D. Wash.); *United States v. Glencore Ltd.*, 3:22-cr-71 (D. Conn.); *United States v. Telefonaktiebolaget LM Ericsson*, 1:19-cr-884 (S.D.N.Y.); *United States v. IAV GmbH*, 2:16-cr-20394 (E.D. Mich.); *United States v. Odebrecht S.A.*, 1:16-cr-643 (E.D.N.Y.); *United States v. BNP Paribas S.A.*, 1:14-cr-460 (S.D.N.Y.).

size and nature of the corporation and their role in its operations, have played no role in the criminal conduct, have been unaware of it, have been unable to prevent it, or have been victimized by it."[66] Moreover, companies like Boeing may also face "non-penal sanctions that may accompany a criminal charge, such as potential suspension or debarment from eligibility for government contracts or federally funded programs such as health care programs."[67] Uncertainty regarding the contours of a criminal resolution can affect a company like Boeing's ability to manage its risk relating to suspension, debarment, and creditors, and the inability to manage these risks may create substantial unwarranted collateral consequences to its employees, investors, pensioners, and customers.[68]

To be sure, a district court in another jurisdiction found this rationale unconvincing and leveled other criticisms of Rule 11(c)(1)(C) corporate pleas in *United States v. Aegerion Pharm., Inc.*, 280 F. Supp. 3d 217 (D. Mass. 2017), though that decision is not binding on this Court. The Families quote this case liberally, but do not discuss the specifics of the agreement that precipitated the court's response. Those included a plea to two misdemeanor offenses; a fine of $6.2 million, with an agreed Guidelines range between approximately $18.5 and $31 million; no restitution for patient victims; no requirement of an independent compliance monitor; and the agreement precluded the court from exercising any discretion at sentencing. 280 F. Supp. 3d at 218-21.

---

[66] JM § 9-28.1100, Comment.

[67] *Id*.

[68] The four Rule 11(c)(1)(B) corporate guilty pleas the Families cite, Ryan Mot. at 7 n.2, are different from the case presented here and those of similarly situated large companies. Those cases involved small, privately held companies that resolved cases involving penalties ranging from approximately $18,000 to $2 million. The Fraud Section and USAO-NDTX were not involved in those cases.

21

Unlike in *Aegerion*, the Agreement here results in a more significant outcome for Boeing in almost every material respect: a plea to a felony, the most serious readily provable offense; a statutory maximum fine; restitution for the Families; an investment of $455 million in its compliance, safety, and quality programs; and an independent compliance monitor. Moreover, the Agreement affords the Court more sentencing discretion than a typical Rule 11(c)(1)(C) agreement. Specifically, the Court can: (i) choose to credit (or not credit) the $243.6 million Boeing previously paid against the $487.2 million statutory maximum fine; (ii) determine the amount of lawful restitution owed to the Families; and (iii) provide feedback on the qualified candidate the Government is inclined to select as the Monitor before the Government finalizes the appointment.

### B. The Agreement Should Be Accepted Because It Holds Boeing Fully Accountable for Its Criminal Conduct

The most important components of the Agreement are that it requires Boeing to plead guilty to the pending Criminal Information, which charges the most serious readily provable offense, and to pay the statutory maximum fine. In other words, the Agreement punishes Boeing to the maximum extent of the law. The Families object, but not based on any charging document the Government has filed, or factual allegation the Government has made in this case or that of the former Chief Technical Pilot. Instead, they present their "Proposed Alternative Statement of Facts" and insist that unless and until the Government agrees to make the same or similar allegations— that Boeing and senior executives engaged in a longer and broader conspiracy that makes them each criminally responsible for the deaths and for a fine in the tens of billions of dollars—the Court must refuse to accept the Agreement.[69] In all but name, then, they are asking the Court to compel

---

[69] Ryan Mot. 11-35; *id*. Exhibit 1 ("Proposed Alternative Statement of Facts").

the Government to charge and prosecute a different conspiracy case that the Government has determined is not supported by the evidence and law.[70]

The Government understands the Families' desire to seek maximum accountability for the deaths of their loved ones. But the Government is bound by the facts and the law, and it cannot prosecute a case that it cannot prove. "It is a bedrock principle of our system of government that the decision to prosecute is made, not by judges or crime victims, but by officials in the executive branch. And so it is not the province of the judiciary to dictate to executive branch officials who shall be subject to investigation or prosecution." *Lefebure v. D'Aquilla*, 15 F.4th 650, 654 (5th Cir. 2021). "As the Supreme Court has unanimously observed, 'the Executive Branch has exclusive authority and absolute discretion to decide whether to prosecute a case.'" *Id.* (quoting *United States v. Nixon*, 418 U.S. 683, 693 (1974)).

It is the Government's role to review "the strength of the case," *Wayte v. United States*, 470 U.S. 598, 607 (1985), and then decide what charges to bring and how it will prove those charges in a legally sound and factually supported manner, *In re Ryan*, 88 F.4th 614, 621-22 (5th Cir. 2023). As it carries out that task, the Government must strive to accord victims their many participatory and dignity-conferring rights, such as "the right to be reasonably heard at any public proceeding in the district court . . . involving plea[s]"; "[t]he reasonable right to confer with" the prosecution; and "the right to be informed in a timely manner of any plea bargain." 18 U.S.C. § 3771 (a)(4), (5), (9), (c)(1). But the CVRA's obligations never "impair" the Government's "prosecutorial discretion." *Id.* § 3771(d)(6). And a "presumption of regularity" supports prosecutorial decisions

---

[70] *E.g.*, Ryan Mot. at 21 (stating that "the Court should *require the Government* to marshal the relevant facts and present its evidence about Boeing's C-suite involvement") (emphasis added).

under which courts presume that prosecutors have properly discharged their official duties absent clear evidence to the contrary. *United States v. Armstrong*, 517 U.S. 456, 464 (1996).

