**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | |
| | ) | **No. 4:21-CR-5-O** |
| THE BOEING COMPANY, | ) | |
| | ) | |
| *Defendant.* | ) | |
| | ) | |

**THE BOEING COMPANY'S CONSOLIDATED RESPONSE TO OBJECTIONS TO
PROPOSED PLEA AGREEMENT, DKTS. 233-236, 238, 242, 243**

## <u>TABLE OF CONTENTS</u>

**Page**

BACKGROUND ..................................................................................................................... 4

ARGUMENT ....................................................................................................................... 11

I.     Objections Related to the Factual Scope of the Plea Agreement ...................................... 11

     A.     The Scope of the Statement of Facts ................................................................. 12

II.     Crash Victim Representatives' Assertions as to the Strength of the Underlying Case ..... 16

     A.     In a Contested Case, Boeing Could Seek Dismissal of the Criminal Information on the Ground that It Complied with the DPA .................................................. 17

     B.     The Government Would Face Litigation Risk at Any Hearing Regarding Boeing's DPA Compliance ................................................................................................. 18

     C.     The Government and Boeing Mutually Face Litigation Risk in Any Prosecution on the Criminal Information. ............................................................................... 20

III.     Objections Related to the Criminal Fine ......................................................................... 21

     A.     Boeing Has Agreed to The Statutory Maximum Fine. ....................................... 21

     B.     Sentencing Guideline Objections ..................................................................... 23

IV.     Objections Related to the Compliance Monitor ............................................................... 25

     A.     The Monitorship Requirement Set Forth in the Proposed Plea Agreement Is Appropriate. ..................................................................................................... 25

          1.     The Independent Compliance Monitor's Scope Addresses the Specific Compliance Concerns Cited by the Department ...................................... 26

          2.     The FAA Is Presently Exercising Robust Oversight Over Boeing, and the Design of Any Monitorship Must Not Usurp that Important Regulatory Relationship ....................................................................................... 27

V.     Objections Related to Restitution ................................................................................... 31

CONCLUSION .................................................................................................................... 34

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Apprendi v. New Jersey*,
    530 U.S. 466 (2000)................................................................................................12, 22

*S. Union Co. v. United States*,
    567 U.S. 343 (2012)........................................................................................................22

*Stolt-Nielsen, S.A. v. United States*,
    442 F.3d 177 (3d Cir. 2006)...........................................................................................18

*United States v. Ataya*,
    864 F.2d 1324 (7th Cir. 1988) .......................................................................................18

*United States v. Booker*,
    543 U.S. 220 (2005)........................................................................................................23

*United States v. Brown*,
    801 F.2d 352 (8th Cir. 1986) .........................................................................................18

*United States v. Calabrese*,
    645 F.2d 1379 (10th Cir. 1981) .....................................................................................17

*United States v. Castaneda*,
    162 F.3d 832 (5th Cir. 1998) .....................................................................................4, 17

*United States v. Cluck*,
    143 F.3d 174 (5th Cir. 1998) .........................................................................................33

*United States v. Garcia*,
    519 F.2d 1343 (9th Cir. 1975) .......................................................................................17

*United States v. Harmon*,
    156 F. App'x 674 (5th Cir. 2005) (unpublished)......................................................33, 34

*United States v. LaGrou Distrib. Sys., Inc.*,
    466 F.3d 585 (7th Cir. 2006) .........................................................................................22

*United States v. Pfaff*,
    619 F.3d 172 (2d Cir. 2010)...........................................................................................22

*United States v. Phillips*,
    No. 3:08-CV-51TSL-FKB, 2011 WL 2457863 (S.D. Miss. June 16, 2011)...................34

ii

*United States v. Sheinbaum*,
    136 F.3d 443 (5th Cir. 1998) ........................................................................33

*United States v. Tilley*,
    964 F.2d 66 (1st Cir. 1992).........................................................................18

*Wong Sun v. United States*,
    371 U.S. 471 (1963).....................................................................................21

**Statutes**

18 U.S.C. § 3571 ..................................................................................................22

Crime Victims' Rights Act, 18 U.S.C. § 3771........................................1, 2, 3, 8, 12, 32

**Rules**

Fed. R. Crim. P. 11 .........................................................................................11, 16

**Other Authorities**

*FAA Continues to Hold Boeing Accountable for Implementing Safety and
    Production Quality Fixes*, FED. AVIATION ADMIN. (May 30, 2024),
    https://www.faa.gov/newsroom/faa-continues-hold-boeing-accountable-
    implementing-safety-and-production-quality-fixes ............................................28, 29

Section 103 Organization Designation Authorizations (ODA) for Transport
    Airplanes Expert Panel Review Report, FED. AVIATION ADMIN. (2024),
    https://www.faa.gov/newsroom/Sec103_ExpertPanelReview_Report_Final.pdf .....................28

*Updates on Boeing 737-9 MAX Aircraft*, FED. AVIATION ADMIN. (Mar. 4, 2024),
    https://www.faa.gov/newsroom/updates-boeing-737-9-max-aircraft......................................28

*Updates on the 737-9 and Safety & Quality Action*, BOEING,
    https://www.boeing.com/737-9-updates (last updated June 18, 2024)...................................28

Douglas S. Harned et al., Commercial Aircraft: How Safe Is Air Travel?
    737MAX, GTF – How Meaningful Are the Headlines, BERNSTEIN (Mar. 25,
    2024) ...............................................................................................................30

Jinshan Hong et al., *Fliers Are More Worried About Plane Safety Even as Air
    Travel Remains as Safe as Ever*, TIME (May 23, 2024),
    https://time.com/6981932/airplane-flying-safety-boeing-accidents-fears-
    reality/ ...............................................................................................................30

Andy Pasztor, *The Airline Safety Revolution*, WALL ST. J. (Apr. 16, 2021, 12:08
    PM), https://www.wsj.com/articles/the-airline-safety-revolution-11618585543 ...................30

Kenneth A. Polite, Jr., *Revised Memorandum on Selection of Monitors in Criminal Division Matters*, U.S. DEPT. OF JUST. at 6-7 (Mar. 1, 2023), https://www.justice.gov/criminal/criminal-fraud/file/1100366/dl..........................................27

U.S.S.G. 8C3.1....................................................................................................................23

Following good faith negotiations taking into account all of the facts and circumstances, the Department of Justice (the "government" or the "Department") and The Boeing Company ("Boeing" or the "Company") have proposed a plea agreement to resolve this longstanding matter. Certain groups of family members of those who perished in the two MAX crashes object to the proposed plea agreement (collectively, the "Crash Victim Representatives"). One of Boeing's airline customers, LOT Polish Airlines ("LOT"), also objects. For ease of the Court, Boeing consolidates its responses to all filed objections. *See* Dkts. 233-236, 238, 242, 243.

As Boeing has made clear throughout these proceedings, Boeing respects the views and concerns of the Crash Victim Representatives. Boeing knows the Court will carefully evaluate their objections in weighing the proposed plea agreement.[1] Boeing accordingly provides information herein to aid the Court in its evaluation of the proposed plea agreement, and Boeing stands ready to answer any questions the Court may have.

As an initial matter, the Crash Victim Representatives broadly object to the process by which the proposed plea agreement was reached, asserting that the agreement is somehow untoward or collusive. *See* Crash Victim Representatives Op., Dkt. 232-1 at 19. This suggestion of impropriety is unsupported, and any suggestion that this proposed plea agreement is the product of a collusive relationship between Boeing and the government is simply incorrect. Both the DPA

---

[1] Certain of the Crash Victim Representatives have not previously appeared in these proceedings and directly established Crime Victims' Rights Act (CVRA) victim status. Because they appear to be similarly situated to other Crash Victim Representatives that have, Boeing assumes the Court will accord them similar treatment consistent with its prior ruling, while reserving its position on that issue. *See* Dkt. 116. With respect to LOT, the Court has not previously accorded LOT CVRA victim status. Boeing has previously briefed the Court on its position that LOT does not qualify for CVRA victim status and respectfully reserves that position as well. Boeing's Response to LOT's CVRA Mot., Dkt. 150. Should the Court determine to conduct proceedings to assess CVRA victim status for any objectors, whether Crash Victim Representatives or LOT, Boeing is prepared to address its arguments in detail for the Court.

and the proposed plea agreement were negotiated at arm's length by Boeing and career government attorneys.  (In fact, the proposed plea agreement was negotiated by a different set of government attorneys than negotiated the DPA.)  And while some family members clearly object to the outcome of this negotiation, it appears that the Crash Victim Representatives were extensively informed and offered the opportunity to provide input to the Justice Department throughout; indeed, based on representations made by the government and the Crash Victim Representatives in this matter, it appears that the government described the terms of its offer to the Crash Victim Representatives *before* offering it to Boeing.  There was, in short, nothing collusive or otherwise inappropriate about the way in which this arms-length negotiation was conducted.

