## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
## FORT WORTH DIVISION

---------------------------------------------------------------- x

UNITED STATES OF AMERICA      §     Case No.  4-21-cr-00005-O
                                 §
                 Plaintiff,     §
                                   §
    vs.                                      §
                                   §
THE BOEING COMPANY              §
                     Defendant.     §
                                   §

---------------------------------------------------------------- x

## POLSKIE LINIE LOTNICZE LOT S.A.'S REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF ITS REQUEST THAT THE COURT RECOGNIZE ITS RIGHTS AS A CRIME VICTIM AND REJECT THE PROPOSED PLEA AGREEMENT

Jeffrey W. Hellberg, Jr.
(Texas Bar No. 00796738)
Jeff.hellberg@wickphillips.com
David J. Drez, III
(Texas Bar No. 24007127)
David.drez@wickphillips.com
Colin P. Benton
(Texas State Bar No. 24095523)
Colin.benton@wickphillips.com
WICK PHILLIPS GOULD & MARTIN, LLP
100 Throckmorton St., Suite 1500
Fort Worth, Texas 76102
Phone: 817.332.7788
Facsimile: 817.332.7789

Anthony U. Battista
(NY Bar No. 2802775)
abattista@condonlaw.com
Diana Gurfel
(NY Bar No. 3040391)
dgurfel@condonlaw.com
Mary Dow
(NY Bar No. 4782017)
mdow@condonlaw.com
CONDON & FORSYTH LLP
7 Times Square, 18th Floor
New York, New York 10036
Phone: 212.490.9100
Facsimile: 212.370.4453

*Attorneys for Polskie Linie Lotnicze LOT S.A.*

## INTRODUCTION

In their respective Responses to LOT's Motion requesting that the Court recognize its rights as a victim of Boeing's crime and reject the proposed Plea between the Government and Boeing, neither the Government nor Boeing present any meaningful challenge to LOT's standing as a "crime victim" under the CVRA.[1] *See* Gov't Resp., ECF No. 245; Boeing Resp., ECF No. 246.[2] Relegating their CVRA arguments to a few sentences and footnotes, the Government and Boeing do not even try to explain why the reasoning contained in the Court's prior CVRA Ruling (ECF No. 116) does not apply to LOT. That is because they can't—just as Boeing's criminal conspiracy to defraud the FAA AEG directly and proximately caused the two 737 MAX accidents, so too did it directly and proximately cause the 737 MAX grounding.

The Government and Boeing do not fare any better in attempting to challenge LOT's right to restitution. Not only are the Government and Boeing wrong on the law, but their arguments miss the fundamental point—it is not for them to summarily and unilaterally decide whether LOT is entitled to restitution as they seek to do in their proposed Plea. LOT's right to restitution—whether it be mandatory under the MVRA as Fifth Circuit precedent instructs, or discretionary under the VWPA—is an issue for the Court. Because the Plea expressly forbids the Court from even considering LOT's rights under either statute, it should be rejected.

## I.     BOEING'S AND THE GOVERNMENT'S MINIMAL ATTEMPT TO CHALLENGE LOT'S CVRA STATUS AS A "CRIME VICTIM" CONFIRMS THAT THEY CANNOT DO SO

Neither Boeing nor the Government present any meaningful challenge to LOT's request

---

[1] The defined terms used in this Reply correspond to those used in LOT's moving papers (ECF No. 235).

[2] This Reply addresses both the Government's and Boeing's Responses, but only as to the portions of their briefs specifically directed at LOT.

that the Court recognize its rights as a "crime victim" under the CVRA.  The few flawed sentences that each devotes to this issue make clear that any greater attempt to do so would have been futile, as neither did—or can—refute that the causation analysis in the Court's prior CVRA Ruling establishes that Boeing's conspiracy to defraud the FAA AEG was the direct and proximate cause of *both* the 737 MAX accidents and the 737 MAX grounding.

Boeing's brief does not even address LOT's request that the Court recognize its rights as a "crime victim" under the CVRA.  Instead, Boeing pretends that the Court already "den[ied] LOT crime victim status" to rationalize its and the Government's joint decision to expressly forbid the Court from considering LOT's right to restitution as part of the Plea.  *See* ECF No. 246 at 32 (referencing the Court's Third Opinion and Order, ECF No. 185).  Not only is Boeing's and the Government's position on restitution wrong for the reasons explained below, but Boeing's suggestion that the Court has already determined LOT's CVRA standing is demonstrably false.  As the Court is well-aware, it denied LOT's initial CVRA motion on the basis of laches "without reaching the merits" of whether LOT qualifies a "crime victim" under the statute. ECF No. 185 at 29.[3]  Further, in recognizing the limited grounds of the Court's denial, the Fifth Circuit ruled that LOT has the right to seek to "be heard as a CVRA victim when this criminal case comes to resolution." *In re Ryan*, 88 F.4th 614, 629 (5th Cir. 2023).

The Government's half-hearted challenge to LOT's CVRA status is likewise lacking and meritless.  Limiting its complaint to a single paragraph, the Government claims that LOT cannot satisfy the causation prongs of the CVRA's "crime victim" definition because LOT cannot show

---

[3] Contradicting itself, Boeing acknowledges in a footnote that LOT's "crime victim" status remains an open issue by "reserve[ing]" the arguments it asserted in response to LOT's initial CVRA motion.  *See* ECF No. 246 at 1, fn. 1 (referencing ECF No. 150).  However, as explained in LOT's pending Motion, the arguments in Boeing's prior opposition are just as wrong now as they were wrong then.  *See* ECF No. 235 at 16-17; *see also* LOT Reply, ECF No. 159, at 3-9.

that the grounding of the 737 MAX was "directly and proximately caused by Boeing's conspiracy to obstruct and impede the FAA AEG," as opposed to "the independent and discretionary decisions of the EASA."   ECF No. 245 at 36.   But the Government's argument ignores controlling law construing the causation requirements of the CVRA[4]—most significantly, this Court's ruling that other possible "but for" causes of the 737 MAX accidents, such as alleged errors by foreign pilots and decisions by foreign aviation regulators, did not break the chain of causation between Boeing's fraudulent concealment of MCAS and the harms suffered by the Families.   *See* ECF No. 116 at 14 ("The Government's efforts to introduce intervening causes to break the causal chain are unpersuasive.").   In fact, because of this "direct causal connection between Boeing's criminal conspiracy and the resulting crashes," the Court rejected the Government's proximate causation argument, finding that: "Nor are the resulting crashes so attenuated from Boeing's lies to the AEG that the accidents might be described as 'mere fortuity.'"   *Id.* at 17.

The Government's attempt to drive a wedge between the 737 MAX accidents and the 737 MAX groundings by inserting EASA's purported "independent and discretionary decision" to suspend 737 MAX operations also ignores the obvious facts.   First, the immediate and uniform action taken by EASA, the FAA, *and Boeing* as a direct response to the Ethiopian Airlines Flight ET302 crash on March 10, 2019—each calling for the suspension of all 737 MAX operations within days of the accident—leaves no room for questioning whether the 737 MAX grounding was a direct and proximate result of the 737 MAX accidents and Boeing's criminal conduct in

---

[4] *See, generally*, ECF No. 116 at 9-17 (explaining the direct and proximate causation standards established by the U.S. Supreme Court and Fifth Circuit, and citing *Paroline v. United States*, 572 U.S. 434 (2014), *United States v. Salinas*, 918 F.3d 463 (5th Cir. 2019), and *Austin v. Kroger Texas, L.P.*, 864 F.3d 326 (5th Cir. 2017)); *see also United States v. Ramos-Delgado*, 763 F.3d 398, 402 (5th Cir. 2014).

causing them, as this Court has already held.[5]  *See* ECF No. 116 at 17.  Moreover, if there was any doubt why EASA issued its grounding order, it stated that its decision was "triggered" by "[t]he tragic losses of Lionair JT-610 and Ethiopian Airlines ET-302."[6]  Thus, it cannot seriously be argued that EASA's decision to ground the 737 MAX was a "mere fortuity" substantially unrelated to the 737 MAX accidents and Boeing's fraud.

In short, any suggestion that the grounding of the 737 MAX "flow[ed] far beyond" the same criminal conduct that directly and proximately caused the two fatal 737 MAX accidents, as the Government contends (ECF No. 245 at 36), ignores the indisputable fact that the crashes and the grounding are inextricably intertwined.  As such, the Court's CVRA Ruling that Boeing's fraudulent conduct directly and proximately caused the 737 MAX accidents and the harms suffered by the Families applies equally to the 737 MAX grounding and the harms suffered by 737 MAX operators, including LOT.

## II.    THE PLEA SHOULD BE REJECTED BECAUSE IT PROHIBITS THE COURT FROM CONSIDERING LOT'S RIGHT TO RESTITUTION

The Government and Boeing fail to provide any authority that supports their behind-

---

[5] While the Government makes a point of noting that EASA's grounding order came out one day before the FAA and Boeing issued their own public directives to cease all 737 MAX operations, it fails to explain the significance of this difference.  The reality is that within three days of the Ethiopian Airlines Flight ET302 accident, LOT could not operate any of its 737 MAX aircraft because all aviation regulators agreed—*as did Boeing*—that the 737 MAX as certified with a "Level B" pilot training determination was not safe to fly.

[6] EASA's Boeing 737 Max Return to Service Report, Jan. 27, 2021, p. 5 (available at https://www.easa.europa.eu/sites/default/files/dfu/B737_Max_Return_to_Service_Report.pdf). The Government also cites to this document to try and show the "independent and discretionary" nature of EASA's 737 MAX decisions, noting that EASA's decision to lift the grounding order was based on its own assessment "independen[t] of Boeing or the FAA."  ECF No. 245 at 36, fn. 93.  That EASA would take such a position in the *aftermath of the 737 MAX accidents* makes complete sense, however, as the numerous post-accident investigations into Boeing's conduct called into question the extent to which foreign aviation regulators could continue to rely on information that was being fed to the FAA by Boeing.

closed-doors decision prohibiting the Court from even considering LOT's right to an order of restitution. *See* Plea, ECF No. 221, at 19-20, ¶ 25(c) ("[T]he Court shall not order the Defendant to pay any restitution amount to the Defendant's airline entity customers."). Instead, the Government—and, to a minimal extent, Boeing—attempts to preemptively displace the Court's restitution determination with its own pronouncement of the law. Not only does the Government lack the authority to make such a premature judicial ruling, but its assertion that LOT is not entitled to restitution under the MVRA's "crime against property" provision is directly contrary to the MVRA precedent it helped to establish in *United States v. Hagen*, 60 F.4th 932 (5th Cir. 2023).

As *Hagen* instructs, because Boeing's conspiracy to defraud the FAA AEG in violation of 18 U.S.C. § 371 is an "offense committed by fraud or deceit," identifiable victims who sustained monetary losses as a result of Boeing's crime—including LOT—are entitled to mandatory restitution under the MVRA. *Id.* at 954 ("[A] Title 18 'offense against property' includes '*any offense committed by fraud or deceit*.'") (quoting 18 U.S.C. § 3663A(c)(1)(A)(ii)) (emphasis added). The proposed Plea expressly forbids the Court from even considering restitution as to LOT, let alone ordering mandatory restitution as the MVRA requires. It should be rejected for this reason.

### A.      LOT Is Entitled to Mandatory Restitution Under the MVRA Because Boeing Committed a "Crime Against Property"

As explained in LOT's moving papers, the *Hagen* Court ruled that when assessing whether a Title 18 criminal offense constitutes a "crime against property" within the meaning of the MVRA, district courts must look to the "factual circumstances of the crime," not whether the criminal offense includes property as an element or reference. 60 F.4th at 953. In attempting to show that Boeing's violation of 18 U.S.C. § 371 does not fall within the scope of the MVRA, the

Government contends that Boeing perpetrated a *Klein* conspiracy that "does not require the government or any individual to suffer a 'property or pecuniary loss.'" ECF No. 245 at 31 (citing cases)). However, by focusing on the elements of Boeing's *Klein* conspiracy instead of the manner in which Boeing carried it out and the financial harms that resulted, the Government engages in the type of analysis that the *Hagen* Court affirmatively rejected.

For this reason, the U.S. Supreme Court cases cited by the Government (*see* ECF No. 245 at 32-33 (citing *Cleveland v. United States*, 531 U.S. 12 (2000), and *Kelly v. United States*, 590 U.S. 391 (2020)), have no bearing on whether the fact-specific fraud perpetrated by Boeing is a "crime against property" within the meaning of the MVRA. In both cases, the issue before the Court was whether the defendants' convictions could stand where the elements of the crimes— mail fraud in *Cleveland*, and federal wire fraud in *Kelly*—required proof that the defendants had deprived their victims of property. *See Cleveland*, 531 U.S. at 15 ("[F]or purposes of the mail fraud statute, the thing obtained must be property in the hands of the victim."); *Kelly*, 590 U.S. at 398 ("[U]nder either provision, the Government had to show not only that [defendants] engaged in deception, but that an object of their fraud was property.") (cleaned up). Neither case involved the MVRA whatsoever, let alone construed the phrase "crime against property" within the meaning of the restitution statute.

Focusing on this irrelevant case law, the Government does not even attempt to address *Hagen*, despite it being discussed at length in LOT's moving papers and despite the Fifth Circuit's decision and reasoning coming straight from the Government's briefing. *See* Exhibit A, *United States v. Hagen*, Case No. 21-11273, Appellee's Brief for the United States, Dkt No. 44, 53-60 (5th Cir. filed Aug. 10, 2022).[7] Indeed, in *Hagen*, the Government argued—and the

---

[7] A copy of the Government's Brief in *Hagen* is attached as Exhibit A to this Reply.

Fifth Circuit agreed—that the defendants' conspiracy to defraud the United States by submitting false and fraudulent Medicare claims was a "crime against property" within the meaning of the MVRA because the defendants' scheme was intended to, and did, result in them obtaining more than $27 million in financial gains through fraud. *See* Ex. A at 57-58; *see also* 60 F.4th at 955. The Government argued—and the Fifth Circuit agreed—that the text and legislative purpose of the MVRA supported this "crime against property" conclusion, because the statute directs district courts to focus on the manner in which a Title 18 offense is committed, and Congress intended for mandatory restitution to apply to a broad range of victims who suffer financial losses regardless of whether "property" is an element of the defendant's crime. Ex. A at 56-57; 60 F.4th at 954-55. Thus, according to the Government's position in *Hagen*, because the defendants' violation of 18 U.S.C. § 371 was predicated on acts of fraud that resulted in financial gain to them, an order of mandatory restitution was required under the MVRA. *See* Ex. A at 58-59 (citing *United States v. Collins*, 854 F.3d 1324 (11th Cir. 2011), and *United States v. Razzouk*, 984 F.3d 181 (2d Cir. 2020)).

