**UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| *Plaintiff* | ) |
| | ) |
| v. | )     Case No. 4:21-cr-00005-O |
| | ) |
| THE BOEING COMPANY, | ) |
| | ) |
| *Defendant.* | ) |
| ——————————————————— | ) |

**REPLY MEMORANDUM OF RECOGNIZED CRIME VICTIMS' FAMILIES NAOISE
CONNOLLY RYAN, ET AL.  REQUESTING THAT THE COURT NOT ACCEPT THE
PROPOSED RULE 11(C)(1)(C) BINDING PLEA AGREEMENT**

Warren T. Burns
Texas Bar No. 24053119
Darren P. Nicholson
Texas Bar No. 24032789
Kyle Oxford
Texas Bar No. 24095806
Chase Hilton
Texas Bar No. 24100866
Burns Charest, LLP
900 Jackson Street, Suite 500
Dallas, Texas 75202
Tel. (469) 458-9890
wburns@burnscharest.com
dnicholson@burnscharest.com
koxford@burnscharest.com
chilton@burnscharest.com

Paul G. Cassell (Utah Bar No. 06078)
(Counsel of Record)
Utah Appellate Project
S.J. QUINNEY COLLEGE OF LAW
University of Utah
cassellp@law.utah.edu
(no institutional endorsement implied)

Tracy A. Brammeier
Clifford Law Offices PC
tab@cliffordlaw.com

Erin R. Applebaum
Kreindler & Kreindler LLP
eapplebaum@kreindler.com

Pablo Rojas
Podhurst Orseck PA
projas@podhurst.com

*Attorneys for Victims' Representatives*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES.................................................................................................. iiii

INTRODUCTORY STATEMENT .............................................................................. 1

THE GOVERNMENT HAS FAILED TO REASONABLY CONFER WITH THE
FAMILIES ABOUT THE SPECIFIC TERMS OF THE PLEA AGREEMENT .......................... 2

REASONS FOR REJECTING THE PROPOSED PLEA AGREEMENT .................................. 3

    I.   The Court Should Remain Free to Craft an Appropriate Sentence. ........................... 3

    II.  The Parties Have "Swallowed the Gun" By Not Disclosing All Relevant Facts About
        Boeing's Culpability. ..................................................................................... 8

    III. The Proposed Agreement Fails to Hold Boeing Accountable for Its Relevant Conduct
        of Causing the Deaths of 346 Victims. ...................................................... 12

    IV. The Proposed Agreement Inappropriately and Surreptitiously Exonerates Boeing's
        Then-Senior Leadership.............................................................................. 16

    V.  The Proposed Agreement Rests on an Inadequate Fine and Misleading Guidelines
        Calculations.................................................................................................. 17

        A. On the Facts of this Case, *Southern Union* Does Not Restrict the Court's
            Ability to Impose a Fine Based on Quantifying the Losses to the Victims'
            Families or Assessing the Gains Derived by Boeing ........................................ . 18

        B. Quantification of the Harm and Gain from Boeing's Crime Results in a
            Much Larger Maximum Possible Fine Than the Parties' Admit...................... . 22

        C. Even if *Southern Union* Applies, Boeing's Admissions Would Permit a
            Larger Fine than the Parties Calculate. ............................................................ 27

    VI. The Proposed Agreement's Corporate Monitor Provision Reprises the Failure of
        Government Supervision of Boeing and Lacks Transparency. ................................. 30

    VII.   The Probation Condition that Boeing Make Additional Investments in
        Compliance, Quality, and Safety Programs is Inadequate and Unenforceable......... 35

    VIII.   The Restitution Provision is Misleading and Unfairly Allows Boeing to Tie Up
        Restitution Through Automatically Approved Appeals. ........................................... 37

CONCLUSION.................................................................................................. 39

CERTIFICATE OF SERVICE ................................................................................ 41

# TABLE OF AUTHORITIES

<u>Cases</u>

*Apprendi v. New Jersey*, 530 U.S. 466 (2000) .................................................................. 18

*Blakley v. Washington*, 542 U.S. 296, 311-12 (2004) .................................................... 21

*Braswell v. United States*, 487 U.S. 99 (1988) ................................................................ 6

*Freeman v. United States*, 564 U.S. 522, 529 (2011) .................................................... 25

*Hester v. United States*, 139 S. Ct. 509 (mem) (2019) ................................................ 20

*In re Dean*, 527 F.3d 391, 395 (5th Cir. 2008) ................................................................ 3

*In re Ryan,* 88 F.4th 614, 629 (5th Cir. 2023) ............................................................... 15

*In re Ryan*, No. 23-10168 (5th Cir. Mar. 27, 2023) ....................................................... 15

*Martinelli v. Hearst Newspapers, LLC.*, 65 F.4th 231, 234 (5th Cir. 2023) .................. 22

*Southern Union v. United States*, 567 U.S. 343 (2012) ................................................. 18

*Southern Union v. United States*, 567 U.S. 343, 346-47 (2012) ................................... 21

*Southern Union v. United States*, 567 U.S. 343, 348 (2012) .................................. 30, 37

*Southern Union v. United States*, 567 U.S. 343, 349 (2012) ........................................ 21

*Southern Union v. United States*, 567 U.S. 343, 349-50 & n.4 (2012) ........................ 19

*Southern Union v. United States*, 567 U.S. 343, 359 (2012) ........................................ 20

*U.S. v. Lopez Lizarraga*, No. 4:24-cr-081-O ................................................................ 4

*United States v Thomas*, 2024 WL 706205 at *3 n.2 (11th Cir. Feb. 21, 2024) .......... 20

*United States v. Aegerion*, 280 F. Supp. 3d 217, 223 (D. Mass 2017) .......................... 4

*United States v. Aegerion*, 280 F. Supp. 3d 217, 224-25 (D. Mass 2017) .................... 4

*United States v. Beard*, 913 F.2d 193, 200 (5th Cir. 1990) .................................... 19, 22

*United States v. Booker*, 543 U.S. 220 (2005) .............................................................. 25

*United States v. Carreon*, 11 F.3d 1225, 1232 (5th Cir. 1994) .................................... 13

*United States v. Castaneda*, 162 F.3d 832, 834 (5th Cir. 1998) .................................... 7

*United States v. Caudillo*, __ F.4th __, 2024 WL 3688472 (5th Cir. Aug. 7, 2024) ...... 20

*United States v. Caudillo*, No. 23-40560, 2024 WL 3688472, at *3 (5th Cir. Aug. 7, 2024) ....... 37

*United States v. Elliott*, 600 F. App'x 225 (5th Cir. 2015) ........................................... 19

*United States v. Elliott*, 600 F. App'x 225, 227 (5th Cir. 2015) ................................... 19

*United States v. Fields*, 483 F.3d 313, 342 (5th Cir. 2007) ......................................... 14

*United States v. Green*, 722 F.3d 1146, 1150 (9th Cir. 2013) ...................................... 21

*United States v. Hankins*, 858 F.3d 1273, 1277-78 (9th Cir. 2017) ............................... 39

*United States v. Nava*, 957 F.3d 581, 588 (5th Cir. 2020) ............................................... 9

*United States v. Parker*, 927 F.3d 374 (5th Cir. 2019) ................................................... 38

*United States v. Parker*, 927 F.3d 374, 381-82 (5th Cir. 2019) ..................................... 38

*United States v. Petras*, 879 F.3d 155, 169 (5th Cir. 2018) ........................................... 20

*United States v. Phillips*, 730 F. Supp. 45, 48–49 (N.D. Tex. 1990) ............................... 8

*United States v. Ramos-Delgado*, 763 F.3d 398, 401 (5th Cir. 2014) ........................... 28

*United States v. Ramos-Delgado*, 763 F.3d 398, 402 (5th Cir. 2014) ............. 14, 15, 23, 28

*United States v. Read*, 710 F.3d 219, 231 (5th Cir. 2012) ............................................. 20

*United States v. Rhine*, 583 F.3 878, 885 n.13 (5th Cir. 2009) ....................................... 9

*United States v. Rosbottom*, 763 F.3d 408, 419-20 (5th Cir. 2014) ............................... 20

*United States v. Ruiz-Hernandez*, 890 F.3d 202, 207-08 (5th Cir. 2018) ...................... 14

*United States v. Salinas*, 918 F.3d 463, 466 (5th Cir. 2019) ................................... 14, 29

*United States v. Shah*, 95 F.4th 328, 383 n.243 (5th Cir. 2024) ................................... 13

*United States v. Shmuckler*, 911 F.Supp.2d 362, 370 (E.D. Va. 2012) .......................... 21

*United States v. Smith*, 417 F.3d 483, 488 (5th Cir. 2005) ........................................... 40

*United States v. Suchowolski*, 838 F.3d 530, 532 (5th Cir. 2016) ................................. 25

*United States v. Thomas*, 973 F.2d 1152, 1159 (5th Cir. 1992) .................................... 14

*United States v. Wilder*, 15 F.3d 1292, 1300 (5th Cir. 1994) ................................... 19, 22

*United States v. Zarco-Beiza*, 24 F.4th 477, 482-83 (5th Cir. 2022) ............................. 30

<u>Statutes</u>

18 U.S.C. § 3553(a)(1) .................................................................................................. 40

18 U.S.C. § 3563 ........................................................................................................... 30

18 U.S.C. § 3571 ........................................................................................................... 19

18 U.S.C. § 3571(d) ........................................................................................ 18, 19, 21, 28

18 U.S.C. § 3572 ........................................................................................................... 19

18 U.S.C. § 3572(a) ...................................................................................................... 18

18 U.S.C. § 3663A ........................................................................................................ 20

18 U.S.C. § 3664(j)(2) ................................................................................................... 38

18 U.S.C. § 3771(a)(8) .................................................................................................... 2

18 U.S.C. § 3771(a)(9) .................................................................................................... 3

18 U.S.C. § 3771(e) ...................................................................................................... 28

18 U.S.C. §3663(a)(1)(A) ........................................................................................... 20

42 U.S.C. § 6928(d) .................................................................................................. 19

Criminal Fine Improvements Act of 1987. Pub. L. 100-185, § 6, 101 Stat. 1280 (Dec. 11, 1987) ................................................................................................................................ 18

<u>Other Authorities</u>

David Shepardson, *Boeing Unauthorized 737 Work Issue Should Have Been Caught Years Earlier, NTSB Says*, REUTERS (Aug. 7, 2024) .......................................................... 7

Dominic Gates, *Why Boeing Pilot Forkner Was Acquitted in the 737 MAX Prosecution*, SEATTLE TIMES (Mar. 25, 2022) ............................................................................................. 6

Gregory Wallace, *Three-Hour Meeting Ends with FAA Saying Boeing Can't Increase Max Plane Production Until Quality is Fixed*, CNN (May 30, 2024) ......................................... 35

Jesus Mesa, *Boeing Agrees to be Branded a Felon. Is It Still Too Big to Fail?*, NEWSWEEK (July 9, 2024) ................................................................................................................... 4

<u>Rules</u>

Fed. R. Crim. P. 11(c)(1)(C) ...................................................................................... 3

Fed. R. Crim. P. 32 (i)(3) ..........................................................................................11

Fed. R. Crim. P. 32.1(b)(2) ....................................................................................... 33

Fed. R. Crim. P. 38(c) ............................................................................................... 39

