# UNITED STATES DISTRICT COURT FOR THE
# NORTHERN DISTRICT OF TEXAS
Fort Worth Division

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) | 4:21-cr-00005-O |
| THE BOEING COMPANY, | ) ) ) | |
| Defendant. | ) ) | |

## GOVERNMENT'S FURTHER RESPONSE
## IN SUPPORT OF THE PROPOSED PLEA AGREEMENT

GLENN S. LEON
Chief, Fraud Section, Criminal Division
United States Department of Justice

LEIGHA SIMONTON
United States Attorney
Northern District of Texas

By: *s/ Sean P. Tonolli*
Sean P. Tonolli
Senior Deputy Chief
D.C. Bar No. 503346
sean.tonolli@usdoj.gov

By: *s/ Chad E. Meacham*
Chad E. Meacham
Assistant United States Attorney
Texas Bar No. 00784584
chad.meacham@usdoj.gov

United States Department of Justice
Criminal Division, Fraud Section
1400 New York Avenue, N.W.
Washington, D.C. 20005
202-514-2000

United States Attorney's Office
Northern District of Texas
801 Cherry Street, 17th Floor
Fort Worth, TX 76102
817-252-5200

**TABLE OF CONTENTS**

I. Introduction ................................................................................................................. 1

II. Relevant Policies ........................................................................................................ 2

III. Defining Diversity and Inclusion ............................................................................... 8

IV. Furthering Compliance and Ethics ........................................................................... 10

V. Applying the Commitment to the Selection Process ................................................ 13

## TABLE OF AUTHORITIES

Clara Hudson, *Lawyers Laud Criminal Division's Diversity Provision for Monitors*, Global Investigations Review, May 3, 2018, *available at* https://globalinvestigations review.com/just-anti-corruption/article/lawyers-laud-criminal-divisions-diversity-provision-monitors ................................................................................................................... 3, 4

Eric Lichtblau & Kitty Bennett, *Thirty Former Officials Became Corporate Monitors*, N.Y. Times (May 23, 2008), *available at* https://www.nytimes.com/2008/05/23/washington/23justice.html .............................................................................................................. 2

Eric Lichtblau and Kitty Bennett, *Thirty Former Officials Became Corporate Monitors*, N.Y. Times (May 23, 2008), *available at* https://www.nytimes.com/2008/05/23/washington/23justice.html .............................................................................................................. 3

Evan Perez, *Justice Department May Steer How Monitors Are Selected*, Wall St. J. (Jan. 11, 2008), *available at* https://www.wsj.com/articles/SB120001011264182409 ............... 2

Exec. Order No. 14305, 86 Fed. Reg. 34593 (June 25, 2021), *available at* https://www.govinfo.gov/content/pkg/FR-2021-06-30/pdf/2021-14127.pdf .............................................. 8, 9

Government Accountability Office Report GAO-10-260T, Corporate Crime: Prosecutors Adhered to Guidance in Selecting Monitors for Deferred Prosecution and Non-Prosecution Agreements, but DOJ Could Better Communicate Its Role in Resolving Conflicts, Statement of Eileen R. Larence (Nov. 19, 2009), *available at* https://www.gao.gov/assets/gao-10-260t.pdf ............................................................................................... 3

Justice Manual § 9-28.1720, *available at* https://www.justice.gov/jm/jm-9-28000-principles-federal-prosecution-business-organizations#9-28.1720 ........................................ 6, 7

List of Independent Compliance Monitors for Active and Previous Fraud Section Monitorships, Fraud Section, *available at* https://www.justice.gov/criminal/criminal-fraud/monitorships ............................................................................................................ 8

Memorandum from the Acting Deputy Attorney General on Selection and Use of Monitors in Deferred Prosecution Agreements and Non-Prosecution Agreements with corporations (Mar. 7, 2008), *available at* https://www.justice.gov/sites/default/files/dag/legacy/2008/03/20/morford-useofmonitorsmemo-03072008.pdf .................................................. passim

Memorandum from the Assistant Attorney General, Criminal Division, on the Selection of Monitors in Criminal Division Matters (Oct. 11, 2008), *available at* https://www.justice.gov/d9/speeches/attachments/2018/10/12/selection_of_monitors_in_criminal_division_matters_memo_0.pdf ........................................................................................ 4

Non-Prosecution Agreement, Fresenius Medical Care AG & Co. KGaA, at 5 (Mar. 28, 2019), *available at* https://www.justice.gov/opa/pr/fresenius-medical-care-agrees-pay-231-million-criminal-penalties-and-disgorgement-resolve ................ 5

