## UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF TEXAS
### Fort Worth Division

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )    4:21-cr-00005-O |
| | ) |
| THE BOEING COMPANY | ) |
| | ) |
| Defendant. | ) |
| | ) |

## GOVERNMENT'S RULE 48(a) MOTION TO DISMISS THE INFORMATION AND MOTION TO TERMINATE PRETRIAL DEADLINES AND VACATE THE TRIAL DATE

LORINDA I. LARYEA
Acting Chief
Fraud Section, Criminal Division
United States Department of Justice

By: *s/ Sean P. Tonolli*
Sean P. Tonolli
Senior Deputy Chief
D.C. Bar No. 503346
sean.tonolli@usdoj.gov

United States Department of Justice
Criminal Division, Fraud Section
1400 New York Avenue, N.W.
Washington, D.C. 20005
202-514-2000

CHAD E. MEACHAM
Acting United States Attorney
Northern District of Texas

By: *s/ Chad E. Meacham*
Chad E. Meacham
Acting United States Attorney
Texas Bar No. 00784584
chad.meacham@usdoj.gov

United States Attorney's Office
Northern District of Texas
801 Cherry Street, 17th Floor
Fort Worth, TX 76102
817-252-5200

**TABLE OF CONTENTS**

I.   INTRODUCTION ................................................................................................ 1

II.  FACTUAL BACKGROUND ............................................................................. 4

III. RULE 48(a) LEGAL STANDARD .................................................................. 9

IV. THE GOVERNMENT'S REASONS FOR MOVING TO DISMISS ................................. 13

    A.  The NPA's Benefits ................................................................................13

        1.  Boeing Will Pay the Statutory Maximum Fine ...................................... 13

        2.  Boeing Will Pay Further Crash-Victim Compensation that Avoids the Uncertain Restitution Process ................................................................. 13

        3.  Boeing Commits to Compliance Improvements that May Not Be Required as Part of a Criminal Sentence ................................................................. 15

        4.  Boeing's Board of Directors Will Meet With the Families ..................................... 16

    B.  Considerations of the Company's Compliance Program and FAA Oversight ...............17

    C.  Potential of No Further Accountability ........................................................18

V.  CONCLUSION ................................................................................................ 20

# TABLE OF AUTHORITIES

**Cases**

*In re Ryan*, 88 F.4th 614 (5th Cir. 2023) ............................................................1, 2, 11

*In re United States*, 345 F.3d 450 (7th Cir. 2003) ................................................. 10, 12

*Rinaldi v. United States*, 434 U.S. 22 (1977) ................................................9, 10, 11, 12

*Southern Union v. United States*, 567 U.S. 343 (2012) ................................................ 13

*Trump v. United States*, 603 U.S. 593 (2024) ............................................................. 10

*United States v. Castaneda*, 162 F.3d 832 (5th Cir. 1998) ........................................... 18

*United States v. CITGO Petroleum Corp.*, 2012 WL 4127800 (S.D. Tex. Sept. 18, 2012) .......... 15

*United States v. Cowan*, 524 F.2d 504 (5th Cir. 1975) .................................................. 10

*United States v. Fokker Servs.*, 818 F.3d 733 (D.C. Cir. 2016) ...................................... 12

*United States v. Hamm*, 659 F.2d 624 (5th Cir. 1981) ........................................... passim

*United States v. Heaton*, 458 F. Supp. 2d 1271 (D. Utah 2006) ....................................2, 11

*United States v. Reyes*, 102 F.3d 1361 (5th Cir. 1996) ................................................. 10

*United States v. Rubin*, 558 F. Supp. 2d 411 (E.D.N.Y. 2008) ...................................... 12

*United States v. Salinas*, 693 F.2d 348 (5th Cir. 1982) ............................................9, 11

*United States v. Sheinbaum*, 136 F.3d 443 (5th Cir. 1998) ........................................... 14

*United States v. Southern Union*, 942 F.Supp.2d 235 (D.R.I. 2013) ............................. 15

*United States v. Welborn*, 849 F.2d 980 (5th Cir. 1988) ..........................................10, 11

*Wayte v. United States*, 470 U.S. 598 (1985) ............................................................ 12

**Statutes**

18 U.S.C. § 3006A note ........................................................................................ 6

18 U.S.C. § 3571 ................................................................................................ 13

18 U.S.C. § 3663 ................................................................................................ 14

18 U.S.C. § 371 .................................................................................................. 19

18 U.S.C. § 3771 ................................................................................................ 1, 3, 12

Pub. L. No. 105-119, § 617, 111 Stat. 2440, 2519 (1997) .......................................... 6

**Rules**

Fed. R. Crim. P. 48(a) .................................................................................... passim

Fed. R. Crim. P. 48, Adv. Committee Note (1948) ...................................... 10

**Other Authorities**

Memorandum of the Head of the Criminal Division on *Selection of Monitors in Criminal Division Matters* (May 12, 2025) ("Criminal Division Monitor Memo"), *available at* https://www.justice.gov/criminal/media/1400036/dl?inline. ................................... 8

