No. _____

*In the*

# United States Court of Appeals

*for the*

# Fifth Circuit

IN RE Naoise Connolly Ryan, Emily Chelangat Babu and Joshua Mwazo Babu, Catherine Berthet, Huguette Debets, Luca Dieci, Bayihe Demissie, Sri Hartati, Zipporah Kuria, Javier de Luis, Nadia Milleron and Michael Stumo, Chris Moore, Paul Njoroge, Yuke Meiske Pelealu, John Karanja Quindos, and Guy Daud Iskandar Zen S., Rini Soegiyono, Dayinta Anggana, Helda Aprilia, Serly Oktaviani, Wilson Sandi, Hendrarti Hendraningrum, Dody Widodo, Myrna Juliasari, Merdian Agustin, Adhitya Wirawan, M. Sholekhudin Zuhri, Siska Ong, Wenny Sia Wijaya, Suharto, Rohmiyatun, Sri Umi Anggraini, Permana Anggrimulja, Linda Manfredi, Sonia Lorenzoni, and Maurizio Manfredi — Crime Victim Rights Act Petitioners.

**REASSERTION OF AN EARLIER, PREMATURE PETITION FOR A WRIT OF MANDAMUS UNDER THE CRIME VICTIMS' RIGHTS ACT**

**Mandamus from the**
**United States District Court for the**
**Northern District of Texas**
**Case No. 4:21-cr-005-O**

Warren T. Burns
Darren P. Nicholson
Chase Hilton
Burns Charest LLP
900 Jackson Street, Suite 500
Dallas, Texas 75202
wburns@burnscharest.com
nicholson@burnscharest.com
chilton@burnscharest.com

Paul G. Cassell (Utah Bar No. 06078)
(Counsel of Record)
Utah Appellate Project
S.J. QUINNEY COLLEGE OF LAW
University of Utah
383 S. Univ. St.
Salt Lake City, UT 84112
Telephone: (801) 585-5202
cassellp@law.utah.edu
(no institutional endorsement implied)
*Additional counsel on signature page.*

*Attorneys for Crime Victims' Representatives-Petitioners*

## <u>CERTIFICATE OF INTERESTED PARTIES AND CORPORATE DISCLOSURE STATEMENT</u>

No. ___

IN RE Naoise Connolly Ryan, Emily Chelangat Babu and Joshua Mwazo Babu, Catherine Berthet, Huguette Debets, Luca Dieci, Bayihe Demissie, Sri Hartati, Zipporah Kuria, Javier de Luis, Nadia Milleron and Michael Stumo, Chris Moore, Paul Njoroge, Yuke Meiske Pelealu, John Karanja Quindos, and Guy Daud Iskandar Zen S., Rini Soegiyono, Dayinta Anggana, Helda Aprilia, Serly Oktaviani, Wilson Sandi, Hendrarti Hendraningrum, Dody Widodo, Myrna Juliasari, Merdian Agustin, Adhitya Wirawan, M. Sholekhudin Zuhri, Siska Ong, Wenny Sia Wijaya, Suharto, Rohmiyatun, Sri Umi Anggraini, Permana Anggrimulja, Linda Manfredi, Sonia Lorenzoni, and Maurizio Manfredi — Crime Victim Rights Act Petitioners.

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made so the judges of this Court may evaluate possible disqualification or recusal. These persons and entities are essentially the same as those in earlier proceedings before this Court on many of the same issues. *See In re Ryan*, No. 23-10168, 88 F.4th 614 (5th Cir. 2023).

**Petitioners**

The underlying reassertion of a Crime Victims' Rights Act (CVRA) petition arises out of the crashes of two Boeing 737 MAX aircraft: (1) the crash of Lion Air Flight 610 into the Java Sea near Jakarta, Indonesia, on October 29, 2018, which killed all 189 passengers and crew on board; and (2) the crash of Ethiopian Airlines Flight 302 near Ejere, Ethiopia, on March 10, 2019, which killed all 157 passengers and crew on board. The families of the 346 persons killed in the two crashes have an interest in this case.

Objections below were filed by a subset of the crashes' victims' families—specifically more than two dozen family members, who assumed rights as representatives of their family members who were killed in crashes of Lion Air Flight JT 610 and ET Flight 302. Those representatives are now proceeding collectively, but were represented by separate counsel in the district court:

**Naoise Connolly Ryan;**

**Emily Chelangat Babu and Joshua Mwazo Babu;**
**Catherine Berthet;**
**Huguette Debets;**
**Bayihe Demissie;**
**Luca Dieci;**
**Zipporah Muthoni Kuria;**
**Javier de Luis;**
**Nadia Milleron and Michael Stumo;**
**Chris Moore;**
**Paul Njoroge;**
**Yuke Meiske Pelealu;**
**John Karanja Quindos;**

These victims' representatives listed above were represented by legal counsel Paul G. Cassell et al. in the court below.

And in addition:

**Rini Soegiyono;**
**Dayinta Anggana;**
**Helda Aprilia;**
**Serly Oktaviani;**
**Wilson Sandi;**
**Hendrarti Hendraningrum;**
**Dody Widodo;**
**Myrna Juliasari;**
**Merdian Agustin;**
**Adhitya Wirawan;**
**M. Sholekhudin Zuhri;**
**Siska Ong;**
**Wenny Sia Wijaya;**
**Suharto;**
**Rohmiyatun;**
**Sri Umi Anggraini;**
**Permana Anggrimulja.**

These victims' representatives listed above were represented by legal counsel Sanjiv Singh et al. in the court below.

And in addition:

**Sonia Lorenzoni**;
**Maurizio Manfredi**;
**Linda Manfredi.**

The victim representatives listed above were represented by legal counsel Filippo Marchino et al. in the court below.

These families are the petitioners in this case, proceeding as representatives of their family members killed in the crashes.

In addition to the family members identified above, there is a larger group of persons who may be interested in the outcome of this litigation—i.e., **family members who serve as representatives of other victims of the two crashes**. *Cf.* 5th Cir. R. 28.2.1 (allowing certificate of interested persons to include a generic description).

**Counsel for Petitioners**:

**Paul G. Cassell** (lead counsel in the Fifth Circuit)
**Robert A. Clifford**
**Tracy A. Brammeier**
**Erin R. Applebaum**
**Warren T. Burns**
**Darren P. Nicholson**
**Kyle Kilpatrick Oxford**
**Chase Hilton**

**Sanjiv N. Singh**

**Filippo Marchino**
**Charles S. Siegel**

**Counsel for Other Crash Victims:**

Certain other crash victims are represented by counsel, and those victims and their counsel did not file or join the objections below at issue. Their counsel are:

**Adrian Vuckovich**

iii

**Jason Robert Marlin**

The families bringing this petition have also received amicus support.

**Amicus Senator Ted Cruz:**

United State Senator Ted Cruz from Texas filed an amicus brief in support of petitioners below.

**Counsel for Ted Cruz**

**Nicholas Jon Ganjei**

**Respondent United States**

One respondent is the **United States.** The underlying deferred prosecution and non-prosecution agreements at issue was negotiated by attorneys for the United States Department of Justice, Criminal Division, Fraud Section, and United States Attorney's Office for the Northern District of Texas.

**Counsel for the United States**

**Chad E. Meacham**
**Alex C. Lewis**
**Allan Jonathan Medina**
**Carlos Antonio Lopez**
**Cory E. Jacobs**
**Jerrob Duffy**
**Lorinda I. Laryea**
**Michael T. O'Neill**
**Scott Philip Armstrong**
**Sean P. Tonolli**
**Daniel S. Kahn**
**William Connor Winn**
**Alex Lewis**
**Jeremy Raymond Sanders**
**Nancy E. Larson**
**Glenn Leon**

**Movant Erin Nealy Cox**

Erin Nealy Cox filed a motion below.

**Counsel for Erin Nealy Cox**

**Marianne Auld.**

**Respondent The Boeing Company**

Another Respondent is **The Boeing Company.** The Boeing Company has no parent corporations and is publicly traded on the NYSE (BA). However, as of December 31, 2012, State Street Corporation, a publicly held company whose subsidiary, State Street Bank and Trust Company, acts as trustee of the Boeing Company Employee Savings Plan Master Trust, has a beneficial ownership of 10% or more of the outstanding stock of The Boeing Company.

**Counsel for The Boeing Company**

In the district court, Boeing has been represented by lawyers from (among other firms) Kirkland & Ellis and McGuireWoods LLP. Boeing's lawyers have been:

**Richard B. Roper, III**
**Benjamin L. Hatch**
**Brandon M. Santos**
**Elissa N. Baur**
**Craig S. Primis**
**Ian Brinton Hatch**
**Jeremy A. Fielding**
**Mark Filip**
**Patrick Haney**
**Richard Cullen**
**John R. Lausch, Jr.**
**Michael P. Heiskell**
**Ralph N. Dado, III**
**C. Harker Rhodes**

**Movant Polskie Linie Lotnicze Lot S.A.**

Polish Airlines, legally incorporated as Polskie Linie Lotnicze LOT S.A., is wholly owned by Polish Aviation Group (Polish: Polska Grupa Lotnicza S. A.), a

Polish state-owned holding company. It filed a motion in the case below and pursued relief in this Court earlier.

**Counsel for LOT**

**Anthony U. Battista**
**Evan Kwarta**
**Jeffrey W. Hellberg**
**Colin Patrick Benton**
**Mary Dow**
**David J. Drez, III**
**Diana Gurfel Shapiro**

**Movant Smartwings A.S.**

Smartwings, A.S. filed a motion in the case below and pursued relief in this Court earlier. It is a European-based airline with its headquarters in the Czech Republic.

**Counsel for Smartwings A.S.**

**David M. Schoeggl**
**Jeffrey Richard Gilmore**
**Katherine A. Staton**
**Katie D. Bass**
**Callie A. Castillo**

**Anthony P. Keyter** has also been a pro se litigant in this matter.

These petitioners have previously been to the Fifth Circuit on an earlier assertion of this mandamus petition. *In re Ryan*, No. 23-10168.

In that case, petitioners received amicus support from the **National Crime Victim Law Institute.**

Counsel for NCVLI was **Margaret Ann Garvin**.

LOT was also a petitioner in the earlier Circuit proceeding, represented by counsel listed above.

In response to the earlier mandamus petition, the United States and Boeing filed oppositions. The United States was represented by counsel listed above.

In this Court, Boeing was represented (in addition to attorneys listed above) by attorneys from Clement and Murphy, specifically:

**Paul D. Clement**
**Mariel A. Brookins**

**Respondent U.S. District Court for the Northern District of Texas**

Because this is a mandamus petition filed under the Crime Victims' Rights Act, the United States District Court for the Northern District of Texas (O'Connor, J.) is technically a nominal respondent.

## <u>STATEMENT REGARDING ORAL ARGUMENT</u>

In view of the importance of the issues the (reasserted) petition presents to the proper administration of the Crime Victims' Rights Act, 18 U.S.C. § 3711, and Federal Rule of Criminal Procedure 48(a), petitioners request oral argument. Indeed, this petition is a reassertion of CVRA rights from an earlier petition that victims' families filed in February 2023. When this petition was originally filed in 2023, this Court deemed the matter worthy of oral argument and resolved the petition through a published opinion. *See In re Ryan*, 88 F.4th 614 (5th Cir. 2023).

## <u>TABLE OF CONTENTS</u>

**CERTIFICATE OF INTERESTED PARTIES AND CORPORATE DISCLOSURE STATEMENT** ........................................................... i

**STATEMENT REGARDING ORAL ARGUMENT** ..............................viii

**TABLE OF CONTENTS** ................................................................... ix

**TABLE OF AUTHORITIES** ............................................................ xi

**STATEMENT OF THE RELIEF SOUGHT** ...................................... 3

**ISSUE PRESENTED** ....................................................................... 4

**FACTS NECESSARY TO UNDERSTAND THE ISSUES PRESENTED** ....... 5

    **I.**    **Boeing's Conspiracy to Defraud the FAA Kills 346 People.** ........... 5

    **II.**    **The Government Covertly Negotiates a Secret Deferred Prosecution Agreement with Boeing.** ................................. 6

    **III.**    **The Government and Boeing Avoid Any Substantive Proceeding Before the District Court.** ................................. 8

    **IV.**    **The District Court Finds that the Government Violated the Victims' Rights to Confer with the Prosecutors About the Deferred Prosecution Agreement but that No Remedy was Possible.** ................................................................... 8

    **V.**    **This Court Denies CVRA Mandamus Relief "Without Prejudice" as the Petition Was "Premature."** .............................. 10

    **VI.**    **Boeing Breaches its DPA Obligations and the District Court Denies a Proposed Plea Bargain to Resolve the Case.** ................. 12

    **VII.**    **The District Court Grants the Government's Motion to Dismiss the Case.** ............................................................. 13

**STANDARD OF REVIEW** .............................................................. 15

**STATEMENT OF THE REASONS WHY THE WRIT SHOULD ISSUE** ..... 16

I.    **The Government Negotiated Its DPA With Boeing in Violation of the Victims' Families' CVRA Rights.** ........................ **17**

    A.  **The Families Represent "Victims" of Boeing's Crime** ............ **17**

    B.  **The Government Violated the Families' CVRA Rights When It Negotiated the DPA.** ...................................... **19**

II.   **The District Court Failed to Protect the Victims' Families' CVRA Rights by Allowing the Illegally Negotiated DPA to Influence Its Dismissal Decision** ........................................ **20**

    A.  **By Failing to Set Aside the DPA, the District Court Failed to Uphold the Victims' Families' CVRA Rights "at Every Stage" of the Proceedings Below.** .................................. **21**

    B.  **The Illegally Negotiated DPA Improperly Influenced the NPA and the District Court's Decision to Grant the Motion to Dismiss.** ...................................................... **27**

**CONCLUSION** ................................................................ **34**

**CERTIFICATE OF COMPLIANCE WITH RULE 32(a)** ............................ **36**

**CERTIFICATE OF SERVICE** .................................................. **37**

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Batchelor v. Cain*, 682 F.3d 400(5th Cir. 2012)........................................... 26

*Does 1 & 2 v. United States*, 359 F.Supp.3d 1201 (S.D. Fla. 2019) ...................... 23

*In re Dean*, 527 F.3d 391 (5th Cir. 2008)......................................... 20, 32

*In re Ryan,* No. 23-10168, 88 F.4th 614 (5th Cir. 2023).. 1, 2, passim, 11, 16, 20, 32

*Jane Does 1 & 2 v. United States*, 950 F.Supp.2d 1262 (S.D. Fla. 2013)............... 23

*Matter of AKD Invs.*, 79 F.4th 487 (5th Cir. 2023) ................................. 18

*United States v. Gonzalez-Lopez*, 548 U.S. 140 (2006)........................ 26

*United States v. Halverson*, 897 F.3d 645(5th Cir. 2018) ........................ 27

*United States v. Hamm*, 659 F.2d 624(5th Cir. 1981) ............................ 30

*Vasquez v. Hillary*, 474 U.S. 254 (1986)................................................. 25

**Statutes**

18 U.S.C. § 3771(a)(5) .......................................................... 4, 19

18 U.S.C. § 3771(a)(8)........................................................... 4, 19

18 U.S.C. § 3771(a)(9)........................................................... 4, 19

18 U.S.C. § 3771(d)(3) ....................................................... 3, passim

18 U.S.C. § 3771(d)(5) ........................................................... 23

28 U.S.C. § 1651.................................................................... 1

**Other Authorities**

NTSB, Boeing's Inadequate "Training, Guidance and Oversight" Led to Mid-Exit
Door Plug Blowout on Passenger Jet (June 24, 2025),
https://www.ntsb.gov/news/press-releases/Pages/NR20250624.aspx............... 12

Restatement (Second) of Contracts § 178 ........................................ 11

**Rules**

Fed. R. Crim. P. 48(a) ......................................................... 2, 4

Fed. R. Crim. P. 52(a) ........................................................... 25

**Regulations**

U.S.S.G. § 2B1.1(b)(16) ........................................................ 29

U.S.S.G. § 2B1.1(b)(2)(A)(i) ................................................... 29

U.S.S.G. § 8C2.5(b)(1) ......................................................... 29

U.S.S.G. § 8C2.5(g)(2) ......................................................... 29

U.S.S.G. § 8C4.2 ............................................................... 29

**TO THE HONORABLE COURT OF APPEALS:**

Petitioners, Ms. Naoise Connolly Ryan, et al. (hereinafter "victims' families" or "families"), respectfully submit this Reassertion of an Earlier, Premature Petition for a Writ of Mandamus Under the Crime Victims' Rights Act (CVRA), 18 U.S.C. § 3771(d)(3), as well as under the All Writs Act, 28 U.S.C. § 1651.