Contrary to the Families' characterizations, the Government is not "allowing" Boeing to escape criminal liability,[71] "exonerating" senior executives,[72] or "hiding" evidence.[73] Consistent with the *Principles of Federal Prosecution*, the Government has reviewed all available evidence and determined that the criminal conduct it can prove Boeing committed beyond a reasonable doubt—and the attendant pecuniary gross gain—is presented in the Criminal Information and the Statement of Facts accompanying the Agreement. The Government reached this determination in good faith and after exhaustive investigation, based on the prosecution team's assessment of the facts, the law, Department policy, and their ethical and professional obligations, and after hearing and considering the views of the Families and Airline Entity Customers.

Were the Court to reject the Agreement, the Government's position would not change. The Government would proceed to trial against Boeing and present evidence and testimony that tracks the Statement of Facts. The trial would effectively be a repeat of the trial of the Chief Technical Pilot's, focused on his lies to the FAA and the $243.6 million the Company saved in training-related costs through those lies. The Government would not—and could not, based on the available evidence and its ethical duties—allege or seek to prove that the conspiracy was longer and broader, and involved senior executives, or that the conspiracy caused the crashes and the groundings. Rejecting the Agreement, then, would not actually address the Families' objection. It would only

---

[71] *Id*. at 17-29.

[72] *Id*. at 19-21.

[73] *Id*. at 11-17.

prolong this case while inviting litigation risks that could jeopardize Boeing being held criminally accountable.

The posture of this case would be different were Boeing facing an additional charge or charges that the Government was now seeking to dismiss. Or if the evidence had supported and the Government had alleged a broader conspiracy and greater pecuniary gain or loss in the Criminal Information and DPA Statement of Facts that it was now seeking to narrow. The Government did neither of those things, however, based on its considered assessment of the facts and the law, consistent with the *Principles of Federal Prosecution*. So while it is true that a court can exercise its discretion to reject a plea agreement for undue leniency based on the charged case before it, as evidenced by two Fifth Circuit opinions the Families cite, *see United States v. Smith*, 417 F.3d 483, 486-87 (5th Cir. 2005) (affirming rejection of plea to one of two counts in the indictment because the dismissed count had a higher statutory maximum); *United States v. Crowell*, 60 F.3d 199, 205-06 (5th Cir. 1995) (affirming rejection of plea to two of 23 counts in the indictment), the Agreement does not afford leniency to Boeing within the scope of the charged case. Furthermore, the Families stretch those cases too far by suggesting the Fifth Circuit would affirm the rejection of a plea in a single-count case such as this solely because the offense conduct had a "large number of victims."[74] As the Fifth Circuit made clear in *Smith*, "a court is well-advised to reject a plea agreement that dismisses a charge if it finds that *the remaining charges* do not adequately reflect the seriousness of a defendant's actual offense behavior." *Smith*, 417 F.3d at 487 (citations omitted and emphasis added). Thus, *Smith*, *Crowell*, and similar cases do not support rejecting the Agreement. *BP Prod.*, 610 F. Supp. 2d at 676 ("One ground for rejecting a plea under

---

[74] *Id*. at 5.

Rule 11(c)(1)(C) does not apply here . . . . BP Products is pleading to the only charge in the information.").

### C.    The Agreement Is Consistent with the Court's CVRA Ruling and Was Fashioned Based on Feedback Obtained Through CVRA Conferrals

The Families argue that there is an incongruence between the Government's prosecution theory, which supports a statutory maximum fine of $487.2 million based on the training-related cost savings, and the Court's ruling that they are CVRA crime victims because Boeing's criminal conduct was a direct and proximate cause of the crashes.[75] But the two determinations are not legally inconsistent because they carry different burdens of proof for which different evidentiary standards apply (and the former is committed to the Government's discretion, and the latter to the Court's, as discussed above).

The Court's CVRA analysis was not confined to the Government's charging document and supporting factual allegations, and it was governed by the preponderance of the evidence standard.[76] The Families presented expert testimony that was not scrutinized under the *Daubert* standard[77] and much of which was hearsay. Though properly admissible in an evidentiary hearing before a court, it would not be admissible during a jury trial.[78] The Government respects and does not challenge the Court's determination on direct and proximate causation under the CVRA.

---

[75] *Id*. at 1 (citing Second Memorandum Opinion and Order, ECF No. 116 (Oct. 21, 2022)).

[76] Second Memorandum Opinion and Order, ECF No. 116 at 9.

[77] *Id*. at 2 n.1.