The Crash Victim Representatives' substantive objections to the proposed plea agreement also should not be accepted by this Court.  The first such objection is that the proposed plea agreement's statement of facts should be rejected because it does not include, among various other things, a factual statement that the Criminal Information offense resulted in the deaths of their loved ones.  Boeing profoundly regrets the accidents and the unspeakable losses that the Crash Victim Representatives have suffered.  And Boeing also fully recognizes that the Crash Victim Representatives have the right to seek justice as they see fit, including through civil litigation against Boeing.

The Crash Victim Representatives' efforts to supplement the statement of facts with their own set of proffered facts is not only unprecedented but would violate the constitutional space reserved for Article II prosecutorial discretion and Boeing's Fifth and Sixth Amendment rights. While victims are afforded certain rights under the CVRA, they are not parties, nor are they the prosecutor.  The government has assessed that it cannot prove beyond a reasonable doubt that the

Criminal Information offense caused either of the MAX crashes, and there is no role under the CVRA for the Crash Victim Representatives to separately seek to establish those facts.

Consistent with the government's determination, the statement of facts includes those facts, including the gain to Boeing from the charged offense, that the government assesses it can prove beyond a reasonable doubt. Boeing, for its part, has accepted responsibility for the MAX crashes, publicly and in civil litigation, because the design of MCAS contributed to those accidents. Boeing has never admitted, and does not believe, that the separate and distinct conduct charged in the Criminal Information, which involved representations made to the training branch of the FAA, caused the accidents. Boeing respectfully recognizes this Court's prior ruling, Second Memorandum Opinion & Order, Dkt. 116 at 18,[2] but the context here is critically different. The CVRA applies a preponderance of the evidence standard to assessing victim status. But the Fifth and Sixth Amendments supply a beyond a reasonable doubt standard of proof to the elements of the crime, which here includes the calculation of the criminal fine amount.

The Crash Victim Representatives also raise various objections amounting to a claim that the plea agreement is insufficiently punitive. In so objecting, the Crash Victim Representatives present the strength of the government's case as overwhelming. But the government *does* bear litigation risk on this charge. As the government informed the Court in May 2022, since filing the Criminal Information in January 2021, "[t]he government's litigation position has not improved over the past 16 months." May 3, 2022 Motions Hearing Tr. 61. As the Court knows, former Boeing employee Mark Forkner was acquitted on charges related to the same underlying conduct

---

[2] With respect to all the Crash Victim Representatives, Boeing respectfully expressly preserves all objections and reserves all rights to appeal any and all of the Court's rulings made in the course of these proceedings, including with respect to this Court's determination of the Crash Victim Representatives' standing under the CVRA and the process it used to reach that determination.

that forms the factual basis of Boeing's plea.  Further, absent a negotiated plea resolution, the government would have to establish in court that Boeing breached its DPA prior to prosecuting the Company.  *See United States v. Castaneda*, 162 F.3d 832, 835–36 (5th Cir. 1998).  Boeing would be entitled to dispute the government's basis for breach and to an evidentiary hearing on the same. *Id.*  In a contested case, Boeing could and would litigate the government's breach determination, and the Court would determine whether any breach occurred and, if so, whether such breach was material.  As discussed herein, this would at least be a substantial litigation risk for the government. If the government failed to establish a material breach, then the Criminal Information would have to be dismissed as the DPA requires.  *Id.*

Boeing is prepared to plead guilty and thereby accept ultimate responsibility for the crime stated in the Criminal Information.  Boeing is also prepared to comply with the various requirements of the plea agreement.  The Company has substantially strengthened, and increased its investment in, its compliance and safety functions under the ongoing oversight of the Department and the Federal Aviation Administration (FAA) over the course of the DPA's term, and will continue those efforts.  If accepted, by the end of the probationary period, Boeing will have been under the Department's supervision for more than six years and under the supervision of an Independent Monitor for three.  Boeing will have paid billions in compensation both to its airline customers and to the Crash Victim Representatives, through compensation provided pursuant to the DPA and through civil settlements.  And Boeing will have paid nearly half a billion dollars in collective criminal fines.  Boeing respectfully requests that the Court accept the proposed plea agreement, and stands ready to address any questions the Court has of it.

## BACKGROUND

The proposed plea agreement comes to the Court with a long and complex history. Following a multi-year investigation of Boeing in the wake of the MAX accidents, the government

4

charged Boeing in January 2021 in a one-count Criminal Information with conspiracy to defraud the FAA.  That charge was based on alleged insufficient disclosures to a component of the FAA responsible for pilot training determinations (the FAA Aircraft Evaluation Group or AEG) regarding aspects of the MAX's Maneuvering Characteristics Augmentation System (MCAS). Concurrently, on January 7, 2021, Boeing and DOJ entered into a DPA that acknowledged the conduct was related to two 737 MAX Flight Technical Pilots; was not pervasive throughout the Company; and was not undertaken or facilitated by senior management.  The DPA also acknowledged that other Boeing employees disclosed the relevant MCAS characteristics to FAA officials responsible for determining airworthiness standards.  DPA ¶ 4(h), Dkt. 4 at 6.

The government agreed to dismiss that charge if Boeing complied with the DPA's requirements for three years.  Boeing undisputedly complied with the terms of that Agreement for years, satisfying substantial financial obligations, complying transparently with reporting obligations, and strengthening the Company's anti-fraud compliance program.  But following the DPA's three-year term, in the aftermath of the January 5, 2024 Alaska Airlines 1282 accident, the government determined that the Company's anti-fraud compliance efforts fell short and that Boeing breached the DPA.

The proposed *additional* punishment for the Company resulting from the alleged DPA breach—as set forth in the plea agreement—is a felony conviction, doubling of the fine payment to the maximum allowed under the statute, and new compliance requirements involving three more years of Department oversight via an Independent Compliance Monitor (which the Company must pay for) as well as hundreds of millions of dollars in mandated compliance program expenditures.

Boeing provides here additional information on the history of its DPA compliance efforts. This history is highly relevant to the Court's consideration of the plea agreement for two reasons.

First, as the Court evaluates the proposed plea agreement and objections thereto, and assesses objections that the plea agreement is insufficiently punitive, it is appropriate for the Court to consider the extent of Boeing's good-faith efforts to comply with the DPA. Second, it is also appropriate for the Court's consideration of what litigation risk the government may face should the proposed plea not be accepted. To be clear, Boeing is not here attempting to litigate the government's breach determination—the point is that the proposed plea reflects an appropriate balancing of litigation risk for both the government and Boeing.[3]

It is undisputed that Boeing complied with many of the DPA's requirements. Boeing timely paid the substantial financial sums required by the agreement. This included $500 million paid to a victim compensation fund; a criminal fine of nearly $250 million; and compensation of airline customers in the amount of $1.77 billion, all as the DPA required.

While the government acknowledged that Boeing had a comprehensive and well-resourced compliance program in January 2021, DPA ¶¶ 4(g), (h), the DPA required Boeing "to implement a compliance and ethics program designed, implemented, and enforced to prevent and detect violations of the U.S. fraud laws throughout its operations," DPA ¶ 21. Attachment C to the DPA set forth the elements the government expects in an effective corporate compliance program. The government does not dispute that Boeing's compliance program satisfied, and continues to satisfy, many of the elements found in Attachment C: (i) independence and oversight; (ii) training and

---

[3] Nor is Boeing attempting in any way to downplay the significance of the Alaska Flight 1282 accident. That accident is unacceptable and Boeing has already taken public responsibility for it and is taking comprehensive steps, under the close oversight of the FAA, to strengthen its quality and manufacturing processes in response to the Alaska 1282 accident, as is detailed *infra* at 27-31. The question of whether the Alaska 1282 accident highlighted needed improvements in Boeing's manufacturing processes is, however, distinct from the question of whether Boeing's *anti-fraud* compliance program met the standards set forth in the DPA.

guidance; (iii) internal reporting and investigation; (iv) enforcement and discipline; (v) mergers and acquisitions; and (vi) monitoring, testing, and remediation. *See* DPA Attachment C, ¶¶ 6-15.