Again, the Fifth Circuit agreed, finding that it was "enough" that the *Hagen* defendants derived a financial benefit from their fraudulent scheme "to establish an 'offense against property ... committed by fraud or deceit' under the MVRA." 60 F.4th at 955; *see also United States v. Ritchie*, 858 F.3d 201, 208 (4th Cir. 2017) (ruling that defendant's Title 18 violation for making a false statement on a HUD form, which resulted in financial losses to the bank that provided the mortgage, was an MVRA "crime against property"); *United States v. Sawyer*, 825 F.3d 287, 292–94 (6th Cir. 2016) (a monetary loss to the victim is sufficient for the offense to be one "against property"), *cert. denied*, 137 S. Ct. 386 (2016); *Federal Criminal Restitution*, Property or fraud offenses under 18 U.S.C.A. § 3663A, § 4:12 ("[A] fraud offense involving

7

monetary loss is an 'offense against property' under the MVRA.") (citing cases).

Here, Boeing's guilty plea for violating 18 U.S.C. § 371 is based on admissions that:

- Boeing engaged in fraud and deceit in order to secure a "Level B" pilot training determination from the FAA AEG;

- Boeing derived a financial benefit of *at least* $243,600,000 from its fraudulent scheme;

- Boeing knew that a change in the FAA AEG's "Level B" pilot training determination—which is precisely what occurred after the 737 MAX accidents and grounding—would cause its 737 MAX customers to sustain millions of dollars in additional costs and lost revenue; and

- Boeing's 737 MAX customers did in fact lose billions of dollars as a result of the 737 MAX grounding.[8]

*See* ECF Nos. 4 and 221, Statements of Fact at ¶¶ 17-19; *see also* ECF No. 4 at 12; ECF No. 150 at 4; ECF No. 245 at 3 ("The Government can prove beyond a reasonable doubt that Boeing defrauded the FAA, and that this fraud caused a gain of $243.6 million.").

This factual scenario—a defendant violating Title 18 by perpetrating a fraudulent scheme for its own financial gain that results in financial losses to identifiable victims—is precisely the type of "crime against property" that qualifies for mandatory restitution under the MVRA.  *See Hagen*, 60 F.4th at 955.

> **B.     Regardless of Whether Boeing's Crime Falls Within the MVRA, the Government and Boeing Are Not Authorized to Prohibit the Court from Considering LOT's Right to Restitution**

Even if Boeing's crime does not qualify for an order of mandatory restitution, LOT is entitled to have the Court—not the Government and Boeing—consider its right to an order of discretionary restitution under the VWPA.  The Government and Boeing fail to provide any legal

---

[8] As the Families point out in their Motion, (*see* ECF No. 234 at 26, fn. 19), although the Airline Compensation Fund only accounted for $1.77 billion in losses, Boeing's public filings establish that the financial losses collectively sustained by 737 MAX operators exceeded $8 billion.

support establishing their authority to affirmatively forbid the Court from doing so.  No such authority exists, as the restitution statutes and the CVRA make clear that the issue of restitution is for "the court" to decide. 18 U.S.C. § 3663(a)(1); 18 U.S.C. § 3663A(a)(1); *see also* 18 U.S.C. § 3771 ("[T]he court shall ensure that the crime victim is afforded the rights described in subsection (a)," which includes "[t]he right to full and timely restitution as provided in law.").

Nevertheless, to justify their decision to exclude LOT from the Plea's restitution provision, the Government and Boeing emphasize that LOT can, and is in fact attempting to, recover its damages from Boeing in a civil action. *See* ECF No. 245 at 30, 38-39; ECF No. 246 at 32.  LOT's lawsuit against Boeing is not relevant to the threshold issue of whether LOT is entitled to restitution.[9]  Both the MVRA and VWPA expressly recognize that victims are entitled to an order of restitution in a criminal proceeding *and* a compensatory damages award in a civil action. *See* 18 U.S.C. § 3664(j)(2).  This is precisely why the Families, including those that have settled their civil claims against Boeing, are still entitled to an order of restitution here.

The Government's claim that restitution cannot be awarded to LOT because its damages are so "complex" is premature, unsupported, and presents a false choice where there is none.  As with the issue of restitution generally, whether the "complexity exception" of the VWPA applies is for the Court to decide, not the Government. *See* 18 U.S.C. § 3663 (a)(1)(B)(ii).  LOT has not yet had the opportunity to be heard by the Court on this issue, and the Government should not be permitted to deny both the Court and LOT of this process based on its own interpretation of an

---

[9] Nor is it relevant that LOT is the "only" 737 MAX customer asserting its right to restitution in this criminal proceeding.  While the Government and Boeing attempt to cast LOT's pursuit of restitution in a negative light, their emphasis on LOT being the sole airline objecting to the Plea overlooks the obvious fact that LOT would not be in this position if Boeing had not lied to the FAA AEG in the first place, or if Boeing had simply accepted responsibility for its actions and compensated LOT as it did with other airlines. *See* ECF No. 150 at 4.

incomplete record.[10]   At the very least, such a decision should not be made without a Pre-Sentence Investigation Report, which the Government has "waived."  ECF No. 221 at 23.

The Government's suggestion that, in asserting its right to restitution and objecting to the Plea, LOT is jeopardizing the Families' rights to relief (*see* ECF No. 245 at 30) is offensive.  As LOT clearly stated in its moving papers, it is not in any way attempting to compare or prioritize the pecuniary losses it sustained to the unspeakable emotional injuries and other losses that the Families have suffered, and continue to suffer, at the hands of Boeing.  *See* ECF No. 235 at 15.  This does not mean, however, that LOT should be precluded from having its CVRA, MVRA, and VWPA rights considered by the Court, as the Government and Boeing's proposed Plea demands.  Contrary to the Government's suggestion, LOT's objection to the Plea *does not* present an either/or choice that requires the Court to pick between the victims of Boeing's crime.

Moreover, the risk that LOT's objection to the Plea would prolong or complicate the proceedings overlooks the obvious fact that the Families have submitted their own motion objecting to the Plea (*see* ECF No. 234), which articulates numerous grounds upon which the Court should reject it.  LOT's objection to the Plea on the ground that it expressly forbids the Court from considering LOT's right to restitution only adds to the reasons why the Government's and Boeing's proposed Plea is unacceptable.

## **CONCLUSION**

LOT respectfully requests that this Court find that LOT is a "crime victim" under to the CVRA and reject the Plea submitted by the Government and Boeing.

---

[10] Although LOT has provided the Government with its preliminary damages information (*see* ECF No. 245 at 37), it has not had the opportunity to fully brief the Government on its financial losses or present expert evidence that explains how LOT's damages were calculated.

Dated: August 19, 2024                    Respectfully Submitted,

                                          */s/ Jeffrey W. Hellberg, Jr.*
                                          Jeffrey W. Hellberg, Jr. (Texas Bar No.00796738)
                                          Jeff.hellberg@wickphillips.com
                                          David J. Drez, III (Texas Bar No. 24007127)
                                          David.drez@wickphillips.com
                                          Colin P. Benton (Texas State Bar. No. 24095523)
                                          Colin.benton@wickphillips.com
                                          **WICK PHILLIPS GOULD & MARTIN, LLP**
                                          100 Throckmorton St., Suite 1500
                                          Fort Worth, Texas 76102

                                          -and-

                                          Anthony U. Battista (NY Bar No. 2802775)
                                          abattista@condonlaw.com
                                          Diana Gurfel (NY Bar No. 3040391)
                                          dgurfel@condonlaw.com
                                          Mary Dow (NY Bar No. 4782017)
                                          mdow@condonlaw.com
                                          **CONDON & FORSYTH LLP**
                                          7 Times Square, 18th Fl.
                                          New York, New York 10036

                                          *Attorneys for Polskie Linie Lotnicze LOT S.A.*

11

## CERTIFICATE REGARDING CONFERENCE

LOT is aware of Local Rules 47.1(a) and (b) regarding motion practice. This rule requires the "parties" in a criminal case to comply with various requirements, including a conferral regarding a motion. Because LOT is not a "party" to this criminal case, LOT does not believe that the conferral requirement applies to this motion. It is proceeding pursuant to separate authority for asserting a crime victim's right contained in the Crime Victims' Rights Act, 18 U.S.C. § 3771(d)(3) and Fed. R. Crim. P. 60.

*/s/ Jeffrey W. Hellberg, Jr.*
Jeffrey W. Hellberg, Jr.


## CERTIFICATE OF SERVICE

On August 19, 2024, I filed the foregoing document with the clerk of courts for the U.S. District Court, Northern District of Texas, using the Court's CM/ECF filing system.

*/s/ Jeffrey W. Hellberg, Jr.*
Jeffrey W. Hellberg, Jr.

12

# EXHIBIT A

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

_____

### No. 21-11273

UNITED STATES OF AMERICA,
Plaintiff–Appellee,

v.

LEAH HAGEN,
Defendant–Appellant.

### CONSOLIDATED WITH
### No. 21-11279

UNITED STATES OF AMERICA,
Plaintiff–Appellee,

v.

MICHAEL HAGEN,
Defendant–Appellant.

_____

On Appeal from the United States District Court for the
Northern District of Texas, No. 3:19-cr-146 (Boyle, J.)

_____

### APPELLEE'S BRIEF FOR THE UNITED STATES

_____

KENNETH A. POLITE, JR.
 Assistant Attorney General
LISA H. MILLER
 Deputy Assistant Attorney General

BRYNN A. SCHIESS
 Acting Assistant Chief
CATHERINE WAGNER
 Trial Attorney, Fraud Section

JOHN-ALEX ROMANO
 U.S. Department of Justice
 Criminal Division, Appellate Section
 950 Pennsylvania Avenue, NW
 Washington, DC 20530
 Tel. 202-353-0249
 John-Alex.Romano@usdoj.gov

## STATEMENT REGARDING ORAL ARGUMENT

The United States does not oppose Defendants-Appellants' request for oral argument given the record-intensive nature of some of their claims on appeal.

# TABLE OF CONTENTS

STATEMENT REGARDING ORAL ARGUMENT ....................................... i

TABLE OF CONTENTS ................................................................ ii

TABLE OF AUTHORITIES ............................................................ v

STATEMENT OF JURISDICTION ..................................................... 1

STATEMENT OF THE ISSUES ........................................................ 1

STATEMENT OF THE CASE .......................................................... 2

 I. Procedural History ......................................................... 2

 II. Relevant Facts ............................................................ 2

   A. Medicare Providers Are Prohibited from Paying Bribes or Kickbacks in Exchange for Patient Referrals. ....... 3

   B. The Hagens Paid Kimble for Completed Doctors' Orders and Used Sham Contracts to Cover Up the Kickback Scheme. ........................................... 5

    1. The Hagens' Agreement with Kimble ...................... 6

    2. The Cover-Up .......................................... 9

    3. Transformation of the Hagens' Business ................. 12

   C. Medicare Frequently Denied and Audited Claims Submitted by the Hagens, While Patients Complained About the Braces the Hagens Sent Them. ......................... 14

   D. The Hagens Received More Than $27 Million in Medicare Payments and Paid Kimble More Than $15 Million in Kickbacks ........................................ 17

 III. Rulings Under Review .................................................. 17

SUMMARY OF ARGUMENT ....................................................... 18

ARGUMENT ................................................................................. 21

I.    The District Court Properly Exercised Its Discretion in
      Excluding Evidence About Co-Conspirator Kimble's
      Consultations With A Lawyer .................................................. 21

      A.    Background ...................................................................... 21

      B.    Standard of Review ......................................................... 26

      C.    The Court's Ruling Was Correct and Not an Abuse of
            Discretion ........................................................................ 26

      D.    Any Error Was Harmless ................................................. 32

II.   The District Court Properly Exercised Its Discretion In
      Denying The Hagens' Requested Jury Instruction On The
      Safe-Harbor Provision ............................................................ 34

      A.    Background ...................................................................... 34

      B.    Standard of Review ......................................................... 35

      C.    The Hagens' Proposed Instruction Lacked Sufficient
            Evidentiary Support and Was Not Necessary to Their
            Defense. ........................................................................... 36

            1.    The Marketing and BPO Contracts Did Not
                  Satisfy the Personal-Services Safe Harbor ............... 37

            2.    The Hagens Were Able to Present Their
                  Intended Defense. ..................................................... 40

      D.    Any Error Was Harmless ................................................. 42

III.  The District Court's Finding That The Hagens Engaged in
      Sophisticated Money Laundering Was Not Clearly
      Erroneous ................................................................................. 43

      A.    Background ...................................................................... 43

      B.    Standard of Review ......................................................... 45

C.   The Hagens' Use of Foreign Bank Accounts and Structuring of Payments to Kimble Involved Sophisticated Money Laundering.................................... 45

IV.   The District Court Correctly Ordered Restitution Under The Mandatory Victims Restitution Act. .......................................... 52

A.   Background ..................................................................... 52

B.   Standard of Review ........................................................ 53

C.   Restitution Was Mandatory Because the Jury Convicted the Hagens of an Offense Against Property...... 53

CONCLUSION.................................................................................... 60

CERTIFICATE OF SERVICE ................................................................ 61

CERTIFICATE OF COMPLIANCE........................................................ 62

# TABLE OF AUTHORITIES

## Cases

*Leocal v. Ashcroft*,
    543 U.S. 1 (2004) ...................................................................... 56

*Mary Kay, Inc. v. Weber*,
    601 F. Supp. 2d 839 (N.D. Tex. 2009) ...................................... 30

*Mathews v. United States*,
    485 U.S. 58 (1988) ................................................................... 36

*Nijhawan v. Holder*,
    557 U.S. 29 (2009) ................................................................... 55

*Russello v. United States*,
    464 U.S. 16 (1983) ................................................................... 56

*Taylor v. United States*,
    495 U.S. 575 (1990) ........................................................... 54, 55

*United States v. Ada*,
    700 F. App'x 689 (9th Cir. 2017) ............................................. 46