<u>Treatises</u>

BRANDON L. GARRETT, TOO BIG TO JAIL: HOW PROSECUTORS COMPROMISE WITH CORPORATIONS 284 (2014)................................................................................................................ 32

Peter R. Reilly, *Justice Deferred Is Justice Denied: We Must End Our Failed Experiment in Deferring Corporate Criminal Prosecutions*, 2015 BYU L. REV. 307, 348 n.162 (2015)......... 7

Veronica Root, *"The Monitor-'Client' Relationship,"* 100 VA. L. REV. 523, 539 (2014)............ 34

William W. Wilkins & John R. Steer, *Relevant Conduct: The Cornerstone of the Sentencing Guidelines,* 41 S.C. L. REV. 495, 496 (1990)........................................................... 13

<u>Regulations</u>

Memo. for all Federal Prosecutors, General Department Policies Regarding Charging, Pleas, and Sentencing at 5 (Dec. 16, 2022)............................................................................... 8

U.S.S.G. Chapter 8, Part B........................................................................................ 36

U.S.S.G. § 1B1.3....................................................................................................11

U.S.S.G. § 1B1.3 (a)(1)(A) ...................................................................................... 14, 23

U.S.S.G. § 1B1.3(a)(3)............................................................................................. 14, 23

U.S.S.G. § 2B1.1(b)(16) ........................................................................................... 22

U.S.S.G. § 2B1.1(b)(2)(A)(i) .................................................................. 15, 22

U.S.S.G. § 3E1.1, App. Note 1 ...................................................................11

U.S.S.G. § 8A1.2. ....................................................................................... 17

U.S.S.G. § 8B1, Historical Note ................................................................. 36

U.S.S.G. § 8B1.2. ....................................................................................... 36

U.S.S.G. § 8C2.5. ....................................................................................... 16

U.S.S.G. § 8C2.5(b)(1) ............................................................................... 23

U.S.S.G. § 8C2.5(g)(2) ............................................................................... 23

U.S.S.G. § 8C2.5(g), App. Note 15 ............................................................ 26

U.S.S.G. § 8C4.2. ................................................................................ 15, 22, 24

U.S.S.G. 6B1.4(a)(2) .................................................................................... 8

U.S.S.G., Chpt. 1, Pt. A.1.1 ........................................................................ 17

U.S.S.G., Chpt. VIII, Intro. Comment ....................................................... 13

**REPLY MEMORANDUM OF RECOGNIZED CRIME VICTIMS' FAMILIES NAOISE CONNOLLY RYAN, ET AL. REQUESTING THAT THE COURT NOT ACCEPT THE PROPOSED RULE 11(C)(1)(C) BINDING PLEA AGREEMENT**

Naoise Connolly Ryan et al. (the "victims' families" or "families"), through undersigned counsel, file this reply in support of their motion and supporting memorandum (ECF No. 232 (unredacted) and No. 234 (redacted) ("Families Br.")) asking the Court to reject the proposed plea agreement between the Government and Boeing (ECF No. 222-1).

## INTRODUCTORY STATEMENT

The Government and Boeing ask this Court to accept a binding plea agreement and then to move "immediately" to sentencing Boeing—a sentencing that will not reflect the truth that Boeing's crime directly and proximately killed 346 people. The parties thus place the Court in a take-it-or-leave-it position. Rather than ignore the truth, the Court should "leave it" and reject this rotten plea.

The parties create a distorted record by misleadingly conflating the demanding proof-beyond-a-reasonable-doubt standard used in jury trials with the lower proof-by-a-preponderance-of-the-evidence standard applicable in sentencing proceedings. Under this lesser standard—which controls here—criminal defendants are responsible for all of their "relevant conduct," including all losses caused by their crimes. In this case, the Court has already found that Boeing's lies directly killed 346 people. ECF No. 116 at 16. For the parties, this is the truth that dare not speak its name. But faithfully determining the factual record on which to base Boeing's sentence requires considering these deaths. And with the deaths properly in mind, a host of features in the proposed plea agreement are revealed to be inadequate, such as its misleading guidelines calculations, paltry fine, non-transparent corporate monitor, insufficient remedial measures, and uncertain restitution awards. For all these reasons, the Court should reject the proposed plea.

## THE GOVERNMENT HAS FAILED TO REASONABLY CONFER WITH THE FAMILIES ABOUT THE SPECIFIC TERMS OF THE PLEA AGREEMENT

Before turning to the substantive problems with the proposed plea agreement, the families need to clarify that the Government has failed to reasonably confer with them about the agreement's specific terms. In its brief, the Government recounts various meetings with the victims' families. As the Government describes things, it met with the families "to discuss the terms of *a* plea agreement." Gov't Br. at 6 (emphasis added). But, of course, what the families were entitled to discuss was not *a* plea agreement but rather *the* plea agreement—that is, the specific terms in the agreement that the Government was going to offer to Boeing.

As explained in the families' opening brief, the Government held a purported "conferral" call which merely informed the families of the proposed terms the Government was going to extend to Boeing. Families Br. at 3. The Government also told the family members that the key terms were "non-negotiable." *Id.*[1]

The families suspected that the Government might not actually be extending "non-negotiable" terms to Boeing. *See id*. But this suspicion has now been confirmed, as the Government admits that "[f]rom July 1 to 7, 2024, the Government and Boeing's counsel negotiated over the material terms of the plea offer." *See* Tonolli Dec., ECF No. 245-1, Ex. 1 ¶ 55. The Government's misdirection violated the families' CVRA rights. If the families had known that the Government was offering Boeing negotiable terms, they would have attempted to confer with the Government about those negotiations (Cassell Dec. ¶¶ 35-41), as is their right. The CVRA promises the victims' families a right to be "treated with fairness" by the Government, 18 U.S.C. § 3771(a)(8), and the

---

[1] *See also* Exhibit 1, Declaration of Paul G. Cassell ("Cassell Dec.") ¶¶ 29-41. Because the Government has submitted a declaration regarding its meetings with the families, undersigned counsel has done so as well. But the points recounted above were described in the families' opening brief (Families Br. at 3), and the Government's declaration does not dispute them.

"reasonable right to confer" with prosecutors. It is unfair treatment to prevent a possible change in the course of negotiations by telling the families that no such negotiations would take place. And, of course, denying that negotiations would occur or continue prevented a reasonable conferral. Indeed, in 2008, the Fifth Circuit instructed prosecutors that they should develop a "reasonable way" to "ascertain the victims' views on the *possible details* of a plea bargain." *In re Dean*, 527 F.3d 391, 395 (5th Cir. 2008) (emphasis added). And in 2015, Congress codified *Dean's* holding by adding a CVRA right for victims "to be informed in a timely manner of any plea bargain …." 18 U.S.C. § 3771(a)(9) (emphasis added). The Government's procedural violation of the families' CVRA rights constitutes (yet another) reason for the Court to reject the proposed plea deal.

## REASONS FOR REJECTING THE PROPOSED PLEA AGREEMENT

The Court should exercise its discretion to reject the parties' proposed binding plea agreement because it "is against the public interest in giving the defendant unduly favorable terms." *United States v. Bean*, 564 F.2d 700, 704 (5th Cir. 1977). The Court has "broad discretion" in evaluating the proposed agreement. *See* DOJ Br. at 17. The Government and Boeing contend that discretion argues in favor of accepting the proposed plea. Their arguments are unpersuasive.

### I.  The Court Should Remain Free to Craft an Appropriate Sentence.

The families first raised a procedural objection to the proposed plea: The plea is a "binding" one under Fed. R. Crim. P. 11(c)(1)(C), restricting the Court's discretion to craft an appropriate sentence. Families Br. at 6-11. The families explained that, unlike other standard plea agreements, this C-plea places the Court in a "take it or leave it" position, meaning the public is left in doubt about whether the final outcome is one that was judicially crafted or backroom-negotiated. *Id.* at 10. The families also cited Judge Young's criticism that C-pleas for large corporations create a "forbidden, two-tier system" of justice because companies "get 'C' pleas after closed door

negotiations with the executive branch while individual offenders are rarely afforded the advantages of a 'C' plea." *United States v. Aegerion*, 280 F. Supp. 3d 217, 224-25 (D. Mass 2017).

In response, Boeing implicitly concedes that its expansive legal team negotiated a deal that is not often available to other criminal defendants. Boeing's 34-page brief does not spend even a single sentence justifying the C-plea approach. Perhaps the "two-tier system of justice" is so painfully obvious that a major corporation could say little in its defense. Almost every Friday, this Court sentences individual defendants, many of modest means, who do not receive C-pleas. For example, this morning, this Court was scheduled to sentence Ms. Eloisa Lopez Lizarraga, who is facing up to twenty years in prison for conspiracy to distribute fentanyl. *See U.S. v. Lopez Lizarraga*, No. 4:24-cr-081-O. Boeing gets a C-plea but no C-plea for her. Why not? That is the lingering question that the public will invariably have if Boeing's special deal goes through.

To its credit, the Government attempts to explain why it gave Boeing a binding agreement not commonly available to other defendants. Boeing, we are told, may have investors and customers who have played no role in Boeing's crime. DOJ Br. at 20-21. It is hard to improve on Judge Young's response: "Say what? … Does [Boeing] think district judges simply are not competent to sentence corporate criminals? Or is it that the interests of drug dealers' innocent [spouses], children, neighbors, and colleagues are somehow less important than those of a corporation's shareholders and investment bankers?" *Aegerion*, 280 F. Supp. 3d at 223.[2]

---

[2] The Government also briefly raises the notion Boeing may face "non-penal sanctions," such as potential "debarment from eligibility for government contracts." DOJ Br. at 21. But the Government fails to disclose the status of Boeing's presumed requests to be exempted from all such debarment requirements—requests that no doubt the Government will grant. *See* Jesus Mesa, *Boeing Agrees to be Branded a Felon. Is It Still Too Big to Fail?*, NEWSWEEK (July 9, 2024) (quoting aviation expert that "[i]f it was anybody else who broke the rules, there would be no question [of debarment]. But [Boeing] is not everybody else."), available at https://www.newsweek.com/boeing-convicted-felon-plea-deal-too-big-fail-1922536. To be clear, the families do not seek debarment of Boeing—only a just sentence.

The Government also fails to recognize a fundamental inconsistency in its position that a C-plea is needed here. On the one hand, to justify the C-plea, the Government initially argues that tying the Court's hands is required to "manage" the "risks … of substantial unwarranted collateral consequences" to Boeing's stakeholders (DOJ Br. at 21)—that is, to "manage" the "risk" that this Court would impose more severe sanctions than the parties believe are appropriate. But then, later in its brief, the Government argues that the Court need not ensure an accurate Sentencing Guidelines calculation because the plea deal already "secures the maximum punishment available under the law." DOJ Br. at 29. Which is it? The truth, of course, is that the Government and Boeing do not want to run the risk that the Court may craft a different sentence than the cozy terms they have come up with—particularly since this Court has been plain-spoken about Boeing's crime being the "deadliest corporate crime in U.S. history." ECF No. 185 at 25.

Unable to mount a convincing case for a C-plea, the Government quickly moves to the issue of "litigation risk" should this case go to trial. DOJ Br. at 11-12. Of course, such an argument could only justify *a* plea deal, not a *binding* plea deal. And, in any event, the "litigation risk" argument is unconvincing.