Revised Memorandum from the Assistant Attorney General, Criminal Division, on Selection of Monitors in Criminal Division Matters (Mar. 1, 2023), *available at* https://www.justice.gov/criminal/criminal-fraud/file/1100366/dl ......................................... 7, 14

U.S. Department of Justice, Diversity, Equity, Inclusion, and Accessibility Strategic Plan for Fiscal Years 2024-2026 (Feb. 2024), *available at* https://www.justice.gov/jmd/media/1340036/dl ................................................................................................ 9

*United States v. Mobile Telesystems PJSC*, Deferred Prosecution Agreement, 1:19-cr-00167, ECF No. 11 (S.D.N.Y. Mar. 6, 2019), *available at* https://www.justice.gov/opa/pr/mobile-telesystems-pjsc-and-its-uzbek-subsidiary-enter-resolutions-850-million-department .............. 5

*United States v. Panasonic Avionics Corp.*, Deferred Prosecution Agreement, 1:18-cr-00118 ECF No. 2-1 (D.D.C. Apr. 30, 2018), *available at* https://www.justice.gov/opa/pr/panasonic-avionics-corporation-agrees-pay-137-million-resolve-foreign-corrupt-practices-act ................................................................................................................ 3

*United States v. Telefonaktiebolaget LM Ericsson*, Deferred Prosecution Agreement, 1:19-cr-00884, ECF No. 6 (S.D.N.Y. Dec. 6, 2019), *available at* https://www.justice.gov/opa/pr/ericsson-agrees-pay-over-1-billion-resolve-fcpa-case ................................................ 5

*United States v. The Bank of Nova Scotia*, Deferred Prosecution Agreement, 3:20-cr-00707, ECF No. 2 (D.N.J. Aug. 19, 2020), *available at* https://www.justice.gov/opa/pr/bank-nova-scotia-agrees-pay-604-million-connection-commodities-price-manipulation-scheme ........................................................................................................ 5

I.  **Introduction**

For over 15 years, the Department of Justice has provided formal guidance to prosecutors on the selection of independent compliance monitors, ensuring a fair, merit-based process that fosters public confidence. From the outset, and as refined over the years, this guidance has emphasized transparency, impartiality, and the value of broadening the pool of qualified candidates—avoiding any perception of favoritism and ensuring the selection of the candidate best suited for the specific role. Starting in 2018, the Department's Criminal Division began including an additional sentence in certain corporate criminal resolutions involving the imposition of an independent compliance monitor, stating that the selection of such a monitor "shall be made in keeping with the Department's commitment to diversity and inclusion." This new language reflected not a change in policy but rather a principle that has always governed the process: that selection of a monitor must be based solely on merit, from the broadest possible pool of qualified candidates. And that principle continues to guide the process today—with the same language appearing verbatim in Paragraph 33 of the Proposed Plea Agreement (the "Agreement") (ECF No. 222-1), reiterating the Department's commitment to identifying the most qualified monitor to oversee the compliance and ethics obligations of Defendant The Boeing Company ("Boeing").

The Court has requested additional information about the above-quoted language. (ECF No. 275). The Department addresses in turn the Court's requests to (i) identify the Department policies relevant to this language; (ii) define the terms "diversity" and "inclusion," as they are used in Paragraph 33 of the Agreement; (iii) explain how the Department's commitment to these principles will further the improvement in Boeing's compliance and ethics program; and (iv) explain how this commitment will factor into the selection of the monitor. The Department's selection process, in sum, will be open to all qualified candidates; will subject those candidates to a rigorous, individualized assessment of their qualifications to meet the challenges specific to the

Boeing monitorship; and will result in the selection of the candidate whose unique skills the Court and the public can be confident will best position the monitorship for success and whose selection was based entirely on merit.

## II.     Relevant Policies

Five documents—described below in chronological order of their issuance—are relevant to understanding the language that appears in Paragraph 33 of the Agreement. Taken together, they demonstrate a longstanding and unbroken commitment to a merit-based monitor selection process.