*Principles of Federal Prosecution,* Justice Manual §§ 9-27.000, -28.000, available at https://www.justice.gov/jm/title-9-criminal ........................................... 4, 8

U.S. Department of Justice, Criminal Division, Evaluation of Corporate Compliance Programs (Sept. 2024), *available at* https://www.justice.gov/criminal/criminal-fraud/page/file/937501/dl?inline ..................................................... 8

## I.      INTRODUCTION

The United States of America (the "Government" or the "Department") respectfully moves, under Federal Rule of Criminal Procedure 48(a) and with the consent of Defendant The Boeing Company ("Boeing" or the "Company"), to dismiss without prejudice the pending Criminal Information ("Information").[1] The Government writes to provide its reasons for moving to dismiss. *See In re Ryan*, 88 F.4th 614, 627-28 (5th Cir. 2023).

The Government has decided not to proceed to trial because the parties have reached a non-prosecution agreement ("Agreement" or "NPA")[2] that secures meaningful accountability, delivers substantial and immediate public benefits, and brings finality to a difficult and complex case whose outcome would otherwise be uncertain. Boeing will pay and invest another $1.1 billion combined in penalties, compensation to the family members of the victims of the Lion Air Flight 610 and Ethiopian Airlines Flight 302 airplane crashes ("Families"), and improvements to its compliance, safety, and quality programs.[3] The Company will continue to enhance its anti-fraud compliance and ethics program and will retain an independent compliance consultant who will report to the Government.[4] And Boeing's Board of Directors will have to meet face-to-face with the Families.[5]

Before deciding to offer and enter the Agreement, the Government solicited the views of the Families, with whom the Government has continued to engage in good faith and in satisfaction of the Crime Victims' Rights Act, 18 U.S.C. § 3771 ("CVRA").[6] Of those who shared their views,

---

[1] Criminal Information, ECF No. 1 (Jan. 7, 2021).

[2] Exhibit 1, May 29, 2025 Non-Prosecution Agreement between Government and Boeing ("NPA").

[3] NPA, at 7, ¶ 12 (penalty); *id*. at 6, ¶ 11 (compensation); *id*. at 7-8, ¶ 13 (investment).

[4] *Id*. at 5-6, ¶¶ 8-10.

[5] *Id*. at 8, ¶ 14.

[6] *See generally* Exhibit 2, Declaration of Sean P. Tonolli ("Gov't NPA Decl."), and accompanying Exhibits 3-27.

the feedback ranged from support for to opposition against the Agreement.[7] Family members on behalf of over 110 crash victims have expressed their support for the Agreement specifically or the Department's judgment to resolve the case pre-trial, or at least do not oppose the Agreement.[8] Several other Families continue to urge the Government to go to trial—even though their conception of what the trial should look like does not align with the charge, the evidence, and the law[9]—and they urge the Government to reject any pre-trial resolution other than a plea by Boeing to the Information without any agreement.[10] Some number of these Families will file oppositions to this motion, and the Government supports their right to do so.

The Government has "recount[ed]" these views to confirm that it has "consulted on the dismissal" contemplated in this motion with the Families and weighed them in its decision to proceed with an NPA and a motion to dismiss the pending charge without prejudice. *In re Ryan*, 88 F.4th at 627 (quoting *United States v. Heaton*, 458 F. Supp. 2d 1271, 1273 (D. Utah 2006)). The Government has the deepest respect for all the Families, including those who do not share the Government's view that the Agreement is in the public interest, and recognizes the deep

---

[7] Gov't NPA Decl., at 19, ¶ 52.

[8] *Id.*

[9] *Compare* Exhibit 24, at 28, 30, May 22, 2025 P. Cassell letter to Government ("The families also believe that a criminal prosecution of Boeing's then-responsible corporate officials at the time of the two crashes, including in particular former Boeing CEO Dennis Muilenburg, is appropriate. . . . A single conspiracy charge for fraud in a case in which the defendant directly and proximately caused 346 deaths is already extraordinarily lenient treatment for an extraordinarily deadly crime.), *with* Gov't Resp. in Support of Proposed Plea Agreement ("Gov't Plea Resp."), at 10-11, ECF No. 245 ("[T]he Government does not have sufficient evidence (i) to charge Boeing with a federal criminal offense with an offense element relating to the deaths; (ii) to allege and prove beyond a reasonable doubt that any other Boeing personnel, including senior executives and board members, conspired with the former Chief Technical Pilot and the other Technical Pilot; or (iii) to allege and prove beyond a reasonable doubt a pecuniary gross gain or loss amount greater than the $243.6 million in training-cost savings Boeing derived.").

[10] Gov't NPA Decl., at 19, ¶ 52.

disappointment caused by this difference in judgment. The Executive Branch, however, remains "the first and presumptively the best judge of whether a pending prosecution should be terminated." *United States v. Hamm*, 659 F.2d 624, 628-29 (5th Cir. Unit A 1981) (en banc) (quotation omitted); 18 U.S.C. § 3771(d)(6) ("Nothing in [the CVRA] shall be construed to impair the prosecutorial discretion of the Attorney General or any officer under [her] direction.").