A year-and-half ago, on February 23, 2023, many of these same victims' families petitioned this Court in the same underlying criminal prosecution, *United States v. Boeing*, No. 4:21-cr-0005-O (N.D. Tex.). *See In re Ryan*, No. 23-10168, 88 F.4th 614 (5th Cir. 2023). In their earlier CVRA petition, the victims' families argued that, after the Government and Boeing secretly and illegally negotiated a deferred prosecution agreement (DPA), the district court had failed to protect their CVRA rights.[1] Following oral argument, on December 15, 2023, this Court (Clement, Southwick, and Higginson, Circuit Judges) agreed with the families that the district court had authority to vindicate their CVRA rights, such as the right to confer about the DPA. 88 F.4th at 623-27. But this Court denied their petition "without prejudice" because it was "premature." *Id.* at 627. This Court explained that, if and when "judicial approval is sought to resolve the instant case, the district court has an ongoing obligation to uphold the public interest and apply the CVRA." *Id.* Judge

---

[1] The Court's opinion below from February 2023 refusing to enforce victims' rights connected to the DPA ("DPA Op.") is attached to this petition as Attachment 1.

1

Clement concurred, joining the Court's opinion while writing separately to explain that "our decision should not be read as holding that the district court was *prohibited* from setting aside the DPA at an earlier stage of these proceedings …." *Id.* at 629 (Clement, J., concurring) (emphasis in original).

Following further proceedings, in May 2025, with new prosecutors handling the case, the Government and Boeing entered into a binding *non*-prosecution agreement (NPA) that relied, in part, on the earlier DPA. Based on this NPA, the Government then filed in the district court a motion to dismiss the pending conspiracy charge against Boeing under Fed. R. Crim. P. 48(a). Appx. 813-96.

The victims' families objected to the Government's motion to dismiss, raising (among other arguments) the fact that it relied on the earlier, illegally negotiated DPA. *See* ECF No. 318. But ultimately, on November 6, 2025, the district court reluctantly granted the motion to dismiss. The court concluded that, even though the victims' families had presented "compelling" arguments against dismissal, the Government had not acted in bad faith. Op. at 1-10.[2] In conclusory fashion, the district court also held that the Government had complied with its CVRA

---

[2] The Court's opinion below from November 2025 granting dismissal ("Op.") is attached to this petition as Attachment 2. References to other filings found in the district court's docket are denoted by the electronic case filing entry in the court below, e.g., "ECF No. 1."

obligations. Op. at 8-9. The district court failed to discuss the families' argument that the illegally negotiated DPA was improperly influencing the proceedings.

In granting the Government's motion to dismiss without addressing the influence of the illegally negotiated DPA, the district court violated the families' CVRA rights. The Government's new NPA repeatedly and explicitly relied on the earlier DPA. The district court should have protected the families' CVRA rights by invalidating relevant parts of the DPA and directing the parties to reach an agreement that did not rest on that illegal agreement—just as the families had "prematurely" argued to this Court in 2023. Accordingly, the families now reassert their earlier petition, seeking the enforcement of their CVRA rights connected to the DPA.[3]

## STATEMENT OF THE RELIEF SOUGHT

In the most recent proceedings, the victims' families asked the district court

---

[3] Contemporaneously with filing of this petition reasserting their claims from 2023, the families are also filing a motion for assignment of this petition back to the same panel of this Court that reviewed their original petition. Judicial economy will obviously be served by assigning the same issues back to the same panel that previously considered them at length and then found them to be "premature."

In addition to this petition reasserting their CVRA rights connected to the DPA, the families will also file in a few hours a separate petition regarding their CVRA rights connected to the NPA.  The families will then file a motion to consolidate their two petitions.

Because the victims' families are petitioning under the CVRA, they have a right to a decision on both of their petitions within 72 hours. *See* 18 U.S.C. § 3711(d)(3). Contemporaneously with filing this petition, the victims' families have filed a motion to waive their right to a decision within 72 hours. The Government has stipulated to that motion. Boeing has also stipulated to the waiver, but takes the position that the victims' families should file one petition rather than two.

to deny the Government's motion to dismiss the pending criminal case on various grounds, including violations of the CVRA connected with the illegally negotiated DPA that continued to influence the prosecution. The district court nonetheless denied the victims' families any relief—without addressing the families' arguments connected to the DPA. *See generally* Op. (failing to acknowledge or discuss the families' arguments for setting aside the DPA).

As specifically authorized by the CVRA, *see* 18 U.S.C. § 3771(d)(3), the victims' families now come to this Court asking it to protect the CVRA rights that Congress promised the families, including their rights to confer, to be treated with fairness, and to timely notice of a DPA. 18 U.S.C. § 3771(a)(5), (8) & (9). Specifically, the families ask this Court to overturn the district's decision to grant the Government's motion to dismiss, to direct the district court to (among other things) afford them their CVRA rights listed above by setting aside the DPA, and to remand the case for further proceedings in which the families' CVRA rights will be protected.[4]

## ISSUE PRESENTED

Did the district court err by granting the Government's motion to dismiss the criminal information under Fed. R. Crim. P. 48(a) where the dismissal motion rested,

---

[4] In their related, second CVRA petition, to be filed later today, the families seek similar relief, but focus on the violation of their rights connected to the NPA, rather than the DPA.

in part, on a DPA that the Government had negotiated and implemented in violation of the victims' families' CVRA rights?

### FACTS NECESSARY TO UNDERSTAND THE ISSUES PRESENTED

**I.    Boeing's Conspiracy to Defraud the FAA Kills 346 People.**

This case arises out of what may "properly be considered the deadliest corporate crime in our nation's history." Appx. 605, 705.

On October 29, 2018, a Boeing 737 MAX aircraft operating as Lion Air Flight 610 crashed shortly after taking off from Jakarta, Indonesia. All 189 passengers and crew members onboard were killed. Less than six months later, on March 10, 2019, another 737 MAX operating as Ethiopian Airlines Flight 302 crashed shortly after taking off from Addis Ababa. Ethiopia. All 157 passengers and crew members onboard were killed. Appx. 451-452.

The two crashes involved strikingly similar circumstances. Investigations subsequently exposed that Boeing had secretly built into its 737 MAX aircraft a software system—the Maneuvering Characteristics Augmentation System ("MCAS")—that improperly activated during both flights. Data later obtained from flight recorders on both aircraft revealed that the pilots were engaged in a terrifying tug-of-war with Boeing's MCAS—a fight that they ultimately lost because they did not know what they were up against. Appx. 460-461.

Around the time of the second crash, the U.S. Department of Justice began

investigating Boeing for concealing safety-related information about MCAS. At first, Boeing deliberately refused to cooperate. Boeing only began to admit what it had done after successfully delaying the Department's criminal investigation for six months. Appx. 006-007.

The Justice Department's criminal investigation ultimately proved that, while developing the 737 MAX, Boeing conspired to deliberately mislead the FAA about MCAS's operational capabilities to increase sales and profits. Because the 737 MAX handled differently than its predecessors, Boeing introduced MCAS in a deceptive effort to replicate more closely the handling characteristics of the previous 737 models. Boeing knew that introducing MCAS (or not introducing it at all) could potentially trigger costly new pilot training requirements. Boeing's criminal solution to increase profits was to incorporate MCAS in the 737 MAX and illegally conceal its expansive characteristics from the FAA and other aviation authorities around the world—and, fatally, from pilots flying the 737 MAX. Appx. 030-045. Boeing's conspiracy to conceal MCAS extended over many years and to the company's highest levels. Appx. 497-505.

## II.  The Government Covertly Negotiates a Secret Deferred Prosecution Agreement with Boeing.

After uncovering Boeing's efforts to fraudulently conceal the 737 MAX's safety issues, the Justice Department began negotiating with Boeing's attorneys about Boeing's crime. In February 2020, having heard nothing from the Justice

Department (or federal investigators), the victims' families contacted the Department to see what was happening. Appx. 378-379. The Department's Victims' Rights Ombudsperson responded that the Department did not have a criminal investigation into the two crashes. Appx. 379. Shortly thereafter, an FBI victim-witness coordinator gave the families the same information. Appx. 379.

The Government's representations that it was not criminally investigating Boeing were false and deceptive. By keeping the victims' families in the dark, the Government misled them and effectively foreclosed any possibility of the victims' families conferring with the prosecutors. Appx. 139-140.

While the Government blocked the victims' families from any conferral with the prosecutors, Boeing had no such difficulty. Behind the same kind of closed doors that set the stage for the MCAS defects remaining concealed for as long as they did, during the last weeks of 2020 and the first week of 2021, Boeing's attorneys covertly rushed to obtain from the Justice Department an extraordinarily generous DPA. *See* Appx. 3-60 (text of DPA). For example, in "unprecedented" language not found in any previous DPA, the DPA exonerated Boeing's senior management for any involvement in the crashes—without any clear factual basis for that conclusion. Appx. 8. And, without any real basis, the DPA contained deceptive Sentencing Guidelines calculations and a resulting range for the appropriate "penalty" that Boeing should pay. Appx. 12-13.

7

III.    **The Government and Boeing Avoid Any Substantive Proceeding Before the District Court.**

After the Government and Boeing reached their DPA, on January 7, 2021, the Government first publicly disclosed the secret agreement by filing it with the Fort Worth Division of the U.S. District Court for the Northern District of Texas. Appx. 3-60.[5] While the Justice Department had negotiated for months with Boeing's expansive legal team, at no point did the Department inform the families about the criminal investigation—much less confer with them. Appx. 108-190. Boeing knew the DPA was being kept secret from the families. Appx. 480. The victims' families first learned that the Government had immunized the company that killed their loved ones via social media. *See*, *e.g.,* Appx. 139.

A few weeks later, the district court approved the DPA.

IV.    **The District Court Finds that the Government Violated the Victims' Rights to Confer with the Prosecutors About the Deferred Prosecution Agreement but that No Remedy was Possible.**

Because the Government failed to notify the victims' families about their CVRA rights, the families never knew that they could challenge the secret negotiating process. But about ten months later, in November 2021, the families secured the undersigned *pro bono* legal counsel to enforce their rights. Appx. 109-

---

[5] The Government has refused to answer the families' questions regarding whether more appropriate venues existed for filing the DPA.

183. Shortly thereafter, on December 16, 2021, the families filed motions to enforce their CVRA rights, including by having the DPA set aside. Appx. 66-230.

Ultimately, the Government sided with Boeing and opposed the victims' families' CVRA motions. The Government apologized for failing to confer with the families and for providing "inaccurate information" about its investigation. ECF No. 58 at 1-2, 18.  The Government maintained that, because Boeing had admitted only to conspiring to defraud the FAA, the only "victims" of the deadliest corporate crime in history were FAA bureaucrats. *Id.* at 9-14. The victims' families responded that Boeing's lies directly and proximately caused the two crashes and thus that they represented "crime victims" under the CVRA. Appx. 261-299.

After the evidentiary hearing, on October 21, 2022, the district court entered factual findings that, through their well-qualified experts, the families had established that they represented "crime victims" under the CVRA. Appx. 448-465. Specifically, the district court found that "but for Boeing's criminal conspiracy to defraud the FAA, 346 people would not have lost their lives in the crashes." Appx. 463. Turning to the CVRA's application, the district court held that the families had standing to assert CVRA conferral rights and that the Government had violated their rights by negotiating the agreement in secret. Appx. 465.

Thereafter, the Government and Boeing argued against any remedy for the violations. Appx. 503-537. The victims' families responded, reaffirming their earlier

request, that (among other things) the district court should set aside relevant provisions in the DPA and allow the families the opportunity to meaningfully confer with the Justice Department about prosecuting Boeing. Appx. 586-613.

On February 9, 2023, the district court issued an order denying any enforcement of the victims' families' CVRA rights, finding it was powerless to award any remedy. Appx. 681-710.

## V. This Court Denies CVRA Mandamus Relief "Without Prejudice" as the Petition Was "Premature."

In February 2023, the families filed a petition for review of their CVRA claims in this Court, as the CVRA provides. *See* 18 U.S.C. § 3771(d)(3). Following briefing and oral argument, on December 23, 2023, this Court denied relief. *See In re Ryan*, 88 F.4th 614 (5th Cir. 2023). This Court addressed the district court's "conclusion that, despite its 'immense sympathy' for the crime victims here, it lack[ed] legitimate authority "to remedy the incalculable harm" those victims have suffered." *Id.* at 623. This Court held that to "the extent that this conclusion determinatively denies application of the CVRA, that is inconsistent with the statute, the criminal rules, and court authority to resolve criminal proceedings commenced in court." *Id.*

Having acknowledged the district court's obligations to enforce the CVRA, however, this Court concluded that "mandamus intercession [was] premature." *Id.* at 627. This Court explained that, "[t]hus far, the district court has demonstrated careful competence that, whereas it cannot substantively revise the DPA between the

10

Government and Boeing, it nonetheless must uphold crime victims' statutory rights at every stage of the court's criminal proceedings." *Id.* This Court then presciently explained how things might unfold in the future: "If a sought-for final stage is a Government motion to dismiss, we are confident … that the district court will assess the public interest according to caselaw as well as the CVRA, including violations already admitted to, as well as any other circumstances brought to its attention by the victims' families." *Id.* at 627. This Court denied relief "without prejudice." *Id.* at 629.

Judge Clement joined the majority opinion in full, while writing separately to clarify "that our decision should not be read as holding that the district court was *prohibited* from setting aside the DPA at an earlier stage of these proceedings—including upon motion from the victims' families …." *Id.* at 629 (Clement, J., concurring) (citing RESTATEMENT (SECOND) OF CONTRACTS § 178 for the proposition that "contracts entered in violation of public policy are void and unenforceable"). Judge Clement explained that, "[o]therwise, we would be inviting criminal defendants and the government to violate victims' CVRA rights by negotiating DPAs in secret and taking their chances that the district court will accept Rule 48(a) dismissal years down the line." *Id.* at 629 (Clement, J., concurring).

**VI.    Boeing Breaches its DPA Obligations and the District Court Denies a Proposed Plea Bargain to Resolve the Case.**

Following this Court's decision, the DPA's three-year term was set to expire less than a month later, on January 7, 2024. But two days before that expiration, on January 5, 2024, during climbout from Portland, the mid-cabin door plug on Alaska Airlines Flight 1282 suddenly detached from the Boeing 737 MAX 9, causing rapid decompression and terrifying passengers as objects—including cell phones and a passenger's shirt—were sucked out through the gaping hole. Thanks to the flight crew's swift actions, the plane made a miraculous and safe emergency return to Portland. Later, the National Transportation Safety Board (NTSB) found that four critical bolts securing the plug had been removed during factory repairs and never reinstalled—pointing to Boeing's inadequate training, guidance, and oversight as the root cause. *See* NTSB, *Boeing's Inadequate "Training, Guidance and Oversight" Led to Mid-Exit Door Plug Blowout on Passenger Jet* (June 24, 2025), https://www.ntsb.gov/news/press-releases/Pages/NR20250624.aspx.

In light of these and numerous other failures by Boeing, on May 14, 2024, the Justice Department notified the district court that it had determined that Boeing had breached its obligations under various DPA provisions. ECF No. 199 at 1. After further negotiations between the Government and Boeing, on July 24, 2024, the parties announced to the district court that they had reached a proposed plea agreement, under which Boeing would plead guilty and receive a stipulated

sentence. Appx. 713-800 (notice and text of proposed plea). The families filing this petition objected to the proposed plea. *See, e.g.,* ECF No. 234.

Following a hearing, on December 5, 2024, the district court rejected the proposed plea as contrary to the public interest. Appx. 801-12. The Court asked the parties how they intended to proceed. Appx. 812.

**VII.    The District Court Grants the Government's Motion to Dismiss the Case.**

On December 11, 2024, the Government held a video conference call with the victims' families about the case. During that call, the Government refused to answer questions about whether it was withholding relevant evidence from the Court. *See* ECF No. 318 at 34-38.

 After further extensions and delays—and the replacement of the Department's previous legal team by a new one—on May 16, 2025, the Government held another video conference call with the victims' families. During this call, the Government indicated that it was considering resolving the case through a motion to dismiss the case along with a non-prosecution agreement (NPA) with Boeing. Then, about two weeks later, the Government filed a motion to dismiss the pending criminal information against Boeing. Appx. 813-36. The Government's motion included a signed and already-in-effect NPA, through which the Government had committed not to further prosecute Boeing—regardless of whether the district court ultimately denied the motion to dismiss. Appx. 814-96. The NPA and its attachments

contained more than forty references to the DPA. *See* Appx. 814-96 *passim*. Among the references, for example, was a "criminal penalty" calculation based on the earlier DPA. Appx. 840, 844.