[78] *See generally* Evidentiary H'rg Tr. (Aug. 5 and 26, 2022). Certain Families mischaracterize the Court's CVRA ruling as the equivalent of a judicial finding of guilt, which it is not. Arfiyandi Mot. at 2 ("However, Boeing's guilt has already been decided by this Court."). Others argue that because Boeing has not conceded that the Court's CVRA ruling is correct, the Company is not accepting responsibility and the guilty plea is the equivalent of an *Alford* plea. Manfredi Mot. at 6. That is incorrect. Boeing has agreed to plead guilty to the charged offense based on the Statement of Facts, acknowledging those facts are true and establish its criminal culpability.

Indeed, the Government is supporting the Families' right to lawful restitution as crime victims. But in exercising its prosecutorial discretion on charging decisions under the *Principles of Federal Prosecution*, the Government must consider only evidence that would be admissible at trial under the Federal Rules of Evidence and whether the sum total of that evidence can clear the highest burden of proof under the law: proof beyond a reasonable doubt.[79] The Government's view, based on a thorough and dispassionate analysis of the facts and circumstances of the lies and the crashes, is that it does not have sufficient admissible evidence to prove beyond a reasonable doubt the causal link. After an exhaustive investigation, the Government does not have evidence sufficient to prove beyond a reasonable doubt that causal link (or a causal link to the groundings) if the Court rejects the Agreement and the case were to proceed to trial.[80]

Notwithstanding the lack of proof beyond a reasonable doubt about causation of the crashes, the Government strongly considered input from the Families in its decision to seek a plea to the most serious, readily provable offense and a statutory maximum fine, as well as other terms.

---

[79] Relatedly, the Families cite the findings by other government bodies about Boeing's conduct: a September 2020 report by the U.S. House Committee on Transportation and Infrastructure on "The Design, Development & Certification of the Boeing 737 MAX," and a September 2022 Cease-and-Desist Order issued by the Securities and Exchange Commission ("SEC"). Ryan Mot. at 15-16. These findings were not admitted to by Boeing or its employees, were not subject to any evidentiary rules or the adversarial process, and would not be admissible evidence in court.

[80] *See* Government Response to Families' Motion that DPA Violated CVRA, ECF No. 58, at 4 ("The Government's investigation, however, did not produce evidence that it believed would allow it to prove beyond a reasonable doubt what factors had caused the crashes of Lion Air Flight 610 and Ethiopian Airlines Flight 302.") (Feb. 8, 2022); *id*. at 11-12 & 12 n.6; Government Response to LOT Motion that DPA Violated CVRA, ECF No. 145, at 4 ("[T]he Government respectfully incorporates its prior causation arguments here and maintains that LOT does not meet the standard for causation.") (Dec. 2, 2022).

D.     **The Agreement, Which Imposes the Statutory Maximum Fine, Comports with the Sentencing Guidelines**

The Families further rely on the CVRA ruling, among other considerations outside the Government's charging document and factual allegations, to argue that the $487.2 million statutory maximum fine is inconsistent with the Guidelines.[81] It is not.

Calculating an applicable Guidelines range has a specific role in Rule 11(c)(1)(C) pleas. Namely, before accepting such a plea agreement, a district court must conclude that "(1) the agreed sentence is within the applicable [G]uidelines range; or (2)(A) the agreed sentence is outside the applicable [G]uideline range for justifiable reasons; and (B) those reasons are set forth with specificity." *Hughes v. United States*, 584 U.S. 675, 682 (2018); U.S.S.G. § 6B1.2(c). A court weighing whether to accept a Rule 11(c)(1)(C) plea agreement must therefore focus on the ultimate sentencing inquiry: is a proposed sentence proper and reasonable given Congress's sentencing framework, *see* 18 U.S.C. § 3553(a); *United States v. Gonzalez*, 62 F.4th 954, 959 (5th Cir. 2023); *see also* U.S.S.G. § 6B1.2(c), cmt. (noting that the court should accept a Rule 11(c)(1)(C) plea "only if the court is satisfied" in this regard). That is a different inquiry than the one facing a court when it comes to a plea under other Rule 11(c) provisions. *See, e.g.*, *United States v. Smith*, 417 F.3d 483, 487 & n.7 (5th Cir. 2005) (addressing a plea agreement under Rule 11(c)(1)(A) and the standards and Sentencing Guidelines concerns underlying such plea agreements).

The Agreement presents what the parties submit is a faithful application of the Guidelines, consistent with the Criminal Information and Statement of Facts, which calls for a fine between $243.6 million to $487.2 million. But no matter how one calculates the Guidelines range—either as the Agreement does or as the Families propose—a $487.2 million fine, which is the statutory

---

[81] Ryan Mot. at 30-35.

maximum, falls within "the applicable [G]uidelines range" because it is by definition the top of the Guidelines range. U.S.S.G. § 8C3.1(a) ("*Except to the extent restricted by the maximum fine authorized by statute* or any minimum fine required by statute, the fine or fine range shall be that determined under §8C1.1 (Determining the Fine – Criminal Purpose Organizations); §8C2.7 (Guideline Fine Range – Organizations) and §8C2.9 (Disgorgement); or §8C2.10 (Determining the Fine for Other Counts), as appropriate.") (emphasis added). Accordingly, any disputed Guidelines-related calculations afford no reason to reject the Agreement. Indeed, disputes about the Agreement's proposed offense score, culpability score, and position on an upward departure,[82] can have no practical effect because the maximum and proposed fine will remain the same no matter those disputes' outcomes. *United States v. Guzman-Rendon*, 864 F.3d 409, 411 (5th Cir. 2017) (explaining that Guidelines errors are harmless if the record demonstrates that a district court would have given the same sentence); *United States v. Sandle*, 123 F.3d 809, 812-13 (5th Cir. 1997) (explaining that any Guidelines error was harmless because the district court could not impose a sentence under the statutory minimum).