Beginning before the DPA and continuing throughout the DPA's three-year term, Boeing devoted significant internal and external resources to implementing a compliance program that, among other functions, is designed to prevent and detect fraud. The Company's good-faith efforts in that regard are undisputed by the parties. *See* Plea Agreement at ¶ (6)(c); A-1-3. "During the term of the DPA, Boeing took considerable steps to enhance the independence, capability, and effectiveness of its compliance program." *Id*. As recognized by the proposed plea agreement, Boeing fundamentally transformed the structure and operations of its entire compliance program in response to the MAX accidents and the DPA. This transformation was dedicated to building, and succeeded in building, a compliance function that is independent, well-resourced, and has authority across the Company. The Chief Compliance Officer leads a team of 519 compliance professionals across the business who play an important role in identifying, prioritizing, and mitigating compliance risks. This well-resourced organization has grown and been strengthened by recruiting compliance-focused individuals within Boeing and through strategic hiring of external talent, including former federal prosecutors, state and federal law enforcement agents, and compliance experts from other multinational corporations.[4]

---

[4] In addition to increasing internal compliance resources and expertise, Boeing engaged and relied on multiple third-party experts to assess the compliance program, identify opportunities for improvements, and help the Company make those improvements. Boeing shared those experts' findings and recommendations with the government. Indeed, the government witnessed Boeing's compliance efforts firsthand and had ample opportunity to recommend improvements, and, where it did recommend improvements, Boeing fully embraced them. The Company's meaningful improvements to the compliance program were chronicled to the government in yearly work plans, quarterly compliance presentations, annual reports, and a sustainment plan, totaling more than 1,000 pages (excluding exhibits). Those submissions were made both live and in writing by Boeing's Compliance and Ethics personnel, with input from Company leadership, subject matter experts, third party consultants, and outside counsel.

During the DPA's term, the government provided Boeing with positive feedback on the Company's compliance efforts and improvements. The government also reported to the Court that Boeing was in compliance with the DPA, which reports were based upon the government's extensive interactions with the Company. For example, in a November 11, 2022 brief filed in the CVRA litigation, the government wrote, "[b]ecause of the DPA, Boeing has also undertaken an extensive overhaul of its compliance and reporting obligations that was designed to protect public safety and prevent future violations of the U.S. fraud laws by significantly improving the manner in which Boeing interacts with government agencies, regulators, and airline customers." Dkt. 128 at 4. In the same filing, the government noted that because "Boeing has so significantly complied with its obligations under that agreement (including completing payments to victims), Boeing could argue that any attempt by the Government to pursue criminal charges would constitute a material breach of the agreement." *Id*. at 5-6.

The government subsequently found that Boeing breached the DPA by not satisfying two compliance program elements—leadership's commitment to compliance and effective antifraud policies and procedures. *See* Plea Agreement at A-1-4 (citing DPA Attach. C, ¶¶ 1, 3-5). Paragraph 1 of the DPA requires Boeing to "ensure that its directors and senior management provide strong, explicit, and visible support and commitment" to anti-fraud policies and that "middle management, in turn, reinforces those standards." *See* DPA, Attach. C, ¶ 1. The DPA also required Boeing to develop, based on periodic risk assessment and regular review, compliance policies and procedures "*designed to reduce* the prospect of violations of U.S. fraud laws" and to encourage and support the observance of those policies and procedures by personnel at all levels of the Company. *See* DPA, Attach. C, ¶¶ 3-5 (emphasis added). At a high level, the government found that Boeing did not adequately extend its anti-fraud compliance program over quality and manufacturing

processes, namely around out-of-sequence work performed in Boeing's factories, processes for employees to confirm their work conforms to requirements, and around the quality of products within Boeing's supply chain. *See* Plea Agreement at A-1-5–A-1-9. These are core manufacturing and quality control matters that Boeing has addressed and continues to address with the FAA.

While Boeing is committed to the proposed plea agreement and of course is not challenging the government's breach determination in this proceeding, it has respectfully disagreed with the government's assessment that the Company's efforts in the above areas were insufficient under the DPA. The Company took significant steps during the DPA's term to promote a culture of compliance; increase and enhance leadership messaging on compliance, quality, and safety; and assess and improve the effectiveness of Boeing's policies and procedures, including those preventing fraud. What follows are just some examples of these efforts.

*Leadership Messaging*. Throughout the term, Boeing's leadership embraced and explicitly communicated the importance of compliance, including the Company's specific obligations under the DPA. Boeing's leadership demonstrated this ongoing commitment to compliance through significant organizational and structural changes, increased compliance resources, and consistent leadership messaging to employees. Boeing also focused on the interaction of compliance with its quality and safety functions. Boeing collected and assessed leadership messaging to ensure it embodied the "strong, explicit, and visible support and commitment" to compliance contemplated by the DPA, including in relationship to manufacturing quality and safety risks. Boeing improved how that leadership messaging flows down to all employees, particularly through middle management. This included providing mid-level leaders with new training and resources to facilitate effective communication with their teams, expanding employee access to leadership messaging, and tailoring that messaging to specific sites and business units to better resonate with

9

individual employees, including those on the factory floor.  Boeing also embedded compliance and ethics personnel and ambassadors at key sites across the Company to drive compliance messaging, identify compliance risks, and work with the business to mitigate those risks.

*Enhanced Policies and Procedures*.  Boeing has a comprehensive body of policies and procedures that guide nearly every aspect of its operations and reflects the Company's commitment to safety, quality, transparency, and integrity.  This begins with the Code of Conduct, which applies to all employees and sets the Company's expectations for ethical and compliant behavior.  During the DPA term, and under the government's supervision, Boeing focused on ensuring its existing policies were designed to prevent fraud, developed new policies to address identified compliance gaps, and improved employees' engagement with, and understanding of, the Company's policies and procedures.  Boeing also revised its Code of Conduct in 2022 to sharpen the emphasis on the Company's core values—explicitly requiring that all employees prioritize safety, quality, and integrity above profit and schedule; speak up about safety concerns; engage regulators and customers with candor, transparency, and respect; and prohibit retaliation.

*Periodic Risk Review*.  Through the Company's Compliance Risk Management (CRM) process, the Compliance organization worked with the Quality organization, and other functions, to identify and prioritize risks, including production-related risks, that could relate to fraud.  And Compliance worked with those organizations to mitigate identified risks through enhanced policies and procedures, revised training, and compliance messaging.  Throughout the term, Boeing assessed the effectiveness of its existing policies and procedures, particularly in areas identified as higher risk.  And it improved processes and procedures governing communications with regulators, "stamping" work as conforming, and regarding Boeing's global supply chain, among many other areas.  This required, at times, developing new policies, procedures, and related training, including

10

regarding governing employees and functions that communicate with the FAA and other regulators.

Again, Boeing has provided its perspective on its course of conduct under the DPA to the Court not because it is contesting the Department's breach determination in this proceeding, or because it does not appreciate the importance of continuing to strengthen Boeing's anti-fraud compliance program. Quite the contrary: Boeing is committed to continuous improvement of its compliance program and, if the proposed plea agreement is approved by this Court, will work closely with the compliance monitor to drive further institutional improvements. Boeing instead provides this context on its sustained and good-faith efforts to comply with its DPA obligations, first, because it relevant to the Court's assessment of the assertion that the proposed plea agreement imposes insufficient additional punishment in light of the government's breach determination; and second, and relatedly, because it sheds light on the litigation risk faced by the government in the absence of a plea agreement.

## ARGUMENT

### I.   Objections Related to the Factual Scope of the Plea Agreement

The Crash Victim Representatives raise various objections to the scope of the proposed plea agreement's accompanying statement of facts. Dkt. 233, 234, 236, 238. These objections do not allege that the statement of facts is insufficient to support a knowing and voluntary plea to the Criminal Information. Fed. R. Crim. P. 11(b)(3) (a plea need be supported only by "a factual basis"). The Crash Victim Representatives' objections generally assert that the statement of facts is "incomplete" for various reasons: "Because the parties' proffered facts are deceptively

incomplete, the Court should reject the plea until all relevant facts surrounding Boeing's culpability are disclosed." Dkt. 232-1 at 11.