*United States v. Alaniz*,
    726 F.3d 586 (5th Cir. 2013) ................................................... 46

*United States v. Amaris-Caviedes*,
    701 F. App'x 84 (3d Cir. 2017) ................................................ 46

*United States v. Barnes*,
    979 F.3d 283 (5th Cir. 2020), *cert. denied*, 142 S. Ct. 94, 142 S. Ct.
    95, 142 S. Ct. 96, and 142 S. Ct. 349 (2021) .................. 36, 40, 42

*United States v. Barnett*,
    945 F.2d 1296 (5th Cir. 1991) ................................................. 30

*United States v. Bienzigha*,
    744 F. App'x 233 (5th Cir. 2018) ............................................. 50

*United States v. Charon*,
    442 F.3d 881 (5th Cir. 2006) .................................................... 45

*United States v. Charroux*,
    3 F.3d 827 (5th Cir. 1993) ....................................................... 51

*United States v. Chon*,
    713 F.3d 812 (5th Cir. 2013) ..............................................47, 48

*United States v. Clements*,
    73 F.3d 1330 (5th Cir. 1996) ................................................... 51

*United States v. Clough*,
    978 F.3d 810 (1st Cir. 2020) .................................................... 34

*United States v. Collins*,
    854 F.3d 1324 (11th Cir. 2011).................................... 54, 55, 58

*United States v. Conner*,
    537 F.3d 480 (5th Cir. 2008) ................................................... 51

*United States v. Edelman*,
    873 F.2d 791 (5th Cir. 1989) ................................................... 27

*United States v. Estrada*,
    297 F. App'x 332 (5th Cir. 2008)............................................. 49

*United States v. Fish*,
    731 F.3d 277 (3d Cir. 2013).................................................... 46

*United States v. Flitcraft*,
    803 F.2d 184 (5th Cir. 1986) ................................................... 30

*United States v. Hatala*,
    552 F. App'x 28 (2d Cir. 2014)............................................... 49

*United States v. Job*,
    387 F. App'x 445 (5th Cir. 2010)............................................. 39

*United States v. Johnson*,
    880 F.3d 226 (5th Cir. 2018) .............................................26, 32

*United States v. Jones*,
    664 F.3d 969 (5th Cir. 2011) ................................................... 26

*United States v. Koutsostamatis*,
    956 F.3d 301 (5th Cir. 2020) ................................................... 55

*United States v. Leal*,
    933 F.3d 426 (5th Cir. 2019) ................................................... 53

*United States v. Lowery*,
    135 F.3d 957 (5th Cir. 1998) ................................................... 31

*United States v. Majors*,
    Nos. 20-40405, 20-40656, 2022 WL 301545 (5th Cir. Feb. 1, 2022) .......... 53

*United States v. Miles*,
    360 F.3d 472 (5th Cir. 2004) ................................................... 46

*United States v. Morales*,
    119 F. App'x 687 (5th Cir. 2005) ............................................... 29

*United States v. Najera Jimenez*,
    593 F.3d 391 (5th Cir. 2010) ................................................... 28

*United States v. Nguyen*,
    493 F.3d 613 (5th Cir. 2007) ..............................................41, 42

*United States v. Nolen*,
    472 F.3d 362 (5th Cir. 2006) ................................................... 53

*United States v. Norton*,
    17 F. App'x 98 (4th Cir. 2001) ................................................ 39

*United States v. Okeke*,
    779 F. App'x 389 (7th Cir. 2019) .............................................. 47

*United States v. Owusu*,
    No. 20-50630, 2021 WL 3854769 (5th Cir. Aug. 27, 2021)...................... 59

*United States v. Portillo*,
    969 F.3d 144 (5th Cir. 2020), *cert. denied*, 141 S. Ct. 1275 (2021) .........26, 27

vii

*United States v. Rajwani,*
    476 F.3d 243 (5th Cir. 2007) ................................................... 33

*United States v. Razzouk,*
    984 F.3d 181 (2d Cir. 2020)............................................. passim

*United States v. Reyes,*
    781 F. App'x 965 (11th Cir. 2019) ......................................... 48

*United States v. Ritchie,*
    858 F.3d 201 (4th Cir. 2017) .............................. 54, 55, 56, 57

*United States v. Robinson,*
    505 F. App'x 385 (5th Cir. 2013) .......................................... 34

*United States v. Rosbottom,*
    763 F.3d 408 (5th Cir. 2014) ...........................................53, 60

*United States v. Saldana,*
    427 F.3d 298 (5th Cir. 2005) ................................................. 29

*United States v. Salinas,*
    480 F.3d 750 (5th Cir. 2007) ................................................. 60

*United States v. Sawyer,*
    825 F.3d 287 (6th Cir. 2016) ................................................. 54

*United States v. Scurlock,*
    52 F.3d 531 (5th Cir. 1995) ................................................... 49

*United States v. Small,*
    210 F. App'x 776 (10th Cir. 2006) ........................................ 50

*United States v. Stowell,*
    953 F.2d 188 (5th Cir. 1992) ................................................. 36

*United States v. Tannehill,*
    49 F.3d 1049 (5th Cir. 1995) ................................................. 36

*United States v. Tarnawa,*
    26 F.4th 720 (5th Cir. 2022) ...........................................53, 54

*United States v. Turner*,
    561 F. App'x 312 (5th Cir. 2014) ........................................................34, 39

*United States v. Valdez*,
    726 F.3d 684 (5th Cir. 2013) ................................................................ 51

*United States v. Vega*,
    813 F.3d 386 (1st Cir. 2016) ................................................................ 39

*United States v. Weast*,
    811 F.3d 743 (5th Cir. 2016) ................................................................ 33

## Statutes

18 U.S.C. § 924 ...................................................................................... 54

18 U.S.C. § 1956 ..........................................................................2, 43, 45

18 U.S.C. § 3231 ...................................................................................... 1

18 U.S.C. § 3663A............................................................................ passim

18 U.S.C. § 3664 .................................................................................... 54

18 U.S.C. § 371 ........................................................................................ 2

18 U.S.C. § 3742 ...................................................................................... 1

28 U.S.C. § 1291 ...................................................................................... 1

42 U.S.C. § 1320a-7b........................................................................2, 4, 34

## Other Authorities

S. Rep. No. 104-179 (1995)..................................................................... 57

## Rules, Regulations and Sentencing Guidelines

42 C.F.R. § 1001.952 ................................................................................ passim

Fed. R. Evid. 401 ........................................................................................ 28

Fed. R. Evid. 403 ...................................................................................18, 27

U.S.S.G. § 1B1.3 ......................................................................................... 51

U.S.S.G. § 2B1.1 ......................................................................................... 43

U.S.S.G. § 2B4.1 ........................................................................ 20, 43, 48, 49

U.S.S.G. § 2S1.1 .................................................................................. passim

U.S.S.G. § 2X1.1 ......................................................................................... 43

U.S.S.G. § 3D1.2 ......................................................................................... 43

## STATEMENT OF JURISDICTION

Leah Hagen and Michael Hagen (collectively "the Hagens"; individually by first name) appeal from judgments of conviction entered by the district court on December 21, 2021.  ROA.21-11273.29; ROA.21-11279.28.[1]  The court had jurisdiction under 18 U.S.C. § 3231.  The Hagens timely filed notices of appeal on December 22, 2021.  ROA.21-11273.29; ROA.21-11279.28.  This Court has jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a).

## STATEMENT OF THE ISSUES

I.    Whether the district court abused its discretion in excluding evidence concerning a co-conspirator's consultations with a lawyer 18 months after the conspiracy began.

II.    Whether the district court abused its discretion in denying the Hagens' requested jury instruction on a safe harbor to the federal Anti-Kickback Statute.

III.    Whether the district court clearly erred in applying the Sentencing Guidelines enhancement for sophisticated money laundering.

IV.    Whether the district court erred in ordering restitution under the Mandatory Victims Restitution Act.

---

[1] "ROA.____" followed by case number refers to the Record on Appeal; "Br." refers to the Hagens' consolidated opening brief.

1

## STATEMENT OF THE CASE

### I.   PROCEDURAL HISTORY

A grand jury in the Northern District of Texas returned a superseding indictment charging the Hagens with conspiring to defraud the United States and to pay and receive healthcare kickbacks, in violation of 18 U.S.C. § 371 and 42 U.S.C. § 1320a-7b(b)(1), (b)(2) (Count One), and conspiring to commit international promotional money laundering, in violation of 18 U.S.C. § 1956(a)(2)(A), (h) (Count Two). ROA.21-11273.182-195. A jury convicted them on both counts after a trial in which they presented a joint defense. ROA.21-11273.3065, 4121; ROA.21-11279.3068. The district court sentenced each defendant to 151 months of imprisonment, to be followed by three years of supervised release, and ordered them to pay, jointly and severally, $27,104,359 in restitution. ROA.21-11273.3261-3265; ROA.21-11279.3263-3267.

### II.   RELEVANT FACTS

The Hagens, a married couple, owned and operated two durable medical equipment ("DME") companies in Arlington, Texas, that billed Medicare and Medicare plans for orthotic braces: Metro DME Supply, LLC ("Metro DME"), and Ortho Pain Solutions, LLC ("OPS"). ROA.21-11273.4154, 5683-5685. Between approximately March 2016 and January 2019, the Hagens' companies submitted almost $60 million in fraudulent claims to Medicare and Medicare

Part C plans, for which they were paid more than $27 million.  ROA.21-11273.9694, 9703.  The claims were based on doctors' orders purchased from Herb Kimble, who operated a call center in the Philippines that lured in elderly patients through advertising and persuaded them to accept braces billed to their Medicare plans.  The Hagens wired approximately $15 million of their ill-gotten gains to Kimble overseas as payment for the orders, and wired $5 million of their own profits overseas to, in part, fund a luxury home in Spain.  ROA.21-11273.5292-5295, 9693.

## A.   Medicare Providers Are Prohibited from Paying Bribes or Kickbacks in Exchange for Patient Referrals.

Medicare is a federal healthcare program that provides benefits to individuals 65 years or older and to disabled individuals.  ROA.21-11273.4250. Administered by the Centers for Medicare and Medicaid ("CMS"), the program is divided into several Parts.  ROA.21-11273.4252-4253.  Part B covers physician services and outpatient care, including access to DME, such as orthotic braces. ROA.21-11273.4253-4254.   Part C, also known as "Medicare Advantage," provides coverage through managed care plans operated by private insurance companies, such as Aetna and Humana.    ROA.21-11273.4254-4255. Enrollment in Part C covers the same services as Part B; the same basic rules apply to both Parts.  ROA.21-11273.4254-4255.

3

To participate in Medicare, a healthcare provider must agree to comply with all Medicare-related laws and regulations, including the Anti-Kickback Statute ("AKS") and reimbursement rules. ROA.21-11273.4275. Generally stated, the AKS prohibits giving or receiving anything of value in exchange for the order, referral, or provision of any medical service or item covered under a federal health program. ROA.21-11273.4291-4292; *see* 42 U.S.C. § 1320a-7b(b)(1), (b)(2). An approved provider may file claims with Medicare for the reimbursement of services rendered, or items provided, to beneficiaries. ROA.21-11273.4274-4275. A provider's enrollment under Medicare Part C is handled by each plan sponsor (*i.e.*, insurer). ROA.21-11273.4343-4344.

Medicare treats a claim associated with a kickback payment as a false claim that should not be paid. ROA.21-11273.4293-4295. Moreover, a claim for DME submitted to Medicare qualifies for reimbursement only if the equipment was medically necessary to treat the beneficiary and supported by appropriate medical documentation. ROA.21-11273.4256-4257. At all times relevant here, Medicare authorized medical care delivered by electronic means—"telehealth"—only if the communication occurred through audio and visual means, the beneficiary resided in a rural area suffering a health professional shortage, and the beneficiary went to a designated medical facility

for the telehealth visit.  ROA.21-11273.4271-4272.  A simple telephone call with the beneficiary did not qualify.  ROA.21-11273.4273.

The Hagens enrolled Metro DME as a Medicare Part B provider in 2006. ROA.21-11273.4275-4278.  In an updated application dated February 7, 2013, they certified that they would comply with all relevant laws, rules, and regulations, including the AKS, and would not submit false or fraudulent claims for payment.    ROA.21-11273.4278-4282.    The Hagens recertified those statements again in applications dated November 15, 2016, and September 26, 2017.  ROA.21-11273.4282-4283.  As discussed below, after Medicare audited Metro DME and suspended its payments, the Hagens voluntarily terminated Metro DME's enrollment in Medicare effective September 30, 2017, and began using OPS to bill private insurers for claims under Medicare Part C.  ROA.21-11273.4341-4344, 4670-4672.

## B. The Hagens Paid Kimble for Completed Doctors' Orders and Used Sham Contracts to Cover Up the Kickback Scheme.

Kimble owned and operated two Philippines-based companies—Chronos Strategies HLK Corp. ("Chronos") and Pantheon Concepts HLK Co. ("Pantheon")—that marketed and sold doctors' orders for orthotic braces issued to Medicare beneficiaries, including back, shoulder, knee, and wrist braces. ROA.21-11273.4689-4692.  Kimble sold the orders to the Hagens' companies

and other DME companies in the United States, which then billed Medicare for reimbursement based on the orders.  ROA.21-11273.4692-4693.

### 1.    The Hagens' Agreement with Kimble

Kimble's companies generated doctors' orders by luring Medicare beneficiaries to contact a call center through advertising, including television commercials and direct-mail campaigns.  ROA.21-11273.4696-4698.  A call center employee first confirmed that the caller was a Medicare patient and then transferred the patient to another employee—a "closer"—who confirmed the patient's eligibility to receive a medical brace and tried to "upsell" the patient on acquiring additional braces.  ROA.21-11273.4697, 4700.    The beneficiary's information was sent to a telemedicine doctor, who signed and returned prescription orders for the braces without examining the patient and sometimes without even speaking to the patient.  ROA.21-11273.4177-4178, 4697, 4779.  Kimble's companies uploaded doctors' orders, as well as the recordings of patient calls, to an online portal; the DME company downloaded the orders and utilized them in support of claim submissions to Medicare or Medicare Part C plans.  ROA.21-11273.4697, 4702-4707.