A trial of Boeing, we are told, "would in *all material respects*, be a repeat of the prior trial" of Boeing test pilot Mark Forkner, which the Government lost. *Id.* at 10 (emphasis added). A repeat in "all material respects"?! In a trial of Boeing, the prosecutors would have Boeing's signed *confession* to its crime. *See* Cassell Dec. ¶¶ 9-25. In its DPA, Boeing admitted to a 54-paragraph statement of facts covering all elements of the conspiracy charge against it. *Id.* ¶ 10 (citing DPA ¶ 2). Boeing's confession was signed by its CEO, Chief Legal Officer, and lawyers. Cassell Dec. ¶¶ 11-12. The Government had no such confession evidence against Forkner. *Id.* ¶ 21. And, for good measure, in a trial of Boeing, the Government could—and should—simply call a Boeing executive

to admit the company's guilt. Unlike Forkner, Boeing has no Fifth Amendment right against self-incrimination. *Id.* ¶ 24 (citing *Braswell v. United States*, 487 U.S. 99 (1988)).

Moreover, the conventional understanding of the Forkner verdict is that the jury acquitted him because he was seen as just a "fall guy." *See* Dominic Gates, *Why Boeing Pilot Forkner Was Acquitted in the 737 MAX Prosecution*, SEATTLE TIMES (Mar. 25, 2022) (noting "experts within the aviation community have long seen Forkner as a fall guy").[3] Professor John Coffee, director of the Center on Corporate Governance at Columbia Law School, concurs that the Government's effort to convict Forkner alone was "quickly repudiated by the jury, which viewed [him] as an innocent pawn in this game."[4] Attorneys for Forkner could present this "fall guy" argument, but it would be unavailable to attorneys for The Boeing Company—one of the world's largest companies. Cassell Dec. ¶ 22. Thus, the past trial of a lower-level "fall guy" (who did not confess) and a potential future trial of Boeing (which has confessed) would clearly be different in "material respects." *See id.* ¶¶ 9-20. And the outcomes would presumably be different. *Id.* ¶¶ 21-25.

Boeing also tries to conjure up "litigation risk" to justify the generous terms it has received. Boeing Br. at 16. Should the Government dare to take it to trial, Boeing threatens to retaliate by moving to dismiss the conspiracy charge because, supposedly, it never breached its DPA. *Id.* at 16-17. Has a saber-rattling threat ever been so hollow? Boeing neglects to mention that in its DPA—signed by its CEO, Chief Legal Officer, and lawyers—Boeing specifically agreed that the "[d]etermination of whether the Company has breached the Agreement and whether to pursue prosecution of the Company … *shall be in the Fraud Section's **sole** discretion*." DPA ¶ 26

---

[3] Available at https://www.seattletimes.com/business/boeing-aerospace/why-boeing-pilot-forkner-was-acquitted-in-the-737-max-prosecution/.

[4] John C. Coffee, Jr., *Nosedive: Boeing and the Corruption of the Deferred Prosecution Agreement* 16 (May 6, 2022), available at
 https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4105514.

(emphases added). If Boeing really wanted to push this procedural challenge, it could raise it—and raise it right now. No doubt the reason Boeing only threatens to raise the objection later is because, if it did so, Boeing would be breaching its own DPA obligations by challenging the "sole discretion" of the Fraud Section it specifically agreed to in the DPA.[5]

Any argument from Boeing that it fully complied with its DPA obligations would also force it to explain why a door plug recently blew out of a brand-new 737 MAX-9 in midair because the bolts intended to hold the door plug in place had not been installed. Indeed, just two weeks ago, the head of the National Transportation Safety Board (NTSB) said during highly publicized hearings that the Alaska Air Flight 1282 "mid-air emergency was entirely avoidable" because Boeing "should have addressed unauthorized production work long ago." David Shepardson, *Boeing Unauthorized 737 Work Issue Should Have Been Caught Years Earlier, NTSB Says*, REUTERS (Aug. 7, 2024).[6] And, as the families pointed out in their earlier filing asking the Court to immediately appoint a corporate monitor, new concerns about Boeing's safety and compliance measures are being raised on an almost daily basis. ECF No. 202 at 6-13. Against that backdrop, Boeing's saber-rattling is revealed to be an empty threat.

---

[5] The case that Boeing cites as support for pursuing litigation involved an "informal" oral promise by prosecutors that, if a defendant disclosed everything he knew about a crime, they would not prosecute him. *United States v. Castaneda*, 162 F.3d 832, 834 (5th Cir. 1998). In interpreting that promise, the Fifth Circuit underscored that non-prosecution agreements are "contractual in nature" and that the informal oral agreement impliedly contained a judicial review requirement for any breach determination. *Id.* at 835-36. Here, of course, Boeing's formal contract (the DPA) specifically sets out that the breach determination is solely in the Government's hands—so the breach determination is explicitly made non-reviewable as part of the contractual bargain that Boeing struck. *See* Peter R. Reilly, *Justice Deferred Is Justice Denied: We Must End Our Failed Experiment in Deferring Corporate Criminal Prosecutions*, 2015 BYU L. REV. 307, 348 n.162 (2015) ("[M]ost DPAs include a provision giving the government the *exclusive and non-reviewable* right to determine whether a breach … has occurred" (emphasis in original)).

[6] Available at https://www.reuters.com/business/aerospace-defense/us-safety-board-scrutinize-faa-oversight-boeing-2024-08-07/.

In sum, this case is particularly poorly suited for resolution through a C-plea. It is undisputed that this case proceeds against the backdrop of an illegally negotiated DPA and Boeing's breach of its obligations (Families Br. at 8-9)—despite both the Government and Boeing reporting to the Court that nothing was amiss. The Court need not reject all C-pleas in all circumstances[7] to conclude that the public will lack confidence in the outcome here if it is dictated through a C-plea. For this reason alone, the Court should reject the deal.

## II. The Parties Have "Swallowed the Gun" By Not Disclosing All Relevant Facts About Boeing's Culpability.

Turning from form to substance, the families explained in their opening brief that the facts underlying the plea deal are incomplete and misleading. Families Br. at 11-17. The families noted that it has long been Justice Department policy that "[w]hen advocating at sentencing, prosecutors must fully and accurately alert the court *to all known relevant facts* ...." Memo. for all Federal Prosecutors, General Department Policies Regarding Charging, Pleas, and Sentencing at 5 (Dec. 16, 2022) (emphasis added).[8] And this Court has recognized that facts offered in support of a plea must be subject to judicial scrutiny because "sentencing is a judicial function .... Thus, under the Guidelines parties may not enter into stipulations of misleading or non-existent facts ... [but must instead] 'fully and accurately disclose all factors relevant to the determination of sentence.'" *United States v. Phillips*, 730 F. Supp. 45, 48–49 (N.D. Tex. 1990) (internal quotations to U.S.S.G. 6B1.4(a)(2) (policy statement)).

---

[7] Sometimes C-pleas are used to reach a binding agreement on a specific issue where the parties might be expected to have greater familiarity than the Court regarding that one particular issue. Such focused use of a C-plea may well be justified. But the C-plea here is effectively all-encompassing—if the Court signs off, the agreement mandates essentially all the significant components of Boeing's sentence.

[8] Available at https://www.justice.gov/d9/2022-12/attorney_general_memorandum_-_additional_department_policies_regarding_charges_pleas_and_sentencing_in_drug_cases.pdf.

The families recognized that they were making a strong allegation about a misleading factual record. And so, the families provided numerous illustrations of how the parties' carefully curated Statement of Facts obscured and minimized Boeing's true culpability. *See* Families' Proposed Alternative Statement of Facts, ECF No. 232, Ex. 1. The families wondered whether, in response, the parties would attempt to reassure the Court that their agreement presented "all known relevant facts" that would bear on Boeing's sentence. But, remarkably, the parties did not.

Instead, the parties insist that relevant facts at sentencing must be filtered through a proof-beyond-a-reasonable-doubt standard. The Government asserts that after reviewing all the evidence, it has "determined that the criminal conduct it can prove Boeing committed *beyond a reasonable doubt*—and the attendant pecuniary gross gain—is presented in the Criminal Information and the Statement of Facts accompanying the Agreement." DOJ Br. at 24 (emphasis added); *see* DOJ Br. *passim* (using the phrase "beyond a reasonable doubt" fifteen times). And Boeing likewise relies on this standard. Boeing Br. at 3 ("the statement of facts includes those facts, including the gain to Boeing from the charged offense, that the government assesses it can prove beyond a reasonable doubt").

Proof beyond a reasonable doubt is, of course, a very high standard. But it is used at criminal trials, not sentencings. When developing a record for sentencing, the applicable standard is by a preponderance of the evidence. *See, e.g., United States v. Nava*, 957 F.3d 581, 588 (5th Cir. 2020) ("it is well-settled ... that a district court may increase a defendant's sentence under the Sentencing Guidelines [within the statutory maximum] based on facts found by the court by a preponderance of the evidence ...."); *United States v. Rhine*, 583 F.3 878, 885 n.13 (5th Cir. 2009) (in imposing sentence the district court "can consider a broad range of conduct" and "is not limited solely to the conduct for which the defendant is being sentenced" (internal quotation omitted)).

Here, the parties ask the Court to adopt their proposed C-plea with its mandated *sentence* based on a factual record restricted to what could be proven *at trial*. This is an obvious mismatch, improperly limiting evidence of Boeing's culpability. Thus, to reject the proposed binding plea, this Court need not find that the parties have "swallowed the gun" in the sense of deliberately concealing evidence. Instead, the Court could simply conclude that the parties are using the incorrect standard of proof for their factual recitation in a plea agreement that also incorporates a mandated sentence.

Boeing points out that the families "cite no case in which a court rejected a proposed plea agreement due to the scope of its statement of facts." Boeing Br. at 12. True enough—but presumably that is because no other case is like this one, with the parties pressing on the Court an airbrushed set of facts demonstrably at odds with the on-the-ground truth. And most pleas are not C-pleas incorporating a mandated sentence. The parties' approach forces the Court, when determining whether to accept their proposed agreement, to simultaneously determine whether its follow-on sentence is appropriate. Indeed, in most cases resolved by plea or otherwise, the Court's probation office will prepare a pre-sentence report that carefully reviews the relevant factual record. Here, in contrast, the parties ask for "a sentencing by the Court *immediately* following the Rule 11 hearing in the absence of a PSR." Proposed Plea Agreement ¶ 27 (emphasis added).

Boeing also complains that "none of [the families'] alleged facts have actually been established—even at a lower standard of proof—in any court of law." Boeing Br. at 13. Again, true enough—so let's have at it. As Boeing acknowledges in its brief, the families have relied on such presumptively reliable sources as congressional reports, SEC findings, and internal emails between Boeing employees revealed through civil discovery. *See* Boeing Br. at 13-14. The families also offered to confer with Boeing (and the Government) regarding any disputes. Families' Alternative Statement of Facts at 44. Boeing didn't take up the offer. If Boeing wants this "court of law" to

make factual findings regarding the accuracy of the families' facts, then Boeing should just deny them—and the Court will then order the preparation of a pre-sentence report and rule on factual disputes as they arise. *See* Fed. R. Crim. P. 32 (i)(3) (providing that the court can resolve any disputed facts at sentencing).