<u>2008 Morford Memo</u>. In March 2008, Acting Deputy Attorney General Craig Morford issued the first Department-wide guidance on the selection of independent compliance monitors (the "2008 Morford Memo").[1] At the time, the Department was facing public scrutiny—and a Government Accountability Office ("GAO") inquiry—about its monitor selection process, including as to whether lucrative monitorships had been steered to a small number of former Department officials.[2] The 2008 Morford Memo established new rules:

> The monitor must be selected based on the merits. The selection process must, at a minimum, be designed to: (1) select a highly qualified and respected person or entity based on suitability for the assignment and all of the circumstances; (2) avoid potential and actual conflicts of interests, and (3) otherwise instill public confidence by implementing the steps set forth in this Principle."[3]

---

[1] Memorandum from the Acting Deputy Attorney General on Selection and Use of Monitors in Deferred Prosecution Agreements and Non-Prosecution Agreements with corporations (Mar. 7, 2008), *available at* https://www.justice.gov/sites/default/files/dag/legacy/2008/03/20/morford-useofmonitorsmemo-03072008.pdf.

[2] Evan Perez, *Justice Department May Steer How Monitors Are Selected*, Wall St. J. (Jan. 11, 2008), *available at* https://www.wsj.com/articles/SB120001011264182409; Eric Lichtblau & Kitty Bennett, *Thirty Former Officials Became Corporate Monitors*, N.Y. Times (May 23, 2008), *available at* https://www.nytimes.com/2008/05/23/washington/23justice.html.

[3] 2008 Morford Memo, at 3.

The purpose of these changes was clear. As explained in a later GAO report, the 2008 Morford Memo was intended to "address concerns that monitors are selected based on favoritism or bias," making plain that the Department needed to—and in fact would—cast a wider net when seeking qualified candidates to serve as monitors.[4]

2018 Panasonic Avionics Resolution. In April 2018, the Criminal Division entered into a deferred prosecution agreement ("DPA") with Panasonic Avionics Corporation—a resolution that, for the first time, included the sentence, "Monitor selections shall be made in keeping with the Department's commitment to diversity and inclusion."[5] In an article published the day after the resolution was announced, a Criminal Division spokesperson explained that this new language was "consistent with" the Department's "long-standing policy" to "foster an inclusive work environment that embraces diversity of opinion and background and is free of discrimination and harassment." The spokesperson further stated that, under the terms of the resolution, the government is "required to select the most qualified candidate irrespective of race or gender, or any other non-merit factor."[6]

---

[4] Government Accountability Office Report GAO-10-260T, Corporate Crime: Prosecutors Adhered to Guidance in Selecting Monitors for Deferred Prosecution and Non-Prosecution Agreements, but DOJ Could Better Communicate Its Role in Resolving Conflicts, Statement of Eileen R. Larence, at 2 (Nov. 19, 2009), *available at* https://www.gao.gov/assets/gao-10-260t.pdf. *See also* Eric Lichtblau and Kitty Bennett, *Thirty Former Officials Became Corporate Monitors*, N.Y. Times (May 23, 2008), *available at* https://www.nytimes.com/2008/05/23/washington/23justice.html.

[5] *United States v. Panasonic Avionics Corp.*, Deferred Prosecution Agreement, at 12, ¶ 12, 1:18-cr-00118, ECF No. 2-1, (D.D.C. Apr. 30, 2018), *available at* https://www.justice.gov/opa/pr/panasonic-avionics-corporation-agrees-pay-137-million-resolve-foreign-corrupt-practices-act ("Monitor selections shall be made in keeping with the Department's commitment to diversity and inclusion."). *See* Clara Hudson, *Lawyers Laud Criminal Division's Diversity Provision for Monitors*, Global Investigations Review, May 3, 2018, *available at* https://globalinvestigationsreview.com/just-anti-corruption/article/lawyers-laud-criminal-divisions-diversity-provision-monitors.

[6] Hudson, *supra* n.5.

3

The Government is unaware of any specific policy in effect in 2018 that required the Criminal Division to include this sentence in the 2018 Panasonic Avionics Resolution. But in the day-after article referenced above, the reporter also quoted the managing partner of a Chicago-based law firm who—nodding to the same issues that animated the 2008 Morford Memo—opined that the new language indicated that Department "will no longer be looking at the 'same old' candidates who are handed these positions 'over and over again.'"[7]

<u>2018 Benczkowski Memo</u>. In October 2018—six months after the Panasonic Avionics Resolution—the Criminal Division's Assistant Attorney General ("AAG"), Brian Benczkowski, issued a memorandum to all Division personnel supplementing the 2008 Morford Memo (the "2018 Benczkowski Memo").[8] In a section on the monitor selection process, the 2018 Benczkowski Memo reiterated the principles first articulated in the 2008 Morford Memo, stating that a "monitor must be selected based on the unique facts and circumstances of each matter and the merits of the individual candidate."[9] And indeed, following the issuance of the 2018 Benczkowski Memo, the Division continued to use the language that first appeared in the 2018 Panasonic Avionics Resolution: in two separate March 2019 corporate resolutions—one with Mobile TeleSystems PJSC, the other with Fresenius Medical Care AG—the Division executed

---

[7] *Id*.