The Government stands by its determination in May 2024 that Boeing breached the deferred prosecution agreement ("DPA")[11] by not fully meeting its compliance obligations and that the Company needs to be held further accountable for that breach.[12] But in the year since the breach determination, the Company has made meaningful progress in improving its anti-fraud compliance and ethics program.[13] And the Federal Aviation Administration ("FAA")—Boeing's congressionally mandated regulator—has sustained its more robust oversight of the Company in the wake of the Alaska Airlines Flight 1282 incident, and that oversight is focused on, among other issues, the very ones that formed the basis of the breach determination.[14]

In light of these changed circumstances, and taking into account the certainty, finality, and substantial benefits the Agreement secures, the Government has determined, after careful and good faith consideration, that it is in the public interest to dismiss the Information in exchange for the obligations the NPA places on Boeing.

Given the Government's decision not to further prosecute Boeing and the need for the Court to rule on the motion to dismiss, in order to avoid unnecessary litigation and expenditure of

---

[11] Deferred Prosecution Agreement, ECF No. 4 (Jan. 7, 2021).

[12] Government Notice, ECF No. 199 (May 14, 2024); Government Status Report, ECF No. 206 (Jul. 8, 2024).

[13] Gov't NPA Decl., at 12-13, ¶¶ 36-38.

[14] *Id*.

resources, the Government also moves, with Boeing's consent, for the Court to terminate the pretrial deadlines and vacate the trial date.[15] A proposed Order accompanies this filing.[16]

## II.    FACTUAL BACKGROUND

On December 5, 2024, the Court rejected the plea agreement proposed by the parties and ordered them to meet and confer regarding how they planned to proceed.[17] That same day, the Government notified the Families of the Court's decision and sought their feedback on how to proceed.[18]

On December 11, 2024, the Government held an over two-hour conferral for the Families and their counsel, more than approximately 90 of whom joined.[19] Those who spoke expressed the view that the Government should proceed to trial.[20]

After careful consideration of the Families' views, the facts and the law, the Department's *Principles of Federal Prosecution*,[21] and the ethical and professional obligations of prosecutors, the Government decided to pursue another pre-trial resolution.[22] The Government informed the Families and the Court of this decision on January 3, 2025.[23]

---

[15] Pretrial Scheduling Order, ECF No. 294 (Mar. 25, 2025); Trial Order, ECF No. 293 (Mar. 25, 2025).

[16] Exhibit 28.

[17] Order Rejecting Proposed Plea Agreement ("Order Rejecting Plea"), ECF No. 282 (Dec. 5, 2024).

[18] Gov't NPA Decl., at 7, ¶¶ 18-20.

[19] *Id*. at 8-9, ¶¶ 24-27.

[20] *Id*. at 9, ¶ 28.

[21] Justice Manual ("JM") §§ 9-27.000, -28.000, *available at* https://www.justice.gov/jm/title-9-criminal.

[22] Gov't NPA Decl., at 9-10, ¶ 29.

[23] *Id*. at 10 ¶ 31.

On May 12, 2025, the parties' discussions resulted in a potential framework—but not an offer by the Government—to resolve this case through a non-prosecution agreement.[24] The next day, the Government invited the Families and their counsel to another conferral to discuss whether to resolve this case through the possible agreement or proceed to trial.[25]

The Government held the over two-hour conferral on May 16, 2025.[26] More than approximately 90 Family members and counsel attended.[27] The Government explained the material terms of the possible agreement and discussed the uncertainty of proceeding to trial.[28] The Families and counsel who spoke voiced opposition to the possible agreement and dismissing the case because, consistent with their views that they have previously shared with the Government and the Court, they believe the Government should take Boeing to trial notwithstanding the risks.[29]

At the request of some of the Family members, the Government agreed, before making its decision, to consider follow-up written submissions it received through the close of business on

---

[24] *Id*. at 11, ¶ 34.

[25] *Id*. at 13-14, ¶ 40.

[26] *Id*. at 15, ¶ 44.

[27] *Id*.

[28] *Id*. at 16-18, ¶ 48.

[29] *Id*. at 18, ¶ 49. The Government had previously raised the possibility of resolving this case through an NPA in a prior conferral on May 31, 2024, after the Government made the DPA breach decision. ECF No. 245-1, at 16-21, ¶¶ 37-43; ECF No. 245-22, at 3 (June 4, 2024 P. Cassell letter to Government) (responding to the option of the Government "enter[ing] into a new NPA or new DPA with Boeing"); *see also* Exhibit 24, at 28, May 22, 2025 P. Cassell letter to Government ("You may recall that at an earlier, May 31, 2024, meeting and in follow-up, the families explained that any effort to dismiss the charges against Boeing would be absurd."); *id*. at 28 n.1 ("In early June [2024], I sent a letter to Glenn Leon, your predecessor. This letter incorporates all concerns and arguments advanced in that letter, and we urge you to read that letter as well. Also, you will have seen our brief and reply brief last summer about the proposed guilty plea. This letter also incorporates all concerns and arguments advanced in that briefing.")