The victims' families urged the district court to deny the motion to dismiss on various grounds, including the Government's failure to reasonably confer about the motion and the related NPA. *See, e.g.,* ECF No. 318; ECF No. 340. In their filings, the families also specifically objected to the DPA provisions that were influencing and infecting the NPA. *See, e.g.,* ECF No. 318 at 40-41 (citing *Ryan* and Judge Clement's concurrence and arguing that "[n]ow the time has come for the Court to give full effect to the CVRA. The Court should hold that the DPA was and is invalid—and therefore not entitled to any further effect."); ECF No. 340 at 20 ("the Court should declare the DPA invalid[] for all the reasons explained in previous briefing, including previously found CVRA violations.").

On September 3, 2025, the district court held a hearing to consider their objections. The victims' families again pressed the district court to (among other things) set aside the DPA. *See* Appx. 1014.

On November 6, 2025, the district court granted the Government's motion to dismiss. Op. at 1-10. Regarding the victims' families' CVRA claims, the district court concluded that the Government had met its obligations by holding two video conference calls with the victims' families. Op. at 8-9. Regarding the families'

arguments that dismissal was clearly contrary to the manifest public interest, the district court acknowledged that the families had presented "compelling" arguments. *Id.* at 8. Nonetheless, the district court reluctantly concluded that it was unable to deny the Government's motion to dismiss, because the Government had not "acted with bad faith" and had "given more than mere conclusory reasons for its dismissal." *Id.* at 9.

Although its order was ten pages long, the district court nowhere acknowledged—much less, discussed—the victims' families' argument that that the DPA was infecting the proceedings and that the DPA needed to be set aside to protect their CVRA rights.

The families now file this timely reassertion of their earlier petition for review of their CVRA claims connected with the DPA, as the CVRA provides. *See* 18 U.S.C. § 3771(d)(3).[6]

## **STANDARD OF REVIEW**

Because the victims' families properly and timely presented their claims below, they are entitled to ordinary appellate review—i.e., to review of the district court's "legal conclusions *de novo*, its factual conclusions for clear error, and its discretionary judgments for abuse of discretion." *See In re Ryan*, 88 F.4th 614, 621

---

[6] The Government has agreed to wait to trigger Boeing's obligations under the NPA until this Court rules on the victims' families' petition. Appx. 1082-83.

(5th Cir. 2023). Because the facts below are essentially undisputed, the claims the families present are legal ones, which this Court reviews *de novo*.

## STATEMENT OF THE REASONS WHY THE WRIT SHOULD ISSUE

The district court previously found that the families represent "crime victims" and that their CVRA rights were violated—but declined to do anything to enforce the families' rights. DPA Op. (Attachment 1). In its earlier decision reviewing that conclusion, this Court concluded that "mandamus intercession" was "premature." 88 F.4th at 627. This Court denied mandamus relief "without prejudice" (*id.* at 629) because it was "confident that the district court will uphold victims' CVRA rights throughout the instant criminal proceedings, above all when, how, and if judicial approval is sought to resolve this case." *Id.* at 629.

And yet, when the time came for the district court to enforce the families' CVRA rights, it did nothing to remedy the proven CVRA violations during the DPA's negotiation. Instead, the district court simply granted the Government's motion to dismiss without even acknowledging the victims' families' arguments on this important issue.

In standing idly by, the district court failed to discharge its CVRA obligation that it "*shall ensure* that . . . crime victim[s] are afforded the rights described in [the CVRA]." 18 U.S.C. § 3771(b)(1) (emphasis added). Through the CVRA, Congress promised the families that they could take part in potentially shaping the course of

16

Boeing's prosecution, including conferring with prosecutors before the DPA was finalized. The Government violated that right. And even to this day, the illegally negotiated DPA continues to stain important parts of this case. This Court should grant the families' petition and enforce Congress's command by remanding this case to the district court with directions to set aside the DPA and ensure that the illegally negotiated agreement does not taint this case.

## I.   The Government Negotiated Its DPA With Boeing in Violation of the Victims' Families' CVRA Rights.

The victims' families' petition rests on two factual findings that are the settled law of this case and, in any event, beyond reasonable dispute: (1) that the families represent "victims" of Boeing's deadly conspiracy crime; and (2) that the Government (with Boeing's acquiescence) violated the families' CVRA rights by scheming to secretly craft the DPA.

### A.   The Families Represent "Victims" of Boeing's Crime.

In their previous CVRA petition, the families explained that the district court found that Boeing's crime directly and proximately killed 346 people. *See* Mand. Pet. at 10, *In Re Ryan*, No. 23-10168 (5th Cir. Feb. 23, 2023). Specifically, after extended evidentiary hearings, the district court found that "but for Boeing's criminal conspiracy to defraud the FAA, 346 people would not have lost their lives in the crashes." Appx. 463.

In the earlier proceedings before this Court, the Government did not challenge

17

this "crime victim" finding. *See* Consolidated Response for Respondent U.S., *In re Ryan*, No. 23-10168. Boeing, however, contested this finding of fact. *See* The Boeing Company's Resp. to Petitions for Writ of Mandamus at 23-30, *In re Ryan,* No. 23-10168. The families replied in support of the district court's finding. *See* Families Reply in Support of Petition at 27-31, *In re Ryan*, No. 23-10168.

When this Court announced its earlier decision, this Court necessarily agreed with families and upheld the district court's "crime victim" finding. For example, this Court denied mandamus relief only because it remained confident that the district court would consider "any other circumstances brought to its attention by the *victims'* families." 88 F.4th at 627 (emphasis added).

The "victim" finding is now settled under the law-of-the-case doctrine. Generally, "when a court decides an issue, that decision should continue to govern the same issues in subsequent stages of the same case." *Matter of AKD Invs.*, 79 F.4th 487, 491 (5th Cir. 2023) (internal quotation omitted). The doctrine applies to issues actually decided and to "those issues decided by necessary implication." *Id.* (internal quotation omitted). Here, of course, given that this Court discussed the "victims' families'" CVRA rights at length, it necessarily decided—as did the district court—that the families represent "crime victims."

## B. The Government Violated the Families' CVRA Rights When It Negotiated the DPA.

It also clear that the Government violated the families' CVRA rights by secretly negotiating the DPA—as the district court found years ago. Appx. 472. Specifically, the Government violated the families' CVRA rights (1) to "confer with the attorney for the Government in the case," (2) to "be treated with fairness," and (3) to "timely notice" of a deferred prosecution agreement. *See* 18 U.S.C. § 3771(a)(5), (8) & (9); Appx. 472 (citing ECF No. 52). The district court's findings that the Government violated the families' CVRA rights follow inexorably from the court's "crime victim" finding. The Government made no effort whatsoever to confer with the families about the DPA, to treat them fairly during its negotiation, or to give any notice to the families about it. Indeed, to add insult to injury, the Government not only failed to involve the victims' families in the DPA negotiations but it even recklessly misled them about the existence of any criminal investigation. Appx. 478.[7]

---

[7] The district court found that the Department provided false information. But then, relying upon an unsworn statement in a Government filing, the district concluded that the Government's two separate false statements were the "result of 'regrettable and inadvertent internal miscommunication.'" Appx. 698 (*quoting* Appx. 519-20). The victims' families had proffered that they could establish that the Justice Department's statements were, at a minimum, made in reckless disregard of the truth. Appx. 478. Because the district court denied the families an evidentiary hearing to prove this point, this Court should assume the truth of the families' allegations here.

These factual findings that the Government violated the victims' families' CVRA rights in negotiating the DPA are now the settled law of the case. As this Court directly stated in the earlier proceedings, "the victims' families 'should have been notified of the ongoing [DPA] discussions and should have been allowed to communicate meaningfully with the government … before a deal was struck.' That is particularly true if the deal, in ultimate outcome *as approved by federal court*, means no company, and no executive and no employee, ends up convicted of any crime, despite the Government and Boeing's DPA agreement about criminal wrongdoing leading, the district court has found, to the deaths of 346 crash victims." *In re Ryan*, 88 F.4th at 626-27 (emphasis in original) (quoting *In re Dean*, 527 F.3d 391, 395 (5th Cir. 2008)).

## II. The District Court Failed to Protect the Victims' Families' CVRA Rights by Allowing the Illegally Negotiated DPA to Influence Its Dismissal Decision.

In granting the Government's recent motion to dismiss without addressing the earlier CVRA violations, the district court gave its imprimatur to the Government's illegally negotiated DPA. Instead, the district court should have set aside the DPA to enforce the victims' families' CVRA rights. The district court's failure to follow that straightforward path flouts the CVRA—and this Court's earlier instructions—and requires reversal.

### A. By Failing to Set Aside the DPA, the District Court Failed to Uphold the Victims' Families' CVRA Rights "at Every Stage" of the Proceedings Below.

In rejecting the families' earlier petition as "premature" (*id.* at 627), this Court observed that the district court had "demonstrated careful competence that, whereas it cannot substantively revise the DPA between the Government and Boeing, it nonetheless must uphold crime victims' statutory rights *at every stage* of the court's criminal proceedings." *Ryan*, 88 F.4th at 627 (emphasis added). So this Court denied the families' petition—"without prejudice" (*id.* at 629)—because it was "confident that the district court will uphold victims' CVRA rights *throughout the instant criminal proceedings,* above all when, how, and if judicial approval is sought to resolve this case." *Id.* (emphasis added). Thus, this Court concluded, any appellate relief was, at that time, "premature." *Id.* at 627.

Given this Court's clear command, the district court was obligated to uphold all the victims' families' CVRA rights when the Government sought to resolve the case—including the families' right to confer about the DPA. But rather than follow that command, the district court blinked. Even though the victims' families repeatedly outlined the Government's CVRA violations connected to the DPA—in both their written briefing and at oral argument—the district court disregarded the issue. *Cf.* 18 U.S.C. § 3771(d)(3) (requiring the district court to "take up and decide"

21

any alleged CVRA violation). This Court should now enforce the families' CVRA rights and reverse.

Concurring in the earlier decision, Judge Clement pointedly observed that this Court's decision "should not be read as holding that the district court was *prohibited* from setting aside the DPA at an earlier stage of these proceedings … after finding that the victims' CVRA rights had been violated." *Ryan*, 88 F.4th at 629 (Clement, J., concurring) (emphasis in original). Otherwise, as Judge Clement explained, "we would be inviting criminal defendants and the government to violate victims' CVRA rights by negotiating DPAs in secret" and then "taking their chances that the district court will accept Rule 48(a) dismissal years down the line." *Id.* (Clement, J., concurring).

In raising this concern, Judge Clement was prophetic. The Government and Boeing did, indeed, "take their chances" that the district court would do nothing about their secret DPA some years down the line. Unless this Court now intervenes, the parties' ploy will succeed: the Government will have escaped its CVRA obligations to have conferred with the families and treated them fairly before concluding the DPA—a DPA that undoubtedly governed the course of the proceedings below for years.

In 2019, the U.S. District Court for the Southern District of Florida considered how to enforce victims' CVRA rights where prosecutors illegally negotiated a secret

non-prosecution agreement (NPA) with notorious sex trafficker Jeffrey Epstein. That district court held that, to afford Epstein's crime victims their rights to confer about the NPA, an appropriate remedy was rescission of relevant provisions, thereby giving the victims an "unfettered" opportunity to confer about prosecuting Epstein. Appx. 591-92 (discussing *Does 1 & 2 v. United States*, 359 F.Supp.3d 1201, 1218 (S.D. Fla. 2019) (quoting 950 F.Supp.2d at 1267)). As that district court explained, in enacting the CVRA, Congress included a narrow "limitations on relief" section, restricting the circumstances in which victims could seek the relief of "re-open[ing] a plea or sentence." 18 U.S.C. § 3771(d)(5). Given the narrow scope of that limitations-on-relief section, the district court held that in situations outside that scope, this CVRA language was "properly interpreted impliedly to authorize a 're-opening' or setting aside of pre-charge prosecutorial agreements made in derogation of the government's CVRA conferral obligations." *Jane Does 1 & 2*, 950 F.Supp.2d at 1267.[8]

So too here. The victims' families are not seeking the "re-open[ing] of a plea or sentence," and so recission of the DPA remains a permissible—and appropriate—

---

[8] In later proceedings in that case, the Eleventh Circuit specifically recognized that "Congress has given crime victims a specific means of judicial enforcement, a 'motion'—which . . . denotes a vehicle *for seeking relief within the context of a preexisting case.*" 994 F.3d at 1259 (emphasis added). Of course, here the victims' families are seeking relief within the context of the preexisting criminal case against Boeing.

remedy for the Government's CVRA violations. The victims' families repeatedly pressed this argument below. The district court ignored the issue.

While the district court failed to consider the victims' families' objections to the DPA, the Government did chip in a few words. From what can be gleaned from the Government's terse, three-sentence response to this argument (ECF No. 334 at 14), the Government seems to contend that its multiple CVRA violations should just be overlooked as normal, close-enough-for-Government-work behavior. For this Court to approve the Government's intransigence would set a dangerous precedent—at odds with Congress' unyielding command that courts "shall ensure" that crime victims and their families are "afforded the rights described [in the CVRA]." 18 U.S.C. § 3771(b)(1). As the CVRA's congressional sponsors explained, it was not Congress's intent that the CVRA's "significance be whittled down or marginalized by the courts or the executive branch. This legislation is meant to correct, not continue, the legacy of the poor treatment of crime victims in the criminal process." 150 CONG. REC. S4260-01, S4269, 2004 WL 867940 (Apr. 4, 2004) (statement of CVRA co-sponsor Sen. Feinstein, agreed with by co-sponsor Sen. Ky).

Moreover, the Government's suggestion that the DPA was somehow irrelevant to the course of proceedings below is remarkable. For example, for three-and-a-half years—from January 7, 2021 (the date the DPA was filed) through May 14, 2024 (the date the Government advised the district court of Boeing's breach, ECF No.

199)—the Justice Department was purportedly monitoring Boeing's compliance with its safety and regulatory obligations under the DPA. *See* Appx. 17 (DPA provision requiring Boeing to report to the Justice Department every three months). Before this flimsy monitoring arrangement was put in place, the victims' families were entitled to have conferred about that monitoring and might have been able to convince the Department to have adopted more rigorous scrutiny. In its earlier decision, this Court expressed its confidence that "the district court will uphold victims' [families] CVRA rights *throughout* the instant criminal proceedings ….." *Ryan*, 88 F.4th at 629 (emphasis added). This Court's confidence was misplaced. The district court did not uphold the victims' families' rights concerning the DPA.

In determining what to do now, this Court should recognize that Congress has not authorized any kind of "harmless error" exception to the CVRA's commands. To be sure, a harmless error doctrine exists in some other settings. *See, e.g.,* Fed. R. Crim. P. 52(a). But here, Congress legislated without any such exception. Indeed, regarding this Court's appellate review under the CVRA, Congress has eliminated discretion by directing that "[t]he courts of appeals s*hall take up and decide* such application forthwith …." 18 U.S.C. § 3771(d)(3) (emphasis added).

Presumably the reason that the CVRA contains no harmless error loophole is that some errors "undermine[] the structural integrity of the criminal tribunal itself" and are therefore "not amenable to harmless-error review." *Vasquez v. Hillary*, 474

U.S. 254, 263-64 (1986). Appellate courts address these structural errors without requiring any individualized showing of prejudice. *See, e.g., United States v. Gonzalez-Lopez*, 548 U.S. 140, 148-50 (2006); *Batchelor v. Cain*, 682 F.3d 400, 405-06 (5th Cir. 2012). The rationale is that some rights do not pertain to the "trial outcome" and thus their denial "is not amenable to 'harmless error' analysis. The right is either respected or denied; its deprivation cannot be harmless." *Batchelor*, 682 F.3d at 405-06 (quoting *McKaskle v. Wiggins*, 465 U.S. 168, 177 n.8 (1984)).

Here, the Government indisputably failed to respect the victims' families' CVRA rights. For example, the Government denied the families' CVRA right to "confer" with the prosecutors about the DPA by concealing it from the victims' families. This Court previously held that "in any criminal prosecution commenced in court, Congress commands that district courts use Article III authority to implement the CVRA, giving procedural guarantees to crime victims which the Government failed to respect here." *Ryan*, 88 F.4th at 624. The only way to "ensure that the crime victim[s']" families are "afforded" (18 U.S.C. § 3771(b)(1)) their right to confer is to now set aside the DPA and have the case resolution begin anew.[9] The Government's denial of the families' CVRA rights connected with the DPA—

---

[9] To be clear, the victims' families are not asking this Court to "rewrite" the DPA. *See* 88 F.4th at 623. They are asking this Court to set it aside, so that the victims' families can confer with prosecutors and ask them to proceed differently.

completely overlooked by the district court in its dismissal last week—was a structural error requiring reversal.

### B. The Illegally Negotiated DPA Improperly Influenced the NPA and the District Court's Decision to Grant the Motion to Dismiss.