Because the Families' concerns with the Guidelines calculations can have no practical effect on the fine amount, their objections boil down to a suggestion that the Agreement's Guidelines calculations obscure "truth in sentencing."[83] But that claim simply rests on many factual premises that, for the reasons discussed above, the Government does not endorse and has not alleged. For the criminal conduct that the Government can prove Boeing committed beyond a reasonable doubt, the Agreement secures the maximum punishment available under the law: a guilty plea to the most serious, readily provable offense, and the imposition of the statutory

---

[82] *Id*. at 17-21, 31-33.

[83] *Id*. at 18.

maximum fine. Together with the other obligations the Agreement imposes on Boeing, the Government submits that the sentence required under the Agreement fully satisfies the requirements of Section 3553(a)—namely, a sentence that reflects the seriousness of the offense charged (and the breach of the DPA), promotes respect for law, provides just punishment for the charged offense, affords general deterrence, and protects the public from further crimes by Boeing.

**E.**     **The Agreement Provides for Full Restitution to the Families and Does Not Prejudice the One Objecting Airline Entity Customer from Pursuing Civil Remedies**

The Agreement requires Boeing to pay all lawful restitution that the Court determines, in its discretion, is owed to the Families, and merely preserves for Boeing the same rights the Company would have to litigate and appeal a restitution order if it was convicted at trial. Of course, absent the Agreement, the Families' ability to obtain lawful restitution would be subject to the risks and uncertainties inherent in any contested litigation and would be extinguished altogether if there is no conviction. The Families would therefore be no better off, and could be worse off, from a restitution perspective, if the Court rejects the Agreement.

That the Agreement does not provide for restitution to LOT, the only objecting Airline Entity Customer, is not a reason to reject it and place in jeopardy the restitution for the Families. Boeing's crime is a *Klein* conspiracy to obstruct and impede the lawful operation of the FAA AEG, not a crime against property that triggers mandatory restitution. LOT can continue to press for remedies in its civil case against Boeing, on which litigation the Agreement has no impact. Adjudicating whether LOT is a CVRA "crime victim" that is entitled to restitution would be too complex and unnecessarily prolong a final resolution in this case.

Below, the Government discusses in more detail the restitution provisions for the Families and the Airline Entity Customers, respectively. But first, the Government explains why, as a matter of law, restitution to either is not mandatory.

### i.        Restitution is discretionary as a matter of law

The Agreement provides that restitution is discretionary under 18 U.S.C. § 3663, based on the offense charged, conspiracy "to defraud the United States, or any agency thereof," in violation of 18 U.S.C. § 371. While some crimes require mandatory restitution, including "offenses against property under [Title 18] . . . committed by fraud or deceit," 18 U.S.C. § 3663A(c)(1)(A)(ii), the "[t]he facts and circumstances" underlying "the offense of conviction" will determine if an offense is "against property" and therefore mandatory. *See United States v. Shah*, 95 F.4th 328, 387 (5th Cir. 2024). Here, the charged offense is not an offense against property.

Boeing is charged with violating Section 371's prohibition against conspiring "to defraud the United States, or any agency thereof"—which permits prosecutions for conspiring "to cheat the government out of property or money" *or* conspiring "to interfere with or obstruct . . . its lawful governmental functions by deceit, craft or trickery, or" other dishonest means. *United States v. Herman*, 997 F.3d 251, 273 (5th Cir. 2021). A conviction for the latter kind of conspiracy, often called a *Klein* conspiracy, does not require the government or any individual to suffer a "property or pecuniary loss." *United States v. Haga*, 821 F.2d 1036, 1039 (5th Cir. 1987) (discussing *Hammerschmidt v. United States*, 265 U.S. 182 (1924)). Indeed, it is well-established that "[18 U.S.C.] § 371 reaches conspiracies other than those directed at property interests." *See McNally v. United States*, 483 U.S. 350, 358 n.8 (1987) (citations omitted); *United States v. Blaszczak*, 56 F.4th 230, 246 (2d Cir. 2022) ("Section 371 encompasses not just conspiracies to commit property crimes, but conspiracy to commit 'any offense against the United States' and any conspiracy to 'defraud the United States, or any agency thereof in any manner or for any purpose.'").

The Criminal Information therefore charges Boeing with a non-property *Klein* conspiracy to interfere with or obstruct the FAA AEG's lawful operations through "dishonest means." The Government has never alleged, nor has Boeing ever admitted, that the Chief Technical Pilot

conspired to deprive the FAA AEG of any money or property interest. Instead, the object of the conspiracy was to deceive the FAA AEG in the exercise of its regulatory decision-making with respect to setting the requisite level of pilot training for the 737 MAX. In short, the conspiracy was aimed at the regulatory, not property, interests of the FAA AEG, which means the charged offense was not against property.

This conclusion is compelled by the line of Supreme Court precedents interpreting the fraud statutes in the context of alleged schemes to defraud government agencies of supposed property interests.