These objections are unfounded in the law and the evidence. The CVRA grants no right to line-edit the government's statement of facts, and Boeing strongly contests many of the facts the Crash Victim Representatives would advance here. The only party that has the discretion to bring a prosecution or determine on what basis any prosecution should be brought, of course, is the government. Moreover, the Crash Victim Representatives cite no case in which a court rejected a proposed plea agreement due to the scope of its statement of facts. And even if there were any lawful basis for the Representatives to present an alternative theory of prosecution, they offer only untested allegations that have never been proven in any court, much less beyond a reasonable doubt as is required for plea and sentencing purposes.

A.    <u>The Scope of the Statement of Facts</u>

The Crash Victim Representatives' arguments, if accepted, would violate Boeing's due process rights because they urge the Court to reject the government's statement of facts in favor of the Representative's alternative proposed statement of facts. It is well established that a criminal defendant is entitled to due process of law and that in a criminal case, guilt must be established by proof beyond a reasonable doubt for all elements of the crime. And for any fact that increases that statutory maximum sentencing range, that fact becomes an element of the crime that must be proved beyond a reasonable doubt. U.S. Const. 6th Amendment; *Apprendi v. New Jersey*, 530 U.S. 466 (2000).

The Court is well aware of these standards, but Boeing recites them here because they cannot be squared with what the Crash Victim Representatives have proposed. Their factual proffer is, by their own admission, drawn from sources such as congressional hearings, Dkt. 232-1 at 16, SEC allegations in no-admit-no-deny settlements, *id.* at 15-16, and other claims based on

characterizations and inferences unilaterally drawn from discovery they have received in civil litigation, *id.* at 12-14.[5]  Some of the proffered accounts relate to Boeing employees at the working level involved in training determinations for the MAX, while others relate to high-level executives and statements to the market, and yet still others arise from different Boeing employees working with the FAA in the wake of the Lion Air accident.  These allegations are wide-ranging and generally lack connection between actors, timing, and subjects.  And some are contrary to the established evidence in this case because the government has admitted and agreed the evidence of the offense does not implicate Boeing senior management.  DPA ¶ 4(h).

Moreover, none of these purported facts were established in an environment where proof must be established beyond a reasonable doubt.  And, generally, none of these alleged facts have actually been established—even at a lower standard of proof—in any court of law.  For aid of the Court, Boeing organizes and addresses the origin of the various proffered facts the Crash Victim Representatives seek to add:

- Congressional Hearings:  Paragraphs 52b through 52k, 52p, 77, and 81 of the proffered statement of facts are drawn from a House of Representatives committee report (hereinafter the "House T&I Report"), as the Crash Victim Representatives acknowledge.  The House T&I Report was generated to serve the Article I legislative purposes of a committee of the House of Representatives.  As the Court well knows, legislative committees operate without an adversarial process, do not follow the strictures of the Fifth and Sixth Amendments, or the Federal Rules of Evidence, and apply no standard of proof as a court

---

[5] Some facts set forth in the Crash Victim Representatives' proffer may overlap with the proposed plea agreement's statement of facts.  To the extent their proffer overlaps identically with the facts contained within the proposed statement of facts to the plea agreement, they are duplicative and presumably not something to which they object.  Boeing's discussion will therefore focus on the proffered facts that the Crash Victim Representatives would *add*.

of law would.  This is of course entirely appropriate when such reports are used to satisfy the function for which they are created: to aid the Article I function of Congress.  But they are not intended to supplant the Article II prosecutor's discretion, and they are not intended to replace an Article III court's consideration of actual evidence in an adversarial process that is governed by the strictures of due process.  There are no witnesses supplying this information in this Court, and Boeing has not had the opportunity to confront them here.

- SEC Allegations:  Paragraphs 52z through 52an, 52ba through 52bc, 55 through 60, and 66 of the proffered statement of facts are drawn from allegations made by the SEC in two civil cases.  *See also In the Matter of The Boeing Company, Respondent*, Release No. 11105 (Sept. 22, 2022); *In the Matter of Dennis A. Muilenburg, Respondent*, Release No. 11106 (Sept. 22, 2022).  Importantly, Boeing neither admitted nor denied those allegations, and the cases were settled without any findings by the court in those cases.  As such, the SEC allegations—again, allegations made in a *civil* proceeding—are not admissions by Boeing: they are simply allegations that have no evidentiary value under the Federal Rules of Evidence.  Just as with the congressional report discussed above, it would violate the Fifth and Sixth Amendments to consider these allegations as evidence against Boeing in this proceeding.

- Civil Discovery:  The remainder of new proffered facts are inferences drawn from or characterizations made of various documents produced by Boeing in civil litigation.  *See* Dkt. 232-1 ¶¶ 23a-23c, 52a, 52m-52o, 52q-52u, 52w, 52aq, 52ar, 52ay, & 55.  These documents are referenced out of context and with characterizations and surmises supplied by the Crash Victim Representatives.  This Court does not have the benefit of the full record in the civil cases, nor should it be called upon to review such a record.  Pulling select

14

documents out of hundreds of thousands that have been produced and characterizing them without context adds little to this proceeding. None of the civil cases have gone to trial, and the allegations and theories of liability at issue in those civil proceedings are much broader than the Criminal Information here. For example, those lawsuits generally allege numerous defects in the MAX, from the design of MCAS itself, to pilot training, to claimed human factors sensory overload from the combination of alerts and warnings on the flight deck. And, just as with the House T&I Report and the SEC allegations, none of them have been proven in a court of law by any standard, much less beyond a reasonable doubt. It would violate the Fifth and Sixth Amendments to consider them as evidence against Boeing in this proceeding.

Ultimately, the proffered facts raise issues and allegations far afield from the Criminal Information. The Criminal Information does not relate to the design of MCAS itself. It does not relate to Boeing's statements to the market or the sufficiency of its securities disclosures. But at base the proffered facts are unproven and irrelevant to this proceeding. The Crash Victim Representatives do not assert that they are necessary to provide a factual basis for Boeing's plea to the Criminal Information—they are not—and they should be rejected.

The Crash Victim Representatives also object that the statement of facts makes no mention that the offense caused the deaths of 346 people. But again, the government—after reviewing evidence gathered over its multi-year criminal investigation—has determined that it cannot prove such causation beyond a reasonable doubt. And for that reason, it would be inappropriate to include such a reference in the statement of facts.[6] This in no way detracts from the loss of the

---

[6] As noted above, Boeing does accept responsibility that *the design of MCAS* contributed to the accidents. But the Criminal Information does not charge misconduct in the design of MCAS. That document, and the associated statement of facts, are instead focused on representations made to

Crash Victim Representatives or ignores them.  The government conferred with them extensively prior to entering into this plea agreement with Boeing.  It simply respects the role of the Executive, the standards of proof in a criminal case, and Boeing's Fifth and Sixth Amendment rights.

## II.     Crash Victim Representatives' Assertions as to the Strength of the Underlying Case

The Crash Victim Representatives object that the proposed plea agreement is under Rule 11(c)(1)(C) of the Federal Rules of Criminal Procedure.  Those objections are generally framed as questions as to the public interest in the plea agreement or its consistency with the Crash Victim Representatives' interests as articulated in their dealings with the government, and Boeing expects the government will address those objections.

But one overarching objection presented by the Crash Victim Representatives is that the plea agreement represents a collusive, "sweetheart" deal.  As purportedly indicative of the collusive nature of the deal, the Crash Victim Representatives claim that the agreement is insufficiently punitive given—in their view—what they describe as the strength of the government's case, and their assertions about Boeing's course of conduct under the DPA.  Dkt. 232-1 at 10 (discussing that a Rule 11(c)(1)(C) case may be appropriate where the government's case is weak and claiming that "such a concern is inapplicable here.  It would be nearly impossible for the Government to have a stronger case against Boeing, given Boeing's *signed confession* to the conspiracy charge in the [DPA].").  The Crash Victim Representatives' objections should not be accepted, given that the proposed plea agreement was negotiated at arm's length and takes into account the parties' mutual litigation risk, including the merits of the underlying charge.

---

the FAA AEG concerning training determinations.  The role that training played in the accidents is distinct from the role of the MCAS function itself.