The Hagens met Kimble during a telephone call in March 2016.  ROA.21-11273.4718-4719, 4724.   At that time, their company, Metro DME, billed Medicare only in small volumes.  ROA.21-11273.5278-5279, 9695.  The Hagens

told Kimble about their unsatisfactory experience paying a marketing company for "leads" on potential customers, but without guaranteed results (*i.e.*, doctors' orders), and said they would not accept such an arrangement again; in response, Kimble "guaranteed result[s]" and gave examples of the amounts he charged per doctor order, such as $350 per back brace order and $125 per wrist brace order. ROA.21-11273.4719-4721.

The Hagens agreed to purchase doctors' orders from Kimble, negotiated pricing and the type of braces they would purchase, and signed the contracts (discussed below) used to cover up the illegal arrangement.   ROA.21-11273.4722-4723.  When Leah indicated in a group email that Metro DME was only interested in back braces—the most lucrative brace reimbursed by Medicare (ROA.21-11273.4505)—Kimble's wife Claire replied, at Kimble's direction, that the price would increase to $375 per brace because "with just Back Brace and no other products," Kimble's companies would be "unable to monetize" all the calls that came into their call center.  ROA.21-11273.4727, 9762.  After Michael complained that Claire had described the kickback arrangement in an email ("We are NOT paying per referral!"), Leah emailed, "Hello all, Ok – we will do both lumbar/back and wrist.  Let's start with 10 back and 5 wrist if we can please. . . .  Have a good day and can't wait to get started."  ROA.21-11273.4728-4729, 9762-9764.

The Hagens' communications with Kimble's companies reflected their purchase of doctors' orders. Leah repeatedly emailed Kimble's companies to complain about the low volume of orders. *See, e.g.*, ROA.21-11273.9796 ("I thought we were going up to 500 after the last invoice??"); ROA.21-11273.9863 ("Just following up on the quantities. Had 38 Monday and 59 on Tuesday….Don't forget we are at 400"); ROA.21-11273.9864 ("Michael asked me to find out why we only received 27 DO's today? He said we should get 212 more between today and tomorrow."); ROA.21-11273.9865 ("I am assuming we will catch up today to reach the 400 from last week? Yes??"); ROA.21-11273.9871 (email with subject line "DO's not on target": "This is very concerning that we are not able to meet 250 to me as what is going to happen when we double again to 500.").

Leah's Skype communications with Kimble similarly focused on whether the Hagens were getting the number of doctors' orders they had purchased. After the Hagens shut down Metro DME and used OPS to bill claims under Medicare Part C, Leah complained to Kimble: "Metro is no longer and we were getting 400 a week but OPS took over for Metro and last week we only got 260 and this week so far 270 soooooo WHO IS GETTING MY ORDERS[?]" ROA.21-11273.9256; *see also* ROA.21-11273.9242 ("good afternoon Herb, we just got our invoices - aren't we supposed to be at 350 this week?").

8

Kimble's companies withheld doctors' orders from the Hagens if they did not pay an invoice. When Leah asked if something was wrong because "Michael checked and there are no orders uploaded [to the portal]," a Pantheon employee responded, "think your account was negative, I'll check if the payment has been posted." ROA.21-11273.9363. The employee later followed up, "Yes, we got the wire, expect [a] lot of orders today." ROA.21-11273.9364.

Similarly, the Hagens insisted that Kimble provide a replacement doctor's order if an earlier order was problematic or resulted in Medicare's denial of a claim. *See* ROA.21-11273.4524-4526, 9858-9860, 9222. The Hagens and their co-conspirators often referred to these replacement doctors' orders as "credits." For example, Michael emailed Kimble's employees, "I cannot accept attached DO for patient [M.G.]. The signature block is photoshopped and no one will believe that the doctor actually signed those documents. Please credit the DO." ROA.21-11273.9793; *see also* ROA.21-11273.9751-9755 (email from Kimble employee with attachment titled "Credit-Metro DME": "Leah – 100 of these have been noted and adjusted today. Attached is the list for your reference.").

### 2.    The Cover-Up

The Hagens and Kimble covered up their scheme by executing contracts stating that Kimble's companies would bill Metro DME and, later, OPS for marketing and "business process outsourcing" (BPO). ROA.21-11273.4708; *see*

ROA.21-11273.8996-9005 (Metro DME-Chronos BPO agreement), 9006-9012 (Metro DME-Pantheon marketing agreement), 9013-9022 (OPS-Pantheon BPO agreement), 9027-9032 (OPS-Chronos marketing agreement). In case of a Medicare audit, the Hagens could point to these contracts as evidence of their supposed compliance with applicable laws. ROA.21-11273.4714-4718.

For example, in the marketing contract, Pantheon agreed to provide Metro DME with marketing services to generate "raw leads" on potential customers, but the contract contained language disclaiming that raw leads were "referrals" or would necessarily lead to business for Metro DME. ROA.21-11273.9006-9007. In the BPO contract, Metro DME agreed to pay Chronos by the hour, and Chronos agreed to "submit properly documented invoices on a weekly basis for the Services performed." ROA.21-11273.8997, 9003. And both contracts represented that the parties would comply with the AKS and other applicable laws. ROA.21-11273.8998-8999, 9008, 9016-9017, 9029. But the Hagens never asked Kimble about raw leads or his advertising campaigns and never tracked "BPO" services provided by Kimble's companies. ROA.21-11273.6019-6020, 6251-6252. They instead paid for completed doctors' orders. ROA.21-11273.5206. Indeed, in an email announcing that she had signed one contract and was "ready to get this marketing campaign rolling," Leah noted that she and Michael had approved "the sample telemed RX that were sent

10

over," that is, sample doctors' orders, and reiterated their "agree[ment] to do lumbar and wrist – Medicare for now." ROA.21-11273.9766.

The Hagens prepaid for a set number of doctors' orders each week, but Kimble's companies invoiced the Hagens' companies for marketing (per raw lead) and BPO services (per hour). ROA.21-11273.4736-4741, 8072-8375. Thus, 75% of a week's worth of doctors' orders was billed as marketing services and 25% was billed as BPO services. ROA.21-11273.4709; *see* ROA.21-11273.9870 (April 13, 2016, email from Claire Kimble to Leah describing structure of invoices and explaining, "for compliance purposes, we have to send you two invoices from 2 difference [sic] companies, one for BPO and one for Marketing"). In September 2016, Kimble began charging a "standardized brace cost of $280" per doctor order regardless of brace type. ROA.21-11273.4507-4510, 9758. Going forward, the Hagens wired payments to Chronos and Pantheon each week in amounts divisible by $280 (excluding minor adjustments to create round numbers)—reflecting the Hagens' purchase of as many as 400 to 600 doctors' orders per week. ROA.21-11273.5553-5555, 5562-5563, 9704, 9706, 9708; *see also* ROA.21-11273.5348-5351 (Hagens' cost/profit analysis for November 2016 showed fixed cost of $280 per brace for "advertis[ing]").

The Hagens prohibited their employees from talking to Kimble or anyone associated with his Philippines-based operations—which they dubbed the "back

office"—or from listening to the recordings of patient calls uploaded with doctors' orders.    ROA.21-11273.4168, 4173, 5228-5230, 5457-5458; *see also* ROA.21-11273.4702 (Kimble: recordings were provided to the Hagens "[s]o that they could inspect our process and understand exactly what we were doing").    Michael retrieved the doctors' orders uploaded to Kimble's online portal and provided them to Metro DME and OPS employees for processing. ROA.21-11273.5460.

### 3.    Transformation of the Hagens' Business

The Hagens' DME business changed significantly after they began purchasing doctors' orders from Kimble's companies.    In 2015, Metro DME stocked a range of DME items, including walkers, oxygen tanks, and crutches, and mostly served local patients and hospitals; after March 2016, the company paid third parties to ship exclusively back, knee, wrist, ankle, and shoulder braces and related equipment to patients nationwide.    ROA.21-11273.4159-4165, 5280, 9700-9702.    As the volume of doctors' orders increased, so did the amounts that the Hagens billed to, and received from, Medicare.    ROA.21-11273.5364-5365.    In 2015, Metro DME submitted approximately 200 claims to Medicare; in 2016, it submitted more than 6,000 claims.    ROA.21-11273.5281. In January 2017 alone, Metro DME received approximately $1 million in Medicare claim payouts, and exceeded that threshold in each of March, April,

and May 2017. ROA.21-11273.9695. The lucrative payouts continued after the Hagens switched to using OPS to bill Medicare Part C. *See* ROA.21-11273.9696 (monthly payouts to OPS exceeded $1 million seven times in 2018).

The Hagens relied on Kimble's companies almost exclusively to generate the doctors' orders they used to bill Medicare. ROA.21-11273.9714 (97% of Medicare beneficiaries in claims submitted by Metro DME and OPS from March 2016 through January 2019 matched Chronos/Pantheon customers). The Hagens repeatedly sought to increase the volume of doctors' orders purchased. ROA.21-11273.4781, 4789, 9796, 9872. In a conversation surreptitiously recorded by Kimble in January 2019, Leah boasted that they were "grossing $12 to $15 million a year," while Michael admitted, "we've got a little bit overserved lately, which is great," adding "[w]e take anything we can get." ROA.21-11273.4847, 9155.

The Hagens were grateful for the financial windfall. Leah sent care packages of canned yams and hot sauce to Kimble in the Philippines, and the Hagens invited Kimble and his wife to visit their house in Spain, which had an infinity pool and a view of the sea. ROA.21-11273.4166, 4850, 6001-6005, 9150-9151. The Hagens also visited Kimble in the Philippines twice, including for his birthday in 2018, and had complete access to the call center's operations. ROA.21-11273.4833-4835. Around the holidays in 2017, Leah messaged

Kimble: "[W]e just wanted to send you Merry Christmas and a Happy New Year!  From both of us.  We are so grateful for all you have done for us and brought to our lives.  Thank you from the bottom of our hearts."  ROA.21-11273.9262.

### C.    Medicare Frequently Denied and Audited Claims Submitted by the Hagens, While Patients Complained About the Braces the Hagens Sent Them.

Medicare increasingly denied claims billed by the Hagens' companies.  *See* ROA.21-11273.8688-8692 (summary exhibit).  It determined that the services were not medically reasonable or necessary, insufficient time had expired since the patient's last acquisition of the same equipment, or the patient had passed away.  ROA.21-11273.4269, 5462-5463.  One CMS denial letter noted: the "beneficiar[y's] address is in Florida, and the physician[']s address is in Ohio more than 1000K [sic] miles away."  ROA.21-11273.8397.  As described by Leah to Kimble, another Medicare denial letter stated "they would request refund of all items on this patient as the doctor ordered so many items that the patient is a 'walking mummy'-literally that is in the denial."  ROA.21-11273.9218.

In some instances, Medicare denied all claims then under review. ROA.21-11273.8688 (denial of 472 claims submitted by Metro DME over 3-

month period in 2017).  In August 2017, a CMS contractor notified Metro DME that it was suspending Medicare payments.  ROA.21-11273.4338, 8688.

The spate of audit activity prompted the Hagens to terminate Metro DME's enrollment in Medicare effective September 30, 2017, and to start using OPS.  ROA.21-11273.4341-4344, 5279-5280; *see* ROA.21-11273.4522 ("[A] big concern of [the] Hagens were audits and how to avoid audits.").  On Kimble's advice, the Hagens focused on submitting DME claims for Medicare Advantage (or Part C) beneficiaries.  ROA.21-11273.4812-4814.  Although OPS was financially successful, receiving millions of dollars in payments between October 2017 and January 2019, old problems resurfaced: plan sponsors frequently denied claims for lack of medical necessity and related reasons, and OPS faced regular audits—most often by Humana.  ROA.21-11273.5241-5247, 5464-5465, 9696.  At one point, Aetna suspended payments to OPS.  ROA.21-11273.5464.

Throughout the conspiracy, patients or their family members called Metro DME or OPS to complain that, for instance, the patient's personal doctor had said they did not need the brace, the patient already had the brace, it was too heavy or hot to wear, or the patient did not realize that they had ordered a brace. ROA.21-11273.4188-4189, 5255-5257, 5465-5466; *see, e.g.*, ROA.21-11273.8983 (patient call note: "Her orthopedic surgeon went over the brace with her and said it won't help her the way she needs."); ROA.21-11273.8989 (patient call

note: "She says they told her they were free and she kept telling the guy she didn't have pain but he kept pushing it."); ROA.21-11273.9045 (patient call note: "His wife thinks someone is giving out her husband[']s information...she thinks it[']s a scam.").  One patient who contacted the call center about a knee brace ended up receiving three or four braces in the mail but not a knee brace—"everything except [] the right thing [he had] ordered."  ROA.21-11273.5216-5217.  The Hagens imposed a strict return policy, usually requiring that returns be initiated within five days, and paid bonuses to employees who kept the number of accepted returns below a monthly threshold.  ROA.21-11273.4190-4191, 4212.

Most beneficiaries received multiple braces from Metro DME or OPS. ROA.21-11273.5239-5240.  For example, Medicare Part B claims data showed that 18% of Metro DME customers received a single orthotic, 14% received two items, 30% received three items, 21% received four items, 16% received five items, and more than 1% received at least six items.  ROA.21-11273.9719. According to Raymond Shores, Kimble's brother who also bought doctors' orders from Kimble and who discussed the kickback scheme with the Hagens, the "iron man package" was an inside term that referred to the practice of upselling as many braces as possible to a beneficiary during a phone call. ROA.21-11273.4452-4455, 4460, 4479-4480, 4528.  As Kimble himself

16

explained, "You've outfitted that individual with body armor."   ROA.21-11273.4701.

### D.   The Hagens Received More Than $27 Million in Medicare Payments and Paid Kimble More Than $15 Million in Kickbacks.

Between March 2016 and January 2019, the Hagens paid Kimble's companies more than $15 million in exchange for doctors' orders, which they used to bill Medicare Part B and Medicare Part C plans.  ROA.21-11273.9694. Metro DME or OPS wired payments each week, in pairs, from a bank account in Texas to the bank accounts of Chronos and Pantheon in the Philippines. ROA.21-11273.5292-5295.  In the same period, the Hagens billed Medicare and Medicare Part C plans for $59,976,900 in DME claims.  ROA.21-11273.9703. The Hagens were paid $27,104,359 on those claims.   ROA.21-11273.9703. They transferred $5 million of this money to bank accounts in Spain and Austria, which they partially used to renovate a luxury house in Spain.   ROA.21-11273.5292-5293, 9693.