The families are confident that Boeing won't deny any of the families' facts because any denials would forfeit Boeing's opportunity to receive credit for accepting responsibility. Boeing claims that "[t]he acceptance of responsibility reduction under the guidelines … is limited to accepting responsibility for the *criminal offense*." Boeing Br. at 25 (emphasis in original). But Boeing ignores the Guidelines' expansive provisions regarding "relevant conduct" related to the criminal offense. *See generally* U.S.S.G. § 1B1.3 (describing how "relevant conduct" extends beyond just the charged offense). And then, under the Guidelines' provision directly covering acceptance of responsibility, a defendant can receive such credit only if it has "not falsely den[ied] any additional relevant conduct for which the defendant is accountable under §1B1.3." U.S.S.G. § 3E1.1, App. Note 1. For Boeing to falsely deny the relevant conduct that the families recount would mean the company would no longer be accepting responsibility under the Guidelines.

Moreover, the facts that the families present in their Proposed Alternative Statement of Facts cannot be reasonably disputed. They include:

- As early as 2012, one of Boeing's own test pilots had failed to recover from uncommanded MCAS activation that led to runaway stabilizer trim in a flight simulator. This was a fundamentally important event that Boeing chose not to share with the FAA or its MAX customers (Proposed Alternative Statement of Fact #52k);

- █████████████████████████████████████████████████████████
  █████████████████████████████████████████████████████████
  █████████

- After the Lion Air flight, Boeing's CEO Muilenburg told Boeing's PR team that "[we] need to start playing some offense" and, per that direction, Boeing's press releases about the Lion Air crash no longer mentioned development of an "MCAS software update" and also

falsely stated that Boeing's customers and passengers "have [Boeing's] assurance that the 737 MAX is as safe as any airplane that has ever flown the skies" (*id.* at # 52ae & #ai);



- Once Boeing was made aware of the Justice Department's Fraud Section's criminal investigation into the circumstances surrounding the 737 MAX and MCAS, Boeing delayed its cooperation with that investigation and only began cooperating after the first six months of the investigation. During those six months, the Company's response frustrated the Fraud Section's investigation (ECF No. 4 at ¶ 4(c)).

In sum, all the families seek is a transparent and thorough adjudication of the facts surrounding this case. Like other crime victims, the families turn to this Court not only for justice but also for some understanding of the crime—that is, how Boeing's lies killed their loved ones. The parties may want this Court to decide the sentence based on curated facts minimizing Boeing's culpability. But this Court should not sign on. Because this Court has an incomplete factual record on which to assess the sentence that the binding plea dictates, this Court should reject it.

### III. The Proposed Agreement Fails to Hold Boeing Accountable for Its Relevant Conduct of Causing the Deaths of 346 Victims.

The most important illustration of how the parties' proof-beyond-a-reasonable-doubt filter distorts the record is the plea agreement's failure to hold Boeing accountable for causing 346 deaths. *See* Families Br. at 17-19. As this Court has previously found, "Boeing's crime may

properly be considered the deadliest corporate crime in U.S. history." ECF No. 185 at 25 (recounting earlier finding, ECF No. 116 at 16, that Boeing "directly and proximately" killed 346 people by lying to the FAA). The families objected to a plea deal (and incorporated sentencing guidelines calculation) that ignores these deaths.

In response, the parties profess sympathy for the families' losses. DOJ Br. at 4; Boeing Br. at 2. But with those inconvenient preliminaries out of the way, the parties set to the task of justifying an agreement that entirely overlooks the deaths. Earlier in the CVRA "victim" proceedings, this Court swept away the parties' efforts to block consideration of the staggering toll from Boeing's crime. ECF No. 116 at 16. Likewise, when crafting an appropriate sentence, the Court should not be blocked from relying on all the facts surrounding the crime.

The Government claims to lack "evidence that could prove beyond a reasonable doubt that Boeing's fraud caused" the deaths of 346 people. DOJ Br. at 4. And Boeing quickly ducks behind this cover. Boeing Br. at 15. But as just explained in the previous section, when imposing a sentence, the Court must hold a defendant accountable for all conduct proven by a preponderance of the evidence. Indeed, as discussed below (*see* Part VII, *infra*), the fundamental tenet of corporate sentencing is that the sentence must respond to "any harm caused by the offense." U.S.S.G., Chpt. VIII, Intro. Comment.

The parties attempt to make 346 deaths vanish by ignoring the broad reach of "relevant conduct," a concept that is "the 'cornerstone' of the Guidelines." *United States v. Carreon*, 11 F.3d 1225, 1232 (5th Cir. 1994) (citing William W. Wilkins & John R. Steer, *Relevant Conduct: The Cornerstone of the Sentencing Guidelines,* 41 S.C. L. Rev. 495, 496 (1990)). When sentencing a defendant, a district court "must consider a defendant's relevant conduct." *United States v. Shah*, 95 F.4th 328, 383 n.243 (5th Cir. 2024) (quoting *United States v. Thomas*, 973 F.2d 1152, 1159

(5th Cir. 1992)). And when determining relevant conduct, a court must review a defendant's criminal acts and omissions and determine "all harm that resulted from" those acts and omissions. *See* U.S.S.G. § 1B1.3(a)(3) & (a)(1)(A). As the Fifth Circuit has explained, the broad language "resulted from" in the relevant conduct guideline means that, to establish a link between a crime and a resulting harm, only "but for" causation needs to exist. *See United States v. Ramos-Delgado*, 763 F.3d 398, 402 (5th Cir. 2014). And proving such but-for causation is "not a difficult burden to meet." *Id*. As multiple Fifth Circuit decisions have emphasized, for resulting harm to be part of relevant conduct, it does not matter that the harm "was unforeseeable to the defendant or only tenuously connected to the defendant's conduct." *United States v. Salinas*, 918 F.3d 463, 466 (5th Cir. 2019) (holding that heart attack death of alien while defendant transporter was fleeing from law enforcement was harm resulting from the crime); *see also United States v. Ruiz-Hernandez*, 890 F.3d 202, 207-08 (5th Cir. 2018) (holding that drowning death of alien caused by Coast Guard cutter while alien was being transported by defendant was harm resulting from the crime).

Here, after two days of evidentiary hearings and an opportunity for the Government and Boeing to present counter-evidence, this Court concluded that Boeing's conspiracy directly and proximately resulted in two deadly crashes. *See* ECF No. 116 at 15. The Government says it "respects and does not challenge the Court's prior determination on direct and proximate causation." DOJ Br. at 3.[9] And Boeing "respectfully recognizes" the Court's ruling, while attempting to preserve its right to appeal. Boeing Br. at 3 & n.3. But at this point in the proceedings,

---

[9] Yet elsewhere in its brief, the Government attempts to throw shade on the Court's ruling by mentioning that the families' experts were not subject to *Daubert* scrutiny. DOJ Br. at 3 n.3. But "neither the Government nor Boeing made a formal *Daubert* objection, despite ample opportunity" to do so. ECF No. 116 at 2 n.1. And in any event, at sentencing, *Daubert* is inapplicable. *See United States v. Fields*, 483 F.3d 313, 342 (5th Cir. 2007) ("No Circuit that we are aware of has applied *Daubert* to sentencing.").

this Court's earlier "victim" finding is the well-settled law of the case, as the Fifth Circuit has effectively adopted the ruling.[10] In any event, this Court's earlier finding in this very case obviously controls at Boeing's sentencing and goes above the required level of proof for relevant conduct. Under the relevant conduct provision, "proximate or legal causation is not required ...." *Ramos-Delgado*, 763 F.3d at 402. And this Court has held that "a direct chain of causation" exists between Boeing's crime and the two crashes. ECF No. 116 at 15.

Because the 346 deaths are part of Boeing's relevant conduct, the deaths must be reflected in Boeing's sentence. For example, in determining the scope of the monitor (Part VI, *infra*), the remedial remedy for the crime (Part VII, *infra*), and the scope of full restitution (Part VIII, *infra*) the Court must consider the deaths. And, in addition, when making a "faithful application" of the Sentencing Guidelines (Proposed Plea Agreement ¶ 24), the Court must add a Specific Offense Characteristic for Boeing's crime "involv[ing] 10 or more victims." U.S.S.G. § 2B1.1 (b)(2)(A)(i). Likewise, the fact that Boeing's crime directly and proximately killed 346 people means that the Court should depart upward from the applicable Guidelines. *See* Families Br. at 18 (citing U.S.S.G. § 8C4.2 (risk of death) (policy statement) ("[i]f the offense resulted in death ... or involved a foreseeable risk of death or bodily injury, an upward departure may be warranted")).

In sum, the parties ask the Court to endorse an offensive fallacy—that the Court should sentence Boeing without regard to the deadly consequences of its crime. If the Court proceeds this way, it would obviously undermine "the statutory purposes of sentencing" and "the sentencing

---

[10] In the Fifth Circuit appellate proceedings brought by the families, Boeing argued at length that this Court's "victim" ruling was incorrect. *See* Boeing's Resp. to Mandamus Petition at 26-30, *In re Ryan*, No. 23-10168 (5th Cir. Mar. 27, 2023). The Fifth Circuit necessarily rejected Boeing's argument in holding that "the *victim's families* should have been notified of the ongoing [DPA] discussions and should have been allowed to communicate meaningfully with the government ...." *In re Ryan,* 88 F.4th 614, 626-27 (5th Cir. 2023) (emphasis added).

guidelines." *Smith*, 417 F.3d at 487 (5th Cir. 2005). Indeed, ignoring the 346 passengers and crew who perished because of Boeing's lies would be morally reprehensible. The Court should reject the disingenuous plea agreement for this reason alone.

### IV. The Proposed Agreement Inappropriately and Surreptitiously Exonerates Boeing's Then-Senior Leadership.

The families also described in their opening brief how the proposed plea agreement contains, buried within its Guidelines calculations, a provision effectively exonerating Boeing's then-senior leadership from criminal culpability. Families Br. at 19-21 (discussing U.S.S.G. § 8C2.5). The families then explained that absolving Boeing's executives would be inappropriate without a full recounting of what they actually did. *Id.*

In response, the parties employ the same dodge: They claim that the Government cannot prove Boeing's C-suite involvement in the conspiracy by proof beyond a reasonable doubt. DOJ Br. at 22-23. But that dodge won't work. It was the Government (and Boeing) who presented to this Court a proposed plea deal with a Sentencing Guidelines calculation regarding the executives baked into it. *See* Proposed Plea Agreement ¶ 24. And part of that proffered calculation was that only mid-level Boeing executives were involved. *See* Proposed Plea Agreement at ¶ 24(d) – (b)(4) (discussed in Families Br. at 20-21). The parties are now asking the Court to approve that plea agreement with only a mid-level executive enhancement. And, as just explained in the previous two sections, the Court makes Sentencing Guidelines calculations based on a preponderance of the evidence and against the backdrop of all of a defendant's relevant conduct. *See* Parts II & III, *supra*. Thus, because of the way the parties have proceeded, this Court must necessarily decide whether only the limited mid-level executive enhancement is accurate—or whether the conspiracy reached all the way to Boeing's C-suite.