[8] Memorandum from the Assistant Attorney General, Criminal Division, on the Selection of Monitors in Criminal Division Matters (Oct. 11, 2008), *available at* https://www.justice.gov/d9/speeches/attachments/2018/10/12/selection_of_monitors_in_criminal_division_matters_memo_0.pdf.

[9] *Id*. at 4. The same section of the 2018 Benczkowski Memo also included a footnote—not present in the 2008 Morford Memo—stating that "[a]ny submission or selection of a monitor candidate by either the Company or the Criminal Division should be made without unlawful discrimination against any person or class of persons."

4

agreements directing that monitor selections "be made in keeping with the [Department's] commitment to diversity and inclusion."[10]

<u>2023 Justice Manual Revisions</u>. In March 2023, the Department updated the Justice Manual ("JM")—which publicly sets forth the Department's internal policies and procedures—to address, among other items, the use of independent compliance monitors in corporate resolutions (the "2023 Justice Manual Revisions"). These revisions—which applied to all Department prosecuting components, including the Criminal Division and United States Attorney's Offices—codified the principles and processes that were first articulated in the 2008 Morford Memo, reflected in the 2018 Panasonic Avionics Resolution, and refined in the 2018 Benczkowski Memo.[11] As a result, following these 2023 revisions, Section 9-28.1720 of Justice Manual (titled "Selection of Monitor") began as follows:

---

[10] *United States v. Mobile Telesystems PJSC*, Deferred Prosecution Agreement, at 13, ¶ 11, 1:19-cr-00167, ECF No. 11 (S.D.N.Y. Mar. 6, 2019), *available at* https://www.justice.gov/opa/pr/mobile-telesystems-pjsc-and-its-uzbek-subsidiary-enter-resolutions-850-million-department; Non-Prosecution Agreement, Fresenius Medical Care AG & Co. KGaA, at 5 (Mar. 28, 2019), *available at* https://www.justice.gov/opa/pr/fresenius-medical-care-agrees-pay-231-million-criminal-penalties-and-disgorgement-resolve. In two other resolutions—a December 2019 resolution with Telefonaktiebolaget LM Ericsson and an August 2020 resolution with The Bank of Nova Scotia—the Criminal Division instead used language similar to the footnote in the 2018 Benczkowski Memo that forbid "unlawful discrimination against any person or class of persons" in the monitor selection process. *United States v. Telefonaktiebolaget LM Ericsson*, Deferred Prosecution Agreement, at 14, ¶ 13, 1:19-cr-00884, ECF No. 6 (S.D.N.Y. Dec. 6, 2019), *available at* https://www.justice.gov/opa/pr/ericsson-agrees-pay-over-1-billion-resolve-fcpa-case; *United States v. The Bank of Nova Scotia*, Deferred Prosecution Agreement, at 16, ¶ 23, 3:20-cr-00707, ECF No. 2 (D.N.J. Aug. 19, 2020), *available at* https://www.justice.gov/opa/pr/bank-nova-scotia-agrees-pay-604-million-connection-commodities-price-manipulation-scheme.

[11] The 2023 Justice Manual Revisions were prompted in part by a September 2022 memorandum issued by Deputy Attorney General Lisa Monaco that addressed a range of corporate criminal enforcement policies and, among other things, directed every Department component "involved in corporate criminal resolutions" to enhance transparency by developing and publishing its monitor selection process, citing to the Criminal Division's 2018 Benczkowski Memo as an example of a component policy that was already in force and could be replicated by others. Memorandum from

> A monitor must be qualified for the position based on the facts and circumstances of the case and the intended scope and duties of the monitorship. The selection process must be transparent, merit-based, and conducted in a manner free from conflicts of interest. Monitor selections shall be made in keeping with the Department's commitment to diversity and inclusion, and prosecutors should consider monitors from a diverse set of backgrounds.
>
> The Department should employ consistent and transparent procedures for selecting monitors, pursuant to policies adopted by each component and office. Every office or component involved in corporate criminal resolutions must adopt a consistent and predictable process for selecting monitors. These component-specific selection process must, as a baseline, be designed to: (1) select a highly qualified and respected person or entity based on suitability for the assignment and all of the circumstances; (2) avoid potential and actual conflicts of interests, and (3) instill public confidence.[12]

This language has remained unchanged since the 2023 Justice Manual Revisions and reflects the Department-wide policy that was in effect at the time the Government entered into the Agreement with Boeing.