May 22, 2025.[30] The Government received 14 written submissions totaling 40 pages, expressing views ranging from support for the Agreement to complete opposition.[31]

The Government again carefully considered the perspectives of the Families—not just from the May 16th conferral and the written submissions, but all the views the Families shared with the Government and Court throughout the case—and all the other relevant factors discussed above.[32] On May 23, 2025, the Government decided to offer the NPA to Boeing, which the Company accepted.[33] The Government informed the Families of these developments before informing the Court.[34] The parties proceeded to memorialize the Agreement in writing, and it became effective May 29, 2025.[35]

The Agreement, which has a term of two years,[36] imposes obligations on both parties. Boeing, for its part, must:

- Admit to conspiracy to obstruct and impede the lawful operation of the Federal Aviation Administration Aircraft Evaluation Group and agree that it is not a "prevailing party" for purposes of the Hyde Amendment.[37] The Agreement will not provide protection against prosecution for any other misconduct.[38] If Boeing breaches the Agreement, the Government can

---

[30] Gov't NPA Decl., at 18, ¶ 50.

[31] *Id*. at 19, ¶ 52.

[32] *Id*. at 19-20, ¶¶ 53-54.

[33] *Id*. ¶ 54.

[34] *Id*. at 20, ¶ 55.

[35] *Id*. ¶ 56.

[36] NPA, at 4, ¶ 5. Two years effectively brings the NPA term in line with the three-year term under the proposed plea agreement if had Boeing been able to plead guilty last July.

[37] NPA, at B-2, ¶ 1. *See* Pub. L. No. 105-119, § 617, 111 Stat. 2440, 2519 (1997); 18 U.S.C. § 3006A note.

[38] NPA, at 1, ¶ 1, 8, ¶ 15.

refile the Information charging the Company for the criminal conduct in this case, so long as the Court has not dismissed the Information with prejudice.[39]

- Pay a criminal monetary penalty of $487.2 million,[40] which is the statutory maximum fine,[41] with credit for the $243.6 million penalty the Company previously paid pursuant to the DPA.[42]

- Fund $444.5 million in another Crash-Victim Beneficiaries fund, to which the estate of each crash victim will be entitled to an equal *pro rata* share.[43] This is in addition to the $500 million Crash-Victim Beneficiaries fund that Boeing paid under the DPA and any civil settlements the Families have received or do receive in the future.[44]

- Invest $455 million to strengthen the Company's compliance, safety, and quality programs.[45]

- Continue to improve the effectiveness of the Company's anti-fraud compliance and ethics program[46], and retain an independent compliance consultant empowered to make recommendations for further improvement and required to report its findings directly to the Government.[47] This approach strikes a careful balance between, on the one hand, the continued

---

[39] *Id*. at 8-9, ¶ 16.

[40] *Id*., at 7, ¶ 12.

[41] Gov't Plea Resp. at 11-12, 26-27.

[42] DPA, at 11, ¶ 10.

[43] NPA, at 6-7, ¶ 11.

[44] DPA, at 12, ¶ 13; Gov't NPA Decl. at 3-6, ¶¶ 8-16 (explaining how the Government, with assistance from financial experts in personal economic loss, calculated the $444.5 million).

[45] NPA, at 7-8, ¶ 13.

[46] *Id*. at 5-6, ¶¶ 8-9.

[47] *Id*. at 6, ¶ 10, D-3-4, ¶ 6.

need to ensure and independently verify that Boeing's program improves, with, on the other hand, the meaningful compliance improvements Boeing has made since the parties proposed the plea agreement last summer and the FAA's sustained, enhanced oversight of the Company since the Alaska Airlines Flight 1282 incident.[48] The FAA's enhanced oversight includes, for example, placing many fulltime, in-person inspectors at each major Boeing production facility, who independently conduct audits, investigate complaints, and have free access to Boeing personnel to continuously evaluate safety and compliance, including compliance issues that were the basis for the Government's DPA-breach determination.[49]

      •    Arrange for the Company's Board of Directors to meet with the Families to hear directly from them about the impact of the Company's conduct, as well as the Company's compliance, safety, and quality programs.[50]

      •    Cooperate with any investigation by the Department of Justice as a matter of course, and, at the Department's request, with any investigations conducted by other domestic or foreign law enforcement and regulatory authorities and agencies.[51]

In exchange for these certain, guaranteed, and substantial benefits the Agreement secures from Boeing, and the litigation risks the Agreement addresses, the Government's primary

---

[48] Gov't NPA Decl., at 11-13, ¶¶ 35-38. In considering whether a monitorship is necessary, Department and Criminal Division policy requires prosecutors to assess the state of the company's compliance and ethics program at the time of a resolution, as well as whether the company is otherwise subject to government oversight. JM § 9-28.1700(A)(10), (B); U.S. Department of Justice, Criminal Division, Evaluation of Corporate Compliance Programs, at 1 (Sept. 2024), *available at* https://www.justice.gov/criminal/criminal-fraud/page/file/937501/dl?inline; Memorandum of the Head of the Criminal Division on *Selection of Monitors in Criminal Division Matters*, at 3 (May 12, 2025) ("Criminal Division Monitor Memo"), *available at* https://www.justice.gov/criminal/media/1400036/dl?inline.