Even if this Court were inclined to read into the CVRA a "harmless error" escape hatch, the Government could only escape its CVRA obligations by shouldering a "heavy burden" of proving harmlessness. *See, e.g., United States v. Halverson*, 897 F.3d 645, 652 (5th Cir. 2018). At the very least, this would require a remand to the district court to evaluate in the first instance. However, a remand is unnecessary, because the Government's proven CVRA violations were plainly not harmless.

The proceedings below continued for more than three years directly under the DPA's provisions, such as its provisions for Justice Department monitoring of Boeing. More broadly, for years the DPA undoubtedly controlled the general trajectory of the prosecution—or lack thereof. And for years, the victims' families have had to wait for any substantive justice for the deaths of their loved ones and for any procedural opportunity to have challenged the DPA.

The DPA continues to haunt this case. Most recently, after more than four years of proceedings had elapsed, the Government moved to dismiss the conspiracy charge against Boeing based on an NPA that directly linked back to the DPA. *See* ECF No. 318 at 32-40. The NPA and its attachments contained more than forty

references to the DPA. *See* Appx. 814-96 (NPA) at *passim*. Clearly, the DPA cast a long shadow over the NPA.

For example, one of the NPA's most notable provisions was for a "criminal penalty," whose size was calculated directly from the earlier DPA. *See* ECF No. 318 at 32-40 (discussing Appx. 840, 844). In the DPA, the Government and Boeing worked together to derive what they deemed to be the appropriate financial penalty[10] for Boeing to pay through an "application of the Sentencing Guidelines to determine the applicable fine range." DPA ¶ 9, Appx. 12. The parties' Guidelines calculation in the DPA ultimately produced a low-end fine range of $243.6 million with multipliers of 1.0 (minimum) to 2.0 (maximum). The Government and Boeing then agreed for Boeing to pay a penalty of $243.6 million, at the "low end" of the fine range. DPA ¶ 4(j), Appx. 9.

Three years later, when negotiating their proposed plea agreement, the Government and Boeing repeated this same Guidelines calculation as the basis for their jointly recommended penalty of an additional $243.6 million (on top of the earlier $243.6 million). *See* Proposed Plea, ECF No. 221-1 at 17-19. As with the penalty range in the DPA, the fine in proposed plea was predicated on Boeing having a total Sentencing Guidelines Offense Level of only 34 and a Culpability Score of

---

[10] The payment was not a "fine" following a conviction and, accordingly, was described as "payment of [a] criminal monetary penalty." *See* ECF No. 4 at 9-10.

only 5. *Compare* DPA, ¶ 9(b) & (c) *with* Proposed Plea, ¶ 24. Those favorable

calculations were demonstrably false, in light of the district court's "victim" ruling.

As the victims' families explained at length to the district court, these calculations:

- • Failed to include a multiple-victim specific offense characteristic under U.S.S.G. § 2B1.1(b)(2)(A)(i);

- • Failed to recognize that Boeing's offense involving a conscious or reckless risk of death under U.S.S.G. § 2B1.1(b)(16);

- • Failed to mention the possibility of an upward departure for hundreds of deaths under U.S.S.G. § 8C4.2 (policy statement);

- • Erroneously gave Boeing credit for accepting responsibility under U.S.S.G. § 8C2.5(g)(2), discussed in Families Br. at 32; and

- • Deceptively concealed Boeing's C-suite's culpability under U.S.S.G. § 8C2.5(b)(1).

*See* ECF No. 318 at 32-40 (discussing ECF No. 268-1 at 30-35; ECF No. 268-2 at

22-24). When properly incorporating the district court's "victim" ruling, an accurate

Guidelines calculation produces a substantially higher Offense Level of 42 and a

higher Culpability Score of 10. *See* ECF No. 318 at 34.

In response to the victims' families' demonstration that proposed plea

agreement's Guidelines calculations were deceptive, the Government and Boeing

offered nothing. Boeing just deferred to the Government; and, in turn, the

Government did not meaningfully defend its calculation but instead relied on a

"harmless error" defense. *See* ECF No. 318 at 34.

29

Then, after the district court rejected the plea agreement, the Government refused to reasonably confer about these issues, including Boeing's true culpability for causing the deaths of hundreds. *See* ECF No. 318 at 34-36. During the two video conference calls, victims' counsel repeatedly pressed the Government to answer how it could justify resolving the case based on Guidelines calculations and other conclusion that failed to reflect the fact that Boeing had killed their loved ones. *Id.* at 35-38. The Government stonewalled. *Id.* Remarkably, the Government even refused to answer the straightforward question: "Does the United States Department of Justice possess information that it has failed to disclose to Judge O'Connor that would support the conclusion that Boeing has directly and proximately killed 346 people?" *Id.* at 36; *see also id.* at 36-38 (Government refuses to answer this question at the later conference call).

Ultimately, the parties simply come back to the district court with the same, deceptive calculations from the DPA. In the NPA that undergirds the Government's dismissal motion—and the district court's dismissal of the case—Boeing will pay only a $243.6 million fine. *See* Appx. 840, 841. These deceptive Guidelines calculations—standing alone—demonstrate that the Government was trying to obscure Boeing's true culpability and these "actions clearly indicate a 'betrayal of the public interest.'" *United States v. Hamm*, 659 F.2d 624, 629 (5th Cir. 1981) (quoting United States v. *Cowan*, 524 F.2d 504, 514 (5th Cir. 1975)). Accordingly,

the district court should have denied the motion to dismiss for these and other substantive reasons—as the victims' families argue here (and in their separate NPA petition, to be filed later today).

But for purposes of this petition concerning the DPA, the key point is that the district court failed to protect the victims' families' CVRA rights by setting aside the DPA and its deceptive Guidelines calculations. The victims' families were entitled to make their arguments—to the Government, and ultimately to the district court— free from the taint of the illegally negotiated DPA. Of course, the victims' families have never waived any right to have the DPA set aside. More than two-and-a-half years ago, on February 23, 2023, they petitioned this Court asking for that very relief. Their patience in seeking justice for Boeing killing their loved ones should not be held against them.

When this case was previously before this Court, Judge Clement pointedly noted that "our decision should not be read as holding that the district court was prohibited from setting aside the DPA at an *earlier stage* of these proceedings." 88 F.4th at 629 (Clement, J., concurring) (emphasis rearranged). That observation indicated that, at an appropriate *later stage* of the proceedings, the district court would, in fact, "set aside" the DPA so that it would not continue to influence the proceedings. The district court failed to take that obvious and necessary step to vindicate the families' CVRA rights.

31

Because the district court failed to protect the victims' families' CVRA rights, that obligation now falls to this Court. And this Court must act. In 2015, Congress changed the CVRA's judicial review provision from "largely prudential" mandamus review, *In re Dean*, 527 F.3d 391, 396 (5th Cir. 2008), to "ordinary standards of appellate review." 18 U.S.C. § 3771(d)(3) (discussed in *Ryan*, 88 F.4th at 621 (citing *In re Doe*, 57 F.4th 667, 672-73 (9th Cir. 2023)). Accordingly, Congress has eliminated any discretionary options open to this Court in handling the *Dean* petition. Now, this Court must decide the victims' families' petition on its merits— meaning that this Court must determine whether the district court followed the CVRA's requirement that a district court "*shall ensure* that the crime victim is afforded the rights described" in the CVRA. 18 U.S.C. § 3771(b)(1) (emphasis added) (cited in *Ryan*, 88 F.4th at 621). This Court reviews *de novo* whether the district court properly interpreted that legal command. *See Ryan*, 88 F.4th at 621. If the district court committed an error of law, under "ordinary standards of appellate review" this Court must reverse and remand with directions that the district court properly apply the law.

Here, the victims' families asked for the DPA to be set aside in their first district court filing in December 2021. *See* ECF No. 15. Despite that request, for years that illegally negotiated agreement has influenced the case below. In the earlier proceedings here, this Court recognized that district courts "must uphold crime

victims' statutory rights at *every stage* of the court's criminal proceedings." *Id.* at 627 (emphasis added). It instructed that the district court must "uphold victims' CVRA rights *throughout* the instant criminal proceedings." *Id.* at 629 (emphasis added). Whatever else may be said about the prosecution below, it is clear that the victims' families' CVRA rights have never been fully enforced concerning the negotiation of the DPA—and the DPA's influence through the later proceedings. This Court should now reverse with directions that the DPA must be set aside and the victims' families afforded a fair opportunity to influence the resolution of the prosecution of the "deadliest corporate crime in U.S. history" (Appx. 705).

## **CONCLUSION**

More than two years ago, the victims' families asked this Court to enforce their CVRA rights. This Court said that their request was "premature." That is no longer the case. Sadly, it is now or never for enforcing the victims' families' CVRA rights.

Because the district court failed to carry out its statutory duty to protect the victims' families' rights, this Court must intervene. This Court should grant the petition, reverse the district court's dismissal order, and remand with instructions that the district court must set aside the DPA (including its sentencing guidelines calculations)—at long last giving the families their promised, unfettered opportunity to confer with prosecutors about holding Boeing criminally accountable for its deadly crime.

Dated: November 13, 2025                    Respectfully submitted,

                                            */s/ Paul G. Cassell*

Warren T. Burns                             Paul G. Cassell (Utah Bar No. 06078)
(Texas Bar No. 24053119)                    (Counsel of Record)
Darren P. Nicholson                         Utah Appellate Project
Chase Hilton                                S.J. QUINNEY COLLEGE OF LAW
BURNS CHAREST LLP                           University of Utah
900 Jackson Street, Suite 500               383 S. Univ. St.
Dallas, Texas 75202                         Salt Lake City, UT 84112
Telephone: (469) 904-5002                   Telephone: (801) 585-5202
wburns@burnscharest.com                     cassellp@law.utah.edu
nicholson@burnscharest.com                  (no institutional endorsement implied)
chilton@burnscharest.com

Erin R. Applebaum                           Robert A. Clifford
KREINDLER & KREINDLER                       Tracy A. Brammeier
LLP                                         CLIFFORD LAW OFFICES PC
485 Lexington Avenue, 28th Floor            120 North LaSalle Street, 36th Floor
New York, New York 10017                    Chicago, Illinois 60602
Telephone: (212) 687-8181                   Telephone: (312) 625-6192
eapplebaum@kreindler.com                    rac@cliffordlaw.com
                                            tab@cliffordlaw.com
Charles S. Siegel
Waters & Kraus LLP
siegel@waterskraus.com

Sanjiv N. Singh
Sanjiv N. Singh, A Professional
Law Corp
ssingh@sanjivnsingh.com

Filippo Marchino
The X-Law Group PC
fm@xlawx.com


*Attorneys for Crime Victims' Representatives-Petitioners*


35

## <u>CERTIFICATE OF COMPLIANCE WITH RULE 32(a)</u>

This brief complies with the type-volume limitation of Fed. R. Appx. P. 32(a)(7)(B) because this brief contains fewer than 7,800 words, as provided in Fed. R. App. P. 21(d)(1).

This brief complies with the typeface requirements of Fed. R. Appx. P. 32(a)(5) and the type-style requirements of Fed R. Appx. P. 32(a)(6) because this brief has been prepared in a proportionally spaced Time New Roman typeface using 14-point Times New Roman type.

*/s/ Paul G. Cassell*
Paul G. Cassell

*Attorney    for    Crime    Victims'*
*Representatives-Petitioners*

## <u>CERTIFICATE OF SERVICE</u>

I certify that on November 13, 2025, the foregoing document was served on the parties to the proceedings below (i.e., the Government and The Boeing Company) through their counsel of record, and on the U.S. District Court for the Northern District of Texas (O'Connor, J.), via e-mail to the following addresses:

*Counsel for the United States*

lorinda.laryea@usdoj.gov
sean.tonolli@usdoj.gov

*Counsel for The Boeing Company*

bhatch@mcguirewoods.com
mark.filip@kirkland.com

*U.S. District Court for the Northern District of Texas*

O'Connor_Orders@txnduscourts.gov

*/s/ Paul G. Cassell*
Paul G. Cassell

*Attorney for Crime Victims' Representatives-Petitioners*

# ATTACHMENT 1 –

# FEBRUARY 10, 2023 DISTRICT COURT ORDER DENYING CVRA RELIEF

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **Criminal Action No. 4:21-cr-5-O** |
| | § | |
| **THE BOEING COMPANY,** | § | |
| | § | |
| **Defendant.** | § | |

**THIRD MEMORANDUM OPINION & ORDER**

Before the Court are the Crime Victims' Representatives'[1] Motion for Exercise of the Court's Supervisory Power over the Deferred Prosecution Agreement (ECF No. 17), filed December 16, 2021; the United States' Response (ECF No. 60), filed February 11, 2022; the Representatives' Reply  to the United States (ECF No. 65), filed February 18, 2022; Boeing's Combined Response (ECF No. 62), filed February 11, 2022; the Representatives' Reply to Boeing (ECF No. 66), filed February 18, 2022; and Senator Ted Cruz's Amicus Brief in Support of the Representatives (ECF No. 90), filed April 29, 2022. Also before the Court are the Representatives' Motion for Leave to Re-File Proffer of Facts Supporting Their Position on Remedies and Request for Evidentiary Hearing (ECF No. 124), filed November 7, 2022; the United States' Response (ECF No. 134), filed November 21, 2022; Boeing's Response (ECF No. 135), filed November 21, 2022; the United States' Supplemental Response Concerning Remedies (ECF No. 128), filed November 11, 2022; Boeing's Supplemental Response Regarding Remedies in Response to Court Order (ECF No. 129), filed November 11, 2022; the Representatives' Supplemental Reply

---

[1] The family members and legal representatives of those who died onboard Lion Air Flight 610 and Ethiopian Airlines Flight 302 are referenced interchangeably herein as "original movants," "crime victims' representatives," "representatives," or "families." *See generally* Second Opinion, ECF No. 116.

Regarding Remedies for the Government's CVRA Violation (ECF No. 140), filed November 22, 2022; the Representatives' Motion for a Finding that the Government has Violated the Crime Victims' Rights Act by Failing to Confer Before Filing its Remedies Brief, to Strike the Government's Remedies Brief, and for an Accelerated Decision (ECF No. 130), filed November 14, 2022; and the United States' Response (ECF No. 142), filed November 28, 2022.

Before the Court are also several motions filed in recent months by foreign carriers Polskie Linie Lotnicze LOT S.A. ("LOT") and Smartwings, A.S. ("Smartwings"), and by additional family members of fifty-five individuals who died in the Lion Air Flight 610 and Ethiopian Airlines Flight 302 crashes.[2] Related briefing includes the Motion of Polskie Linie Lotnicze LOT S.A. Pursuant to the Crime Victims' Rights Act for Findings that the Proposed Boeing Deferred Prosecution Agreement was Negotiated in Violation of the Victim's Rights and for Remedies for Those Violations (ECF No. 120), filed October 28, 2022; the United States' Response (ECF No. 145), filed December 2, 2022; Boeing's Response (ECF No. 150), filed December 12, 2022; LOT's Reply (ECF No. 153), filed December 22, 2022; the Motion of Marti Faidah, et al. to Seek Remedies Pursuant to Crime Victims' Rights Act (ECF No. 138), filed November 22, 2022; the United States' Response (ECF No. 147), filed December 6, 2022; Boeing's Response (ECF No. 146), filed December 6, 2022; Marti Faidah, et al.'s Reply (ECF No. 152), filed December 19, 2022; Smartwings' Motion to be Designated as a Crime Victim Under the CVRA and for an Accounting of the "Airline Compensation Amount" in Boeing's Deferred Prosecution Agreement (ECF No. 141), filed November 28, 2022; the United States' Response (ECF No. 149), filed December 12, 2022; Boeing's Response (ECF No. 151), filed December 12, 2022; and Smartwings' Reply (ECF No. 160), filed January 6, 2023.

---

[2] Collectively, the Court refers to the carriers and the additional family members as the "2022 Movants."

On October 21, 2022, this Court ruled in favor of the original movants, holding that the crash victims of Lion Air Flight 610 and Ethiopian Airlines Flight 302 are "crime victims" for purposes of the Crime Victims' Rights Act ("CVRA") and that their lawful representatives are therefore entitled to assert rights under the Act.[3] The Court reserved the question of remedies for later resolution, which it takes up in Section III.A of this Opinion. The Court takes up the 2022 Movants' pending motions in Section III.B.

The parties have provided initial and supplemental briefing regarding appropriate remedies and the motions are ripe for review. Having considered the briefing and applicable law, and for the reasons discussed herein, the Court **DENIES** the crime victims' representatives' requested relief and **DENIES** the 2022 Movants' motions for recognition as crime victims and associated remedies.