Take, for instance, *Cleveland v. United States*, 531 U.S. 12 (2000), which reversed a defendant's mail fraud conviction for a scheme to obtain through false statements government licenses to operate video poker machines. Finding "it beyond genuine dispute that whatever interests Louisiana might be said to have in its video poker licenses, the State's core concern is *regulatory*," the Supreme Court concluded that the mail-fraud "statute does not reach fraud in obtaining a state or municipal license of the kind here involved, for such a license is not 'property' in the government regulator's hands." 531 U.S. at 20 (emphasis in original).

Another example is *Kelly v. United States*, 590 U.S. 391 (2020), the "Bridgegate" case, in which the defendants orchestrated a scheme to shut down several lanes on a bridge to punish a political rival. The defendants were convicted of wire fraud and federal-program fraud, but the Supreme Court reversed, characterizing the defendants' conduct as "alter[ing] a regulatory decision about the toll plaza's use—in effect, about which drivers had a 'license' to use which lanes. And under *Cleveland*, that run-of-the-mine exercise of regulatory power cannot count as the taking of property." 590 U.S. at 401 (characterizing *Cleveland* as holding that the "defendant's fraud implicated the Government's role as sovereign wielding traditional police powers—not its

32

role as property holder" and therefore "his conduct, however deceitful, was not property fraud")
(cleaned up). In doing so, the Supreme Court rejected the government's argument that the attendant
downstream costs of the scheme—the time and labor of the workers who shut down the lanes—
transformed the scheme into an offense against property. Inflicting those costs was not the "object
of the fraud," the Supreme Court held, and "a property fraud conviction cannot stand when the
loss to the victim is only an incidental byproduct of the scheme." *Id*. at 402 (citing *Pasquantino v.
United States*, 544 U.S. 349, 357 (2005)).

      In arguing that restitution is mandatory, LOT does not cite these or any related cases, let
alone try to explain why the losses LOT incurred were not an "incidental byproduct of the scheme."
Instead, LOT focuses on Boeing's admission in the Statement of Facts that it committed the
charged conspiracy, in part, "to bring about a financial gain to Boeing" by avoiding certain costs
and to make the 737 MAX "a more attractive [i.e., less costly] option for Boeing's airline
customers."[84] That admission of motive, however, does not transform the offense charged into a
fraud scheme perpetrated against the property interests of the FAA AEG. The defendant in
*Cleveland*, for example, sought the government licenses to be able to operate video poker
machines, and thereby make money. Even though the defendant had a profit motive, his scheme
was directed at the regulatory authority of the government licensing agency. Such was the case
with the Chief Technical Pilot and the other Technical Pilot, whose scheme, though intended to
save Boeing money, was aimed at deceiving the FAA AEG in the exercise of its regulatory
authority. Accordingly, restitution for the charged *Klein* conspiracy is discretionary, not mandatory.

---

[84] LOT Mot. at 21-22 (quoting Statement of Facts).

ii.        **The Agreement allows full restitution for the Families, and the process is the same under the Agreement as it would be after trial**

Despite restitution not being mandatory, the Agreement calls for the Court to exercise its discretion to award full lawful restitution to the Families, and for the Government to support the Families in seeking the same. The Families nevertheless object, but their arguments fail to acknowledge that whether Boeing is convicted by guilty plea or at trial, the restitution process will not change for them.[85]

*First*, the Families object that the Agreement does not track what they call "the standard language in plea agreements."[86] They also take issue with the Agreement specifying that Boeing's obligation is to pay "*lawful* restitution."[87] But there is no standard plea agreement language, and Boeing could never be ordered to pay anything other than a restitution amount authorized under the law. Contrary to the Families' argument, this language does not reveal any unstated arrangement between the Government and Boeing to undermine the Families' right to restitution.

*Second*, the Families object to Boeing retaining the right to litigate restitution, including whether any offsets lawfully apply, and to appeal the Court's sentence with respect to restitution.[88] But if the Court rejects the Agreement, as the Families urge, then the Families and Boeing will be in the exact same position after a successful prosecution: litigating restitution, including possible

---

[85] Some of the Families also suggest that the Agreement should be rejected for not including other sentencing terms related to civil litigation on possible future crashes, but without explaining how the Court could lawfully impose them in this criminal case. Arfiyandi Mot. at 19 (requesting imposition of "an escrow fund . . . for future Boeing crashes, for a period of seven years" and a requirement that Boeing "waive any right to file and prosecute a *forum non conveniens* motion for the purpose of having [civil] lawsuits transferred from the United States to other foreign jurisdictions"). The Government respectfully submits that the fact these terms are not in the Agreement is not a proper basis to reject the Agreement.

[86] Ryan Mot. at 44-45.

[87] *Id*. at 44 (emphasis in original).

[88] *Id*. at 46; Soegiyono Mot. at 6.

offsets, with Boeing having a right to appeal the Court's determination. In other words, the proposed remedy would be no better than the alleged failings of the Agreement. And it could be worse. Absent the Agreement, there is a litigation risk that Boeing is not convicted, in which case restitution would not be available to the Families.