A.   **In a Contested Case, Boeing Could Seek Dismissal of the Criminal Information on the Ground that It Complied with the DPA.**

The Crash Victim Representatives' assessment of the strength of this case is based on the DPA's statement of facts.  What this position neglects, however, is that the government committed in the DPA not to prosecute Boeing and to dismiss the Criminal Information *if* Boeing complied with the DPA.  DPA ¶ 25.  As the Fifth Circuit has stated, "if a defendant lives up to his end of the bargain, the government is bound to perform its promises."  *United States v. Castaneda*, 162 F.3d 832, 835–36 (5th Cir. 1998).  Due process prohibits the government from unilaterally declaring a breach to try to renege on its contractual obligations.  *Id.*

Rather than permit the government to unilaterally declare a breach and walk away from its obligations without scrutiny, the law is clear on what must be done:

> When the government believes that a defendant has breached the terms of [an agreement not to prosecute] and wishes to be relieved of performing its part of the bargain – here, refraining from prosecuting the defendant – due process prevents the government from making this determination and nullifying the agreement unilaterally.  Instead, the *government must prove to the court by a preponderance of the evidence* that (1) the defendant breached the agreement, *and* (2) the breach is sufficiently material to warrant rescision.

*Castaneda*, 162 F.3d at 836 (emphasis added).

This principle is firmly rooted in due process concerns and well-established throughout the judiciary.  *See e.g.*, *United States v. Garcia*, 519 F.2d 1343, 1345 (9th Cir. 1975) (dismissing conviction obtained in contravention of express terms of the deferred prosecution agreement because "when the prosecution makes a 'deal' within its authority and the defendant relies on it in good faith, the court will not let the defendant be prejudiced as a result of that reliance"); *United States v. Calabrese*, 645 F.2d 1379, 1390 (10th Cir. 1981) (due process prohibits government from unilaterally declaring a breach and instead entitles the defendant to a "judicial determination, based on adequate evidence, of a defendant's breach" with the government bearing the burden of proof);

17

*Stolt-Nielsen, S.A. v. United States*, 442 F.3d 177, 186 (3d Cir. 2006) (same); *United States v. Tilley*, 964 F.2d 66, 71 (1st Cir. 1992) (same); *United States v. Ataya*, 864 F.2d 1324, 1329-30 (7th Cir. 1988) (same); *United States v. Brown*, 801 F.2d 352, 355 (8th Cir. 1986) (same)

**B.    The Government Would Face Litigation Risk at Any Hearing Regarding Boeing's DPA Compliance.**

As noted above, in a contested case, Boeing could move to dismiss the Criminal Information on the grounds that it complied with the DPA.  At an evidentiary hearing on such a motion, the government would bear the burden of proving, by a preponderance of the evidence, that Boeing breached the DPA and that the breach was material.  As Boeing discusses in this section, the government would face substantial litigation risk at any such hearing.[7]

As explained in greater detail in the Background section, *supra*, the government could not dispute that Boeing complied with all of the DPA's financial requirements, with its cooperation requirements, and with its enhanced reporting requirements.  Indeed, even with respect to the DPA's compliance program requirements, the government has stated that Boeing "took considerable steps to enhance its compliance program through structural and leadership changes, including but not limited to steps to enhance the independence, capability, and effectiveness of its compliance program; steps to enhance its annual Compliance Risk Management process; and steps

---

[7] The Crash Victim Representatives appear in places to suggest that Boeing's views concerning its compliance with its obligations under the DPA call into question its acceptance of responsibility for the conduct at issue in the plea agreement.  *See* Dkt. 232-1 at 32.  This suggestion is mistaken. Acceptance of responsibility is reserved for the criminal charge, and Boeing would accept responsibility as part of this proposed plea agreement, as it did before when it accepted the DPA statement of facts.  Boeing's reservation of rights as to whether it committed a breach of the DPA is distinct from, and does not in any way call into question, Boeing's acceptance of responsibility for conduct underlying the criminal charge.  And it also bears emphasis that, regardless of Boeing's view regarding the correctness of the government's breach determination, Boeing is deeply committed to continuous improvement of its anti-fraud compliance program, and also is committed to implementing the substantial quality and manufacturing improvements that are contained in the comprehensive action plan submitted to the FAA earlier this year.

to integrate compliance efforts across its business . . . ."  Proposed Plea Agreement, ¶ 6(c), Dkt. 221-1.  *See also* Attachment A-1, ¶ 5 ("During the term of the DPA, Boeing took considerable steps to enhance the independence, capability, and effectiveness of its compliance program. Among other things, Boeing enhanced its annual Compliance Risk Management process, including in ways that strengthened compliance controls with respect to potential safety and quality risks, and took steps to integrate compliance efforts across its business.  As direct remediation of the charged misconduct, Boeing implemented policies and procedures to manage and coordinate the formal communication of information between Boeing and its regulators and customers and mandatory training regarding transparency in interactions with regulators and customers.").  These statements recognizing Boeing's DPA compliance are consistent with the Department's reports to the Court throughout the DPA's term and as recently as January 2023.  *See supra* 6-8.

Thus, in a contested proceeding on whether Boeing breached the DPA, the government would have to acknowledge that Boeing took *at least* "considerable steps" in compliance with the DPA's compliance program requirements.  It would then be incumbent on the Department to adduce evidence of what, if anything, Boeing did that fell short of the requirements of the DPA. And even if the Department could show some shortfall, it would also have to establish that such shortfall was a material breach within the context of the DPA as a whole.  The Department would have substantial litigation risk on carrying that burden.  *See supra* 9-11.  Boeing has acknowledged responsibility for the Alaska 1282 accident and is taking sweeping actions under the supervision of the FAA to strengthen its quality programs in response to it.  But the DPA's obligations pertain to Boeing's anti-fraud compliance controls, and the Department would need to establish that the items identified in its breach notice reflect deficiencies in those controls, rather than manufacturing

or quality issues.  If the Court ultimately ruled for Boeing, the Department would be required to dismiss the Criminal Information, ending the prosecution.

Beyond the question of breach itself, it is also appropriate for the Court to consider Boeing's good faith compliance efforts and improvements as it evaluates this proposed plea agreement.  The proposed resolution is tailored to what the government found wanting in Boeing's compliance program but credits the Company for what it is doing well.  For example, the scope of the Independent Compliance Monitor required under the agreement is defined to focus on what the government assesses was the area of shortcoming, as opposed to pretending that the last three years of Boeing's compliance improvements did not happen.  That scope is also tailored to recognize the role that the FAA is playing in Boeing's oversight and not to intrude on the work Boeing and the FAA already have underway based on findings in the wake of the Alaska 1282 accident.

C.     **The Government and Boeing Mutually Face Litigation Risk in Any Prosecution on the Criminal Information.**

Even if the Court were to deny Boeing's motion to dismiss, the government would also bear substantial litigation risk in a prosecution of the Criminal Information.  As the Court knows, Mark Forkner was acquitted on charges that almost entirely overlap in their facts with the Criminal Information and form the foundation of the offense Boeing is charged with.  *See* Tr. May 3, 2022, Dkt. 95 at 61 (government attorney: "The government's litigation position has not improved over the past 16 months.  As the Court well knows, Mr. Forkner was acquitted on four counts of wire fraud, a different charge, admittedly, than the charge set forth in the information, but nonetheless involving almost all of the same evidence.").  Since that acquittal, the Court has declared that a key witness for the prosecution—the FAA AEG official whom Mr. Forkner was accused of defrauding—was not credible.  Aug. 26, 2022 Hearing Tr., Dkt. 106 at 35.  And one of the bases

for the Court's finding was that this official was invited to—but chose not to attend—the very meetings where Boeing personnel were briefing the FAA on the full scope of the MCAS function. *Id.*; *see also United States v. Forkner*, 4:21-cr-00268-O-1, Trial Tr. Vol. 2 at 450-62 and 465.

The Crash Victim Representatives may dismiss these issues based on their view that the DPA statement of facts alone is sufficient for conviction. But, in a contested case, Boeing could bring certain challenges to the admissibility of that statement of facts. And even if the DPA statement of facts remains admissible, "[i]t is a settled principle of the administration of criminal justice in the federal courts that a conviction must rest upon firmer ground than the uncorroborated admission or confession of the accused." *Wong Sun v. United States*, 371 U.S. 471, 488–89 (1963). Whether the government could sufficiently corroborate the DPA statement of facts given developments during and after Mr. Forkner's trial is at least an issue of litigation risk, and an issue that this Court should take into account as it assesses objections that the plea agreement is insufficiently punitive.