## III.   RULINGS UNDER REVIEW

The Hagens appeal the district court's (1) exclusion of evidence concerning Kimble's consultations with a lawyer approximately 18 months into the conspiracy, ROA.21-11273.3220-3223, 5623-5624, 5984-5985; (2) denial of their requested jury instruction on a safe harbor to the AKS, ROA.21-11273.6320-6321; (3) application of the Sentencing Guidelines enhancement for

sophisticated money laundering (U.S.S.G. § 2S1.1(b)(3)), ROA.21-11273.6583-6586; and (4) order of restitution, ROA.21-11273.3264-3265; ROA.21-11279.3266-3267.[2]

## SUMMARY OF ARGUMENT

I.     The district court properly exercised its discretion under Fed. R. Evid. 403 in excluding testimony by an attorney, Joshua Skora, about his consultations with Kimble and documentation concerning those consultations. This evidence, proffered outside the presence of the jury, had little if any probative value.    Skora was not engaged by, and never met, the Hagens. Moreover, Skora reviewed copies of contracts between Kimble's companies and an unrelated third party, not the Hagens' companies, and he did so only for background purposes.    This all occurred after the Hagens had signed their contracts with Kimble and 18 months after the conspiracy began.    Contrary to the Hagens' argument, the fact that Kimble did not tell Skora he was selling doctors' orders does not show that Kimble similarly misled the Hagens about his operations; Kimble had every reason to deceive his lawyers because the purpose of the sham contracts was to disguise Kimble's pay-for-play arrangement with the Hagens.

---

[2] The specific background for each claim on appeal is discussed in the corresponding Argument section.

In any event, Skora's testimony would have been cumulative of Kimble's testimony, elicited by the Hagens on cross-examination, that lawyers had reviewed templates of the marketing and BPO contracts. Admitting evidence of Skora's consultations with Kimble also risked leaving the jury with the false impression that Skora had vetted Kimble's business dealings with the Hagens. The court properly excluded this evidence, but any error was harmless given the substantial evidence that the Hagens knowingly and intentionally purchased doctors' orders from Kimble.

II.    The district court properly exercised it discretion in denying the Hagens' proposed jury instruction on a safe-harbor provision under the AKS for personal-service contracts. The Hagens failed to present evidence that the marketing and BPO contracts between Kimble and the Hagens satisfied all the requirements of that safe harbor, *see* 42 C.F.R. § 1001.952(d), including that compensation was not based on the volume of referrals generated. Nor was the proposed instruction necessary for the Hagens to present their defense that the contracts were legitimate. Further, any error in not giving the instruction was harmless based on all the evidence and arguments presented to the jury.

III.   The district court did not clearly err in applying the sophisticated money laundering enhancement. *See* U.S.S.G. § 2S1.1(b)(3). The enhancement was warranted by the Hagens' wiring of Medicare fraud proceeds to offshore

19

accounts—both to Kimble's accounts in the Philippines and to their own accounts in Europe—and by the manner in which they and Kimble structured the kickback payments to avoid detection.  The enhancement also did not result in double counting because it targeted different conduct than the improper-benefits enhancement applied under Guidelines § 2B4.1(b)(1)(B).

IV.    The district court correctly ordered restitution under the Mandatory Victims Restitution Act ("MVRA") because the Hagens were convicted of an "offense against property." 18 U.S.C. § 3663A(c)(1)(A)(ii).   The Hagens' challenge to restitution rests solely on the argument that the categorical approach should be used when determining if a conviction was an offense against property.  But every court of appeals to have addressed the question has rejected that argument, based largely on the MVRA's text, and concluded that § 3663A(c)(1)(A)(ii) authorizes sentencing courts to consider the manner in which the offense was actually committed.  Here, the Hagens conspired to defraud the United States and violate the AKS for the purpose of deriving unlawful benefits—to the tune of $27,104,359—from the Medicare program through the submission of false and fraudulent DME claims.  Their crime was accordingly an "offense against property" that triggered mandatory restitution.

# ARGUMENT

## I.   THE DISTRICT COURT PROPERLY EXERCISED ITS DISCRETION IN EXCLUDING EVIDENCE ABOUT CO-CONSPIRATOR KIMBLE'S CONSULTATIONS WITH A LAWYER.

The Hagens contend (Br. 15-20) that the district court erroneously excluded testimony by Kimble's prior lawyer, Joshua Skora of K&L Gates, and documentary evidence concerning legal advice Skora provided to Kimble's companies (but not to the Hagens).  The Hagens are wrong.

### A.   Background

Before trial, the district court ordered the Hagens to provide notice of their intent to assert an advice-of-counsel defense "or any good-faith defense that in any way relates to advice of counsel."  ROA.21-11273.570.  The Hagens disavowed any intent to assert such a defense.  ROA.21-11273.587.  After the Hagens named Kimble's prior attorneys, including Skora, and their own prior attorney on their witness list, and listed hundreds of emails involving Kimble's attorneys on their exhibit list, the Government moved in limine to preclude the Hagens from asserting an advice-of-counsel defense or a good-faith defense related to legal advice, arguing, among other things, that such information was irrelevant and should be excluded under Federal Rule of Evidence 403.  ROA.21-11273.1604-1612.  The court denied that motion in part, allowing the defense "to call as witnesses four former attorneys of co-conspirator Herb

Kimble and to present evidence of Kimble's attorney-client communications, *if admissible*." ROA.21-11273.1782 (emphasis added).

At trial, Kimble testified on direct examination that he and the Hagens had used marketing and BPO agreements to disguise the fact that the Hagens purchased doctor orders from Kimble, which would enable them, in the event of an audit, to present the contracts as proof they were "compliant" with the law. ROA.21-11273.4708-4709, 4717. The defense sought to cross-examine Kimble on whether he had vetted the contracts with lawyers; the Government objected on relevance grounds because Kimble never told the Hagens about the vetting. ROA.21-11273.5024-5028. After a lengthy bench conference, ROA.21-11273.5047-5081, the court allowed the defense, "in an abundance of caution," to ask Kimble about whether the contracts had been drafted by lawyers as long as the defense asked Kimble whether he had shared that fact with the Hagens, ROA.21-11273.5069-5070. The court also allowed the defense to question Kimble about his email communications with his previous lawyers but did not admit those communications into evidence. ROA.21-11273.5072-5073.

When trial resumed, Kimble testified that the templates for the contracts had been prepared by a lawyer at the law firm of King & Spalding and that he later sought advice from the law firm of K&L Gates, ROA.21-11273.5083-5087, but he never told the Hagens about those legal consultations, ROA.21-

22

11273.5090-5091.  The defense questioned Kimble in detail about his vetting of documents with attorneys, showing Kimble templates and contracts while he was testifying.  ROA.21-11273.5084-5090.  It also cross-examined Kimble, almost paragraph-by-paragraph, about the marketing and BPO contracts between Chronos/Pantheon and the Hagens' companies, including the requirement that the parties comply with the AKS.  ROA.21-11273.5103-5150. Kimble maintained that the contracts "were there to defraud the Government and Medicare in the event that someone walked in and wanted to see how you were getting your patients."  ROA.21-11273.5038.  On redirect, Kimble reiterated, "[t]he contracts were a disguise, [and] the Hagens knew that." ROA.21-11273.5209.[3]

As part of their case, Leah and Michael testified that, consistent with the contracts and what Kimble told them, they believed they were purchasing marketing and business processing services from Kimble's companies, not doctors' orders.  ROA.21-11273.5735-5740, 6056, 6095-6097.  The Hagens sought to introduce Kimble's communications with his previous attorneys about

---

[3] According to the Hagens, Kimble admitted on cross-examination to previously telling the Government "that the Hagens believed his arrangement with them was 'legal and correct.'"  Br. 16-17.  But Kimble was referring to Leah, and his testimony was not as clear as the Hagens suggest: Kimble testified on this point after the defense tried to refresh his recollection with an interview report and he immediately clarified that he did not know the context for what was in the report.  ROA.21-11273.5170; *see also* ROA.21-11273.5205-5206.

the contracts through one of those attorneys, Skora.  ROA.21-11273.2207-2216, 5601-5624.  The defense contended that this evidence was admissible to bolster the Hagens' testimony, that is, to show that what Kimble told lawyers about his operations was the same thing Kimble allegedly told the Hagens.  ROA.21-11273.5608.  The Government objected on the grounds that the evidence was hearsay, irrelevant, misleading, and cumulative.  ROA.21-11273.2218-2233, 5608-5618.  The district court excluded the documentary evidence of Kimble's communications on hearsay and relevance grounds but allowed the defense to recall Kimble and further question him about his communications with lawyers.  ROA.21-11273.5623-5624.  The defense declined that invitation.  ROA.21-11273.5645.

The court heard a proffer of Skora's testimony.  ROA.21-11273.5645, 5963-5978.  Skora stated that Kimble had retained K&L Gates to provide compliance advice for Chronos and Pantheon on "prospective activities that the companies wanted to do with third-party companies."  ROA.21-11273.5977-5978.  As part of the process of "getting to know a new client," Skora reviewed contracts for marketing and BPO services between Kimble's companies and a third-party company (not Metro DME or OPS) dated October 11, 2017 (which was after Kimble and the Hagens had executed all of their contracts).  ROA.21-11273.5970-5971.  Kimble never told Skora that he was selling doctors' orders,

24

and Skora's impression was that Kimble's companies were compliant with federal law. ROA.21-11273.5977-5978. Skora was not engaged by, and never met, the Hagens. ROA.21-11273.5976-5977.

The court excluded Skora's testimony because Skora never reviewed the contracts between Kimble's and the Hagens' companies, but the court stated that it would consider allowing a lawyer who had reviewed those contracts to testify. ROA.21-11273.5984-5985. The Hagens did not call any of the other lawyers on their joint witness list. ROA.21-11273.2021-2027.

The Hagens later moved for a new trial based on the exclusion of Skora's testimony and related documentary evidence. ROA.21-11273.3220-3221. The court denied that motion, finding that Skora's testimony "does not make the point the Hagens suggest," *i.e.*, that "Kimble misled them"—the Hagens—"by concealing the illegal nature of his operation." ROA.21-11273.3221. Moreover, the court continued, Skora's testimony was cumulative of Kimble's testimony, elicited by the defense and not disputed by the Government, "that he had attorneys review the contracts so that they would appear legitimate to auditors." ROA.21-11273.3222. The court found that Skora's testimony "would therefore have had little or no effect"—a conclusion "bolstered by the fact that Kimble engaged Skora *after* the Hagens signed their relevant agreements with Kimble." ROA.21-11273.3222.

25

The court rejected the Hagens' challenge to the exclusion of documentary evidence of Kimble's communications with his lawyers "for the same reason," emphasizing that the Hagens had not "identified any specific document . . . that would have impacted the jury's verdict and [explained] how." ROA.21-11273.3222-3223.

### B.    Standard of Review

The Court reviews a ruling excluding evidence "for abuse of discretion, subject to harmless error review." *United States v. Jones*, 664 F.3d 969, 974 (5th Cir. 2011). "A district court abuses its discretion if it bases its decision on an error of law or a clearly erroneous assessment of the evidence." *United States v. Portillo*, 969 F.3d 144, 168 (5th Cir. 2020) (quotation omitted), *cert. denied*, 141 S. Ct. 1275 (2021). An error excluding evidence "does not necessitate reversal unless it affected the defendant's substantial rights"; the Court "must consider the other evidence in the case and determine whether the improperly excluded evidence, if admitted, would have had a substantial impact on the jury's verdict." *United States v. Johnson*, 880 F.3d 226, 231 (5th Cir. 2018) (quotation omitted).

### C.    The Court's Ruling Was Correct and Not an Abuse of Discretion.

The district court's exclusion of Skora's testimony and related documentary evidence was correct and hardly based on a "clearly erroneous

assessment of the evidence." *Portillo*, 969 F.3d at 168. The ruling was well within the court's broad discretion to "exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403; *see United States v. Edelman*, 873 F.2d 791, 795 (5th Cir. 1989).

Skora's testimony was not even relevant. He reviewed contracts Kimble had already signed with an unrelated client. Skora never reviewed the contracts between the Hagens' and Kimble's companies. *See* ROA.21-11273.5984-5985 (district court: "If . . . he was talking about the same contracts[,] maybe I would let you do some of this, but he's not, and I'm not going to let you do it."). As the court found, "Kimble engaged Skora *after* the Hagens signed their relevant agreements with Kimble." ROA.21-11273.3222. Skora never met the Hagens, and there was no evidence that Skora's communications with Kimble were ever shared with the Hagens. ROA.21-11273.5090-5091, 5977.[4] Skora's testimony, therefore, was not relevant to the Hagens' intent or to any other issue in the case.

That Kimble did not inform Skora about the true nature of his companies' operations—selling completed doctors' orders—does not have "any tendency to

---

[4] Michael testified that Kimble told him that the contracts had been "vetted, reviewed by attorneys," but Kimble did not "describe any specific comments or communications with any attorneys." ROA.21-11273.6109.

make [it] more or less probable" that he also misled the Hagens.  Fed. R. Evid. 401(a).  Kimble had every reason to withhold information from his lawyers; the sole purpose of the sham contracts was to give the conspiracy legal cover in the event it came under scrutiny.  ROA.21-11273.4708-4709, 4717, 5038, 5207.  But that does not make it more probable that Kimble deceived the Hagens—his customers and partners in crime—about what he was selling them.

To the extent Skora's testimony had any probative value, it was cumulative of testimony the jury already heard.  The defense elicited from Kimble that his prior attorneys had prepared templates for his marketing and BPO contracts with the Hagens; the defense also questioned Kimble in detail about the vetting process.  ROA.21-11273.5083-5090.  The Government did not dispute that the contract templates had been legally vetted.  ROA.21-11273.3222.  Thus, having Skora testify that he was engaged by Chronos and Pantheon to provide compliance advice 18 months after the conspiracy began and that he was unaware Kimble trafficked in signed doctors' orders would "have had little or no effect" on the record before the jury.  ROA.21-11273.3222.  *See, e.g.*, *United States v. Najera Jimenez*, 593 F.3d 391, 402 (5th Cir. 2010) (finding that excluded evidence had "minimal relevance" because the government did not challenge the point that the evidence was intended to address); *United States*

*v. Morales*, 119 F. App'x 687, 688 (5th Cir. 2005) (unpublished) (upholding exclusion of evidence that "had little relevance and was cumulative").