To be clear, the families are not asking "the Government to charge and prosecute a different conspiracy case." DOJ Br. at 23. All the families seek is a full review of the relevant conduct surrounding *this* conspiracy case, which the Government has already charged and is presenting to this Court for a plea and sentencing. In imposing its sentence, this Court should not ignore the truth: Boeing's senior executives were involved in the conspiracy. *See generally* ECF 232.1, Ex. 1, Families' Proposed Alternative Statement of Facts. In their opening brief, the families suggested that, at the very least, before signing off on a C-plea resting on the stipulated fact that Boeing's C-suite was uninvolved, the Court should require the Government to marshal the relevant evidence. Families Br. at 21. The families submitted that if the Government were to disclose all its evidence, it would require a five-level enhancement under the Guidelines reflecting that at least one of Boeing's senior executives, at a minimum, had "condoned" or was "willfully ignorant" of the offense. *Id.* (citing U.S.S.G. § 8A1.2). The Government fails to respond to the families' challenge.

Boeing's only specific response is that, in the DPA in 2021, the Government stipulated that Boeing's crime was not facilitated by Boeing's senior management. Boeing Br. at 5. But as the families noted in their opening brief, the Government has removed that get-out-of-jail-free card from the current agreement. Families Br. at 19. And what the parties collusively (and illegally) negotiated in the 2021 DPA cannot control in these later proceedings, particularly against the backdrop of the fundamental principle of "honesty in sentencing." U.S.S.G., Chpt. 1, Pt. A.1.1.

In sum, as presented to the Court, the plea agreement contains an unfounded, conclusory assessment that no member of Boeing's senior leadership was involved in the conspiracy, or even that an executive "condoned" or was "willfully ignorant of" the offense. Families Br. at 21. Because that assessment is unsupported and unjustified, the Court should reject the agreement.

**V. The Proposed Agreement Rests on an Inadequate Fine and Misleading Guidelines Calculations.**

The Court should also reject the plea agreement because the parties' proposed $487.2 million fine is inadequate—or, at the very least, rests on misleading and inaccurate accounting. The Alternative Fines Statute authorizes a much larger fine, a fact that the Court must consider.[11] Nothing in the Supreme Court's *Southern Union* decision restricts the Court's ability to impose a bigger fine, because *Southern Union* is not controlling here. And even if the decision were controlling, the Court could impose a much more significant fine than $487.2 million.

### A. On the Facts of this Case, *Southern Union* Does Not Restrict the Court's Ability to Impose a Fine Based on Quantifying the Losses to the Victims' Families or Assessing the Gains Derived by Boeing.

In their opening brief, the families explained that under the Alternative Fines Provision, 18 U.S.C. § 3571(d), Boeing is subject to a fine of twice the "gross gain" or twice the "gross loss" from its crime. Families Br. at 21-30. In response, the parties concede that the Alternative Fines Provision applies. But the parties contend that, under *Southern Union v. United States*, 567 U.S. 343 (2012), Boeing's Sixth Amendment right to jury factfinding by proof beyond a reasonable doubt precludes any fine larger than $487.2 million. DOJ Br. at 28-30; Boeing Br. at 21-23.

Section 3571(d) presupposes judicial determinations of the amount of a fine. Congress enacted § 3571(d) in 1987 as part of the Criminal Fine Improvements Act. Pub. L. 100-185, § 6, 101 Stat. 1280 (1987). Of course, 1987 was before *Apprendi v. New Jersey*, 530 U.S. 466 (2000), and its progeny, *Southern Union*. Accordingly, when Congress enacted § 3571(d), it followed the then-standard practice of allowing judges to determine the size of fines. *See* 18 U.S.C. § 3572(a) (setting out factors "*the court* shall consider" in imposing a fine (emphasis added)). And follow-

---

[11] The families have reasonably calculated maximum possible fines of billions of dollars. To be clear, at this juncture, the families' limited point is that the Court must consider these maximum possible fines as part of its sentencing determination. Whether the Court should actually impose that maximum fine would require an assessment of the other parts of the sentence.

on Fifth Circuit authority interpreting the statute holds that judges are empowered to quantify the size of the gross gain or loss from a crime when imposing a fine. *See, e.g., United States v. Wilder*, 15 F.3d 1292, 1300 (5th Cir. 1994)) (approving district court factfinding for a $2 million fine based on a "gain" calculation under § 3571); *see also United States v. Beard*, 913 F.2d 193, 200 (5th Cir. 1990) (holding "it is up to the sentencing court to define the term ['gain' in § 3571] as it applies to the particular case under consideration.").

While the parties concede that §§ 3571 and 3572 allow judges to quantify loss or gain as part of imposing a fine, they then argue that *Southern Union* imposes a constitutional requirement for a jury finding on such quantification. But the support for the parties' position is vanishingly thin. The Government cites *United States v. Elliott*, 600 F. App'x 225 (5th Cir. 2015) (cited in DOJ Br. at 11). But the unpublished *Elliott* decision involves not a fine but rather restitution, to which *Southern Union* does not even apply. 600 F. App'x at 227. Boeing's analysis is similarly sparse. Boeing cites *Southern Union* and two out-of-Circuit cases pre-dating the decision. Boeing Br. at 22. But Boeing makes no real effort to analyze how *Southern Union*'s holding applies to § 3571(d).

On closer analysis, it would be dubious to apply *Southern Union* to an alternative fine determination on the facts of this case. To be sure, as background to its holding, *Southern Union* observes that some statutes (such as § 3571) set losses calculated with reference to particular facts and that "the animating principle" of *Apprendi* is that juries should find the facts necessary to impose punishment. 567 U.S. at 349-50 & n.4. But in *Southern Union*, the Court considered a Resource Conservation and Recovery Act (RCRA) provision, which allowed a criminal fine of not more than $50,000 "*for each day of violation.*" *Id.* at 352 (citing 42 U.S.C. § 6928(d) (emphasis added)). As *Southern Union* explains, under that statute, the fact that would "ultimately determine the maximum fine Southern Union faces  is  the  number  of  days  the  company  violated  the

statute. Such a finding is not fairly characterized as *merely 'quantifying the harm'* Southern Union caused. Rather, it is a determination that for each given day, the Government has proved that Southern Union committed all of the acts constituting the offense." 567 U.S. at 359 (citing Br. for the U.S. at 25) (emphasis added). Thus, *Southern Union*'s holding hinges on factfinding involving "the number of days" that the defendant violated the statute—factfinding involving the duration of the crime. The holding could not and does not cover other, narrower statutes because such statutes were not before the Court.[12] And, importantly, *Southern Union*'s holding specifically distinguishes sentences involving "merely quantifying the harm" from an already proven crime.

A simple example will illustrate *Southern Union*'s limits. Assume that a defendant robs a bank, escaping with $2 million. He is charged with federal bank robbery. A jury finds him guilty of robbery without specifying how much he took. At sentencing, under *Southern Union*, it would be entirely appropriate for the district judge—based on information from the victim bank (among other things)—to conclude that the loss to the bank was $2 million. Indeed, at sentencing, the district judge would be required to determine, for purposes of awarding restitution, how much loot the robber stole. And, as the Fifth Circuit has repeatedly held, such restitution determinations are not covered by *Apprendi* (or *Southern Union*).[13] Thus, a district court would award $2 million in

---

[12] Also, because the precise scope of *Apprendi*'s holding remains controversial, it should not be given an expansive reading. *See, e.g., Hester v. United States*, 139 S. Ct. 509 (mem) (2019) (Alito, J., concurring in the denial of certiorari) (noting that "fidelity to original meaning counsels against further extension of these suspect precedents" such as *Apprendi*).

[13] *See, e.g., United States v. Caudillo*, __ F.4th __, 2024 WL 3688472 (5th Cir. Aug. 7, 2024) ("it is settled in this circuit that *Apprendi*'s requirements do not apply to non-mandatory-minimum restitution awards under 18 U.S.C. §§ 3663A and 3663(a)(1)(A)); *accord United States v. Petras*, 879 F.3d 155, 169 (5th Cir. 2018); *United States v. Rosbottom*, 763 F.3d 408, 419-20 (5th Cir. 2014); *United States v. Read*, 710 F.3d 219, 231 (5th Cir. 2012) (per curiam); *see also United States v Thomas*, 2024 WL 706205 at *3 n.2 (11th Cir. Feb. 21, 2024) (noting that "numerous sister circuits … support our conclusion that *Apprendi* is inapplicable to restitution orders").

restitution to the bank to cover its loss. And once the district court has determined in awarding restitution that the bank lost $2 million, it would be odd to say that the district court could not use exactly the same amount to set a fine. Imposing a $2 million fine would be "merely quantifying the harm" from an already proven bank robbery, as described by *Southern Union*. Thus, a defendant's Sixth Amendment rights would be protected since the fine determination would be based on a jury's determination of "particular facts" (567 U.S. at 349)—i.e., that the facts that the defendant robbed the bank and escaped with the loot.[14]

Applying these principles here, the parties are proposing a plea agreement in which Boeing would plead guilty to its conspiracy crime of defrauding the FAA. The question then becomes merely one of "quantifying the harm" from Boeing's admitted crime—or, similarly, quantifying the gain from that admitted crime. Such mechanical calculations of the ramifications of an admitted crime fall outside *Southern Union*'s holding.[15]

Because *Southern Union* did not reach the issue of "quantifying the harm," this case is controlled by statute (§ 3571(d)) and binding Fifth Circuit caselaw interpreting that statute. As noted above, § 3571(d) contains no jury determination requirement. And controlling Fifth Circuit

---

[14] In addition, "[r]estitution carries with it no statutory maximum; it's pegged to the amount of the victim's loss. A judge can't exceed the non-existent statutory maximum for restitution no matter what facts he finds, so *Apprendi* [is] not implicated." *United States v. Green*, 722 F.3d 1146, 1150 (9th Cir. 2013). Of course, exactly the same is true with the Alternative Fines Provision—it is impossible to set a fine amount exceeding the statutory maximum. So, for this reason as well, *Southern Union* does not limit the size of fines under the Alternative Fines Provision.

[15] In addition, Boeing has yet to plead guilty and is now clearly on notice as to the size of the fine the Court might impose. The *Apprendi* line of cases is concerned about "a criminal justice regime 'in which a defendant, with no warning in either his indictment *or plea*, would routinely see his maximum potential sentence balloon ....'" *United States v. Shmuckler*, 911 F.Supp.2d 362, 370 (E.D. Va. 2012) (quoting *Blakley v. Washington*, 542 U.S. 296, 311-12 (2004) (emphasis added)). The Court could entirely dispel any possible *Southern Union* issue in this case by simply warning Boeing in advance of its plea. *Cf. Southern Union*, 567 U.S. at 346-47 (defendant made aware of possible fine range only after guilty verdict at trial).

precedent agrees judges can quantify the size of the harm and the fine. *See United States v. Wilder*, 15 F.3d 1292, 1300 (5th Cir. 1994); *United States v. Beard*, 913 F.2d 193, 200 (5th Cir. 1990). These Fifth Circuit cases create the law of the Circuit, which this Court could ignore only if *Southern Union* explicitly overruled them. *See Martinelli v. Hearst Newspapers, LLC.*, 65 F.4th 231, 234 (5th Cir. 2023) ("For a Supreme Court decision to change our circuit's law, it must unequivocally overrule prior precedent" (cleaned up)). But in the context of merely quantifying the harm from a proven crime, *Southern Union* did not implicitly overrule these cases, much less "explicitly" do so. *Southern Union* does not impose a cap on Boeing's fine on the facts of this case.