<u>2023 Criminal Division Policy</u>. Also in March 2023, Criminal Division AAG Kenneth Polite issued an updated policy to all Criminal Division personnel regarding monitor selection (the "2023 Criminal Division Policy"), stating in its second sentence that the "substance and purpose of this memorandum is much the same as that of the memorandum that preceded it, issued by then-

---

the Deputy Attorney General on Further Revisions to Corporate Criminal Enforcement Policies Following Discussions with Corporate Crime Advisory Group (Sept. 15, 2022), *available at* https://www.justice.gov/d9/pages/attachments/2022/09/15/2022.09.15_ccag_memo.pdf. This was the first explicit incorporation of the commitment to "diversity and inclusion" that previously appeared in the 2018 Panasonic Avionics Resolution and subsequent corporate resolutions into a Department-wide memorandum. At the October 11, 2024 hearing, the Government mistakenly stated that the policy on which the same language in the Agreement is based was first articulated in 2021.

[12] JM § 9-28.1720 (citations omitted), *available at* https://www.justice.gov/jm/jm-9-28000-principles-federal-prosecution-business-organizations#9-28.1720.

[AAG] Brian Benczkowski."[13] The 2023 Criminal Division Policy further stated that it intended to "clarify four things," one of which was that "monitor selections are and will be made in keeping with the Department's commitment to diversity, equity, and inclusion."[14] The 2023 Criminal Division Policy further noted that, "as set forth in the Morford Memorandum," a monitor must be selected "based on the unique facts and circumstances of each matter and the merits of the individual candidate."[15]

In the Boeing matter, the Agreement adopts a monitor-selection process that adheres to the Justice Manual and the 2023 Criminal Division Policy. Indeed, the Agreement's only departure from the well-established Criminal Division process is to allow an open solicitation of monitor candidates—a modification intended to address the unique facts and circumstances of this case, specifically, to incorporate the views of the family members of the victims of the Lion Air Flight 610 and Ethiopian Airlines Flight 302 airplane crashes.[16] And the creation of this open solicitation process simply reaffirms an effort—underway since the 2008 Morford Memo—to broaden the pool of potential candidates in order to identify the most qualified candidate possible.

In sum, the Criminal Division is obligated to and does conduct a rigorous selection process that draws from a diverse and inclusive pool of qualified candidates and involves an individualized,

---

[13] Revised Memorandum from the Assistant Attorney General, Criminal Division, on Selection of Monitors in Criminal Division Matters (Mar. 1, 2023), at 1, *available at* https://www.justice.gov/criminal/criminal-fraud/file/1100366/dl.

[14] *Id*. at 2.

[15] *Id*. at 5.

[16] *Id*. at 11 (expressly allowing modification of the monitor-selection process based on the "unique facts and circumstances" of a case); Gov't Br., at 5-6 (ECF No. 245) (explaining that the modification was intended "to more extensively incorporate [the family members'] feedback regarding the monitorship process"); Gov't Decl., at 28-29, ¶ 53 (describing feedback from Paul Cassell and others during the June 30, 2024 conferral, including "criticism of the Government following its standard process for selecting the Monitor").

7

merit-based selection of the candidate whose specific background, skills, and experiences are best suited to address the facts and circumstances of the company's criminal conduct and the scope of the monitorship, all while avoiding conflicts of interest and unlawful discrimination based on race, gender, or any other protected class. The selection process must be and is broadly inclusive, fair, and free from favoritism and preconceptions of who should serve. To reiterate, the Criminal Division specifically, and the entire Department, must select and does select the most qualified candidate irrespective of race or gender, or any other non-merit factor. And the Criminal Division's track record of success in this regard—merit-based selections of monitors whose individual diverse backgrounds and experiences are best suited to address the facts and circumstances of the relevant company that is the subject of the monitorship—is evident in the monitors who have been selected in Criminal Division matters and the successful completion of those monitorships.[17]

### III. Defining Diversity and Inclusion

In June 2021, the President issued *Executive Order on Diversity, Equity, Inclusion, and Accessibility in the Federal Workforce* ("EO 14305").[18] Targeted at the federal workforce, EO 14305 did not address whether and under what circumstances the Department could or should consider diversity and inclusion in the selection of an independent compliance monitor arising from a corporate criminal enforcement matter. Nonetheless, Section 2 of EO 14305 defined the terms "diversity" and "inclusion" as follows:

> (b) The term "diversity" means the practice of including the many communities, identities, races, ethnicities, backgrounds, abilities,

---

[17] *See, e.g.*, List of Independent Compliance Monitors for Active and Previous Fraud Section Monitorships, Fraud Section, *available at* https://www.justice.gov/criminal/criminal-fraud/monitorships (naming all monitors appointed in the Criminal Division's Fraud Section matters since 2012).