[49] Gov't NPA Decl., at 12, ¶ 37.

[50] NPA, at 8, ¶ 14.

[51] *Id.*, at 4-5, ¶¶ 6-7.

obligation is to move to dismiss the Information without prejudice and to not further prosecute the Company for the conduct that is the subject of this case.[52] Boeing has consented in writing to the dismissal without prejudice.[53]

## III.    RULE 48(a) LEGAL STANDARD

Under Federal Rule of Criminal Procedure 48(a), "[t]he government may, with leave of court, dismiss an . . . information." The Fifth Circuit has read the Rule's "leave of court" language to grant courts "discretion" to deny a motion to dismiss under this provision in two situations. *Hamm*, 659 F.2d at 629. *First*, because "[t]he principal object of the 'leave of court' requirement is . . . to protect a defendant from prosecutorial harassment, *e.g.*, charging, dismissing, and recharging," a court may refuse to dismiss a prosecution if the defendant objects to that dismissal. *Rinaldi v. United States*, 434 U.S. 22, 29 n.15 (1977); *e.g.*, *United States v. Salinas*, 693 F.2d 348, 351-53 n.15 (5th Cir. 1982) (holding that the government wrongly dismissed an indictment and reindicted one week later because it wanted a "better" jury). *Second*, the Fifth Circuit has stated that, "even where the defendant consents to the motion to dismiss, the trial court, in extremely limited circumstances in extraordinary cases, may deny the motion when the prosecutor's actions

---

[52] *Id*., at 8, ¶ 15.

[53] *Id*. at 8, ¶ 15, B-2, ¶ 1.

clearly indicate a 'betrayal of the public interest.'"[54] *Hamm*, 659 F.2d at 629 (citation omitted). A trial court may therefore, according to the Fifth Circuit, deny a Rule 48(a) motion to dismiss only if the court "finds that the prosecutor is clearly motivated by considerations other than his assessment of the public interest." *Id.* at 630 (using the example of a prosecutor "motivated to dismiss because he has accepted a bribe or because he desires to attend a social event instead of attend upon the court in the trial of the case or because he personally dislikes the victim of the crime").

Absent evidence of such highly unusual (and unlikely) conduct, a court ordinarily should grant a Rule 48(a) motion to dismiss if the parties agree that dismissal is appropriate. *See, e.g.*, *United States v. Reyes*, 102 F.3d 1361, 1367-68 (5th Cir. 1996). If the motion is contested, further inquiry is appropriate. *United States v. Welborn*, 849 F.2d 980, 983-84 (5th Cir. 1988). The court still "must begin with the presumption that the prosecutor acted in good faith" in moving to dismiss a charging document. *Id.* at 983. After all, the Executive Branch remains "the first and presumptively the best judge of whether a pending prosecution should be terminated." *Hamm*, 659 F.2d at 628-29. The court may, however, expect the prosecutor "to supply sufficient reasons" supporting the dismissal—not just "a bare conclusion in support of its motion." *Welborn*, 849 F.2d

---

[54] The Court in *Rinaldi* found it "unnecessary to decide whether [a] court has discretion" to refuse to dismiss a charging document in this second scenario. *Rinaldi*, 434 U.S. at 29 n.15. To preserve the issue for review, the government notes its disagreement with the Fifth Circuit's position that Rule 48(a)'s "leave of court" requirement permits a court to deny a motion to dismiss unopposed by the defendant and requires the prosecutor to give reasons for his motion to dismiss. Reading Rule 48(a) in that way undercuts the Executive Branch's "'exclusive authority and absolute discretion'" to decide which crimes to investigate and prosecute, *Trump v. United States*, 603 U.S. 593, 620 (2024), and allows Rule 48(a) to drift far from the founding-era and "common-law rule that the public prosecutor may enter a *nolle prosequi* in his discretion," Fed. R. Crim. P. 48, Adv. Committee Note (1944); *see United States v. Cowan*, 524 F.2d 504, 505 (5th Cir. 1975) (noting that common-law history); *cf. In re United States*, 345 F.3d 450, 454 (7th Cir. 2003) (explaining that the Constitution requires the "concurrence of all three branches" of government before "one can be convicted of a crime").

at 983 (quotation omitted). "Based on the prosecutor's statement of reasons and any response," the court must decide if "the presumption of good faith is overcome by 'an affirmative reason to believe that the dismissal motion was motivated by considerations contrary to the public interest.'" *Id.* at 984 (citation omitted); *Salinas*, 693 F.2d at 352 ("Although the burden of proof is not on the prosecutor to prove that dismissal is in the public interest, the prosecutor is under an obligation to supply sufficient reasons—reasons that constitute more than a mere conclusory interest [supporting dismissal].") (quotation omitted). That judgment must turn, not on any prior improprieties in the case, but on whether "the Government's later efforts to terminate the prosecution were . . . tainted with impropriety." *Rinaldi*, 434 U.S. at 30; *accord Hamm*, 659 F.2d at 629 ("[T]he trial judge must look to the motivation of the prosecutor at the time of the decision to dismiss.").