## I.    FACTUAL & PROCEDURAL BACKGROUND[4]

On October 29, 2018, a Boeing 737 MAX aircraft operating as Lion Air Flight 610 crashed shortly after taking off from Indonesia. None of the 189 passengers and crew members onboard survived. Less than six months later, on March 10, 2019, another 737 MAX operating as Ethiopian Airlines Flight 302 crashed shortly after taking off from Ethiopia. Again, all 157 passengers and crew members onboard died.

Three days after the second crash, the President ordered the grounding of all 737 MAX aircrafts operating in the United States. Initial investigations by the United States Federal Aviation Administration's ("FAA") Aircraft Evaluation Group ("AEG") subsequently revealed that a system Boeing had installed in its 737 MAX aircrafts—the Maneuvering Characteristics

---

[3] Second Opinion, ECF No. 116.
[4] The factual and procedural background is taken from portions of the record in this case. Additional background information is set out exhaustively in the Court's prior Opinions. *See* First Opinion, ECF No. 96; Second Opinion, ECF No. 116.

Augmentation System ("MCAS")—activated during both flights. The AEG, the group responsible for determining minimum levels of training required for U.S.-based airline pilots to fly a new version of an aircraft ("differences training"), began investigating the operation of MCAS in connection with pilot training.

Shortly after the second crash, the U.S. Department of Justice began investigating Boeing. Though initially uncooperative, Boeing eventually aided the Justice Department's investigation by identifying relevant documents and witnesses.[5] In February 2020, while that investigation was ongoing, Thomas Gallagher, a representative of the Flight 302 crash victims' families, reached out to the Justice Department seeking information about possible investigations.[6] The Justice Department's Victims' Rights Ombudsman informed Gallagher that the Federal Bureau of Investigation had advised her that it was not investigating the crash, nor was it aware of any open cases at the Justice Department.[7] She told Gallagher, "If criminal charges are filed at some point, victims will be advised of that and notified of their rights under the [Crime Victims' Rights Act]."[8] Gallagher then reached out to the FBI Victim-Witness Office, and a victim specialist informed Gallagher that she, too, was unaware of any FBI investigations.[9]

The Justice Department's investigation ultimately revealed that, during Boeing's development of the 737 MAX, two Boeing Technical Pilots had misled the AEG about the aircraft's MCAS operational capabilities in order to affect the AEG's pilot differences training determination.[10] This deception prompted the AEG to authorize a lower level of training for the

---

[5] Deferred Prosecution Agreement ("DPA") 5, ECF No. 4.
[6] *See* Movants' App. 62–65, Ex. 16, Decl. of Thomas Gallagher, ECF No. 16-1.
[7] *Id.* at 64.
[8] *Id.*
[9] *Id.* at 65.
[10] *See generally* DPA, ECF No. 4.

737 MAX, resulting in the promulgation of inadequate pilot training worldwide, in turn leading to the catastrophic plane crashes that cost 346 individuals their lives.[11]

On January 7, 2021, the Government charged Boeing with conspiracy to defraud the United States under 18 U.S.C. § 371.[12] The Government alleges that Boeing conspired to defraud the AEG in connection with the AEG's evaluation of the Boeing 737 MAX aircraft's MCAS, the agency's pilot differences training determination, and related reporting.[13] The same day, the Government filed a deferred prosecution agreement ("DPA")[14] and a Joint Motion for Exclusion of Time Under the Speedy Trial Act, which allows the parties to defer impending criminal trial proceedings upon the Court's approval of the agreement.[15] In the DPA, Boeing admitted to the Government's statement of facts and accepted responsibility for the acts charged.[16] On January 24, 2021, this Court approved the DPA and suspended the Speedy Trial Act's time requirements for a period of three and a half years.[17]

The DPA obligates Boeing to pay a criminal monetary penalty of $243.6 million, which the DPA says "reflects a fine at the low end of the otherwise-applicable Sentencing Guidelines fine range."[18] Boeing also must pay $1.77 billion in compensation to its airline customers and set up a fund of an additional $500 million to be paid to the heirs, relatives, and beneficiaries of those who died in the two airplane crashes.[19] The DPA requires Boeing to meet with and report to the Justice Department's Fraud Section to ensure Boeing's compliance with the DPA and other federal

---

[11] *See generally* Second Opinion, ECF No. 116.
[12] *See* Criminal Information, ECF No. 1.
[13] *Id.*
[14] DPA, ECF No. 4.
[15] Joint Mot. for Exclusion of Time, ECF No. 5; 18 U.S.C. § 3161(h)(2).
[16] DPA ¶¶ 1–2, ECF No. 4.
[17] Order, ECF No. 13.
[18] DPA 7, ECF No. 4.
[19] *Id.*

laws.[20] In exchange, the DPA immunizes Boeing from criminal prosecution for all conduct described in the statement of facts.[21] If, in the DOJ's sole discretion, Boeing complies with its obligations under the DPA for three years, the Government will dismiss the charge with prejudice.[22] If, on the other hand, Boeing breaches or fails to comply with any provision, the Government may prosecute Boeing for the crime charged.[23]

On December 16, 2021, eleven months after the DPA was filed, certain family members of those who died onboard Lion Air Flight 610 and Ethiopian Airlines Flight 302, moved this Court for a determination that the United States had negotiated the DPA in violation of the Crime Victims' Rights Act, 18 U.S.C. § 3771, and for appropriate remedies.[24] First, they argued (and the Court agreed) that the Government and Boeing violated the CVRA by negotiating the DPA behind closed doors, without conferring with the families.[25] As a remedy, they now request that the Court supervise implementation of the DPA to ensure the crime victims' rights under the CVRA are adequately protected.[26] Despite the substantial fines imposed and DOJ's continued oversight of Boeing's interim conduct, the victims' families maintain that the DPA is grossly inadequate and should be rejected or substantially modified. Third, they asked for (and received) an arraignment of Boeing at which they would have an opportunity to be heard on the company's conditions of release.[27] As an additional remedy, the representatives also ask this Court to order the Government to disclose information about Boeing's crimes and the DPA's negotiation history.[28]

---

[20] *Id.* at 7–9, Attachment D.
[21] *Id.* at 14.
[22] *Id.* at 3, 16.
[23] *Id.* at 16–19.
[24] *See generally* Supervisory Mot., ECF No. 17; Arraignment Mot., ECF No. 18; CVRA Mot., ECF No. 52; Disclosure Mot., ECF No. 72.
[25] *See generally* CVRA Mot., ECF No. 52.
[26] *See generally* Supervisory Mot., ECF No. 17.
[27] *See generally* Arraignment Mot., ECF No. 18.
[28] *See generally* Disclosure Mot., ECF No. 72; Representatives' Supp. Remedies Reply 17, ECF No. 140.

In January 2022, before the families' legal status as crime victims' representatives had been recognized, the Justice Department held several meetings at which the representatives were given the opportunity to voice their concerns over the DPA. The United States Attorney General personally attended one of those meetings. Still, after listening to the families' perspectives, the Government reiterated its position to stand by the DPA. The families insist these meetings inadequately fulfilled their rights under the CVRA.

On May 3, 2022, the Court held a hearing regarding several of the families' motions.[29] Following that hearing, on July 27, 2022, this Court issued its first Memorandum Opinion & Order in which it held that the CVRA's definition of "crime victims" included the crash victims; meaning their legal representatives could assert rights under the Act provided they could establish the crash victims were "directly and proximately harmed" by Boeing's criminal conspiracy to defraud the United States.[30] In its Second Memorandum Opinion & Order, issued October 21, 2022, this Court determined that the families had in fact established direct and proximate causation and granted their motion for findings that the DPA was negotiated in violation of the victims' rights.[31] Thus, the crime victims' lawful representatives are entitled to assert the victims' rights under the Act.[32] The Court permitted the parties to supplement their briefing regarding appropriate remedies in light of its ruling.[33]

Following that decision, the Justice Department held two additional meetings for the newly identified "crime victims' representatives." The latter occurred on November 18, 2022, during which the Government, over the course of five hours, discussed appropriate remedies with several

---

[29] *See* May 3, 2022 Minute Entry, ECF No. 94.
[30] First Opinion 7–8, 17–21, ECF No. 96.
[31] Second Opinion 17–18, ECF No. 116.
[32] *Id*.
[33] *Id.*

hundred of the victims' family members.[34] As a result of those discussions, the Government agreed to support the representatives' request for Boeing's arraignment and filed its motion shortly thereafter.[35]

On January 26, 2023, the Court held a three-hour public arraignment at which Boeing appeared and the crime victims' representatives were permitted to speak personally or through counsel.[36] Thirteen of the crash victims' representatives offered in person testimony and several dozen more filed written statements on the docket.[37] Counsel for the crime victims' representatives, the Government, and Boeing presented argument regarding appropriate conditions of Boeing's release. The Court imposed the sole condition that Boeing not commit another Federal, State, or local crime for the term of its release but reserved the decision to impose any additional conditions for further consideration.[38] Having considered the parties' briefing regarding additional conditions of release,[39] the Court is of the view that no factual record exists to justify a finding that Boeing—while subject to the Government's continued supervision—currently presents an ongoing threat to public safety such that imposition of additional conditions of release pursuant to 18 U.S.C. § 3142 are necessary. In this Opinion, the Court takes up the remaining issue of remedies and resolves the pending motions of the 2022 Movants.

## II.       LEGAL BACKGROUND

The Speedy Trial Act generally requires courts to begin criminal trial proceedings within seventy days of a defendant being charged with a crime. *See* 18 U.S.C. § 3161(c)(1). The parties

---

[34] United States' Resp. to Second CVRA Mot. 3, ECF No. 142.
[35] *Id.*
[36] *See* Order 3–5, ECF No. 162; January 26, 2023 Minute Entry, ECF No. 174.
[37] *See* App. of Victim Statements, ECF No. 171-1; Statement on Arraignment of The Boeing Company, ECF No. 172; Exhibit to Statement on Arraignment of The Boeing Company, ECF No. 173; App. of Additional Victim Statements, ECF No. 176-1.
[38] Arraignment Hr'g Tr. 130:8–10, ECF No. 175.
[39] *See generally* ECF Nos. 167, 170, 178–81.

may seek an exemption from that general timeline, however, if the Government, in exercise of its prosecutorial discretion, opts to negotiate a deferred prosecution agreement. *See id.* § 3161(h)(2). Upon negotiating and reaching an agreement, the Government and the defendant file the DPA with the district court for "approval." *Id*. The statutory language setting out this deferral of prosecution provides that:

> (h) The following periods of delay shall be excluded in computing the time within which an information or an indictment must be filed, or in computing the time within which the trial of any such offense must commence: . . .
>
> (2) Any period of delay during which prosecution is deferred by the attorney for the Government pursuant to written agreement with the defendant, *with the approval of the court*, for the purpose of allowing the defendant to demonstrate his good conduct.

*Id.* (emphasis added). While that process generally satisfies the requirements of the Speedy Trial Act, if the crime affected victims, the Government and the Court must take additional steps to afford those crime victims their statutory rights.

The Crime Victims' Rights Act, 18 U.S.C. § 3771, guarantees crime victims certain rights in criminal proceedings. Among those are the right to timely notice of proceedings involving the release, plea, sentencing, or parole of the defendant; the right not to be excluded from and to be heard at any such proceeding; the right to confer with the Government attorney in the case; the "right to full and timely restitution as provided in law"; the "right to be treated with fairness and respect for the victim's dignity and privacy"; and the right to be timely informed of any deferred prosecution agreement.[40] *Id.* § 3771(a).

---

[40] Other rights under the Crime Victims' Rights Act include the following:

(1) The right to be reasonably protected from the accused.
(2) The right to reasonable, accurate, and timely notice of any public court proceeding, or any parole proceeding, involving the crime or of any release or escape of the accused.
(3) The right not to be excluded from any such public court proceeding, unless the court, after receiving clear and convincing evidence, determines that testimony by the victim would be materially altered if the victim heard other testimony at that proceeding.

The CVRA requires the Government to make its "best efforts to see that crime victims are notified of, and accorded, [their statutory] rights." *Id.* § 3771(c)(1). It also imposes duties on district courts. In any relevant proceedings, "the court *shall ensure* that the crime victim is afforded the rights described in subsection (a) . . . [and that] [t]he reasons for any decision denying relief under this chapter shall be clearly stated on the record." *Id.* § 3771(b)(1) (emphasis added). And the district court "shall take up and decide any motion asserting a victim's right forthwith." *Id.* § 3771(d)(3). Finally, the crime victim, the crime victim's representative, or the Government attorney may assert the victim's rights under the Act. *Id.* § 3771(d)(1).

## III.     DISCUSSION

### A.

Having decided that the Government negotiated the DPA in violation of the crime victims' rights, the Court takes up the issue of remedies. Among other requested remedies, the representatives ask the Court to exercise its supervisory authority, whether statutory or inherent, to "withhold its approval of the DPA" or to specifically "excise from the DPA" the immunity provisions that block Boeing from prosecution.[41] Ultimately, the representatives attack the DPA

---

(4) The right to be reasonably heard at any public proceeding in the district court involving release, plea, sentencing, or any parole proceeding.
(5) The reasonable right to confer with the attorney for the Government in the case.
(6) The right to full and timely restitution as provided in law.
(7) The right to proceedings free from unreasonable delay.
(8) The right to be treated with fairness and with respect for the victim's dignity and privacy.
(9) The right to be informed in a timely manner of any plea bargain or deferred prosecution agreement.
(10) The right to be informed of the rights under this section and the services described in section 503(c) of the Victims' Rights and Restitution Act of 1990 (42 U.S.C. 10607(c)) and provided contact information for the Office of the Victims' Rights Ombudsman of the Department of Justice.

18 U.S.C. § 3771(a).
[41] Reply to Supervisory Mot. 24, ECF No. 65; Representatives' Supp. Remedies Reply 20, ECF No. 140.

on grounds that it is grossly inadequate and should be rejected or reformed until it is commensurate with the severity of Boeing's crime—perhaps the deadliest corporate crime in our nation's history.[42] They also present arguments that DPAs are inherently problematic, raising significant separation of powers concerns, and urge the Court to invoke its supervisory powers on that basis.[43]

The representatives also ask the Court to order the Government to confer with them about "other ways to hold Boeing accountable for its crimes beyond the provisions in the existing DPA" and to disclose evidence and information about Boeing's crimes and the DPA negotiation process.[44] Though the Court will refer to this request as relating to the representatives' "conferral rights," the Court notes that throughout their briefing the victims' representatives claim they are entitled to this remedy based also on their rights to full and timely restitution, to be treated with fairness, and to timely notice of the DPA.[45] Finally, the representatives ask the Court to refer the Government to the appropriate investigative authorities for its violations of the CVRA.[46]

Thus, the representatives' several requested remedies are best organized into three categories that ask the Court to: (1) exercise its statutory or inherent supervisory authority over the DPA; (2) enforce the victims' conferral rights; and (3) refer the Government to appropriate investigative authorities.[47] And, only if necessary for the Court to rule in their favor, the representatives request an evidentiary hearing to prove the Government's bad faith in excluding them from the DPA negotiation process.[48] The Government and Boeing oppose the

---

[42] Reply to Supervisory Mot. 24, ECF No. 65; Representatives' Supp. Remedies Reply 9 n.10, 20, ECF No. 140.

[43] Supervisory Mot. 5–9, ECF No. 17.

[44] CVRA Mot. 27, ECF No. 52; Representatives' Supp. Remedies Reply 15–17, ECF No. 140.

[45] *See* Disclosure Mot. 12–18, ECF No. 72; Representatives' Supp. Remedies Reply 20, ECF No. 140; 18 U.S.C. § 3771(a)(6), (a)(8), (a)(9).

[46] CVRA Mot. 27–28, ECF No. 52 (identifying several requested remedies).

[47] *See generally* Supervisory Mot., ECF No. 17; CVRA Mot, ECF No. 52; Reply to Supervisory Mot., ECF No. 65; Representatives' Supp. Remedies Reply, ECF No. 140.

[48] Representatives' Supp. Remedies Reply 19, ECF No. 140.

representatives' requested relief on several grounds, namely: (1) that the Court lacks statutory and inherent authority to supervise, and thereby reject or modify, the DPA; (2) the Court has no inherent authority or alternative legal basis for awarding the other remedies that the representatives seek; and, (3) even if it does possess such authority, equitable and other legal considerations counsel against granting the representatives' requested relief.[49]

In short, the parties' disagreement is principally over the scope of this Court's judicial authority, i.e., does it have the power to award the remedies the crime victims' representatives claim they are entitled to. Settling this dispute requires the Court to decide two questions:

1. Whether the Court has statutory or inherent authority to provide the remedies the representatives seek; and

2. If indeed it does have authority to provide such remedies, whether it must.

Because the answer to both questions is no, the Court **DENIES** the representatives' requested relief.