### iii.   The restitution process for LOT, the only Airline Entity Customer to oppose the Agreement, would be complex and prolonged

The Government respectfully submits that the Agreement's tradeoff between guaranteeing full restitution to the Families in exchange for not granting discretionary restitution to LOT, the only Airline Entity Customer to object, is fair and just and in the public interest. This is for two reasons. Determining if LOT is a CVRA "crime victim" eligible for restitution, and the amount of restitution it would be owed, would be a complex and prolonged process that would impede the efficient resolution of this case. And whether or not LOT qualifies as a "crime victim," it is a well-resourced, state-owned company[89] that is in active litigation with Boeing, and the Agreement does not prejudice LOT in continuing to press its evidence and arguments in that case to secure whatever civil remedies to which it is entitled.

LOT has not established—and the Court has never held—that it has been directly and proximately harmed by the charged offense. LOT previously argued that "the causal connection between Boeing's fraud and LOT's grounding losses *is the same* as that between Boeing's fraud and the crash victims' families' losses."[90] But now LOT acknowledges, as it must, that "an

---

[89]    *See*   Ownership   Structure,   LOT   Polish   Airlines,   *available*   *at* https://www.lot.com/us/en/corporate/ownership-structure; LOT Polish Airlines Reports Record-Breaking   2023   Results,   AirlineGeeks.com   (July   15,   2024),   *available*   *at* https://airlinegeeks.com/2024/07/15/lot-polish-airlines-reports-record-breaking-2023-results/ (linking   to   LOT   press   release   in   Polish,   *available at*   https://www.lot.com/pl/pl/biuro-prasowe/informacje-prasowe/pll-lot-z-miliardem-zysku-za-rok-2023).

[90] LOT CVRA Motion, ECF No. 120 at 2 (Oct. 28, 2022) (emphasis added).

additional link in the chain of causation" must be proved.[91] Namely, that the decision of LOT's regulator, the European Union Aviation Safety Agency ("EASA"), to ground the planes to conduct an independent safety assessment was directly and proximately caused by Boeing's conspiracy to obstruct and impede the FAA AEG. The EASA's grounding decision, however, was issued on March 12, 2019, a day *before* the FAA issued its grounding order in the United States.[92] And the EASA's ensuing evaluation of the 737 MAX was similarly and purposefully independent of the FAA's evaluation.[93] Thus, what LOT tries to minimize as a mere "additional" causal link is much more than that. LOT's proposed chain of causation relies on "ripples of harm" that "flow far beyond" Boeing's criminal misconduct, *see Bank of Am. Corp. v. City of Miami, Fla.*, 581 U.S. 189, 191 (2017), and relies on the independent and discretionary decisions of the EASA.

The details of LOT's civil litigation against Boeing underscore why adjudicating LOT's status as a "crime victim" and eligibility for restitution is not nearly as straightforward as LOT urges. LOT's civil case has been pending since October 2021[94] and is currently scheduled for trial

---

[91] LOT Mot. at 17.

[92] EASA Boeing 737 MAX Return to Service Report, January 27, 2021, at 17, *available at* https://www.easa.europa.eu/sites/default/files/dfu/B737_Max_Return_to_Service_Report.pdf.

[93] Unlike the FAA, which announced the 737 MAX's return to service in the United States beginning November 18, 2020 (Order *available at* https://www.faa.gov/sites/faa.gov/files/2022-08/737_MAX_Rescission_of_Grounding_Order.pdf), the EASA did not complete its evaluation for several more weeks and did not permit the 737 MAX to return to service in Europe until January 27, 2021. In doing so, its Director announced the agency's "assessment was carried out in full independence of Boeing or the [FAA] and without any economic or political pressure . . . . We carried out our own flight tests and simulator sessions and did not rely on others to do this for us." . . . . We carried out our own flight tests and simulator sessions and did not rely on others to do this for us." *See* EASA declares Boeing 737 MAX safe to return to service in Europe, January 27, 2021, *available at* https://www.easa.europa.eu/en/newsroom-and-events/press-releases/easa-declares-boeing-737-max-safe-return-service-europe#.

[94] Complaint, ECF No. 1, *Polskie Linie Lotnicze Lot SA v. The Boeing Co.*, 2:21-cv-01449 (W.D. Wash. Oct. 25, 2021).

in July 2025.[95] According to a March 2024 joint motion to extend the deadlines in the case, the parties described needing more time before trial for several reasons, including that "LOT's document productions exceed two hundred thousand pages and Boeing's document productions exceed one and a half million pages of documents"; the parties "anticipate the need to complete several dozen party depositions and several non-party depositions in Poland and the United States"; and "each party expects to have multiple experts with an expectation of up to ten expert depositions."[96]

Just as litigating causation would be complicated and prolonged, so too would litigating LOT's alleged pecuniary losses, which it claims total more than $200 million.[97] By LOT's accounting, this includes 15 different line-item categories of harm allegedly related to the EASA's grounding of the 737 MAX, such as claims ranging from $1.5 million for "[p]assenger disruption after the grounding" (including the "[c]osts to accommodate passengers whose travel was disrupted by the grounding, including hotel and meal costs) to $75 million for "[r]educed passenger contribution prior to Covid-related flight restrictions" (including "[l]ost profits from pre-COVID flights from reduced passenger contributions on routes planned for the 737 MAX but operated by other aircraft").[98] These claims also include various technical claims for costs related to aircraft storage and maintenance.[99]

---

[95] Scheduling Order, ECF No. 87, *Polskie Linie Lotnicze Lot SA v. The Boeing Co.*, 2:21-cv-01449 (W.D. Wash. Apr. 1, 2024).