## III.    Objections Related to the Criminal Fine

### A.    Boeing Has Agreed to The Statutory Maximum Fine.

The Crash Victim Representatives object to the proposed criminal fine on the ground that the loss amount used to calculate the statutory maximum fine is insufficient. They object that the fine should instead be calculated based on some combination of doubling the amount of loss to the Crash Victim Representatives and costs imposed on airlines because of the grounding of the MAX fleet.

The Crash Victim Representatives are correct of course that the Court determined, after an evidentiary hearing at which the Crash Victim Representatives called two expert witnesses, that they were directly and proximately harmed as a result of the offense in the Criminal Information. The Court made that determination based on a preponderance of the evidence standard. *See* Dkt.

116 at 9.  That is the critical difference as it relates to the objections leveled at this stage.  Under *Apprendi*, the statutory maximum fine is an element of the criminal offense where, as here, the Section 3571(d) alternative fine of double the gain or loss is being utilized.  This is because those facts "increase[] the penalty for a crime beyond the prescribed statutory maximum."  *United States v. Pfaff*, 619 F.3d 172, 174-75 (2d Cir. 2010) ("[B]y fining [defendant] $6 million under 18 U.S.C. § 3571(d), a fine supported only by the district court's own pecuniary loss finding, the court violated *Apprendi*."); *United States v. LaGrou Distrib. Sys., Inc.*, 466 F.3d 585, 594 (7th Cir. 2006) (same); *see also S. Union Co. v. United States*, 567 U.S. 343, 360 (2012) ("the rule of *Apprendi* applies to the imposition of criminal fines").  Accordingly, the statutory maximum fine amount must be proven to a jury beyond a reasonable doubt, the highest standard of proof employed in the law.

After completing its investigation, the government concluded that it had sufficient evidence to charge Boeing with a conspiracy to defraud the FAA AEG.  The resultant Criminal Information nowhere alleges that the crime stated therein caused either of the MAX crashes.  Indeed, the government has reported to the Court that it cannot establish beyond a reasonable doubt that the Criminal Information offense caused either of the crashes.  Dkt. 58 at 10-11 ("To bring a federal charge, a prosecutor must believe 'that the person's conduct constitutes a federal offense, and that the admissible evidence will probably be sufficient to obtain and sustain a conviction' beyond a reasonable doubt…. The Government did not charge Boeing with any form of federal negligent homicide in connection with the crashes of Lion Air Flight 610 and Ethiopian Airlines Flight 302.") (internal citations omitted).  Accordingly, it would be inappropriate to include any losses related to the crashes in the statement of facts because those are not facts the government could establish beyond a reasonable doubt.  *See* May 3, 2022 Motion Hearing Tr. at 93 (government attorney

22

distinguishing direct and proximate causation based on information outside the statement of facts from the statement of facts: "But what we would say, your Honor, is that the [DPA] statement of facts are what the government can prove beyond a reasonable doubt, or said they can, and that's what the defendant has agreed.").[8]

As a criminal defendant in this proceeding, Boeing is entitled to rights under the Fifth and Sixth Amendments, and those include the requirement of due process and that elements of the offense that increase the statutory maximum must be proven beyond a reasonable doubt. *United States v. Booker*, 543 U.S. 220, 244 (2005). These are vital safeguards, particularly where, as here, the Crash Victim Representatives' objections are premised generally on the addition of proposed facts that have never been proven in any court, much less beyond a reasonable doubt. *See supra* 12-16.

B.  **Sentencing Guideline Objections**

The Crash Victim Representatives raise numerous objections to the sentencing guideline calculations in the proposed plea agreement. These alternate guideline calculations appear to spring from the Crash Victim Representatives' proposed alternative statement of facts. As is discussed above, the government has not sponsored that alternative statement of facts, and it therefore cannot be a basis for calculating the advisory sentencing guidelines. The plea agreement sets forth a guideline calculation based upon the government's statement of facts, which contains those facts relevant to that charged offense which the government asserts it can prove beyond a reasonable doubt. The Crash Victim Representatives proposed guideline calculations are also

---

[8] There are only two substantive changes between the DPA statement of facts and the proposed plea agreement statement of facts. First, as the Crash Victim Representatives have noted, the plea agreement statement of facts adds a paragraph at the end reciting the amount of gain to Boeing that establishes the basis of the statutory maximum fine calculation. Second, the plea agreement statement of facts removes a sentence that was in the DPA statement of facts related to whether MCAS was a "part" under federal law.

unnecessary given that Boeing is agreeing to pay the statutory maximum fine.  Where the sentencing guidelines would otherwise recommend a fine in excess of a statutory maximum, then the advisory sentencing guideline range becomes the statutory maximum sentence.  U.S.S.G. 8C3.1(a).  So, even assuming for the sake of argument that the Crash Victim Representatives' computations were correct, it still would not change the sentencing guideline range.[9]

Boeing does, however, address two statements the Crash Victim Representatives make in support of their guideline calculations.  First, they argue that Boeing has publicly recognized, including through former CEO David Calhoun's statements to Congress, the loss caused to them. They object that guideline computations that do not account for that loss are inconsistent with Mr. Calhoun's statements.  But, as noted above, this mistakenly conflates the distinction between Boeing's acknowledged responsibility for the accidents, on the one hand, with the question of whether the *charged criminal conduct* caused the accidents.  Boeing has accepted, both publicly and in civil cases, responsibility for the MAX accidents, because the *design of MCAS* contributed to the accidents.  The misconduct at issue in the Criminal Information does not involve decisions about the design of MCAS, but rather stem from representations made by Boeing employees to FAA AEG personal making 737 MAX training determinations.  As to that question, as is discussed above, the government has assessed that the evidence does not show beyond a reasonable doubt that the Criminal Information offense caused the accidents.

Second, the Crash Victim Representatives argue that Boeing should not receive credit for acceptance of responsibility because Boeing has not agreed with the government's assessment that

---

[9] The law requires that Boeing receive a credit for the $243.6 million the Company already paid to the United States under the DPA.  This amount was treated as a criminal fine, and accordingly, Boeing can only face an additional $243.6 million fine consistent with the statutory maximum fine amount.

the Company breached the DPA.  Dkt. 232-1 at 32.  The acceptance of responsibility reduction under the guidelines, however, is limited to accepting responsibility for the *criminal offense*. Boeing's compliance with the DPA is a matter of contract between the government and Boeing. *See supra*, n.7.  Should the Court accept the proposed plea agreement, Boeing will accept responsibility through a plea of guilty and through the statement of facts supporting the Criminal Information.

**IV.**   **Objections Related to the Compliance Monitor**

   **A.**   **The Monitorship Requirement Set Forth in the Proposed Plea Agreement Is Appropriate.**

The Crash Victim Representatives have also asserted that the proposed plea agreement should be rejected because the Independent Compliance Monitor provision is inadequate.  The plea agreement's Independent Compliance Monitor requirement, however, directly addresses the specific anti-fraud concerns raised by the Department in its Factual Basis for Breach (Attachment A-1) and in the underlying offense.  *See* Dkt. 221-1.  That purpose is the essence of any monitorship: to address the future detection and prevention of the type of misconduct at issue in the prosecution.  When coupled with the robust compliance obligations Boeing was subject to under the DPA, the additional three-year monitorship requirement will effectively stretch the Department's oversight over Boeing to nearly seven years—from January 2021 through 2027 (depending on when the monitorship begins).  This is nearly unprecedented in the history of the Department's corporate prosecutions.  Moreover—and critically important—Boeing continues to actively work with its primary, congressionally authorized safety regulator, the FAA, to enhance the safety of its products and services.  The proposed plea agreement recognizes the importance of the FAA's role as the Company's primary regulator and the need to mitigate any interference with that vital role.

     **1.**     ***The Independent Compliance Monitor's Scope Addresses the Specific Compliance Concerns Cited by the Department***

The Crash Victim Representatives assert that the scope of the proposed Independent Compliance Monitor is too narrow, and that it should cover safety. *See* Dkt. 232-1 at 40. But the proposed Independent Compliance Monitor covers the very things it should—the anti-fraud compliance concerns specifically identified by the Department in its Factual Basis for Breach (Attachment A-1 to the Plea Agreement). *See* Dkt. 221-1.