Moreover, while the district court did not expressly rely on this ground, Skora's testimony also risked leading the jury to believe he had meaningfully vetted the operations of Kimble's companies when that was not the case. The Hagens contend that one reason they wanted to call Skora was to show that "[t]here was nothing manifestly fraudulent about Kimble's organization." Br. 17. But Skora was not in a position to provide that testimony (assuming it would have been permissible). The documents Kimble had his lawyers review were a sham—they did not reflect Kimble's actual operations. Further, Skora explained that he was engaged by Kimble's companies to provide legal advice about the companies' "prospective activities," and that he reviewed contracts between Kimble's companies and a third-party company only to familiarize himself with "a new client"—he did not provide comments or advice on the contracts. ROA.21-11273.5970-5971, 5977-5978.

The danger that the jury would give outsized importance to Skora's review of Kimble's later marketing and BPO contracts with an unrelated client substantially outweighed any minimal probative value in the testimony. *See United States v. Saldana*, 427 F.3d 298, 306-07 (5th Cir. 2005) (district court appropriately excluded tax-related manuals that had "slight" probative value,

29

were cumulative of the defendant's testimony that he relied on them, and risked confusing the jury); *United States v. Barnett*, 945 F.2d 1296, 1301 (5th Cir. 1991) (similar); *United States v. Flitcraft*, 803 F.2d 184, 185-86 (5th Cir. 1986) (similar).

The Hagens' challenge to the exclusion of documentary evidence fails for the same reasons. They proffered only documents relating to Kimble's consultations with Skora, not the larger set of documents involving Kimble's other attorneys on their exhibit list. ROA.21-11273.5986-5994; *see* ROA.21-11273.7277-7343, 7416-7420. Regardless, this evidence: (a) lacked probative value because Kimble never shared those emails or the legal advice in them with the Hagens; (b) was cumulative because the court allowed the defense to cross-examine Kimble about his attorneys' review of contracts and about specific documents that were excluded, including the contracts Skora reviewed for background purposes and the contract templates prepared by a King & Spalding attorney (ROA.21-11273.5083-5090); and (c) risked misleading the jury about the significance of the legal review. Moreover, many documents contained inadmissible hearsay because they were out-of-court statements offered to prove that the attorneys, in fact, had provided legal advice. *See, e.g.*, *Mary Kay, Inc. v. Weber*, 601 F. Supp. 2d 839, 850-51 (N.D. Tex. 2009) ("Although the record of the e-mails would be covered by the Rule 803(6) exception, the e-mails themselves would still have to be covered by some other hearsay exception.").

The district court, which heard extensive arguments about this evidence before and during trial, had ample discretion to exclude it.

The Hagens' reliance on *United States v. Lowery*, 135 F.3d 957 (5th Cir. 1998), is misplaced.  Br. 18.  In that case, the Court held that the district court erroneously excluded evidence about a related trial because the evidence was relevant and "necessary to prove" a defense to the obstruction of justice charge, leaving the defendant's "hands . . . tied."  135 F.3d at 958-60.  No such determination is possible here.  Skora's testimony added nothing to the Hagens' defense: the fact that Skora was unaware that Kimble's companies sold doctors' orders did not make it more probable that Kimble misled the Hagens about his operations.  And, based on Kimble's testimony, it was undisputed that Kimble's attorneys had vetted the marketing and BPO language in the contracts with Metro DME and OPS.  The Hagens also declined the district court's invitation to call a different lawyer who had knowledge of those contracts.

Still, Kimble's testimony enabled the defense to argue at closing that contracts identical to those between Kimble's and the Hagens' companies had been "vetted and prepared" by healthcare attorneys at "an international law firm" in the United States.  ROA.21-11273.6382.  The defense argued that the contracts were legitimate (ROA.21-11273.6408-6410), or the Hagens believed in good faith that the contracts were legitimate (ROA.21-11273.6408-6410), and

31

that Kimble had deceived them about his true operations (ROA.21-11273.6384, 6398-6401). The Hagens were fully able to present their intended defense to the jury. The jury simply rejected it. *Lowery* is thus inapposite.

The Hagens' other arguments fail. The court did not set an "extremely high" admissibility "bar" (Br. 19) in stating that Skora's testimony was "hardly the key exculpatory information that the Hagens allege" (ROA.21-11273.3222); the court was parroting the Hagens' own language from their new-trial motion (ROA.21-11273.3086). Nor did the court engage in "circular" reasoning or "miss[] the point" of Skora's testimony (Br. 19) by finding it cumulative. The Hagens got what they needed from Kimble for their defense—that Kimble's lawyers had vetted the marketing and BPO contract language. And even if the contracts reviewed by Skora were identical to those involving the Hagens, *see* Br. 19-20, Skora's testimony was still irrelevant and cumulative.

## D.    Any Error Was Harmless.

Any error by the district court here did not have an impact, let alone a substantial impact, on the verdict. *See Johnson*, 880 F.3d at 231.

The inference that the Hagens wanted to draw from Skora's testimony— that Kimble must have misled the Hagens about the legitimacy of the contracts because he misled Skora—was weak and inconsistent with the other evidence before the jury. Kimble's testimony that the Hagens knew the marketing and

BPO contracts were shams was corroborated by the email and Skype communications between the Hagens and Kimble, Kimble's wife, and their staff and by all of the other evidence that the Hagens intentionally bought doctors' orders from Kimble, including the testimony of Kimble's brother (Raymond Shores); testimony from the Hagens' staff; Kimble's recorded conversation with the Hagens; the spike in Medicare billing by the Hagens once they started doing business with Kimble; and the spate of Medicare audits and patient complaints while the Hagens were doing business with Kimble. *See* pp. 5-17, *supra*. And as discussed, the Hagens ultimately presented their intended defense—that the marketing and BPO contracts were legitimate, they believed the contracts were legitimate, and Kimble duped them.

The jury would have convicted the Hagens even if the court had allowed Skora's testimony and admitted the documentary evidence. *See United States v. Rajwani*, 476 F.3d 243, 247-48 (5th Cir. 2007) (holding harmless any error in excluding testimony "[g]iven the extensive evidence of [the defendant's] guilty knowledge and the cumulative nature of the testimony"); *cf. United States v. Weast*, 811 F.3d 743, 751 (5th Cir. 2016) (finding no effect on substantial rights from limits placed on defense expert's testimony "because the government presented significant incriminating evidence" and the defendant "was able to develop the points at issue during cross-examination and closing argument").

## II. THE DISTRICT COURT PROPERLY EXERCISED ITS DISCRETION IN DENYING THE HAGENS' REQUESTED JURY INSTRUCTION ON THE SAFE-HARBOR PROVISION.

The Hagens contend (Br. 21-26) that the district court erroneously denied their request for a jury instruction on a safe-harbor provision under the AKS for remuneration paid under a personal-services contract. The Hagens are wrong. The proposed instruction lacked sufficient evidentiary support, and the district court's denial did not affect the Hagens' ability to present their intended defense.

### A. Background

The AKS, 42 U.S.C. § 1320a-7b(b), criminalizes knowingly and willfully offering, paying, soliciting, or receiving any "remuneration" in exchange for referring another party to a Medicare provider for items or services to be paid by the Medicare program. *See United States v. Robinson*, 505 F. App'x 385, 387 (5th Cir. 2013) (unpublished). The Department of Health and Human Services has promulgated "safe harbor" provisions that exclude certain forms of remuneration from criminal liability, including payments under personal-services contracts and for referral services. 42 C.F.R. § 1001.952(d), (f); *see United States v. Clough*, 978 F.3d 810, 821-22 (1st Cir. 2020). The safe-harbor provision "is an affirmative defense." *United States v. Turner*, 561 F. App'x 312, 319 (5th Cir. 2014) (unpublished).

34

The Hagens requested jury instructions on these safe-harbor provisions and a prefatory instruction directing the jury to acquit if it found that a defendant had showed "by a preponderance of the evidence that one Safe Harbor provision or exception applies to him or her." ROA.21-11273.3014-3018. At the charge conference, the Hagens withdrew their request for an instruction on the referral-services safe harbor but maintained their request for an instruction on the personal-services safe harbor. ROA.21-11273.6308, 6316-6317. The Government objected on the ground that the Hagens had not provided evidence that the marketing and BPO contracts satisfied each requirement of the personal-services safe harbor, including that the contract (1) specified all services to be provided by the agent, (2) did not take into account the volume or value of referrals, and (3) provided for compensation consistent with fair-market value. ROA.21-11273.6308-6320; *see* 42 C.F.R. § 1001.952(d)(1)(ii), (iv). The district court declined to give the safe-harbor instruction but granted the Hagens' request for a good-faith instruction. ROA.21-11273.6307, 6320-6321, 6478-6479; *see also* ROA.21-11273.3242 (denying as insufficiently briefed the Hagens' new-trial claim concerning safe-harbor instruction request).

## B.    Standard of Review

The denial of a defendant's proposed jury instruction is reviewed under the abuse-of-discretion standard. *United States v. Barnes*, 979 F.3d 283, 302 (5th

Cir. 2020), *cert. denied*, 142 S. Ct. 94, 142 S. Ct. 95, 142 S. Ct. 96, and 142 S. Ct. 349 (2021). A district court abuses its discretion if the denied instruction "(1) is substantively correct; (2) is not substantially covered in the charge given to the jury; and (3) concerns an important point in the trial so that the failure to give it seriously impairs the defendant's ability to present effectively a particular defense." *Id.*

A district court may refuse to give an instruction that, *inter alia*, "incorrectly states the law" or "is without foundation in the evidence." *United States v. Tannehill*, 49 F.3d 1049, 1057-58 (5th Cir. 1995) (quotation omitted). "As a general proposition a defendant is entitled to an instruction as to any recognized defense for which there exists sufficient evidence for a reasonable jury to find in his favor." *Mathews v. United States*, 485 U.S. 58, 63 (1988). But a "mere scintilla of evidence in support of a defense theory" is not sufficient to justify a defense instruction. *United States v. Stowell*, 953 F.2d 188, 189 (5th Cir. 1992).

## C.    The Hagens' Proposed Instruction Lacked Sufficient Evidentiary Support and Was Not Necessary to Their Defense.

The district court did not abuse its discretion by denying the Hagens' proposed instruction. The defense failed to present evidence that the marketing and BPO contracts between Kimble and the Hagens satisfied all requirements of the safe harbor for personal-services contracts in 42 C.F.R. § 1001.952(d). Nor

36

was the proposed instruction necessary for the Hagens to present their defense that the contracts were legitimate.

> 1.   The Marketing and BPO Contracts Did Not Satisfy the Personal-Services Safe Harbor.

The Hagens did not establish their entitlement to an instruction on the personal-services safe harbor.

First, they failed to show that the "compensation paid" to Kimble's companies was "not determined in a manner that t[ook] into account the volume or value of any referrals or business." 42 C.F.R. § 1001.952(d)(1)(iv). The evidence proved that the Hagens paid Kimble based on the volume of doctors' orders they received. *See, e.g.*, ROA.21-11273.9872 (email from Kimble's wife to Leah: "The invoices we just sent you are for 500 products. Let's increase to 600 next week, however on our end, we'll start increasing your pipeline."); *see generally* pp. 6-12, *supra*. But even under the defense's theory that "raw leads" were merely potential customers, not guaranteed customers with signed doctors' orders, the Hagens both testified that they paid Kimble "per raw lead" generated. ROA.21-11273.5740, 6116. That matched how the Hagens were invoiced under the marketing services agreements, *i.e.*, $7.50 per raw lead. *See, e.g.*, ROA.21-11273.8144, 8227. Even if "raw leads" meant only potential customers (which it didn't), the compensation paid under the marketing

agreements was still based on the volume of referrals—contrary to the safe-harbor provision.

Second, the Hagens failed to show that the agreements fully "specifie[d] the services to be provided by the agent" (*i.e.*, Kimble's companies) and "cover[ed] all of the services the agent provide[d]." 42 C.F.R. § 1001.952(d)(1)(ii). For example, the marketing agreements relied in part on a "Campaign Insertion Order" to define the services provided, ROA.21-11273.9006, 9027, but Michael testified that the insertion order was not attached to the contracts he reviewed, ROA.21-11273.6221-6222. And, the BPO agreements defined the services to be provided by Kimble's company in often general terms, referencing undefined "instructions and requirements" that Metro DME or OPS was supposed to provide. ROA.21-11273.8996, 9003, 9013, 9020-9021. Thus, the BPO and marketing agreements did not fully define the complete services provided by Kimble's companies.

Finally, the Hagens did not show that the compensation paid to Kimble under either contract was "consistent with fair market value in arm's-length transactions" for the marketing and BPO services purportedly provided by his companies from the Philippines. 42 C.F.R. § 1001.952(d)(1)(iv). Rather, the Hagens presented no evidence as to fair market value—only passing testimony that the BPO services were cost effective. ROA.21-11273.5019, 5723.

Because the Hagens failed to present evidence allowing a reasonable jury to find that the BPO and marketing agreements satisfied all the requirements of the personal-services safe harbor, the district court did not abuse its discretion by denying their proposed instruction. *See Turner*, 561 F. App'x at 320; *United States v. Vega*, 813 F.3d 386, 397 (1st Cir. 2016); *United States v. Norton*, 17 F. App'x 98, 102 (4th Cir. 2001) (unpublished); *see also United States v. Job*, 387 F. App'x 445, 454-56 (5th Cir. 2010) (unpublished) (finding no plain error).

The Hagens' brief ignores the marketing agreement and argues only that the BPO agreement satisfied the personal-services safe harbor. Br. 24-25. That is inconsistent with their position below, where they argued that *both* contracts satisfied the personal-services safe harbor. ROA.21-11273.6316-6317. Allowing the jury to apply the safe harbor based solely on the BPO agreement disregards the requirement that "[t]he agency agreement covers *all* of the services the agent provides to the principal for the term of the agreement." 42 C.F.R. § 1001.952(d)(1)(ii) (emphasis added). The BPO agreement, for example, did not address the delivery of "raw" patient leads to the Hagens, which was covered by the marketing agreement. ROA.21-11273.9006, 9027. Rather, both agreements worked in tandem to cover all the services that Kimble purportedly provided to the Hagens under the defense's theory of the case. And even though different Kimble companies (Chronos and Pantheon) were on the BPO and

marketing contracts at a given time, both companies fell under Kimble's control. *See* ROA.21-11273.4689-4691 (Kimble testimony that he owned Chronos and Pantheon with his wife; although his wife held majority ownership given requirements of Philippine law, Kimble was in charge); ROA.21-11273.4736 (Kimble testimony that he directed every email communication out of his company).