### B.  Quantification of the Harm and Gain from Boeing's Crime Results in a Much Larger Maximum Possible Fine Than the Parties' Admit.

It is easy to understand why the parties so desperately want *Southern Union* to provide a cap on Boeing's fine—and a cap to which they can conveniently agree (*see* the next section, below). Without a cap, the Government and Boeing would be left to explain how they assess the "losses" from the deadliest corporate crime in U.S. history. For the Government, this would be particularly embarrassing. If we understand the Government's position correctly, it believes that loss was zero—as the Government fails to report any loss figure either in the Statement of Facts or in its brief.

The families explained in their opening brief obvious mistakes in the parties' Guidelines calculations, including not just the absence of realistic loss and gains calculations but also:

- Failure to include a multiple-victim specific offense characteristic under U.S.S.G. § 2B1.1(b)(2)(A)(i), discussed in Families Br. at 33;

- Failure to recognize that Boeing's offense involving a conscious or reckless risk of death under U.S.S.G. § 2B1.1(b)(16), discussed in Families Br. at 33;

- Failure to mention the possibility of an upward departure for hundreds of deaths under U.S.S.G. § 8C4.2 (policy statement), discussed in Families Br. at 25;

- Erroneously giving Boeing credit for accepting responsibility under U.S.S.G. § 8C2.5(g)(2), discussed in Families Br. at 32; and

- Deceptively concealing Boeing's C-suite's culpability under U.S.S.G. § 8C2.5(b)(1), discussed in Families Br. at 20.

In response, the parties offer nothing but handwaving. The Department asserts that it has presented "a faithful application of the Guidelines" (DOJ Br. at 28), but then it hastily adds the qualifier "consistent with the Criminal Information and Statement of Facts" (*id.*). Of course, the Government's failure to insert information in its Information or Statement of Facts cannot dictate a Sentencing Guidelines calculation. Under the Guidelines, the relevant conduct from Boeing's multi-year conspiracy encompasses the losses caused by the two crashes. *See* Part III, *supra* (discussing U.S.S.G. § 1B1.3(a)(3) & (a)(1)(A) (defining "relevant conduct" as "all harm that *resulted from* the acts and omissions" involved with the crime)). And under controlling Fifth Circuit precedent, a crime need only be a "but-for cause of harm" for the harm to be considered, which "is not a difficult burden to meet." *United States v. Ramos-Delgado*, 763 F.3d 398, 402 (5th Cir. 2014). So the Government's position ultimately becomes "[n]o matter how one calculates the Guidelines," Boeing is paying the statutory maximum fine because of the cap supposedly imposed by *Southern Union*. DOJ Br. at 28. Thus, without the ability to hide behind a cap, the Government would have to justify its "faithful" Guidelines calculations—a justification it can't provide.

Likewise, Boeing states only that the "plea agreement sets forth a guideline calculation based upon the government's statement of facts" (Boeing Br. at 23)—a position infected with the same problems as the Government's. So, like the Government, Boeing beats a hasty retreat to the position that "even assuming for the sake of argument that the [families'] computations were correct, it would not change" the fact that Boeing is paying the maximum fine. Boeing Br. at 24.

It is worth pausing for a moment to note how offensive Boeing's position is. The premise is that a well-heeled corporation can simply pay the "maximum" fine that it and the Government collusively put together, and then the need for a "faithful" application of the Guidelines disappears. Boeing should not be allowed to buy its way out of having the Sentencing Guidelines properly determined for its crime.

In their opening brief, the families explained that a reasonable loss calculation is $1,901,783,118 for losses to the families and $9,257,000,000 for losses to Boeing's customers, producing total losses Boeing caused of $11,158,000,000. Families Br. at 21-27. The parties offer no specific objection to these calculations.[16] Nor could they, since the figures ultimately rest on such things as standard economic loss calculations for homicide or Boeing's own submissions to the SEC. *See* Families Br. at 21-27.

Based on these straightforward loss calculations—and a proper application of the Sentencing Guidelines—the fine range in this case is $22,316,000,000 (minimum) to $42,632,000,000 (maximum). In addition, the Court needs to consider the possibility of an upward departure because of the 346 deaths Boeing caused. *See* U.S.S.G. § 8C4.2 (policy statement). But, for present purposes of considering the proposed plea, the important point is not the precise size of the fine that the Court might ultimately impose but rather the parties' failure to present for the Court's consideration an accurate calculation of the fine range. The parties concede that a prerequisite to imposing a sentence on Boeing in this case is a proper determination of the applicable guidelines. *See* Proposed Plea Agreement ¶ 23 (citing *United States v. Booker*, 543 U.S.

---

[16] The Government does argue that one of Boeing's foreign aircraft customers (LOT) cannot establish that it suffered "direct and proximate harm" from Boeing's crime and, therefore, that it is not a "victim." DOJ Br. at 36-37 (arguing that direct and proximate causation issues are complicated). But as explained in the next section below, for purposes of losses under the Alternative Fines Provision, no enhanced causation beyond simple but-for causation is required.

220 (2005)). Indeed, it would be error for the Court to proceed based on an incorrect Guidelines calculation. *See, e.g., United States v. Suchowolski*, 838 F.3d 530, 532 (5th Cir. 2016).

Remarkably, rather than strive to avoid error on the foundational Guidelines calculations, the Government eventually suggests it will not defend "truth in sentencing" but rather a "harmless error" analysis. DOJ Br. at 29. Thus, after declining to defend its Guidelines calculation in its proposed plea agreement, the Government comfortably observes that "[g]uidelines errors are harmless if the record demonstrates that a district court would have given the same sentence." DOJ Br. at 29. But whether it would truly be "harmless error" for this Court to accept the Government's invitation to defer making an accurate Guideline calculation is doubtful. *See Freeman v. United States*, 564 U.S. 522, 529 (2011) (noting the district court's "independent obligation to exercise its discretion" at sentencing). Rather than bake into these proceedings an erroneously calculated fine range, the Court should straightforwardly reject the proposed agreement as lacking an accurate range.

Finally, even if the parties were correct that the statutory maximum possible fine is $487.2 million, the Court would still need an accurate Sentencing Guidelines calculation. To justify their plea, the parties claim that it "guarantees that Boeing pays the highest possible statutory maximum fine consistent with the evidence that the Government would present at trial: $487.2 million." DOJ Br. at 11-12. But this "guarantee" is illusory against the backdrop that both the Government and Boeing recommend that the Court cut the fine in half by "crediting" a payment Boeing previously made under the DPA. *See* Proposed Plea Agreement at ¶ 25(a). The Court might decide to adopt that recommendation, resulting in a fine to Boeing of only $243.6 million. To be sure, the families recognize that the Court has discretion in setting the size of the fine and, accordingly, in deciding whether to credit a previous payment Boeing made. But surely the Court would need to exercise

its discretion against the backdrop of a properly calculated guideline range for the fine. As the families explained (Families Br. at 34-35), a properly calculated Guideline range includes a "top-end" recommendation as well as a possible upward departure[17]—factors that the Court should consider in determining whether, in its discretion, to give Boeing a credit.

Boeing also makes the remarkable claim that "[t]he law requires that Boeing receive a credit for the $243.6 million the Company already paid to the United States under the DPA." Boeing Br. at 24 n.9. Boeing never cites "the law" that somehow "requires" this result; obviously, no such "law" exists. Moreover, Boeing's DPA payment was not legally "treated as a criminal fine" (Boeing Br. at 24 n.9) because no fine was possible at that time. In 2021, Boeing had not been found guilty and made subject to paying a criminal fine. Indeed, the DPA specifically called the payment a "Criminal Monetary *Penalty*"—not a fine. *See* DPA ¶¶ 10, 11 (providing for Boeing to pay a "Criminal Monetary Penalty" which is "final and shall not be refunded").

In any event, a credit for Boeing's DPA payment of $243.6 million would be inappropriate because the DPA set that amount based on the same flawed Guidelines calculations that now taint the proposed plea agreement. *See* DPA ¶ 9 (Guidelines calculation). Among other problems, the five flaws identified above in the proposed agreement's calculations (e.g., failure to include a multiple-victim enhancement) infect the identical DPA calculations. Moreover, because a DPA is simply a pre-trial contractual agreement between the two parties, *Southern Union's* interpretation of Sixth Amendment jury trial rights would not place any limit on the maximum amount that

---

[17] A properly calculated Guideline range could also shed light on whether to require Boeing's CEO to attend the sentencing hearing. *See* U.S.S.G. § 8C2.5(g), App. Note 15 (in making its acceptance of responsibility decision, the court "may determine that the chief executive officer … of an organization should appear at sentencing in order to signify that the organization has clearly demonstrated recognition and affirmative acceptance of responsibility").

Boeing could have paid in 2021 under the DPA. Boeing should not receive an offset against its fine for this earlier payment, which rests on demonstrably false premises and analysis.

### C.  Even if *Southern Union* Applies, Boeing's Admissions Would Permit a Larger Fine than the Parties Calculate.

For the reasons explained above, *Southern Union* does not impose a cap on the fine in this case. In this section, the families assume (for the sake of argument) that *Southern Union* creates a potential cap. Even on this (incorrect) assumption, the Court should still reject the proposed plea because *Southern Union* permits a much larger fine than the parties admit.

The Government argues that this Court should use its discretion to approve the plea because the $243.6 million is supposedly the "maximum" readily provable gain under *Southern Union*. But the Government reaches this conclusion in a curious way. As the families pointed out in their opening brief, the basis for the $243.6 million figure is *Boeing's own assessment* of its cost savings from its crimes. *See* Families Br. at 27-28. And then, in turn, Boeing's gain figure is the only figure that the Government chooses to include in its Statement of Facts. *See* Proposed Plea Agreement, Att. A-2 (Statement of Facts), ¶ 55. And then, finally, the Government says that $243.6 million is the maximum fine allowed under *Southern Union* because it is the only figure "admitted by the defendant." DOJ Br. at 11.

Cobbling together a fine in this way might be called the Build-Your-Own-Fine approach. If this Court approves, then in future cases, the Government will simply leave out of its indictments any allegations about loss or gain, essentially transferring the power to determine the size of fines away from courts and placing them exclusively within the plea bargaining process. To be sure, it might be possible for plea bargaining to produce an appropriately sized fine. But in this case, the Court (and the public) have no such assurance. Indeed, even with respect to the $243.6 million, the Government simply asserts that the amount constitutes a supposed "high end" estimate of total

27

cost-savings. DOJ Dec., ECF No. 245-1 at 3-4. But the Government never "shows its work" (i.e., the basis for this calculation)—placing the Court in a "take it or leave it" position without any assurance that the parties have properly calculated the figure. *See* Cassell Dec. ¶¶ 26-28.[18]

But the problems get worse. The Government contends that it "cannot prove beyond a reasonable doubt that Boeing's fraud *directly and proximately caused* the 737 MAX plane crashes, and it cannot prove beyond a reasonable doubt that the loss (or gain) arising from Boeing's fraudulent activity exceeded $243.6 million." DOJ Br. at 3; *see also* Boeing Br. at 23 (endorsing the Government's position). The Government sets its legal bar too high. To prove loss (or gain) of more than $243.6 million, the Alternative Fines Provision does not require proof of "direct" and "proximate" causation of losses. Instead, § 3571(d) pegs the maximum fine for loss to situations where "the offense *results in* pecuniary loss to a person other than the defendant …." And it pegs the maximum fine for gain to situations where "any person *derives* pecuniary gain from the offense …." Neither statutory phrase contains a requirement of "direct" or "proximate" causation. The Government appears to confuse the more stringent "direct" and "proximate" harm requirements the CVRA specifies for a "victim" determination, 18 U.S.C. § 3771(e), as somehow being implicitly contained in § 3571(d)'s more expansive language. But the Alternative Fine Provision's plain language contains no such requirements.