[18] Exec. Order No. 14305, 86 Fed. Reg. 34593 (June 25, 2021), *available at* https://www.govinfo.gov/content/pkg/FR-2021-06-30/pdf/2021-14127.pdf.

cultures, and beliefs of the American people, including underserved communities.

[ . . . ]

(d) The term "inclusion" means the recognition, appreciation, and use of the talents and skills of employees of all backgrounds.[19]

In February 2024, the Department issued a "strategic plan for fiscal years 2024-2026" relating to "diversity, equity, inclusion, and accessibility"—a document that was mandated by EO 14305 and which the Court cited in its order requesting this supplemental briefing.[20] As with EO 14305, this "strategic plan" did not address the monitor selection process in the context of corporate criminal resolutions. However, the document adopted the definitions of "diversity" and "inclusion" contained in EO 14305.[21]

As the Court is aware, the Agreement does not itself define the terms "diversity" and "inclusion." While generally consistent with the definitions provided in EO 14305 and the February 2024 strategic plan, the terms as used in the Agreement (as well as the broader phrase "in keeping with the Department's commitment to diversity and inclusion") must be understood in the context of the Department's use of identical language in monitor agreements since the 2018 Panasonic Avionics Resolution—which preceded EO 14305 or the strategic plan. The terms and that phrase, in turn, can only be understood against the backdrop of the Department's fifteen-year effort to broaden the pool of monitor candidates since the issuance of the 2008 Morford Memo.

---

[19] *Id*. at 34594, §§ 2(b), 2(d).

[20] October 15, 2024 Order at 3-4 (ECF No. 275).

[21] U.S. Department of Justice, Diversity, Equity, Inclusion, and Accessibility Strategic Plan for Fiscal Years 2024-2026 (Feb. 2024), at 3-4, *available at* https://www.justice.gov/jmd/media/1340036/dl.

Put another way, in the specific context of the monitor selection process for Boeing, "diversity" encompasses the Department's commitment to considering the many ways that an individual candidate can demonstrate his or her unique abilities, experiences, and qualifications as a member of the monitor candidate pool—including with a professional background other than as a former Department official.[22] Likewise, in this context, "inclusion" reflects the Department's openness to how these various abilities, experiences, and qualifications may inform the candidate's capacity to serve effectively as the monitor of Boeing's compliance and ethics program. What diversity and inclusion do *not* mean—and what the Department will not permit—is affording preference to a candidate based on their membership or non-membership in a protected class.

## IV. Furthering Compliance and Ethics

Before explaining how the Department's commitment to diversity and inclusion will further the monitor's ability to meet the challenge presented by Boeing's compliance and ethics program, it is important to review how the Agreement tasks the monitor with carrying out their mandate.

As set forth in Attachment D, the monitor is expected to engage throughout the three-year term with a wide range of Boeing personnel—from the boardroom to the factory floor—as well as with "business partners, agents, and other persons" relevant to the mandate.[23] The monitor is also expected to remain in regular contact with the Federal Aviation Administration ("FAA") (and likely

---

[22] *See* Arfiyandi Mot. at 18-19 (certain families stating, "Ideally, the [monitor] would be a former member of the United States Military . . . .") (ECF No. 233).

[23] *See* Agreement, Attachment D, at pp. 4-5, ¶¶ 9-11.

other regulators) to ensure the monitorship is appropriately respecting the boundaries of the FAA's jurisdiction and oversight efforts.[24]

Such broad and personal engagement is necessary to ensure the monitor conducts more than a paper review of the Company's compliance and ethics program, but rather digs in to understand how the policies, procedures, controls, and training are working in practice at the human level and are integrated with the safety and quality programs. The monitor's ability to conduct an on-the-ground effort to meet Boeing personnel at different levels is particularly important given Boeing's large, diverse, and geographically dispersed workforce across its complex operations. To effectively diagnose what is working and what is not, the monitor will need to command the respect, confidence, and trust of everyone with whom they engage. To that end, the Department's commitment to diversity and inclusion, and the transparent articulation of that commitment in the Agreement, will enhance the monitor's effectiveness in three ways.