Although the parties to this case agree that dismissal is appropriate—and thus the Rule 48(a) motion is not contested in the traditional sense—the Government acknowledges that some of the Families disagree with this resolution. *Ryan* provides further guidance as to how a Rule 48(a) dismissal intersects with the rights of crime victims under the CVRA. The prosecutor must "recount that the victim[s] ha[ve] been consulted on the dismissal and what the victim[s'] views were on the matter." 88 F.4th at 627 (quoting *Heaton*, 458 F. Supp. 2d at 1273). Then, this Court must "assess the public interest according to case law as well as the CVRA, including violations already admitted to, as well as any other circumstances brought to its attention by the victims' families." *Id.* In other words, this Court may consider the victims' views and any CVRA violations in considering whether the government's current decision to dismiss the case is "tainted with impropriety." *Rinaldi*, 434 U.S. at 30. Findings of such impropriety are appropriate only in rare and extreme cases, such as if a prosecutor sought dismissal "because he personally dislikes the

victim[s]," *Hamm*, 659 F.2d at 630, or to shirk his duties under the CVRA, 18 U.S.C. § 3771. Otherwise, the presumption that the government seeks dismissal in good faith remains intact even if a crime's victims disagree with the government's decision. 18 U.S.C. § 3771(d)(6) (disclaiming any intent for the CVRA "to impair the prosecutorial discretion of the Attorney General or any officer under [her] direction"); *see United States v. Rubin*, 558 F. Supp. 2d 411, 418 (E.D.N.Y. 2008) ("[T]he CVRA, for the most part, gives victims a voice, not a veto.").

So long as the government follows this process and has weighed the matter carefully and in good faith, a district court must grant the motion to dismiss. The "court cannot deny leave of court because of a view that the defendant should stand trial notwithstanding the prosecution's desire to dismiss the charges." *United States v. Fokker Servs.*, 818 F.3d 733, 742 (D.C. Cir. 2016). Nor may a court deny leave on the ground that the prosecution has "fail[ed] adequately to redress the gravity of the defendant's alleged conduct." *Id*. "The authority to make such determinations remains with the Executive," *id.*, and decisions on those fronts are "particularly ill-suited to judicial review," *Wayte v. United States*, 470 U.S. 598, 607 (1985); *see Rinaldi*, 434 U.S. at 31-32 (finding an abuse of discretion where the district court refused to grant a post-conviction Rule 48(a) motion based on the Department of Justice's *Petite* policy, which limits the bringing of federal prosecutions).

To the Government's knowledge, neither the Fifth Circuit nor any other appellate court has ever affirmed the denial of a Rule 48(a) motion to dismiss to which the defendant consented. *Cf. In re United States*, 345 F.3d 450, 453 (7th Cir. 2003) ("We are unaware . . . of any appellate decision that actually upholds a denial of a motion to dismiss a charge" on grounds that dismissal would not serve the "public interest.").

## IV.    THE GOVERNMENT'S REASONS FOR MOVING TO DISMISS

After extensive review and careful consideration and conferral with the Families, the Government has determined that it is in the public interest to resolve this case through the NPA. The NPA secures tangible and significant benefits to the public immediately that further prosecution may not provide. Further, the Agreement accounts for the Government's view of the uncertainty attendant with proceeding to trial and the current state of Boeing's anti-fraud compliance and ethics program—which has improved in the almost one year since the parties proposed the plea agreement—and the FAA's enhanced and sustained oversight of the Company. Dismissal of the Information without prejudice—which, importantly, will allow the Government to refile if Boeing does not satisfy its obligations—is an appropriate tradeoff for the certain, guaranteed, and substantial benefits the Agreement provides.

### A.    The NPA's Benefits

#### 1.    Boeing Will Pay the Statutory Maximum Fine

The NPA requires Boeing to pay another $243.6 million criminal penalty. Between the DPA and the NPA, Boeing will have paid the $487.2 million statutory-maximum fine given the offense gain or loss provable here beyond a reasonable doubt. 18 U.S.C. § 3571(d); *see Southern Union v. United States*, 567 U.S. 343 (2012). And the Agreement resolves liability only for the conduct described in the Statement of Facts and does not provide protection from prosecution for any other misconduct.

#### 2.    Boeing Will Pay Further Crash-Victim Compensation that Avoids the Uncertain Restitution Process

The NPA requires Boeing to pay $444.5 million into another Crash-Victim Beneficiaries Compensation fund to further compensate the Families and without prejudice to their recovery in civil suits. This figure reflects extensive analysis of the claims for restitution that the Government

13

has received from certain Families and provides greater certainty, and likely greater recovery, than would continued litigation here.

As the Government has explained, restitution and its scope in this matter are uncertain. Restitution here requires the Government to secure a conviction and, because restitution is discretionary but not mandatory for the potential crime of conviction, to persuade the Court at sentencing that determining restitution is proper and not too complex or prolonged a process.[55] Notably, the Government's financial experts on personal economic loss spent over 3,000 hours designing and conducting its analysis of the restitution information provided for just under half of the crash victims.[56]

Boeing could seek to limit the restitution available under the statute's plain terms and seek to offset any restitution obligation it may have against amounts that the Families have previously recovered in civil litigation. *See* 18 U.S.C. § 3663(b); *United States v. Sheinbaum*, 136 F.3d 443, 449 (5th Cir. 1998) ("Of course, to avoid double-counting, a district court must reduce the size of its restitution order by any amount received by the victim as part of a civil settlement."). To be sure, the Government would support the Families in seeking full and timely restitution upon a conviction, but there remains litigation risk as to what restitution, if any, the Families would receive.