### i.    The Court Does Not Possess Statutory Authority Permitting it to Exercise Substantive Supervision Over the DPA

As noted, the Speedy Trial Act permits the Government and a criminal defendant to negotiate a DPA and thereby delay, for an interim period, the seventy-day timeline by which criminal proceedings must ordinarily begin. 18 U.S.C. § 3161(h)(2). The relevant statutory text provides that "[a]ny period of delay during which prosecution is deferred by the attorney for the Government pursuant to written agreement with the defendant, *with the approval of the court*, for

---

[49] United States' Resp. to CVRA Mot., ECF No. 58; United States' Resp. to Supervisory Mot., ECF No. 60; United States' Resp. to Disclosure Mot., ECF No. 73; United States' Supplemental Remedies Resp., ECF No. 128; Boeing's Combined Resp., ECF No. 62; Boeing's Supplemental Remedies Resp., ECF No. 129.

the purpose of allowing the defendant to demonstrate his good conduct," shall be excluded from the Act's strict timeliness requirements. *Id.* § 3161(h)(2) (emphasis added).

The Court begins with the pertinent statutory text, "with the approval of the court," to decide whether the Speedy Trial Act confers substantive supervisory authority. The representatives apply the nearest-reasonable-referent canon to the statutory language, arguing that the nearest reasonable referent to "with the approval of the court" is "written agreement."[50] This, the representatives contend, means the "written agreement" is subject to "the approval of the court."[51] This, apparently by implication, evinces Congress' intent to confer on the district court authority to substantively review (and approve or disapprove) the written terms of any DPA that comes before it.[52] But the Court does not find this persuasive. Even if the canon properly applies in this instance, it says nothing about the *ambit* of the court's approval authority. Moreover, "canons are not mandatory rules. They are guides that need not be conclusive." *Chickasaw Nation v. United States*, 534 U.S. 84, 94 (2001) (cleaned up). And "[e]ach may be overcome by the strength of differing principles that point in other directions." Antonin Scalia and Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 70 (2012). Such principles undoubtedly apply here.

The representatives argue that, as a general matter, deferred prosecution agreements present constitutional separation of powers concerns.[53] "Relegating courts to a mere rubber-stamp role on DPAs effectively grants prosecutors [combined] judicial and legislative powers," by giving them the power to both discipline and attempt to reshape corporate governance.[54] However, the

---

[50] Reply to Supervisory Mot. 12, ECF No. 65 (citing Antonin Scalia and Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 152 (2012)).

[51] *Id.*

[52] *See id.* at 12 ("Thus, the congressional syntax makes clear that what requires court approval is the 'written agreement.'").

[53] Supervisory Mot. 5–9, ECF No. 17.

[54] *Id.* at 6 (citing *Criminal Law—Separation of Powers—D.C. Circuit Holds that Courts May Not Reject Deferred Prosecution Agreements Based on the Inadequacy of Charging Decisions or Agreement*

same separation of powers principles the representatives urge this Court to protect also restrain it from stepping beyond its judicial purview to reform Congress' legitimate legislative enactment. Indeed, an attempt by the judiciary to weigh in on the Executive's DPA presents an even more worrisome separation of powers concern than does the Executive's *congressionally authorized* consolidation of power the representatives say is inherent to deferred prosecution agreements.[55] Given this tension, the constitutional-doubt canon is particularly apt here. This canon dictates that "[a] statute should be interpreted in a way that avoids placing its constitutionality in doubt." Scalia & Garner, *Reading Law* 214 (quoting *United States ex rel. Attorney General v. Delaware & Hudson Co.*, 213 U.S. 366, 408 (1909) (White, J.) ("[W]here a statute is susceptible of two constructions, by one of which grave and doubtful constitutional questions arise and by the other of which such questions are avoided, our duty is to adopt the latter.")). Applying these principles here, the Court cannot accept the representatives' interpretation of the statute.

The D.C. and Second Circuits interpret this provision to mean that a court's statutorily conferred supervisory authority over a DPA consists principally of determining whether the agreement was reached for a legitimate or illegitimate purpose. *United States v. Fokker Servs., B.V.*, 818 F.3d 733, 744–45, 747 (D.C. Cir. 2016); *United States v. HSBC Bank USA, N.A.*, 863 F.3d 125, 129 (2d Cir. 2017).

In *United States v. Fokker Services*, the D.C. Circuit said it understands a court's supervisory role with respect to a DPA "to have a particular focus: i.e., to assure that the DPA in fact is geared to enabling the defendant to demonstrate compliance with the law, and is not instead a pretext intended merely to evade the Speedy Trial Act's time constraints." 818 F.3d at 744.

---

*Conditions*—United States v. Fokker Services B.V., 130 HARV. L. REV. 1048, 1054–55 (2017) and Brandon L. Garrett, *Structural Reform Prosecution*, 93 VA. L. REV. 853, 936 (2007)).

[55] And, importantly, the representatives have not raised a constitutional challenge to § 3161(h)(2), so the Court has no occasion to decide that question here.

Therefore, under *Fokker*, a district court has no authority under the Speedy Trial Act to withhold its approval of a DPA because the court disagrees with the agreement's substantive terms or the Government's decision to negotiate such an agreement. *Id.* at 738, 740–41, 743, 746–47. Similarly, in *United States v. HSBC Bank*, the Second Circuit held that, barring evidence of misconduct or impropriety, a district court's role in supervising a DPA is confined to arraigning the defendant, ensuring the agreement is *bona fide* (not for purposes of evading the Speedy Trial Act clock), and adjudicating related motions or disputes as they arise. 863 F.3d at 129, 137–38.

The representatives argue that *Fokker* only prohibits district courts from rejecting a DPA based on disagreement with the Government's "charging decisions."[56] And, in addition to its being merely persuasive, they say *Fokker* is inapplicable to this case because of its distinguishable procedural posture—i.e., the Court is not asked to question the prosecution's *charging decisions*, but to evaluate the substance of the agreement against the particular facts of this case.[57]

But the Court disagrees with such a narrow reading of that case. Hints throughout the *Fokker* opinion suggest its reasoning applies more broadly to any attempt at judicial review of the substantive terms or implementation of a DPA, not just the prosecution's charging decisions. *See, e.g., Fokker Servs.*, 818 F.3d at 747 ("The court instead denied the exclusion of time under § 3161(h)(2) based on a belief that the prosecution had been unduly lenient in its charging decisions *and in the conditions agreed to in the DPA*. The court significantly overstepped its authority in doing so.") (emphasis added); *id.* at 744 ("The Judiciary's lack of competence to review the prosecution's initiation and dismissal of charges equally applies to review of the prosecution's decision to pursue a DPA *and the choices reflected in the agreement's terms*.") (emphasis added) (cleaned up).

---

[56] Reply to Supervisory Mot. 12–15, ECF No. 65.
[57] *Id.*

The *HSBC Bank* opinion confirms this broader reading. There, the Second Circuit interpreted *Fokker* as denying a district court's authority to disapprove a speedy trial waiver "based on its view that the DPA at issue was too lenient." *HSBC Bank*, 863 F.3d at 137. Relying on its reading of *Fokker*, the Second Circuit went on to hold that "in the absence of any clear indication that Congress intended courts to evaluate the *substantive merits* of a DPA or to supervise a DPA's out-of-court implementation, the relative functions and competence of the executive and judicial branches counsel against [the opposite] interpretation." *Id.* at 138 (emphasis added) Thus, contrary to the position the representatives urge the Court to adopt, both the D.C. and Second Circuits believe district courts lack statutory authority to substantively review and withhold approval of a DPA based on disagreement with its terms or leniency. *Fokker Servs.*, 818 F.3d at 738, 740–41, 743, 746–47; *HSBC Bank*, 863 F.3d at 129, 137–38. This Court agrees. Although the Fifth Circuit has not yet offered binding interpretive guidance on the meaning of § 3161(h)(2), the Court sees no reason to depart from these persuasive authorities and accept an alternate reading of the statute, as the representatives advocate.

In sum, based on its understanding of 18 U.S.C. § 3161(h)(2), the Court holds that it lacks statutory authority to supervise, or substantively review and reject, the subject DPA. Because district courts do not possess authority to *disapprove* of DPAs based on their substantive terms, it follows that the Court may not *modify* the DPAs terms to adequately reflect the Court's assessment that doing so would better effect justice for the crime victims.

### ii.     Nor May the Court Supervise the DPA by Relying on its Inherent Authority

Statutory authority aside, Courts also possess a degree of inherent authority over the proceedings that come before them. *Bank of Nova Scotia v. United States*, 487 U.S. 250, 264 (1988) (Scalia, J., concurring). This inherent authority permits a federal court to "supervise the

administration of criminal justice among the parties before the bar." *HSBC Bank*, 863 F.3d at 135

(cleaned up). Traditionally, exercise of this supervisory power has been for the purposes of

"implement[ing] a remedy for violation of recognized rights; . . . preserv[ing] judicial integrity by

ensuring that a conviction rests on appropriate considerations validly before the jury; and . . .

deter[ing] illegal conduct." *Id*. (quoting *United States v. Hasting*, 461 U.S. 499, 505 (1983)). Thus,

the scope of a court's inherent supervisory authority is itself inherently limited to those three

discrete purposes.

The Court's inherent authority provides no basis upon which the Court may exercise

supervisory authority over the DPA. The representatives are correct that, in some cases, a district

court may invoke its inherent authority to "monitor the implementation of the DPA or take other

appropriate action." *Id*. at 137. However, exercising this inherent supervisory authority over a DPA

is likely only appropriate when the agreement "so transgresses the bounds of lawfulness or

propriety as to warrant judicial intervention to protect the integrity of the Court" or when there is

clear evidence of bad faith or misconduct on the part of the Government. *Id*. at 136; *see also*

*Fokker*, 818 F.3d at 747 (noting use of inherent authority may be appropriate when the DPA's

terms are expressly illegal or clearly unethical).

Here, the representatives urge the Court to invoke its inherent authority on grounds that the

Government has acted with impropriety warranting judicial intervention and on purported

evidence of bad faith. They argue, first, that the DPA is necessarily marked by "impropriety" in

light of this Court's ruling that the Government violated the CVRA.[58] "Acting illegally is, by

definition, acting with impropriety."[59] To overlook this impropriety and approve the DPA would,

they argue, lend a judicial imprimatur to the Government's wrongdoing and threaten this Court's

---

[58] Representatives' Supp. Remedies Reply 6, ECF No. 140.
[59] *Id*. at 6.

own "judicial integrity."[60] But a court may invoke its supervisory powers in the name of "judicial integrity" only for the specific purpose of "ensuring that a conviction rests on appropriate considerations validly before the jury." *Hasting*, 461 U.S. at 505. Not based upon a vague notion that it must "restore respect for the law."[61] Because there is neither conviction nor jury at issue here, there is no basis to use judicial integrity as a justification for invoking this Court's inherent authority.

The representatives also claim the Government acted in bad faith by secretly negotiating the DPA and excluding the crime victims' representatives from the process.[62] In support, they point to the uncontested facts that the DOJ's Victims' Rights Ombudsman and a victim specialist from the FBI's Victim-Witness Office "provided inaccurate information to the victims' families about its investigation into the two crashes."[63] Among a host of other proffered facts, they also claim the Government has refused to disclose requested information related to its prosecutorial charging decisions and its negotiation process with Boeing.[64]

Even if ultimately proven, none of the representatives' proffered evidence meets the exacting standard for a showing of impropriety or bad faith that justifies exercising the Court's inherent supervisory authority over the DPA.[65] *In re Moore*, 739 F.3d 724, 729–30 (5th Cir. 2014) (requiring clear and convincing evidence of "bad faith or willful abuse of the judicial process" to

---

[60] *Id*. at 3–4.

[61] Representatives' Supp. Remedies Reply 5, ECF No. 140.

[62] *Id*. at 19–20.

[63] Ex. 1 of Mot. to Re-File Proffer of Facts ¶¶ 253–77, ECF No. 124-1; *see also* United States' Supplemental Remedies Resp. 9–10, ECF No. 128 (acknowledging the Victim Rights' Ombudsman's incorrect statements were the result of "regrettable and inadvertent internal miscommunication" within the DOJ).

[64] Representatives' Supp. Remedies Reply 15–17, ECF No. 140; Ex. 1 of Mot. to Re-File Proffer of Facts ¶¶ 294–315, 368, ECF No. 124-1 (offering potential evidence of the Government's misinformation, the inadequacy of the DPA, the Government's engagement with the representatives, and other proffered facts pertaining to Boeing's misconduct).

[65] For this reason, the Court need not hold another evidentiary hearing to develop the factual record.

support invocation of inherent authority). Indeed, "[l]eveling an extraordinary claim of bad faith against a coordinate branch of government requires an extraordinary justification." *In re Dep't of Commerce*, 139 S. Ct. 16, 17 (2018) (Gorsuch, J., concurring in part). None exists here.

It is true that the Government violated the CVRA. By denying the crime victims' representatives their rights to confer prior to reaching an agreement with Boeing, the Government transgressed its statutory obligations under the CVRA. But the Government avers it excluded the representatives from the DPA negotiation process based on its bona fide—albeit errant—assessment that the crash victims were not legal "crime victims" of Boeing's conspiracy to defraud the United States.[66] And the false statements made by the Ombudsman and FBI victim specialist about any ongoing DOJ investigations were purportedly a result of "regrettable and inadvertent internal miscommunication," not a willful attempt to deceive the victims' representatives.[67]

A showing of bad faith requires substantially more than legal error. *Crowe v. Smith*, 261 F.3d 558, 563 (5th Cir. 2001) ("A court abuses its discretion when its finding of bad faith is based on an erroneous view of the law or a clearly erroneous assessment of the evidence."); *see also Gate Guard Servs., L.P. v. Perez*, 792 F.3d 554, 561 (5th Cir. 2015) (explaining that bad faith, in the context of litigation-related misbehavior justifying an award of attorneys' fees, requires *willful* misconduct or improper motive such as the intent to harass another party).

Importantly, even if it were established that the Government acted in bad faith, it is unclear (doubtful even) that this Court may legitimately wield judicial sanctions to discipline Executive misconduct that occurred in the course of exclusively Executive functions like those at issue here (i.e., criminal investigation and pre-prosecutorial negotiations). Doing so would likely violate separation of powers principles this Court is duty-bound to preserve. "Indeed, 'the federal

---

[66] *See, e.g.*, United States' Supplemental Remedies Resp. 8, ECF No. 128.
[67] *Id*. at 9–10.

judiciary's supervisory powers over prosecutorial activities that take place *outside* the courthouse is extremely limited, *if it exists at all*.'" *HSBC Bank*, 863 F.3d at 136 (emphasis added) (quoting *United States v. Lau Tung Lam*, 714 F.2d 209, 210 (2d Cir. 1983)).

Nevertheless, the Government's historic engagement with the families undercuts arguments that it dealt with them in bad faith. Before the families were ever recognized as representatives of "crime victims" for purposes of the CVRA, the Government hosted several meetings at which the representatives could advocate their positions regarding the DPA. Attorney General Merrick Garland personally attended one of those meetings. Despite their complaint that these listening sessions were inadequate, that the victims' representatives were offered several meetings and a personal conference with the United States' chief law enforcement officer amplifies DOJ's good faith efforts to treat the families with dignity and respect.[68] Moreover, following this Court's recent decision, the Government hosted an additional meet and confer with the newly classified "crime victims' representatives" and took other remedial steps (e.g., revising internal guidelines for engaging with victims and witnesses to ensure future compliance with the Act).[69] Though these measures do not alter the fact that the families were originally denied their legal status and associated rights as crime victims' representatives, they evince the Government's good faith—not the opposite.

The Court is of the view that, regrettably, legal error on the Government's part is what occurred here, not bad faith or impropriety that warrants the Court's acting to preserve judicial integrity. Therefore, no justification exists to reach the extraordinary finding of bad faith or impropriety necessary for this Court to invoke its inherent supervisory authority over the DPA and reject or excise select provisions of the same.

---

[68] Representatives' Supp. Remedies Reply 17, ECF No. 140.
[69] United States' Supplemental Remedies Resp. 6–10, ECF No. 128.

### iii.    The Representatives are Not Entitled to their Other Requested Remedies

Finally, while the representatives' remaining forms of relief likely fall within the scope of this Court's broad remedial powers, other legal considerations counsel against granting their requests. Here, the representatives ask the Court to enforce their conferral rights by ordering the Government to turn over evidence and information about Boeing's crimes and the DPA's negotiation history.[70] Importantly, the representatives concede that, at this point in time, the Government has in fact conferred with them.[71] Nonetheless, the representatives seek remedies for the prior violations of their right to confer.[72] The representatives also contend their conferral rights were violated by the Government's refusal to provide requested information before it filed its remedies briefing in this case.[73] Additionally, they ask the Court to refer the Government to appropriate investigative authorities for its violations of the CVRA.[74] Because the Court finds that the crime victims' statutory rights have already been substantially and meaningfully satisfied, further judicial relief is inappropriate under the circumstances.