[96] Joint Motion to Extend Remaining Deadlines, ECF No. 85, at 1-2, *Polskie Linie Lotnicze Lot SA v. The Boeing Co.*, 2:21-cv-01449 (W.D. Wash. Mar. 29, 2024) (citing declaration of LOT's counsel).

[97] Gov't Decl. ¶ 45.

[98] *Id.*; Exhibit 26.

[99] Gov't Decl. ¶ 45; Exhibit 26.

"Nothing in the legislative history [of the Victim and Witness Protection Act, 18 U.S.C. §3663] evidences an expectation that a sentencing judge would adjudicate, in the course of the court's sentencing proceeding, all civil claims against a criminal defendant arising from conduct related to the offense." *United States v. Kones*, 77 F.3d 66, 69 (3d Cir. 1996). "Rather, it was expected that entitlement to restitution could be readily determined by the sentencing judge based upon the evidence he had heard during the trial of the criminal case or learned in the course of determining whether to accept a plea and what an appropriate sentence would be." *Id.* Consistent with these limits, "[t]o the extent that the court determines that the complication and prolongation of the sentencing process resulting from the fashioning of an order of restitution under this section outweighs the need to provide restitution to any victims, the court may decline to make such an order."[100] 18 U.S.C. § 3663 (a)(1)(B)(ii).

"[T]he complexity exception in the VWPA was designed to avoid 'bring[ing] fault and causation issues before the sentencing court that cannot be resolved with the information otherwise generated in the course of the criminal proceedings on the indictment.'" *BP Prod.*, 610 F. Supp. 2d at 692 (quoting *Kones*, 77 F.3d at 69). Among other factors the court may consider in determining whether "complication" outweighs the need for restitution is the availability to the victim of alternative civil remedies. *See United States v. Gallant*, 537 F.3d 1202, 1254 (10th Cir. 2008) ("Where, as here, a civil suit has not only been commenced but has proceeded to the point where the parties have conducted extensive pretrial motions practice, settlement negotiations, and

---

[100] Even if the Court were to find that mandatory restitution applied here, the same complexity exception would apply under 18 U.S.C. § 3663A(c)(3)(B) ("This section shall not apply . . . if the court finds, from facts on the record, that—(B) determining complex issues of fact related to the cause or amount of the victim's losses would complicate or prolong the sentencing process to a degree that the need to provide restitution to any victim is outweighed by the burden of the sentencing process.").

discovery, the victim's need to rely upon the sentencing process for compensation may be lessened to some degree."); *United States v. Malone*, 747 F.3d 481, 486 (7th Cir. 2014) ("[T]he court is not prohibited from considering the existence of a separate civil suit involving the defendant that may provide a full or partial recovery to the victim.").[101]

Balancing the factors relevant to 18 U.S.C. § 3663(a)(1)(B)(ii), the Government submits that "complication and prolongation of the sentencing process . . . outweighs the need for restitution" to the Airline Entity Customers. Accordingly, the Agreement appropriately excludes discretionary restitution for LOT and all Airline Entity Customers, whether or not the Court were to determine that LOT is a "crime victim" under the CVRA.[102] For that reason, the Government respectfully submits that, in making its individualized assessment of the Agreement, the Court can assume without deciding that LOT is a "crime victim," which would obviate the need for an evidentiary hearing on that issue before the Court makes its decision.[103] If the Court were to reject

---

[101] While courts have recognized that "[a] district court should not place great weight on this factor" *see, e.g., Malone*, 747 F.3d at 486, importing this private litigation over a commercial dispute between sophisticated parties into the sentencing hearing would more than take over the entire sentencing process. Further, any ruling that LOT may assert its civil claims as restitution would equally apply to all the Airline Entity Customers. While no others have come forward or objected to the Agreement, a finding that they are entitled restitution would require the Court to conduct an analysis of the restitution owed to them. *See* 18 U.S.C. § 3664(a) ("the court shall order the probation officer to obtain and include in its presentence report, or in a separate report, as the court may direct, information sufficient for the court to exercise its discretion in fashioning a restitution order" that "shall include, to the extent practicable, a complete accounting of the losses of each victim, any restitution owed pursuant to a plea agreement, and information relating to the economic circumstances of each defendant.").

[102] The Government's position continues to be that LOT and the other Airline Entity Customers are not "crime victims." Government Response to LOT Motion that DPA Violated CVRA, ECF No. 145, at 4 ("[T]he Government respectfully incorporates its prior causation arguments here and maintains that LOT does not meet the standard for causation.") (Dec. 2, 2022).

[103] LOT Mot. at 12-13 n.13.

the Agreement, the Court could revisit, and the parties and LOT could brief, any next steps on LOT's request to be recognized as a "crime victim."

### F.    The Agreement Should Be Accepted Because It Provides for an Independent Compliance Monitorship That Is Appropriately Scoped and Overseen by the Government

The Agreement establishes a rigorous three-year monitorship with a scope that is tailored to address Boeing's criminal conduct while respecting the FAA's Congressionally mandated authority. Entrusting the selection and oversight of the Monitor to the Government reflects the Fraud Section's deep expertise, gained through the appointment and management of numerous monitors in similar cases, as well as its proven dedication to holding Boeing accountable for its compliance failures. The objections raised by the Families on these points lack merit.[104] Expanding the Monitor's mandate beyond compliance and ethics would encroach on the FAA's jurisdiction, creating confusion and potential conflicts that could ultimately undermine safety. Moreover, excluding the Government from the monitorship process would be both impractical and inefficient, given its experience in this domain generally and in this case specifically.