Pursuant to the proposed plea agreement, the Company intends to plead guilty to a charge of conspiring to defraud a government agency (the FAA AEG) via the conduct of two of its employees—the same charge underlying the predecessor DPA. *See id.* ¶ 1-2; DPA ¶ 1. The government's factual basis supporting this fraud charge was set forth in both the DPA and proposed plea agreement, and it addresses the specific facts and circumstances leading to the offense. *See* Dkts. 4 (DPA, Attachment A) and 221-1 (Plea Agreement, Attachment A-2). The Independent Compliance Monitor requirement, in short, is designed to help the Company "address and reduce the risk of any recurrence of the Company's misconduct, as described in Attachment A-2, and to address the Offices' basis for breach [of the DPA], as described in Attachment A-1." *See* Dkt. 221-1, Attachment D-1 at ¶ 3. To impose monitorship requirements beyond these factors would be outside the scope of this criminal proceeding—both the specific facts upon which the offense is based and the specific circumstances where the Department submits that the Company's compliance function fell short. *See* Dkt. 221-1, Attachment A-1 at ¶ 5 (listing several enhancements in the Company's compliance function under the DPA, but noting its belief that the Company "failed to sufficiently extend its anti-fraud ethics and compliance program over its quality and manufacturing process before the end of the DPA term.").

The record establishes that Boeing's DPA compliance was distinguished by good faith and full engagement with the Department, as the Department has acknowledged, and as described above. The record also reflects—and the Department has confirmed in filings with the Court, including in the proposed plea agreement—that the Company made significant progress in improving its compliance program during the term of the DPA, including in response to the Department's requests and recommendations, as described above. *See id.* ("During the term of the DPA, Boeing took considerable steps to enhance the independence, capability, and effectiveness of its compliance program.").

It is against this backdrop that the mandate of the proposed Independent Compliance Monitor must be viewed. The result is a monitorship appropriately tailored to address the specific conduct set forth in Attachment A-2 (statement of facts), and the remaining concerns the Department has about the Company's anti-fraud compliance program after the three-year DPA as described in Attachment A-1 (Factual Basis for Breach).[10]

## 2. *The FAA Is Presently Exercising Robust Oversight Over Boeing, and the Design of Any Monitorship Must Not Usurp that Important Regulatory Relationship*

The Crash Victim Representatives' concerns regarding the proposed monitor's scope are also misplaced given the FAA's rigorous oversight of Boeing and the general state of aviation safety.

---

[10] Additionally, the monitor selection process here, which reflects conferral feedback from the Crash Victim Representatives and their counsel, *see* Dkt. 206 at ¶ 7, addresses any potential concern regarding independence. The process here differs from the Department's standard process in which the defendant recommends a pool of potential candidates, *see* Kenneth A. Polite, Jr., *Revised Memorandum on Selection of Monitors in Criminal Division Matters*, U.S. DEPT. OF JUST. at 6-7 (Mar. 1, 2023), https://www.justice.gov/criminal/criminal-fraud/file/1100366/dl, and instead will involve a monitor chosen by the government (with notice to the Court) from a government-selected "pool of qualified candidates based on a public solicitation, to which anyone can apply, including candidates supported by the families." *See* Dkt.206 at ¶ 7.

Boeing is currently subject to robust and heightened oversight by its primary safety regulator, the FAA.[11]  In the first quarter of this year, the FAA completed a detailed audit of Boeing's production and manufacturing quality systems.[12] The FAA then gave Boeing ninety days to develop a comprehensive safety enhancement proposal, which Boeing has developed ("Product Safety and Quality Plan") to address the FAA's audit findings.  Boeing anticipates that it will continue refining certain details of the Product Safety and Quality Plan under the FAA's supervision, but its main components have been established and Boeing has begun and will continue to implement them.  Importantly, these efforts will be "thoroughly review[ed]" by the FAA.[13]  The ongoing efforts organized under the Product Safety and Quality Plan provide for significant improvements to manufacturing and quality processes and enhancements to Boeing's safety culture.[14]  This includes quality and safety enhancements Boeing was already undertaking in response to the Alaska 1282 accident, including in the following areas: fully implementing the Company's Safety Management System (SMS) across the production system; simplifying and enhancing processes and procedures; reducing incoming defects from suppliers; improving

---

[11] *See generally FAA Continues to Hold Boeing Accountable for Implementing Safety and Production Quality Fixes*, FED. AVIATION ADMIN. (May 30, 2024), https://www.faa.gov/newsroom/faa-continues-hold-boeing-accountable-implementing-safety-and-production-quality-fixes; *see also Updates on the 737-9 and Safety & Quality Action*, BOEING, https://www.boeing.com/737-9-updates (last updated June 18, 2024).

[12] *See generally Updates on Boeing 737-9 MAX Aircraft*, FED. AVIATION ADMIN. (Mar. 4, 2024), https://www.faa.gov/newsroom/updates-boeing-737-9-max-aircraft.

[13] *Id.*; *see also FAA Continues to Hold Boeing Accountable for Implementing Safety and Production Quality Fixes*, FED. AVIATION ADMIN. (May 30, 2024), https://www.faa.gov/newsroom/faa-continues-hold-boeing-accountable-implementing-safety-and-production-quality-fixes.

[14] The plan also responds to findings of the comprehensive panel report regarding Boeing's safety culture, ODA, and safety management systems.  *See* Section 103 Organization Designation Authorizations (ODA) for Transport Airplanes Expert Panel Review Report, FED. AVIATION ADMIN. (2024), https://www.faa.gov/newsroom/Sec103_ExpertPanelReview_Report_Final.pdf; *Updates on Boeing 737-9 MAX Aircraft*, FED. AVIATION ADMIN. (Mar. 4, 2024), https://www.faa.gov/newsroom/updates-boeing-737-9-max-aircraft.

employee training; ensuring total production system compliance; strengthening Boeing's culture of safety and quality through engagement and communication; and simplifying installation and build plans. Layered onto these initiatives are the development of specific key performance indicators (KPIs) which will enable Boeing and the FAA to track the Company's progress to achieving the enhancements in the plan or corrective actions where necessary.

Importantly, this comprehensive plan of safety improvements (and tracking mechanisms to gauge actual progress) will not take place in a vacuum—the FAA will hold Boeing accountable to ensure that the Product Safety and Quality Plan is carried out and that it is directly responsive to the FAA's audit findings. As stated by FAA Administrator Whitaker: "[o]n the FAA's part, we will make sure they [follow through on corrective actions and effectively transform their safety culture] and that their fixes are effective. [Boeing's completion of a plan responding to the FAA's audit findings] does not mark the end of our increased oversight of Boeing and its suppliers[]. . . ."[15]

The Crash Victim Representatives' request that the monitor must have a "broader mandate [which] squarely focuses on the safety issues that are of greatest concern to the public[,]" Dkt. 232-1 at 40, must be considered not only in light of this ongoing scrutiny from Boeing's safety regulator, but also within the broader context of the recent safety record of the aviation industry. While Boeing constantly strives to improve safety, commercial air travel—both globally and in the United States—is in the safest period in its history. As described in one recent article, "[t]he reality, statistics show, remains that getting on a Boeing or Airbus SE jetliner is still exponentially

---

[15] *FAA Continues to Hold Boeing Accountable for Implementing Safety and Production Quality Fixes*, FED. AVIATION ADMIN. (May 30, 2024), https://www.faa.gov/newsroom/faa-continues-hold-boeing-accountable-implementing-safety-and-production-quality-fixes.

safer than the drive to the airport."[16]  This trend of improving aviation safety has been seen on both Boeing and Airbus airplanes.[17]

Boeing fully appreciates and has acknowledged publicly that the Alaska 1282 accident was unacceptable, and the Company is taking comprehensive actions in response to it.  But that accident, and the litany of news articles the Crash Victim Representatives cite in their prior filing, *see* Dkt. 232-1 at 36 and n.30, must be considered in the context of the improving level of safety that has been achieved by the commercial aviation industry, with Boeing being a critical contributor to that shared record of safety.

In short, Boeing is already subject to enhanced oversight by the FAA as a result of the Alaska 1282 accident.  Boeing has developed, is executing, and will be assessed by the FAA against a sweeping plan of safety enhancement.  And this work will take place in the context of Boeing's ongoing commitment to safety, which is reflected in the record of aviation safety described above.