Granting the Hagens' requested instruction based solely on the BPO agreement would have meant that, even if the jury found—consistent with the evidence—that the "raw leads" Kimble provided under the marketing agreement violated the AKS, the jury could acquit them because the BPO agreement fell within the safe harbor. The Hagens point to nothing in the AKS or safe-harbor regulations authorizing such an artificial carve out from criminal liability. Because the marketing and BPO agreements reflected the complete, alleged contractual relationship between the Hagens and Kimble, the Hagens needed to present sufficient evidence that both contracts—in place concurrently—satisfied the safe-harbor provision to obtain a jury instruction. They failed to do so. Indeed, neither contract satisfied the safe harbor.

### 2.    The Hagens Were Able to Present Their Intended Defense.

Denying the instruction did not "seriously impair[]" the Hagens' "ability to present effectively [their] particular defense." *Barnes*, 979 F.3d at 302; *see*

40

*United States v. Nguyen*, 493 F.3d 613, 623 (5th Cir. 2007) (no error in denial of proposed instruction because other instruction and defense's presentation "sufficiently informed the jury regarding the substance of the proposed charge in relation to [the] defense"). The Hagens testified that the contracts were legitimate and they believed the contracts were legitimate. ROA.21-11273.5729-5748, 6056, 6112-6123. The defense also cross-examined Kimble extensively about the contracts, ROA.21-11273.5018-5020, 5037-5039, 5103-5150, even showing him emails that, in its view, reflected the legitimacy of the contracts. ROA.21-11273.5037-5041. During closing argument, the defense maintained that the Hagens had paid for legitimate services under the BPO and marketing contracts, not completed doctors' orders. ROA.21-11273.6408-6411; *see, e.g.*, ROA.21-11273.6408 ("These were real contracts for real services."); ROA.21-11273.6411 (Chronos/Pantheon offices visited by the Hagens "were legitimate offices doing legitimate businesses").

At base, the Hagens did not need a jury instruction on the safe-harbor provision to present their defense that the BPO and marketing contracts were legitimate. *See* ROA.21-11273.6318 (defense counsel acknowledging that "just because you don't meet the four corners . . . of the Safe Harbor doesn't necessarily mean you've created a criminal violation"). For this additional

reason, the district court did not abuse its discretion by denying the requested instruction. *See Barnes*, 979 F.3d at 302.

### D.    Any Error Was Harmless

This Court will not reverse a conviction based on the erroneous denial of a jury instruction "if [it] determine[s], based on the entire record, that the challenged instruction could not have affected the outcome of the case." *Nguyen*, 493 F.3d at 623 (quotation omitted).

Any error here was harmless.  As discussed, the Hagens fully presented their defense that the BPO and marketing agreements were legitimate contracts, but the jury rejected it based on overwhelming evidence that the Hagens bought completed doctors' orders from Kimble.  The Hagens also maintained that they had relied on the contracts in good faith, ROA.21-11273.6408-6411, and the district court instructed the jury, *inter alia*, that good faith was a "complete defense" to both conspiracy counts and that a defendant's "good faith"—defined to include an "honestly held" belief—was "simply inconsistent" with willfully providing the remuneration charged in the indictment, ROA.21-11273.6478-6479.  By rejecting that defense and finding that the Hagens acted knowingly and willfully, the jury found that the BPO and marketing contracts were a sham, the Hagens knew they were a sham, and they intended to engage in conduct "the

law forbids."  ROA.21-11273.6479-6481.  The jury's verdict would have been
the same if it had been instructed on the safe-harbor provision.

## III.  THE DISTRICT COURT'S FINDING THAT THE HAGENS ENGAGED IN SOPHISTICATED MONEY LAUNDERING WAS NOT CLEARLY ERRONEOUS.

The Hagens contend (Br. 27-30) that the district court erroneously
imposed a two-level Sentencing Guidelines enhancement for sophisticated
money laundering.  That argument lacks merit.

### A.  Background

As amended, the pre-sentence report ("PSR") for Leah and Michael
grouped the counts of conviction under U.S.S.G. § 3D1.2(c) (2018); calculated
a base offense level of 8 under U.S.S.G. § 2B4.1(a), by operation of U.S.S.G.
§§ 2S1.1(a)(1), 2X1.1(a); and applied enhancements of 20 levels based on the
amount of benefits received from the kickback payments to Kimble (U.S.S.G.
§§ 2B4.1(b)(1)(B), 2B1.1(b)(1)(K)), two levels for conviction under 18 U.S.C.
§ 1956 (U.S.S.G. § 2S1.1(b)(2)(B)), and two levels for sophisticated money
laundering (U.S.S.G. § 2S1.1(b)(3)).    ROA.21-11273.9893-9894, 9994-9995;
ROA.21-11279.9895-9897, 9997.  Based on a total offense level of 32 and a
category I criminal history, Leah and Michael each faced an advisory
Guidelines range of 121 to 151 months' imprisonment.  ROA.21-11273.9999;
ROA.21-11279.10000.

43

As relevant here, the amended PSRs based the sophisticated money laundering enhancement on the Hagens' use of offshore accounts, specifically, that they had "sent unlawfully derived gains from Medicare fraud" both "to Kimble's bank account in the Philippines" (in order "to promote and continue the Medicare fraud") and "to their personal bank accounts in Spain and Austria" (to fund a "second home in Spain").    ROA.21-11273.9995; ROA.21-11279.9997.

The Hagens objected to the enhancement.    ROA.21-11273.6578-6579. The district court overruled that objection based on the information and recommendation in the amended PSRs and the Government's arguments at sentencing, which focused on how the payments to Kimble were structured. ROA.21-11273.6583-6586.  As the Government explained, the payments were "reverse engineered based on the sham invoices" from Chronos and Pantheon— for services purportedly rendered under the marketing and BPO agreements— in order to "conceal the nature of the payments." ROA.21-11273.6581.  The payments were also made upfront, allowing Kimble to "deduct" the charge "for each [doctor's] order" provided to the Hagens, which further concealed the scheme. ROA.21-11273.6581.

The court overruled the Hagens' other objections and adopted the recommended Guidelines range of 121 to 151 months.  ROA.21-11273.6572-

6578, 6611-6612, 6641-6642.  The court sentenced each defendant to 151 months.  ROA.21-11273.6670.

### B.    Standard of Review

The Court reviews a district court's finding of sophisticated money laundering for clear error.  *United States v. Charon*, 442 F.3d 881, 890 (5th Cir. 2006).  Reversal under this standard requires a "definite and firm conviction that a mistake has been committed"; "[i]f the district court's account of the evidence is plausible in light of the record viewed in its entirety," this Court will not reverse even if it is "convinced that had it been sitting as trier of fact, it would have weighed the evidence differently."  *Id.* at 890-91 (quotation omitted).

### C.    The Hagens' Use of Foreign Bank Accounts and Structuring of Payments to Kimble Involved Sophisticated Money Laundering.

Guidelines § 2S1.1(b)(3) provides for a two-level enhancement of the offense level for a defendant convicted under 18 U.S.C. § 1956 if "the offense involved sophisticated laundering."   Under the Commentary, "'sophisticated laundering' means complex or intricate offense conduct pertaining to the execution or concealment" of the money laundering offense.  U.S.S.G. § 2S1.1, cmt. (n.5(A)).  The Commentary further states that sophisticated laundering "typically involves" using "fictitious entities," "shell corporations," "layering" transactions, and "offshore financial accounts."  *Id.*  Nevertheless, "[t]he factors listed in Application Note 5 are illustrative but not required; they are typical but

45

non-exhaustive." *United States v. Fish*, 731 F.3d 277, 280 (3d Cir. 2013); *accord United States v. Ada*, 700 F. App'x 689, 690 (9th Cir. 2017) (unpublished). But when a factor is present, this Court has found that "the commentary clearly subjects an individual to the sophisticated laundering enhancement." *United States v. Miles*, 360 F.3d 472, 482 (5th Cir. 2004).

The district court's finding that the Hagens committed sophisticated money laundering was correct and certainly "plausible" in light of the entire record. First, they used "offshore financial accounts" as contemplated by Application Note 5(A). The Hagens regularly wired proceeds of their Medicare fraud from their Texas bank accounts to Kimble's bank accounts in the Philippines as payment for completed doctors' orders. They also wired $5 million in illegal proceeds to their personal bank accounts in Spain and Austria to pay for their luxury home in Spain. *See* pp. 17, 44, *supra*. The use of these offshore accounts justified the enhancement. *See United States v. Amaris-Caviedes*, 701 F. App'x 84, 85 (3d Cir. 2017) (unpublished) (construing "offshore financial accounts" to "embrace[] *all* foreign bank accounts," not just those in countries providing protection from law enforcement, and holding that this factor "alone" provided a sufficient basis for the enhancement); *see also United States v. Alaniz*, 726 F.3d 586, 625-26 (5th Cir. 2013) (repeated "cross-border wire transfers," among other factors, supported enhancement); *United States v. Okeke*, 779 F.

App'x 389, 390-91, 393 (7th Cir. 2019) (unpublished) (defendant's use of foreign account and transfer of funds to co-conspirator authorized enhancement).

Second, the Hagens' offshore payments to Kimble were structured to conceal the kickback and money laundering schemes.  The Hagens prepaid for doctors' orders based on invoices from Kimble's companies that listed illusory marketing and BPO services.  *See* pp. 9-11, *supra*.  Each week, Metro DME or OPS wired two payments to the Philippines, one to Chronos and one to Pantheon, as remuneration for the doctors' orders that the Hagens purchased. The individual payment amounts were reverse engineered from the total weekly cost: 75% of the total was invoiced as per-raw-lead marketing services and 25% was invoiced as hourly BPO services.  ROA.21-11273.4709, 9870.  As Kimble explained, this structure concealed the unlawful nature of the activity.  ROA.21-11273.4708-4714.    Frontloading  the  payments  each  week,  with  Kimble's companies deducting the cost of doctors' orders actually provided and crediting amounts  back  to  the  Hagens  if  necessary  (ROA.21-11273.4822),  further disguised the unlawful transactions.

This use of bifurcated payments and reverse-engineered invoices to conceal the unlawful scheme mirrors the conduct in *United States v. Chon*, 713 F.3d 812 (5th Cir. 2013), where the defendant used false financial records to conceal the proceeds of an alien smuggling conspiracy.  *Id.* at 822-23.  This Court

upheld application of the sophisticated money laundering enhancement, rejecting the defendant's argument that the conduct did not match the Guidelines commentary. *Id.* at 823. The Court reasoned that "[m]aintaining two sets of books, skimming income on a daily basis, and disguising alien-smuggling proceeds as 'parking income' in an attempt to make the criminally derived funds appear legitimate are sufficiently complex to support the enhancement here." *Id.* Likewise, the Hagens' weekly wiring of bifurcated payments for doctors' orders that tracked reverse-engineered invoices was sufficiently intricate or complex to warrant an enhancement under § 2S1.1(b)(3).

Contrary to the Hagens' arguments (Br. 28, 30), applying the sophisticated laundering enhancement is not precluded by Application Note 5(B), which provides that if "the conduct that forms the basis for an enhancement under the guideline applicable to the underlying offense is the only conduct that forms the basis for application of subsection (b)(3) of this guideline, do not apply subsection (b)(3) of this guideline." U.S.S.G. § 2S1.1, cmt. (n.5(B)); *see generally United States v. Reyes*, 781 F. App'x 965, 969 (11th Cir. 2019) (unpublished) ("[Application Note 5(B)] is designed to prevent a defendant from receiving the same enhancement both for the underlying offense and for the sophisticated laundering."). The sole enhancement applied to the underlying offense was Guidelines § 2B4.1(b)(1) for the amount of "improper benefit" ($24,620,325.63

48

net) the Hagens received from billing Medicare and Medicare Part C plans for fraudulent claims.  ROA.21-11273.9994-9995; ROA.21-11279.9995-9996.  The conduct underlying that enhancement is not "the only conduct" supporting the sophisticated laundering enhancement for two reasons.

First, the improper-benefit enhancement was based on the *volume* of the fraud, *i.e.*, the amount of fraudulent claims paid out to the Hagens, whereas the sophisticated laundering enhancement was based on the *manner* in which the fraud was executed, *i.e.*, paying Kimble in a way that disguised the fact that the Hagens were buying signed doctors' orders.  Each enhancement targeted a different aspect of the Hagens' conduct.  The method by which the Hagens paid Kimble for doctors' orders was irrelevant under § 2B4.1(b)(1) to how much they billed and received from the Medicare program.  *See United States v. Estrada*, 297 F. App'x 332, 333 (5th Cir. 2008) (unpublished) ("[A]pplication of two different adjustments to the same course of conduct does not constitute double counting if each adjustment targets a different aspect of the defendant's behavior."); *United States v. Scurlock*, 52 F.3d 531, 540-41 (5th Cir. 1995) (application of minimal-planning and abuse-of-trust enhancements was not "impermissible double counting" because they were "based on different aspects of behavior"); *see also United States v. Hatala*, 552 F. App'x 28, 30 (2d Cir. 2014) (unpublished) (rejecting double-counting challenge in part because "the sophisticated means

enhancement was justified by [the defendant's] intricate and complex computer programming, whereas the individualized loss enhancement was justified by the significant monetary damage his actions inflicted"); *United States v. Small*, 210 F. App'x 776, 783 (10th Cir. 2006) (unpublished) (rejecting challenge to sophisticated means enhancement applied on top of loss and gross receipt enhancements under § 2B1.1 because "the method by which the money was obtained or concealed is irrelevant" to the latter two enhancements).