The Fifth Circuit's decision in *Ramos-Delgado* is instructive on this issue. There, the Fifth Circuit discussed the "resulted from" language found in the Guidelines' relevant conduct causation provision. 763 F.3d at 402. The Circuit observed that the provision itself "contains no causation requirement" and, therefore, that courts had "no license to impose one." *Id.* at 401. The Circuit

---

[18] In their opening brief, the families relied on Boeing's own statements to derive a conservative figure for Boeing's gain of $2.607 billion. Families Br. at 28-29 & n.23. The parties never specifically question the families' evidence or calculations.

explained that "the ordinary meaning of 'resulted from' imposes" only a requirement "of actual or but-for causation …." *Id*. Notably, the Circuit emphasized that this burden "is not a difficult burden to meet" because an event "may have many but-for causes." *Id.* at 402. And "proximate or legal causation is not required" under this Guidelines language. *Id.; see also United States v. Salinas*, 918 F.3d 463, 466 (5th Cir. 2019) (endorsing and applying this reasoning). This analysis of the "resulted from" language in the Guidelines likewise applies to the "results in" language in the Alternative Fines Provision—neither the Government nor this Court have "license" to read into the statute additional restrictions on the size of fines.

Because the Government has made an error of law in describing its legal burden, the Court should reject the proposed plea. The Court would not be disagreeing with the Government's claim that it lacks sufficient evidence to prove that (for example) Boeing's crimes "directly" and "proximately" caused losses. Instead, the Court would simply be pointing out that the Government has erred in reading those additional requirements into the Alternative Fines Provision. And without those additional requirements restricting a causation determination, no one can doubt that Boeing's lies to the FAA were "one of many" but-for causes of the two crashes.[19]

With the legal standard for causation properly understood, it becomes clear that Boeing's crime caused losses far greater than $243.6 million.  For example, as the families explained in their opening brief, one straightforward path would be to simply rely on Boeing's annual Form 10-K submissions to the SEC. Families Br. at 26-27. According to information on those forms for 2019 and 2020, Boeing took a total loss for both years of $9.257 billion for losses to its customers. *Id*. Because this information comes from Boeing's own, legally mandated submissions to the SEC,

---

[19] Boeing also conflates the legal requirements in asserting that the "design of MCAS" was partially responsible for the crashes. Boeing Br. at 24. Even assuming Boeing's assertion is true, that does not mean that Boeing's lies to the FAA were not also a contributing cause of the crashes.

the information is "readily provable" beyond a reasonable doubt—and neither the Government nor Boeing offers any specific arguments to the contrary.

A similar path to a potential maximum fine is to rely on language in *Southern Union* allowing a fine based on "facts reflected in the jury verdict or *admitted by the defendant*." 567 U.S. at 348 (emphasis added). As the families pointed out in their opening brief, in its DPA, Boeing agreed "to pay a total Airline Compensation Amount of $1,770,000,000 to its airline customers for *the direct pecuniary harm that its airline customers incurred as a result of the grounding of the Company's 737 MAX*." DPA ¶ 12 (emphasis added). This constitutes an admission of a loss of at least $1.770 billion—well above the "maximum" that the Government is willing to admit.

For all these reasons, the parties' claim that a $487.2 million fine is the maximum fine is incorrect. Because that claim is a critical justification for the plea, the Court should reject the plea.

### VI. The Proposed Agreement's Corporate Monitor Provision Reprises the Failure of Government Supervision of Boeing and Lacks Transparency.

In their opening brief, the families explained why the parties' novel corporate monitor arrangement was inadequate. Families Br. at 35-40.[20] The Government's response to the families' concerns is, to put it charitably, incomplete. The families had hoped the Government would provide them, the Court, and the public with at least *some* explanation for what went wrong with the Government's first three-year monitorship of Boeing. But the Government declines to discuss why its initial attempt at supervising Boeing failed so miserably. Nor does the Government explain why it felt comfortable representing to the Court—*two years into a three-year monitorship period*—that "[o]ver these two years, the government has been enforcing and implementing the

---

[20] All issues surrounding the corporate monitor and related conditions of probation are decided by the Court by a preponderance of the evidence, as they are conditions of *sentencing*. *See* 18 U.S.C. § 3563; *United States v. Zarco-Beiza*, 24 F.4th 477, 482-83 (5th Cir. 2022).

requirements of the DPA and overseeing Boeing's compliance with those requirements." Hrng. Tr. (Jan. 26, 2023) at 96.

Today, one need only read the Government's determination that Boeing breached the DPA (Attachment A-1 to the plea agreement) to see how lacking the Boeing-DOJ collaboration was in assuring effective compliance enforcement. After observing the failure of this DPA collaboration—which the parties have not even attempted to explain—how could the Court have the confidence in going down that road again?

The families obviously lack confidence in a rerun of that botched collaboration. Indeed, the Court will recall that a year-and-a-half ago, the families specifically requested that the Court should impose a condition of release that "Boeing provide the substance of its efforts regarding corporate compliance to the [families'] experts—and, ultimately (after appropriate redactions), to the general public. Boeing's efforts can then be critiqued and any defects remedied." ECF No. 170 at 32. Based on the parties' soothing assurances that everything was under control, the Court denied the families' request. ECF No. 185 at 8. If the Court had granted the families' request, perhaps the fiasco of Boeing's breach could have been avoided.

The monitor selection process that the parties now jointly propose is similarly flawed. The Government asks the Court to trust it in selecting the monitor because of the Government's alleged "proven track record of effective oversight." DOJ Br. at 41. Say what?! With respect, the Government's "proven track record" here has been a disaster—with (among other problems) nearly fatal consequences for the 178 passengers and crew onboard Alaska Airlines Flight 1282. A strong case can be made that judges should *always* select monitors. *See* Families Br. at 37 (citing BRANDON L. GARRETT, TOO BIG TO JAIL: HOW PROSECUTORS COMPROMISE WITH CORPORATIONS

31

284 (2014)). But given the Government's earlier failures, if there were ever a case for judicial selection of the monitor, this is the one.

The parties' proposed monitor selection process cozily allows Boeing to meet with the candidates (Proposed Plea Agreement ¶ 32) and to provide "feedback" to the Government about the candidates—and even to veto one of them (*id.* ¶ 33). No such opportunities are directly provided to the families or the public.[21]

Nor does the proposed agreement provide the Court with any meaningful role. As the families pointed out (Families Br. at 37), the Court was originally given a specific right to "raise concerns" about the final monitor selection. Now the parties have eliminated that feature (*see* Proposed Plea Agreement ¶ 35)—without explanation. Instead, the name of the Government's final monitor pick will be sent to the Court "under seal." *Id.* Presumably the sealing is so that the families and the public will be unable to criticize the choice. Then, after sending the name secretly to the Court, the Government will wait ten days and, we are promised, "will take the Court's feedback into consideration before making the appointment." DOJ Br. at 15. But nothing in the agreement spells out how the Court's "concerns" are to be handled. And even if the Court concludes that the final pick is so concerning as to be *inappropriate*, the Court lacks the ability to stop it.

After the Government selects its desired monitor through this non-transparent process, the problems only worsen. The monitor can, of course, make recommendations to Boeing about defects in Boeing's compliance processes. But the parties have crafted a plea deal that transforms these conditions into what might be called non-condition conditions (if that isn't too confusing).

---

[21] The Government asserts in its brief that the plea "does not exclude the [f]amilies from the selection process" because they can "support" the application of qualified candidates that they identify." DOJ Br. at 14. But the application process does appear to be a public one and other aspects of narrowing the pool provide no opportunity for input by the families or the public.

The Government says that the reason for this curious "carveout" is not to leave the agreement toothless but rather to create a process where violations of these conditions "would trigger *the Government's authority* to find the Company in breach." DOJ Br. at 15 (emphasis added).

The Government reports that this is not "the first corporate plea agreement" with such strange features. *Id.* And if the Court approves it here in this prominent case, it certainly won't be the last. No doubt, the Justice Department would love to transfer from the Judiciary to the Executive the "authority" to find corporations have breached their sentencing obligations. Amicus Senator Cruz commented on similar features found in the Boeing DPA, explaining that they "cede[] enormous oversight authority to lawyers at the Justice Department. These lawyers may be experienced in criminal law, but they are not experts in corporate compliance for aeronautics companies …. Nor has the government's conduct so far given much reason to believe that its lawyers will act in accordance with the law or in the public interest." ECF No. 90 at 3.

Amicus Senator Cruz also identified another serious problem with vesting a breach decision in the Justice Department. He warned that maybe it "will be good; maybe it won't, but what is certain is that all the important decisions will be made behind closed doors, away from public accountability." *Id.* Of course, judicial determinations regarding breaches are made in open court with full due process guarantees. *See* Fed. R. Crim. P. 32.1(b)(2). In contrast, under the plea agreement, the Government retains "sole discretion" to make any breach determinations. Proposed Plea Agreement ¶ 40.

Such arrangements would be fraught with potential conflicts of interest and resulting public skepticism in any criminal case. But in this case, that potential is heightened to the $n$th degree. The Government is a major customer of Boeing—or, to flip things around, Boeing is a major supplier for the Government. Will Boeing use its power over the Government in connection with its billions

of dollars in defense and space contracts to dissuade the Government from making a breach determination? Or will the Government use its breach power over Boeing to extort more favorable terms in those contracts? Or a little bit of both? There is no way to tell—or to dispel the appearance of impropriety—as the Government, in consultation with Boeing, will make all the breach determinations secretly. *See* Proposed Plea Agreement ¶¶ 40, 41.[22]

This arrangement is beyond peculiar and can't be justified other than on the premise that the Government should have complete discretion without any external review. This arrangement thus clashes with what should be the premise for a monitoring program—i.e., that a corporate monitoring "program necessitates *court involvement* and functions *on behalf of the court*." Veronica Root, "*The Monitor-'Client' Relationship*," 100 VA. L. REV. 523, 539 (2014) (emphases added). The Government appears to be working hard to eradicate court involvement, not only with a front-end binding plea that ties the hands of the Court but also with back-end control over breach determinations that the judiciary conventionally makes.

Finally, the Government and Boeing insist that the monitor must focus myopically only on "fraud" within Boeing. *See* Proposed Plea Agreement ¶ 7(k) and Attachment C. The Government claims that a broader perspective "could lead to conflicting directives" with the FAA (DOJ Br. at 41), and Boeing even suggests that considering background FAA regulations would run the risk of "affirmatively harming" aviation safety (Boeing Br. at 30). But surely a monitorship could be structured to complement other public and private safety efforts. Because of the monitor's limited mandate and the other problems outlined above, the Court should reject the proposed plea.