*First*, the commitment ensures the Department has the broadest pool of qualified candidates from which to select the monitor. The Agreement sends a strong message to the public that the position is open to candidates from all backgrounds and experiences who meet the threshold qualification requirements, and that the selection process will be fair and free from favoritism and preconceptions of who should serve. This is an especially important principle for the Department,

---

[24] At the end of the October 11, 2024 hearing, certain of the families confirmed yet again that they want the monitorship mandate to extend well beyond compliance and ethics, and specifically to address what they argue are supposed shortcomings in the FAA's oversight of the Company. *See* October 11, 2024 Tr. at 116:25-117:1-2 ("So you can see that this would be a situation where a monitor that can be crafted in this case could improve the regulatory regime that currently exists."); Ryan Proposed Monitor Order at 2-4, ¶¶ 1(g) (ECF No. 202-2). For the reasons the Government has articulated previously, this proposed encroachment on the Congressionally mandated authority of the FAA would be unprecedented and imprudent, and it is one of the reasons why the Agreement—which respects the boundary while requiring better integration of the compliance and ethics program with the safety and quality programs—is being submitted to the Court pursuant to Rule 11(c)(1)(C).

11

given its longstanding efforts—dating to the 2008 Morford Memo—to cast a wider net for monitor candidates. When combined with the open candidate solicitation process, the Department's commitment will incentivize the greatest number of candidates to apply.

*Second*, the commitment furthers the Department's goal to identify and select the candidate who is individually best suited based on their background and experiences to address the challenges Boeing's compliance and ethics program presents. As discussed more below, the commitment requires the Department personnel involved in the selection process to conduct an open-minded and rigorous assessment of the specific competencies and suitability of each candidate for the position while avoiding conflicts of interest and unlawful discrimination. Combined with the broad candidate pool the commitment helps to attract, and any input and direction the Court provides, the commitment and overall process will ensure the most qualified candidate to monitor Boeing rises to the top. In other words, the Department will be able to select the candidate best positioned to successfully execute on the monitor's mandate—to identify gaps in Boeing's compliance and ethics program and where it can be better integrated with the safety and quality programs, make recommendations to improve the effectiveness of Boeing's compliance and ethics program, and test the effectiveness of Boeing's improvements—all to ensure Boeing brings its program up to the minimum standards required in Attachment C to the Agreement by the end of the three-year term.

*Third*, the commitment enhances the authority and credibility of the monitor. A monitor selected through an inclusive and individualized selection process will have greater legitimacy within Boeing, among its stakeholders and regulators, and the broader public. That is because the process communicates outside the Department, and ensures within the Department, that each candidate will be judged fairly on their own merits and as compared to a broad and competitive

field. It is especially important to foster this buy-in from Boeing personnel because the success of the monitorship will depend to a large degree on the trust and cooperation the monitor can engender within the Company. That trust and cooperation will be enhanced if the monitor's appointment is understood to, and actually does, embody the qualities of inclusion, impartiality, and merit.

## V.     Applying the Commitment to the Selection Process

In keeping with the policies and principles articulated above, and consistent with its past practice, the Department's commitment to diversity and inclusion will factor into the monitor-selection process in this case as follows.[25]

*First*, if the Court were to accept the Agreement, the Department will that same day issue a public notice on the case website calling for candidates to apply for the monitorship. The website will solicit the submission of the application package called for by Paragraph 30 of the Agreement and provide a link to another website through which candidates can answer the conflicts/ethics questionnaire referenced in Paragraph 30(g) and provide additional information in support of their application. The notice will incorporate relevant language from the Agreement, including the commitment language in Paragraph 33, thereby encouraging all qualified candidates to apply, regardless of background. Neither the notice nor the website will call for the submission of any demographic or similar-type information that could be used to sort candidates based on protected classes.[26] Rather, candidates will need to submit information that establishes they meet the threshold qualifications defined in the Agreement and provide additional information that they believe demonstrates that they are the best candidate for the monitorship.

---

[25] This discussion tracks the process provided for in Paragraphs 30 to 35 of the Agreement.

[26] Attached as Exhibits 1 and 2, respectively, are the near-final notice and website the Department will publish if the Court accepts the Agreement. The Department is not soliciting submissions at this time and will not engage with any potential candidates who attempt to submit applications prior to the Court accepting the Agreement.