Meanwhile, the $444.5 million that Boeing must pay under the NPA's second Crash-Victim Beneficiaries Fund represents tangible substantiated benefits free from litigation risk. The payments would not impact any ongoing civil litigation with Boeing, meaning the Families could still pursue any additional claims for losses as they see fit, and this funding supplements the

---

[55] 18 U.S.C. § 3663(a)(1)(B)(ii); *see* Gov't Plea Resp. at 31-33.

[56] Gov't NPA Decl., at 5, ¶ 13.

payments already made to the Families through civil litigation or the DPA's initial Crash-Victim Beneficiaries Compensation fund.

### 3. Boeing Commits to Compliance Improvements that May Not Be Required as Part of a Criminal Sentence

To address Boeing's compliance operations, the NPA requires Boeing to invest $455 million to strengthen its compliance, safety, and quality programs. These enhancements will benefit the public by reducing the risk of the recurrence of fraud at Boeing and ensuring that the Company effectively integrates its safety and compliance programs. It is not certain the Court could require this remedial investment as part of a post-conviction sentence, at least not without impacting the amount of a criminal fine the Court could impose.[57]

Next, the NPA demands that Boeing spend two more years continuing to implement and maintain a rigorous anti-fraud compliance program. The compliance program must incorporate relevant internal controls, policies, and procedures designed to effectively detect and deter violations of U.S. federal anti-fraud laws and integrate its ethics and compliance program with its safety and quality programs as necessary to reasonably prevent violations of U.S. anti-fraud laws or policies. The compliance program will include, but not be limited to, the minimum elements set forth in the NPA's Attachment C. Throughout this two-year period, Boeing will remain under enhanced self-reporting obligations to the Government.

The Company must also retain an independent compliance consultant. This consultant will serve as an independent third party evaluating whether Boeing is meeting its obligations to implement an effective compliance program and recommending actions Boeing should take to

---

[57] *See* Proposed Plea Hearing Transcript, at 84-85 (discussing *United States v. Southern Union*, 942 F.Supp.2d 235 (D.R.I. 2013)); *see also United States v. CITGO Petroleum Corp.*, 2012 WL 4127800, at *4-*5 (S.D. Tex. Sept. 18, 2012).

meet those obligations. However, rather than conduct the compliance-program testing itself, the consultant will observe Boeing's team as the Company conducts the testing. This will allow Boeing to implement self-sustained improvements to its anti-fraud compliance program, demonstrate its capacity to self-test its own program, and remediate deficiencies, but under observation by a sophisticated third party that will be reporting directly to the Department on Boeing's progress. The compliance consultant will help address any lingering anti-fraud compliance risks while still providing an independent check on the company and an independent set of eyes to help the Government assess the company's progress in meeting its compliance obligations.

The consultancy arrangement ensures a prudent amount of oversight. As the Government has previously explained, it is sensitive to the risks and complications that a monitor could pose to the FAA's oversight and Boeing's continued improvement. The Government continues to prioritize a resolution that accounts for these concerns. For these reasons, the NPA strikes a balance of ensuring the FAA continues taking the lead role in its regulatory functions, accounts for improvements that the Company is making, and requires additional investment and measures to further improve the Company's compliance regime.

The NPA finally requires that Boeing's Chief Executive Officer and Chief Compliance Officer certify before the end of the term that Boeing has met its compliance-related obligations under the NPA.

### 4.     Boeing's Board of Directors Will Meet With the Families

The Agreement requires Boeing's Board of Directors to meet with the Families to hear directly from them about the impact of the Company's conduct, as well as the Company's compliance, safety, and quality programs. A conviction could not provide a guarantee of such a meeting, in which some Families have expressed interest.

**B.      Considerations of the Company's Compliance Program and FAA Oversight**

Since the summer of 2024, when the Government determined that Boeing had breached the DPA and sought a plea agreement, there have been significant changes internal and external to Boeing impacting Boeing's anti-fraud compliance program. These changes bear on the Government's view as to the proper resolution in this matter.

*First*, under the oversight of the FAA, Boeing has prepared and begun executing a remediation program designed to address the findings from a special FAA audit conducted in the wake of the January 2024 Alaska Airlines Flight 1282 incident. The FAA-approved remediation program includes specific production health metrics that senior career FAA officials review weekly. The FAA has also increased the number of air safety inspectors staffed at Boeing's production facilities. These air safety inspectors independently conduct audits, investigate whistleblower complaints received by the FAA, and validate Boeing's completion of the enhancements promised under the remediation plan. As before with its proposed plea agreement, the Government believes that a resolution of this matter whether before or after trial must respect the FAA's congressionally mandated authority.