In conjunction with their somewhat circumscribed inherent judicial authority, discussed above, district courts possess broad remedial powers that permit them to vindicate rights that have been violated. Indeed, "[o]nce a right and a violation have been shown, the scope of a district court's equitable powers to remedy past wrongs is broad, for breadth and flexibility are inherent equitable remedies." *Swann v. Charlotte-Mecklenburg Bd. of Ed.*, 402 U.S. 1, 15 (1971); *see also Marbury v. Madison*, 5 U.S. 137, 163 (1803) ("where there is a legal right, there is also a legal remedy"); *Fed. Sav. & Loan Ins. Corp. v. Dixon*, 835 F.2d 554, 561 (5th Cir. 1987) (noting that

---

[70] Representatives' Supp. Remedies Reply 17, ECF No. 140.
[71] *Id.* ("*Until just a few days ago*, the Government had failed to confer with the families.") (emphasis added).
[72] *Id.*
[73] *See generally* Second CVRA Mot., ECF No. 130.
[74] CVRA Mot. 27, ECF No. 52.

"the full range of equitable remedies [is] traditionally available to [district courts]"). Of course, "[a]s with any equity case, the nature of the violation determines the scope of the remedy." *Swann*, 402 U.S. at 16. Consequently, any exercise of a court's broad remedial powers originating from its inherent supervisory authority must be tempered by the knowledge that such supervisory power is to be "sparingly exercised" with "restraint and discretion." *HSBC Bank*, 863 F.3d at 136 (quoting *United States v. Jones*, 433 F.2d 1176, 1181–82 (D.C. Cir. 1970) and *Chambers v. NASCO, Inc.*, 501 U.S. 32, 44 (1991)).[75]

Again, it is true the Government violated the crime victims' rights under the CVRA, including the right to confer with counsel for the Government *before* a DPA was executed. And, certainly, district courts have broad remedial powers to vindicate rights that have been violated. Yet, for several reasons, the fact that these rights were offended does not necessitate the remedies the representatives propose. Chief among these reasons is that the victims' statutory rights have been substantially and meaningfully realized.

In another case involving victims' rights under the CVRA, the Fifth Circuit declined to issue a writ of mandamus—even though the district court had clearly violated the Act—because the victims' rights to notice and to confer were eventually meaningfully recognized. *In re Dean*, 527 F.3d 391 (5th Cir. 2008). Though *In re Dean* is procedurally distinguishable and involved the more stringent standard for issuance of a writ, the Court finds the Circuit's reasoning applicable to the instant case. Here, the victims' representatives have had several meetings with DOJ, including one with the Attorney General himself. As in *In re Dean*, these meetings occurred too late in the process and after the DPA had already been negotiated. *See id.* at 395–96. The

---

[75] This may be particularly true with regard to supervision of a deferred prosecution agreement—a dynamic that would raise serious separation of powers concerns should the judiciary's exercise of oversight intrude upon the Executive's ultimate prerogatives.

22

representatives were also given the opportunity to speak at Boeing's arraignment or to submit

written statements.[76] Thirteen representatives testified in person at the arraignment, several others

through counsel.[77] Though testimony at the arraignment was intended to address conditions of

release, the thirteen representatives who testified in person presented moving victim impact

statements while dozens more filed victim impact statements on the docket.[78] And while

these opportunities to be heard do not cure the prior violation, they give meaningful effect to those

rights. Additionally, the Court disagrees with the representatives' claim that the Government

illegally refused to confer by offering only "listening sessions" rather than a more substantive

exchange of information.[79] Citing Webster's Dictionary, they say the right to "confer" means "to

compare view or take counsel: consult."[80] In the context of a DPA, however, the reasonable right

to confer is the right "to communicate meaningfully with the government, personally or through

counsel, before a deal [is] struck." *In re Dean*, 527 F.3d at 395. As noted, the Fifth Circuit has

considered this right vindicated when victims or their representatives are "allowed substantial and

meaningful participation" in *post hoc* conferral meetings or judicial proceedings. *Id.* at 395–96.

Other Circuits have held there was no CVRA violation of the conferral right where a victim "had

received ample opportunities to speak with the government counsel about the alleged [crime]."

*In re Rivers*, 832 Fed. App'x 204, 204 (4th Cir. 2020). Indeed, the right to confer requires only

---

[76] *See* Order, ECF No. 162; Order Regarding Arraignment Hearing, ECF No. 165.
[77] *See generally* Arraignment Hr'g Tr., ECF No. 175.
[78] *See generally* Representatives' Statement on Conditions of Release, ECF No. 170; App. of Victim Statements, ECF No. 171-1; Statement on Arraignment of The Boeing Company, ECF No. 172; Exhibit to Statement on Arraignment of The Boeing Company, ECF No. 173; App. of Additional Victim Statements, ECF No. 176-1.
[79] Representatives' Supp. Remedies Reply 17, ECF No. 140 ("But, as the Government knows, it repeatedly refused to *confer* . . . and instead agreed only to a 'listening session' to hear from the victims").
[80] *Id.* (citing *Merriam-Webster's Collegiate Dictionary* 260 (11th ed. 2006)).

that victims are provided "an opportunity to be heard concerning a proposed settlement agreement." *See In re W.R. Huff Asset Mgmt. Co.*, 409 F.3d 555, 564 (2d Cir. 2005).

None of these decisions suggest that the right to confer includes mandatory disclosure of information on the Government's part. And as the Eleventh Circuit put it in a similar case involving victims' rights under the CVRA, "[i]t is hard to imagine a more significant impairment of prosecutorial discretion than a district court's . . . affirmatively ordering government lawyers (presumably on pain of contempt) to conduct their prosecution of a particular matter in a particular manner." *In re Wild*, 994 F.3d 1244, 1262 (11th Cir. 2021), *cert. denied sub nom. Wild v. United States Dist. Ct. for S. Dist. of Fla.*, 142 S. Ct. 1188 (2022). *In re Wild* involved the point at which the right to confer attaches, but the Eleventh Circuit's reasoning applies equally to a case, like this one, in which the Court is asked to dictate precisely *how* and *about what* the Government must confer with the representatives. For this reason, a finding that the Government violated its conferral rights by refusing to disclose certain information, or by filing its remedies briefing before conferring, is unwarranted.

Nor is the Court persuaded that the representatives' rights to "full and timely restitution," or "to be treated with fairness" justifies mandatory disclosure of such information.[81] A line of cases from other circuits affirms this understanding. *See, e.g.*, *United States v. Hunter*, 548 F.3d 1308, 1317 (10th Cir. 2008) ("The district court and this court have already held that the CVRA does not provide 'victims' with a right of access to the government's files."); *United States v. Moussaoui*, 483 F.3d 220, 224 (4th Cir. 2007) (holding that neither a district court's statutory authority under

---

[81] Disclosure Mot. 12–18, ECF No. 72; Reply to Disclosure Mot. 12–19, ECF No. 75; Representatives' Supp. Remedies Reply 20, ECF No. 140; 18 U.S.C. § 3771(a)(6), (a)(8).

the CVRA nor its inherent authority permit ordering the Government to disclose non-public information to victims).[82]

Thus, based on the record before it, the Court finds that the crime victims' rights have been given meaningful effect. The Court knows of no other victims' rights case in which victims' representatives were offered the ear of the United States Attorney General, even before their legal status as such had been confirmed. Regrettably, this occurred too late in the process after the DPA had already been entered and approved.[83] Still, to award a novel remedy (i.e., by obligating the Government to turn over evidence or disclose specific information to the victims' representatives) under these circumstances is precisely the opposite of a sparing and restrained exercise of inherent remedial authority.

Finally, even if referring DOJ to appropriate investigative authorities for its violations of the CVRA is permissible in this case, it is not warranted. Here again, the DOJ's good faith engagement with the crime victims' representatives before and after this Court's recent determination that the Government violated the Act invalidates the need for such a referral. Moreover, members of the Congressional committees that may provide such oversight are already well aware of this case—at least one Senate Judiciary Committee member has written in support of the crime victims' representatives as amici.[84] As the representatives point out, Boeing's crime may properly be considered the deadliest corporate crime in U.S. history.[85] Indeed, news of the

---

[82] *See also* United States' Resp. to Disclosure Mot. 4–9, ECF No. 73 (collecting cases).

[83] *See generally* DPA, ECF No. 4; Joint Mot. for Exclusion of Time, ECF No. 5; Order, ECF No. 13.

[84] Amicus Br. of Senator Ted Cruz, ECF No. 90.

[85] Representatives' Supp. Remedies Reply 9, 9 n.10, ECF No. 140 ("According to Bloomberg Law, PG&E's 2020 plea to 84 separate involuntary manslaughter counts in connection with a wildfire in Paradise, California, was 'the deadliest corporate crime in U.S. history.' Bloomberg Law, *Deadliest Corporate Crime in the U.S. Will End with 84 Guilty Pleas* (June 15, 2020). With this Court's recent finding that 'but for Boeing's criminal conspiracy 346 people would not have lost their lives in the crashes' (Dkt. 116), this case has tragically become the deadliest corporate crime in our nation's history.").

tragic accidents and of DOJ's DPA with Boeing has made headlines worldwide. Should Congress wish to take further action with respect to the Government's conduct in this matter, or with respect to DPAs more generally, it is well positioned to do so without this Court's referral to investigative authorities.

*    *    *    *

The Court holds that it lacks both statutory and inherent authority that would permit any substantive review and disapproval or modification of the DPA at issue in this case. Thus, even if it held legitimate concerns about the substance of the Government's negotiated agreement, the Court has no occasion to address whether the DPA is in fact grossly incommensurate with Boeing's egregious criminal conduct. With respect to the remaining remedies, the Court finds that the crime victims' rights have been meaningfully recognized and that awarding the relief sought under the circumstances would be an unjustified exercise of this Court's remedial powers. For these reasons, the Court **DENIES** the representatives' requested relief.

**B.**

Next, the Court turns to the 2022 Movants' pending motions. Following this Court's October 21, 2022 Opinion recognizing those who died in the crashes as "crime victims" for purposes of the CVRA, foreign carriers LOT and Smartwings moved for victim status and remedies under the Act.[86] The additional family members of fifty-five individuals who died in the Boeing crashes—already recognized as crime victims' representatives in light of that October Opinion—also moved to assert their rights in this proceeding for the first time.[87] They do not

---

[86] Second Opinion, ECF No. 116; LOT Mot., ECF No. 120; Smartwings Mot., ECF No. 141.
[87] Mot. of Marti Faidah, et al., ECF No. 138; Reply of Marti Faidah, et al., ECF No. 152.

identify which remedies they seek, however, and wish to preserve the issue for subsequent decision.[88]

Laches—which the Government invokes only as against foreign carrier LOT—applies to the 2022 Movants' pending motions.[89] The doctrine of laches functions to bar equitable claims when Congress has imposed no statutory timeline for seeking relief. *See Petrella v. Metro-Goldwyn-Mayer, Inc.*, 572 U.S. 663, 678 (2014). A party may assert the defense of laches when another party's unreasonable delay in seeking redress of its rights prejudices the party asserting the defense. *SCA Hygiene Prods. Aktiebolag v. First Quality Baby Prods., LLC*, 580 U.S. 328, 333 (2017); *Radiator Specialty Co. v. Pennzoil-Quaker State Co.*, 207 Fed. App'x 361, 362 (5th Cir. 2004). Whether laches should apply is a question ultimately left to the district court's discretion. *Nat'l Ass'n of Gov't Employees v. City Public Serv. Bd. of San Antonio, Tex.*, 40 F.3d 698, 707 (5th Cir. 1994).

Here, the 2022 Movants seek forms of equitable relief through recognition as "crime victims" under the CVRA, judicial oversight of the DPA's implementation, and other novel remedies not expressly provided for in the statute.[90] However, they did not pursue their requested relief until nearly two years after the Government filed the DPA in this case, ten months after the original movants sought recognition of rights, and now only fifteen months before the subject DPA is set to expire. Only after this Court's favorable ruling for the original movants have these

---

[88] Mot. of Marti Faidah, et al., ECF No. 138; Reply of Marti Faidah, et al., ECF No. 152. Importantly, as noted above, the Government has acted in accordance with this Court's October 21 Opinion, and has invited the family members to conferral meetings in an effort to afford these victims' representatives their statutory rights under the CVRA.

[89] United States' Resp. to LOT Mot., ECF No. 145.

[90] *See generally* LOT Mot., ECF No. 120 (asserting notice and conferral rights and proposing judicial supervision of the DPA); Mot. of Marti Faidah, et al., ECF No. 138 (asserting the right to seek unspecified remedies under the Act); Smartwings Mot., ECF No. 141 (seeking victim status and a public accounting of the Airline Fund created via the DPA).

2022 Movants chosen to assert their rights in this proceeding. They make no claim that this substantial delay resulted from a lack of knowledge about the proceedings, incapacity, or other reason justifying the lethargic pace at which they decided to act. Indeed, all took earlier legal action against Boeing in other forums.[91] This two-year delay is therefore without excuse.

Allowing the 2022 Movants to seek their requested legal status and remedies this late into the proceedings is prejudicial to the current parties. The Government and Boeing have spent the last fourteen months litigating the original movants' status as crime victims and desired remedies. To start that process over again now with a new set of purported crime victims would likely prolong resolution of the DPA well beyond its expected expiration date. Such a result would prejudice the Government by forcing further expenditure of resources on a DPA it wishes to conclude and Boeing by disrupting reliance interests it has established throughout the term of its DPA and by protracting resolution of its criminal case.

Importantly, the Court does not believe the Fifth Circuit's timeliness analysis in *In re Allen* is applicable in this case. 701 F.3d 734, 734–35 (5th Cir. 2012) (per curiam). There, the Circuit held that the movants' four-year delay in seeking recognition as crime victims was not barred by laches because the defendant's criminal sentencing hearing was still two months away. *Id.* Under the Act, those movants would have been entitled to be heard at such proceedings. 18 U.S.C. § 3771(a)(4). In this case, however, the DPA has already been entered and approved, the Court is without authority to reject or oversee its implementation, and no public proceedings or trial are pending at which these late-arriving crime victims would be able to assert their rights. Thus, the period in which 2022 Movants' statutorily conferred rights (e.g., the right to notice and conferral prior to entry of the DPA) would have been recognized has long since expired. And in light of its

---

[91] LOT Mot. 4, ECF No. 120; LOT Mot., Ex. A, ECF No. 120 at 20–28; Mot. of Marti Faidah, et al. 6–7, ECF No. 138; Smartwings Mot., ECF No. 141 at 4.

prior reasoning regarding its limited supervisory power over the DPA, the Court lacks authority to afford the novel remedies (e.g., public accounting of the DPA Airline Fund) these late coming movants propose. Nor can the Court afford remedies the parties have yet to identify or request.[92]

Given these circumstances, the Court holds that the motions are inexcusably delayed and prejudicial such that laches bars their consideration or, in the case of the individual family members, are not ripe for decision. Therefore, without reaching the merits of the foreign carriers' motions, the Court **DENIES** their requested relief as inexcusably delayed and prejudicial to the parties before the Court. The Court **DENIES** the motion of Marti Faideh, et al. for unspecified remedies.

## IV.     CONCLUSION

This Court has immense sympathy for the victims and loved ones of those who died in the tragic plane crashes resulting from Boeing's criminal conspiracy. Had Congress vested this Court with sweeping authority to ensure that justice is done in a case like this one, it would not hesitate. But neither the Speedy Trial Act nor this Court's inherent supervisory powers provide a means to remedy the incalculable harm that the victims' representatives have suffered. And no measure of sympathy nor desire for justice to be done would legitimize this Court's exceeding the lawful scope of its judicial authority.

The Speedy Trial Act gives the Executive exclusive discretion to negotiate deferred prosecution agreements without judicial oversight, even in response to the most heinous crimes. Despite increasing and perhaps legitimate criticism of these agreements, Congress—not the courts—is the appropriate venue to redress the inadequacies of this statutory enactment. In our system of justice, a judge's role is constitutionally confined to interpreting and applying the law,

---

[92]Mot. of Marti Faidah, et al., ECF No. 138 (asserting the right to seek unspecified remedies under the Act).

not revising it. For this Court to step outside those constitutional bounds in an attempt to remedy wrongs it has no legitimate authority to correct would compound injustice, not see justice through.

*     *     *     *

For these reasons, the Court **DENIES** the representatives' motions for remedies under the CVRA (ECF Nos. 17, 124, 130). The Court **DENIES** the motions of LOT S.A., Smartwings, A.S., and Marti Faideh, et al. as untimely barred by the doctrine of laches or as unripe (ECF Nos. 120, 141, 138).