The Monitor's mandate is deliberately focused on compliance and ethics, aligning with both the specific nature of the offense to which Boeing is pleading guilty, fraud on the FAA, and its breach of the DPA compliance obligations. This focus is crucial, as it ensures that the Monitor addresses the most relevant risk underlying both the criminal conduct and the breach: fraud, a matter that falls squarely within the domain of compliance and ethics. By concentrating the Monitor's oversight on these areas—including that the Company better integrate compliance and ethics into its safety functions—the monitorship directly targets the root causes of Boeing's criminal conduct, facilitating meaningful reform. And this reform will have the dual benefit of

---

[104] Ryan Mot. at 35-40.

respecting the FAA's regulatory and oversight authority over Boeing's safety, manufacturing, and related operations, while helping to ensure that the FAA can more effectively carry out its mandate by receiving accurate information from Boeing.[105] Expanding the Monitor's jurisdiction to overlap with the FAA's could lead to conflicting directives and regulatory confusion, ultimately hindering the FAA's ability to effectively manage safety and operational oversight, and undermining the very protections the monitorship seeks to enhance.

The decision to have the Government select and oversee the Monitor is informed by the Fraud Section's proven track record of effective oversight. The Fraud Section has extensive monitorship experience, having appointed and overseen more than 60 monitors in similar cases over the past two decades. In each case, the Fraud Section has devoted resources to work extensively with both the monitor and the corporate defendant to navigate issues arising throughout the monitorship, to ensure the monitor's mandate is carried out effectively and to completion, and to determine the final disposition of the monitorship, consistent with the terms of the criminal resolution agreement. The effectiveness of this oversight is enhanced by the Criminal Division and the Fraud Section's extensive experience evaluating corporate compliance programs, which they do as part of every corporate criminal case.[106] And the Fraud Section has specialized prosecutors with experience evaluating and operationalizing corporate compliance programs who are responsible for overseeing monitorships.

---

[105] Since 1958, amid the advent of commercial jet travel, the FAA has been "empowered" by Congress to prescribe standards "governing the design, materials, workmanship, construction, and performance of aircraft […] as may be required in the interest of safety." Pub. L. 85-726 (August 23, 1958). To this day, the FAA is mandated by Congress to "promote safe flight of civil aircraft" by prescribing standards "for the design, material, construction, quality of work, cybersecurity, and performance of aircraft." 49 U.S.C. § 44701.

[106] *See* JM §§ 9-28.300(5)-(6), 9-28.800.

Drawing on this long-standing practice and accumulated experience, the Criminal Division (of which the Fraud Section is a part) has established a process for transparent selection of monitors that has been developed, enhanced, and refined over many years. The process is designed to achieve "the selection of a highly qualified person or entity, free of any actual or potential conflict of interest or appearance of a potential or actual conflict of interest, and suitable for the assignment at hand."[107]

The Government will follow the same process in this case, with two important modifications made in response to concerns voiced by the Families. First, Boeing will not nominate Monitor candidates. Rather, the Department will solicit candidates through a public notice and application process and identify six qualified candidates from which to make a final selection. Boeing can veto one, leaving five qualified candidates to choose from. Second, the Court will have an opportunity to weigh in on the selection. At the conclusion of the selection process, the Government will inform the Court under seal of the proposed selection. The Government will not finalize the selection for 10 days, allowing time for the Court to provide feedback.

The Fraud Section's specialized expertise, combined with its oversight of Boeing's compliance reporting under the DPA, will ensure that the selection process is thorough and efficient, and that the chosen Monitor will possess the necessary qualifications to address the specific challenges faced by Boeing. Excluding the Government from this process would not only be inefficient—imposing a substantial burden on the time and resources of the Court—but would also disregard the Government's demonstrated ability to scrutinize Boeing's compliance and hold the Company accountable when it falls short.

---

[107] Revised Memorandum on Selection of Monitors in Criminal Division Matters, at 5 (March 1, 2023), *available at* https://www.justice.gov/criminal/criminal-fraud/file/1100366/dl.

\*       \*       \*

For the reasons above, the Agreement is a strong resolution that holds Boeing accountable, protects the American public, and provides the Families with all legally available remedies. The Government respectfully urges the Court to accept the Agreement and take Boeing's guilty plea.

Respectfully submitted,

GLENN S. LEON                                            LEIGHA SIMONTON
Chief, Fraud Section, Criminal Division      United States Attorney
United States Department of Justice             Northern District of Texas


By: *s/ Sean P. Tonolli*                                  By: *s/ Chad E. Meacham*
Sean P. Tonolli                                             Chad E. Meacham
Senior Deputy Chief                                    Assistant United States Attorney
D.C. Bar No. 503346                                  Texas Bar No. 00784584
sean.tonolli@usdoj.gov                              chad.meacham@usdoj.gov

United States Department of Justice          United States Attorney's Office
Criminal Division, Fraud Section               Northern District of Texas
1400 New York Avenue, N.W.                   801 Cherry Street, 17th Floor
Washington, D.C. 20005                           Fort Worth, TX 76102
202-514-2000                                           817-252-5200


cc: Counsel of Record (via ECF)