This regulatory backdrop is important, because the insertion of a monitor with a "broad[] mandate" is not merely unjustified, but also runs the risk of affirmatively harming aviation safety. Boeing previously briefed this concern in its 2023 response to the Crash Victim Representatives' original request for a monitor, Dkt. 181, and it remains relevant now given the FAA's focus on enhanced oversight of the Company; the specific, detailed remediation plan developed after the

---

[16] Jinshan Hong et al., *Fliers Are More Worried About Plane Safety Even as Air Travel Remains as Safe as Ever*, TIME (May 23, 2024), https://time.com/6981932/airplane-flying-safety-boeing-accidents-fears-reality/.

[17] An analysis of airline safety data conducted after Alaska 1282 demonstrated that the rate of incidents on equivalent Boeing versus Airbus aircraft was comparable and proportional to the number of flights being taken.  Douglas S. Harned et al., Commercial Aircraft: How Safe Is Air Travel?  737MAX, GTF – How Meaningful Are the Headlines, BERNSTEIN (Mar. 25, 2024); *see generally* Andy Pasztor, *The Airline Safety Revolution*, WALL ST. J. (Apr. 16, 2021, 12:08 PM), https://www.wsj.com/articles/the-airline-safety-revolution-11618585543.

FAA audit that Boeing continues to execute under FAA supervision; and now the inclusion of an additional Independent Compliance Monitor as part of the proposed plea agreement.

Injecting a wide-ranging monitor with a "safety-oriented mandate[,]" Dkt. 232-1 at 40, ironically has the potential to increase, not decrease, safety risk. Any divergence between the direction of the FAA and a putative monitor of the sort requested by the Crash Victim Representatives, for example, would leave Boeing in the untenable position of deciding between compliance with the congressionally mandated safety experts (the FAA), and compliance with the plea agreement conditions. The FAA is responsible for regulating safety, and it would be counterproductive to have an independent safety monitor directing measures different from those mandated by the FAA. The significance and complexity of Boeing's Product Safety and Quality Plan, which Boeing is presently refining and implementing under the FAA's oversight, further cautions against inserting a monitor with a "broad[] mandate" along the lines suggested by the Crash Victim Representatives. The scope of the Independent Compliance Monitorship set forth in the proposed plea agreement prudently recognizes the potential for problematic conflict with the FAA's regulatory mandate, and would have the monitor instead focus on the anti-fraud compliance program areas identified by the government in its breach determination.

## V.      Objections Related to Restitution

The Crash Victim Representatives and LOT object that the restitution provisions in the proposed plea agreement are misleading. These objections are misplaced, as Boeing explains below. The Crash Victim Representatives' objection is somewhat unclear to Boeing but generally seems to center on the proposed plea agreement's recognition that Boeing asserting credits based on prior payments to them. LOT, for its part, objects that the plea agreement excludes it from recovering any restitution. Boeing first addresses the objections and then provides the Court with context and information on the status of related civil litigation.

The Crash Victim Representatives' objections to the restitution provision in the proposed plea agreement as misleading are misplaced. The restitution provision allows for the Court to have a hearing to assess what, if any, lawful restitution should be awarded. What amount, if any, will be awarded cannot be known without knowing which claimants come forward, what restitution they may claim, and what credits apply to the same. The plea agreement allows this restitution process to proceed in a separate hearing and for Boeing to appeal.

LOT objects to being excluded from potential restitution. It is notable that out of all of Boeing's customers, foreign and domestic, LOT is the only one that has appeared and raised an objection to the proposed plea agreement. As with the Crash Victim Representatives, LOT has a civil claim that it is pursuing against Boeing. That claim will rise or fall on its own merit, but there is a long-pending civil case that is solely devoted to assessing whether LOT has any valid claims to compensation against Boeing and, if so, what the appropriate measure of damages for those claims would be. Boeing and the government have argued to this Court why LOT does not qualify as a crime victim under the CVRA. Dkt. 145 and 150. Accordingly, the exclusion of LOT from potential restitution is consistent with the parties' longstanding position, the discretionary nature of restitution, and this Court's prior rulings. *See* Dkt. 185 at 29 (denying LOT crime victim status).

The Crash Victim Representatives claim that the proposed plea agreement's references to restitution are misleading because Boeing may assert that any restitution award should be offset by payments Boeing has made to claimants in civil settlements. This objection is premature and hypothetical as the plea agreement does not calculate any restitution amounts and provides for a separate, later proceeding at which any restitution issues will be addressed. The Crash Victim Representatives' filing also notes that there may not be claims for restitution, Dkt. 232-1 at 47, in which case the Court would not need to consider offsets.

In short, these are issues that could be taken up in connection with the restitution hearing. But Boeing will briefly provide the Court here with information bearing on the status of compensation should claimants come forward. As the Court knows, family members or representatives of decedents from the two MAX crashes sued Boeing in Chicago. Those suits have since proceeded through the various phases of litigation and have addressed many issues, ranging from legal issues related to applicable law to discovery issues. Of the civil suits brought related to the 346 decedents of the two MAX accidents, 313 have settled and, as noted above, substantial compensation has already been paid. The remainder are proceeding through the civil justice system. Boeing stipulated in the Ethiopian Airlines cases to provide full compensatory damages to the plaintiffs, including lost income as measured by Illinois law. **Exhibit A**. That stipulation has been endorsed by all Ethiopian Airlines plaintiffs except for two. **Ex. A** at 6 n.4. So, for those stipulating parties, even though the case has not yet settled or been adjudicated through trial, it is not in dispute that Boeing will pay the full measure of compensatory damages, including lost income. And, as the Court is aware, Boeing has also fully funded and paid out an additional $550[18] million in a fund for the Crash Victim Representatives.

The plea agreement's recognition of Boeing's prerogative to point to these payments in the context of potential restitution proceedings is not novel; it is settled law. The Fifth Circuit has recognized that "to avoid double-counting, a district court must reduce the size of its restitution order by any amount received by the victim as part of a civil settlement." *United States v. Sheinbaum*, 136 F.3d 443, 449 (5th Cir. 1998); *see also United States v. Cluck*, 143 F.3d 174, 180 n.9 (5th Cir. 1998) ("district court must reduce [a] restitution order by any amount that defendant can show was received by victim as part of a civil settlement."); *United States v. Harmon*, 156 F.

---

[18] This includes a voluntary $50 million that Boeing funded prior to the DPA.

App'x 674, 676 (5th Cir. 2005) (unpublished) (footnote omitted) (affirming a restitution order that had included a reduction for a prior civil settlement: "even though a court must reduce restitution by any amount the victim received as part of a civil settlement, the court reduced restitution by that amount here."); *United States v. Phillips*, No. 3:08-CV-51TSL-FKB, 2011 WL 2457863, *8 (S.D. Miss. June 16, 2011) (a criminal defendant is "entitled to the benefit of [a] settlement" that predated the restitution order, and reducing the later restitution order accordingly).

Ultimately, as noted above, it is premature for the Court to assess restitution at this stage. But if the Crash Victim Representatives claim that it is inappropriate for the plea agreement to note that Boeing can assert credits based on prior settlements in a potential restitution proceeding, that notation is fully in accord with Fifth Circuit law, with the purposes of restitution, and common sense.

## CONCLUSION

Boeing respectfully requests that the Court accept the proposed plea agreement. And the Company stands ready to address any questions the Court may have in evaluating its terms.

Dated: August 14, 2024

Respectfully submitted,

/s/ Mark Filip
Mark Filip
John Lausch
Ralph Dado
KIRKLAND & ELLIS LLP
333 West Wolf Point Plaza
Chicago, Illinois 60654

Ian Brinton Hatch
KIRKLAND & ELLIS LLP
4550 Travis Street
Dallas, Texas 75205

***Counsel for The Boeing Company***

/s/ Benjamin L. Hatch
Benjamin L. Hatch
Brandon M. Santos
Elissa N. Baur
MCGUIRE WOODS LLP
888 16th Street, N.W., Suite 500
Black Lives Matter Plaza
Washington, D.C. 20006

***Counsel for The Boeing Company***

34

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 14, 2024, the foregoing was filed with the Clerk of the United States District Court for the Northern District of Texas using the CM/ECF system.  The system will serve counsel of record.

*/s/ Benjamin L. Hatch*
Benjamin L. Hatch