Second, only the sophisticated-laundering enhancement accounted for the Hagens' transfer of $5 million in ill-gotten gains to offshore accounts in Spain and Austria. *See, e.g.*, *United States v. Bienzigha*, 744 F. App'x 233, 234 (5th Cir. 2018) (unpublished) (rejecting double-counting challenge to § 2S1.1(b)(3) where conduct supporting the underlying Guidelines enhancement "was not the only conduct supporting the 'sophisticated laundering' enhancement"). The Hagens contend (Br. 30) that their transfer of illegal proceeds to European accounts was the "ordinary movement of money" because Michael "is an Austrian citizen," they "had ties to Europe," and their European bank accounts were "all openly owned and controlled by [them]." But as discussed, the accounts in Spain and Austria were "offshore financial accounts" under Application Note 5(A), and the use of such accounts is sufficient to apply § 2S1.1(b)(3). Moreover, by sending $5 million overseas and diverting some of that money into a luxury

home in Spain, the Hagens made it more difficult for U.S. law enforcement to seize illegal proceeds from their fraud.[5]

The cases cited by the Hagens (Br. 29-30) do not involve the sophisticated laundering provision in § 2S1.1(b)(3) and do not otherwise support a determination of clear error here.  Three cases simply affirmed the application of sophisticated-means enhancements under other guidelines, in factual settings different from this case.  *See United States v. Conner*, 537 F.3d 480, 492 (5th Cir. 2008); *United States v. Clements*, 73 F.3d 1330, 1340 (5th Cir. 1996); *United States v. Charroux*, 3 F.3d 827, 836-37 (5th Cir. 1993).  And the main case the Hagens rely upon, *United States v. Valdez*, 726 F.3d 684 (5th Cir. 2013), differs completely from this one.  In *Valdez*, the Court found "no indication that [the defendant's] open and transparent direct deposit and movement of funds involved sophisticated means or could have made it more difficult for his offense of health care fraud to be detected."  726 F.3d at 695.  Here, there was nothing "open and transparent" about the Hagens' financial transactions with Kimble; the whole purpose of wiring upfront, bifurcated payments to Kimble's companies each week, based on reverse-engineered invoices, was to conceal the fraudulent scheme.

---

[5] The Hagens do not dispute that the wiring of proceeds to their Spanish and Austrian accounts is relevant conduct under Guidelines § 1B1.3(a)(1).

The district court's application of the sophisticated laundering enhancement should be affirmed.

## IV. THE DISTRICT COURT CORRECTLY ORDERED RESTITUTION UNDER THE MANDATORY VICTIMS RESTITUTION ACT.

The Hagens contend (Br. 31-34) that the district court erred by ordering restitution under the MVRA, 18 U.S.C. § 3663A, because they were not convicted of an "offense against property." That argument is mistaken.

### A.  Background

The PSRs recommended that the Hagens pay restitution of $27,104,359 pursuant to the MVRA and identified four victims: CMS ($7,425,789), Aetna ($1,157,826), Humana ($3,588,772), and United Healthcare ($14,931,972). ROA.21-11273.9999-10000; ROA.21-11279.9904.

The Hagens objected to the amount of restitution but did not argue that the MVRA was inapplicable to their offenses. ROA.21-11273.6573-6577, 9915-9916; ROA.21-11279.9917-9918. The district court overruled their objection and, pursuant to the MVRA, ordered that they pay $27,104,359 in restitution, jointly and severally, to the listed victims. ROA.21-11273.6655-6656; *see* ROA.21-11273.3265 (Leah judgment); ROA.21-11279.3267 (Michael judgment).

## B.     Standard of Review

The Hagens contends that, even though they failed to argue below that the MVRA does not authorize restitution in this case, this Court's review is de novo because they are challenging the legality of the order.  Br. 31 (citing *United States v. Nolen*, 472 F.3d 362, 382 (5th Cir. 2006)).  But this Court has also reviewed unpreserved challenges to the legality of a restitution order under the plain-error standard, *see United States v. Leal*, 933 F.3d 426, 431 (5th Cir. 2019); *United States v. Rosbottom*, 763 F.3d 408, 419 (5th Cir. 2014), and the Court recently highlighted its use of different standards of review in an unpublished decision, *United States v. Majors*, Nos. 20-40405, 20-40656, 2022 WL 301545, at *2 (5th Cir. Feb. 1, 2022) (unpublished).  Regardless of which standard is applied here, the Hagens cannot prevail because the MVRA mandated restitution.

## C.     Restitution Was Mandatory Because the Jury Convicted the Hagens of an Offense Against Property.

The MVRA requires that the district court order restitution if the defendant was convicted of, *inter alia*, "an offense against property under [Title 18], . . . including any offense committed by fraud or deceit," and "an identifiable victim or victims . . . suffered a physical injury or pecuniary loss." 18 U.S.C. § 3663A(c)(1)(A)(ii), (c)(1)(B); *see United States v. Tarnawa*, 26 F.4th 720, 723 (5th Cir. 2022).  "Upon making such findings, district courts must 'order restitution to each victim in the full amount of each victim's losses as

53

determined by the court and without consideration of the economic circumstances of the defendant.'"  *Tarnawa*, 26 F.4th at 723-24 (quoting 18 U.S.C. § 3664(f)(1)(A)).

The Hagens contend that, when determining if a defendant committed an "offense against property," courts must use the categorical approach associated with the Armed Career Criminal Act (ACCA), 18 U.S.C. § 924(e), and focus exclusively on the elements of the offense rather than the manner in which it was committed.  Br. 32-34; *see, e.g.*, *Taylor v. United States*, 495 U.S. 575, 600-01 (1990).  The Hagens contend that they were not convicted of an offense against property because the elements of their conspiracy crimes do not refer to property.

The Hagens do not cite a single circuit case applying the categorical approach to the offense-against-property determination under the MVRA; to the contrary, they acknowledge that several courts of appeals have rejected their position.  Br. 34; *see United States v. Razzouk*, 984 F.3d 181, 187-89 (2d Cir. 2020); *United States v. Ritchie*, 858 F.3d 201, 208-10 (4th Cir. 2017); *United States v. Collins*, 854 F.3d 1324, 1333-35 (11th Cir. 2011); *see also United States v. Sawyer*, 825 F.3d 287, 292-93 (6th Cir. 2016) (analyzing manner in which crimes committed without addressing categorical approach).

Those cases are correct: the text and structure of the MVRA, supported by its remedial purpose, authorize a sentencing court to consider the specific

circumstances in which the offense was committed in determining whether it was an offense against property.

First, the MVRA's plain text indicates that the manner in which a crime was committed guides the offense-against-property determination. *See United States v. Koutsostamatis*, 956 F.3d 301, 310 (5th Cir. 2020) (interpreting MVRA and affirming that "what Congress says in a statute's text is the best guide to what Congress intends"). Section 3663A(c)(1)(A)(ii) "refers to the way in which some offenses 'against property' are 'committed'" because it "specifies" that an offense against property "'include[s] any offense committed by fraud or deceit.'" *Razzouk*, 984 F.3d at 187 (quoting 18 U.S.C. § 3663A(c)(1)(A)(ii)); *accord Collins*, 854 F.3d at 1334. In *Taylor*, the Supreme Court "emphasized that a statute's use of the word 'committed' suggests a focus on the manner of commission and stands in contrast to a reference to a conviction for a 'generic' crime, which requires instead a focus on the crime's elements." *Razzouk*, 984 F.3d at 187 (citing *Taylor*, 495 U.S. at 599-600). Moreover, unlike the ACCA, Section 3663A(c)(1)(A)(ii) "contains no language suggesting that courts look only to the elements of Title 18 statutory offenses, nor does it provide an illustrative list of property offenses that 'must refer to generic crimes.'" *Ritchie*, 858 F.3d at 210 (quoting *Nijhawan v. Holder*, 557 U.S. 29, 37 (2009)); *accord Razzouk*, 984 F.3d at 187; *Collins*, 854 F.3d at 1334. The inclusion of the term "committed" and the

lack of any reference to offense elements in § 3663A(c)(1)(A)(ii) are textual signals that the offense-against-property determination looks to the specific manner in which the crime was carried out.

The MVRA's structure reinforces this point. In the preceding subsection, Congress specified that the offenses triggering mandatory restitution include "a crime of violence, as defined in section 16" of Title 18. 18 U.S.C. § 3663A(c)(1)(A)(i). It is well settled that, under § 16, courts "look to the elements and the nature of the offense of conviction, rather than to the particular facts relating to [the] crime." *Leocal v. Ashcroft*, 543 U.S. 1, 7 (2004). Congress "could have used such an 'elements' formulation" when describing offenses against property; that it chose not to "suggests . . . treat[ing] the difference as intentional and significant." *Razzouk*, 984 F.3d at 187-88; *accord Ritchie*, 858 F.3d at 210. The contrasting terminology of these neighboring provisions further indicates that a court should focus on the specific circumstances of the offense when determining if it was an offense against property. *Cf. Russello v. United States*, 464 U.S. 16, 23 (1983) ("[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.") (quotation omitted).

Finally, interpreting the statute in this manner is consistent with the broad remedial purpose of the MVRA. "When it enacted the MVRA, Congress sought to build on the progress achieved by the discretionary [Victim Witness Protection Act, 18 U.S.C. § 3663,] in making 'significant strides . . . toward a more victim-centered justice system,' and identified the MVRA's primary goal: 'to ensure that the loss to crime victims is recognized, and that they receive the restitution that they are due.'" *Ritchie*, 858 F.3d at 210 (quoting S. Rep. No. 104-179 at 12-13 (1995)).  Given its clear intent to expand the availability of restitution, "Congress could not have intended to exclude from the broad, mandatory reach of the MVRA those unfortunate victims who suffer property loss as a result of an offense that doesn't contain as an element a reference to 'property.'" *Id.*; *accord Razzouk*, 984 F.3d at 188.  Such an approach "necessarily limits the pool of victims entitled to mandatory restitution, and illogically invites courts to disregard the actual consequences to an identifiable victim's property." *Ritchie*, 858 F.3d at 210.  Consistent with the decision of every court of appeals to have addressed the question, this Court should hold that the MVRA authorizes a sentencing court to examine the specific circumstances in which the crime was committed in determining whether it was an offense against property.

By this methodology, the Hagens do not seriously dispute that their convictions on Count One for conspiring to defraud the United States and to

violate the AKS involved an offense against property. Nor could they. The object of the charged conspiracy was for the Hagens and their co-conspirators "to unlawfully enrich themselves" by paying and receiving "kickbacks and bribes in exchange for the referral of Medicare beneficiary information that could be used to submit and cause the submission of false claims to Medicare on behalf of Metro DME and [OPS]." ROA.21-11273.187. Consistent with that object, the trial evidence proved that the Hagens obtained $27,104,359 in payments from the Medicare program through fraud.

In *Collins*, the Eleventh Circuit held that § 3663A(c)(1)(A)(ii) covers "situations where the defendant seeks to derive an unlawful benefit from another's property or otherwise deprive a person of his property." 854 F.3d at 1331; *see id.* (property "must serve as the object of the offense, not simply a collateral component"). That was the case here: the Hagens sought to derive unlawful benefits from the Medicare program by submitting fraudulent DME claims for reimbursement based on doctors' orders obtained in violation of the AKS. *See Razzouk*, 984 F.3d at 188-89 (bribery was against property because defendant admitted that his actions deprived Con Edison of payments it made to the briber for which Con Edison received no consideration); *Collins*, 854 F.3d at 1334 (conspiracy to accept gratuities in connection with a bank transaction was against property because defendant sought to derive improper benefit from

property at play in bank transactions); *see also United States v. Owusu*, No. 20-50630, 2021 WL 3854769, at *3 (5th Cir. Aug. 27, 2021) (unpublished) (defendant's conviction for access device fraud triggered restitution under § 3663A(c)(1)(A)(ii)).

The Hagens surmise (Br. 32-33) that the jury could have convicted them on Count One not for "cheating the government out of money," but for "'impairing' the operation of a government agency" or for agreeing to violate the AKS. That argument misses the point: the Hagens' whole reason for "impairing" government operations and paying kickbacks for doctors' orders was to obtain unlawful benefits from the Medicare program—in other words, to obtain property.[6]

The district court did not err by ordering restitution under the MVRA. Moreover, if the Hagens' claim is reviewed under the plain-error standard, any error here was not "plain" because this Court has not previously addressed the Hagens' interpretation of the MVRA and every other court of appeals to have

---

[6] Under the instructions given by the district court, the jury had to find that the Hagens conspired to violate the AKS to convict them on Count One. ROA.21-11273.6464-6469.

considered their position has rejected it.  *See United States v. Salinas*, 480 F.3d

750, 759 (5th Cir. 2007).[7]

## CONCLUSION

For the foregoing reasons, the judgments of conviction should be affirmed.

Respectfully submitted,

KENNETH A. POLITE, JR.
Assistant Attorney General

LISA H. MILLER
Deputy Assistant Attorney General

BRYNN A. SCHIESS
Acting Assistant Chief
CATHERINE WAGNER
Trial Attorney, Fraud Section

s/ John-Alex Romano
_____

JOHN-ALEX ROMANO
U.S. Department of Justice
Criminal Division, Appellate Section
950 Pennsylvania Avenue, NW
Washington, DC 20530
Tel. 202-353-0249
John-Alex.Romano@usdoj.gov

---

[7] The Hagens also contend that the Sixth Amendment requires that the jury, rather than the sentencing court, find the amount of restitution owed, but they concede that their claim is foreclosed by Circuit precedent.  Br. 35 (citing *Rosbottom*, 763 F.3d at 420).

## CERTIFICATE OF SERVICE

Undersigned counsel of record certifies that all participants in this case are registered users of the Court's electronic case filing system and that the foregoing Appellee's Brief for the United States was this day delivered by electronic case filing to the Clerk of the Court and to counsel for defendants-appellants.

DATED:    AUGUST 10, 2022

s/John-Alex Romano
_____
JOHN-ALEX ROMANO
U.S. Department of Justice
Criminal Division, Appellate Section
950 Pennsylvania Avenue, NW
Washington, DC 20530
Tel. 202-353-0249
John-Alex.Romano@usdoj.gov

61

## CERTIFICATE OF COMPLIANCE

1.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2013 in Calisto MT 14-point font in text and footnotes.

2.      This brief complies with Fed. R. App. P. 32(a)(7)(B) because it contains 12,610 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

3.      This brief complies with the privacy redaction requirement of Fed. R. App. P. 25(a) because it contains no personal data identifiers.

4.      The digital version of this brief electronically filed with the Court on this day is an exact copy of the written document to be sent to the Clerk.

5.      The brief has been scanned for viruses with the most recent version of a commercial virus scanning program, and according to that program, the brief is free of viruses.

**Dated:  August 10, 2022**          s/John-Alex Romano

_____

JOHN-ALEX ROMANO
U.S. Department of Justice
Criminal Division, Appellate Section
950 Pennsylvania Avenue, NW
Washington, DC 20530
Tel. 202-353-0249
John-Alex.Romano@usdoj.gov