---

[22] In a small nod toward transparency, the proposed plea agreement requires an "executive summary" of the monitor's report to be filed annually on the public court docket. Proposed Plea Agreement ¶ 14. But in aviation safety issues, the devil is in the details. The public presumably won't see any of the important details in the executive summary.

**VII.    The Probation Condition that Boeing Make Additional Investments in Compliance, Quality, and Safety Programs is Inadequate and Unenforceable.**

In their opening brief, the families explained why the probation condition requiring Boeing to make "additional" investments in its compliance, quality, and safety programs was inadequate to protect public safety and essentially unenforceable.  Families Br. at 41.  The families explained that the touted "new investment" was impossible to measure because no baseline investment amount was ever given. *Id.* at 41-42. And, in any event, the new investments were tiny drops in the bucket against Boeing's bottom line. *Id.* at 43-44.

In response, Boeing ignores these issues entirely. One can understand why Boeing chose to stand silent—even though, as a corporation, it has no right against self-incrimination. As the families explained in their brief, the supposed "increase of approximately 75% above [Boeing's] previously planned expenditures" (Proposed Plea Agreement ¶ 25(g)) is blatantly misleading because it compares an increase in investment across *three* programs to Boeing's planned expenditure in just *one*. Families Br. at 41. Additionally, the spending increase is not subject to review by the corporate monitor and is given without comparison to any historical expenditures in any of those three programs. *Id.* Determining an "additional" investment level is thus impossible because Boeing acknowledged in other fora, months before the plea deal, that it already planned to make substantial increases in safety and related programs. *Id.* at 42-43 (citing Gregory Wallace, *Three-Hour Meeting Ends with FAA Saying Boeing Can't Increase Max Plane Production Until Quality is Fixed*, CNN (May 30, 2024) (reporting Boeing's commitments to "sweeping changes" in the company's "production process and safety systems.").

The Government, too, does not substantially engage on these issues. It spends just five sentences (and one footnote) supporting the provision. DOJ Br. at 16-17 & 12 n.36. With regard to enforceability, the Government merely recounts its opinion that "the Government is confident

that [it and the Probation Office] can adequately assess" the Company's reports. DOJ Br. at 16. But how that assessment will be made remains a mystery, without any clear baseline against which to measure the purportedly "new" investment. The Government further muddies the waters when it states that Boeing would only need to keep its compliance expenditures "*at* or above its current funding level." DOJ Br. at 17 (emphasis added).

Moreover, the Government ignores the more important issue: Even assuming that Boeing makes "new" investments in its compliance, quality, and safety programs, an annual expenditure of $152 million for three years is wholly inadequate to remedy the proven harm from its crime. The Government acknowledges, in a one-sentence footnote, that the investment provision is a "remedial order" pursuant to U.S.S.G. § 8B1.2. *See* DOJ Br. at 12 n.36. But the Government fails to fully unpack what such an order should entail. The Guidelines provide for remedying all harm from criminal conduct. *See* U.S.S.G Chapter 8, Part B.  The Guidelines explain that "[a]s a general principle, the court should require that the organization take *all appropriate steps* to provide compensation to victims and otherwise remedy the harm caused or threatened by the offense." U.S.S.G. § 8B1, Historical Note (emphasis added).

As justification for the three-year, $455 million remedial order, the Government notes it is pegged at slightly below the maximum fine of $487.2 million. DOJ Br. at 12 n.36. The Government contends that were the Court to order a larger remedial investment, the amount could be "subject to litigation" because it might "exceed[] the statutory maximum fine." *Id.* But this is a bizarre apples-to-oranges comparison. No reason is given why the size of a separate *punitive* fine amount somehow legally restricts the size of a *remedial* order. The Government has mistakenly set the size of its remedial order based on an illusory concern about limitations stemming from *Apprendi* and *Southern Union*. But the *Apprendi* line of cases concerns jury determinations establishing the

maximum "penalty" for a crime. *See Southern Union*, 567 U.S. at 348. By definition, a "remedial order" is not a "penalty"—nor is there any statutory maximum. Thus, any *Apprendi* litigation over the size of the remedial order would be frivolous under well-settled Circuit precedent excluding from *Apprendi* analysis restitution orders, a type of "remedial" order under the Guidelines. *See, e.g., United States v. Caudillo*, __ F.4th ___, No. 23-40560, 2024 WL 3688472, at *3 (5th Cir. Aug. 7, 2024) (a court order remedying a harm through restitution is not subject to *Apprendi*).

In sum, the Government has based its remedial order on a figure that has nothing to do with the goal of "remedy[ing] the harm caused by the offense and … eliminat[ing] or reduc[ing] the risk that the instant offense will cause future harm." U.S.S.G. § 8B1.2. It could hardly be otherwise. Because the Government has failed to calculate any "loss" from Boeing's crime, it cannot begin to argue that its "remedial measure" is commensurate with that loss. Rather, this remedial measure is merely aimed at keeping Boeing's compliance program "*at* or above its current funding level." DOJ Br. at 17 (emphasis added). The Court should accordingly reject the proposed plea and direct the parties to determine the size of the loss from Boeing's crime—and appropriate measures to address that past harm and protect against future harm.

### VIII.    The Restitution Provision is Misleading and Unfairly Allows Boeing to Tie Up Restitution Through Automatically Approved Appeals.

In their final objection, the families explained that the plea agreement misleadingly gives Boeing credit for having "agreed to pay lawful restitution owed" to the families. Families Br. at 44-47 (citing Proposed Plea Agreement ¶ 6(f)). The families noted that, under the proposed plea agreement, the Justice Department is not clearly required to support restitution (*id.* at 45), Boeing seemed to be setting up an illegal "offset" argument (*id.* at 46), and Boeing is granted greater power to tie up restitution payments than the Rules of Criminal Procedure allow (*id.* at 46-47).

In response, the Government claims that "the Agreement calls for the Court to exercise its

37

discretion to award full lawful restitution to the Families, and for the Government to support the Families in seeking the same." DOJ Br. at 34. But the Government never explains why this proposed plea agreement uses language different from that commonly used in this judicial district. *See* Families Br. at 44-45. Nor does the Government mention—much less explain—why this proposed agreement contains curious language that the Government only "retain[s] the right" to support restitution requests from the families rather than the statutorily required support from prosecutors that the CVRA requires. *Id.* at 45.

Boeing's responses are even more concerning. Boeing boldly announces that it intends to assert offset claims for about 90% (313 of 346 families) because of previously agreed-to civil settlements. Boeing Br. at 33. Indeed, Boeing broadly argues that its right to offset is somehow "settled law." *Id.* But Boeing never cites—much less analyzes—the federal statute on restitution offsets. Under 18 U.S.C. § 3664(j)(2), a defendant is only entitled to have a restitution award "*reduced*" by any amount that a victim "*later* recovered" as compensatory damages for the same loss—i.e., "later" than the entry of a criminal restitution order. While Boeing cites two Fifth Circuit cases from several decades ago, it ignores *United States v. Parker*, 927 F.3d 374 (5th Cir. 2019). *Parker* explains that "[t]he use of the words '*reduced*' and '*later recovered*'" indicates that [a defendant] can make the argument [for offset] as it applies to [civil] judgments recovered *after* the restitution order is final." *Id.* at 381-82 (emphases added). This reduction for amounts "later recovered" makes sense because for amounts earlier recovered (i.e., before the restitution order is entered) it would be impossible to determine with certainty whether those amounts were for losses that corresponded to the later restitution judgment—or whether victims were pressured into settling for reduced amounts because no criminal conviction existed at that time. *See United States*

*v. Hankins*, 858 F.3d 1273, 1277-78 (9th Cir. 2017) (noting concern that criminal defendants could try to reduce criminal restitution awards by "coerc[ing] victims into settling" civil claims).

And then it gets even worse on appeal. Boeing has inserted into the proposed agreement language that it will not have to actually pay restitution until "completion of any timely and properly noticed appeal." Proposed Plea Agreement ¶ 25(c). The families pointed out that this language contravenes the federal rules, which give the Court discretion on whether to stay a restitution order pending appeal. Families Br. at 46 (citing Fed. R. Crim. P. 38(c)). Neither Boeing nor the Government dispute that the plea's provision makes an improper end-run around the normal judicial review of a defendant's stay request. This is yet another example of how the plea agreement puts the victims' families in a worse position than if no agreement existed at all.

## CONCLUSION

This Court is well familiar with the factors it must consider when imposing a sentence, including the "nature and circumstances of the offense" and the need for the sentence "to reflect the seriousness of the offense, to promote respect for the law, … to provide just punishment for the offense," and to "afford adequate deterrence to criminal conduct." 18 U.S.C. § 3553(a)(1) & (2). The mandated sentence that would follow from the Court accepting this binding plea flunks on every measure. The plea agreement does not disclose the true "circumstances of the offense" because it ignores the 346 deaths. And because the agreement disregards the deaths, the resulting sentence does not "reflect the seriousness of the offense." Nor does the agreement promote "respect for the law." Instead, it smacks of favoritism for a well-connected defendant and requires a fictitious sentencing guideline calculation. And the agreement can hardly be expected to provide "adequate deterrence" to criminal conduct when it allows Boeing to escape with more than two billion dollars in profits while paying just a fraction of that amount.

Accordingly, pursuant to the Court's authority under Fed. R. Crim. P. 11(c)(3)(A), the Court should reject the proposed plea agreement. Consistent with recognized practice in this Circuit, the Court should give its reasons for doing so. *See United States v. Smith*, 417 F.3d 483, 488 (5th Cir. 2005) (the district court "may state its reasons for rejecting a plea agreement" while avoiding specifying the "plea agreements that would be acceptable"). The families respectfully request that the Court give as its reasons for rejecting the proposed plea the reasons the families explained above.[23]

Dated: August 23, 2024                    Respectfully submitted,

/s/ Darren P. Nicholson                    /s/ Paul G. Cassell
Warren T. Burns                            Paul G. Cassell (Utah Bar No. 06078)
Texas Bar No. 24053119                     (Counsel of Record)
Darren P. Nicholson                        Utah Appellate Project
Texas Bar No. 24032789                     S.J. QUINNEY COLLEGE OF LAW
Kyle Oxford                                University of Utah
Texas Bar No. 24095806                     cassellp@law.utah.edu
Chase Hilton                               (no institutional endorsement implied)
Texas Bar No. 24100866
Burns Charest, LLP                         Tracy A. Brammeier
900 Jackson Street, Suite 500              CLIFFORD LAW OFFICES PC
Dallas, Texas 75202                        tab@cliffordlaw.com
Tel. (469) 458-9890
wburns@burnscharest.com                    Erin R. Applebaum
dnicholson@burnscharest.com                KREINDLER & KREINDLER LLP
koxford@burnscharest.com                   eapplebaum@kreindler.com
chilton@burnscharest.com
                                           Pablo Rojas
                                           PODHURST ORSECK PA
                                           projas@podhurst.com

*Attorneys for Victims' Families*

---

[23] If the Court in its discretion decides to hold a hearing on the matter, the families respectfully request two weeks' notice so that some of them can make arrangements to attend and exercise their rights to be heard under the CVRA. ECF No. 242.

**CERTIFICATE OF SERVICE**

I certify that on August 23, 2024, the foregoing document was served on the parties to the proceedings via the Court's CM/ECF filing system.

*/s/ Darren P. Nicholson*
Darren P. Nicholson