*Second*, for those candidates who submit complete applications and meet the threshold qualifications, Fraud Section attorneys will conduct an individualized assessment of the applications to identify a critical mass of candidates to advance to in-person interviews. Consistent with the 2023 Criminal Division Policy, this assessment will be focused on each candidate's:

- General background, education and training, professional experience, professional commendations and honors, licensing, reputation in the relevant professional community, and past experience as a monitor;

- Experience and expertise with the particular areas at issue in the case, and experience and expertise in applying the particular areas at issue in an organizational setting;

- Degree of objectivity and independence from the Company so as to ensure effective and impartial performance of the monitor's duties;

- The adequacy and sufficiency of available resources to discharge the monitor's responsibilities effectively; and

- Any other factor determined by the Government, based on the circumstances, to relate to the qualifications and competency of each monitor.[27] For instance, in matters involving global companies whose overseas operations are at issue, the Fraud Section has considered relevant foreign language skills and familiarity with and operational capacity in the relevant geographic areas.

To the extent it is possible to determine from the application materials and review whether a candidate is a member of a protected class or not, the Fraud Section will not use the factor of their membership or non-membership in the protected class as a basis to advance or not advance the candidate to the interview stage. Rather, the Fraud Section will assess whether the candidate's

---

[27] 2023 Criminal Division Policy, at 7-8.

14

individualized background, experience, and qualifications make them well suited to be considered further.

*Third*, the Fraud Section will take the same approach in conducting the in-person candidate interviews and determining which of them to select for the preliminary group of six finalists. The interview questions will further develop the factual record on the candidate's individualized background, experience, and qualifications, and how those qualities will inform and shape their approach to the monitorship. If, after Boeing interviews the six finalists, the Company expresses the view that a finalist does not meet the threshold qualifications, the Fraud Section will determine whether to agree with Boeing's assessment based strictly on those same qualifications, as provided in the Agreement. And to the extent the Fraud Section does agree, it will replace the finalist with another candidate based on the same evaluation criteria discussed above, repeating the process until it has a settled group of six finalists. From that group, Boeing has the right to strike one candidate, leaving a group of five finalists.

*Fourth*, from the group of five finalists, the Fraud Section will prepare a memorandum for the Criminal Division's Standing Committee on Monitor Selection recommending the selection of one of the five finalists. The 2023 Criminal Division Policy prescribes the content of the memorandum. The selection recommendation will be based on the same criteria and information sources discussed above, all to the goal of selecting the most qualified candidate.

*Fifth*, and finally, the Standing Committee determines whether to accept the recommendation, with review and concurrence of that recommendation by the head of the Criminal Division and ultimate approval by the Office of the Deputy Attorney General.[28] At each

---

[28] This multi-stage review process dates to the 2008 Morford Memo, which required review by a component-level standing committee and ultimate approval by the Office of the Deputy Attorney General. *See* 2008 Morford Memo, at 3.

15

level of this review, the respective Department officials will apply the same criteria discussed above to assess the candidates and the selection recommendation. Once the Office of the Deputy Attorney General approves the recommended selection, the Department will notify the Court and wait ten days before appointing the selected candidate to the position. The purpose of this ten-day waiting period is to allow for the Court to provide feedback on the proposed selection, which the Government will take into consideration before making the appointment. The Government, as it explained at the hearing, has no interest in selecting a candidate who does not have the Court's full confidence and support.

\* \* \*

For the reasons above, and those cited in the Government's prior submission and at the October 11, 2024 hearing, the Government respectfully urges the Court to accept the Agreement and take Boeing's guilty plea.

Respectfully submitted,

| | |
|---|---|
| GLENN S. LEON | LEIGHA SIMONTON |
| Chief, Fraud Section, Criminal Division | United States Attorney |
| United States Department of Justice | Northern District of Texas |
| | |
| By: *s/ Sean P. Tonolli* | By: *s/ Chad E. Meacham* |
| Sean P. Tonolli | Chad E. Meacham |
| Senior Deputy Chief | Assistant United States Attorney |
| D.C. Bar No. 503346 | Texas Bar No. 00784584 |
| sean.tonolli@usdoj.gov | chad.meacham@usdoj.gov |
| | |
| United States Department of Justice | United States Attorney's Office |
| Criminal Division, Fraud Section | Northern District of Texas |
| 1400 New York Avenue, N.W. | 801 Cherry Street, 17th Floor |
| Washington, D.C. 20005 | Fort Worth, TX 76102 |
| 202-514-2000 | 817-252-5200 |

cc: Counsel of Record (via ECF)