*Second*, beyond its engagement with the FAA, Boeing has made meaningful enhancements to its compliance program to address the core concerns underlying the Government's DPA breach finding. For example, Boeing established a compliance integration team to support and integrate the compliance and ethics program with the quality, manufacturing, and safety functions. Additionally, to better position Boeing to identify and remediate gaps in its controls over compliance and safety, Boeing has restructured and improved resourcing around its internal audit function to increase its stature and independence, all of which are essential to Boeing's ability to independently test and mitigate compliance risk.

### C.    Potential of No Further Accountability

The Government continues to hold its considered view of what the pretrial litigation and trial in this case would look like, and the attendant risks.[58] Although the Government stands by its case, these risks would, if they came to fruition, allow Boeing to escape any further accountability. And even if Boeing were convicted, there is no guarantee that sentencing could secure all the benefits provided under the NPA, and certainly not on the immediate timeline provided for under the Agreement. The Government has carefully considered and weighed these risks in deciding to proceed with the NPA.

*First*, before this case even proceeds to trial, the Government expects that Boeing would vigorously challenge the Government's determination that it breached the DPA. The Company has repeatedly invoked *United States v. Castaneda*, 162 F.3d 832 (5th Cir. 1998), to argue that the Government's breach determination is subject to judicial review.[59] Although the Government disagrees with the company's reading of *Castaneda*, if Boeing prevailed, the Government would have to prove by a preponderance of the evidence to this Court that Boeing breached the DPA's terms. The Government believes that it could do so but cannot ignore the possibility of this Court issuing an adverse finding.[60] Such a finding would compel the Government to move for dismissal under Rule 48(a), but without the benefits of the instant NPA.

*Second*, notwithstanding the strength of the Government's case, conviction at trial is not guaranteed—as is true in any matter that the Government must prove beyond a reasonable doubt.

---

[58] *E.g.*, Gov't Plea Resp., at 9-12.

[59] *E.g.*, Boeing Resp. in Support of Plea Agreement, at 4, 17, ECF No. 246 (Aug. 14, 2024) (citing *Castaneda*).

[60] *See* Order Rejecting Plea, at 11 (noting when rejecting the proposed plea agreement that the Court thought it "not clear what all Boeing has done to breach the Deferred Prosecution Agreement" despite the Government's Factual Basis for Breach concerning the breach).

The Government would, of course, seek to admit the Statement of Facts that Boeing agreed to when executing the now-breached DPA. But even if the Statement of Facts was admitted in whole or in part over any objection, the Government has concluded that there remains risk a jury would not be convinced beyond a reasonable doubt that Boeing violated 18 U.S.C. § 371. The Court observed for itself how the trial of the former Chief Technical Pilot proceeded, which ended in acquittal, and has commented on potential vulnerabilities in the Government's evidence.[61]

Many Family members want the Government to go to trial regardless of the litigation risks. But at the core of their objection to the NPA, and the proposed plea agreement before that, is the presumption that the Government would present a more expansive case at trial (or at sentencing post-trial) that reveals a criminal conspiracy that reached to the highest levels of the Company, and proves that Boeing is criminally responsible for the deaths of their loved ones. But the reality presented by the evidence and the law is that the Government could not, consistent with Department policy and its ethical and professional obligations, put on such a case. The testimony and evidence the Government can seek to introduce against Boeing would track the Statement of Facts accompanying the Agreement and overlap to a substantial degree with the testimony and evidence the Government introduced in the trial of Boeing's former Chief Technical Pilot. While the Government appreciates the significance of a felony conviction in its own right, the Government has taken into consideration that the conviction the Government could secure at trial would not be the same conviction that the objecting Families actually envision or want.

*Third*, as discussed above, the sentencing outcomes are not certain to exceed the benefits secured by the NPA but are certain to be subject to drawn-out litigation before the Court and the Fifth Circuit.

---

[61] *See e.g.*, Evidentiary H'rg Tr. at 35:9-16, 36:2, 37:1-5 (Aug. 26, 2022).

V.    **CONCLUSION**

For the reasons given, the Government respectfully asks the Court to enter an Order dismissing the Information without prejudice under Rule 48(a) and, in the interim, to terminate the pretrial deadlines and vacate the trial date.

Respectfully submitted,

LORINDA I. LARYEA                      CHAD E. MEACHAM
Acting Chief                           Acting United States Attorney
Fraud Section, Criminal Division       Northern District of Texas
United States Department of Justice

By: *s/ Sean P. Tonolli*               By: *s/ Chad E. Meacham*
Sean P. Tonolli                        Chad E. Meacham
Senior Deputy Chief                    Acting United States Attorney
D.C. Bar No. 503346                    Texas Bar No. 00784584
sean.tonolli@usdoj.gov                 chad.meacham@usdoj.gov

United States Department of Justice    United States Attorney's Office
Criminal Division, Fraud Section       Northern District of Texas
1400 New York Avenue, N.W.             801 Cherry Street, 17th Floor
Washington, D.C. 20005                 Fort Worth, TX 76102
202-514-2000                           817-252-5200


cc: Counsel of Record (via ECF)

20