**SO ORDERED** this **9th day** of **February, 2023**.

_Reed O'Connor_
**UNITED STATES DISTRICT JUDGE**

# ATTACHMENT 2 –

# NOVEMBER 6, 2025 DISTRICT COURT ORDER GRANTING DISMISSAL

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
### FORT WORTH DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Criminal Action No. 4:21-cr-5-O |
| | § | |
| THE BOEING COMPANY, | § | |
| | § | |
| Defendant. | § | |

## MEMORANDUM OPINION AND ORDER

Before the Court are the Government's Rule 48(a) Motion to Dismiss the Information (ECF No. 312), filed May 29, 2025, ("Motion"); Response and Objection by counsel for the families of crash victims who object to the dismissal ("Movants"), filed June 18, 2025, (ECF No. 318); some of the victim's families' Motion for Appointment of a Special Prosecutor, filed June 18, 2025, (ECF No. 321); Mr. Keyter's Motion to Deny Government's Motion to Dismiss, filed June 24, 2025, (ECF No. 327); Mr. Keyter's Motion to Be Heard Pursuant 18 U.S.C. § 3771(a)(4), filed October 25, 2024, (ECF No. 277);[1] the Government's Reply, filed July 2, 2025 (ECF No. 334); and The Boeing Company's ("Boeing") Reply, filed July 2, 2025 (ECF No. 335).  The Court held a hearing on the Motion on September 3, 2025, and heard from those who desired to speak, as well as arguments from counsel.  Having considered the foregoing, the Government's Motion to Dismiss is **GRANTED**.

---

[1] Anthony Keyter does not qualify as a crime victim under the CVRA because he is not "directly or proximately harmed."  18 U.S.C.A. § 3771.  As such, he has no rights here, and his Motion (ECF No. 277) is **DENIED**.  Further, his Motion to Deny Government's Motion to Dismiss is **DISMISSED**. Nevertheless, the Court has considered his pleadings and provided him an opportunity to speak against the Government's Motion to Dismiss along with all of the victims who desired to speak.

## I.    BACKGROUND

After the catastrophic crash of two Boeing 737s operating as Lion Air Flight JT610 and Ethiopian Airlines Flight ET302 resulted in 346 deaths, the Government began investigating Boeing's conduct.  Subsequently, the Government filed a Criminal Information charging Boeing with conspiracy to defraud and simultaneously entered into a deferred prosecution agreement ("DPA") on January 7, 2021.  On May 14, 2024, the Government notified the Court that Boeing breached the DPA for "failing to design, implement, and enforce a compliance and ethics program to prevent and detect violations of U.S. fraud laws throughout its operations."[2]  As a result, in July 2024 the parties submitted a plea agreement that required Boeing to plead guilty and serve a term of probation.  On December 5, 2024, the Court rejected the plea agreement because the terms of the parties' agreement were not in the public interest.

The Government now seeks to dismiss the Criminal Information under Rule 48(a) with Boeing's consent after signing a non-prosecution agreement ("NPA").  Some of the victims' families oppose this action, and others support it.[3]  While pursuing pre-trial resolution, the Government conferred with the victims' families and their counsel on two separate occasions and considered written submissions from families regarding the NPA.[4]  The Court held a hearing on the Motion on September 3, 2025, and heard from all who wished to speak, including the victims' family members. The Government's Motion to Dismiss is now ripe for the Court's review.

## II.    LEGAL STANDARD

Rule 48(a) of the Federal Rules of Criminal Procedure provides that the Government may dismiss an indictment, information, or complaint "by leave of court."   The leave of court

---

[2] Notice, ECF No. 199.
[3] Gov't.'s Mot. Dismiss, Ex. 2 (Gov't NPA Decl.), at 19, ¶ 2, ECF No. 312-2.
[4] *Id*. at 8–9, ¶ ¶ 24–27; *Id*. at 13–14, ¶34; *Id*. at 15–19, ¶ ¶ 44, 48, 50, 52.

requirement authorizes the judiciary to evaluate and, in an appropriate case, deny a Government motion.  But to "preserve the essential functions" of the Executive and the Judicial branches, a court should only deny leave when dismissal is "clearly contrary to manifest public interest." *United States v. Cowan*, 524 F.2d 504, 513 (5th Cir. 1975).  A court may not "substitute its judgment for the prosecutor's determination or . . . second guess the prosecutor's evaluation" when making its public interest determination.  *United States v. Salinas,* 693 F.2d 348, 351 (5th Cir. 1982).  Rather, "[u]nless the court finds that the prosecutor is clearly motivated by considerations other than his assessment of the public interest, it must grant the motion to dismiss."  *United States v. Hamm*, 659 F.2d 624, 630 (5th Cir. 1981); *see also Rinaldi v. United States*, 434 U.S. 22, 30 (1977) (holding that a trial court cannot properly deny a prosecutor's motion to dismiss unless the prosecutor's actions are "tainted with impropriety").

The Court "must begin with the presumption that the prosecutor acted in good faith" when moving to dismiss.  *United States v. Welborn*, 849 F.2d 980, 983 (5th Cir. 1988).  To evaluate whether the prosecutor acted in good faith, the Court may require the prosecutor "to supply sufficient reasons" that are "more than a conclusory statement in support of its motion."  *Id.* at 983, 985; *see also Salinas,* 693 F. 2d 348 at 352.  The Court may look to the record, including hearings.  *See e.g., Rinaldi*, 434 U.S. at 30; *Salinas*, 693 F.2d at 352.  Finally, the Court must ensure that the Government has satisfied its obligations under the Crime Victim's Rights Act ("CVRA").  *In re Ryan*, 88 F.4th 614, 627 (5th Cir. 2023).

### III.   ANALYSIS

The Government contends it has satisfied its obligations under Fed. R. Crim. P. 48(a).  Movants disagree, asserting that dismissing the case is "against manifest public interest" such that the Court may deny dismissal under Fed. R. Crim. P. 48(a).  Namely, Movants state that the

3

dismissal is against public interest because: (1) the NPA is an "unprecedented effort to short-circuit Rule 48(a)'s judicial review requirement;"[5] (2) Boeing's obligations are unenforceable under the NPA because the statute of limitations has run, meaning the Government would be unable to re-file charges against Boeing even if it breached; (3) the NPA exempts Boeing from any independent monitoring of its corporate compliance and safety efforts; (4) the monetary provision of the NPA does not secure the maximum possible fine; (5) the practical effect of the victim compensation payments is to allow the company to buy their way out of a criminal conviction; and (6) the Government's claims of litigation risk are meritless.[6]

The Court begins with the presumption that the Government is acting in good faith. *Welborn*, 849 F.2d 980 at 983. This presumption can be rebutted if (1) "the prosecutor's actions clearly indicate a betrayal of the public interest," *Hamm*, 659 F.2d at 629, and (2) when the motion is contested, the prosecutor fails "to supply sufficient reasons—reasons that constitute more than a mere conclusory interest." *Welborn*, 849 F.2d at 983. Actions that indicate betrayal of public interest include harassing a defendant, accepting a bribe, dismissing an indictment to gain a strategic advantage, to attend a social event, or because the prosecutor personally dislikes a victim. *See Salinas*, 693 F.2d at 352–53; *Hamm*, 659 F.2d at 629.

The Government declares that the NPA "secures meaningful accountability, delivers substantial and immediate public benefits, and brings finality to a difficult and complex case whose outcome would otherwise be uncertain."[7] Specifically, it states the NPA requires Boeing pay the maximum statutory fine, further pay into a crash-victim compensation fund, and commits Boeing

---

[5] Movants' Obj., 2, ECF No. 318.
[6] *Id.*
[7] Mot. Dismiss, 1, ECF No. 312.

to compliance improvements.[8]   And, it asserts that "the Company has made meaningful progress in improving its anti-fraud compliance and ethics program."[9]

Movants contest these reasons, and some of their arguments are persuasive.  For instance, the Court agrees with Movants that the NPA disregards the need for Boeing to be subject to independent monitoring.  Indeed, last year the Court denied a proposed plea agreement because it was against the public interest, in part, because Boeing would have had veto power over the Government's choice of an independent monitor.[10]   At that time, the Government was insistent that an independent monitor was necessary to remedy Boeing's corporate criminal culture as Boeing was unable to do so on its own, which endangered the flying public.  The Court agreed with the Government.  Now, however, under the Government's NPA, Boeing is no longer subject to an independent monitor and instead is authorized to pick its own "Independent Compliance Consultant."[11]

The NPA's "weakened provision"[12] is even more concerning than its predecessor.  It does not even pretend to address the need for a truly independent compliance monitor given Boeing's troubling history leading up to the Lion Air Flight JT610 and Ethiopian Airlines Flight ET302 crashes and then, while under intense scrutiny by the Government, its breach of the DPA.  When asked by the Court how the Boeing-selected consultant would stop a culture of fraud, the Government said that the independent consultant would work "next to Boeing" to make sure it is "reacting and appropriately addressing any concerns raised by the FAA."[13] It then will "report to

---

[8] *Id.* at 13-15.
[9] *Id.* at 3.
[10] Order Denying Plea Agreements, ECF No. 282.
[11] Gov't Mot. Dismiss, EX 1 (NPA), ⁋ 10, ECF No. 312-1.
[12] Movants' Obj., 28, ECF No. 318.
[13] Mot. Dismiss Hr'g. Tr. at 85: 12-16.

the government on what they are seeing" and if necessary, "make recommendations for improvements."[14]

The Government now believes that Boeing can be trusted to select a compliance consultant because Boeing has made "meaningful progress in improving its anti-fraud compliance and ethics programs."[15]    In summary, the Government's position in this lawsuit has been that Boeing committed crimes sufficient to justify prosecution, failed to remedy its fraudulent behavior on its own during the DPA which justified a guilty plea and the imposition of an independent monitor, but now Boeing will remedy that dangerous culture by retaining a consultant of its own choosing. Given Boeing's history related to this case (and the Government's continued failure to gain Boeing's compliance), the Movants are correct that this agreement fails to secure the necessary accountability to ensure the safety of the flying public.

The Court further agrees with Movants that the Government's claim of "uncertainty and litigation risk presented by proceeding to trial"[16] is unserious. The Government has a confession from Boeing, signed by the CEO and Chief Legal Officer, admitting to all the elements of the conspiracy charge against it in the DPA.[17] As such, the assertion that there is a legitimate risk that Boeing would be acquitted at a trial lacks support.[18] Neither is the Government's contention that

---

[14] Mot. Dismiss Hr'g. Tr. at 86: 12-18.
[15] Gov't's Mot. Dismiss, 3, ECF No. 312.
[16] *Id.* at 4.
[17] DPA, ¶ 2, ECF No. 4.
[18] The Government asserts the risk of acquittal is legitimate because a jury acquitted a technical pilot of various charges related to his role in testing the 737 Max. This overlooks the nature of the charges made against the two Defendants. The technical pilot's central defense was that he was a scapegoat for the broader and systematic failure of Boeing's corporate culture which led to the crashes. The Government agrees with that theme, given the nature of the information filed in this case and the stipulated facts agreed to by Boeing, which targets the corporate culture.

Boeing may litigate whether it actually breached the DPA a serious justification because Boeing agreed that determination was left to the Government's sole discretion.[19]

Movants contend that if the Court believes the Government's reasons are unsupported, it may hold that dismissal is clearly contrary to manifest public interest.[20]  The Court does not agree the case law permits that reasoning.  Movants rely on the Fifth Circuit's recent discussion of the "clearly contrary to manifest public interest" language of Rule 48(a).  *See In Re Ryan*, 88 F.4th 614 at 627 (collecting cases citing "clearly contrary to manifest public interest").  They suggest the Fifth Circuit's emphasis means this Court may evaluate the public interest independently when determining if leave to dismiss should be granted.[21]

In *Ryan*, the Fifth Circuit directed the Court to "assess the public interest *according to caselaw* as well as the CVRA," at the motion to dismiss stage.  *In re Ryan*, 88 F.4th at 627–28 (emphasis added).  The caselaw dictates that "the essential judicial function of protecting the public interest in the evenhanded administration of criminal justice" requires—and authorizes the Court to do no more—than ensure that the prosecutor has acted in good faith motivated by the interest of justice and that he has satisfied his obligations under the CVRA.  *Cowan,* 524 F.2d at 514.

The Fifth Circuit is clear that a district court may not "substitute its judgment for the prosecutor's determination or . . . second guess the prosecutor's evaluation" when assessing if a motion to dismiss is against manifest public interest.  *Salinas*, 693 F.2d at 351; *see also United States v. Hamm*, 659 F.2d 624 at 631 ("[T]he prosecutor is the first and presumptively the best judge of where the public interest lies.  The trial judge cannot merely substitute his judgment for

---

[19] Movants identify a number of other objections which, in their view, undermine the Government's proffered basis for dismissal, such as the fine calculation, guideline calculation, limitations, and others. But, as discussed below, those objections as well as these, even if valid, do not overcome the presumption afforded the Government in this case.

[20] Movant's Obj., 4, ECF No. 318.

[21] Movant's Obj., 3, ECF No. 318.

that of the prosecutor.").  Otherwise, the judiciary would "encroach[] on the primary duty of the Executive to take care that the laws are faithfully executed." *Hamm*, 659 F. 2d 624 at 631.

*Cowan* is instructive.  524 F.2d 504.  There, the trial judge refused to grant leave to dismiss because he did not believe dismissing serious charges in favor a guilty plea carrying a lower penalty in an unrelated case was in the interest of justice.  The Fifth Circuit reversed, holding that the trial judge's disapproval of the dismissal was "legally insufficient to overcome the presumption of the government's good faith and establish its betrayal of the public interest."  *Id*. at 514.

Just as the trial judge in *Cowan*, the Court's concerns about the Government's decision-making in this case are an insufficient reason to deny leave to dismiss.  Thus, Movants' argument that the Government's agreement in this case is contrary to public interest, while compelling, cannot justify denying leave to dismiss under Rule 48(a).

Finally, and as emphasized by the Fifth Circuit in the mandamus proceedings following the entry of the DPA in this case, the Court cannot grant leave unless the Government fulfilled its obligations under the Crime Victim's Rights Act.  *See In re Ryan*, 88 F.4th at 627 ("[I]n passing on the government's motion under Rule 48(a) the court will expect to see the prosecutor recount that the victim has been consulted on the dismissal and what the victim's views were on the matter."); *see also id.* at 626 (stating in the event of a dismissal, "courts retain adjudicatory responsibility, including an obligation to apply the CVRA").  The CVRA requires that crime victims—here, the family members of those who died in the crashes—have "[t]he right not to be excluded from any such public court proceeding," "the reasonable right to confer with the attorney for the government in the case," and "the right to be informed in a timely manner of any plea bargain or deferred prosecution agreement."  18 U.S.C. § 3771.

The Court finds that the Government has complied with the CVRA. The Government conferred with the victims' families after the plea agreement was denied in December 2024 and noted that the families present wanted the Government to go to trial.[22] The Government conferred with the victims' families about the framework of the then-potential NPA in May 2025 and considered written submissions afterward.[23] It noted that some families supported the NPA and others opposed it.[24] It informed the families that Boeing accepted the NPA before informing the Court.[25] At the hearing on the Government's motion, counsel for more than 60 of the families stated that "there's been reasonable conferral, to say otherwise would be unfair."[26] On this record, the Government has satisfied its obligations under the CVRA.

## IV.   CONCLUSION

The Court recognizes that "in every political institution a power to advance the public happiness involves a discretion that may be abused." THE FEDERALIST NO. 41 (James Madison). Nevertheless, poor discretion may not be countered with judicial overreach: "the judges can exercise no executive prerogative, though they are shoots from the executive stock." THE FEDERALIST NO. 47 (James Madison). The Court acknowledges that it does not have the authority to deny leave because it disagrees with the Government that dismissing the criminal information in this case is in the public interest. Accordingly, because the Government has not acted with bad faith, has given more than mere conclusory reasons for its dismissal, and has satisfied its

---

[22] Gov't NPA Decl. at 8–9, ¶¶ 24–28, ECF No. 312-2.

[23] Id. at 15, ¶ 44,

[24] Id. at 19, ¶ 52.

[25] Id. at 20, ¶ 55.

[26] Mot. Dismiss Hr'g. Tr. at 124: 22–23, ECF No. 353.

obligations under the CVRA, the Motion to Dismiss (ECF No. 312) is **GRANTED**.  The Motion

to Appoint a Special Prosecutor (ECF No. 321) is **DENIED**.

   **SO ORDERED** this **6th day** of **November 2025**.

_____
Reed O'Connor
**CHIEF UNITED STATES DISTRICT JUDGE**